DEALY & SILBERSTEIN, LLP
William J. Dealy (WD 9776)
Milo Silberstein (MS 4637)
225 Broadway, Suite 1405
New York, New York 10007
(212) 385-2117

*Attorneys for Plaintiffs-Intervenors Jill Patricot*
*Tanys Lancaster and Janet Loures*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

|  |  |
|---|---|
| Plaintiff, | **Case No.: 07 CV 8383 (LAP)(HP)**<br>**ECF ACTION** |
| -against- | **COMPLAINT OF**<br>**PLAINTIFFS-INTERVENORS**<br>**JILL PATRICOT, TANYS** |
| BLOOMBERG L.P., | **LANCASTER AND JANET**<br>**LOURES** |
| Defendant. | |

-----------------------------------------------------------------X
JILL PATRICOT, TANYS LANCASTER and     **JURY TRIAL DEMANDED**
JANET LOURES,

                    Plaintiffs-Intervenors,

            -against-

BLOOMBERG L.P.,

                    Defendant.
-----------------------------------------------------------------X

        Plaintiffs-Intervenors Jill Patricot, Tanys Lancaster and Janet Loures, by their attorneys,

Dealy & Silberstein, LLP, respectfully allege the following:

## NATURE OF ACTION

1.      This is an action brought against Defendant Bloomberg L.P. ("Bloomberg") under Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000, et seq. ("Title

VII"), Title I of the Civil Rights Act of 1991, 42 U.S.C. Section 1981a ("Title I"), the New

York State Human Rights Law, N.Y. Executive Law Section 290 et seq. ("State HRL"),

and the New York City Human Rights Law, N.Y. City Administrative Code Section 8-101

et seq. ("City HRL").

2.     The Plaintiffs-Intervenors have brought this lawsuit because Bloomberg is and has been

engaged in a pervasive course of discriminatory conduct based on sex/pregnancy against

its pregnant employees and female employees with newborns, including the Plaintiffs-

Intervenors.  This systemic, top-down discrimination against female employees is fostered,

condoned and perpetuated by the highest levels of management within Bloomberg and by

the ownership of Bloomberg, to wit, Michael Bloomberg, Peter Grauer, Alexius "Lex"

Fenwick and Thomas Secunda.  In addition, female employees, including the Plaintiffs-

Intervenors, who at points in their careers at Bloomberg were high level female executives,

have suffered retaliation by Bloomberg for complaining about Bloomberg's unlawful

employment practices.

3.     The culture at Bloomberg prizes physical image, and once female executives announce

that they are pregnant and/or become new mothers, they fall into disfavor at Bloomberg

and their careers at Bloomberg, no matter how previously promising, quickly become

derailed based upon Bloomberg's perception that these female employees somehow do not

fit the profile of female executives at Bloomberg and have become incapable of fulfilling

their job responsibilities.

4.     This disfavor is telegraphed by Bloomberg and its management to the female employees in

various guises, including but not limited to unfounded and pretextual demotions, dwindling opportunities for advancement and/or decreases in compensation.

5.     The compensation decreases are commonly effectuated through cuts in the number of Bloomberg Equity Equivalence Certificates ("Bloomberg Certificates"), which are awarded to the employee by Bloomberg each year on an employee's anniversary date with the company.  The value of a Bloomberg Certificate is based on the performance of the company, not the individual, and while their value is projected at the time they are awarded, their value is "locked-in" one (1) year after they are issued.  The Bloomberg Certificates are then paid two (2) years following their issuance, provided the employee still works for Bloomberg.

6.     As a Bloomberg employee becomes more senior, a larger percentage of their compensation is based upon the Bloomberg Certificates.  Moreover, since Bloomberg Certificates are more intricate and confusing to the general public, Bloomberg's preferred method to decrease an employee's compensation, and thus effectuate the systemic discrimination against the Plaintiffs-Intervenors and other female executives, is to reduce their Bloomberg Certificates rather than their base salary.

7.     Bloomberg is a privately held company, whose founder and former Chairman of the Board of Directors, Michael Bloomberg, is the current Mayor of the City of New York.

8.     Upon information and belief, Michael Bloomberg continues to own sixty-eight (68%) percent of Bloomberg.

9.     Since Michael Bloomberg became Mayor of the City of New York in 2001, Bloomberg has allegedly been managed by a handful of high-level male executives who sit on

3

Bloomberg's Board of Directors, including Peter Grauer, Bloomberg's current Chairman of the Board, Lex Fenwick, Bloomberg's Chief Executive Officer, and Thomas Secunda, one of Bloomberg's founding partners.

10.    However, despite public proclamations and assurances from Michael Bloomberg that during his tenure as Mayor he has divested himself from the day to day operations of Bloomberg, upon information and belief Michael Bloomberg has in fact stayed involved with the management and monitoring of Bloomberg's business.

11.    Upon information and belief, since becoming Mayor, Michael Bloomberg has communicated directly with Lex Fenwick regarding claims of disparate treatment of female executives and about the management of Bloomberg's Human Resources Department, which customarily fields the initial complaints from aggrieved female employees at Bloomberg.

12.    As recently as September 13, 2007, at a meeting held at Bloomberg's Princeton, New Jersey offices regarding Bloomberg's "People Product" that was attended by approximately twenty (20) employees of Bloomberg including Plaintiff-Intervenor Janet Loures, a Senior Business Manager stated that while Michael Bloomberg (who originated the People Product), does not actively work at Bloomberg, he still looks at the People Product all the time and has a very strong opinion regarding the People Product.

13.    Later during the September 13, 2007 meeting, the aforementioned Senior Business Manager told the attendees at the meeting, including Plaintiff-Intervenor Janet Loures, "Mike calls Lex all the time about the People Product – he probably shouldn't but he does."

4

14.     Upon information and belief, in another highly publicized incident occurring in or around August 2006, Michael Bloomberg instructed Bloomberg Radio, a subsidiary company, that it was not permitted to run advertisements for law firms specializing in prosecuting employment discrimination cases after hearing one such ad on Bloomberg Radio.

15.     This incident was described in an article captioned "Mike gives station an earful" that ran in the August 27, 2006 edition of the New York Post.

16.     Based upon these incidents, the claims made by Michael Bloomberg that he is no longer involved with Bloomberg, including his recent statement to the media that he knows nothing about the instant lawsuit because he hasn't worked at Bloomberg "...as you know, in an awful long time", are open to question.

17.     Upon information and belief, Michael Bloomberg is responsible for the creation of the systemic, top-down culture of discrimination which exists within Bloomberg, and Bloomberg has been sued in the past for complaints relating directly to Michael Bloomberg by several female executives who have alleged in their lawsuits that a hostile environment exists for women at Bloomberg.

18.     One such woman, former employee Sekiko Garrison, alleged that Michael Bloomberg told her twice to "kill it" when she informed him that she was pregnant.

19.     Upon information and belief, Michael Bloomberg left an apology message on the voicemail to Sekiko Garrison's phone.

20.     Upon information and belief, Sekiko Garrison left Bloomberg shortly after this incident.

21.     It was subsequently reported in the July 30, 2007 edition of AM New York that Bloomberg paid Sekiko Garrison a substantial sum of money in a confidential settlement.

5

22.    Upon information and belief, Bloomberg management and ownership has continued to foster and condone this hostile, discriminatory workplace since Michael Bloomberg became Mayor in 2002.

23.    For example, upon information and belief, Lex Fenwick, upon learning that two (2) of his female executives had become pregnant, instructed another Bloomberg executive to terminate them, saying "I'm not having any pregnant bitches working for me."

24.    Upon information and belief, Lex Fenwick's intention to terminate these employees based upon their sex/pregnancy was reported to Bloomberg's Human Resources Department.

25.    However, upon information and belief, the female employees in question were terminated or forced out of the company by Lex Fenwick and Bloomberg management.

26.    In another incident, upon information and belief, during a conference call with subordinates in which he became infuriated, Thomas Secunda told the employees on the line that he would "kill their children and burn down their houses" if a business goal was not accomplished.

## THE PARTIES

27.    Plaintiff-Intervenor Jill Patricot, a female born on June 22, 1972, resides in Westchester County, New York.  She is a citizen of the United States, and is a current employee of Bloomberg.

28.    Plaintiff-Intervenor Tanys Lancaster, a female born on March 4, 1969, resides in Montebello, New York.  She is a citizen of the United Kingdom, and is a former employee of Bloomberg.

29.    Plaintiff-Intervenor Janet Loures, a female born on February 26,1966, resides in

Englishtown, New Jersey.  She is a citizen of the United States, and is a current employee of Bloomberg.

30.    Bloomberg is, upon information and belief, a privately held Limited Partnership organized and existing under the laws of the State of Delaware and is authorized to conduct business in the State of New York.  Bloomberg maintains a principal place of business located at 731 Lexington Avenue in New York City.  Bloomberg also maintains offices located in Princeton, New Jersey as well as various international offices.

31.    Bloomberg meets the definition of "employer" under Title VII, the State HRL and the City HRL.

## JURISDICTION

32.    This Court has subject matter jurisdiction over the Plaintiffs-Intervenors' Title VII claims under 28 U.S.C. Sections 1331 and 1343, because they arise under the laws of the United States and are brought to recover damages for deprivation of equal rights.  This Court has supplemental subject matter jurisdiction over the State HRL and City HRL claims under 28. U.S.C. Section 1367, because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

33.    The Plaintiffs-Intervenors have complied fully with any and all prerequisites to jurisdiction in this Court under Title VII, the State HRL and the City HRL.

34.    Contemporaneously with the filing of this Complaint, the Plaintiffs-Intervenors have served a copy of this Complaint upon the New York City Commission of Human Rights and the Office of the Corporation Counsel of the City of New York, satisfying the notice

7

requirements of Section 8-502 of the New York City Administrative Code.

## VENUE

35.   Venue is proper in this District under 28 U.S.C. Section 1391(b) and (c), in that
Bloomberg resides in this District and a substantial part of the events giving rise to the
Plaintiffs-Intervenors' claims occurred herein.   Venue is also proper under 42 U.S.C.
Section 2000e-5(f)(3) in that a substantial part of the unlawful employment practices
giving rise to the Plaintiffs-Intervenors' claims were committed in New York and the
employment records relevant to such practices are, upon information and belief,
maintained and administered in New York.

## PROCEDURAL HISTORY

36.   On or about March 24, 2006, Plaintiff-Intervenor Jill Patricot filed a timely charge of
discrimination against Bloomberg with the Equal Employment Opportunity Commission
("EEOC") complaining of the unlawful actions described herein.

37.   On or about May 10, 2006, Plaintiff-Intervenor Tanys Lancaster filed a timely charge of
discrimination against Bloomberg with the EEOC complaining of the unlawful actions
described herein.

38.   On or about October 27, 2006, Plaintiff-Intervenor Janet Loures filed a timely charge of
discrimination against Bloomberg with the EEOC complaining of the unlawful actions
described herein.

39.   The EEOC investigated the three (3) charges filed by the Plaintiff-Intervenors
contemporaneously, and on or about June 27, 2007, issued a combined Determination as
to all three (3) charges.

40.    In the Determination, the EEOC found, <u>inter alia</u>, the following:

> The Charging Parties' claims of discrimination on account of sex/pregnancy were echoed by a number of other female current and former employees who have taken maternity leave. EEOC's investigation shows that their careers lost momentum and that they were transferred, displaced, and/or demoted. Some complained to the Human Resources Department, others firmly declined to do so, fearful of retaliation. The Respondent has no policy allowing employees to work part time, at home, or on a flexible schedule. It places a high value on customer service, on "coverage," and on "leading by example."

> The Commission finds cause to believe that Respondent discriminated against the three Charging Parties and a class of similarly-situated women based on their sex/pregnancy by demoting them, decreasing their compensation, and otherwise discriminating against them in the terms, conditions and privileges of their employment.

41.    On September 27, 2007, the EEOC filed a Complaint in this Court against Bloomberg alleging, among other things, that Bloomberg engaged in unlawful employment practices against the Plaintiffs-Intervenors and a class of similarly situated women at Bloomberg.

42.    The Plaintiffs-Intervenors seek to intervene in the proceeding commenced by the EEOC pursuant to 42 U.S.C. Section 2000e-5(f)(1) and Rule 24 of the Federal Rules of Civil Procedure.

## <u>JILL PATRICOT'S EMPLOYMENT HISTORY AT BLOOMBERG</u>

43.    In or around May 1998, Plaintiff-Intervenor Jill Patricot started at Bloomberg in its London office as a senior salesperson responsible for covering Russia and Eastern Europe.

44.    In or around November 1999, Ms. Patricot moved back to the United States to work for Bloomberg, and was promoted to a Sales Team Leader position.

45.    In this capacity, Ms. Patricot went on to lead sales teams covering large corporations and hedge funds in New York and New England, including servicing large accounts such as

Citigroup and Fidelity.

46. As a Sales Team Leader, Ms. Patricot routinely had a tremendous amount of face-to-face contact with Bloomberg's clients, including some of its major hedge fund clients in Connecticut.

47. Ms. Patricot's leadership skills were rewarded in April 2004, when Ms. Patricot and her team won Bloomberg's "Best Sales Team Award".

48. In August 2004, Ms, Patricot became pregnant.

49. Upon information and belief, Bloomberg became aware of Ms. Patricot's pregnancy in or around October 2004.

50. In November 2004, when Ms. Patricot was three (3) months pregnant and just "beginning to show,"  Thomas Secunda, one of Bloomberg's founding partners, and Beth Mazzeo, Bloomberg's Global Head of Data Operations, approached Ms. Patricot regarding taking on a new position as Global Manager for Data, which they couched as a promotion. Although Ms. Patricot doubted whether this transfer was in truth a promotion, Ms. Patricot reluctantly accepted.

51. In this regard, Ms. Patricot's new position required her to work at a satellite office on West Street in Lower Manhattan, in which she had little to no contact with Bloomberg's customers, which had previously been her speciality.

52. Upon information and belief, Bloomberg's stated reasons for "promoting" Ms. Patricot were pretextual, in that the real reason they did not want her leading Bloomberg's best sales team was because she had become pregnant.

53. Additionally, transferring Ms. Patricot to the West Street facility near "Ground Zero"

added between sixty (60) to ninety (90) minutes to her daily commute.  This placed Ms. Patricot out of the business limelight and out of sales, which was her forte for many years.

54.    In April 2005, Ms. Patricot went on maternity leave.  Ms. Patricot delivered her baby on June 1, 2005.

55.    While on maternity leave, Ms. Patricot did not receive her regularly scheduled annual review in May (her anniversary month with Bloomberg) but was informed by Ms. Mazzeo that her Bloomberg Certificates had been cut from the 210 she had been awarded in May 2004 to 185.

56.    When Ms. Patricot questioned the cut in her Bloomberg Certificates, she was informed that it was not related to her performance, and that Bloomberg had simply had a bad year.

## Ms. Patricot Was Discriminated Against Upon Returning From Maternity Leave in September 2005

57.    On September 22, 2005, Ms. Patricot returned from her maternity leave, whereupon she was immediately subjected to a hostile work environment by her direct supervisor, Beth Mazzeo.

58.    Upon information and belief, it is well known within Bloomberg that it is Ms. Mazzeo's preference to have male managers or childless female managers report to her, to avoid all childcare related issues.

59.    Upon information and belief, Ms. Mazzeo has made her preference known in this regard in several ways, including after her return from a business trip to Asia, making derogatory comments regarding the amount of women who in Bloomberg's Tokyo offices, their inability to "speak up", and the need to get more men to work in the Tokyo office.

11

60.    Ms. Mazzeo has also openly acknowledged the lack of female executives at Bloomberg, and has stated publicly that Bloomberg does not make it easy on women, especially mothers, including making such comments to a meeting with Bloomberg's summer interns attended by Plaintiff-Intervenor Janet Loures, in or around August 2004.

61.    Upon Ms. Patricot's return from maternity leave, Ms. Mazzeo repeatedly failed to respond to messages or phone calls from Ms. Patricot, and excluded Ms. Patricot from managerial meetings, including compensation reviews affecting staff reporting to Ms. Patricot.

62.    In the past, Ms. Patricot had always been involved in such meetings.

63.    Thereafter, for childcare issues, Ms. Patricot attempted to change her schedule to work from 7:00 AM to 5:00 PM, rather than work her prior schedule of 8:00 AM to 5:30 PM.

64.    Upon information and belief, at all relevant times, Bloomberg has permitted other managers at Bloomberg to this 7:00 AM to 5:00 PM daily schedule.

65.    On or about December 22, 2005, Ms. Mazzeo informed Ms. Patricot that her career at Bloomberg had been "paused" because she had a child.

66.    Thereafter, on or about February 3, 2006, Ms. Mazzeo informed Ms. Patricot that she was going to be demoted because she was not staying until 5:30 PM each day, and that she could either be a data analyst (a position 3 levels below Ms. Patricot's current position), or find her own job within Bloomberg.

67.    During subsequent communications occurring in or around early February 2006 between Ms. Patricot and the Human Resources Department regarding the failure of Bloomberg to restore her to an equal position after her pregnancy and regarding Ms. Patricot's work schedule, Ms. Patricot informed the Human Resources Department that she would be

willing to sit down directly with Ms. Mazzeo to discuss her proposal that she work from 7:00 AM to 5:00 PM each day, and thus leave one half hour earlier (but work a total of an additional half hour each day).

68.   Ms. Patricot further informed the Human Resources Department that her position had not and would not be affected in any fashion by her working from 7:00 A.M. to 5:00 P.M. rather than 8:00 A.M. to 5:30 P.M., particularly in light of the fact that the North American markets, for which Ms. Patricot was responsible, closed at 4:00 P.M., and that the proposed arrangement represented a compromise that would be beneficial to all concerned.

69.   Thereafter, on or about February 10, 2006, Ms. Mazzeo telephoned Ms. Patricot at approximately 2:00 P.M.

70.   Ms. Mazzeo was verbally abusive to Ms. Patricot during this telephone call, and informed Ms. Patricot that while Human Resources had suggested that she call Ms. Patricot to arrange a meeting to discuss her situation, she felt there was nothing further to discuss, and intended to demote Ms. Patricot to a data analyst position (three levels below Ms. Patricot's current position).

71.   In response, Ms. Patricot noted that many other managers at Bloomberg work from 7:00 A.M. to 5:00 P.M. as she was proposing to do, to which Ms. Mazzeo responded that she didn't want to hear about it.

72.   Ms. Patricot also told Ms. Mazzeo that the proposed arrangement would only be temporary in nature, lasting only until her baby turned one (1) on June 1, 2006.

73.   In response, Ms. Mazzeo stated that she did not have "three (3) months to continue like

13

this".

74. Lastly, Ms. Patricot told Ms. Mazzeo that both she and her group were performing quite well, and had not been adversely affected by Ms. Patricot's slightly adjusted schedule.

75. Ms. Mazzeo responded that the performance of Ms. Patriciot's group was "irrelevant", making it clear to Ms. Patricot that Ms. Mazzeo was not really interested in reaching a constructive solution to the situation, and wanted only to oust Ms. Patricot from her position.

76. The aforementioned telephone conversation was overheard by several of Ms. Patricot's colleagues, which was extremely embarrassing to Ms. Patricot.

77. Following the conclusion of the conversation, Ms. Patricot sent Human Resources an e-mail, which stated the following:

> Jen, Beth called me at my desk at 2:00 pm and said there was nothing to discuss with HR. This is something that you suggested to me to do and she came back and blasted me for it. Additionally, it was extremely embarrassing as my voice was raised at my desk and everyone on the floor now knows my situation. I am disappointed on many levels on how this is being handled.

78. Human Resources responded to this e-mail from Ms. Patricot by informing Ms. Patricot that Ms. Mazzeo was her manager and she had every right to call Ms. Patricot if she wished, and to refuse to meet directly with Ms. Patricot on this issue.

79. Thereafter, on or about, February 14, 2006, after months of working in a hostile environment and fighting to keep her position, Ms. Patricot was formally demoted to a position as a data analyst in the Data License Department.

80. Ultimately, in March 2006, at her own initiative, Ms. Patricot obtained a position in Bloomberg's Sales Department.

81.    Upon assuming a position in Bloomberg's Sales Department, Ms. Patricot was informed
       by Max Linnington, the Head of New York Sales, that there were no Team Leader
       positions available (the position she held prior to her "promotion" to Head of Global Data
       for North America).  However, contrary to Linnington's statements, there have been
       several new Team Leaders promoted, virtually all of whom are men or without children.

82.    Upon information and belief, none of those new "Team Leaders" were ever the Team
       Leader of the Best Sales Team in Bloomberg as was Ms. Patricot.

83.    The pretextual nature of Ms. Mazzeo's concern that Ms. Patricot work from 7:30 A.M. to
       5:30 P.M. daily is further belied by the fact that she was initially replaced by Ray
       Whitman, who commuted to the job in New York City from Princeton, New Jersey only
       two (2) to three (3) times per week, not daily, as was required of Ms. Patricot.

84.    Ms. Patricot was ultimately replaced as the Head of Global Data for North America on a
       full time basis two (2) months later by Ulrik Bjerke, a single male with no children.

85.    Mr. Bjerke had been brought by Ms. Mazzeo from Bloomberg's European offices to work
       in Bloomberg's New York City offices shortly after Ms. Patricot had become pregnant,
       and had started as the Head of Global Data for North America in November 2004.

86.    Thereafter, Mr. Bjerke became a "Global Project Manager" in Bloomberg's New York
       offices, a position that previously did not exist, and, upon information and belief, was
       created for him specifically by Ms. Mazzeo.

87.    Upon information and belief, Mr. Bjerke was moved to New York and was being groomed
       from the start by Ms. Mazzeo to replace Ms. Patricot.

88.    During Ms. Patricot's maternity leave during the Summer of 2005, Mr. Bjerke received

15

two (2) promotions (over Ms. Patricot's objections, which were overridden by Ms. Mazzeo), so that when Ms. Patricot returned from her leave, Mr. Bjerke was a manager directly below Ms. Patricot on Bloomberg's organizational chart.

89.    Mr. Bjerke then replaced Ms. Patricot as the Head of Global Data for North America, for which he needed to obtain a special work visa.

90.    Accordingly, in the time that Ms. Patricot went out on maternity leave and was then demoted three (3) levels to data analyst (April 2005 - February 2006), Mr. Bjerke, a male with no children, received three (3) promotions to go from being "Global Project Manager" to assuming Ms. Patricot's position.

91.    Upon information and belief, when Ms. Patricot was transferred to the Head of Global Data for North America, this occurred solely because Bloomberg management did not want a pregnant executive to be "Team Leader" of Bloomberg's Best Sales Team dealing with the powerful hedge fund players in Stamford and Southern Connecticut.

92.    Mr. Bjerke was transferred from Europe to New York around that time because Bloomberg management intended to replace Ms. Patricot with Mr. Bjerke upon her return from pregnancy leave.

93.    Accordingly, upon information and belief, Ms. Mazzeo's ostensible concern over Ms. Patricot not working until 5:30 P.M. was simply a pretext to remove Ms. Patricot from her position and install Mr. Bjerke in her stead for discriminatory reasons.

## **Bloomberg Has Retaliated Against Ms. Patricot**

94.    On April 15, 2006, approximately three (3) weeks after Ms. Patricot had filed her charge with the EEOC on March 24, 2006, and in advance of her annual review which occurs in

16

May of each year, Ms. Patricot submitted her "Self-Evaluation" to Bloomberg.

95.    On the final page of Ms. Patricot's self-evaluation, in the space captioned "What

challenges do you face in your role", What changes would you recommend?", Ms. Patricot

wrote as follows:

> When I returned back from maternity leave I was discriminated against.  As a result of this discrimination I was demoted and taken from my position when I was performing well. The reason was that I worked until 5:00 pm and not 5:30 which I feel was a pretext to discrimination.  I have voiced this opinion to HR and management and this continues to be an issue for me.  My manager, Beth Mazzeo, did not respond to any messages I sent on the progress in NY after I returned from maternity leave.  Although I invited her to NY on occasion to visit with the team she never came to NY until I was forced to depart.  Her lack of interest in the employees in NY had an impact on employees morale that was challenging to me. Her insistence to take headcount away from the NY group and not keep me informed about changes or group developments was frustrating (for example the new pricing group that would be staring New York that at the time would put 20 people under my jurisdiction that I was never told about until I talked to Zach Cohen).  I worked hard to instill unity and loyalty for the New York team and as a result we did well in our performance and this was reflected by Max Linnington, News and project managers.  I have addressed this issue repeatedly with HR, Peter Grauer and Tracy Keogh and asked for the investigation into what happened to me and it was frustrating that only Beth Mazzeo was asked for her opinion.  I asked to look into my performance, talk to my managers and the employees that reported to me.  None of this was done.  I am still asking that an investigation into Beth Mazzeo take place, which is why I have reached out to the Federal Government to hold an unbiased investigation.  My hope is that other new mothers at Bloomberg will not face the same discrimination that took place with me.

96.    Following the submission of this self-evaluation, during May 2006 Ms. Patricot was

provided with a compensation summary detailing her actual and projected compensation

for the upcoming year.

97.    While Ms. Patricot learned that her salary would remain the same ($130,000 per annum),

her Bloomberg Certificates had been decreased from the 185 Bloomberg Certificates

awarded in May 2005 worth $146,994, to 140 Bloomberg Certificates awarded in May

17

2006 with a projected value of $103,727, a projected decrease of $43,267 in compensation.

98.   Of course, this decrease in Bloomberg Certificates came on the heels of Ms. Patricot's Bloomberg Certificates being decreased from 210 in May 2004 (the final review she received prior to becoming pregnant), to 185 during her maternity leave during the Summer 2005.

99.   Accordingly, since becoming pregnant and then having her first child, Ms. Patricot's Bloomberg Certificates were cut from 210 to 185, and then again to 140, a decrease of 33 1/3 %.

100.   The decrease in the award of Ms. Patricot's Bloomberg Certificates was completely unwarranted and is further indicia of both Bloomberg's discriminatory course of conduct as well as retaliation by Bloomberg for the filing of the Charge.

101.   In February 2006, Ms. Patricot announced that she was pregnant with her second child.

102.   From September 2006 through March 2007, Ms. Patricot was on maternity leave from Bloomberg.

103.   When Ms. Patricot returned from her second maternity leave in March 2007, she was once again discriminated against and retaliated against by Bloomberg.

104.   In this regard, when Ms. Patricot returned from her second maternity leave, Bloomberg discriminated and retaliated against her by changing the terms and conditions of her employment.

**Ms. Patricot's Losses Resulting from Bloomberg's Discrimination and Retaliation**

105.   As a result of Bloomberg's discrimination and retaliation, Ms. Patricot has suffered

substantial loss of income and employment-related benefits as well as a substantial

diminution of her standing in the business information and securities community.

106.   As a result of Bloomberg's discrimination and retaliation, Ms. Patricot has suffered

substantial harm to her reputation in the financial community, adverse effects on her

career, diminished earning capacity, and substantial harm and emotional distress.

## TANYS LANCASTER'S EMPLOYMENT HISTORY AT BLOOMBERG

107.   Plaintiff-Intervenor Tanys Lancaster worked for Bloomberg L.P. ("Bloomberg") from in or

around September 1994 through on or about October 3, 2005.

108.   Ms. Lancaster started with Bloomberg in September 1994 in its London office as a

member of the Transactions Products Team.

109.   In March 1997, Ms. Lancaster was promoted and asked to run the Transaction Products

Account Management Team in London.  This group was comprised of approximately fifty

(50) people and had responsibility for covering all of Europe.

110.   In March 2000, Ms. Lancaster moved to New York where she joined Bloomberg's U.S.

Transactions Products Business Management Team.

111.   After a few months in this position, Ms. Lancaster was promoted and asked to run the

team, which was comprised of approximately fifteen (15) senior, experienced sales people,

with responsibility for covering all of North America.

112.   In March 2001, having proven herself with the Transactions Products Business

Management Team, Ms. Lancaster was requested to run the Transaction Products Sales

Specialists Teams, consisting of approximately ten (10) experienced senior Transactions

Products sales people with responsibility for covering all of North America.

19

113.   In December 2002, Ms. Lancaster was requested to manage the strategic alliance that Bloomberg had recently established with Algorithmics, Inc., a company that develops risk management software.

114.   In addition, due to Ms. Lancaster's in-depth global experience with Transaction Products, Ms. Lancaster was asked to become Bloomberg's "Transaction Products Advocate," whereby she was given oversight of all development requests coming from outside of the United States.

115.   The roles that Ms. Lancaster was performing at this juncture for Bloomberg required that she travel extensively and spend many evenings on conference calls with colleagues, clients and prospective clients in Asia.

116.   All of the aforementioned promotions received by Ms. Lancaster were accompanied by regular increases in compensation.  By July 2004, Ms. Lancaster was earning a base salary of $130,000.

117.   In addition, in September 2003, Ms. Lancaster's last anniversary prior to becoming pregnant in August 2004, she received 475 Bloomberg Certificates with an ultimate actual value in September 2005 of $285,000, making her total compensation $415,000.00.

118.   Ms. Lancaster had become one of Bloomberg's top level female executives.

## Events of August 2004 - October 2005

119.   After many years of unsuccessful attempts to become pregnant, Ms. Lancaster and her husband elected to pursue in vitro fertilization ("IVF").

120.   In August 2004, Ms. Lancaster met with Ken Cooper, her direct supervisor to inform him that she was undertaking IVF treatment, and would need two (2) weeks off from work.

20

121.  Mr. Cooper was sympathetic, told Ms. Lancaster not to meet with Human Resources and claimed that Bloomberg would be one hundred (100%) percent behind Ms. Lancaster and that she should do everything possible to ensure her well being.

122.  Ms. Lancaster was scheduled to receive her annual review in August (one (1) month ahead of her anniversary date), however Mr. Cooper informed Ms. Lancaster that the company needed more time to prepare.

123.  In September 2004, Ms. Lancaster learned that the IVF process had been successful and that she was pregnant with twins, with a projected due date in May 2005.

124.  Ms. Lancaster immediately shared her good news with Mr. Cooper.

125.  Ms. Lancaster then received her annual performance review just prior to the end of September 2004.  The review was positive, and Ms. Lancaster was praised by Bloomberg for being someone who is happy to take on and run with any task given to her.  Ms. Lancaster was also commended as being someone who was always willing to "step up".

126.  In October 2004, subsequent to her annual performance review, Ms. Lancaster discussed her compensation with Mr. Cooper.

127.  At this time, to Ms. Lancaster's astonishment, she was told by Mr. Cooper that she was being demoted, and would now be reporting to a prior peer, Brenton Karmen.

128.  The explanation provided by Mr. Cooper for Ms. Lancaster's demotion was that Bloomberg wanted to decrease the number of managers reporting directly to Mr. Cooper.

129.  However, out of five (5) such managers reporting to Mr. Cooper, Ms. Lancaster was the only manager who received a demotion.

130.  In addition to her demotion, Ms. Lancaster was told that her number of Bloomberg

Certificates was being cut by thirty-three (33%) percent from the prior year, from 475 to 315, with a predicted value of $152,000.

131.   When Ms. Lancaster voiced her objection to this demotion, she was told by Mr. Cooper that given her professional nature, she "would, of course, accept it," just like she had with all of the other challenges she had faced at Bloomberg.

132.   Accordingly, despite Ms. Lancaster's excellent performance for the prior year, she was demoted and her compensation was drastically cut, despite the fact that, upon information and belief, most Bloomberg executives were at the time being given an increase in Bloomberg Certificates.

133.   Upon information and belief, the reason why Ms. Lancaster was demoted by Bloomberg in October 2004 was her recently announced pregnancy.

134.   Thereafter, also in October 2004, George Geyer became an additional direct report to Mr. Cooper, thus bringing the number of managers reporting directly to Mr. Cooper back to five (5).

135.   This occurred in spite of Mr. Cooper's false and pretextual assertion at the time of Ms. Lancaster's demotion that Bloomberg wished to reduce the number of managers reporting to Mr. Cooper.

136.   In January 2005, in light of Ms. Lancaster's long driving commute from Rockland County into New York City and back each day, her doctor recommended that she reduce her hours from her customary ten (10) hours in the office per day to seven (7) hours per day in the office.

137.   Thereafter, on her doctor's advice, Ms. Lancaster did cut her hours from ten (10) hours per

22

day to approximately eight and a half (8 ½) hours per day (i.e. 7:00 A.M. to 3:30 P.M.). However, Ms. Lancaster continued to fulfill all of her job responsibilities, including making telephone calls during her commute and working at home.

138.   In late February 2005, Ms. Lancaster's doctor told her that she should stop work at thirty-two (32) weeks of her pregnancy, in March 2005.

139.   After stopping work, Ms. Lancaster continued to work from home for Bloomberg. However, one (1) week later, Ms. Lancaster went into pre-term labor and was put on bed rest for two (2) weeks after spending four (4) days in the hospital.

140.   In May 2005, Ms. Lancaster had healthy twin baby boys.

141.   Shortly thereafter, Ms. Lancaster notified Bloomberg that pursuant to Bloomberg's company policy, she was extending her maternity leave from twelve (12) weeks to sixteen (16) weeks (12 weeks paid, 4 weeks unpaid).

142.   In June 2005, during Ms. Lancaster's maternity leave, she requested a conference call with her manager, Mr. Karmen, to discuss the details of her return.

143.   However, Ms. Lancaster's repeated conference call appointments with Mr. Karmen during this time were either missed or postponed by Mr. Karmen.

144.   In July 2005, Ms. Lancaster ultimately spoke with Mr. Karmen regarding her return to work.

145.   Ms. Lancaster explained to Mr. Karmen that she would need to work flexible hours to accommodate her child care constraints for her newborn twins.  Specifically, Ms. Lancaster informed Mr. Karmen that she would not be able to drop off her children at daycare until 7:00 A.M., and could not pick-up her children later than 6:00 P.M.

23

146.    As such, Ms. Lancaster told Mr. Karmen that she would be able to work from 8:15 to 4:45 each day, as well as by phone and e-mail during her commute.

147.    Mr. Karmen did not voice any opposition to this arrangement to Ms. Lancaster, and gave Ms. Lancaster two (2) options for a return role to Bloomberg.

148.    Of these two (2) options, one (1) was a clear demotion, while the other was in an area that was peripheral to Ms. Lancaster's area of expertise.  Ms. Lancaster told Mr. Karmen that she was unhappy with each of these options.

149.    Mr. Karmen then stated that he was open to exploring other suitable alternatives for Ms. Lancaster's return.

150.    In July 2005, wishing to explore alternative opportunities within Bloomberg, Ms. Lancaster discussed a potential new role with Pat Eldridge, another prior peer, in the Transaction Products Support Group.

151.    Mr. Eldridge was extremely enthusiastic about the prospect of Ms. Lancaster joining his group, and stated to Ms. Lancaster that her wealth of experience and seniority would be an asset to his team.

152.    As with Mr. Karmen, Ms. Lancaster again explained her need to Mr. Eldridge to work flexible hours due to her childcare constraints, and Mr. Eldridge similarly did not convey to Ms. Lancaster that this could be a problem.

153.    On August 23, 2005, Ms. Lancaster returned to work at Bloomberg, reporting to her existing manager, Mr. Karmen, while at the same time continuing to explore alternative opportunities within the company.

154.    In September 2005, after many discussions with Mr. Eldridge, and an interview with Mr.

Eldridge's manager, Nicole Comello, Ms. Lancaster accepted a position with Mr. Eldridge's team, with the express understanding that she would be directly reporting to Mr. Eldridge.

155.   At the time, Ms. Lancaster was informed that her position with Mr. Eldridge's team had been approved by Bloomberg's senior management.

156.   However, only days later, and prior to her making the move to Mr. Eldridge's team, Ms. Lancaster was informed by Mr. Eldridge that she had now been demoted another level, and would now be reporting to one of Mr. Eldridge's subordinates, rather than Mr. Eldridge himself.

157.   The explanation provided to Ms. Lancaster by Mr. Eldridge was that Bloomberg's senior management had approved the demotion, and that the decision was final.  No rationale was provided for the demotion.

158.   Thereafter, and also in September 2005, Ms. Lancaster filed a formal complaint with Bloomberg's Human Resources Department, expressing concern about her career growth at Bloomberg and her future earnings potential following her demotion.

159.   Ms. Lancaster also informed Human Resources that she had not returned to Bloomberg following her pregnancy leave in a "like position" as mandated by the Bloomberg HR Manual.

160.   Ten (10) days later, Human Resources informed Ms. Lancaster that it had completed its investigation of her complaint, and that "career growth", "earnings potential" and "like position" are all subjective, and are the responsibility of Bloomberg's management, not Human Resources.

161.   In sum, Ms. Lancaster was told by management that if Mr. Eldridge stated that her demotion was to have no adverse consequences for Ms. Lancaster at Bloomberg, then she should believe him.

162.   This made no logical business sense to Ms. Lancaster, and despite the clear language of the Bloomberg Human Resources Manual, Ms. Lancaster was not returned to a "like position."

163.   It quickly became apparent to Ms. Lancaster that because she had complained about being treated unfairly after the birth of her twins, that she had become the target for additional disparate treatment and retaliation, and that Bloomberg's management was systematically forcing her out of the company.

164.   Ms. Lancaster became even more suspicious when her annual performance review was postponed.

165.   When this annual performance review did take place with Mr. Karmen at the end of September 2005, the review contained unfair and pretextual critiques of Ms. Lancaster's performance that had no basis in fact.

166.   During her September 2005 performance review, Ms. Lancaster was also informed by Mr. Karmen that her Bloomberg Certificates were being reduced in excess of fifty (50%) percent, from 315 to 150, with a projected value of $103,000.

167.   Ms. Lancaster disagreed with her September 2005 review, and requested changes to the document.

168.   Ultimately, faced with such blatant discrimination, Ms. Lancaster determined that although she had planned to remain at Bloomberg on a long term basis, she was being forced out of

the company (i.e. constructively discharged).

169.    Thereafter, on Monday, October 3, 2005, Ms. Lancaster resigned from Bloomberg.

### Analysis Of Reduction In Ms. Lancaster's Bloomberg Bonus Certificates

170.    The financial impact of the discrimination to which Ms. Lancaster was subjected is best

understood by examining the reduction in her Bloomberg Certificates following her

becoming pregnant in September 2004, as opposed to those awarded prior to her

pregnancy.

| Year Awarded | No. Certificates Awarded | Year Vested | Value |
|---|---|---|---|
| 1998 | 120 | 2000 | $73,800 |
| 1999 | 145 | 2001 | $110,200 |
| 2000 | 220 | 2002 | $144,635 |
| 2001 | 325 | 2003 | $116,935 |
| 2002 | 475 | 2004 | $105,797 |
| 2003 | 475 | 2005 | $285,238 |
| 2004 | 315 | 2006 | $152,088 |
| 2005 | 150 | 2007 | $103,830 |

171.    The Bloomberg Certificates awarded to Ms. Lancaster in 2004 and 2005 did not vest

because Ms. Lancaster left Bloomberg in or around October 2005.  The values listed above

for the 2004 and 2005 Bloomberg Certificates are the values projected for these

Bloomberg Certificates when they were awarded.

### Ms. Lancaster's Losses Resulting from Bloomberg's Discrimination and Retaliation

172.    As a result of Bloomberg's discrimination and retaliation, Ms. Lancaster has suffered

substantial loss of income and employment-related benefits.

173. As a result of Bloomberg's discrimination and retaliation, Ms. Lancaster has suffered substantial harm to her reputation in the financial community, adverse effects on her career, diminished earning capacity, and substantial harm and emotional distress.

## JANET LOURES' EMPLOYMENT HISTORY AT BLOOMBERG

174. Plaintiff-Intervenor Janet Loures, the mother of two (2) children, has been employed by Bloomberg since in or around 1989 through the present, and currently works for Bloomberg as a Profiles Analyst, a relatively low level position.

175. Prior to having children, Ms. Loures had received regular promotions and increases in pay, and was considered by many to be a rising star within the Bloomberg organization including being featured in the October/November 1999 issue of the Bloomberg publication "Bloomberg Pulse."

176. In this regard, by 2001, Ms. Loures had risen through the ranks to a senior management level position, reporting directly to Michael Bloomberg as Interim Director of Bloomberg's Princeton, New Jersey office.

177. As Interim Director, Ms. Loures supervised approximately one thousand (1000) Bloomberg employees.  Now, seventeen (17) years after Ms. Loures began working for Bloomberg, she is in virtually the same position as the position in which she started doing essentially entry level work, while her similarly situated male peers, many of whom she at one time supervised, are in senior management level positions.

178. The initial catalyst for this long downward spiral was Ms. Loures' first pregnancy and maternity leave in 2001, which occurred while she was Interim Director of the Princeton

office.

179.    The events since that time constitute a chain of discrimination and disparate treatment, marked by repeated demotions, dwindling opportunities for advancement, and decreases in compensation.

180.    Ultimately, Ms. Loures was stripped of all meaningful managerial responsibilities in January 2006.

## 1989 through September 2005

181.    Ms. Loures started working at Bloomberg in September 1989 following her graduation from college and has thus worked for the company for virtually her entire adult life.

182.    Ms. Loures began as an analyst (at a salary of $19,500) and worked her way up in the organization holding various positions within the company.

183.    In 1998, Ms. Loures was given the task of evaluating all the data quality procedures within the Data Division and reporting these results to Michael Bloomberg and Stuart Bell (the previous Global Data Manager).

184.    Based on her prior performance, in 1999 Ms. Loures was asked to create a new Quality Assurance Department to focus on the quality of Bloomberg's data.

185.    As the manager of the Quality Assurance Department, Ms. Loures managed approximately 190 employees, and regularly worked 12 hour days to get the Quality Assurance Department off the ground.

186.    In December 2000, after his announcement that he was running for Mayor of New York City, Michael Bloomberg announced that he would be conducting a management rotation as he did his succession planning.

187.    Michael Bloomberg asked all of the company's senior managers to step out of their roles as he selected a CEO.

188.    At this time, Ms. Loures was asked to act as Interim Global Data Manager of Bloomberg's Princeton, New Jersey offices.

189.    Ms. Loures accepted this position, pursuant to which she reported directly to Michael Bloomberg, and attended a weekly conference call with all senior managers.

190.    Bloomberg's Global Data Division at time encompassed approximately 1200 employees – 1000 of which were based out of Princeton, and all of whom reported to Ms. Loures.

191.    Ms. Loures worked in this capacity as the Interim Global Data Manager from January 2001 through March 2001.

192.    During this period, Ms. Loures appointed a product manager within the Quality Assurance Department to take over her responsibilities.  It was also during this period that Ms. Loures became pregnant with her first child.

**Ms. Loures Was Discriminated Against After Becoming Pregnant**

193.    Ms. Loures' first maternity leave occurred from October 23, 2001 through February 19, 2002.

194.    In March 2001, it had been announced that Beth Mazzeo would assume the responsibility for the Global Data Operations out of the Princeton office.

195.    Ms. Mazzeo formally assumed this position in April 2001.  Ms. Loures worked closely with Ms. Mazzeo over the next few months to assist her in getting acclimated to her new responsibilities.

196.    In June 2001, Ms. Mazzeo asked Ms. Loures and another manager, Hank Kelbaugh, to

help her restructure Bloomberg's Global Data Division.  After many weeks of restructuring planning alongside Ms. Mazzeo, Ms. Mazzeo was scheduled to present the new structure to Lex Fenwick, the newly appointed CEO, during the first or second week of September 2001.

197.   Due to the terrorist attacks on September 11, 2001, this announcement was delayed until the first week of October 2001.

198.   After the realization that the announcement would be delayed - but not knowing exactly for how long -  Ms. Mazzeo asked Ms. Loures (then 34 weeks pregnant) to "hold on" as long as she could stating that it was important that both Ms. Loures and Mr. Kelbaugh both be present since they represented in Ms. Mazzeo's own words  "the two core business groups".

199.   During the week of October 5, 2001, Ms. Mazzeo announced the restructuring to the entire office using an organizational chart created by Ms. Loures.  Pursuant to this restructuring, Ms. Loures was put in her charge of a new department titled the "New Issuance Markets Department", consisting of 192 employees divided into 5 separate groups, Translations, Data License/Web/Imaging, New Issuance, TREQ Administration and Global Bonds.

200.   Pursuant to this restructuring, Ms. Loures was also to be the Manager for Bloomberg's London Global Data Division, in which capacity she was to supervise an additional 200 employees, meaning that a total of approximately 400 employees would be under Ms. Loures' supervision.

201.   On Monday, October 23, 2001, as Ms. Loures was leaving work to begin her maternity leave, Ms. Mazzeo escorted Ms. Loures to her car.  Ms. Mazzeo thanked Ms. Loures for

all of her help and told her "You take care of yourself and that baby and don't worry about anything here your job will be waiting for you when you get back."

202.    In February 2002, prior to returning from maternity leave, Ms. Loures visited the office to meet with Ms. Mazzeo.  At that time, Ms. Mazzeo informed Ms. Loures that she had thought about the structure of Bloomberg's London Global Data Division and that when Ms. Loures returned, that Division would continue to report to Ms. Mazzeo, as they had been reporting during Ms. Loures' absence.

203.    There was no mention of any other changes mentioned and the meeting ended.

204.    Ms. Loures returned from maternity leave on February 19, 2002 to the position she had left on October 23, 2001, i.e. Department Manager of New Issuance Department, which had been renamed the Security Issuance Department in her absence.

205.    However, almost immediately following Ms. Loures' return from her maternity leave, various groups that had previously reported to her began to be assigned instead to Mr. O'Grady, the male manager who had filled in for Ms. Loures as the Manager of the Security Issuance Department during Ms. Loures' maternity leave.

206.    When Ms. Loures complained about this to Ms. Mazzeo, Ms. Mazzeo commented that just because Ms. Loures went on leave that she could not expect the business to stand still, and that Mr. Fenwick had given her ultimate autonomy to run the business (the Data Division), including restructuring groups if necessary.

207.    Thereafter, Mr. O'Grady reported directly to Ms. Mazzeo, retaining responsibility for the "core business groups," while Ms. Loures retained responsibility for the other non-core product groups in Global Data as follows: Data License/Web Indexing/Imaging, TREQ