DEALY & SILBERSTEIN, LLP
William J. Dealy (WD 9776)
Milo Silberstein (MS 4637)
225 Broadway, Suite 1405
New York, New York 10007
(212) 385-2117

*Attorneys for Plaintiffs-Intervenors Jill Patricot
Tanys Lancaster and Janet Loures*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

                              Plaintiff,

              -against-

BLOOMBERG  L.P. ,

                              Defendant.
-------------------------------------------------------------------X
JILL PATRICOT, TANYS LANCASTER and
JANET LOURES,

                   Plaintiffs-Intervenors,

              -against-

BLOOMBERG L.P.,

                              Defendant.
-------------------------------------------------------------------X

**Case No.: 07 CV 8383 (LAP)(HP)
ECF ACTION**

**COMPLAINT OF
PLAINTIFFS-INTERVENORS
JILL PATRICOT, TANYS
LANCASTER AND JANET
<u>LOURES</u>**

**<u>JURY TRIAL DEMANDED</u>**

Plaintiffs-Intervenors Jill Patricot, Tanys Lancaster and Janet Loures, by their attorneys,

Dealy & Silberstein, LLP, respectfully allege the following:

## <u>NATURE OF ACTION</u>

1.      This is an action brought against Defendant Bloomberg L.P. ("Bloomberg") under Title

1

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000, et seq. ("Title VII"), Title I of the Civil Rights Act of 1991, 42 U.S.C. Section 1981a ("Title I"), the New York State Human Rights Law, N.Y. Executive Law Section 290 et seq. ("State HRL"), and the New York City Human Rights Law, N.Y. City Administrative Code Section 8-101 et seq. ("City HRL").

2.     The Plaintiffs-Intervenors have brought this lawsuit because Bloomberg is and has been engaged in a pervasive course of discriminatory conduct based on sex/pregnancy against its pregnant employees and female employees with newborns, including the Plaintiffs-Intervenors.  This systemic, top-down discrimination against female employees is fostered, condoned and perpetuated by the highest levels of management within Bloomberg and by the ownership of Bloomberg, to wit, Michael Bloomberg, Peter Grauer, Alexius "Lex" Fenwick and Thomas Secunda.  In addition, female employees, including the Plaintiffs-Intervenors, who at points in their careers at Bloomberg were high level female executives, have suffered retaliation by Bloomberg for complaining about Bloomberg's unlawful employment practices.

3.     The culture at Bloomberg prizes physical image, and once female executives announce that they are pregnant and/or become new mothers, they fall into disfavor at Bloomberg and their careers at Bloomberg, no matter how previously promising, quickly become derailed based upon Bloomberg's perception that these female employees somehow do not fit the profile of female executives at Bloomberg and have become incapable of fulfilling their job responsibilities.

4.     This disfavor is telegraphed by Bloomberg and its management to the female employees in

various guises, including but not limited to unfounded and pretextual demotions, dwindling opportunities for advancement and/or decreases in compensation.

5.    The compensation decreases are commonly effectuated through cuts in the number of Bloomberg Equity Equivalence Certificates ("Bloomberg Certificates"), which are awarded to the employee by Bloomberg each year on an employee's anniversary date with the company.  The value of a Bloomberg Certificate is based on the performance of the company, not the individual, and while their value is projected at the time they are awarded, their value is "locked-in" one (1) year after they are issued.  The Bloomberg Certificates are then paid two (2) years following their issuance, provided the employee still works for Bloomberg.

6.    As a Bloomberg employee becomes more senior, a larger percentage of their compensation is based upon the Bloomberg Certificates.  Moreover, since Bloomberg Certificates are more intricate and confusing to the general public, Bloomberg's preferred method to decrease an employee's compensation, and thus effectuate the systemic discrimination against the Plaintiffs-Intervenors and other female executives, is to reduce their Bloomberg Certificates rather than their base salary.

7.    Bloomberg is a privately held company, whose founder and former Chairman of the Board of Directors, Michael Bloomberg, is the current Mayor of the City of New York.

8.    Upon information and belief, Michael Bloomberg continues to own sixty-eight (68%) percent of Bloomberg.

9.    Since Michael Bloomberg became Mayor of the City of New York in 2001, Bloomberg has allegedly been managed by a handful of high-level male executives who sit on

Bloomberg's Board of Directors, including Peter Grauer, Bloomberg's current Chairman of the Board, Lex Fenwick, Bloomberg's Chief Executive Officer, and Thomas Secunda, one of Bloomberg's founding partners.

10.    However, despite public proclamations and assurances from Michael Bloomberg that during his tenure as Mayor he has divested himself from the day to day operations of Bloomberg, upon information and belief Michael Bloomberg has in fact stayed involved with the management and monitoring of Bloomberg's business.

11.    Upon information and belief, since becoming Mayor, Michael Bloomberg has communicated directly with Lex Fenwick regarding claims of disparate treatment of female executives and about the management of Bloomberg's Human Resources Department, which customarily fields the initial complaints from aggrieved female employees at Bloomberg.

12.    As recently as September 13, 2007, at a meeting held at Bloomberg's Princeton, New Jersey offices regarding Bloomberg's "People Product" that was attended by approximately twenty (20) employees of Bloomberg including Plaintiff-Intervenor Janet Loures, a Senior Business Manager stated that while Michael Bloomberg (who originated the People Product), does not actively work at Bloomberg, he still looks at the People Product all the time and has a very strong opinion regarding the People Product.

13.    Later during the September 13, 2007 meeting, the aforementioned Senior Business Manager told the attendees at the meeting, including Plaintiff-Intervenor Janet Loures, "Mike calls Lex all the time about the People Product – he probably shouldn't but he does."

4

14.    Upon information and belief, in another highly publicized incident occurring in or around August 2006, Michael Bloomberg instructed Bloomberg Radio, a subsidiary company, that it was not permitted to run advertisements for law firms specializing in prosecuting employment discrimination cases after hearing one such ad on Bloomberg Radio.

15.    This incident was described in an article captioned "Mike gives station an earful" that ran in the August 27, 2006 edition of the New York Post.

16.    Based upon these incidents, the claims made by Michael Bloomberg that he is no longer involved with Bloomberg, including his recent statement to the media that he knows nothing about the instant lawsuit because he hasn't worked at Bloomberg "...as you know, in an awful long time", are open to question.

17.    Upon information and belief, Michael Bloomberg is responsible for the creation of the systemic, top-down culture of discrimination which exists within Bloomberg, and Bloomberg has been sued in the past for complaints relating directly to Michael Bloomberg by several female executives who have alleged in their lawsuits that a hostile environment exists for women at Bloomberg.

18.    One such woman, former employee Sekiko Garrison, alleged that Michael Bloomberg told her twice to "kill it" when she informed him that she was pregnant.

19.    Upon information and belief, Michael Bloomberg left an apology message on the voicemail to Sekiko Garrison's phone.

20.    Upon information and belief, Sekiko Garrison left Bloomberg shortly after this incident.

21.    It was subsequently reported in the July 30, 2007 edition of AM New York that Bloomberg paid Sekiko Garrison a substantial sum of money in a confidential settlement.

22.    Upon information and belief, Bloomberg management and ownership has continued to foster and condone this hostile, discriminatory workplace since Michael Bloomberg became Mayor in 2002.

23.    For example, upon information and belief, Lex Fenwick, upon learning that two (2) of his female executives had become pregnant, instructed another Bloomberg executive to terminate them, saying "I'm not having any pregnant bitches working for me."

24.    Upon information and belief, Lex Fenwick's intention to terminate these employees based upon their sex/pregnancy was reported to Bloomberg's Human Resources Department.

25.    However, upon information and belief, the female employees in question were terminated or forced out of the company by Lex Fenwick and Bloomberg management.

26.    In another incident, upon information and belief, during a conference call with subordinates in which he became infuriated, Thomas Secunda told the employees on the line that he would "kill their children and burn down their houses" if a business goal was not accomplished.

## THE PARTIES

27.    Plaintiff-Intervenor Jill Patricot, a female born on June 22, 1972, resides in Westchester County, New York.  She is a citizen of the United States, and is a current employee of Bloomberg.

28.    Plaintiff-Intervenor Tanys Lancaster, a female born on March 4, 1969, resides in Montebello, New York.  She is a citizen of the United Kingdom, and is a former employee of Bloomberg.

29.    Plaintiff-Intervenor Janet Loures, a female born on February 26,1966, resides in

6

Englishtown, New Jersey.  She is a citizen of the United States, and is a current employee of Bloomberg.

30.    Bloomberg is, upon information and belief, a privately held Limited Partnership organized and existing under the laws of the State of Delaware and is authorized to conduct business in the State of New York.  Bloomberg maintains a principal place of business located at 731 Lexington Avenue in New York City.  Bloomberg also maintains offices located in Princeton, New Jersey as well as various international offices.

31.    Bloomberg meets the definition of "employer" under Title VII, the State HRL and the City HRL.

## JURISDICTION

32.    This Court has subject matter jurisdiction over the Plaintiffs-Intervenors' Title VII claims under 28 U.S.C. Sections 1331 and 1343, because they arise under the laws of the United States and are brought to recover damages for deprivation of equal rights.  This Court has supplemental subject matter jurisdiction over the State HRL and City HRL claims under 28. U.S.C. Section 1367, because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

33.    The Plaintiffs-Intervenors have complied fully with any and all prerequisites to jurisdiction in this Court under Title VII, the State HRL and the City HRL.

34.    Contemporaneously with the filing of this Complaint, the Plaintiffs-Intervenors have served a copy of this Complaint upon the New York City Commission of Human Rights and the Office of the Corporation Counsel of the City of New York, satisfying the notice

requirements of Section 8-502 of the New York City Administrative Code.

## VENUE

35.    Venue is proper in this District under 28 U.S.C. Section 1391(b) and (c), in that Bloomberg resides in this District and a substantial part of the events giving rise to the Plaintiffs-Intervenors' claims occurred herein.  Venue is also proper under 42 U.S.C. Section 2000e-5(f)(3) in that a substantial part of the unlawful employment practices giving rise to the Plaintiffs-Intervenors' claims were committed in New York and the employment records relevant to such practices are, upon information and belief, maintained and administered in New York.

## PROCEDURAL HISTORY

36.    On or about March 24, 2006, Plaintiff-Intervenor Jill Patricot filed a timely charge of discrimination against Bloomberg with the Equal Employment Opportunity Commission ("EEOC") complaining of the unlawful actions described herein.

37.    On or about May 10, 2006, Plaintiff-Intervenor Tanys Lancaster filed a timely charge of discrimination against Bloomberg with the EEOC complaining of the unlawful actions described herein.

38.    On or about October 27, 2006, Plaintiff-Intervenor Janet Loures filed a timely charge of discrimination against Bloomberg with the EEOC complaining of the unlawful actions described herein.

39.    The EEOC investigated the three (3) charges filed by the Plaintiff-Intervenors contemporaneously, and on or about June 27, 2007, issued a combined Determination as to all three (3) charges.

40.     In the Determination, the EEOC found, <u>inter alia</u>, the following:

> The Charging Parties' claims of discrimination on account of sex/pregnancy were echoed by a number of other female current and former employees who have taken maternity leave.  EEOC's investigation shows that their careers lost momentum and that they were transferred, displaced, and/or demoted.  Some complained to the Human Resources Department, others firmly declined to do so, fearful of retaliation.  The Respondent has no policy allowing employees to work part time, at home, or on a flexible schedule.  It places a high value on customer service, on "coverage," and on "leading by example."

> The Commission finds cause to believe that Respondent discriminated against the three Charging Parties and a class of similarly-situated women based on their sex/pregnancy by demoting them, decreasing their compensation, and otherwise discriminating against them in the terms, conditions and privileges of their employment.

41.     On September 27, 2007, the EEOC filed a Complaint in this Court against Bloomberg alleging, among other things, that Bloomberg engaged in unlawful employment practices against the Plaintiffs-Intervenors and a class of similarly situated women at Bloomberg.

42.     The Plaintiffs-Intervenors seek to intervene in the proceeding commenced by the EEOC pursuant to 42 U.S.C. Section 2000e-5(f)(1) and Rule 24 of the Federal Rules of Civil Procedure.

## <u>JILL PATRICOT'S EMPLOYMENT HISTORY AT BLOOMBERG</u>

43.     In or around May 1998, Plaintiff-Intervenor Jill Patricot started at Bloomberg in its London office as a senior salesperson responsible for covering Russia and Eastern Europe.

44.     In or around November 1999, Ms. Patricot moved back to the United States to work for Bloomberg, and was promoted to a Sales Team Leader position.

45.     In this capacity, Ms. Patricot went on to lead sales teams covering large corporations and hedge funds in New York and New England, including servicing large accounts such as

Citigroup and Fidelity.

46. As a Sales Team Leader, Ms. Patricot routinely had a tremendous amount of face-to-face contact with Bloomberg's clients, including some of its major hedge fund clients in Connecticut.

47. Ms. Patricot's leadership skills were rewarded in April 2004, when Ms. Patricot and her team won Bloomberg's "Best Sales Team Award".

48. In August 2004, Ms, Patricot became pregnant.

49. Upon information and belief, Bloomberg became aware of Ms. Patricot's pregnancy in or around October 2004.

50. In November 2004, when Ms. Patricot was three (3) months pregnant and just "beginning to show," Thomas Secunda, one of Bloomberg's founding partners, and Beth Mazzeo, Bloomberg's Global Head of Data Operations, approached Ms. Patricot regarding taking on a new position as Global Manager for Data, which they couched as a promotion. Although Ms. Patricot doubted whether this transfer was in truth a promotion, Ms. Patricot reluctantly accepted.

51. In this regard, Ms. Patricot's new position required her to work at a satellite office on West Street in Lower Manhattan, in which she had little to no contact with Bloomberg's customers, which had previously been her speciality.

52. Upon information and belief, Bloomberg's stated reasons for "promoting" Ms. Patricot were pretextual, in that the real reason they did not want her leading Bloomberg's best sales team was because she had become pregnant.

53. Additionally, transferring Ms. Patricot to the West Street facility near "Ground Zero"

added between sixty (60) to ninety (90) minutes to her daily commute.  This placed Ms. Patricot out of the business limelight and out of sales, which was her forte for many years.

54.   In April 2005, Ms. Patricot went on maternity leave.  Ms. Patricot delivered her baby on June 1, 2005.

55.   While on maternity leave, Ms. Patricot did not receive her regularly scheduled annual review in May (her anniversary month with Bloomberg) but was informed by Ms. Mazzeo that her Bloomberg Certificates had been cut from the 210 she had been awarded in May 2004 to 185.

56.   When Ms. Patricot questioned the cut in her Bloomberg Certificates, she was informed that it was not related to her performance, and that Bloomberg had simply had a bad year.

### Ms. Patricot Was Discriminated Against Upon Returning From Maternity Leave in September 2005

57.   On September 22, 2005, Ms. Patricot returned from her maternity leave, whereupon she was immediately subjected to a hostile work environment by her direct supervisor, Beth Mazzeo.

58.   Upon information and belief, it is well known within Bloomberg that it is Ms. Mazzeo's preference to have male managers or childless female managers report to her, to avoid all childcare related issues.

59.   Upon information and belief, Ms. Mazzeo has made her preference known in this regard in several ways, including after her return from a business trip to Asia, making derogatory comments regarding the amount of women who in Bloomberg's Tokyo offices, their inability to "speak up", and the need to get more men to work in the Tokyo office.

60.   Ms. Mazzeo has also openly acknowledged the lack of female executives at Bloomberg, and has stated publicly that Bloomberg does not make it easy on women, especially mothers, including making such comments to a meeting with Bloomberg's summer interns attended by Plaintiff-Intervenor Janet Loures, in or around August 2004.

61.   Upon Ms. Patricot's return from maternity leave, Ms. Mazzeo repeatedly failed to respond to messages or phone calls from Ms. Patricot, and excluded Ms. Patricot from managerial meetings, including compensation reviews affecting staff reporting to Ms. Patricot.

62.   In the past, Ms. Patricot had always been involved in such meetings.

63.   Thereafter, for childcare issues, Ms. Patricot attempted to change her schedule to work from 7:00 AM to 5:00 PM, rather than work her prior schedule of 8:00 AM to 5:30 PM.

64.   Upon information and belief, at all relevant times, Bloomberg has permitted other managers at Bloomberg to this 7:00 AM to 5:00 PM daily schedule.

65.   On or about December 22, 2005, Ms. Mazzeo informed Ms. Patricot that her career at Bloomberg had been "paused" because she had a child.

66.   Thereafter, on or about February 3, 2006, Ms. Mazzeo informed Ms. Patricot that she was going to be demoted because she was not staying until 5:30 PM each day, and that she could either be a data analyst (a position 3 levels below Ms. Patricot's current position), or find her own job within Bloomberg.

67.   During subsequent communications occurring in or around early February 2006 between Ms. Patricot and the Human Resources Department regarding the failure of Bloomberg to restore her to an equal position after her pregnancy and regarding Ms. Patricot's work schedule, Ms. Patricot informed the Human Resources Department that she would be

12

willing to sit down directly with Ms. Mazzeo to discuss her proposal that she work from 7:00 AM to 5:00 PM each day, and thus leave one half hour earlier (but work a total of an additional half hour each day).

68.    Ms. Patricot further informed the Human Resources Department that her position had not and would not be affected in any fashion by her working from 7:00 A.M. to 5:00 P.M. rather than 8:00 A.M. to 5:30 P.M., particularly in light of the fact that the North American markets, for which Ms. Patricot was responsible, closed at 4:00 P.M., and that the proposed arrangement represented a compromise that would be beneficial to all concerned.

69.    Thereafter, on or about February 10, 2006, Ms. Mazzeo telephoned Ms. Patricot at approximately 2:00 P.M.

70.    Ms. Mazzeo was verbally abusive to Ms. Patricot during this telephone call, and informed Ms. Patricot that while Human Resources had suggested that she call Ms. Patricot to arrange a meeting to discuss her situation, she felt there was nothing further to discuss, and intended to demote Ms. Patricot to a data analyst position (three levels below Ms. Patricot's current position).

71.    In response, Ms. Patricot noted that many other managers at Bloomberg work from 7:00 A.M. to 5:00 P.M. as she was proposing to do, to which Ms. Mazzeo responded that she didn't want to hear about it.

72.    Ms. Patricot also told Ms. Mazzeo that the proposed arrangement would only be temporary in nature, lasting only until her baby turned one (1) on June 1, 2006.

73.    In response, Ms. Mazzeo stated that she did not have "three (3) months to continue like

this".

74.    Lastly, Ms. Patricot told Ms. Mazzeo that both she and her group were performing quite well, and had not been adversely affected by Ms. Patricot's slightly adjusted schedule.

75.    Ms. Mazzeo responded that the performance of Ms. Patriciot's group was "irrelevant", making it clear to Ms. Patricot that Ms. Mazzeo was not really interested in reaching a constructive solution to the situation, and wanted only to oust Ms. Patricot from her position.

76.    The aforementioned telephone conversation was overheard by several of Ms. Patricot's colleagues, which was extremely embarrassing to Ms. Patricot.

77.    Following the conclusion of the conversation, Ms. Patricot sent Human Resources an e-mail, which stated the following:

> Jen, Beth called me at my desk at 2:00 pm and said there was nothing to discuss with HR.  This is something that you suggested to me to do and she came back and blasted me for it.  Additionally, it was extremely embarrassing as my voice was raised at my desk and everyone on the floor now knows my situation.  I am disappointed on many levels on how this is being handled.

78.    Human Resources responded to this e-mail from Ms. Patricot by informing Ms. Patricot that Ms. Mazzeo was her manager and she had every right to call Ms. Patricot if she wished, and to refuse to meet directly with Ms. Patricot on this issue.

79.    Thereafter, on or about, February 14, 2006, after months of working in a hostile environment and fighting to keep her position, Ms. Patricot was formally demoted to a position as a data analyst in the Data License Department.

80.    Ultimately, in March 2006, at her own initiative, Ms. Patricot obtained a position in Bloomberg's Sales Department.

14

81. Upon assuming a position in Bloomberg's Sales Department, Ms. Patricot was informed by Max Linnington, the Head of New York Sales, that there were no Team Leader positions available (the position she held prior to her "promotion" to Head of Global Data for North America). However, contrary to Linnington's statements, there have been several new Team Leaders promoted, virtually all of whom are men or without children.

82. Upon information and belief, none of those new "Team Leaders" were ever the Team Leader of the Best Sales Team in Bloomberg as was Ms. Patricot.

83. The pretextual nature of Ms. Mazzeo's concern that Ms. Patricot work from 7:30 A.M. to 5:30 P.M. daily is further belied by the fact that she was initially replaced by Ray Whitman, who commuted to the job in New York City from Princeton, New Jersey only two (2) to three (3) times per week, not daily, as was required of Ms. Patricot.

84. Ms. Patricot was ultimately replaced as the Head of Global Data for North America on a full time basis two (2) months later by Ulrik Bjerke, a single male with no children.

85. Mr. Bjerke had been brought by Ms. Mazzeo from Bloomberg's European offices to work in Bloomberg's New York City offices shortly after Ms. Patricot had become pregnant, and had started as the Head of Global Data for North America in November 2004.

86. Thereafter, Mr. Bjerke became a "Global Project Manager" in Bloomberg's New York offices, a position that previously did not exist, and, upon information and belief, was created for him specifically by Ms. Mazzeo.

87. Upon information and belief, Mr. Bjerke was moved to New York and was being groomed from the start by Ms. Mazzeo to replace Ms. Patricot.

88. During Ms. Patricot's maternity leave during the Summer of 2005, Mr. Bjerke received

two (2) promotions (over Ms. Patricot's objections, which were overridden by Ms. Mazzeo), so that when Ms. Patricot returned from her leave, Mr. Bjerke was a manager directly below Ms. Patricot on Bloomberg's organizational chart.

89.    Mr. Bjerke then replaced Ms. Patricot as the Head of Global Data for North America, for which he needed to obtain a special work visa.

90.    Accordingly, in the time that Ms. Patricot went out on maternity leave and was then demoted three (3) levels to data analyst (April 2005 - February 2006), Mr. Bjerke, a male with no children, received three (3) promotions to go from being "Global Project Manager" to assuming Ms. Patricot's position.

91.    Upon information and belief, when Ms. Patricot was transferred to the Head of Global Data for North America, this occurred solely because Bloomberg management did not want a pregnant executive to be "Team Leader" of Bloomberg's Best Sales Team dealing with the powerful hedge fund players in Stamford and Southern Connecticut.

92.    Mr. Bjerke was transferred from Europe to New York around that time because Bloomberg management intended to replace Ms. Patricot with Mr. Bjerke upon her return from pregnancy leave.

93.    Accordingly, upon information and belief, Ms. Mazzeo's ostensible concern over Ms. Patricot not working until 5:30 P.M. was simply a pretext to remove Ms. Patricot from her position and install Mr. Bjerke in her stead for discriminatory reasons.

## Bloomberg Has Retaliated Against Ms. Patricot

94.    On April 15, 2006, approximately three (3) weeks after Ms. Patricot had filed her charge with the EEOC on March 24, 2006, and in advance of her annual review which occurs in

May of each year, Ms. Patricot submitted her "Self-Evaluation" to Bloomberg.

95.     On the final page of Ms. Patricot's self-evaluation, in the space captioned "What

challenges do you face in your role", What changes would you recommend?", Ms. Patricot

wrote as follows:

> When I returned back from maternity leave I was discriminated against. As a result of this discrimination I was demoted and taken from my position when I was performing well. The reason was that I worked until 5:00 pm and not 5:30 which I feel was a pretext to discrimination. I have voiced this opinion to HR and management and this continues to be an issue for me. My manager, Beth Mazzeo, did not respond to any messages I sent on the progress in NY after I returned from maternity leave. Although I invited her to NY on occasion to visit with the team she never came to NY until I was forced to depart. Her lack of interest in the employees in NY had an impact on employees morale that was challenging to me. Her insistence to take headcount away from the NY group and not keep me informed about changes or group developments was frustrating (for example the new pricing group that would be staring New York that at the time would put 20 people under my jurisdiction that I was never told about until I talked to Zach Cohen). I worked hard to instill unity and loyalty for the New York team and as a result we did well in our performance and this was reflected by Max Linnington, News and project managers. I have addressed this issue repeatedly with HR, Peter Grauer and Tracy Keogh and asked for the investigation into what happened to me and it was frustrating that only Beth Mazzeo was asked for her opinion. I asked to look into my performance, talk to my managers and the employees that reported to me. None of this was done. I am still asking that an investigation into Beth Mazzeo take place, which is why I have reached out to the Federal Government to hold an unbiased investigation. My hope is that other new mothers at Bloomberg will not face the same discrimination that took place with me.

96.     Following the submission of this self-evaluation, during May 2006 Ms. Patricot was

provided with a compensation summary detailing her actual and projected compensation

for the upcoming year.

97.     While Ms. Patricot learned that her salary would remain the same ($130,000 per annum),

her Bloomberg Certificates had been decreased from the 185 Bloomberg Certificates

awarded in May 2005 worth $146,994, to 140 Bloomberg Certificates awarded in May

2006 with a projected value of $103,727, a projected decrease of $43,267 in compensation.

98.  Of course, this decrease in Bloomberg Certificates came on the heels of Ms. Patricot's Bloomberg Certificates being decreased from 210 in May 2004 (the final review she received prior to becoming pregnant), to 185 during her maternity leave during the Summer 2005.

99.  Accordingly, since becoming pregnant and then having her first child, Ms. Patricot's Bloomberg Certificates were cut from 210 to 185, and then again to 140, a decrease of 33 1/3 %.

100.  The decrease in the award of Ms. Patricot's Bloomberg Certificates was completely unwarranted and is further indicia of both Bloomberg's discriminatory course of conduct as well as retaliation by Bloomberg for the filing of the Charge.

101.  In February 2006, Ms. Patricot announced that she was pregnant with her second child.

102.  From September 2006 through March 2007, Ms. Patricot was on maternity leave from Bloomberg.

103.  When Ms. Patricot returned from her second maternity leave in March 2007, she was once again discriminated against and retaliated against by Bloomberg.

104.  In this regard, when Ms. Patricot returned from her second maternity leave, Bloomberg discriminated and retaliated against her by changing the terms and conditions of her employment.

## Ms. Patricot's Losses Resulting from Bloomberg's Discrimination and Retaliation

105.  As a result of Bloomberg's discrimination and retaliation, Ms. Patricot has suffered

18

substantial loss of income and employment-related benefits as well as a substantial

diminution of her standing in the business information and securities community.

106. As a result of Bloomberg's discrimination and retaliation, Ms. Patricot has suffered

substantial harm to her reputation in the financial community, adverse effects on her

career, diminished earning capacity, and substantial harm and emotional distress.

## TANYS LANCASTER'S EMPLOYMENT HISTORY AT BLOOMBERG

107. Plaintiff-Intervenor Tanys Lancaster worked for Bloomberg L.P. ("Bloomberg") from in or

around September 1994 through on or about October 3, 2005.

108. Ms. Lancaster started with Bloomberg in September 1994 in its London office as a

member of the Transactions Products Team.

109. In March 1997, Ms. Lancaster was promoted and asked to run the Transaction Products

Account Management Team in London. This group was comprised of approximately fifty

(50) people and had responsibility for covering all of Europe.

110. In March 2000, Ms. Lancaster moved to New York where she joined Bloomberg's U.S.

Transactions Products Business Management Team.

111. After a few months in this position, Ms. Lancaster was promoted and asked to run the

team, which was comprised of approximately fifteen (15) senior, experienced sales people,

with responsibility for covering all of North America.

112. In March 2001, having proven herself with the Transactions Products Business

Management Team, Ms. Lancaster was requested to run the Transaction Products Sales

Specialists Teams, consisting of approximately ten (10) experienced senior Transactions

Products sales people with responsibility for covering all of North America.

113.   In December 2002, Ms. Lancaster was requested to manage the strategic alliance that Bloomberg had recently established with Algorithmics, Inc., a company that develops risk management software.

114.   In addition, due to Ms. Lancaster's in-depth global experience with Transaction Products, Ms. Lancaster was asked to become Bloomberg's "Transaction Products Advocate," whereby she was given oversight of all development requests coming from outside of the United States.

115.   The roles that Ms. Lancaster was performing at this juncture for Bloomberg required that she travel extensively and spend many evenings on conference calls with colleagues, clients and prospective clients in Asia.

116.   All of the aforementioned promotions received by Ms. Lancaster were accompanied by regular increases in compensation. By July 2004, Ms. Lancaster was earning a base salary of $130,000.

117.   In addition, in September 2003, Ms. Lancaster's last anniversary prior to becoming pregnant in August 2004, she received 475 Bloomberg Certificates with an ultimate actual value in September 2005 of $285,000, making her total compensation $415,000.00.

118.   Ms. Lancaster had become one of Bloomberg's top level female executives.

### Events of August 2004 - October 2005

119.   After many years of unsuccessful attempts to become pregnant, Ms. Lancaster and her husband elected to pursue in vitro fertilization ("IVF").

120.   In August 2004, Ms. Lancaster met with Ken Cooper, her direct supervisor to inform him that she was undertaking IVF treatment, and would need two (2) weeks off from work.

121.   Mr. Cooper was sympathetic, told Ms. Lancaster not to meet with Human Resources and claimed that Bloomberg would be one hundred (100%) percent behind Ms. Lancaster and that she should do everything possible to ensure her well being.

122.   Ms. Lancaster was scheduled to receive her annual review in August (one (1) month ahead of her anniversary date), however Mr. Cooper informed Ms. Lancaster that the company needed more time to prepare.

123.   In September 2004, Ms. Lancaster learned that the IVF process had been successful and that she was pregnant with twins, with a projected due date in May 2005.

124.   Ms. Lancaster immediately shared her good news with Mr. Cooper.

125.   Ms. Lancaster then received her annual performance review just prior to the end of September 2004.  The review was positive, and Ms. Lancaster was praised by Bloomberg for being someone who is happy to take on and run with any task given to her.  Ms. Lancaster was also commended as being someone who was always willing to "step up".

126.   In October 2004, subsequent to her annual performance review, Ms. Lancaster discussed her compensation with Mr. Cooper.

127.   At this time, to Ms. Lancaster's astonishment, she was told by Mr. Cooper that she was being demoted, and would now be reporting to a prior peer, Brenton Karmen.

128.   The explanation provided by Mr. Cooper for Ms. Lancaster's demotion was that Bloomberg wanted to decrease the number of managers reporting directly to Mr. Cooper.

129.   However, out of five (5) such managers reporting to Mr. Cooper, Ms. Lancaster was the only manager who received a demotion.

130.   In addition to her demotion, Ms. Lancaster was told that her number of Bloomberg

Certificates was being cut by thirty-three (33%) percent from the prior year, from 475 to 315, with a predicted value of $152,000.

131.   When Ms. Lancaster voiced her objection to this demotion, she was told by Mr. Cooper that given her professional nature, she "would, of course, accept it," just like she had with all of the other challenges she had faced at Bloomberg.

132.   Accordingly, despite Ms. Lancaster's excellent performance for the prior year, she was demoted and her compensation was drastically cut, despite the fact that, upon information and belief, most Bloomberg executives were at the time being given an increase in Bloomberg Certificates.

133.   Upon information and belief, the reason why Ms. Lancaster was demoted by Bloomberg in October 2004 was her recently announced pregnancy.

134.   Thereafter, also in October 2004, George Geyer became an additional direct report to Mr. Cooper, thus bringing the number of managers reporting directly to Mr. Cooper back to five (5).

135.   This occurred in spite of Mr. Cooper's false and pretextual assertion at the time of Ms. Lancaster's demotion that Bloomberg wished to reduce the number of managers reporting to Mr. Cooper.

136.   In January 2005, in light of Ms. Lancaster's long driving commute from Rockland County into New York City and back each day, her doctor recommended that she reduce her hours from her customary ten (10) hours in the office per day to seven (7) hours per day in the office.

137.   Thereafter, on her doctor's advice, Ms. Lancaster did cut her hours from ten (10) hours per

22

day to approximately eight and a half (8 ½) hours per day (i.e. 7:00 A.M. to 3:30 P.M.). However, Ms. Lancaster continued to fulfill all of her job responsibilities, including making telephone calls during her commute and working at home.

138.   In late February 2005, Ms. Lancaster's doctor told her that she should stop work at thirty-two (32) weeks of her pregnancy, in March 2005.

139.   After stopping work, Ms. Lancaster continued to work from home for Bloomberg. However, one (1) week later, Ms. Lancaster went into pre-term labor and was put on bed rest for two (2) weeks after spending four (4) days in the hospital.

140.   In May 2005, Ms. Lancaster had healthy twin baby boys.

141.   Shortly thereafter, Ms. Lancaster notified Bloomberg that pursuant to Bloomberg's company policy, she was extending her maternity leave from twelve (12) weeks to sixteen (16) weeks (12 weeks paid, 4 weeks unpaid).

142.   In June 2005, during Ms. Lancaster's maternity leave, she requested a conference call with her manager, Mr. Karmen, to discuss the details of her return.

143.   However, Ms. Lancaster's repeated conference call appointments with Mr. Karmen during this time were either missed or postponed by Mr. Karmen.

144.   In July 2005, Ms. Lancaster ultimately spoke with Mr. Karmen regarding her return to work.

145.   Ms. Lancaster explained to Mr. Karmen that she would need to work flexible hours to accommodate her child care constraints for her newborn twins.  Specifically, Ms. Lancaster informed Mr. Karmen that she would not be able to drop off her children at daycare until 7:00 A.M., and could not pick-up her children later than 6:00 P.M.

23

146.  As such, Ms. Lancaster told Mr. Karmen that she would be able to work from 8:15 to 4:45 each day, as well as by phone and e-mail during her commute.

147.  Mr. Karmen did not voice any opposition to this arrangement to Ms. Lancaster, and gave Ms. Lancaster two (2) options for a return role to Bloomberg.

148.  Of these two (2) options, one (1) was a clear demotion, while the other was in an area that was peripheral to Ms. Lancaster's area of expertise.  Ms. Lancaster told Mr. Karmen that she was unhappy with each of these options.

149.  Mr. Karmen then stated that he was open to exploring other suitable alternatives for Ms. Lancaster's return.

150.  In July 2005, wishing to explore alternative opportunities within Bloomberg, Ms. Lancaster discussed a potential new role with Pat Eldridge, another prior peer, in the Transaction Products Support Group.

151.  Mr. Eldridge was extremely enthusiastic about the prospect of Ms. Lancaster joining his group, and stated to Ms. Lancaster that her wealth of experience and seniority would be an asset to his team.

152.  As with Mr. Karmen, Ms. Lancaster again explained her need to Mr. Eldridge to work flexible hours due to her childcare constraints, and Mr. Eldridge similarly did not convey to Ms. Lancaster that this could be a problem.

153.  On August 23, 2005, Ms. Lancaster returned to work at Bloomberg, reporting to her existing manager, Mr. Karmen, while at the same time continuing to explore alternative opportunities within the company.

154.  In September 2005, after many discussions with Mr. Eldridge, and an interview with Mr.

Eldridge's manager, Nicole Comello, Ms. Lancaster accepted a position with Mr. Eldridge's team, with the express understanding that she would be directly reporting to Mr. Eldridge.

155. At the time, Ms. Lancaster was informed that her position with Mr. Eldridge's team had been approved by Bloomberg's senior management.

156. However, only days later, and prior to her making the move to Mr. Eldridge's team, Ms. Lancaster was informed by Mr. Eldridge that she had now been demoted another level, and would now be reporting to one of Mr. Eldridge's subordinates, rather than Mr. Eldridge himself.

157. The explanation provided to Ms. Lancaster by Mr. Eldridge was that Bloomberg's senior management had approved the demotion, and that the decision was final. No rationale was provided for the demotion.

158. Thereafter, and also in September 2005, Ms. Lancaster filed a formal complaint with Bloomberg's Human Resources Department, expressing concern about her career growth at Bloomberg and her future earnings potential following her demotion.

159. Ms. Lancaster also informed Human Resources that she had not returned to Bloomberg following her pregnancy leave in a "like position" as mandated by the Bloomberg HR Manual.

160. Ten (10) days later, Human Resources informed Ms. Lancaster that it had completed its investigation of her complaint, and that "career growth", "earnings potential" and "like position" are all subjective, and are the responsibility of Bloomberg's management, not Human Resources.

161.  In sum, Ms. Lancaster was told by management that if Mr. Eldridge stated that her demotion was to have no adverse consequences for Ms. Lancaster at Bloomberg, then she should believe him.

162.  This made no logical business sense to Ms. Lancaster, and despite the clear language of the Bloomberg Human Resources Manual, Ms. Lancaster was not returned to a "like position."

163.  It quickly became apparent to Ms. Lancaster that because she had complained about being treated unfairly after the birth of her twins, that she had become the target for additional disparate treatment and retaliation, and that Bloomberg's management was systematically forcing her out of the company.

164.  Ms. Lancaster became even more suspicious when her annual performance review was postponed.

165.  When this annual performance review did take place with Mr. Karmen at the end of September 2005, the review contained unfair and pretextual critiques of Ms. Lancaster's performance that had no basis in fact.

166.  During her September 2005 performance review, Ms. Lancaster was also informed by Mr. Karmen that her Bloomberg Certificates were being reduced in excess of fifty (50%) percent, from 315 to 150, with a projected value of $103,000.

167.  Ms. Lancaster disagreed with her September 2005 review, and requested changes to the document.

168.  Ultimately, faced with such blatant discrimination, Ms. Lancaster determined that although she had planned to remain at Bloomberg on a long term basis, she was being forced out of

the company (i.e. constructively discharged).

169.   Thereafter, on Monday, October 3, 2005, Ms. Lancaster resigned from Bloomberg.

### Analysis Of Reduction In Ms. Lancaster's Bloomberg Bonus Certificates

170.   The financial impact of the discrimination to which Ms. Lancaster was subjected is best understood by examining the reduction in her Bloomberg Certificates following her becoming pregnant in September 2004, as opposed to those awarded prior to her pregnancy.

| Year Awarded | No. Certificates Awarded | Year Vested | Value |
|---|---|---|---|
| 1998 | 120 | 2000 | $73,800 |
| 1999 | 145 | 2001 | $110,200 |
| 2000 | 220 | 2002 | $144,635 |
| 2001 | 325 | 2003 | $116,935 |
| 2002 | 475 | 2004 | $105,797 |
| 2003 | 475 | 2005 | $285,238 |
| 2004 | 315 | 2006 | $152,088 |
| 2005 | 150 | 2007 | $103,830 |

171.   The Bloomberg Certificates awarded to Ms. Lancaster in 2004 and 2005 did not vest because Ms. Lancaster left Bloomberg in or around October 2005.  The values listed above for the 2004 and 2005 Bloomberg Certificates are the values projected for these Bloomberg Certificates when they were awarded.

### Ms. Lancaster's Losses Resulting from Bloomberg's Discrimination and Retaliation

172.   As a result of Bloomberg's discrimination and retaliation, Ms. Lancaster has suffered

substantial loss of income and employment-related benefits.

173. As a result of Bloomberg's discrimination and retaliation, Ms. Lancaster has suffered substantial harm to her reputation in the financial community, adverse effects on her career, diminished earning capacity, and substantial harm and emotional distress.

## JANET LOURES' EMPLOYMENT HISTORY AT BLOOMBERG

174. Plaintiff-Intervenor Janet Loures, the mother of two (2) children, has been employed by Bloomberg since in or around 1989 through the present, and currently works for Bloomberg as a Profiles Analyst, a relatively low level position.

175. Prior to having children, Ms. Loures had received regular promotions and increases in pay, and was considered by many to be a rising star within the Bloomberg organization including being featured in the October/November 1999 issue of the Bloomberg publication "Bloomberg Pulse."

176. In this regard, by 2001, Ms. Loures had risen through the ranks to a senior management level position, reporting directly to Michael Bloomberg as Interim Director of Bloomberg's Princeton, New Jersey office.

177. As Interim Director, Ms. Loures supervised approximately one thousand (1000) Bloomberg employees.  Now, seventeen (17) years after Ms. Loures began working for Bloomberg, she is in virtually the same position as the position in which she started doing essentially entry level work, while her similarly situated male peers, many of whom she at one time supervised, are in senior management level positions.

178. The initial catalyst for this long downward spiral was Ms. Loures' first pregnancy and maternity leave in 2001, which occurred while she was Interim Director of the Princeton

office.

179.   The events since that time constitute a chain of discrimination and disparate treatment, marked by repeated demotions, dwindling opportunities for advancement, and decreases in compensation.

180.   Ultimately, Ms. Loures was stripped of all meaningful managerial responsibilities in January 2006.

## 1989 through September 2005

181.   Ms. Loures started working at Bloomberg in September 1989 following her graduation from college and has thus worked for the company for virtually her entire adult life.

182.   Ms. Loures began as an analyst (at a salary of $19,500) and worked her way up in the organization holding various positions within the company.

183.   In 1998, Ms. Loures was given the task of evaluating all the data quality procedures within the Data Division and reporting these results to Michael Bloomberg and Stuart Bell (the previous Global Data Manager).

184.   Based on her prior performance, in 1999 Ms. Loures was asked to create a new Quality Assurance Department to focus on the quality of Bloomberg's data.

185.   As the manager of the Quality Assurance Department, Ms. Loures managed approximately 190 employees, and regularly worked 12 hour days to get the Quality Assurance Department off the ground.

186.   In December 2000, after his announcement that he was running for Mayor of New York City, Michael Bloomberg announced that he would be conducting a management rotation as he did his succession planning.

187. Michael Bloomberg asked all of the company's senior managers to step out of their roles as he selected a CEO.

188. At this time, Ms. Loures was asked to act as Interim Global Data Manager of Bloomberg's Princeton, New Jersey offices.

189. Ms. Loures accepted this position, pursuant to which she reported directly to Michael Bloomberg, and attended a weekly conference call with all senior managers.

190. Bloomberg's Global Data Division at time encompassed approximately 1200 employees – 1000 of which were based out of Princeton, and all of whom reported to Ms. Loures.

191. Ms. Loures worked in this capacity as the Interim Global Data Manager from January 2001 through March 2001.

192. During this period, Ms. Loures appointed a product manager within the Quality Assurance Department to take over her responsibilities. It was also during this period that Ms. Loures became pregnant with her first child.

## Ms. Loures Was Discriminated Against After Becoming Pregnant

193. Ms. Loures' first maternity leave occurred from October 23, 2001 through February 19, 2002.

194. In March 2001, it had been announced that Beth Mazzeo would assume the responsibility for the Global Data Operations out of the Princeton office.

195. Ms. Mazzeo formally assumed this position in April 2001. Ms. Loures worked closely with Ms. Mazzeo over the next few months to assist her in getting acclimated to her new responsibilities.

196. In June 2001, Ms. Mazzeo asked Ms. Loures and another manager, Hank Kelbaugh, to

help her restructure Bloomberg's Global Data Division.  After many weeks of restructuring planning alongside Ms. Mazzeo, Ms. Mazzeo was scheduled to present the new structure to Lex Fenwick, the newly appointed CEO, during the first or second week of September 2001.

197.    Due to the terrorist attacks on September 11, 2001, this announcement was delayed until the first week of October 2001.

198.    After the realization that the announcement would be delayed - but not knowing exactly for how long - Ms. Mazzeo asked Ms. Loures (then 34 weeks pregnant) to "hold on" as long as she could stating that it was important that both Ms. Loures and Mr. Kelbaugh both be present since they represented in Ms. Mazzeo's own words "the two core business groups".

199.    During the week of October 5, 2001, Ms. Mazzeo announced the restructuring to the entire office using an organizational chart created by Ms. Loures.  Pursuant to this restructuring, Ms. Loures was put in her charge of a new department titled the "New Issuance Markets Department", consisting of 192 employees divided into 5 separate groups, Translations, Data License/Web/Imaging, New Issuance, TREQ Administration and Global Bonds.

200.    Pursuant to this restructuring, Ms. Loures was also to be the Manager for Bloomberg's London Global Data Division, in which capacity she was to supervise an additional 200 employees, meaning that a total of approximately 400 employees would be under Ms. Loures' supervision.

201.    On Monday, October 23, 2001, as Ms. Loures was leaving work to begin her maternity leave, Ms. Mazzeo escorted Ms. Loures to her car.  Ms. Mazzeo thanked Ms. Loures for

all of her help and told her "You take care of yourself and that baby and don't worry about anything here your job will be waiting for you when you get back."

202.    In February 2002, prior to returning from maternity leave, Ms. Loures visited the office to meet with Ms. Mazzeo. At that time, Ms. Mazzeo informed Ms. Loures that she had thought about the structure of Bloomberg's London Global Data Division and that when Ms. Loures returned, that Division would continue to report to Ms. Mazzeo, as they had been reporting during Ms. Loures' absence.

203.    There was no mention of any other changes mentioned and the meeting ended.

204.    Ms. Loures returned from maternity leave on February 19, 2002 to the position she had left on October 23, 2001, i.e. Department Manager of New Issuance Department, which had been renamed the Security Issuance Department in her absence.

205.    However, almost immediately following Ms. Loures' return from her maternity leave, various groups that had previously reported to her began to be assigned instead to Mr. O'Grady, the male manager who had filled in for Ms. Loures as the Manager of the Security Issuance Department during Ms. Loures' maternity leave.

206.    When Ms. Loures complained about this to Ms. Mazzeo, Ms. Mazzeo commented that just because Ms. Loures went on leave that she could not expect the business to stand still, and that Mr. Fenwick had given her ultimate autonomy to run the business (the Data Division), including restructuring groups if necessary.

207.    Thereafter, Mr. O'Grady reported directly to Ms. Mazzeo, retaining responsibility for the "core business groups," while Ms. Loures retained responsibility for the other non-core product groups in Global Data as follows: Data License/Web Indexing/Imaging, TREQ

32

Admin and Translations.

208.    In later meetings between Ms. Loures and Ms. Mazzeo, Ms. Mazzeo attempted to justify
Mr. O'Grady's position by saying that the restructuring in October 2001 was really not
complete when Ms. Loures left on maternity leave, a comment which made little sense in
that Ms. Mazzeo had gone to the trouble of announcing the restructuring to hundreds of
people using a Power Point presentation.

209.    While Ms. Loures did not agree with the subsequent restructuring which adversely
affected her position, she continued to work on plans for the groups for which she
maintained responsibility.

210.    Thereafter, in or around June 2002, Ms. Loures' supervisory responsibility was further
diminished when the TREQ group was removed from her control.  At this point, Ms.
Loures had been back from her maternity leave for only four (4) months.

211.    On or about October 17, 2002, Ms. Mazzeo requested a meeting with Ms. Loures.  At this
meeting, Ms. Mazzeo stated that she was transferring the data license group portion of the
Data Licensing/Web Imaging Team to a "core product group" since it allegedly made
more structural sense.

212.    This resulted in eleven (11) fewer employees reporting to Ms. Loures.

213.    During this meeting, Ms. Loures disagreed with Ms. Mazzeo's decision, and stated that
she did not believe that any additional benefit would be gained from this switch, but did
not argue the point as Ms. Mazzeo had clearly been given absolute authority to make any
management changes she deemed necessary.

214.    On this occasion, Ms. Mazzeo again told Ms. Loures that she would be in line for other

33

opportunities down the road.

215.   Ms. Loures suffered various physical manifestations resulting from the stress associated with her repeated unwarranted demotions.  Some of these physical manifestations were very serious in nature.

216.   On or about February 19, 2003, one (1) year to the day from the date of Ms. Loures' return from maternity leave, Mr. O'Grady and Ms. Loures' departments were officially divided as follows:

Mr. O'Grady's  Dept: Security Issuance:

| Groups: | Money Markets/Loans<br>Ratings/Corp. Actions<br>Structured Finance<br>New Issuance<br>Global Mkt. Debt |
|---|---|
| Employees: | 110 |

Ms. Loures' Dept:   Data Resources:

| Groups: | Translations<br>Data License/Web/Imaging<br>TREQ Administration |
|---|---|
| Employees: | 60 |

217.   Accordingly, prior to her leaving on maternity leave, Ms. Loures was responsible for supervising approximately four hundred (400) employees.  However, within one (1) year of her return from maternity leave, this number had been reduced to sixty (60) for no legitimate business reason.

218.   From the first day that Ms. Loures had returned from her maternity leave, she had been forced to operate in a hostile work environment as she futilely attempted to make up

whatever ground the company perceived her to have lost during her maternity leave.

### Ms. Loures Was Discriminated Against Following Her Second Pregnancy and Maternity Leave

219.  Ms. Loures' second maternity leave occurred from October 20, 2003 through April 7, 2004.

220.  At the time Ms. Loures went on this maternity leave, through hard work she had somewhat resurrected her career at Bloomberg, and in March 2003 she was asked to take over additional management responsibility for the Quality Assurance Department, with a total of 112 employees reporting to her.  At the time, Ms. Loures was four (4) weeks pregnant with her second child, but had not yet announced this fact to the company.

221.  Ms. Loures was hospitalized for pre-term labor in September 2003.  Upon information and belief, the stress associated with working in such a hostile work environment was a contributing factor in her deteriorating health and pregnancy complications.

222.  During Ms. Loures' second maternity leave, Mark Zoldi served as Department Manager for Ms. Loures' department.

223.  However, when Ms. Loures returned from her leave on April 9, 2004, her responsibilities were immediately reduced, with Ms. Loures' department being divided between Ms. Loures and Mr. Zoldi as follows:

Mr. Zoldi's Dept:

| | |
|---|---|
| Groups: | New Issues Quality Assurance; Dynamic Data Quality Assurance, Mutual Funds Quality Assurance, Creative Strategy |
| Employees: | 93 |

35

Ms. Loures' Dept:

|  | Groups: | Data Resources; Translations |
|--|---------|------------------------------|
|  | Employees: | 20 |

224. When dividing up the department, Ms. Mazzeo told Ms. Loures "Mark [Zoldi] just really got going with QA so I'm not going to take him out" and "you have already made your mark on QA and now I want to see where he can take it".

225. Ms. Loures objected, saying that she had just had the group transferred over prior to her leave, and had not had time to implement any changes.

226. However, Ms. Mazzeo citing a "restructuring" was unreceptive to any further conversation regarding this issue, other than to tell Ms. Loures not to "worry" about losing responsibility for Quality Assurance.

227. Again, Ms. Mazzeo attempted to rationalize the restructuring by stating that Ms. Loures hadn't lost anything, which in actuality could not have been further from the truth.

228. Simply put, Ms. Loures was not returned to a like position as mandated by Bloomberg's policy.

229. On or about September 20, 2005, Ms. Loures attended the 9:30 AM weekly managers meeting. At this meeting, Ms. Mazzeo informed the managers present that because of the departure of Kevin Iraca, another manager, she needed to redistribute some responsibilities as she had been instructed by Thomas Secunda, a principal of Bloomberg, that department managers should have equal responsibilities and direct reports.

230. Thereafter, the group of managers, including Ms. Loures, spent the entire day reviewing each group and deciding how to split the responsibilities such that each manager had

responsibility for an equal number of employees.

231.    At the conclusion of this meeting, it was decided that Ms. Loures was to assume

responsibility for Profiles and Bloomberg Law, for which she would have over one

hundred (100) direct reports.

232.    Thereafter, one (1) week later, on September 27, 2005, Ms. Loures attended the weekly

managers meeting and immediately noticed strange looks from the other department

managers when she entered the room.

233.    Ms. Mazzeo then humiliated Ms. Loures by informing her in front of her colleagues that

she had been removed from the plan, a fact that appeared to already have been known by

everyone else present in the room.

234.    Thereafter, on or about September 27, 2005, Ms. Mazzeo told Ms. Loures that she had

rescinded her offer to expand Ms. Loures' management responsibilities due to downsizing

at the Princeton site and that the Bloomberg Law and Profiles groups would easily be

handled by the current manager, Mr. Whitman.

235.    However, upon information and belief, within a year, Mr. Whitman was relieved of his

duties as escalation manager of NY Global Data because he allegedly had "too many

responsibilities" and needed to focus on some core projects.  The group was then

transferred to Mr. Warms.

### Ms. Loures' January 2006 Demotion

236.    From November 20-23, 2005, Ms. Loures attended a "Global Leadership Forum" in New

York City, which was a three (3) day intensive retreat for Bloomberg managers.

237.    At the time of the retreat, Ms. Loures was employed as a Translations Coordinator, with

supervisory responsibility for twenty-three (23) employees, a position she had held since she had returned from her second maternity leave in April 2004.

238.   As part of the process, on the first day of the retreat, Ms. Loures received a "360 Personal Feedback Report" (the "Feedback Report").

239.   This Feedback Report was established as a result of review forms distributed to nine (9) of Ms. Loures' colleagues at Bloomberg, including her direct supervisor, Ms. Mazzeo, Bloomberg's Global Data Manager.

240.   Ms. Loures was stunned when she read the Feedback Report, as her ratings from Ms. Mazzeo were extremely negative in key areas and were significantly lower than those she had received from her peers and subordinates in these key areas.

241.   Although the participants had been instructed to view all criticism as constructive, upon reviewing the Feedback Report, Ms. Loures immediately became concerned that she was being set-up for a demotion, because in the five (5) years that Ms. Mazzeo had been her direct supervisor, she had never received any negative feedback or evaluations from her.

242.   Notably, while Ms. Mazzeo had been Ms. Loures' supervisor since in or around April 2001, and during this five (5) year period, Ms. Mazzeo had never provided Ms. Loures with any written goals or with any written feedback.

243.   Indeed, although Ms. Loures was supposed to receive an annual performance review, she never received one from Ms. Mazzeo, meaning that her last formal review occurred in September 2000 when she was reviewed by her prior supervisor, Stuart Bell.

244.   Ms. Loures viewed Ms. Mazzeo's comments in the Feedback Report as purposefully destructive, as she was aware that the comments would be viewed by Bloomberg's senior

38

managers.

245. Thereafter, on December 9, 2005, Ms. Loures met with Ms. Mazzeo at Ms. Mazzeo's request. This was Ms. Loures' first meeting with Ms. Mazzeo since the leadership retreat.

246. Ms. Loures brought to the meeting the "Leadership Development Plan" she had created for herself based upon the Feedback Report.

247. However, instead of discussing the contents of Ms. Loures' Development Plan, Ms. Mazzeo quickly stated she did not feel that Ms. Loures was a competent manager, and that this was evidenced by the feedback contained in the Feedback Report.

248. Ms. Loures calmly disagreed, and asked for specific examples as to why she was allegedly not a competent manager, which Ms. Mazzeo was unable to provide.

249. Upon information and belief, Ms. Mazzeo was unable to provide any specific examples to Ms. Loures because she had never made such observations previously, and was relying solely on the feedback, some of which she directly authored, as an excuse for pushing Ms. Loures out of her position as Translations Coordinator and out of management entirely.

250. Ms. Mazzeo then became visibly agitated and told Ms. Loures that the Translations Department would be moving to Hank Kelbaugh, another male manager, and that Ms. Loures would need to find a new job.

251. Ms. Mazzeo further informed Ms. Loures that she wasn't any good at management, and could not lead people, as evidenced by the Feedback Report.

252. Accordingly, since becoming pregnant in 2001, Ms. Loures had gone from managing 1,000 Bloomberg employees as "Interim Global Manager" and directly reporting to Michael Bloomberg, to being incapable of managing anyone according to Ms. Mazzeo.

253. Ms. Mazzeo then informed Ms. Loures that she wanted her to work on Bloomberg's Process Analysis Team, which represented a significant demotion for Ms. Loures.

254. Ms. Mazzeo tried to convince Ms. Loures that a move to the Process Analysis Team would not been frowned upon within Bloomberg, and told Ms. Loures that there were many paths that an employee at Bloomberg could take to be successful other than management.

255. When Ms. Loures calmly tried to reopen the topic and state her disagreement with Ms. Mazzeo's assessment of her skills, she was abruptly rebuffed by Ms. Mazzeo.

256. At the conclusion of the brief meeting, Ms. Loures was stripped of her managerial responsibilities, and given no other choice but to accept the demotion to data analyst (the same position in which Ms. Loures started seventeen (17) years ago, and a position three (3) levels below Translations Coordinator), in order to keep her job.

### Juxtaposition of Ms. Loures To Similarly Situated Male Colleagues

257. The discrimination which Ms. Loures has faced at Bloomberg is perhaps best exemplified by the fact that seventeen (17) years after Ms. Loures began working for Bloomberg, she is in virtually the same position as she started, while her similarly situated male peers, many of whom she at one time supervised, are now in senior management level positions.

258. In this regard, while the aforementioned "restructurings" served to eventually strip Ms. Loures of all of her management responsibility, male managers continuously reaped the benefits of these restructurings. The following are some examples of how, commencing with Ms. Loures' return from her first pregnancy leave in February 2002, Ms. Loures' responsibilities were divided out to other male managers:

| | |
|---|---|
| Neil O'Grady: | Mr. O'Grady reported to Ms. Loures in 2001 as a Product Manager. He is now a Department Manager of the portion of Ms. Loures' department that was "restructured" in 2002. |
| Mark Zoldi: | Mr. Zoldi assumed responsibilities for Ms. Loures while she was on her second maternity leave.  He retained control of Quality Assurance due to a "restructuring" after Ms. Loures returned from her second leave in April 2004.  Mr. Zoldi was later given increased responsibilities within Security Issuance under Mr. O'Grady and Quality Assurance was transferred to Mr. Warms. |
| Pete Warms: | Mr. Warms assumed the responsibilities for three (3) of Ms. Loures' previous groups:  Quality Assurance, Data License and TREQ Admin.  All of the groups were transferred at different times, after Ms. Loures became pregnant. |
| Hank Kelbaugh: | Mr. Kelbaugh assumed responsibility for the Translations team in January 2006 due to a "synergistic restructuring". |

259.   It is also worth noting that Mr. Whitman, another male department manager, reported to Ms. Loures in 1998 as a data analyst, in 1999 as a Product Manager and again in 2001 as a Product Manager.  Mr. Whitman is now Ms. Loures' supervisor three (3) levels above her in the organizational structure, as Ms. Loures is a data analyst, the same title she held seventeen (17) years ago when she was hired.

260.   As a data analyst, Ms. Loures essentially now spends her days at Bloomberg verifying information and checking data files, work that could be performed by an entry level

employee.

## Decreases in Compensation and Retaliation

261.    In addition to the Ms. Loures' repeated demotions, she has also suffered repeated

decreases in her compensation, most notably to amount of Bloomberg Certificates she has

been awarded. In this regard, Ms. Loures was awarded 250 Bloomberg Certificates in

2003, 165 in 2004, 135 in 2005 and 100 in 2006, following her most recent demotion.

This represents a year over year decrease of 60% in the amount of Bloomberg Certificates

awarded to Ms. Loures since 2003.

262.    Upon information and belief, following the filing of Ms. Loures' Charge of Discrimination

with the EEOC in October 2006, Bloomberg has also retaliated against Ms. Loures in

connection with the performance of her duties at Bloomberg.

263.    Specifically, as part of Ms. Loures' responsibilities as a Data Analyst, whenever there are

problems with the transmission or receipt of vendor files, Ms. Loures is required to fill out

a "ticket" requesting programming investigation and/or support to resolve the issue.

264.    A prompt response to these types of problems whenever they arise is critical to Ms. Loures

being able to adequately perform her job.

265.    However, upon information and belief, since Ms. Loures filed her Charge in October 2006,

Bloomberg has intentionally failed to bring the issues raised in Ms. Loures' tickets to

resolution by either ignoring her tickets, refusing to act upon her tickets by withdrawing

them, only partially completing the work required to be performed, or ostensibly fixing the

problem completely, only to have the same problem resurrect itself shortly thereafter.

266.    In so doing, Bloomberg has unlawfully retaliated against Ms. Loures, and has attempted to

create pretextual performance problems for Ms. Loures at Bloomberg.

### Ms. Loures' Losses Resulting from Bloomberg's Discrimination and Retaliation

267. As a result of Bloomberg's discrimination and retaliation, Ms. Loures has suffered substantial loss of income and employment-related benefits.

268. During the foregoing process of demotions and other negative actions by Bloomberg intended to force Ms. Loures out of the Company, Ms. Loures has suffered the worst possible forms of humiliation in Bloomberg's working environment.  In the October/November 1999 issue of the Bloomberg publication, "Bloomberg Pulse," Ms. Loures was described as one of Bloomberg's rising stars.  However, after her first pregnancy, Ms. Loures was subjected to a wide variety of insults to her business reputation and her business career, such as being made to look the "fool" in front of her peers by the disparate treatment of Bloomberg management like Beth Mazzeo.  The emotional distress that Ms. Loures suffered resulted in a wide variety of physical ailments for which Ms. Loures was forced to seek medical care.

269. As a result of Bloomberg's discrimination and retaliation, Ms. Loures has suffered substantial harm to her reputation in the financial community, adverse effects on her career, diminished earning capacity, and substantial harm and emotional distress.

### AS AND FOR A FIRST CAUSE OF ACTION FOR GENDER DISCRIMINATION ON BEHALF OF JILL PATRICOT PURSUANT TO TITLE VII AND TITLE I

270. Plaintiff-Intervenor Jill Patricot repeats and realleges the allegations contained in paragraphs "1" through "269" with the same force and effect as if set forth at length herein.

271. Based upon the foregoing, Bloomberg has discriminated against Ms. Patricot based upon her

gender in violation of Title VII and Title I and has damaged her thereby.

272.   The discriminatory conduct of Bloomberg substantially interfered with Ms. Patricot's employment and created an intimidating, hostile, and offensive work environment in violation of Title VII.

273.   As a direct and proximate result of the unlawful employment practices of Bloomberg, Ms. Patricot has suffered the indignity of gender discrimination, the invasion of her right to be free from gender discrimination, and great humiliation.

274.   As a further and proximate result of these unlawful employment practices, Ms. Patricot has suffered extreme mental anguish, depression, severe disruption of her personal and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

275.   As a result of Bloomberg's violation of Title VII, Ms. Patricot has been damaged in an amount to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotion distress, for adverse effects on her career and for diminished earning capacity resulting from the discriminatory actions of Bloomberg.

276.   Moreover, because Bloomberg's conduct constitutes a malicious, willful, and reckless violation of Title VII, Ms. Patricot is entitled to punitive damages in the sum of Three Hundred Thousand Dollars ($300,000.00) Dollars to punish and deter continuation of Bloomberg's unlawful employment practices.

277.   Ms. Patricot is further entitled to pre-judgment interest on all monies awarded to her, as well as reasonable attorney's fees and costs as provided by Title VII.

## AS AND FOR A SECOND CAUSE OF ACTION FOR RETALIATION ON BEHALF OF JILL PATRICOT PURSUANT TO TITLE VII AND TITLE I

278.  Plaintiff-Intervenor Jill Patricot repeats and realleges the allegations contained in paragraphs "1" through "277" with the same force and effect as if set forth at length herein.

279.  Based upon the foregoing, Bloomberg has retaliated against Ms. Patricot in violation of Title VII and Title I and has damaged her thereby.

280.  The retaliatory conduct of Bloomberg substantially interfered with Ms. Patricot's employment and created an intimidating, hostile, and offensive work environment in violation of Title VII.

281.  As a further and proximate result of these unlawful employment practices, Ms. Patricot has suffered extreme mental anguish, depression, severe disruption of her personal and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

282.  As a direct and proximate result of the unlawful employment of Bloomberg in violation of Title VII, Ms. Patricot has been damaged in an amount to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotional distress, for adverse effects on her career, and for diminished earning capacity resulting from the retaliatory actions of Bloomberg.

283.  Moreover, because Bloomberg's conduct constitutes a malicious, willful, and reckless violation of Title VII, Ms. Patricot is entitled to punitive damages in the sum of Three Hundred Thousand ($300,000.00) Dollars to punish and deter continuation of Bloomberg's unlawful employment practices.

284.  Ms. Patricot is further entitled to pre-judgment interest on all monies awarded to her, as well as reasonable attorney's fees and costs as provided by Title VII.

## AS AND FOR A THIRD CAUSE OF ACTION FOR GENDER DISCRIMINATION ON BEHALF OF JILL PATRICOT PURSUANT TO STATE HRL

285.  Plaintiff-Intervenor Jill Patricot repeats and realleges the allegations contained in paragraphs "1" through "284" with the same force and effect as if set forth at length herein.

286.  Based upon the foregoing, Bloomberg has discriminated against Ms. Patricot, based upon her gender in violation of the State HRL and has damaged her thereby.

287.  The discriminatory conduct of Bloomberg substantially interfered with Ms. Patricot's employment and created an intimidating, hostile, and offensive work environment in violation of the State HRL.

288.  As a direct and proximate result of the unlawful employment practices of Bloomberg, Ms. Patricot has suffered the indignity of gender discrimination, the invasion of her right to be free from gender discrimination, and great humiliation.

289.  As a further and proximate result of these unlawful employment practices, Ms. Patricot has suffered extreme mental anguish, depression, severe disruption of her personal and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

290.  As a result of Bloomberg's violation of the State HRL, Ms. Patricot has been damaged in an amount to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotional distress, for adverse effects on her career and for diminished earning capacity resulting from the discriminatory and retaliatory actions of Bloomberg.

291.  Ms. Patricot is further entitled to pre-judgment interest on all monies awarded to her.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR RETALIATION ON BEHALF OF JILL PATRICOT PURSUANT TO STATE HRL

46

292.  Plaintiff-Intervenor Jill Patricot repeats and realleges the allegations contained in paragraphs "1" through "291" with the same force and effect as if set forth at length herein.

293.  Based upon the foregoing, Bloomberg has retaliated against Ms. Patricot in violation of the State HRL and has damaged her thereby.

294.  The retaliatory conduct of Bloomberg substantially interfered with Ms. Patricot's employment and created an intimidating, hostile, and offensive work environment in violation of the State HRL.

295.  As a further and proximate result of these unlawful employment practices, Ms. Patricot has suffered extreme mental anguish, depression, severe disruption of her personal and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

296.  As a direct and proximate result of the unlawful employment practices of Bloomberg in violation of the State HRL, Ms. Patricot has been damaged in an amount to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotional distress, for adverse effects on their careers, and for diminished earning capacity resulting from the retaliatory actions of Bloomberg.

297.  Ms. Patricot is further entitled to pre-judgment interest on all monies awarded to her.

## AS AND FOR A FIFTH CAUSE OF ACTION FOR GENDER DISCRIMINATION ON BEHALF OF JILL PATRICOT PURSUANT TO CITY HRL

298.  Plaintiff-Intervenor Jill Patricot repeats and realleges the allegations contained in paragraphs "1" through "297" with the same force and effect as if set forth at length herein.

299.  Based upon the foregoing, Bloomberg has discriminated against Ms. Patricot based upon her

gender in violation of the City HRL and has damaged her thereby.

300.   The discriminatory conduct of Bloomberg substantially interfered with Patricot's employment and created an intimidating, hostile, and offensive work environment in violation of the City HRL.

301.   As a direct and proximate result of the unlawful employment practices of Bloomberg, Ms. Patricot has suffered the indignity of gender discrimination, the invasion of her right to be free from gender discrimination, and great humiliation.

302.   As a further and proximate result of these unlawful employment practices, Ms. Patricot has suffered extreme mental anguish, depression, severe disruption of her personal and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

303.   As a result of Bloomberg's violation of the City HRL, Ms. Patricot has been damaged in an amount to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotional distress, for adverse effects on her career and for diminished earning capacity resulting from the discriminatory actions of Bloomberg.

304.   Moreover, because Bloomberg's conduct constitutes a malicious, willful, and reckless violation of the City HRL, Ms. Patricot is entitled to punitive damages in the sum of Thirty-Two Million ($32,000,000.00) Dollars to punish and deter continuation of Bloomberg's unlawful employment practices.

305.   Plaintiff Intervenor Patricot is further entitled to pre-judgment interest on all monies awarded to them, as well as reasonable attorney's fees and costs as provided by the City HRL.

## AS AND FOR A SIXTH CAUSE OF ACTION FOR RETALIATION ON BEHALF OF JILL PATRICOT PURSUANT TO CITY HRL

306.   Plaintiff-Intervenor Jill Patricot repeats and realleges the allegations contained in paragraphs "1" through "305" with the same force and effect as if set forth at length herein.

307.   Based upon the foregoing, Bloomberg has retaliated against Ms. Patricot in violation of the City HRL and has damaged her thereby.

308.   The retaliatory conduct of Bloomberg substantially interfered with Ms. Patricot's employment and created an intimidating, hostile, and offensive work environment in violation of the City HRL.

309.   As a further and proximate result of these unlawful employment practices, Ms. Patricot has suffered extreme mental anguish, depression, severe disruption of her personal and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

310.   As a direct and proximate result of the unlawful employment practices of Bloomberg in violation of the City HRL, Ms. Patricot has been damaged in an amount to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotional distress, for adverse effects on her career, and for diminished earning capacity resulting from the retaliatory actions of Bloomberg.

311.   Moreover, because Bloomberg's conduct constitutes a malicious, willful, and reckless violation of the City HRL, Ms. Patricot is entitled to punitive damages in the sum of Thirty-Two Million ($32,000,000.00) Dollars to punish and deter continuation of Bloomberg's unlawful employment practices.

312.   Ms. Patricot is further entitled to pre-judgment interest on all monies awarded to her, as well

as reasonable attorney's fees and costs as provided by the City HRL.

## AS AND FOR A SEVENTH CAUSE OF ACTION FOR GENDER DISCRIMINATION ON BEHALF OF TANYS LANCASTER PURSUANT TO TITLE VII AND TITLE I

313.     Plaintiff-Intervenor Tanys Lancaster repeats and realleges the allegations contained in paragraphs "1" through "312" with the same force and effect as if set forth at length herein.

314.     Based upon the foregoing, Bloomberg has discriminated against Ms. Lancaster based upon her gender in violation of Title VII and Title I and has damaged her thereby.

315.     The discriminatory conduct of Bloomberg substantially interfered with Ms. Lancaster's employment and created an intimidating, hostile, and offensive work environment in violation of Title VII.

316.     As a direct and proximate result of the unlawful employment practices of Bloomberg, Ms. Lancaster has suffered the indignity of gender discrimination, the invasion of her right to be free from gender discrimination, and great humiliation.

317.     As a further and proximate result of these unlawful employment practices, Ms. Lancaster has suffered extreme mental anguish, depression, severe disruption of her personal and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

318.     As a result of Bloomberg's violation of Title VII, Ms. Lancaster has been damaged in an amount to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotion distress, for adverse effects on her career and for diminished earning capacity resulting from the discriminatory actions of Bloomberg.

319.     Moreover, because Bloomberg's conduct constitutes a malicious, willful, and reckless

violation of Title VII, Ms. Lancaster is entitled to punitive damages in the sum of Three Hundred Thousand Dollars ($300,000.00) Dollars to punish and deter continuation of Bloomberg's unlawful employment practices.

320.   Ms. Lancaster is further entitled to pre-judgment interest on all monies awarded to her, as well as reasonable attorney's fees and costs as provided by Title VII.

## AS AND FOR A EIGHTH CAUSE OF ACTION FOR RETALIATION ON BEHALF OF TANYS LANCASTER PURSUANT TO TITLE VII AND TITLE I

321.   Plaintiff-Intervenor Tanys Lancaster repeats and realleges the allegations contained in paragraphs "1" through "320" with the same force and effect as if set forth at length herein.

322.   Based upon the foregoing, Bloomberg has retaliated against Ms. Lancaster in violation of Title VII and Title I and has damaged her thereby.

323.   The retaliatory conduct of Bloomberg substantially interfered with Ms. Lancaster's employment and created an intimidating, hostile, and offensive work environment in violation of Title VII.

324.   As a further and proximate result of these unlawful employment practices, Ms. Lancaster has suffered extreme mental anguish, depression, severe disruption of her personal and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

325.   As a direct and proximate result of the unlawful employment practices of Bloomberg in violation of Title VII, Ms. Lancaster has been damaged in an amount to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotional distress, for adverse effects on her career, and for diminished earning capacity resulting from the retaliatory actions of Bloomberg.

326.    Moreover, because Bloomberg's conduct constitutes a malicious, willful, and reckless violation of Title VII, Ms. Lancaster is entitled to punitive damages in the sum of Three Hundred Thousand ($300,000.00) Dollars to punish and deter continuation of Bloomberg's unlawful employment practices.

327.    Ms. Lancaster is further entitled to pre-judgment interest on all monies awarded to her, as well as reasonable attorney's fees and costs as provided by Title VII.

## AS AND FOR A NINTH CAUSE OF ACTION FOR GENDER DISCRIMINATION ON BEHALF OF TANYS LANCASTER PURSUANT TO STATE HRL

328.    Plaintiff-Intervenor Tanys Lancaster repeats and realleges the allegations contained in paragraphs "1" through "327" with the same force and effect as if set forth at length herein.

329.    Based upon the foregoing, Bloomberg has discriminated against Ms. Lancaster, based upon her gender in violation of the State HRL and has damaged her thereby.

330.    The discriminatory conduct of Bloomberg substantially interfered with Ms. Lancaster's employment and created an intimidating, hostile, and offensive work environment in violation of the State HRL.

331.    As a direct and proximate result of the unlawful employment practices of Bloomberg, Ms. Lancaster has suffered the indignity of gender discrimination, the invasion of her right to be free from gender discrimination, and great humiliation.

332.    As a further and proximate result of these unlawful employment practices, Ms. Lancaster has suffered extreme mental anguish, depression, severe disruption of her personal and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

333.    As a result of Bloomberg's violation of the State HRL, Ms. Lancaster has been damaged in

an amount to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotional distress, for adverse effects on her career and for diminished earning capacity resulting from the discriminatory actions of Bloomberg.

334.  Ms. Lancaster is further entitled to pre-judgment interest on all monies awarded to her.

## AS AND FOR A TENTH CAUSE OF ACTION FOR RETALIATION ON BEHALF OF TANYS LANCASTER PURSUANT TO STATE HRL

335.  Plaintiff-Intervenor Jill Patricot repeats and realleges the allegations contained in paragraphs "1" through "334" with the same force and effect as if set forth at length herein.

336.  Based upon the foregoing, Bloomberg has retaliated against Ms. Lancaster in violation of the State HRL and has damaged her thereby.

337.  The retaliatory conduct of Bloomberg substantially interfered with Ms. Lancaster's employment and created an intimidating, hostile, and offensive work environment in violation of the State HRL.

338.  As a further and proximate result of these unlawful employment practices, Ms. Lancaster has suffered extreme mental anguish, depression, severe disruption of her personal and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

339.  As a direct and proximate result of the unlawful employment practices of Bloomberg in violation of the State HRL, Ms. Lancaster has been damaged in an amount to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotional distress, for adverse effects on her career, and for diminished earning capacity resulting from the retaliatory actions of Bloomberg.

340.   Ms. Lancaster is further entitled to pre-judgment interest on all monies awarded to her.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION FOR GENDER DISCRIMINATION ON BEHALF OF TANYS LANCASTER PURSUANT TO CITY HRL

341.   Plaintiff-Intervenor Tanys Lancaster repeats and realleges the allegations contained in paragraphs "1" through "340" with the same force and effect as if set forth at length herein.

342.   Based upon the foregoing, Bloomberg has discriminated against Ms. Lancaster based upon her gender in violation of the City HRL and has damaged her thereby.

343.   The discriminatory conduct of Bloomberg substantially interfered with Ms. Lancaster's employment and created an intimidating, hostile, and offensive work environment in violation of the City HRL.

344.   As a direct and proximate result of the unlawful employment practices of Bloomberg, Ms. Lancaster has suffered the indignity of gender discrimination, the invasion of her right to be free from gender discrimination, and great humiliation.

345.   As a further and proximate result of these unlawful employment practices, Ms. Lancaster has suffered extreme mental anguish, depression, severe disruption of her personal and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

346.   As a result of Bloomberg's violation of the City HRL, Ms. Lancaster has been damaged in an amount to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotional distress, for adverse effects on her career and for diminished earning capacity resulting from the discriminatory actions of Bloomberg.

347.   Moreover, because Bloomberg's conduct constitutes a malicious, willful, and reckless

violation of the City HRL, Ms. Patricot is entitled to punitive damages in the sum of Thirty-Two Million ($32,000,000.00) Dollars to punish and deter continuation of Bloomberg's unlawful employment practices.

348.   Plaintiff Intervenor Tanys Lancaster is further entitled to pre-judgment interest on all monies awarded to her, as well as reasonable attorney's fees and costs as provided by the City HRL.

## AS AND FOR A TWELFTH CAUSE OF ACTION FOR RETALIATION ON BEHALF OF TANYS LANCASTER PURSUANT TO CITY HRL

349.   Plaintiff-Intervenor Tanys Lancaster repeats  and realleges the allegations contained in paragraphs "1" through "348" with the same force and effect as if set forth at length herein.

350.   Based upon the foregoing, Bloomberg has retaliated against Ms. Lancaster in violation of the City HRL and has damaged her thereby.

351.   The  retaliatory  conduct of Bloomberg substantially interfered with Ms. Lancaster's employment and created an  intimidating, hostile, and offensive work environment in violation of the City HRL.

352.   As a further and proximate result of these unlawful employment practices, Ms. Lancaster has suffered extreme mental anguish, depression, severe disruption of  her personal  and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

353.   As a direct and proximate result of the unlawful employment practices of Bloomberg in violation of the City HRL, Ms. Lancaster has been damaged in an amount to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotional distress, for adverse effects on her career, and for diminished earning capacity resulting from the retaliatory actions of Bloomberg.

354. Moreover, because Bloomberg's conduct constitutes a malicious, willful, and reckless violation of the City HRL, Ms. Lancaster is entitled to punitive damages in the sum of Thirty-Two Million ($32,000,000.00) Dollars to punish and deter continuation of Bloomberg's unlawful employment practices.

355. Ms. Lancaster is further entitled to pre-judgment interest on all monies awarded to her, as well as reasonable attorney's fees and costs as provided by the City HRL.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION FOR GENDER DISCRIMINATION ON BEHALF OF JANET LOURES PURSUANT TO TITLE VII AND TITLE I

356. Plaintiff-Intervenor Janet Loures repeats and realleges the allegations contained in paragraphs "1" through "355" with the same force and effect as if set forth at length herein.

357. Based upon the foregoing, Bloomberg has discriminated against Ms. Loures based upon her gender in violation of Title VII and Title I and has damaged her thereby.

358. The discriminatory conduct of Bloomberg substantially interfered with Ms. Loures' employment and created an intimidating, hostile, and offensive work environment in violation of Title VII.

359. As a direct and proximate result of the unlawful employment practices of Bloomberg, Ms. Loures has suffered the indignity of gender discrimination, the invasion of her right to be free from gender discrimination, and great humiliation.

360. As a further and proximate result of these unlawful employment practices, Ms. Loures has suffered extreme mental anguish, depression, severe disruption of her personal and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

361. As a result of Bloomberg's violation of Title VII, Ms. Loures has been damaged in an amount

to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotion distress, for adverse effects on her career and for diminished earning capacity resulting from the discriminatory actions of Bloomberg.

362.    Moreover, because Bloomberg's conduct constitutes a malicious, willful, and reckless violation of Title VII, Ms. Loures is entitled to punitive damages in the sum of Three Hundred Thousand Dollars ($300,000.00) Dollars to punish and deter continuation of Bloomberg's unlawful employment practices.

363.    Ms. Loures is further entitled to pre-judgment interest on all monies awarded to her, as well as reasonable attorney's fees and costs as provided by Title VII.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION FOR RETALIATION ON BEHALF OF JANET LOURES PURSUANT TO TITLE VII AND TITLE I

364.    Plaintiff-Intervenor Janet Loures repeats and realleges the allegations contained in paragraphs "1" through "363" with the same force and effect as if set forth at length herein.

365.    Based upon the foregoing, Bloomberg has retaliated against Ms. Loures in violation of  Title VII and Title I and has damaged her thereby.

366.    The retaliatory conduct of Bloomberg substantially interfered with Ms. Loures' employment and created an intimidating, hostile, and offensive work environment in violation of Title VII.

367.    As a further and proximate result of these unlawful employment practices, Ms. Loures has suffered extreme mental anguish, depression, severe disruption of her personal and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

368.    As a direct and proximate result of the unlawful employment of Bloomberg in violation of

Title VII, Ms. Loures has been damaged in an amount to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotional distress, for adverse effects on her career, and for diminished earning capacity resulting from the retaliatory actions of Bloomberg.

369. Moreover, because Bloomberg's conduct constitutes a malicious, willful, and reckless violation of Title VII, Ms. Loures is entitled to punitive damages in the sum of Three Hundred Thousand ($300,000.00) Dollars to punish and deter continuation of Bloomberg's unlawful employment practices.

370. Ms. Loures is further entitled to pre-judgment interest on all monies awarded to her, as well as reasonable attorney's fees and costs as provided by Title VII.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION FOR GENDER DISCRIMINATION ON BEHALF OF JANET LOURES PURSUANT TO STATE HRL

371. Plaintiff-Intervenor Janet Loures repeats and realleges the allegations contained in paragraphs "1" through "370" with the same force and effect as if set forth at length herein.

372. Based upon the foregoing, Bloomberg has discriminated against Ms. Loures, based upon her gender in violation of the State HRL and has damaged her thereby.

373. The discriminatory conduct of Bloomberg substantially interfered with Ms. Loures' employment and created an intimidating, hostile, and offensive work environment in violation of the State HRL.

374. As a direct and proximate result of the unlawful employment practices of Bloomberg, Ms. Loures has suffered the indignity of gender discrimination, the invasion of her right to be free from gender discrimination, and great humiliation.

375.    As a further and proximate result of these unlawful employment practices, Ms. Loures has suffered extreme mental anguish, depression, severe disruption of her personal and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

376.    As a result of Bloomberg's violation of the State HRL, Ms. Loures has been damaged in an amount to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotional distress, for adverse effects on her career and for diminished earning capacity resulting from the discriminatory and retaliatory actions of Bloomberg.

377.    Ms. Loures is further entitled to pre-judgment interest on all monies awarded to her.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION FOR RETALIATION ON BEHALF OF JANET LOURES PURSUANT TO STATE HRL

378.    Plaintiff-Intervenor Janet Loures    repeats and realleges the allegations contained in paragraphs "1" through "377" with the same force and effect as if set forth at length herein.

379.    Based upon the foregoing, Bloomberg has retaliated against Ms. Loures in violation of the State HRL and has damaged her thereby.

380.    The retaliatory conduct of Bloomberg substantially interfered with Ms. Loures' employment and created an intimidating, hostile, and offensive work environment in violation of the State HRL.

381.    As a further and proximate result of these unlawful employment practices, Ms. Loures has suffered extreme mental anguish, depression, severe disruption of  her personal  and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

382.    As a direct and proximate result of the unlawful employment practices of Bloomberg in

violation of the State HRL, Ms. Loures has been damaged in an amount to be determined, but believed to exceed Sixteen  Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotional distress, for adverse effects on their careers, and for diminished earning capacity resulting from the retaliatory actions of Bloomberg.

383.   Ms. Loures is further entitled to pre-judgment interest on all monies awarded to her.

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION FOR GENDER DISCRIMINATION OF BEHALF OF JANET LOURES PURSUANT TO CITY HRL

384.   Plaintiff-Intervenor Janet Loures repeats and realleges the allegations contained in paragraphs "1" through "383" with the same force and effect as if set forth at length herein.

385.   Based upon the foregoing, Bloomberg has discriminated against Ms. Loures  based upon her gender in violation of the City HRL  and has damaged her thereby.

386.   The discriminatory conduct of  Bloomberg substantially interfered with Loures' employment and created an intimidating, hostile, and offensive work environment in violation of the City HRL.

387.   As a direct and proximate result of the unlawful employment practices of Bloomberg, Ms. Loures  has suffered the indignity of gender discrimination, the invasion of her right to be free from gender discrimination, and great humiliation.

388.   As a further and proximate result of these unlawful employment practices, Ms. Loures has suffered  extreme  mental  anguish,  depression,  severe  disruption  of  her  personal  and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

389.   As a result of Bloomberg's violation of the City HRL, Ms. Loures has been damaged in an amount to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for

compensatory damages for injury to her reputation, for emotional distress, for adverse effects on her career and for diminished earning capacity resulting from the discriminatory actions of Bloomberg.

390.   Moreover, because Bloomberg's conduct constitutes a malicious, willful, and reckless violation of the City HRL, Ms. Loures is entitled to punitive damages in the sum of Thirty-Two Million ($32,000,000.00) Dollars to punish and deter continuation of Bloomberg's unlawful employment practices.

391.   Plaintiff Intervenor Janet Loures is  further entitled to pre-judgment interest on all monies awarded to her, as well as reasonable attorney's fees and costs as provided by the City HRL.

## AS AND FOR AN EIGHTEENTH CAUSE OF ACTION FOR RETALIATION ON BEHALF OF JANET LOURES  PURSUANT TO CITY HRL

392.   Plaintiff-Intervenor Janet Loures repeats and realleges the allegations contained in paragraphs "1" through "391" with the same force and effect as if set forth at length herein.

393.   Based upon the foregoing, Bloomberg has retaliated against Ms. Loures in violation of the City HRL  and has damaged her thereby.

394.   The retaliatory conduct of Bloomberg substantially interfered with Ms. Loures' employment and created an intimidating, hostile, and offensive work environment in violation of the City HRL.

395.   As a further and proximate result of these unlawful employment practices, Ms. Loures has suffered extreme mental anguish, depression, severe disruption of her personal  and professional life and loss of enjoyment in the ordinary pleasures of everyday life.

396.    As a direct and proximate result of the unlawful employment practices of Bloomberg in violation of the City HRL, Ms. Loures has been damaged in an amount to be determined, but believed to exceed Sixteen Million ($16,000,000) dollars, for compensatory damages for injury to her reputation, for emotional distress, for adverse effects on her career, and for diminished earning capacity resulting from the retaliatory actions of Bloomberg.

397.    Moreover, because Bloomberg's conduct constitutes a malicious, willful, and reckless violation of the City HRL, Ms. Loures is entitled to punitive damages in the sum of Thirty-Two Million ($32,000,000.00) Dollars to punish and deter continuation of Bloomberg's unlawful employment practices.

398.    Ms. Loures is further entitled to pre-judgment interest on all monies awarded to her, as well as reasonable attorney's fees and costs as provided by the City HRL.

**WHEREFORE,** Plaintiffs-Intervenors pray this honorable Court for judgment:

a)    On the First Cause of Action, in favor of the Plaintiff-Intervenor Jill Patricot and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages; for punitive damages in the amount of Three Hundred Thousand ($300,000) Dollars; for pre-judgment interest on all monies awarded to Ms. Patricot; and for reasonable attorney's fees and costs.

b)    On the Second Cause of Action, in favor of the Plaintiff-Intervenor Jill Patricot and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages; for punitive damages in the amount of Three Hundred Thousand ($300,000) Dollars; for pre-judgment interest on all monies awarded to Ms. Patricot; and for reasonable attorney's fees and costs.

c)  On the Third Cause of Action, in favor of the Plaintiff-Intervenor Jill Patricot and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages and for pre-judgment interest on all monies awarded to Ms. Patricot.

d)  On the Fourth Cause of Action, in favor of the Plaintiff-Intervenor Jill Patricot and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages and for pre-judgment interest on all monies awarded to Ms. Patricot.

e)  On the Fifth Cause of Action, in favor of the Plaintiff-Intervenor Jill Patricot and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages; for punitive damages in the amount of Thirty Two Million ($32,000,000) Dollars; for pre-judgment interest on all monies awarded to Ms. Patricot; and for reasonable attorney's fees and costs.

f)  On the Sixth Cause of Action, in favor of the Plaintiff-Intervenor Jill Patricot and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages; for punitive damages in the amount of Thirty Two Million ($32,000,000) Million Dollars; for pre-judgment interest on all monies awarded to Ms. Patricot; and for reasonable attorney's fees and costs.

g)  On the Seventh Cause of Action, in favor of the Plaintiff-Intervenor Tanys Lancaster and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages; for punitive damages in the amount of Three Hundred Thousand ($300,000) Dollars; for pre-judgment interest on all monies

awarded to Ms. Lancaster; and for reasonable attorney's fees and costs.

h) On the Eighth Cause of Action, in favor of the Plaintiff-Intervenor Tanys Lancaster and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages; for punitive damages in the amount of Three Hundred Thousand ($300,000) Dollars; for pre-judgment interest on all monies awarded to Ms. Lancaster; and for reasonable attorney's fees and costs.

I) On the Ninth Cause of Action, in favor of the Plaintiff-Intervenor Tanys Lancaster and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages and for pre-judgment interest on all monies awarded to Ms. Lancaster.

j) On the Tenth Cause of Action, in favor of the Plaintiff-Intervenor Tanys Lancaster and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages and for pre-judgment interest on all monies awarded to Ms. Lancaster.

k) On the Eleventh Cause of Action, in favor of the Plaintiff-Intervenor Tanys Lancaster and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages; for punitive damages in the amount of Thirty Two Million ($32,000,000) Million Dollars; for pre-judgment interest on all monies awarded to Ms. Lancaster; and for reasonable attorney's fees and costs.

l) On the Twelfth Cause of Action, in favor of the Plaintiff-Intervenor Tanys Lancaster and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages; for punitive damages in the amount

of Thirty Two Million ($32,000,000) Million Dollars; for pre-judgment interest on all monies awarded to Ms. Lancaster; and for reasonable attorney's fees and costs.

m) On the Thirteenth Cause of Action, in favor of the Plaintiff-Intervenor Janet Loures and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages; for punitive damages in the amount of Three Hundred Thousand  ($300,000) Dollars; for pre-judgment interest on all monies awarded to Ms. Loures; and for reasonable attorney's fees and costs.

n) On the Fourteenth Cause of Action, in favor of the Plaintiff-Intervenor Janet Loures and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages; for punitive damages in the amount of Three Hundred Thousand  ($300,000) Dollars; for pre-judgment interest on all monies awarded to Ms. Loures; and for reasonable attorney's fees and costs.

o) On the Fifteenth Cause of Action, in favor of the Plaintiff-Intervenor Janet Loures and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages and for pre-judgment interest on all monies awarded to Ms. Loures.

p) On the Sixteenth Cause of Action, in favor of the Plaintiff-Intervenor Janet Loures and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages and for pre-judgment interest on all monies awarded to Ms. Loures.

q) On the Seventeenth Cause of Action, in favor of the Plaintiff-Intervenor Janet Loures and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen

Million ($16,000,000) Dollars for compensatory damages; for punitive damages in the amount of Thirty Two Million ($32,000,000) Million Dollars; for pre-judgment interest on all monies awarded to Ms. Loures; and for reasonable attorney's fees and costs.

r)   On the Eighteenth Cause of Action, in favor of the Plaintiff-Intervenor Janet Loures and against Defendant Bloomberg in an amount to be determined but believed to exceed Sixteen Million ($16,000,000) Dollars for compensatory damages; for punitive damages in the amount of Thirty Two Million ($32,000,000) Million Dollars; and for pre-judgment interest on all monies awarded to Ms. Loures; and for reasonable attorney's fees and costs.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs-Intervenors demand a trial by jury on all claims properly triable by a jury.

Dated: New York, New York
        October 2, 2007

Yours, etc.

DEALY & SILBERSTEIN, LLP

By: _____
        William J. Dealy (WD 9776)
        Milo Silberstein (MS 4637)
        *Attorneys for Plaintiffs-Intervenors Jill Patricot, Tanys Lancaster and Janet Loures*
        225 Broadway, Suite 1405
        New York, New York 10007
        (212) 385-0066