IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,                                          :

                Plaintiff,              :        07-CV-8383 (LAP/HP)

            v.                        :        ECF ACTION

BLOOMBERG L.P.,                                      :

                Defendant.              :

-------------------------------------------------------------- x
                               :

JILL PATRICOT, TANYS LANCASTER,
JANET LOURES, MONICA PRESTIA,            :
MARINA KUSHNIR and MARIA
MANDALAKIS,                                          :

              Plaintiff-Intervenors,      :

            v.                        :

BLOOMBERG L.P.,                                      :

                Defendant.              :

-------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION
## TO EXCLUDE THE REPORTS AND TESTIMONY OF DR. EUGENE BORGIDA

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................................ ii

BACKGROUND ............................................................................................................... 2

ARGUMENT .................................................................................................................... 7

I.  DR. BORGIDA'S PROPOSED OPINION AND TESTIMONY SHOULD BE
EXCLUDED BECAUSE THEY ARE UNRELIABLE .................................................... 8

II.  DR. BORGIDA'S PROPOSED OPINION AND TESTIMONY SHOULD BE
EXCLUDED BECAUSE THEY ARE IRRELEVANT .................................................. 16

III.  DR. BORGIDA SHOULD BE PRECLUDED FROM OFFERING ANY
CASE-SPECIFIC OPINION ABOUT BLOOMBERG ................................................. 18

CONCLUSION ............................................................................................................... 20

i

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ........................................................................8

*Amos v. Rent-A-Center, Inc.*,
No. 00-6289, 2001 WL 36095915 (S.D. Fla. Dec. 13, 2001) ...........10, 11

*Barber v. United Airlines*,
17 F. App'x 433 (7th Cir. 2001) ..............................................................11, 12

*Collier v. Bradley University*,
113 F. Supp. 2d 1235 (C.D. Ill. 2000) ..............................................10, 11, 12

*Cooper v. Southern Co.*,
205 F.R.D. 596 (N.D. Ga. 2001), *aff'd* 390 F.3d 695 (11th Cir. 2004)...............................20

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ........................................................................7, 8, 12, 16

*Downey v. The Coalition Against Rape & Abuse, Inc.*,
No. 99-3370, slip op. (D.N.J. Sept. 17, 2003) .....................................16, 17

*EEOC v. Morgan Stanley & Co.*,
324 F. Supp. 2d 451 (S.D.N.Y. 2004) .................................................19

*EEOC v. Morgan Stanley & Co.*,
No. 01 Civ. 8421, 2004 WL 1542264 (S.D.N.Y. July 8, 2004) ..........19, 20

*EEOC v. Wal-Mart Stores, Inc.*,
No. 6:01-CV-339 KKC, 2010 WL 583681 (E.D. Ky. Feb. 16, 2010) .................17, 18, 19, 20

*Hnot v. Willis Group Holdings Ltd.*,
No. 01 CIV 6558, 2007 WL 1599154 (S.D.N.Y. June 1, 2007) ..........16

*In re Fosamax Prods. Liab. Litig.*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009) .................................................14

*In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*,
MDL No. 1358, 2008 WL 2324112 (S.D.N.Y. June 5, 2008) ............8

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004) .................................................12

*Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*,
470 F. Supp. 2d 345 (S.D.N.Y. 2007) .................................................16

*Israel v. Spring Indus., Inc.*,
  No. 98 CV 5106, 2006 WL 3196956 (E.D.N.Y. Nov. 3, 2006) ................................. 11

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ............................................................................................. 14, 16

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*,
  No. 03 Civ. 7037 (PKC), 2005 WL 4684238 (S.D.N.Y. Apr. 11, 2005) ..................... 9

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005) ................................................................................. 12, 13

*Ray v. Miller Meester Advertising, Inc.*,
  664 N.W.2d 355 (Minn. Ct. App. 2003) ........................................................... 16, 17, 18

*Robinson v. Metro-North Commuter R.R. Co.*,
  175 F.R.D. 46 (S.D.N.Y. 1997) ................................................................................. 20

*Roniger v. McCall*,
  No. 97 Civ. 8009 (RWS), 2000 WL 1191078 (S.D.N.Y. Aug. 22, 2000) ..................... 9

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
  No. 98 Civ. 8272 (RPP), 2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003) ("*Rowe I*") ....... 9, 14

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
  No. 98 CV 8272, 2003 WL 22272587 (S.D.N.Y. Oct. 2, 2003) ("*Rowe II*") ....... 11, 13, 14, 15

*Serrano v. Cintas Corp.*,
  Nos. 04-40132 & 06-12311, 2009 WL 910702 (E.D. Mich. Mar. 31, 2009) ......................... 19

*United States v. Johnson*,
  588 F. Supp. 2d 997 (S.D. Iowa 2008) ......................................................................... 8

*United States v. Williams*,
  506 F.3d 151 (2d Cir. 2007) ......................................................................................... 8

*Velez v. Novartis Pharm. Corp.*,
  No. 04 Civ. 9194 (CM) (S.D.N.Y. Feb. 25, 2010) (order granting in part and denying
  in part parties' motions in limine) ....................................................................... 17, 18

*Wills v. Amerada Hess Corp.*,
  379 F.3d 32 (2d Cir. 2004) ......................................................................................... 11

*Zenith Elec. Corp. v. WH-TV Broad. Corp.*,
  395 F.3d 416 (7th Cir. 2005) ......................................................................................... 9

## RULES

Federal Rule of Civil Procedure 26(a)(2)(B) .................................................................. 9

Federal Rule of Evidence 403 ......................................................................................7, 8, 18, 20

Federal Rule of Evidence 702 ......................................................................................7, 8

The proposed opinion and testimony of EEOC's proffered expert, Dr. Eugene Borgida, are neither reliable nor relevant, and therefore should be excluded.

Dr. Borgida sweepingly opines that "gender stereotypic thinking more likely than not" influenced employment decisions about pregnant employees and mothers at Bloomberg L.P.. *See, e.g.*, Dreiband Decl. Ex. A at 4 (Borgida Rep.).[1]  Dr. Borgida's opinion is the product of nothing more than his subjective, impressionistic speculation.  Indeed, Dr. Borgida admits that he did not use *any* specific methodology to reach his opinion.  By his own account, he purports to summarize literature about gender stereotypes and to identify supposed characteristics at Bloomberg, gleaned from his one-sided review of incomplete case materials supplied by EEOC, that allegedly trigger stereotypic thinking.  In doing so, he merely searched for and "dog-eared," Dreiband Decl. Ex. B at 72-73, 138 (Borgida Dep.), pages of case materials that, he says, support EEOC's theory of the case, while consciously ignoring counterexamples that cast doubt on that theory.  He did not systematically track or code the case materials.  He does not know precisely when, where, why, or by whom this supposed company-wide gender stereotyping occurred.  He did not seek out, or address in his reports, any contrary evidence or alternative explanations.  In fact, he appears to have relied on direction from EEOC about where to look for examples and which ones to cite in his report.  To make matters worse, he relied on snippets of deposition testimony that he ripped out of context and portrayed in an inaccurate, biased, and misleading manner.

The opinion resulting from this profoundly unscientific process lacks any of the necessary indicia of reliability or relevance.  Dr. Borgida's proposed opinion and testimony

---

[1] Defendant's Memorandum of Law in Support of Defendant's Motion to Exclude the Reports and Testimony of Dr. Eugene Borgida is supported by the Declaration of Eric S. Dreiband, Esq. ("Dreiband Decl.") and accompanying exhibits.

should therefore be excluded in their entirety.  At a minimum, Dr. Borgida should be precluded from offering his prejudicial, unfounded case-specific opinion about gender stereotyping *at Bloomberg*.

## BACKGROUND

1.    EEOC has designated Dr. Eugene Borgida, a psychologist, Ex. A at 1-2, as an expert witness.  Dr. Borgida's principal proposed opinion is that "the social scientific research literature on gender stereotypes and prejudice plays an important role in understanding how *gender stereotypic thinking more likely than not influenced perceptions and evaluations of, and employment decisions about[,] Bloomberg L.P. employees who are mothers and/or pregnant*." Ex. A at 4 (emphasis added).  As Dr. Borgida explained "[i]n summary," he proposes to testify that:

> [T]he *stereotypes* about employees who are mothers and/or pregnant *more likely than not influenced the perceptions, evaluations, and decisions about them at Bloomberg*.  The cultural and organizational context at Bloomberg more likely than not activated the gender stereotype about mothers as less competent and as less agentic and less committed to their careers.  Given the subjectivity, discretion, and lack of accountability in the *Bloomberg decision making process, stereotypic perceptions more likely than not influenced employment decisions about employees who are mothers and/or pregnant*.

*Id.* at 38-39 (emphasis added).

2.    Dr. Borgida purports to reach this case-specific, causal opinion by applying "a social framework analysis." Ex. A at 4 (emphasis omitted).  His report professes to summarize "research literature on gender stereotyping and gender prejudice" and to "use[] specific examples . . . from . . . case materials to illustrate and highlight the scientific conclusions drawn from the social scientific research that are most applicable to the case at hand." *Id.* at 6.

3.    Dr. Borgida did not "deploy" any "specific methodology" in reaching his causal opinion. Ex. B at 142.  He did not conduct a scientific study or adhere to peer-review standards.

Ex. B at 95-96 ("You know, I was not doing any kind of scientific study here."); *id.* at 101, 105, 114-15, 117, 125, 142; *id.* at 134 ("I didn't conduct . . . a study that would meet peer review standards in this context.  Somebody could do that.  I didn't do that.").

4.     Rather than use a reliable methodology, Dr. Borgida "went through the material" selected by EEOC and "dog-ear[ed]" "examples that [he] thought illustrated" his conclusions. Ex. B at 72-73; *see also id.* at 138, 147, 150, 156, 158.  While he was aware of examples that contradicted his opinion, he did not cite *any* such examples in his report or explain how, if at all, they factored into his conclusion.  *See* Ex. B at 170 ("I did not include the examples that were contrary or disconfirming in the report . . . .  [T]he approach that I took led me to pick illustrations of the point affirmatively . . . ."); *see also id.* at 94-99.  Indeed, he "didn't systematically go through and track [counterexamples]" or "use a written coding system" for any of the materials, whether confirming or "disconfirming," because "[t]hat wasn't [his] goal."  Ex. B at 96, 151.  Instead, he repeatedly invoked the application of his "expertise" to the case materials as the basis for his conclusion.  Ex. B at 80, 88, 133, 141, 174.

5.     Dr. Borgida testified that a more systematic approach was possible.  *See* Ex. B at 99 ("I'd have to go back to the materials and then systematically re-review all of those materials and take copious notes of what was said when, and then put them in a spreadsheet and then sort of rotate that so that I have some sort of, you know, printout of what was said when—what was allegedly said when, to whom, and under what circumstances.").  He simply "didn't do that" here.  Ex. B at 99.

6.     Dr. Borgida reviewed only material provided and selected by EEOC.  *See* Ex. B at 145, 149.  He made no effort to ensure that the materials that he reviewed were representative. *See* Ex. B at 164, 167 ("I do not have a sense of how representative that set of materials [that he

reviewed] is with regard to whatever constitutes the entire set."); *id.* at 93 (acknowledging that he had not "scrutinized the population of decisions" at Bloomberg). He "assume[d]," but made no effort to verify or "measure," that the materials he reviewed covered the relevant class period. *Id.* at 97. Dr. Borgida did not interview or examine any witnesses, observe claimants in the workplace, conduct focus groups, review statistical analyses that EEOC provided him, or otherwise verify the veracity of the materials that he received from EEOC. *See, e.g.*, *id.* at 122-27, 171-72. Instead, he simply assumed the validity of, and relied heavily on, the allegations of the claimants in this case, which constitute nearly half of the citations to case materials in his report. *See* Dreiband Decl. Ex. C ¶ 34 (Tetlock Rep.). He did not ask EEOC for any additional information to test his conclusions. *See* Ex. B at 45-51, 57.

7.      In the weeks before Dr. Borgida submitted his report, he asked EEOC to provide any "better examples" of the "points" that he told EEOC that he "wanted to make." Ex. B at 149-50. In turn, more than 40% of the record cites that appear in Dr. Borgida's report can be found in the deposition snippets that EEOC sent him just before his report was due. *See* Ex. C ¶ 33.

8.      Dr. Borgida initially testified that he assumed all deposition testimony was true, *see* Ex. B at 165-66, and that he accepted the testimony of claimants as true, *see id.* at 161-62. He then admitted that he made credibility determinations—based on incomplete and, at times, incorrect information—about the testimony of company representatives.

a.      For instance, as one example of Bloomberg's supposed "emphasis on loyalty and commitment," Dr. Borgida relied on deposition testimony by Peter Grauer, Chairman of Bloomberg, in which Mr. Grauer supposedly "rejected 'raising a family' as an exception" to Bloomberg's policy of not rehiring employees who leave the company. Ex. A at 20-21. In fact,

however, Mr. Grauer testified that Bloomberg's no-rehire policy did *not* apply to employees who left for family or other personal reasons—as Dr. Borgida admitted at his deposition. *See* Ex. B at 199-200. Dr. Borgida nevertheless discounted Mr. Grauer's deposition testimony and chose to credit instead an ambiguous e-mail in which Mr. Grauer supposedly wrote that he was "'inclined to take . . . out'" the family exception to the no-rehire policy. Ex. A at 20-21. But the e-mail that Dr. Borgida reviewed did not include the entire exchange, in which the missing part (which had been provided in full as part of Bloomberg's document production) reveals Mr. Grauer's view that Bloomberg should *retain* the family exception to the no-rehire policy. *See* Ex. B at 209; *see also* Ex. C ¶ 47. Even when presented with the full exchange, however, Dr. Borgida testified that he was not prepared to "back off" from the characterization in his report. *See* Ex. B at 213.

        b.      Similarly, in arriving at his erroneous conclusion about the family exception to the no-rehire policy, Dr. Borgida ignored and effectively discredited contradictory deposition testimony of Michael Bloomberg about the period before 2001, in which Mr. Bloomberg stated that "[i]f [employees] took time off for family things or to do public service, which includes working in the government, we've always been willing to hire them back if they want to come back." Dreiband Decl. Ex. D at 42 (Bloomberg Dep.); *see also* Ex. C ¶ 50. Elsewhere in his report, however, Dr. Borgida credited *other* nearby portions of Mr. Bloomberg's testimony that supported Dr. Borgida's claims about the company's corporate culture. *See* Ex. A at 18-19.

        9.      Based on this approach, Dr. Borgida reached his opinion that "stereotypic thinking more likely than not" influenced evaluations and decisions about women at Bloomberg who were pregnant and/or mothers. Dr. Borgida testified about the breadth of his opinion, stating that, "[i]n theory," *every* woman at Bloomberg had a decision made about her during the

class period that was influenced by gender stereotypes. Ex. B at 108-09. Dr. Borgida defined "more likely than not" as greater than 50% but less than 100%, *id.* at 85, a range that reflects "a level of certainty that [he] attach[es] to it subjectively." *Id.* at 87. Dr. Borgida effectively intuited this conclusion: "[I]n knowing the research as I do, and in seeing and reading what I read and saw, and in looking at the relationship between what I expected and what I saw, I attached a more likely than not expression to . . . that." *Id.* at 87. In explaining his subjective determination, he is unable to identify examples of gender stereotypic thinking or of decisions influenced by such thinking in each of the months or years in the class period, *see id.* at 98-99; by each of the managers at Bloomberg, *see id.* at 90; within each department at the company, *see id.* at 85-86; or affecting each woman in the company, *see id.* at 105-06, 110. He is unable to determine the number of decisions at Bloomberg that he believes were affected by gender stereotypic thinking. *See id.* at 373. He is unable to assess alternative explanations for the decisions on which he opined, such as whether women who were pregnant and/or mothers had weaker performance records or were less interested in their work than others. *See id.* at 171-74. And he is unable to state whether the gender stereotypic thinking that he attributes to Bloomberg is intentional or not. *See id.* at 443-45.

10.    Bloomberg engaged Dr. Philip Tetlock, a psychologist and the Mitchell Endowed Professor at the Haas School of Business, University of California, Berkeley, "to review [Dr. Borgida's] report" and "assess the soundness of" Dr. Borgida's "methods" and "opinions." Ex. C ¶ 1. Dr. Tetlock concludes that Dr. Borgida, "a seasoned social scientist[,] *repeatedly and knowingly* disregarded the scientific principles that he has honored throughout his own three-decade research career and employed a biased approach that *predictably* led to" errors both in his case specific opinions and in his literature review. *Id.* ¶¶ 9-11 (emphasis in original).

11.     Dr. Tetlock notes that Dr. Borgida's Report contains descriptions of case materials that are inaccurate and incomplete, and that Dr. Borgida's Report "cites remarks by claimants that were contradicted through other testimony—including other testimony of the claimants themselves." Ex. C ¶ 37. *See also id.* ¶¶ 37-42, 45-53 (providing examples of Dr. Borgida's inaccurate portrayal of deposition testimony).

12.     In sum, Dr. Tetlock concludes that:

> The Borgida Report is a prime example of work by a social scientist who, by training and prior research, ought to be keenly aware of basic scientific norms for drawing causal inferences and of the dangers of relying on subjective hunches, yet who willingly opines that gender bias 'more likely than not' affected personnel decisions about Bloomberg based only on his personal feelings after reading an unrepresentative sample of case materials hand-selected by his client, without conducting any analysis of any specific decisions inside Bloomberg, much less a systematic analysis of comparably situated employees in each job in each unit of Bloomberg.

*Id.* ¶ 179. EEOC does not challenge the admissibility of Dr. Tetlock's opinions. *See* Dreiband Decl. Ex. E (EEOC Mar. 15, 2010 letter to the Court).

## ARGUMENT

Expert testimony "can be both powerful and quite misleading." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). Federal judges must therefore exclude proffered expert evidence under Federal Rules of Evidence 702 and 403 unless they are convinced that it is scientifically reliable, that it speaks clearly and directly to a disputed issue in the case, and that it will not mislead the trier of fact. *Id.*

Specifically, Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rules 702 and 403, as interpreted by the Supreme Court in *Daubert*, 509 U.S. at 590-91, require district courts to engage in a "rigorous" analysis of both the *reliability* and the *relevance* of proposed expert testimony. *See, e.g.*, *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). The party offering an expert's testimony has the burden to establish that it satisfies these reliability and relevance standards. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). Courts within the Second Circuit consistently exclude expert testimony that does not satisfy these exacting standards. *See, e.g.*, *Amorgianos*, 303 F.3d at 267. Dr. Borgida's proposed opinion and testimony should be excluded because they are unreliable and irrelevant.

## I.    DR. BORGIDA'S PROPOSED OPINION AND TESTIMONY SHOULD BE EXCLUDED BECAUSE THEY ARE UNRELIABLE

Courts have identified several related circumstances in which expert opinions and testimony must be excluded as unreliable. Dr. Borgida's proposed opinions and testimony exhibit each of these hallmarks of unreliability. Because he has not used any reliable method to reach his sweeping conclusion about company-wide stereotypic thinking at Bloomberg, his opinion and testimony should be excluded.

*First*, an expert must explain the method that led to his conclusion and make his analysis transparent, so that another individual with similar qualifications can reproduce and test the proposed analysis. *See, e.g.*, *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, MDL No. 1358, 2008 WL 2324112, at *3-4 (S.D.N.Y. June 5, 2008) (excluding expert opinion because expert "fails to identify any methodology and thereby prevents the Court any means by which to assess the reliability of his opinions"); *see also United States v. Johnson*, 588 F. Supp. 2d 997, 1007 (S.D. Iowa 2008) (explaining that it is "the duty of the researchers to be transparent and to fully incorporate their methodology and conclusions into the Study so that other independent researchers could verify [its] reliability"). Indeed, Dr. Borgida himself has previously opined as

a rebuttal expert witness that a social scientist must "articulate[]" the bases for her opinion "in her report" "[f]or the purpose of independent evaluation and appraisal," and that it is insufficient for an expert merely to "have [those grounds] in mind." Expert Report of Eugene Borgida, Ph.D., *Redmond v. Peter*, Univ. of Nebraska, No. 4:CV95-3223 (D. Neb.), 1996 WL 34395888.

This is because a "witness who invokes '[his] expertise' rather than analytic strategies," and "who supplies nothing but a bottom line" conclusion, neither follows a proper "*scientific* approach[]" nor "supplies [any]thing of value to the judicial process." *Zenith Elec. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419-20 (7th Cir. 2005) (emphasis added); *see also Roniger v. McCall*, No. 97 Civ. 8009 (RWS), 2000 WL 1191078, at *3 (S.D.N.Y. Aug. 22, 2000) (explaining that an expert "must do more than aver conclusorily that his experience led to his opinion"). Indeed, an expert who "either had no method or [failed to] describe one" is "relying on intuition" and speculation, "which won't do." *Zenith*, 395 F.3d at 418.

This requirement of transparency is also mandated by Federal Rule of Civil Procedure 26(a)(2)(B), which provides that an expert's written report must contain "a complete statement of all opinions the witness will express *and the basis and reasons for them*," as well as "the data or other information considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i), (ii) (emphasis added). Thus, if an expert's report fails to include "essential details needed to understand and assess [his] conclusions" or "the methodology that [the expert] used (other than in the most general and unhelpful terms)," it fails to satisfy Rule 26(a)(2)(B) and should be excluded under *Daubert*. *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, No. 03 Civ. 7037 (PKC), 2005 WL 4684238, at *7 (S.D.N.Y. Apr. 11, 2005); *see also Rowe Entm't, Inc. v. William Morris Agency, Inc.*, No. 98 Civ. 8272 (RPP), 2003 WL 22124991, at *1, 9 (S.D.N.Y. Sept. 15, 2003) ("*Rowe I*").

Numerous courts have excluded expert testimony that contravenes these requirements. For example, in *Amos v. Rent-A-Center, Inc.*, No. 00-6289, 2001 WL 36095915 (S.D. Fla. Dec. 13, 2001), the court excluded a psychologist's testimony that plaintiffs were psychologically harmed by alleged racial discrimination because the expert "did not take any notes of what she asked the plaintiffs or their responses" and "did not retain any documents reflecting the procedure she used in evaluating the plaintiffs." *Id.* at *2. Thus, her testimony was unreliable because, "[a]side from the summary of her clinical interviews and the conclusions in her report, there [was] nothing regarding her technique that [could] be reviewed and tested." *Id.*

Similarly, in *Collier v. Bradley University*, 113 F. Supp. 2d 1235 (C.D. Ill. 2000), the court excluded a psychologist's opinion that the plaintiff experienced employment discrimination because the psychologist was "unable to specify what type of methodology she employed," and instead described her methodology as a "gestalt"—an "overall reading"—of the plaintiff's deposition and other case materials. *Id.* at 1245. The expert testified that she "just read [the materials] and pulled [her analysis] together." *Id.* 1244. The court explained that the Federal Rules of Evidence "demand" more than such a "gestalt" approach, which makes an expert's "conclusions . . . impossible to test . . . ." *Id.* at 1246.

Here, Dr. Borgida testified repeatedly that he did not "deploy" any "specific methodology" at all, Ex. B at 142, let alone make his methodology or reasoning transparent in his report. Dr. Borgida merely "went through the material" selected by EEOC and "dog-ear[ed]" "examples that [he] thought illustrated" and supported his conclusions. *Id.* at 72-73; *see also supra* ¶ 4. He did not account for any counterexamples in his report or explain how, if at all, they factor into his conclusion. Ex. B at 170; *see also supra* ¶ 4. He "didn't systematically go through and track" the materials or "use a written coding system." Ex. B at 96, 151. He cannot

explain how he attached a level of certainty to his opinion about the alleged effect of gender stereotypes at Bloomberg, other than to say it is "a level of certainty that [he] attach[es] to it subjectively," *id.* at 87, and based on his own "expertise," *id.* at 80, 88, 133, 141, 174. Like the proposed expert in *Collier*, Dr. Borgida used no discernible methodology other than a "gestalt"—his own "overall reading" of selected case materials. *Collier*, 113 F. Supp. 2d at 1245. In short, Dr. Borgida intuited his subjective, speculative opinion without providing any methodology or reasoning that can be "reviewed and tested." *Amos*, 2001 WL 36095915, at *2. That failure renders his opinion and testimony in this case entirely unreliable.

*Second*, and relatedly, courts have held that reliable expert testimony must consider and refute major counterexamples to the conclusion reached by the expert, and cannot simply rely on cherry-picked data or anecdotes. *See, e.g., Wills v. Amerada Hess Corp.*, 379 F.3d 32, 50 (2d Cir. 2004) (testimony excluded because toxicologist failed to account for other "major risk factors" in reaching his conclusion about the cause of plaintiff's cancer); *Israel v. Spring Indus., Inc.*, No. 98 CV 5106, 2006 WL 3196956, at *5 (E.D.N.Y. Nov. 3, 2006) (reliable expert testimony must "provide a reasonable explanation for dismissing [evidence advanced] by the defendant").

In *Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, for example, this Court excluded a sociologist's testimony as unreliable because, among other things, it did "not attempt to concern itself with the Defendants' evidence." No. 98 CV 8272, 2003 WL 22272587, at *10 (S.D.N.Y. Oct. 2, 2003) ("*Rowe II*"). Similarly, in *Barber v. United Airlines*, 17 F. App'x 433, 437-38 (7th Cir. 2001), the Seventh Circuit upheld the district court's exclusion of unreliable testimony by an aviation expert that "did not adequately explain why he ignored certain facts and data" that "contradicted his opinion," while "accept[ing] . . . testimony and . . . data [that]

supported [it]." The district court correctly held that an expert who "cherry-picked the facts" to offer a causation opinion "fails to satisfy the scientific method and *Daubert*." *Id.*

An expert's reliance on one-sided data renders his testimony all the more unreliable when the expert also makes credibility determinations in the course of cherry-picking evidence. For this reason, this Court has excluded expert testimony that amounted to an "interpretation[] of conduct or views as to the motivation of parties." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004). Similarly, the court in *Collier* excluded a psychologist's opinion that the psychologist reached by crediting 90% of deposition testimony and "discrediting 10% of unspecified testimony." 113 F. Supp. 2d at 1246. Such testimony was " "unreliable" and "fundamentally unhelpful." *Id.* The Second Circuit, "echoed by [its] sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility . . . are inadmissible under Rule 702." *Nimely v. City of New York*, 414 F.3d 381, 397-98 (2d Cir. 2005). "Such testimony does not assist the trier of fact, but rather undertakes to tell the jury what result to reach, and attempts to substitute the expert's judgment for the jury's." *Id.* (quotations omitted).

Dr. Borgida was aware of "disconfirming" examples, but he chose to omit any reference to them in his reports, nor did he track or search for such evidence, because "that wasn't [his] goal." Ex. B at 94-99, 151, 170. Moreover, although Dr. Borgida testified that stereotyping is contextual and may be inhibited by certain organizational factors, *see id.* at 60, he purports to offer a causal opinion about the effect of stereotyping at Bloomberg without even acknowledging any countervailing factors. Rather, his "approach led [him] to pick illustrations of [his] point[s] affirmatively" while omitting any counterexamples from his report. Ex. B at 170. Such

testimony that does "not attempt to concern itself with [contrary] evidence" or alternative explanations, *Rowe II*, 2003 WL 22272587, at *10, is unscientific and unreliable.

Worse yet, by relying on the testimony or actions of company officials when it serves his purposes but discrediting those same company officials elsewhere, Dr. Borgida assumes for himself the role of trier of fact, and contravenes his own declared policy of accepting deposition testimony at face value (a policy he applied consistently to the testimony of class members and selectively to company representatives), *see* Ex. B at 161-62, 166.  For instance, as described above, *see supra* ¶ 8b, Dr. Borgida ignores the sworn deposition testimony of Michael Bloomberg that Bloomberg's no-rehire policy did not apply to employees who left for family reasons, yet Dr. Borgida relies on other testimony by Mr. Bloomberg when doing so served Dr. Borgida's purposes.  Likewise, Dr. Borgida discredits sworn deposition testimony in which Peter Grauer stated that Bloomberg's no-rehire policy did not apply to employees who leave the company to raise a family, and instead credited and misrepresented an ambiguous e-mail in which Mr. Grauer supposedly indicated that he was "inclined" to eliminate the exception.  *See supra* ¶ 8a.  In fact, the dangers and unreliable nature of such an approach are illustrated vividly here, since the e-mail that Dr. Borgida reviewed was incomplete, and in its entirety *confirmed* Mr. Grauer's deposition testimony that the no-rehire policy did not apply to employees who left for family reasons.  *See* Ex. B at 209; Ex. C ¶ 47.  Yet even when the evidentiary basis for his conclusion was shown to be false, Dr. Borgida still would not "back off" from his characterization of the e-mail in his report.  *See* Ex. B at 213; Ex. C ¶ 49.  Because Dr. Borgida improperly made credibility determinations about cherry-picked testimony and zealously ignored contrary evidence, his testimony should be excluded.  *See Nimely*, 414 F.3d at 397-98.

- 13 -

*Third*, courts have excluded proposed expert testimony as unreliable if it is based on unrepresentative data, particularly when an expert obtains such data from an interested party and relies on it uncritically. *See, e.g.*, *Rowe II*, 2003 WL 22272587, at *7, 10 (excluding sociologist's testimony as unreliable because it was based on "anecdotal" support, namely "allegations in the Amended Complaint and on certain other case materials provided by Plaintiffs' counsel, such as Plaintiffs' depositions and on a limited number of other depositions"); *Rowe I*, 2003 WL 22124991, at *3 ("[A]ny expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply.").

Here, Dr. Borgida made no effort to ensure that the materials he reviewed, which were provided and selected entirely by EEOC, *see* Ex. B at 145, 149, were representative of the documents produced in this case or of the population at Bloomberg. *Id.* at 167; *see also supra* ¶ 6. Even more important, just before his report was due, he relied on EEOC to supply him with "better examples" of the "points" that he had already decided to make in his report. Ex. B at 149-50. In turn, more than 40% of the record cites that appear in Dr. Borgida's report can be found in the deposition excerpts that he received from EEOC in response to his request. *See* Ex. C ¶ 33.

*Fourth*, an expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 188 (S.D.N.Y. 2009) (excluding testimony of epidemiologist who "applie[d] in his own work a more rigorous methodology before making causal determinations than he ha[d] in forming his opinions in this case").

Dr. Borgida's work here fails that standard. In fact, Dr. Borgida admitted numerous times that he did not follow the scientific principles and methods required to reach reliable causal and descriptive inferences, as he does in his out-of-court work, *see* Ex. B at 134, 292, and he testified that he did not conduct any "scientific study" at all. *Id.* at 95-96, 101, 105, 114, 117, 125. A more "systematic[]" approach to the case materials was possible, but he simply "didn't do that" here. *Id.* at 99.

By contrast, as Dr. Tetlock describes, Dr. Borgida's academic work has "followed the requirements for conducting a reliable documentary analysis," including independent and systematic data collection (rather than relying exclusively on materials provided "by a party with an interest in the outcome of the study"), "coding" the data, and "building in checks for reliability and bias." Ex. C ¶¶ 29-30. "Dr. Borgida's work in this case satisfied none of the basic requirements for reaching reliable, unbiased conclusions." *Id.* ¶ 30.

In sum, Dr. Borgida's subjective, impressionistic, and unfounded conclusion that gender stereotypic "thinking more likely than not" affected decisions about women at Bloomberg who are pregnant and/or mothers contravenes numerous benchmarks of reliability. At bottom, he simply uses no method that would support such a sweeping conclusion—let alone a reproducible method that is based on representative data, that considers major counterarguments, or that displays the same level of scientific rigor, independence, and objectivity that characterize the practice of an expert in the field. Courts have held repeatedly that such unreliable opinions are inadmissible. *See, e.g.*, *Rowe II*, 2003 WL 22272587, at *7, 10. Indeed, Dr. Borgida's own testimony has previously been excluded because, among other reasons, he "failed to establish any credible grounds supporting the link between his general theories on gender stereotyping and his opinion that gender stereotyping of [a particular] plaintiff resulted in her termination . . . ."

Dreiband Decl. Ex. F at 14 (*Downey v. The Coalition Against Rape & Abuse, Inc.*, No. 99-3370, slip op., at 14 (D.N.J. Sept. 17, 2003)).

To be sure, expert testimony concerning social framework analysis has also been admitted in different circumstances. *See, e.g.*, *Hnot v. Willis Group Holdings Ltd.*, No. 01 CIV 6558, 2007 WL 1599154, at *1-4 (S.D.N.Y. June 1, 2007) (admitting Dr. Borgida's testimony where, among other things, defendants' "own counter-expert" "agree[d] that Dr. Borgida's basic methods [were] scientifically appropriate"); *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 355 (S.D.N.Y. 2007) (admitting Dr. Borgida's testimony in single-plaintiff discrimination case). But nothing in these cases or any others excuses a social scientist from complying with Rule 702 and using a reliable methodology appropriate for the particular opinion that he offers. *See generally Kumho*, 526 U.S. at 147-48 (explaining that the *Daubert* standards apply to all expert witnesses, including social scientists). Because Dr. Borgida has not used any reliable methodology to reach his sweeping, company-wide conclusion that gender stereotyping more likely than not affected decisions about pregnant women and mothers at Bloomberg, his opinion and the reports and testimony that he offers in support of it should be excluded.

## II.    DR. BORGIDA'S PROPOSED OPINION AND TESTIMONY SHOULD BE EXCLUDED BECAUSE THEY ARE IRRELEVANT

Dr. Borgida's proposed opinion and testimony should be excluded for another independent reason: They are irrelevant and do not fit the facts or legal issues of this case.

In *Ray v. Miller Meester Advertising, Inc.*, 664 N.W.2d 355 (Minn. Ct. App. 2003), the court of appeals held that the trial court abused its discretion by admitting Dr. Borgida's irrelevant testimony. Dr. Borgida summarized literature about gender stereotyping, cited "illustrat[ive]" statements by the defendant's employees about the plaintiff, and concluded that

gender stereotyping "played a role in understanding the [plaintiff's] termination." *Id.* at 365.  He admitted that, in reaching this conclusion, "he did not attempt to do 'any type of scientific study'" and did not consider potential countervailing evidence.  *Id.*  Instead, he proposed to offer a "framework" based solely on applying "research literature" to his review of certain "pleadings, affidavits, and depositions in the case."  *Id.*  The court held that Dr. Borgida's "testimony was not sufficiently helpful to the fact-finders to satisfy rule 702 requirements" because Dr. Borgida's testimony about gender stereotyping in general was common knowledge among "virtually all adults" and his case-specific record analysis added nothing that could "be uncovered only with the help of [an] expert, such as a statistical demonstration."  *Id.* at 366.  *See also, e.g.*, *Downey*, Ex. F at 28 (excluding Dr. Borgida's social framework testimony as unhelpful); Dreiband Decl. Ex. G (*Velez v. Novartis Pharm. Corp.*, No. 04 Civ. 9194 (CM) (S.D.N.Y. Feb. 25, 2010)) (order granting in part and denying in part parties' motions in limine), at 9-10 (excluding testimony of Professor Deborah L. Rhode as "unnecessary" and unhelpful, because expert proposed merely to "contextualize and evaluate" the "testimony of witnesses and documents and other exhibits" with which the jury would be presented).

In *EEOC v. Wal-Mart Stores, Inc.*, No. 6:01-CV-339 KKC, 2010 WL 583681 (E.D. Ky. Feb. 16, 2010), the court also excluded proposed social framework analysis as irrelevant.  The court explained that, while EEOC alleged that the defendant *intentionally* discriminated against women, the proposed testimony of EEOC's social framework expert, Dr. William Bielby, "makes clear that gender stereotyping does not even necessarily include intentional discrimination," and can instead "occur subconsciously."  *Id.* at *3.  Because such "subconscious," unintentional discrimination is not pertinent to the alleged *intentional* discrimination at issue in the case, the court "exclude[d] Dr. Bielby's testimony as irrelevant."

*Id.*; *see also Downey*, Ex. F at 18 (excluding "Dr. Borgida's testimony as to [certain] defendants' perceptions or conduct toward plaintiff" because his testimony was "not relevant to proving any facts supporting such a claim").

Dr. Borgida's testimony here should likewise be excluded as irrelevant. Dr. Borgida's abstract testimony about gender stereotyping literature addresses nothing beyond the ordinary comprehension of "virtually all adults." *Ray*, 664 N.W.2d at 366. And his one-sided, unsystematic recounting of "illustrat[ions]" from the case materials, Ex. B at 72-73, is unhelpful to determine the central issue in this case—whether EEOC can prove that Bloomberg engaged in a pattern or practice of intentional discrimination. *See Ray*, 664 N.W.2d at 366; *Velez*, Ex. G, order, at 9-10. Indeed, Dr. Borgida is unable to state whether the gender stereotypic thinking that he attributes to Bloomberg happens intentionally or not. *See* Ex. B at 443-45; Dreiband Decl. Ex. H at 9, 14, 24, 28 (Borgida Reply Rep.). His opinion does not fit this case because EEOC does not assert any claim about intentional, disparate-impact discrimination. Rather, EEOC alleges *only* intentional discrimination. As in *Wal-Mart*, Dr. Borgida's opinion is irrelevant to that claim. 2010 WL 583681, at *3.

## III.    DR. BORGIDA SHOULD BE PRECLUDED FROM OFFERING ANY CASE-SPECIFIC OPINION ABOUT BLOOMBERG

At a minimum, this Court should preclude Dr. Borgida from offering case-specific opinions about Bloomberg. Dr. Borgida's opinion that gender stereotypic "thinking more likely than not" influenced decisions at Bloomberg is more prejudicial than probative (to the extent it is probative at all), and therefore should be excluded under Federal Rule of Evidence 403. *See* Fed. R. Evid. 403 ("[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . .").

In *EEOC v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 462 (S.D.N.Y. 2004), this Court limited the proposed social framework testimony of Dr. William Bielby and precluded him from offering case-specific opinions about gender stereotyping. The Court explained that Dr. "Bielby's discussion about the susceptibility of the [defendant's] pay and promotion procedures to gender bias would tend to confuse the [trier of fact] about the burden of proof," because, in effect, Dr. Bielby "asks the [trier of fact] to begin with the expectation of discrimination and compel" the defendant to disprove it. *Id.* Therefore, while the Court permitted Dr. Bielby to "testify about gender stereotypes" and gender stereotyping literature generally, *id.*, it rejected EEOC's attempts to introduce his testimony that a "male-dominated environment existed" in the defendant's organization, the defendant's "decisions about total compensation and promotion are highly subjective and arbitrary," "[w]ritten guidelines for making promotions and pay decisions" are "inadequate" and "insufficient[ly] monitor[ed]," and the defendant has an inadequate "practice for investigating complaints . . . ." *EEOC v. Morgan Stanley & Co.*, No. 01 Civ. 8421, 2004 WL 1542264, at *3 & n.2 (S.D.N.Y. July 8, 2004) (reaffirming earlier order). Consistent with *Morgan Stanley*, the Court in *Wal-Mart*, 2010 WL 583681, at *4, likewise explained that social framework testimony may be unfairly prejudicial it if it leads the trier of fact to "presume [that] stereotyping existed," thereby requiring the defendant to disprove it.

Here, Dr. Borgida's conclusory opinion that stereotypical "thinking more likely than not" influenced decisions, Ex. B at 326-27, 356-58, 373, lacks any probative value because it was not derived through any scientifically reliable methodology and does not fit the issues in this case. *See supra* ¶ 3. Indeed, numerous courts have found studies similar to Dr. Borgida's to have little or no probative value. *See, e.g., Serrano v. Cintas Corp.*, Nos. 04-40132 & 06-12311, 2009 WL 910702, at * 6 (E.D. Mich. Mar. 31, 2009) ("a plaintiff [must] present more than mere

allegations and conjecture" concerning discrimination and that a sociologist's "observations that people tend to have personal biases [are] entirely insufficient to support the claim that in this particular case, [the defendant's] managers acted on their biases"); *Cooper v. Southern Co.*, 205 F.R.D. 596, 611 (N.D. Ga. 2001) (explaining that expert testimony that makes "wide-ranging assertions and conclusions based entirely on a set of documents provided for [the expert's] review" "has no usefulness"), *aff'd* 390 F.3d 695 (11th Cir. 2004); *Robinson v. Metro-North Commuter R.R. Co.*, 175 F.R.D. 46, 48 (S.D.N.Y. 1997) ("No meaningful weight can reasonably be attributed" to a report by Dr. William Bielby that "baldly premises" that the defendant engaged in racial stereotyping).

Moreover, Dr. Borgida's opinion—based on a complete absence of methodology—is highly "prejudic[ial]" and may "confus[e] . . . the issues" and "mislead[]" the trier of fact. Fed. R. Evid. 403. There is a substantial threat that his opinion could confuse or mislead the trier of fact into believing that Bloomberg may be held liable for unconscious, unintentional stereotyping in this *intentional* discrimination case. Further, his opinion could effectively shift the burden of proof to Bloomberg to *disprove* that gender stereotyping played a role in its decisionmaking. *See, e.g.*, *Wal-Mart*, 2010 WL 583681, at *4. Under any scenario, the threat of unfair prejudice substantially outweighs any probative value of his opinions.

Thus, if Dr. Borgida is allowed to testify at all, his testimony should be limited to gender stereotyping literature generally, and he should be precluded from offering case-specific opinions about Bloomberg. *See Morgan Stanley*, 2004 WL 1542264, at *3 & n.2.

## CONCLUSION

For the foregoing reasons, Dr. Borgida's proposed opinion and testimony should be excluded in their entirety. At a minimum, Dr. Borgida should be precluded from offering any case-specific opinions about Bloomberg.

Dated: May 14, 2010                 WILLKIE FARR & GALLAGHER LLP

By:  /s/ Thomas H. Golden
       Thomas H. Golden (TG 1467)
       tgolden@willkie.com
       (A Member of the Firm)

       787 Seventh Avenue
       New York, New York 10019
       (212) 728-8000

- and -

JONES DAY

By:  /s/ Eric S. Dreiband
       Eric S. Dreiband *(admitted pro hac vice)*
       edreiband@JonesDay.com
       (A Member of the Firm)

       51 Louisiana Avenue, N.W.
       Washington, DC 20001
       (202) 879-3939

## CERTIFICATE OF SERVICE

The undersigned certifies that, on May 14, 2010, I caused a copy of Defendant's Memorandum of Law in Support of Defendant's Motion to Exclude the Reports and Testimony of Dr. Eugene Borgida to be served by e-mail upon the following counsel of record:

Kam Wong, Esq.
Raechel Adams, Esq.
Robert Rose, Esq.
United States Equal Employment Opportunity Commission
33 Whitehall Street, 5th Floor
New York, New York 10004
kam.wong@eeoc.gov
raechel.adams@eeoc.gov
robert.rose@eeoc.gov

Attorneys for Plaintiff Equal Employment Opportunity Commission

Milo Silberstein, Esq.
William Dealy, Esq.
Dealy & Silberstein, LLP
225 Broadway, Suite 1405
New York, New York 10007
msilberstein@dealysilberstein.com
wjd@dealysilberstein.com

Attorneys for Plaintiff-Intervenors Jill Patricot, Tanys Lancaster, Janet Loures and Marina Kushnir

Richard A. Roth, Esq.
Jonah Grossbardt, Esq.
The Roth Law Firm, PLLC
295 Madison Avenue, 22nd Floor
New York, New York, USA 10017
rich@rrothlaw.com
jonah@rrothlaw.com

Attorneys for Plaintiff-Intervenors Monica Prestia and Maria Mandalakis

/s/   Tonya M. Osborne
Tonya M. Osborne (tmosborne@jonesday.com)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939