UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

                    Plaintiff,

               -against-

BLOOMBERG L.P.,

                   Defendant.
-------------------------------------------------------------------------x     07-CV-8383 (LAP)(HBP)

JILL PATRICOT, TANYS LANCASTER,
JANET LOURES, MARINA KUSHNIR, MONICA PRESTIA,
and MARIA MANDALAKIS,

                   Plaintiff-Intervenors,

               -against-

BLOOMBERG L.P.,

                   Defendant.
-------------------------------------------------------------------------x

**EEOC'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION
TO EXCLUDE THE REPORTS AND TESTIMONY OF DR. EUGENE BORGIDA**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................. 1

FACTUAL BACKGROUND .................................................... 1

   I.   Dr. Borgida Is Undisputedly Qualified to Opine in This Case .......................................... 1

   II.   Dr. Borgida's Opinions Reflect Well-Accepted Social Framework Analysis................ 2

      A.   Dr. Borgida's Opinions Are Based on Extensive Peer-Reviewed Social Science on Gender Stereotyping ...................................... 3

      B.   Dr. Borgida's Opinions Are Based on a Thorough Review of the Extensive Case Record ...................................... 4

      C.   Dr. Borgida Reliably Applied the Social Science Findings to Bloomberg.................... 6

ARGUMENT ............................................................... 8

   I.   Dr. Borgida's Testimony Is Helpful to the Trier of Fact and Thus Relevant ................ 8

   II.   Social Framework Analysis Is Based on Reliable Principles and Methods ................. 11

   III.   Dr. Borgida Reliably Applied Social Science Findings to the Facts of This Case ....... 14

   IV.   Dr. Borgida's Testimony Is Based on Sufficient Facts and Data ................................ 17

   V.   Dr. Borgida's Testimony Is Not Excludable under Rule 403 ....................................... 18

CONCLUSION.............................................................. 20

# **TABLE OF AUTHORITIES**

Page(s)

## **Cases**

*Amos v. Rent-A-Center, Inc.*,
No. 00-6289-CIV,  2001 WL 36095915  (S.D. Fla. Dec. 13, 2001)............................................. 15

*Arnold v. Cargill Inc.*,
    No. 01-2086 (DWF/AJB), 2006 WL 1716221 (D. Minn. June 20, 2006)......................... 13, 17

*Barber v. United Airlines*,
    17 F. Appx. 433 (7th Cir. 2001) ..................................................................................... 13

*Beck v. Boeing Co.*,
    No. 00-0301, 2004 WL 5495670 (W.D. Wash. May 14, 2004) ...................................... 2, 8, 14

*Brooks v. Woodline Motor Freight, Inc.*,
    852 F.2d 1061 (8th Cir. 1988) .......................................................................................... 9

*Butler v. Home Depot, Inc.*,
    984 F. Supp. 1257 (N.D. Cal 1997) .................................................................. 8, 12, 13, 16, 18

*Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999) ....................................... 20

*City of L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702 (1979) ....................................... 9

*Collier v. Bradley University*, 113 F. Supp 2d 1235 (C.D. Ill 2000)............................................ 15

*Cooper v. Southern Co.*,
    205 F.R.D. 596 (N.D. Ga. 2001).................................................................................... 19

*Coston v. Plitt Theatres*,
    860 F.2d 834  (7th Cir. 1988) ........................................................................................ 10

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).......................................................................................................... 8

*Downey v. Coalition against Rape and Abuse*,
    No. 99-3370 (D.N.J. Sept. 18, 2003) ............................................................................ 10, 11

*Dukes v. Wal-Mart Stores, Inc.*,
    No. 01-2252 (N.D. Cal.) .................................................................................................... 2

*Dukes v. Wal-Mart Stores, Inc.*,
    Nos. 04-16688, 04-16720, 2010 U.S. App. LEXIS 8576 (9th Cir. April 26, 2010)................. 12

*EEOC v. Morgan Stanley & Co.*,
    324 F. Supp. 2d 451 (S.D.N.Y. 2004)............................................................ 12, 13, 16, 18, 20

*EEOC v. Morgan Stanley & Co.*,
01 Civ. 8421 (RMB)(RLE),
2004 U.S. Dist. LEXIS 12724 (S.D.N.Y. July 8, 2004), .................................... 12, 13, 16, 18, 20

*EEOC v. Wal-Mart Stores, Inc.*,
    No. 6:01-CV-339-KKC, 2010 U.S. Dist. LEXIS 13192 (E.D. Ky. Feb. 16, 2010)........... 10, 19

*Ellis v. Costco Wholesale Corp.*,
240 F.R.D. 627 (N.D. Cal. 2007) ........................................................................................ 12, 16

*George v. Celotex Corp.*,
    914 F.2d 26 (2d Cir. 1990)........................................................................................................ 18

*Hnot v. Willis Group Holdings, Ltd.*,
    No. 01-6558, 2007 WL 1599154 (S.D.N.Y. June 1, 2007) .................................. 1, 9, 14, 19, 20

*Hurst v. F.W. Woolworth Co.*,
    95 Civ. 6584 (CSH), 1997 U.S. Dist. LEXIS 17233 (S.D.N.Y. Nov. 3, 1997)............. 8, 10, 11

*In re Fosamax Prods. Liab. Litig.*,
    645 F. Supp. 2d 164 (S.D.N.Y. 2009) ...................................................................................... 13

*In re Initial Pub. Offering Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006)........................................................................................................ 20

*In re Methyl Tertiary Butyl ither Prod. Liab. Litig.*
    No. 1:00-1898, 2008 WL 2324112 (S.D.N.Y. June 5, 2008) .................................................. 13

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp 2d 531 (S.D.N.Y. 2004)........................................................................................ 13

*Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*,
    470 F. Supp. 2d 345 (S.D.N.Y. 2007)........................................................................ 2, 14, 16, 18

*Israel v. Spring Indus., Inc.*,
    No. 98 CV 5106(ENV)(RML), 2006 WL 3196956 (E.D.N.Y. Nov. 3, 2006) ........................ 13

*Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847 (D. Minn 1993) ......................................... 2, 14

*Jin Zhao v. State Univ. of N.Y.*,
   472 F. Supp. 2d 289 (E.D.N.Y. 2007) ............................................................... 10

*Johnson v. Stone*,
   No. 90-K-923, 1992 U.S. Dist. LEXIS 3200 (D. Colo. March 16, 1992) ................................. 10

*Kelly v. Bank Midwest, N.A.*,
   177 F. Supp. 2d 1190 (D. Kansas 2001) ............................................................... 10

*Kuhmo Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) ................................................................................. 13

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*,
   No. 03 Civ. 7037(PKC), 2005 WL 4684238 (S.D.N.Y. Apr. 11, 2005) ................................. 13

*Madison v. IBP, Inc.*,
   149 F. Supp. 2d 730  (S.D. Iowa 1999) ............................................................ 2, 14

*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038 (2d Cir. 1995) ........................................................................... 9

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005) ....................................................................... 8, 15

*Price Waterhouse v. Hopkins*,
   490 U.S. 228 (1989) ......................................................................... 2, 7, 11, 14

*Ray v. Miller Meester Advertising Inc.*,
   664 N.W.2d 355 (Minn. Ct. App. 2003) .............................................................. 11

*Robinson v. Jacksonville Shipyards, Inc.*,
   760 F. Supp. 1486 (M.D. Fla. 2001) .............................................................. 12, 17

*Robinson v. Metro-North Commuter R.R. Co.*,
   175 F.R.D. 46 (S.D.N.Y. 1997) ...................................................................... 20

*Robinson v. Metro-North Commuter R.R. Co.*,
   267 F.3d 147 (2d Cir. 2001) ......................................................................... 20

*Roniger v. McCall*,
   No. 97 Civ. 8009(RWS), 2000 WL 1191078 (S.D.N.Y. Aug. 22, 2000) ............................ 13, 15

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
   No. 98 CIV, 8272(RPP), 2003 WL 22124991 (S.D.N.Y. Sept. 15, 2003) ............................... 13

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
   No. 98 Civ. 8272 (RPP), 2003 U.S. Dist. LEXIS 17623 (S.D.N.Y. Oct. 3, 2003)................... 15

*Serrano v. Cintas Corp.*,
   Nos. 04-40132, 06-12311, 2009 WL 910702 (E.D. Mich. Mar. 31, 2009) ............................ 19

*Stender v. Lucky Stores, Inc.*,
   803 F. Supp. 259 (N.D. Cal. 1992) ........................................................................ 17

*Syvock v. Milwaukee Boiler Mfg., Co.*,
   665 F.2d 149 (7th Cir. 1981) ................................................................................ 10

*Thomas v. Eastman Kodak Co.*,
   183 F.3d 38 (1st Cir. 1999)..................................................................................... 9

*Tuli v. Brigham & Women's Hospital, Inc.*,
   592 F. Supp. 2d 208 (D. Mass. 2009) ...................................................... 9, 12, 14, 20

*U.S. v. Gelzer*,
   50 F.3d 1133 (2d Cir. 1995)................................................................................... 19

*U.S. v. Johnson*,
   588 F. Supp. 2d 997 (S.D. Iowa 2008) ................................................................... 13

*U.S. v. Snype*,
   441 F.3d 119 (2d Cir. 2006).................................................................................... 20

*U.S. ex rel. Suter v. Nat'l Rehab Partners Inc.*,
   CV-03-015-S-BLW, CV-03-128-S-BLW,
   2009 U.S. Dist. LEXIS 88630 (D. Idaho Sept. 24, 2009)......................................... 17

*Velez v. Novartis Pharmaceuticals Corp.*,
   No. 04 Civ 9194 (CM), Doc. 270,
   Rulings on Motions *in Limine* (S.D.N.Y. Feb. 25, 2010) ........................................ 12

*Willis v. Amerada Hess Corp.*,
   379 F.3d 32 (2d Cir. 2004).................................................................................... 13

*Wright v. Stern*,
   450 F. Supp. 2d 335 (S.D.N.Y. 2006)................................................................ 8, 12, 16, 18

*Zenith Elec. Corp. v. WH-TV Broad. Corp.*,
   395 F.3d 416 (7th Cir. 2005) ................................................................................. 14

**Rules**

Fed. R. Evid. 702 Advisory Comm. Notes (2000 Amendments) .................................................... 8

Fed. R. Evid. Rule 702............................................................................................................... 10, 11

## PRELIMINARY STATEMENT

EEOC seeks to introduce the expert opinion and testimony of social psychologist Dr. Borgida to educate the fact-finder about the social science on stereotyping, the nature of the Bloomberg L.P. (Bloomberg) organizational structure, practices, and culture that may lead to stereotyping, and organizational remedies for monitoring and reducing the effects of stereotypes. Dr. Borgida's testimony is reliable because he uses an established social framework analysis supported by a sound and accurate review of the research literature with case-specific illustrations and an extensive review of the case materials.  Dr. Borgida's testimony is relevant because it will enable the jury to develop more than a common sense understanding of gender stereotypes and because in a pattern or practice case like this, evidence of discriminatory conduct is often widely-dispersed and difficult to evaluate such that expert testimony will aid the fact-finder in assessing liability by educating the fact-finder about stereotypes that may affect decisionmaking, the contexts in which stereotyping may flourish, and how stereotypes may be a part of the employer's regular practice.  Because his opinions and testimony are both reliable and relevant, they should be admitted.

## FACTUAL BACKGROUND

### I.  Dr. Borgida Is Undisputedly Qualified to Opine in This Case

Dr. Borgida is one of the nation's preeminent experts on the nature and influences of gender stereotyping, and Defendant does not challenge his qualifications to testify.  (See Borgida Report 1-4, Appendix B, C for credentials and expert qualifications.)[1]  Dr. Borgida is often retained as an expert on the topic of gender-stereotyping (Borgida Report App. B), and his expert testimony has been admitted in numerous cases, including in *Hnot v. Willis Group Holdings,*

---

[1] Dr. Borgida's Expert Report is attached as Exhibit 1 to the Declaration of Konrad Batog filed with this brief.

*Ltd.*, No. 01-6558, 2007 WL 1599154 (S.D.N.Y. June 1, 2007), *Int'l Healthcare Exch., Inc. v.*

*Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 355 (S.D.N.Y. 2007), *Beck v. Boeing Co.*,

No. 00-0301, 2004 WL 5495670 (W.D. Wash. May 14, 2004), *Madison v. IBP, Inc.*, 149 F.

Supp. 2d 730, 802  (S.D. Iowa 1999), and *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847,

880-83 (D. Minn 1993).  (Borgida Report App. B.)  He has been retained by plaintiff and defense

counsel, including Bloomberg's own defense counsel in *Dukes v. Wal-Mart Stores, Inc.*, No. 01-

2252 (N.D. Cal.).  (Borgida Report App. B.)  He also co-authored the American Psychological

Association's (APA) amicus brief in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the

seminal Supreme Court decision recognizing that an employer acting on the basis of gender

stereotypes commits intentional discrimination.  (Borgida Report 6.)

## II.    Dr. Borgida's Opinions Reflect Well-Accepted Social Framework Analysis

Dr. Borgida's opinions reflect the application of a social framework analysis.  (Borgida

Report 4.)  Social framework analysis uses social science to educate fact-finders about how

stereotyping operates, what stereotypes are prevalent and the circumstances under which

decision makers are more or less likely to rely on stereotypes.  (Borgida Report 5-6.)   It is "an

established approach to using social science evidence in litigation" (Borgida Report 4) that is

here based on three components: i) Dr. Borgida's expertise in the field of social psychology; ii)

social science findings about gender stereotyping and when it is more or less likely to occur; and

iii) a review and application of case materials to the social framework.  (Borgida Report 6;

Borgida Reply 34-35.)[2]  Social framework analysis does not employ empirical methodologies

such as statistical sampling techniques, double-blinded coding, clinical studies, or systematic

---

[2] Dr. Borgida's Reply Report is attached as Exhibit 2 to Konrad Batog's Declaration.

content analysis.  (Borgida Report 6; Borgida Reply 3-4; Borgida Dep. 122-25.)[3]  Indeed, as

Bloomberg's rebuttal witness admits, such empirical methodologies are not required.  (Tetlock

Dep. 40-42.)[4]

### A.    Dr. Borgida's Opinions Are Based on Extensive Peer-Reviewed Social Science on Gender Stereotyping

Dr. Borgida's discussion of gender stereotypes is based on over three decades of social

science research and literature, including comprehensive peer reviews that base their conclusions

on the synthesis of hundreds of scientific papers.  (Borgida Report References; Borgida Reply 7-

8.)  Additionally, Dr. Borgida's overview focuses on research regarding mothers and pregnant

women and is based on experimental and non-experimental studies.  (Borgida Report

References; Borgida Reply 8, 10-15, 22-23.)

Based on this research, Dr. Borgida explains that stereotypes are formed from normal

cognitive processes.  (Borgida Report 8.)  He states that gender stereotypes have a descriptive

and prescriptive component.  (Borgida Report 9.)  As Dr. Borgida lays out, according to well-

established "social role theory," gender stereotypes are rooted in women's traditional role in the

family, specifically their role as mothers, and that men are stereotyped as more "agentic" and

women as more communal.  (Borgida Report 10.)  He discusses how "status characteristics

theory" and related research indicate that greater competence and worth is associated with

groups who are not mothers.  (Borgida Reply 13-15.)  Additionally, Dr. Borgida describes the

"stereotype content model," which predicts reactions to childless career women and working

mothers and provides a context for findings indicating that working mothers face additional

barriers in the workplace.  (Borgida Report 10-11.)  He explains that according to "role congruity

---

[3] Excerpts of Dr. Borgida's deposition are attached as Exhibit 3 to Konrad Batog's Declaration.
[4] Excerpts of testimony and exhibits from Dr. Tetlock's deposition are attached as Exhibit 4 to Konrad Batog's Declaration.

theory," the inconsistency between the qualities people associate with pregnancy and maternity and what people perceive to be qualities of a "successful" worker likely leads to gender prejudice.  (Borgida Report 9, 12.)

Further, Dr. Borgida explains that gender stereotyping is more likely under certain conditions such as when there is ambiguity in evaluation standards or when evaluations of women are vulnerable to unchecked subjectivity and discretion.  (Borgida Report 7-8, 14-16.) He also discusses key "moderator" variables that may reduce the activation and application of stereotypes.  (Borgida Report 8, 14, 16; Borgida Reply 26-33.)  He even considers and refutes the major counterarguments offered by Bloomberg's rebuttal expert, including the role of individuating information in preventing stereotyping, outcome interdependence as an approach to reducing gender bias, and the role of accountability measures in curbing gender bias. (Borgida Reply 15-33; Borgida Dep. 38-59.)

**B.      Dr. Borgida's Opinions Are Based on a Thorough Review of the Extensive Case Record**

Dr. Borgida requested that EEOC provide him as much and as comprehensive an amount of material as possible.  (Borgida Dep. 148.)  The case materials he reviewed consist of testimony and documents from both Plaintiffs and Defendant and relate to the practices and policies of the company during the entire class period.[5]  (Borgida Report App. A; Borgida Reply App. A; Batog Decl. Ex. 5.)  Excluding testimony from damages witnesses, he reviewed over 91% of all deposition testimony in the case.  (Borgida Reply 36; Batog Decl. Ex. 5 at 19-20.) Specifically, he reviewed 74 out of 76 claimant depositions, including 27 supervisors and 47 non-supervisors employed across the class time period in seven of the company's main business

---

[5] The class time period is defined as February 1, 2002 through the present.  (EEOC's Second Amended Complaint 3, Doc. 49.)

areas: Administration, Human Resources, Data, News, Sales, Product, and Research & Development.  (Borgida Report App. A; Borgida Reply 35; Batog Decl. Ex. 5 at 8-12.)   Dr. Borgida also reviewed depositions of 18 of the 19 potential claimants who Bloomberg identified as defense witnesses.  (Borgida Report App. A; Borgida Reply 35-36; Batog Decl. Ex. 5 at 13-15.)  He also reviewed depositions of Bloomberg's nine top-level managers and executives representing the seven business areas across the class time period.  (Borgida Report App. A; Borgida Reply 35; Batog Decl. Ex. 5 at 1.)  Dr. Borgida also examined 69 of the 76 depositions taken by EEOC, including 65 supervisors and four non-supervisors employed in the seven business areas across the class time period, many of whom were identified as defense witnesses.  (Borgida Report App. A; Borgida Reply 35, App. B; Batog Decl. Ex. 5 at 4-7.)  Additionally, Dr. Borgida reviewed depositions of other experts in this case.  (Borgida Reply 36, App. A; Batog Decl. Ex. 5 at 16.)  Dr. Borgida also read Rule 30(b)(6) testimony about Bloomberg's work schedules, disciplinary policies, leave policies, employee-relations policies, anti-discrimination policies, complaint procedures, promotion and transfer policies, performance evaluations, compensation policies, and company organization and structure throughout the class period.  (Borgida Reply 35; Borgida Report App A; Batog Decl. Ex. 5 at 2-3.)  He did not make credibility determinations and assumed that deposition testimony was truthful.  (Borgida Dep. 165-66.)

Moreover, Dr. Borgida did not rely on any particular individual or only on claimants' allegations but considered depositions of Bloomberg's own managers and witnesses and the company's own documents.  (Borgida Dep. 158-59.)  He reviewed thousands of pages of deposition exhibits and documents produced in this case, including Mayor Michael Bloomberg's book about his founding of and philosophy for the company.  (Borgida Report App. A.)  He also

reviewed corporate documents concerning internal complaints and investigations of discrimination; flexible work requests and arrangements; internal company reviews of flexible work arrangements; Bloomberg resources for pregnant women and mothers; Bloomberg's organizational structure; performance evaluations; evaluation guidelines; employee handbooks; compensation guidelines; internal company reviews of compensation and evaluation guidelines; correspondence concerning employee compensation, promotions, transfers, and evaluations; interviews from exiting male and female employees; and six expert reports.  (Borgida Reply 36; Borgida Report App. A; Batog Decl. ¶ 7.)  Additionally, Dr. Borgida also considered evidence that may disconfirm EEOC's allegations of gender discrimination.  (Borgida Dep. 94, 169-70.)

### C. Dr. Borgida Reliably Applied the Social Science Findings to Bloomberg

Using the social framework analysis, Dr. Borgida assessed Bloomberg's culture, organization, and practices and policies as represented in the case record against the peer-reviewed literature to draw conclusions about how social science theory and research applies to the circumstances of this case.  (Borgida Report 6.)  Dr. Borgida uses case facts to illustrate and highlight the relevant science to help the fact-finder understand the conditions under which pregnancy/maternity stereotypes are likely activated.  (Borgida Report 6, 17.)  Specifically, using the stereotype content model, role congruity theory, and status characteristics theory, Dr. Borgida explains that Bloomberg's culture and emphasis on loyalty and commitment, inflexible and long hours in the office, and monitoring and scrutiny of employees to ensure loyalty and commitment are features consistent with the scientific findings on the activation of gender-stereotypic thinking about mothers and pregnant employees. (Borgida Report 18-25; Borgida Reply 36-39.) Additionally, he compares social psychology and industrial-organizational psychology findings to Bloomberg's informal organizational structure that has no titles, decisionmaking processes

marked by a lack of consistency, lack of communication, lack of accountability, lack of standards, and unchecked subjectivity and discretion, and explains how these features are consistent with the social science research on the activation and application of gender stereotypes. (Borgida Report 25-29; Borgida Reply 39-43.) Dr. Borgida also uses examples from the case record to illustrate how mothers and pregnant employees are perceived, monitored and scrutinized in a manner consistent with the research on stereotyping. (Borgida Report 29-38.) Through this application of social science findings to the case record, Dr. Borgida explains that the cultural and organizational context at Bloomberg more likely than not activated gender stereotypes about mothers and pregnant employees as less competent, less agentic and less committed, and that given the subjectivity, discretion, and lack of accountability at Bloomberg, stereotypic perceptions more likely than not influenced employment decisions about mothers and pregnant employees. (Borgida Report 38-39.)

The basis for identifying these features is not arbitrary or speculative, but based on Dr. Borgida's expertise and the science on gender stereotypes. (Borgida Reply 39.) Information about Bloomberg's organization and processes and about how mothers and pregnant women are treated came from employees, managers, human resources, Rule 30(b)(6) witnesses and company records. (Borgida Report 25-29; Borgida Reply 39-43.) Moreover, Dr. Borgida neither opines that any specific decision was affected by bias nor that all company decisions were the result of gender stereotyping. (Borgida Dep. 92-93, 364-65.) He also does not address the ultimate legal conclusion: whether Bloomberg actually engaged in discrimination. (Borgida Dep. 79-83.) Dr. Borgida's approach here is the same methodology taken by the APA in its *amicus curiae* brief submitted in *Price Waterhouse* (Borgida Report 6), and in the cases cited above admitting Dr. Borgida's expert analysis.

**ARGUMENT**

"It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinion." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993)).  The "rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702 Advisory Comm. Notes (2000 Amendments).  "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."  *Wright v. Stern*, 450 F. Supp. 2d 335, 359-60 (S.D.N.Y. 2006) (quotation omitted).  Thus, "in a close case the testimony should be allowed for the jury's consideration…where it can be tested by cross-examination and measured against the other evidence in the case."  *Id.*  Under these liberal standards, Dr. Borgida's opinion should be admitted.

**I.     Dr. Borgida's Testimony Is Helpful to the Trier of Fact and Thus Relevant**

Dr. Borgida's testimony is helpful in educating the fact-finder about the science on stereotyping, how the organizational structure, practices, and culture at Bloomberg may lead to stereotyping, and organizational mechanisms for reducing the effects of stereotypes.  *See Beck,* 2004 WL 5495670, at *2 (finding Dr. Borgida's report helpful to jury in deciding whether discrimination was defendant's general practice because it will explain stereotyping and what conditions make it more or less likely to occur); *Butler v. Home Depot, Inc.*, 984 F. Supp. 1257, 1264 (N.D. Cal 1997) (testimony about "the causes, manifestations, and consequences of gender stereotyping as well as the organizational circumstances which allow such stereotypes to flourish…would appear to be relevant and of assistance to the jury").  His testimony is especially helpful in a pattern or practice case such as this one.  *Hurst v. F.W. Woolworth Co.*, 95 Civ. 6584 (CSH), 1997 U.S. Dist. LEXIS 17233, at *2 (S.D.N.Y. Nov. 3, 1997) ("in a pattern or practice

discrimination case, evidence of discriminatory conduct is often widely-dispersed and difficult to

evaluate; expert testimony as to age stereotyping may again aid jurors in assessing liability.").

Moreover, testimony about how stereotyping operates and how Bloomberg's conduct is

consistent with scientific findings is "an area that the jury may well not have common

knowledge." *Tuli v. Brigham & Women's Hospital, Inc.,* 592 F. Supp. 2d 208, 215 (D. Mass.

2009); *see also Hnot*, 2007 WL 1599154, at *2 (even if "few jurors will be surprised at the basic

outlines of the testimony," it does "not mean the testimony adds nothing to ordinary experience")

(citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (characterizing expert

testimony that stated "an obvious concept" as nevertheless going "far beyond that of a

layman")).  The admission of such testimony reflects the recognition that "[t]he concept of

'stereotyping' includes not only simple beliefs such as 'women are not aggressive' but also a

host of more subtle cognitive phenomena which can skew perceptions and judgments." *Thomas*

*v. Eastman Kodak Co.*, 183 F.3d 38, 61 (1st Cir. 1999)

      Contrary to Defendant's argument, courts have held that if an employer acts on the basis

of stereotypes, including unreflective beliefs, assumptions or preconceived notions about a

protected group, it can be held liable.  *See City of L.A. Dep't of Water & Power v. Manhart*, 435

U.S. 702, 707 (1979) ("Myths and purely habitual assumptions about a woman's inability to

perform certain kinds of work are no longer acceptable reasons for refusing to employ qualified

individuals, or for paying them less.") (subsequent history omitted); *Thomas*, 183 F.3d at 58 (the

"ultimate question is whether an employee has been treated disparately 'because of race,'" and

this "is so regardless of whether the employer consciously intended to base the evaluations on

race, or simply did so because of unthinking stereotypes or bias"), *cert. denied*, 528 U.S. 1161

(2000); *Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1064 (8th Cir. 1988) ("Age

discrimination is often subtle and may simply arise from an *unconscious* application of stereotyped notions of ability rather than from a deliberate desire to remove older employees from the workforce.") (italics in original; quotations and citation omitted); *Syvock v. Milwaukee Boiler Mfg., Co.*, 665 F.2d 149, 157 (7th Cir. 1981) ("Age discrimination resulting from unconscious stereotyping of an older person's abilities violates the ADEA"), *overruled in part by Coston v. Plitt Theatres*, 860 F.2d 834  (7th Cir. 1988).[6]  *EEOC v. Wal-Mart Stores, Inc.*, No. 6:01-CV-339-KKC, 2010 U.S. Dist. LEXIS 13192 (E.D. Ky. Feb. 16, 2010), which Defendant relies on, cites no case law to support the exclusion of stereotyping evidence and is of no precedential value to this Court.  Further, that court wrongly held that "to the extent that the EEOC proffers [the expert's] testimony as evidence that intentional discrimination is plausible, his testimony is not necessary", *id.* at *9, because under Rule 702, the question of relevancy is whether the expert testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue," not whether his testimony is "necessary."  Moreover, unlike the expert in *EEOC v. Wal-Mart Stores, Inc.*, Dr. Borgida opines that Bloomberg's culture, policies and practices likely triggered conscious as well as implicit stereotyping.  (Borgida Dep. 443-48.)

The cases precluding Dr. Borgida's testimony on relevancy grounds relied on by Defendant are distinguishable.  In *Downey v. Coalition against Rape and Abuse*, No. 99-3370

---

[6] *See also Jin Zhao v. State Univ. of N.Y.*, 472 F. Supp. 2d 289, 309-10 (E.D.N.Y. 2007) ("the Supreme Court and the Second Circuit have held that decisions resulting from 'stereotyped' impressions or assumptions about the characteristics or abilities of women violate Title VII."); *Kelly v. Bank Midwest, N.A.*, 177 F. Supp. 2d 1190, 1206 (D. Kansas 2001) ("The law is clear, then, that intentional discrimination includes those acts or decisions based on unthinking racial stereotypes or bias."); *Hurst*, 1997 U.S. Dist. LEXIS 17233, at *2 (expert testimony admissible because it will make jurors aware of fact that age discrimination may simply arise from unconscious application of stereotyped notions of ability); *Johnson v. Stone*, No. 90-K-923, 1992 U.S. Dist. LEXIS 3200, at *9 (D. Colo. March 16, 1992) ("subjective criteria may offer a convenient pretext giving force and effect to [prejudice], perhaps without a conscious effort by the decision maker") (quotations omitted; brackets in original).

(D.N.J. Sept. 18, 2003), the court excluded Dr. Borgida's testimony because it related to analysis of statements and actions made by persons who were irrelevant because they could not be held liable.  *Id.* at *17-30.  While the *Downey* court recognized cases allowing expert gender-stereotyping analysis, including Dr. Borgida's, it emphasized that the analysis in question was of actions and comments from people who had no say in plaintiff's employment, could not be held liable, and were thus irrelevant.  *Id.* at *18-30.  Here, in contrast, Dr. Borgida's analysis concerns Bloomberg's actions, practices and policies as reflected in company records and testimony for which the company can be liable.  Moreover, *Downey* was not a pattern or practice case where expertise in stereotyping is especially helpful.  *See Hurst*, 1997 WL 685341, at *2.

The non-precedential, state court opinion in *Ray v. Miller Meester Advertising Inc.*, 664 N.W.2d 355, 364-66 (Minn. Ct. App. 2003), is likewise unhelpful.  Like *Downey*, *Ray* was not a pattern or practice case, a distinction the court actually emphasized.  *Id.* at 366 ("There is nothing in this case that shows [a]…scheme or pattern of gender discrimination that can be uncovered only with the help of expert analysis").  Moreover, as discussed above, under Rule 702, the question is whether expert testimony will "assist the trier of fact" not whether the trier of fact would be rendered "incapable of forming a correct judgment", *id.*, but for a particular expert's testimony.

Because stereotyping evidence can be used to establish intentional discrimination and because expert testimony is helpful in educating the fact-finder about stereotyping, Dr. Borgida's testimony is relevant and should be admitted.

## II.    Social Framework Analysis Is Based on Reliable Principles and Methods

Courts have accepted social framework analysis as a reliable methodology.  *See Price Waterhouse*, 490 U.S. at 255-56 (rejecting criticisms of methodology as only "intuitive hunches"

or "intuitively divined"); *Dukes v. Wal-Mart Stores, Inc.*, Nos. 04-16688, 04-16720, 2010 U.S.

App. LEXIS 8576, at *82 (9th Cir. April 26, 2010) (expert "presented scientifically reliable

evidence"); *Velez v. Novartis Pharmaceuticals Corp.*, No. 04 Civ. 9194, (CM), Doc. 270,

Rulings on Motions *in Limine*, at *7 (S.D.N.Y. Feb. 25, 2010) (use of professional literature to

conclude that evaluation system is flawed and excessively subjective, creating a likelihood of

discriminatory exercises of discretion is not "junk science")[7]; *Tuli,* 592 F. Supp. 2d at 215-16

(testimony about "the settings in which discrimination typically occurs and opin[ion] on whether

the allegations in the case at bar are consistent with the observed patterns" has "scientific

validity"); *Wright*, 450 F. Supp. 2d at 360-61 (application of scientific literature to defendant's

personnel practices is relevant and reliable); *EEOC v. Morgan Stanley & Co.*, 324 F. Supp. 2d

451, 460-62 (S.D.N.Y. 2004) ("*Morgan Stanley I*") (use of accepted social science research to

examine defendant's policies and practices is reliable methodology).[8]  Indeed, in contrast to the

over a dozen cases cited in this brief admitting social framework analysis, the only cases

Defendant cites regarding social framework analysis are the three cases discussed in the previous

section, which mistakenly excluded testimony on relevancy but not on reliability grounds.

---

[7] The opinion is attached as Exhibit 7 to Konrad Batog's Declaration.  The testimony of
Professor Rhode that was excluded in *Velez* and for which Defendant cites the case is not at all
similar to Dr. Borgida's testimony.  Ms. Rhode is a law professor who planned to "opine that
[defendant] has a corporate culture pervaded by bias – which is, of course, both the ultimate
issue in the case and one that we routinely ask juries to assess in employment discrimination
cases, without any expert telling them the answer."  *Id.* at *8.  The expert analysis in *Velez* that is
more akin to Dr. Borgida's is that of Dr. Outtz, whose testimony was admitted.  *Id.* at 6-7.
[8] *See also Ellis v. Costco Wholesale Corp.*, 240 F.R.D. 627, 650 (N.D. Cal. 2007) (evaluation of
defendant's personnel policies and practices and deposition testimony in context of social
scientific research literature on sex stereotyping is not "junk science"); *Robinson v. Jacksonville
Shipyards, Inc.*, 760 F. Supp. 1486, 1505 (M.D. Fla. 2001) (testimony regarding stereotyping
"provided a sound, credible theoretical framework"); *Butler*, 984 F. Supp. at 1263 (scientific
basis for social psychologist's testimony about how stereotyping operates and the role of gender
stereotyping in defendant's employment practices is "well-established").

The empirical methodologies Bloomberg criticizes Dr. Borgida for failing to use are inconsistent with a social framework analysis and are not a required social science methodology. *See Arnold v. Cargill Inc.*, No. 01-2086 (DWF/AJB), 2006 WL 1716221, at *7 (D. Minn. June 20, 2006) ("empirical research is not required under [social framework analysis]" and "there is no expectation that an expert opinion be quantifiable.") (citation omitted); *Morgan Stanley I*, 324. F. Supp. 2d at 461-62 (social framework analysis does not use first hand knowledge of the employer's practices such as would be gleaned from empirical research); *Butler*, 984 F. Supp. at 1263-64 (criticisms that social psychologist used non-representative sampling techniques are misplaced).  Indeed, as noted above, Bloomberg's own rebuttal expert admits that empirical studies are not required to render an expert opinion in this case, and Bloomberg admits in its brief that "expert testimony concerning social framework analysis has also been admitted" (Def.'s Br.16), but fails to differentiate how Dr. Borgida's methodology here differs from that which was admitted.  Similarly, the majority of Bloomberg's citations are irrelevant because they do not concern social framework analysis.[9]  *See Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S.

---

[9] *See, e.g., Willis v. Amerada Hess Corp.*, 379 F.3d 32 (2d Cir. 2004) (forensic toxicologist's report regarding cause of decedent's cancer); *Barber v. United Airlines*, 17 F. Appx. 433, 435-36 (7th Cir. 2001) (aviation expert's opinion about weather data, use of radar, and pilot's failure to avoid weather system); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 175 (S.D.N.Y. 2009) (epidemiologist's application of certain epidemiological factors establishing causal relationship between defendant's drugs and certain adverse events); *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.* No. 1:00-1898, 2008 WL 2324112 (S.D.N.Y. June 5, 2008) (expert in property appraisal); *U.S. v. Johnson*, 588 F. Supp. 2d 997, 1000 (S.D. Iowa 2008) (study on the "Incidence of Hands-on Child Victimization by Child Pornography Offenders"); *Israel v. Spring Indus., Inc.,* No. 98 CV 5106(ENV)(RML), 2006 WL 3196956, at *3-6 (E.D.N.Y. Nov. 3, 2006) (medical doctor's opinion about the cause of plaintiff's eczema); *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, No. 03 Civ. 7037(PKC), 2005 WL 4684238, at *4 (S.D.N.Y. Apr. 11, 2005) (expert in determining company's lost revenue); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp 2d 531 (S.D.N.Y. 2004) (experts in product liability litigation); *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, No. 98 CIV, 8272(RPP), 2003 WL 22124991, at *1  (S.D.N.Y. Sept. 15, 2003) (statistical sampling technique); *Roniger v. McCall*, No. 97 Civ. 8009(RWS), 2000 WL 1191078, at *1 (S.D.N.Y. Aug. 22, 2000) (expert assessing plaintiff's job search activity).

137, 141 (1999) (*Daubert* analysis is "flexible" and allows experts to use different

methodologies and approaches).  As the court in *Tuli* noted, social framework analysis

> is not the same as performing diagnostic tests of specific individuals who may
> have discriminated against [plaintiff] or a systematic investigation into the social
> climate at [defendant].  While one could attempt to perform such tests, their
> scientific integrity would be fatally compromised when conducted within the
> context of a lawsuit against those individuals or the corporation that employs
> them."  *Tuli*, 592 F. Supp. 2d at 214 (quoting expert's report).

Additionally, the Supreme Court has approved of expert testimony even though the expert "could

not say with certainty whether any particular comment was the result of stereotyping."  *Price

Waterhouse*, 490 U.S. at 236.  In sum, Dr. Borgida's analysis is reliable because he uses an

accepted methodology that does not require independent empirical research of Bloomberg's

policies and practices.

## III.    Dr. Borgida Reliably Applied Social Science Findings to the Facts of This Case

As explained in the Factual Background above, to arrive at his opinions, Dr. Borgida

evaluated Bloomberg's practices and policies, as reflected in the case record, against the social

science research on stereotyping.  Dr. Borgida's use of social framework analysis has been

recognized as reliable by courts.  *See, e.g., Hnot*, 2007 WL 1599154; *Int'l Healthcare Exch., Inc*,

470 F. Supp. 2d at 355; *Beck*, 2004 WL 5495670 at *1; *Madison v. IBP, Inc.*, 149 F. Supp. 2d at

813 (subsequent history omitted); *Jenson*, 824 F. Supp. at 883 ("[Dr. Borgida's] testimony on

sexual stereotyping provides a sound, credible theoretical framework") (subsequent history

omitted).  Unlike the experts in the cases Defendant relies on, Dr. Borgida thoroughly explains

social framework analysis, the social science on gender stereotyping, and how the social science

applies to the case materials.[10]

---

[10] *Cf. Zenith Elec. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418  (7th Cir. 2005) (expert "had
no method or could not describe one"); *Amos v. Rent-A-Center, Inc.*, No. 00-6289-CIV,  2001

There is nothing to support Bloomberg's contentions that Dr. Borgida ignored purportedly inconsistent evidence, disregarded other interpretations of the case record, and discounted alternative explanations for the disparate treatment experienced by mothers and pregnant women. Additionally, there is nothing to contradict the fact that Dr. Borgida does not make credibility determinations in his analysis. Unlike the expert in *Collier*, 113 F. Supp. 2d at 1246, relied on by Defendant, Dr. Borgida does not employ any gestalt methodology to assess credibility, and unlike the expert in *Nimely*, 414 F.3d at 398, Borgida does not offer an opinion about the credibility of a witness. Defendant's argument that Dr. Borgida purportedly ignores contrary evidence, cherry-picks testimony, and makes credibility determinations rests on two misrepresentations. First, Bloomberg argues that Dr. Borgida misinterpreted and arrived at an "erroneous conclusion" about the removal of the "raise a family" exception to Bloomberg's no-rehire policy. Dr. Borgida's analysis of the removal of the "raise a family" exception, however, is correct because in fact the exception was rejected and removed from the employee handbook shortly after the email exchange Dr. Borgida referenced. (Tetlock Dep. 482-87; Tetlock Dep. Ex. 6 at 5, Ex. 7 at 3, Ex. 8 at 3-4.) Second, Defendant argues that Dr. Borgida "ignored" and "discredited" Michael Bloomberg's testimony about the "raise a family" exception, but defendant does not and cannot cite to any portion of Dr. Borgida's report or testimony supporting

---

WL 36095915, at *2 (S.D. Fla. Dec. 13, 2001) (expert conceded that she "did not rely on any theory or methodology in evaluating the plaintiffs."); *Collier v. Bradley University*, 113 F. Supp 2d 1235 (C.D. Ill 2000) (expert was "unable to specify what methodology she employed in the case"); *Roniger,* 2000 WL 1191078, at *3 (expert did "not explain what theory or method he used to arrive at this opinion."). Additionally, unlike the expert report in *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, No. 98 Civ. 8272 (RPP), 2003 U.S. Dist. LEXIS 17623 (S.D.N.Y. Oct. 3, 2003), which Defendant relies on, Dr. Borgida uses an established approach to compare an extensive case record to a large body of peer-reviewed research without reaching the ultimate issue of fact. *Cf. id.* at *20-34 (expert only compared information in plaintiff's complaint and some case materials, consisting primarily of plaintiff's depositions, to anecdotal accounts of people's perceptions in unrelated industries and concluded that alleged facts amounted to racial discrimination).

this contention.  Further, as indicated above in the Factual Background, Dr. Borgida stated that

he examined and considered counter-examples and alternative interpretations and explanations.

Moreover, the "raise a family" exception was indeed removed from the company's handbook.

     If anything, Defendant's argument that Dr. Borgida purportedly evaluated and

summarized evidence in a one-sided manner goes to the weight and not the admissibility of his

conclusions.  *See Int'l Healthcare Exch., Inc.*, 470 F. Supp. 2d at 355 (defendant's arguments

that Dr. Borgida neglected to consider alternative explanations go to the weight and propriety of

his conclusions and can be raised at trial); *Wright*, 450 F. Supp. 2d at 360 (arguments that expert

summarized the evidence in an argumentative manner, failed to present evidence inconsistent

with his own, and offered his personal evaluation of the testimony go to weight rather than

admissibility); *Morgan Stanley I*, 324 F. Supp. 2d at 461-62 (defendant's critiques should be

evaluated and weighed by the trier of fact); *Butler*, 984 F. Supp. at 1263 (such attacks on social

psychologist expert go to the weight of the evidence and not it's admissibility).[11]  Even if an

expert's opinions is "based in part on disputed factual information, it does not invalidate her

study." *Ellis*, 240 F.R.D. at 650 ("The mistake in Dr. Reskin's study, if a mistake at all, goes to

---

[11] Significantly, while Bloomberg's rebuttal expert purports to provide counter examples and alternative interpretations, he admits in his deposition that he is in fact not providing that type of opinion.  Dr. Tetlock states that he is not providing an opinion as to whether there is outcome interdependence, accountability pressures, and objectivity measures in Bloomberg's personnel practices that can reduce bias.  (Tetlock Dep. 370-373.)  He does not represent that the purported accountability mechanisms he identifies in his Report are actually effective in ensuring accountability in judgments.  (Tetlock Dep. 285-86, 395-96.)  He is not providing an opinion as to whether Bloomberg managers used job-relevant information in making compensation decisions.  (Tetlock Dep. 373.)  Further, he is not aware of any study that reliably found that merely having an antidiscrimination policy is an effective mechanism to check bias, and he is not claiming that an antidiscrimination policy in itself acts sufficiently as an accountability measure. (Tetlock Dep. 291, 393-94.)  On other hand, if Bloomberg's expert is using the case materials and social science literature to evaluate whether Bloomberg's culture, organization, and policies and practices curb rather than activate stereotypes (See, e.g., Tetlock Report 70-74), he is effectively admitting that such an approach is appropriate.  Dr. Tetlock's Report is attached as Exhibit 8 to Konrad Batog's Declaration.

its weight, but does not render her study completely unreliable so that it lacks any probative value.").  As such, Dr. Borgida's social framework analysis in this case is reliable and should be admitted.

## IV.    Dr. Borgida's Testimony Is Based on Sufficient Facts and Data

As indicated above, Dr. Borgida's opinions are based on an extensive litigation record documenting Bloomberg's organizational context, culture, and employment policies and procedures.  Courts have accepted similar uses of litigation records as the basis for expert testimony.  *See e.g., Arnold*, 2006 WL 1716221, at *6-7 (expert's review of deposition testimony of defendant's executives and managers, corresponding exhibits, a statistical report, and a book about the defendant company was found "reliable"); *Robinson*, 760 F. Supp. at 1503 (expert on stereotyping relied on "fifteen depositions of male and female [defendant] employees, defendants' responses to plaintiff's requests for admissions, and the EEO-1 reports prepared by [defendant]"); *Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 301 (N.D. Cal. 1992) (expert worked from workforce statistics, union contract, E.E.O.C. determination, and depositions of managers).  Bloomberg cannot point to any critical gaps in the record or show that the record was an inaccurate representation of Bloomberg's culture, organization, policies and practices, and such conclusory allegations are insufficient to exclude an expert.[12]  *See U.S. ex rel. Suter v.*

---

[12] In contrast, Bloomberg supplied its expert with a case record replete with major gaps.  In contrast to the 177 depositions Dr. Borgida reviewed, Dr. Tetlock only reviewed 58 depositions. (Tetlock Report Ex. C.)  Further, critical to the issue of whether there were adequate accountability pressures at Bloomberg, Dr. Tetlock was not aware of employee complaints about Bloomberg's Human Resources department inadequately responding to employee grievances and was not aware of retaliation complaints arising after grievances with the department were made. (Tetlock Dep. 404-05.)  Similarly, he was not aware that Bloomberg had no policy about how to conduct investigations of employee grievances.  (Tetlock Dep. 406.)  Additionally, while claiming that part of Bloomberg's compensation system acts as an incentive to check manager bias because it is purportedly linked to company performance, Dr. Tetlock in fact does not know what aspect of company performance that part of the compensation system is linked to: "that's a

*Nat'l Rehab Partners Inc.*, CV-03-015-S-BLW, CV-03-128-S-BLW, 2009 U.S. Dist. LEXIS 88630, at *13 (D. Idaho Sept. 24, 2009) ("Without specific details as to how [expert's] consideration of a limited subset of the available documents skewed her conclusions or otherwise affected the reliability of her opinion…the Court cannot find that [expert's] opinion should be barred under Rule 702.").  Further, claims that Dr. Borgida purportedly failed to review all facts or data are not grounds to exclude his testimony.  *Int'l Healthcare Exch., Inc.*, 470 F. Supp. 2d at 355 (defendant's argument that Dr. Borgida did not review all relevant facts goes to weight rather than admissibility); *Wright*, 450 F. Supp. 2d at 360 (same); *Butler*, 984 F. Supp. at 1263 (same).  Additionally, Dr. Borgida need not have done his own data collection, and basing his opinion on facts and data from the litigation record does not make his testimony inadmissible. *Morgan Stanley I*, 324 F. Supp. 2d at 461-62 (argument that expert did not have first hand knowledge and relied on deposition testimony should be evaluated and weighed by the trier of fact).  As such, Dr. Borgida's analysis is reliable because it is based on extensive facts and data from the broad litigation record provided to him.

## V.     Dr. Borgida's Testimony Is Not Excludable under Rule 403

Bloomberg fails to show that the probative value of Dr. Borgida's testimony is substantially outweighed by a risk of unfair prejudice or confusion.  *See Int'l Healthcare Exch., Inc.*, 470 F. Supp. 2d at 355 (arguments about Dr. Borgida's application of the research literature to the facts of the case "do not raise such issues of unfair prejudice as to outweigh the probative value of the Borgida Report").  Exclusion of relevant evidence under Rule 403 "is an extraordinary remedy that must be used sparingly." *George v. Celotex Corp.*, 914 F.2d 26, 31 (2d

---

complex financial judgment call that's beyond the scope of my report."  (Tetlock Dep. 469.) EEOC did not challenge the admissibility of Dr. Tetlock's opinion because Defendant only presented him as a rebuttal expert.

Cir. 1990).  All evidence is intended to prejudice the opponent's case and just because Dr. Borgida's testimony has legitimate probative value that will help prove that Bloomberg's practices and policies fostered pregnancy/maternity stereotyping is not grounds for exclusion. *See U.S. v. Gelzer,* 50 F.3d 1133, 1139 (2d Cir. 1995) (evidence is prejudicial under Rule 403 if it "involves some adverse effect ... beyond tending to prove the fact or issue that justified its admission into evidence.") (quotation omitted).

Dr. Borgida's illustration of the social science research by reference to examples in the case record stays within the bounds of Rule 403 because he does not testify that these examples are representative of the experiences of all pregnant women and mothers at Bloomberg, that any particular comment, process, or decision is discriminatory or the result of stereotyping nor does he undertake to tell the trier of fact what ultimate conclusions to draw.  *Hnot*, 2007 WL 11599154, at *3 ("It is permissible for an expert to illustrate general principles by reference to evidence in the record.").  Additionally, unlike *EEOC v. Wal-Mart Stores, Inc.*, 2010 U.S. Dist. LEXIS 13192, at *10, relied on by Defendant, Dr. Borgida does not testify that "gender stereotyping exists in all facets of life" but rather that stereotyping is more or less likely under certain conditions.  Further, unlike *EEOC v. Morgan Stanley & Co.*, 01 Civ. 8421 (RMB)(RLE), 2004 U.S. Dist. LEXIS 12724, at *8 n.2 (S.D.N.Y. July 8, 2004), relied on by Defendant, Dr. Borgida does not opine that any feature of Bloomberg's organization is actually biased nor does he draw any other factual conclusion such as opining that Bloomberg's practices are "male dominated," "inadequate," or "insufficiently monitored."[13]  Rather, he explains how the

---

[13] Defendant's other citations concerning the alleged prejudice of Dr. Borgida's opinion either (1) support EEOC's argument here, (2) do not apply, or (3) are bad law.  In *Serrano v. Cintas Corp.*, Nos. 04-40132, 06-12311, 2009 WL 910702 (E.D. Mich. Mar. 31, 2009), the court denied defendant's motion to strike plaintiff's expert report.  In *Cooper v. Southern Co.*, 205 F.R.D. 596, 611 (N.D. Ga. 2001), the expert did not opine about stereotyping or the contexts in which

materials in the case record describing Bloomberg's organization, culture, practices and policies are consistent with the social science findings on stereotyping.  *See Tuli*, 592 F. Supp. 2d at 214 (expert's social framework analysis done "in a way that has scientific validity: he cannot say whether a given act or word was discriminatory; he can only show the settings in which discrimination typically occurs and opine on whether the allegations in the case at bar are consistent with the observed patterns."); *Morgan Stanley I,* 324 F. Supp. at 462 (expert "may properly testify about gender stereotypes, and about how these stereotypes may have affected decisions at Morgan Stanley.").[14]  As shown by the numerous cases accepting a social framework analysis and admitting Dr. Borgida in particular, such testimony is a legitimate method of persuasion.

## CONCLUSION

Because Dr. Borgida's opinions and testimony are relevant and based on extensive case facts, sound scientific findings, and a reliable application of social science findings to the case facts, Bloomberg's Motion should be denied.

---

stereotypes are more or less likely to occur.  And the district court's opinion in *Robinson v. Metro-North Commuter R.R. Co.*, 175 F.R.D. 46 (S.D.N.Y. 1997) has no precedential value because the district court was reversed by the Second Circuit on the issue of whether "the delegation of discretionary authority to supervisors for discipline and promotion constitutes a policy or practice sufficient to satisfy the commonality requirement," which was directly related to the expert's sociological report.  *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 156 (2d Cir. 2001) (citing *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 292-93 (2d Cir. 1999), *overruled in part by In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 40 (2d Cir. 2006) (district court cannot certify a class based merely on "some showing" of compliance with Rule 23 requirements)).

[14] Even if credited, Bloomberg's concerns of prejudice may be properly addressed through appropriate jury instructions, limiting instructions, and cross examination, not the wholesale exclusion of a witness whose testimony is so highly relevant to and probative of EEOC's claims. *See Hnot*, 2007 WL 11599154, at *3 ("limiting instructions reminding the jury of its role and of the limits of expert testimony will clarify the extent of their consideration of such testimony.") (citing *U.S. v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions.")).

Dated: June 11, 2010
      New York, New York

                     Respectfully submitted,

                     EQUAL EMPLOYMENT OPPORTUNITY
                     COMMISSION

                     s/ Konrad Batog_____
                     Konrad Batog
                     Trial Attorney
                     Equal Employment Opportunity Commission
                     New York District Office
                     33 Whitehall Street, 5th floor
                     New York, New York 10004
                     (212) 336-3700
                     Facsimile: (212) 336-3623
                     konrad.batog@eeoc.gov