UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

                    Plaintiff,

                -against-

BLOOMBERG L.P.,

                    Defendant.

------------------------------------------------------------------------x     07-CV-8383 (LAP)(HBP)
                                     ECF CASE
JILL PATRICOT, TANYS LANCASTER,
JANET LOURES, MARINA KUSHNIR, MONICA PRESTIA, and
MARIA MANDALAKIS,

                    Plaintiff-Intervenors,

                -against-

BLOOMBERG L.P.,

                    Defendant.

------------------------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BLOOMBERG L.P.'S MOTION TO EXCLUDE THE REPORTS AND TESTIMONY OF DR. LOUIS LANIER

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ................................................................................................... 1

I.   EEOC Asserts That Bloomberg Has Engaged in a Broad-Based and Lasting Pattern or Practice of Sex/Pregnancy Discrimination Under Title VII of the Civil Rights Act ......... 1

II.  Dr. Lanier Appropriately Studied the Effect of Class Membership (and of Leave) on Compensation ........................................................................................... 4

ARGUMENT ........................................................................................................ 7

I.   Dr. Lanier's Reports and Testimony Are Admissible ....................................... 7

  A.   Dr. Lanier's Expert Qualifications Are Undisputed .................................... 8

  B.   Dr. Lanier's Expert Opinions Are Relevant to Whether Bloomberg Compensates Class Members Differently from Non-Class Members Based on Sex/Pregnancy ........ 8

    1.   The Only Relevant Question Is Whether Bloomberg Discriminates Against Class Members Based on Their Sex/Pregnancy .................................................... 9

    2.   Defendant Erroneously Argues that Just Because EEOC Asserts a PDA Claim, the Focus of EEOC's Allegations Is On Leave-Taking ............................................. 11

  C.   Dr. Lanier's Expert Opinions Are Reliable .............................................. 15

    1.   Dr. Lanier's Interaction Model and His Interpretation of It Are Reliable ................. 15

    2.   Defendant's Criticisms of Dr. Lanier's Analyses Go to Weight, Not Admissibility ...................................................................................... 18

CONCLUSION ................................................................................................... 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abdu-Brisson v. Delta Air Lines, Inc.*,
    239 F.3d 456 (2d Cir. 2001)...................................................................................... 17

*Bazemore v. Friday*,
    478 U.S. 385 (1986)................................................................................................... 20

*Bickerstaff v. Vassar College*,
    196 F.3d 435 (2d Cir. 1999)...................................................................................... 16

*California Fed. Sav. & Loan Ass'n v. Guerra*,
    479 U.S. 272 (1987)................................................................................................... 12

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)................................................................................................. 7, 8

*Doe v. C.A.R.S. Protection Plus, Inc.*,
    527 F.3d 358 (3d Cir. 2008)...................................................................................... 14

*EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*,
    186 F.3d 110 (2d Cir. 1999)...................................................................................... 19

*Hazelwood Sch. Dist. v. United States*, 433 U.S. 299 (1977) ........................................ 9

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977)................................. 9, 20

*Laxton v. Gap, Inc.*,
    333 F.3d 572 (5th Cir. 2003) ............................................................................... 10, 12

*Minott v. Port Authority,*
    116 F. Supp. 2d 513 (S.D.N.Y. 2000)....................................................................... 14

*Mozee v. Am. Commercial Marine Serv. Co.*,
    940 F.2d 1036 (7th Cir. 1991) .................................................................................. 16

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
    462 U.S. 669 (1983)................................................................................................... 13

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005)........................................................................................ 7

*Obrey v. Johnson*,
 400 F.3d 691 (9th Cir. 2005) ................................................................. 20

*Orr v. City of Albuquerque*,
 531 F.3d 1210 (10th Cir. 2008) ............................................................. 13

*Ottaviani v. State Univ. of New York*, 875 F.2d 365, 367 (2d Cir. 1989) ................................ 9, 11

*Piraino v. Int'l Orientation Res., Inc.*,
 137 F.3d 987 (7th Cir. 1998) ................................................................. 14

*Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147 (2d Cir. 2001) ...................................... 9

*Sheehan v. Donlen Corp.*,
 173 F.3d 1039 (7th Cir. 1999) ............................................................... 11

*Sigmon v. Parker Chapin Flattau & Kimpl*, 901 F. Supp. 667 (S.D.N.Y. 1995) .................... 9, 10

*Velez v. Novartis Pharms. Corp.*,
 No. 04 Civ. 9194 (CM) (S.D.N.Y.) ...................................................... 8, 9

*Velez v. Novartis Pharms. Corp.*,
 244 F.R.D. 243 (S.D.N.Y. 2007) .................................................... 10, 14, 15

*Velez v. Novartis Pharms. Corp.*,
 No. 04 Civ. 9194 (CM), 2009 WL 3395091 (S.D.N.Y. Oct. 20, 2009) ...................... 19

*Velez v. Novartis Pharms. Corp.*, No. 04 Civ. 9194 (CM), Doc. 270,
 Rulings on Motions *in Limine* (S.D.N.Y. Feb. 25, 2010) ......................... 8, 19

*Vosdingh v. Qwest Dex, Inc.*,
 No. Civ. 03-4284, 2005 WL 914732 (D. Minn. Apr. 21, 2005) ......................... 14

*Watson v. Fort Worth Bank & Trust*,
 487 U.S. 977 (1988) ......................................................................... 20

*Wright v. Stern*,
 450 F. Supp. 2d 335 (S.D.N.Y. 2006) .................................................. 8, 19

**Statutes**

Title VII of the Civil Rights Act of 1964 ...................................................... 1

Title I of the Civil Rights Act of 1991 ........................................................ 1

The Pregnancy Discrimination Act,
Pub. L. No. 95-555, § 1, 1978 U.S.C.C.A.N. (92 Stat.) 2076 ............................................. 1, 12

The Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k) ........................................... 12

**Other Authorities**

29 C.F.R. § 1604.10(a)................................................................................................. 13

EEOC Compliance Manual (BNA) ............................................................................... 13

EEOC Enforcement Guidance: Unlawful Disparate Treatment of Workers with Caregiving
Responsibilities (May 23, 2007) .............................................................................. 13

EEOC's Caregiver Guidance ...................................................................................... 13

*Velez v. Novartis Pharms. Corp.*, No. 04 Civ. 9194 (CM), Trial Transcript (S.D.N.Y. April 19,
2010) ............................................................................................................... 8

*Velez v. Novartis Pharms. Corp.*, No. 04 Civ. 9194 (CM), Trial Transcript (S.D.N.Y. May 17,
2010) ............................................................................................................ 8, 10

*Velez v. Novartis Pharms. Corp.*, No. 04 Civ. 9194 (CM), Trial Transcript (S.D.N.Y. May 19,
2010) ............................................................................................................... 8

**Rules**

Fed. R. Evid. 702 ....................................................................................................  7

Fed. R. Evid. 702 advisory committee's note (2000 Amendments)........................................... 7

## PRELIMINARY STATEMENT

Plaintiff Equal Employment Opportunity Commission ("EEOC") opposes Bloomberg L.P.'s ("Bloomberg's") motion to exclude Dr. Louis Lanier, EEOC's labor economist expert. Dr. Lanier's reports and testimony describe how class status adversely affects the compensation of class members, which is directly relevant to EEOC's claim that Bloomberg maintains a pattern or practice of sex/pregnancy discrimination. Moreover, Dr. Lanier's analyses are reliable as he appropriately controls for leave duration and he appropriately distinguishes the effect class membership has on pay from the effect leave-taking has on pay. For these reasons, Dr. Lanier's proposed opinions are admissible and Defendant's motion should be denied.

## BACKGROUND

I.    **EEOC Asserts That Bloomberg Has Engaged in a Broad-Based and Lasting Pattern or Practice of Sex/Pregnancy Discrimination Under Title VII of the Civil Rights Act**

EEOC brings this case under Title VII of the Civil Rights Act of 1964 ("Title VII"), Title I of the Civil Rights Act of 1991, and the Pregnancy Discrimination Act of 1978 ("PDA"). EEOC alleges, *inter alia*, that Bloomberg has engaged in a pattern or practice of discriminating against pregnant women and mothers that has manifested in a variety of ways, including but not limited to: awarding class members less compensation, demoting class members, diminishing class members' responsibilities, excluding class members from employment opportunities, subjecting class members to stereotypes regarding female caregivers, and discriminating against class members in other terms, conditions, or privileges of employment. The class is defined as nonclerical female employees worldwide who became pregnant and/or returned from maternity

leave between February 2002 and the present.  (*See* Adams Decl.[1] ¶ 2 (Complaint); Adams Decl. ¶ 3 (EEOC Interrog. Resps.) at 3; Adams Decl. ¶ 4 (Adams Letter).)

This suit arose from three women's EEOC charges alleging that starting when they announced their pregnancies, Bloomberg treated them worse than employees who were not pregnant or mothers.  Since EEOC filed this case in 2007, dozens more women have echoed and expanded on these allegations.  (*See* Adams Decl. ¶ 3 (EEOC Interrog. Resps.) at 8-159.)  The collective experiences of the 79 claimants, along with evidence of Defendant's discriminatory policies, practices and acts flowing from its highest echelon, comprise the worldwide, ongoing, pattern or practice of discrimination that EEOC challenges in this case.  (*See generally id.*)

In terms of compensation, class members have suffered: decreases in their salaries; salaries remaining "flat" or increasing at a lesser rate; receiving the same number or fewer certificates (discretionary compensation); decreased total intended compensation from the actual value of their prior year's compensation; total intended compensation increasing at a lesser rate; and salaries, number of certificates, rates of salary increase, and rates of intended compensation increase being less than those of individuals who performed similarly, but who were not pregnant or returning from maternity leave during comparable time periods.  (*See id.*)  Two-plus years of discovery, including depositions of all 79 claimants and EEOC's 219-page responses to Defendant's contention interrogatories, have made the specifics of EEOC's allegations against Bloomberg crystal clear.

Despite Defendant's full knowledge of the specific allegations, claims and theories in this suit, it disingenuously focuses on how it treats leave takers, as opposed to how it treats pregnant

---

[1] EEOC's Memorandum in Opposition to Defendant's Motion To Exclude the Reports and Testimony of Dr. Louis Lanier is supported by the Declaration of Raechel L. Adams ("Adams Decl.") and accompanying exhibits, and by the Declaration of Dr. Louis Lanier ("Lanier Decl.").

women and mothers, arguing now that EEOC has the burden to prove that Bloomberg treated pregnant women less favorably than it treated those "similarly situated in their ability or inability to work."  (Defendant's Memorandum of Law in Support of Its Motion To Exclude the Reports and Testimony of Dr. Louis Lanier ("Def. Mem.") at 1, 10, 11.)  As discussed herein, Defendant misstates the core issue in this case and in turn propones the application of the wrong legal standard in the context of arguing that Dr. Lanier has studied the wrong question.

Specifically, Defendant inaccurately portrays the role of class members' maternity leave itself in EEOC's allegations.  While EEOC's Complaint refers to Defendant's treatment of the class "once class members return from maternity leave," that reference simply helps identify the scope of the class and of the relevant time period.  In other words, EEOC's Complaint conveys clearly that Bloomberg does not limit its discrimination against women to employment actions occurring solely in the nine months the class members are pregnant; rather, the discrimination occurs at varying times in varying ways during the period surrounding class members' pregnancy and motherhood status, with the class period starting on February 1, 2002 and continuing through the class members' employment.  Defendant's misplaced, overly literal focus on class members' maternity leave leads it to emphasize a PDA proof framework that simply does not fit the allegations of this case.  Therefore, Defendant's argument that Dr. Lanier's analyses are irrelevant to that framework misses the mark and must be rejected.

The proper legal question to consider in assessing the relevance of Plaintiff's statistical expert's evidence is whether the expert analyses demonstrate any variation in compensation[2] that

---

[2] The statistical experts on both sides focused their analyses primarily on compensation, due to the insufficiency of Bloomberg data relating to EEOC's other allegations.  (*See* Adams Decl. ¶ 5, (Ward Dep.) at 157-58; 434-38; Adams Decl. ¶ 6 (Johnson Dep.) at 64-65, 76-78; Adams Decl. ¶ 7 (Johnson initial report), at 8 n.8).)  Additionally, although the class includes pregnant employees who have not yet taken maternity leave, all three statistical experts were constrained

is correlated with class status.  Dr. Lanier's analysis does just that.  As Defendant knows, EEOC's claims include discrimination that occurs after a class member has announced her intent or efforts to become pregnant, while (and because) she is pregnant, while she is on maternity leave, and after she returns from maternity leave.  The proper statistical comparison, then, pits class members (a set group of approximately 600 female employees agreed upon by the parties) against all similarly situated non-class members (that is, women and men who were not pregnant and have not returned from maternity leave between February 2002 and the present and who are similar to the class members in their job tenure, experience level, amount of leave taken in the preceding year, etc.).  This is precisely the comparison that Dr. Lanier makes.[3]

## II.   Dr. Lanier Appropriately Studied the Effect of Class Membership (and of Leave) on Compensation

Dr. Lanier used appropriate regression models with appropriate explanatory variables to compare compensation outcomes for class members to those of non-class members.  For his initial report, Dr. Lanier used maternity leave dates (provided by Defendant for individuals it identified as Class Members) as a proxy for employees fitting the class definition, because Bloomberg does not track pregnancy *per se*.  (*See* Adams Decl. ¶ 8 (Lanier Initial Report)[4] ¶¶ 7, 8.)  He then compared class compensation outcomes to non-class compensation outcomes.  (*Id.* ¶¶ 24, 29.)  For purposes of Dr. Lanier's analysis, each class member's status as a class member

---

by Bloomberg's data, which do not track pregnancy; therefore, all three experts only analyzed the compensation of class members with identifiable maternity leaves.  (*See* Adams Decl. ¶ 8 (Lanier initial report), at ¶¶ 5, 7-8; Adams Decl. ¶ 9 (Ward initial report) at 7, 9; Adams Decl. ¶ 7 (Johnson initial report), at ¶ 15; Adams Decl. ¶ 5 (Ward Dep.) at 105-06; Adams Decl. ¶ 6 (Johnson Dep.) at 124.)

[3] For further discussion of how Dr. Lanier studies the right question and Defendant's experts study the wrong question, see EEOC's Motion To Exclude the Reports and Testimony of Drs. Ward and Johnson and supporting documents, filed May 14, 2010 [Docket Entry 115].

[4] Note that in connection with its motion, Defendant filed Dr. Lanier's *uncorrected* tables in connection with Exhibit B to the supporting Declaration of Eric Dreiband.

began on the date of her first maternity leave after February 1, 2002; prior to going on maternity leave, class members were included in the non-class member control group. (*See id*. at ¶¶ 8, 24, 29.)[5]  Dr. Lanier found that class members received lower base pay rate increases and lower EEC[6] grants than non-class members when he compared employees in the same year, in the same business unit, with the same amount of company tenure and pre-Bloomberg experience, and who were paid the same base pay and EEC grants in the previous year. (*See* Adams Decl. ¶ 8 (Lanier Initial Report), Tables 1 and 2.)  These results were statistically significant at more than two standard deviations, meaning there is less than a five percent probability that the results could have occurred by random chance. (*Id*.)

Initially, Dr. Lanier did not control for leave duration for two reasons: (1) because he properly understood that EEOC's reference in its Complaint to employment decisions made "after a class member's maternity leave" merely conveyed the timeframe of the allegations and helped define the class,[7] and (2) because Bloomberg's policy specifically states that managers are not to take leave into account in compensation decisions.[8]  (*See* Lanier Decl. ¶ 4.)

However, as Bloomberg acknowledges (*see* Def. Mem. at 5-7), in Dr. Lanier's reply analyses, he *did* control for leave duration, and he studied the effect of class membership on pay, along with and in contrast to the effect of leave on pay. (*See* Adams Decl. ¶ 11 (Lanier Reply Report) ¶¶ 5, 6.)  Dr. Lanier controlled for leave duration in his Reply because, even though

---

[5] If anything, Dr. Lanier's analysis is conservative regarding identification of the class because he took an all-or-nothing approach to an individual's class status: female employees who returned from maternity leave before February 1, 2002 were included in the non-class control group, solely because their maternity dates fell outside the class period. Likewise, if someone was pregnant or returned from maternity leave within the relevant period but was a foreign national not covered by Title VII, she was placed within the non-class member control group.
[6] EECs, or Bloomberg certificates, are the discretionary component of Bloomberg compensation.
[7] *See* Adams Decl. ¶ 10 (Lanier Rebuttal Report) ¶¶ 4, 6.
[8] *See id*. ¶ 24; Adams Decl. ¶ 11 (Lanier Reply Report) ¶ 21 n.6; Adams Decl. ¶ 12 (Cooper 30(b)(6) Dep.) at 99-100; Adams Decl. ¶ 13 at BLP 0062018; Adams Decl. ¶ 14 at BLP 092994.

Bloomberg's official policy is not to consider leave-taking or leave duration in compensation decisions, labor economics literature shows that leaves can be correlated with negative pay consequences to the extent there are changes in an employee's productivity associated with being out on leave.  (*See* Adams Decl. ¶ 10 (Lanier Rebuttal Report) ¶ 24; Adams Decl. ¶ 11 (Lanier Reply Report) ¶ 21 n.6.)  Because Dr. Lanier as a labor economist would expect different types of leave to result in different pay outcomes upon the employees' return (an expectation Dr. Ward, one of Defendant's labor economist experts, confirmed held true in this case (*see* Adams Decl. ¶ 9 (Ward Initial Report) at 14), Dr. Lanier used a refined leave duration control to account differently for the duration of a maternity leave versus the duration of a nonmaternity leave.[9] (*See* Adams Decl. ¶ 11 (Lanier Reply Report) ¶¶ 20-23; Lanier Decl. ¶¶ 5, 6.)

After modifying his analyses to control for the amount of time each employee was out on leave, Dr. Lanier still found statistically significant class-related disparities in total intended compensation, base salary, and intended EEC grants.  (*See* Adams Decl. ¶ 16 (Lanier Corr. Reply) ¶¶ 6-15.)  Indeed, Dr. Lanier's Table 0 shows that on average, class members received a 1.17% lower total intended compensation increase than similarly situated non-class members receiving compensation changes in the same year, in the same business unit, with the same amount of company tenure and pre-Bloomberg labor force experience, who were previously paid the same total intended compensation and EEC grants, and who took the same amount of leave in the previous year.  (*Id*. at Table 0.)  Dr. Lanier found similar class disparities in base pay (0.92% lower base pay rate increases) and EEC grants ($1,399 lower intended EEC grants), using the same controls.  (*Id*. at Table 1 and Table 2.)  Dr. Lanier's results are statistically

_____

[9] Technically, Dr. Lanier differentiated between class members' leaves and non-class members' leaves, as opposed to maternity leave versus other leave types, due to the fact that only the class members took maternity leave and due to the unreliability of the leave reasons in Bloomberg's data.  (*See* Adams Decl. ¶ 15 (Lanier Dep.) at 322-25; Lanier Decl. ¶¶ 5-7.)

significant at 3.08 standard deviations for total intended compensation changes, 4.5 standard deviations for base pay rate changes, and 2.40 standard deviations for EEC grants (the higher the standard deviations, the lower the probability the result could have occurred by random chance). (*Id.* at Tables 0-2.)  In other words, class members experience a "fixed class penalty" in compensation that is solely attributable to their class status, once all legitimate business factors (including leave duration) are controlled for.  (*See* Adams Decl. ¶ 11 (Lanier Reply Report) at 20-23; Adams Decl. ¶ 15 (Lanier Dep.) at 340-45; Lanier Decl. ¶¶ 11, 29, 30.)

Given Dr. Lanier's refined leave duration control, he was able to isolate (or distinguish) the effect of class membership on compensation from the effect of leave-taking on compensation.  (*See* Adams Decl. ¶ 10 (Lanier Rebuttal Report) ¶ 6; Adams Decl. ¶ 11 (Lanier Reply Report) ¶¶ 20-23; Lanier Decl. ¶¶ 6, 7, 12, 29, 30.)  Unlike Defendant's experts' methodologies, Dr. Lanier's methodology therefore permitted him to study the relevant legal question:  Does Bloomberg treat class members less favorably in compensation than it treats non-class members who are otherwise similarly situated, based solely on their class status?

## ARGUMENT

## I.   Dr. Lanier's Reports and Testimony Are Admissible

Under Federal Rule of Evidence 702, a qualified expert may testify if the expert's knowledge will assist the trier of fact to understand the evidence or determine a fact in issue: *i.e.,* if the testimony is relevant, and if it is reliable.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587-88 (1993).  "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinion."  *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005) (citing *Daubert*, 509 U.S. at 588).  The "rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702 advisory committee's note (2000 Amendments).  "[T]he trial court's

role as gatekeeper is not intended to serve as a replacement for the adversary system." *Wright v. Stern*, 450 F. Supp. 2d 335, 360 (S.D.N.Y. 2006) (quotation omitted).  Thus, even "in a close case the testimony should be allowed for the jury's consideration . . . where it can be tested by cross-examination and measured against the other evidence in the case." *Id.*  Under these liberal standards, the Court should admit Dr. Lanier's opinions.

## A.  Dr. Lanier's Expert Qualifications Are Undisputed

Dr. Lanier has a Ph.D. in labor economics and has provided expert testimony in many employment discrimination cases over several years.  (*See* Adams Decl. ¶ 8 (Lanier Initial Report) ¶ 1).  Most recently, Judge McMahon denied the defendant's motion to exclude Dr. Lanier's testimony and accepted Dr. Lanier as the plaintiffs' labor economist expert at trial in *Velez v. Novartis Pharms. Corp.*, No. 04 Civ. 9194 (CM) (S.D.N.Y.), a sex and pregnancy discrimination class action in which the jury rendered a verdict on all liability allegations and awarded more than $250 million in compensatory and punitive damages (the court has not yet decided a classwide backpay amount).  (*See* Adams Decl. ¶ 17 (*Velez* Rulings on Motions *in Limine*), at 8 ("Defendant's motion to preclude the testimony of Dr. Louis R. Lanier is DENIED. . . . Dr. Lanier's testimony is both relevant and reliable.  It is the sort seen all the time in employment discrimination litigation."); Adams Decl. ¶ 18 (4/19/10 Trial Transcript) at 770; Adams Decl. ¶ 19 (5/17/10 Trial Transcript) at 3601-02; Adams Decl. ¶ 20 (5/19/10 Trial Transcript) at 3701.)  Defendant has not challenged Dr. Lanier's qualifications in this case.

## B.  Dr. Lanier's Expert Opinions Are Relevant to Whether Bloomberg Compensates Class Members Differently from Non-Class Members Based on Sex/Pregnancy

The Federal Rules' basic relevance standard is a liberal one.  *Daubert*, 509 U.S. at 587.  In particular, statistical evidence is relevant and admissible in cases alleging a pattern or practice of employment discrimination, where EEOC has the burden of producing evidence that raises the

inference "that unlawful discrimination [on the basis of sex/pregnancy] has been a regular procedure or policy followed by [Defendant]." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 360 (1977); *see also Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977). EEOC can (and typically does) make this showing through two kinds of circumstantial evidence: "(1) statistical evidence aimed at establishing the defendant's past treatment of the protected group, and (2) testimony from protected class members detailing specific instances of discrimination." *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 158 (2d Cir. 2001) (citations omitted). As to the statistical evidence "[i]n disparate treatment cases involving claims of gender discrimination, plaintiffs typically use multiple regression analysis to isolate the influence of gender on employment decisions relating to a particular job or job benefit, such as salary." *Ottaviani v. State Univ. of New York*, 875 F.2d 365, 367 (2d Cir. 1989).

      **1.**   **The Only Relevant Question Is Whether Bloomberg Discriminates Against Class Members Based on Their Sex/Pregnancy**

As explained above, EEOC brings the instant case under Title VII, which includes the PDA in its Definitions section. EEOC's allegations center on how women working at Bloomberg are treated when they announce their intention to become pregnant, become pregnant, and once they are mothers, as compared to employees who do none of those. For this reason, Dr. Lanier compared how Bloomberg compensates class members versus how it compensates non-class members, and he isolated class status as a basis for any variation between class members' expected compensation and what Bloomberg actually awards them.

EEOC's broad-based sex/pregnancy discrimination allegations are not unusual. For example, *Velez v. Novartis Pharms. Corp.*, No. 04 Civ. 9194 (CM) (S.D.N.Y.), and *Sigmon v. Parker Chapin Flattau & Kimpl*, 901 F. Supp. 667 (S.D.N.Y. 1995), both arose under Title VII generally and the PDA specifically. As in the instant case, the plaintiffs in *Velez* and *Sigmon*

9

successfully emphasized that their employers treated pregnant women and mothers worse than employees who were not pregnant or mothers.

In *Velez*, a nationwide class of female sales representatives alleged, *inter alia*, that "women returning from pregnancy leave are subjected to denial of promotions and promotional opportunities, 'stricter scrutiny,' hostile comments, unreasonable discipline, and 'adverse employment actions.'"  244 F.R.D. 243, 265 (S.D.N.Y. 2007) (quoting plaintiffs' complaint). Then-District Judge Lynch certified a classwide claim based on pregnancy discrimination in plaintiffs' terms, conditions or privileges of employment, *id.* at 267, the court deemed admissible statistical evidence by none other than Dr. Lanier supporting plaintiffs' sex discrimination claims to "shed light" on their anecdotal evidence of pregnancy discrimination.  *Id.*  A jury recently found *Novartis* liable for classwide sex and pregnancy discrimination.  (*See* Adams Decl. ¶ 19 (5/17/10 Trial Transcript) at 3602.)

In *Sigmon*, the plaintiff alleged "that she was discriminated against, and ultimately terminated, by defendant because she is a woman, became pregnant, and had a child."  901 F. Supp. at 671.  Sigmon presented evidence that: shortly after she announced her pregnancy, defendant spread a rumor that she was planning on taking advantage of defendant by working shorter hours for full pay, *see id.* at 671-72, suddenly began to isolate her and exclude her, *see id.* at 672, the chairman of the department made a discriminatory comment, *see id.*, during plaintiff's maternity leave she was called to a meeting in which multiple partners criticized her work performance, *see id.*, and she was fired two months after her return from maternity leave, *see id.* at 672-73.  Given the totality of the above evidence, Judge Leisure denied summary judgment on plaintiff's sex and pregnancy discrimination claim.  *Id.* at 676-78; s*ee also Laxton v. Gap, Inc.*, 333 F.3d 572, 584 (5th Cir. 2003) (in PDA case, reversing summary judgment for employer

because employer's stated reasons for firing plaintiff were not credible and because "[i]t is reasonable to infer from [supervisor's] negative reaction to news of [plaintiff's] pregnancy that she harbored a stereotypical presumption about [plaintiff's] ability to fulfill job duties as a result of her pregnancy."); *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044-45 (7th Cir. 1999) (in PDA case, affirming jury verdict for plaintiff whose supervisor made negative comments about plaintiff's pregnancy, put her on a performance plan, and fired her while she was pregnant, saying "Hopefully this will give you some time to spend at home with your children" and noting that "with respect to stereotypes [ ] pregnancy discrimination law is no different from other sorts of anti-discrimination law. . . . Discrimination on the basis of pregnancy is part of discrimination against women, and one of the stereotypes involved is that women are less desirable employees because they are liable to become pregnant.  This was one of Congress' concerns in passing the Pregnancy Discrimination Act.").  As here, the focus in each case was purely the defendant's treatment of the plaintiffs based on their sex/pregnancy.

## 2.   Defendant Erroneously Argues that Just Because EEOC Asserts a PDA Claim, the Focus of EEOC's Allegations Is On Leave-Taking

In its motion, Defendant misrepresents EEOC's allegations and the appropriate legal standard to justify its contorted argument that Dr. Lanier's analysis is irrelevant to those allegations.[10]  Specifically, Defendant erroneously insists that this case is about how it treats leave takers, and it examines how it treats pregnant women and mothers only as a sub category

---

[10] Preliminarily, Defendant asserts that "[t]o be admissible in a disparate-treatment discrimination case such as this one, statistical regressions must draw comparisons between individuals who are similarly situated to the plaintiffs in legally relevant ways" and cites cases from outside the Second Circuit.  (Def. Mem. at 8.)  The focus in a disparate treatment case in the Second Circuit is on how the employer treats the members of the protected class.  *See Ottaviani*, 875 F.2d at 370-71 ("[P]laintiffs in a disparate treatment case frequently rely on statistical evidence to establish that there is a disparity between the predicted and actual treatment of employees who are members of a disadvantaged group, and to argue that such disparities exist because of an unlawful bias directed against these employees").

of those leave takers.  But EEOC's case is only about discriminatory treatment of pregnant women and mothers, and not about treatment of leave takers.  Dr. Lanier, understanding that leave from work may legitimately affect compensation, controlled for leave duration in his reply analyses, just as he did for other legitimate factors, such as business unit.  However, Dr. Lanier appropriately concentrated on Bloomberg's treatment of pregnant women and mothers, rather than making the effect of leave on compensation the centerpiece of his inquiry.

To support its theory, Defendant emphasizes that EEOC's claims arise in part under the PDA, which provides, in relevant part: "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . . ."  42 U.S.C. § 2000e(k).  Bloomberg argues narrowly that the PDA "requires that the employer not treat individuals who take maternity leave *less favorably* than other leave takers" (Def. Mem. at 15) and that Dr. Lanier's analysis fails to analyze the class compared to "persons not so affected [pregnant] but similar in their ability or inability to work."  (*Id*. at 9-10 (quoting 42 U.S.C. § 2000e(k)).)  But the PDA is not a separate statute giving rise to separate claims – it is merely a definition, passed to clarify that sex discrimination under Title VII (and not disability discrimination as Defendant suggests) includes pregnancy discrimination.  *See* The Pregnancy Discrimination Act, Pub. L. No. 95-555, § 1, 1978 U.S.C.C.A.N. (92 Stat.) 2076 (codified as amended at 42 U.S.C. § 2000e(k)).  Moreover, "[t]he Supreme Court has held that the first clause of the PDA is not limited by the specific language in the second clause."  *Laxton*, 333 F.3d 572, 577-78 (5th Cir. 2003) (citing *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 285

(1987); *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678 n.14 (1983)).

Again, EEOC's claims are much broader than how Bloomberg describes them: the case does not

center on pregnant women's or mothers' "inability to work" but rather, on how Bloomberg has

treated the class members while they are at work.  Thus, Defendant posits the wrong legal

framework against which to evaluate the relevance of Dr. Lanier's analyses.

Because Defendant erroneously characterizes leave-taking as the focus of this case,

Defendant argues that Dr. Lanier should analyze class members compared to "persons not so

affected [pregnant] but similar in their ability or inability to work."  42 U.S.C. § 2000e(k).  Not

surprisingly, in support of its argument, Bloomberg cites cases emphasizing the second clause of

the PDA, which essentially contemplates pregnant employees simply as a sub category of

employees unable to work due to short-term disability.[11]

In Defendant's cited cases, the plaintiffs generally sought a particular benefit denied to

pregnant employees but provided to a subset of nonpregnant employees who were unable to

work.  Those cases are inapposite, and some of them support EEOC's position outside the

statistical context that Title VII does not require a plaintiff alleging pregnancy discrimination to

present a comparison with similarly situated employees at all, let alone a comparison exclusively

with other leave takers.  *See Orr v. City of Albuquerque*, 531 F.3d 1210, 1216 (10th Cir. 2008)

(reversing summary judgment for employer, in part relying on plaintiff's non-comparator

---

[11] Defendant also disingenuously points to EEOC regulations and Enforcement Guidance that
discuss the second clause of the PDA.  (Def. Mem. at 11.)  Defendant ignores multiple sections
of EEOC guidance providing that the PDA meant to clarify that Title VII's sex discrimination
prohibition includes discrimination based on pregnancy and related conditions, and related sex
stereotypes.  *See, e.g.*, EEOC Compliance Manual (BNA) § 626.1(c), § 626.4; *see also* 29 C.F.R.
§ 1604.10(a).  Defendant also fails to cite EEOC's Caregiver Guidance, which discusses sex-
based disparate treatment of female caregivers.  *See* EEOC Enforcement Guidance: Unlawful
Disparate Treatment of Workers with Caregiving Responsibilities (May 23, 2007), at Sections
II.A. and II.B., available at http://www.eeoc.gov/policy/docs/caregiving.html.

evidence); *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 366-71 (3d Cir. 2008) (reversing summary judgment for employer *not* because plaintiff compared herself to non-pregnant or non-maternity *leave takers* but instead by relying in part on non-comparator evidence); *see also Minott v. Port Authority,* 116 F. Supp. 2d 513, 521 (S.D.N.Y. 2000) (plaintiff fired for excessive absences sought special treatment where comparators' absences were work-related and therefore exempt from defendant's attendance policy); *Piraino v. Int'l Orientation Res., Inc.*, 137 F.3d 987 (7th Cir. 1998) (plaintiff unable to show pregnancy discrimination when defendant fired her under neutral policy granting leave only after one year of company service). *Piraino* is clearly distinguishable in that EEOC makes no claim about Bloomberg's actual provision of leave or failure to provide leave to anyone. Further, Bloomberg does have a policy of not considering leave in compensation decisions. (*See* Adams Decl. ¶ 13 at BLP 0062018; Adams Decl. ¶ 14 at BLP 0092994.) None of the cases Defendant cites relate to the appropriate question here.

Defendant's reliance on *Velez v. Novartis Pharms. Corp.* is particularly misplaced, as certain facts are distinguishable and the analysis and outcome support EEOC's position. In *Velez*, the plaintiffs' motion to certify a class was denied as to their pregnancy discrimination claim related to incentive compensation because at Novartis, incentive compensation is directly related to time employees are working. *See* 244 F.R.D. at 264-65. Judge Lynch suggested, however, that had plaintiffs' claim included "an affirmative sanction [on pay] for taking [maternity] leave," they may have been more successful. *Id*. at 265 n.18 (comparing to *Vosdingh v. Qwest Dex, Inc.*, No. Civ. 03-4284, 2005 WL 914732 (D. Minn. Apr. 21, 2005), in which employees on leave got a score of zero on their performance evaluation – the same score for poor performance, "which much more closely resembles an affirmative sanction for taking leave").

Here, EEOC alleges that class members do suffer such affirmative sanctions for taking maternity leave in connection with their becoming mothers.  (*See* Adams Decl. ¶ 2 (Complaint) ¶ 7; Adams Decl. ¶ 3 (EEOC Interrog. Resps.) at 3-4.)  In any event, although statistics were not sufficient to support class certification in *Velez* on plaintiffs' claims related to incentive compensation while on leave, the class was still certified as to pregnancy discrimination in other employment terms, conditions or privileges, and the court found Dr. Lanier's other statistical evidence relevant and admissible to support the plaintiffs' evidence of pregnancy discrimination. 244 F.R.D. at 267 ("Pregnancy discrimination, after all, is a form of discrimination against women, and so the fact that plaintiffs have offered significant statistical evidence of other forms of gender discrimination sheds light on their anecdotal evidence of pregnancy discrimination").

In sum, Defendant applies the wrong legal standard in this case, attempting to distract the Court from the detrimental class effect on compensation by misidentifying the focus as being on leave-taking and not on sex/pregnancy.  Defendant cannot be permitted to ignore the relevant legal question, ignore reliable evidence of discrimination, or bootstrap its own improper analysis.

### C.  Dr. Lanier's Expert Opinions Are Reliable

#### 1.  Dr. Lanier's Interaction Model and His Interpretation of It Are Reliable

Dr. Lanier controlled for leave duration, and he studied the effect of class status on pay, in a reliable way.  The interaction model he used is not the only way to study these two effects, but it is one appropriate and reliable way, and Dr. Lanier interprets its results reliably.  (*See* Adams Decl. ¶ 15 (Lanier Dep.) at 355.)  Dr. Lanier used a "class-leave interaction variable" in his regression analysis in order to distinguish the leave duration effect experienced by class members from the leave duration effect experienced by non-class members.  (Lanier Decl. ¶¶ 6-8.)  He separated out these two effects based on his knowledge of labor economics and due to Dr.

Ward's observation in this case that indeed, maternity leave duration has a different effect on compensation than non-maternity leave duration does.  (*Id*. ¶ 6.)  Thus, Defendant is simply wrong to argue that "Dr. Lanier did not control for leave."  (Def. Mem at 8-16.)[12]  Not only did Dr. Lanier control for leave in his reply analyses, he used a more appropriate and more refined leave duration control than Defendant's experts did.  (Lanier Decl. ¶ 5.)

Furthermore, Defendant incorrectly interprets Dr. Lanier's model and results.  Primarily, Defendant criticizes Dr. Lanier's analysis because the measured class pay disparities represent the disparities that would be expected for class members who took no leave in a pay cycle (one year), and Defendant emphasizes that class members, by definition, have taken some (maternity) leave.  (Def. Mem. at 6, 11, 14-15.)  Yet Dr. Lanier's analysis includes an observation for every active, full-time class and non-class member for every annual pay cycle during the class period, and 92% of the class members have at least one pay cycle where they take no leave; indeed, zero leave in a pay cycle is the most common amount of leave taken by class members across all observations in Dr. Lanier's analysis.  (Lanier Decl. ¶ 22a.)  For example, in the case of a class member who took one maternity leave, in 2002, her pay observations for 2003-2008 will reflect

---

[12] As Defendant's own expert acknowledged, the experts' statistical analyses and corresponding reports are an evolving process (Adams Decl. ¶ 5 (Ward Dep.) at 116-17, 128-29) and should be considered as a whole.  Dr. Lanier's analyses are reliable taken together and separately.  As explained above, Dr. Lanier did not initially use a leave duration variable in part due to Defendant's clear policy of not taking leave into account in compensation decisions.  In a Title VII case, a proper statistical (regression) analysis takes into account not only commonly accepted principles and methods of labor economics (*i.e.,* in selecting appropriate controls), but also the particular business policies and practices of the particular employer at issue.  *See Bickerstaff v. Vassar College*, 196 F.3d 435, 449-50 (2d Cir. 1999) (rejecting an expert's statistical analysis in an employment discrimination case because the expert excluded "major variables" from his model, *i.e.*, variables corresponding to particular criteria the defendant used in its decisionmaking); *see also Mozee v. Am. Commercial Marine Serv. Co*., 940 F.2d 1036, 1045 (7th Cir. 1991) ("[T]he use of hindsight to construct [variables representing factors the employer did not actually consider] must be viewed with some suspicion.").  Moreover, Dr. Lanier did appropriately control for leave duration in his reply analyses.

zero days of leave.  By suggesting that class members who have taken no leave in the preceding year should only be compared with non-class members who have taken leave sometime in the past, Defendant makes an invalid assumption that once a class member takes maternity leave, that leave's effect on her compensation (presumably due to a change in her productivity) lasts beyond a year.  (*Id*. ¶¶ 24-27.)  Additionally, by criticizing Dr. Lanier's analysis of class members' pay when those class members have taken zero days of leave in the preceding year, Defendant chooses to ignore the "fixed class penalty" (*i.e.*, discrimination against class members) that exists in all years, including years when they are not taking leave.  (*Id*. ¶ 31.)

In its argument that Dr. Lanier inappropriately interprets the class effect portion of his interaction model results, Defendant describes Dr. Lanier's model in an overly simplistic and erroneous way.  Although Dr. Lanier uses a class-leave duration interaction variable (control), there is no presumed relationship (interaction) between the alleged discrimination against class members and the amount of leave taken.  (*Id*. ¶¶ 14, 23.)  In other words, whereas Dr. Ward provides an example in his unauthorized sur-sur-reply report of a typical interaction involving the interdependent effects of sunlight and water on plant growth, no such interdependent relationship is alleged to exist in this case.  (*Id*. ¶ 13, 14.)  EEOC does not allege that the level of sex/pregnancy discrimination against class members fluctuates with the number of days of leave they take. (*Id*. ¶¶ 18, 19; *see also generally* Adams Decl. ¶ 2 (Complaint).)

Indeed, Defendant tortures the legal standard and EEOC's allegations to focus on leave-taking rather than class membership, presumably to fit its own statistical results.[13]  Defendant

---

[13] Defendant's apparent defense that *all* Bloomberg employees who take leave are penalized not only flies in the face of Defendant's own policy but represents precisely the "grotesque scenario where an employer can effectively immunize itself from suit if it is so thorough in its discrimination that all similarly situated employees are victimized."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001); *see also* Lanier Decl. ¶¶ 5, 31.

reports that class members tend to have better pay outcomes upon return from leave than non-class members who took the same amount of leave in the same preceding year.  (Lanier Decl. ¶ 28.)  However, the fixed class penalty measured at zero days of leave exists when class members do take some amount of leave.  (*Id*. ¶ 29.)  The pay difference between class members who took leave and non-class members who took the same amounts of leave therefore consists of two parts: 1) the fixed class penalty, and 2) the net effect of leave duration on pay.  (*Id*.)  These two factors are independent, in that they are driven by different forces.  (*Id*.)  The fixed class pay penalty is explained only by class status.  (*Id*.)  The net leave duration effect is explained by leave duration, which is assumed to be a legitimate effect.  (*Id*.)

Thus, to the extent leave (either maternity leave or non-maternity leave) affects an employee's "ability to work," Dr. Lanier controls for it.  But labor economic studies show that after an initial negative consequence, pay outcomes tend to increase faster for leave takers as they "recover" from the effects of the leave, and predict no class effect of the kind Dr. Lanier found in his analyses.  (Adams Decl. ¶ 10 (Lanier Rebuttal Report) ¶ 24.)  Defendant only criticizes Dr. Lanier's explanations in an attempt to distract from the class effect Dr. Lanier discovered, which suggests that Bloomberg discriminates against the class in compensation.

## 2. Defendant's Criticisms of Dr. Lanier's Analyses Go to Weight, Not Admissibility

Finally, to the extent Dr. Lanier made any data mistakes in his analyses, those purported mistakes provide no basis for exclusion of Dr. Lanier's reports or testimony.  First, the consequences of the purported mistakes in Dr. Lanier's initial Report were slight and insignificant, as Dr. Ward acknowledged in his Rebuttal tables and his deposition.  (*See* Adams Decl. ¶ 21 (Ward Rebuttal Report) at 11, 12; Adams Decl. ¶ 5 (Ward Dep.) at 252-58.)  Second, for the sake of reducing the degree and areas of dispute between the opposing experts'

methodologies, Dr. Lanier used Dr. Ward's "corrected" data in his reply analyses.  (*See* Adams Decl. ¶ 11 (Lanier Reply Report) ¶ 13.)  Third, Dr. Lanier submitted a Corrected Reply Report just three days after his Reply Report to address a data error regarding employees in foreign offices, which Dr. Ward had not discovered until writing his Reply Report.  (*See* Adams Decl. ¶ 16 (Lanier Corr. Reply) ¶¶ 2-4; Adams Decl. ¶ 5 (Ward Dep.) at 335-36.)  Fourth, Dr. Ward had the opportunity (in his deposition and in his unauthorized sur-sur-reply report) to find data mistakes in Dr. Lanier's reply analyses but identified none.  Thus, Defendant's statement that Dr. Lanier failed to correct the "mistakes" Defendant identified is patently false.

In any event, the reliability of an expert's analysis (including any inaccuracies) affects not the admissibility of the expert's testimony, but the weight the jury chooses to give it.  *EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 116 (2d Cir. 1999) (even though EEOC's statistics were not "flawless," they were sufficient to establish a *prima facie* case of discrimination); *Wright v. Stern*, 450 F. Supp. 2d 335, 364 (S.D.N.Y. 2006) ("[E]rrors in statistical evidence do not necessarily render them meaningless").  To the extent Dr. Lanier made any minor mistakes in his analyses, he corrected them as advocated by Dr. Ward, and they do not provide sufficient basis for exclusion.

Indeed, disputes between experts over which variables to control for, which groups of employees to leave in or out when there are justifiable reasons for including or excluding certain groups of employees, and other such arguments are precisely the sort of "statistical dueling" that should be resolved by the fact-finder.  *See Velez v. Novartis Pharms. Corp.*, No. 04 Civ. 9194 (CM), 2009 WL 3395091 at *1 (S.D.N.Y. Oct. 20, 2009); *see also* Adams Decl. ¶ 17 (*Velez* Rulings on Motions *in Limine*), at 8 ("Dr. Lanier and Dr. Welch (Novartis' expert) will engage in a classic 'battle of the experts,' jousting about judgments about Novartis' data that were made by

19

the opponent's champion, with the jury determining the winner.")  Whether Dr. Lanier's statistical analyses carry the day in the instant case will depend "on the factual context of [the] case in light of all the evidence presented by both the plaintiff and the defendant." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986); *see also Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995 (1988) ("[S]tatistics 'come in infinite variety and . . . their usefulness depends on all of the surrounding circumstances'") (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977)); *see also Obrey v. Johnson*, 400 F.3d 691, 695 (9th Cir. 2005) ("A statistical study may fall short of proving the plaintiff's case, but still remain relevant to the issues in dispute. The [plaintiff's expert's] study may be relevant, and therefore admissible, even if it is not sufficient to establish [plaintiff's] prima facie case or a claim of pretext.")

## CONCLUSION

For the foregoing reasons, EEOC respectfully requests that the Court deny in its entirety Defendant's Motion To Exclude the Reports and Testimony of Dr. Louis Lanier.


Dated: June 11, 2010

Respectfully submitted,

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

/s/_____
Raechel L. Adams (RA-0460)
33 Whitehall Street, 5th Floor
New York, NY 10004
Tel: (212) 336-3707
Fax: (212) 336-3623
e-mail: raechel.adams@eeoc.gov