IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- x

                                              :

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,                                     :

                Plaintiff,          :      07-CV-8383 (LAP/HP)

          v.                     :      ECF ACTION

BLOOMBERG L.P.,                    :

              Defendant.       :

----------------------------------------------------------- x

                                                :

JILL PATRICOT, TANYS LANCASTER,
JANET LOURES, MONICA PRESTIA,     :
MARINA KUSHNIR and MARIA
MANDALAKIS,                           :

              Plaintiff-Intervenors,   :

          v.                     :

BLOOMBERG L.P.,                    :

              Defendant.       :

----------------------------------------------------------- x

# **MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF EEOC'S MOTION TO EXCLUDE EXPERT OPINIONS OF DR. MICHAEL P. WARD AND DR. JOHN H. JOHNSON, IV**

# TABLE OF CONTENTS

BACKGROUND ...................................................................................................................2

    A.  Dr. Ward Found That Bloomberg's Personnel Data Refute EEOC's Allegations .............3

    B.  Dr. Johnson Independently Reached The Same Conclusion As Dr. Ward.........................6

    C.  EEOC's Criticisms Did Not Effect Bloomberg's Experts' Conclusions............................8

ARGUMENT ......................................................................................................................9

I.  BLOOMBERG'S EXPERTS' ANALYSES ARE RELEVANT BECAUSE THEY REFUTE EEOC'S ALLEGATIONS........................................................................................11

II.  DRS. WARD AND JOHNSON RELIABLY PERFORMED THEIR ANALYSES .............13

    A.     Dr. Ward and Dr. Johnson Meticulously Applied Reliable Methods To Available Data ..............................................................................................................13

    B.     EEOC's Challenges To The Analyses And Testimony Of Drs. Ward And Johnson Are Without Merit..........................................................................................16

        1.     EEOC's "Single Leave Duration" Variable Critique Mischaracterizes Both Dr. Ward's and Dr. Johnson's Analyses................................................................16

        2.     EEOC's Remaining Criticisms Of Dr. Ward's And Dr. Johnson's Analyses Are Inaccurate and Do Not Render Those Analyses Inadmissible .................18

            a.   EEOC's Other Criticisms Of Dr. Ward's Analyses Do Not Render Those Analyses Unreliable .................................................................20

            b.   EEOC's Other Criticisms Of Dr. Johnson's Analyses And Testimony Are Unconvincing .............................................................................22

III. DR. WARD'S AND DR. JOHNSON'S ANALYSES AND TESTIMONY WILL NOT CONFUSE THE FACT-FINDER ..........................................................................25

IV. DR. WARD'S AND DR. JOHNSON'S TESTIMONY IS NOT NEEDLESSLY CUMULATIVE................................................................................................28

V.  DR. WARD'S UNCHALLENGED CONCLUSIONS ARE ADMISSIBLE.........................29

CONCLUSION...................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)..................................................................................19, 20

*Asher v. Riser Foods, Inc.*,
    No. 92-3357, 1993 U.S. App. LEXIS 7560 (6th Cir. Mar. 30, 1993) (per curiam)................12

*Bickerstaff v. Vassar College*,
    196 F.3d 435 (2d Cir. 1999)......................................................................................24

*Bonton v. City of New York*,
    No. 03 Civ. 2833, 2004 WL 2453603 (S.D.N.Y. Nov. 3, 2004) ............................................24

*Campbell v. Metro. Prop. & Cas. Ins. Co.*,
    239 F.3d 179 (2d Cir. 2001)..................................................................................14, 19

*Colon v. BIC U.S.A., Inc.*,
    199 F. Supp. 2d 53 (S.D.N.Y. 2001).................................................................................28

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)........................................................................................................11

*Doe v. C.A.R.S Protection Plus, Inc.*,
    527 F.3d 358 (3d Cir. 2008)............................................................................................12

*Edmonds v. United States*,
    No. 05-540, 2009 WL 969938 (D.D.C. Apr. 7, 2009)............................................................27

*EEOC v. Venator Group*,
    No. 99 Civ. 4758, 2002 WL 181711 (S.D.N.Y. Feb. 5, 2002) ................................................24

*Fahmy v. Duane Reed, Inc.*,
    No. 04 Civ. 1798, 2006 WL 1582084 (S.D.N.Y. June 9, 2006)...........................................24

*FDIC v. Suna Assocs., Inc.*,
    80 F.3d 681 (2d Cir. 1996)...............................................................................................14

*Fisher v. Vassar College*,
    70 F.3d 1420 (2d Cir. 1995).............................................................................................13

*Freeland v. AT&T Corp.*,
    238 F.R.D. 130 (S.D.N.Y. 2006) .....................................................................................24

*Gratton v. JetBlue Airways*,
    No. 04 Civ. 7561, 2005 WL 1251786 (S.D.N.Y. May 25, 2005)..........................................12

*Gratton v. JetBlue Airways*,
    No. 04 Civ. 7561, 2006 WL 2037912 (S.D.N.Y. July 21, 2006) ............................................12

*In re Fosamax Prods. Liab. Litig.*,
    645 F. Supp. 2d 164 (S.D.N.Y. 2009)..............................................................................16, 19

*Int'l Minerals & Res., S.A. v. Pappas*,
    96 F.3d 586 (2d Cir. 1996).................................................................................................28

*Marshall v. Am. Hosp. Ass'n.*,
    157 F.3d 520 (7th Cir. 1998) ............................................................................................12

*Mengele v. Patriot II Shipping Corp.*,
    No. 99 Civ. 8745, 2002 WL 237847 (S.D.N.Y. Feb. 19, 2002) ............................................29

*Minott v. Port Authority of N.Y.*,
    116 F. Supp. 2d 513 (S.D.N.Y. 2000).................................................................................12

*MTBE Prods. Liab. Litig.*,
    643 F. Supp. 2d 471 (S.D.N.Y. 2009).....................................................................19, 20, 25

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005)...............................................................................................11

*Orr v. City of Albuquerque*,
    531 F.3d 1210 (10th Cir. 2008) .........................................................................................12

*Padillas v. Stork-Gamco, Inc.*,
    186 F.3d 412 (3d Cir. 1999)...............................................................................................26

*Piraino v. Int'l Orientation Res.*,
    137 F.3d 987 (7th Cir. 1998) ............................................................................................12

*Schanzer v. United Techs. Corp.*,
    120 F. Supp. 2d 200 (D. Conn. 2000).................................................................................24

*Smith v. Xerox*,
    196 F.3d 258 (2d Cir. 1999)...............................................................................................24

*Stone v. Stoker*,
    962 F.2d 7, 1992 WL 98356 (4th Cir. May 13, 1992) (per curiam) ......................................28

*United States v. Mahaffy*,
    No. 05-CR-613, 2007 WL 1213738 (S.D.N.Y. Apr. 24, 2007)...............................................27

*United States v. Walker*,
  910 F. Supp. 861 (N.D.N.Y. 1995) ........................................................................29

*Velez v. Novartis Pharm. Corp.*,
  244 F.R.D. 243 (S.D.N.Y. 2007) ...........................................................................12

*Williams v. County of Orange*,
  No. 03 Civ. 5182, 2005 WL 6001507 (S.D.N.Y. Dec. 13, 2005)...........................29

*Wills v. Amerada Hess Corp.*,
  379 F.3d 32 (2d Cir. 2004)....................................................................................14

*Wright v. Stern*,
  450 F. Supp. 2d 335 (S.D.N.Y. 2006)................................................14, 19, 20, 25

## STATUTES

42 U.S.C. § 2000e(k) ....................................................................................................12

## RULES AND REGULATIONS

29 C.F.R. § 1604.10(b) .................................................................................................12

Federal Rule of Evidence 403.......................................................................................28

Federal Rule of Evidence 702...............................................................................9, 11, 14, 25

## OTHER AUTHORITIES

EEOC Compliance Manual, § 626.15(a) ......................................................................12

Bloomberg L.P. hired two statistical experts, Dr. Michael P. Ward and Dr. John H. Johnson, IV, to analyze whether available data supports or refutes EEOC's allegations that Bloomberg paid class members less than non-class members or demoted them.  Drs. Ward and Johnson independently concluded, using different methodologies, that the data refutes EEOC's claim that Bloomberg cut class member pay during the period studied.  Both also concluded that class members received the same or greater compensation growth than other similarly situated employees "once they announced their pregnancy and once they returned to work after taking maternity leave."  Second Am. Compl. ¶ 7(a).[1]  Dr. Ward also concluded that the data refutes EEOC's claim that Bloomberg stripped class members of direct reports "once they announced their pregnancy and once they returned to work after taking maternity leave."  *Id.* ¶ 7(b).

EEOC cannot and does not seriously dispute these conclusions.  Instead, it attempts to avoid them by claiming that Dr. Ward's and Dr. Johnson's testimony is inadmissible because it is not relevant or reliable.  EEOC's relevance argument completely ignores both its allegations and the law that indisputably governs them, which establish that Drs. Ward and Johnson performed relevant analyses by testing EEOC's allegations using the comparison population that the law requires.  EEOC's effort to demonstrate that Drs. Ward and Johnson performed their work unreliably mischaracterizes both experts' work and, incredibly, also mischaracterizes the work of EEOC's own proffered expert, Dr. Louis Lanier.  When the analyses are properly understood, two things become clear.  First, EEOC's claim that Dr. Ward's and Dr. Johnson's studies do not examine distinctions between maternity and non-maternity leave is completely untrue.  Second, EEOC's claim that Dr. Lanier's analysis separates the effect of maternity and

---

[1] Annexed as Exhibit A to the Declaration of Eric S. Dreiband in Support of Bloomberg's Opposition to EEOC's Motion to Exclude Expert Opinions of Dr. Michael P. Ward and Dr. John H. Johnson, IV ("Dreiband Decl.").

non-maternity leave on compensation, and thus establishes a "class effect" separate from any "leave effect," is likewise completely untrue.  EEOC also points to a number of supposed flaws in Dr. Ward's and Dr. Johnson's analyses, none of which are actually flaws, and none of which affect their conclusions.

In short, when their analyses are accurately portrayed, it is clear that Drs. Ward and Johnson conducted reliable analyses that directly test whether Bloomberg's personnel data support EEOC's specific pattern-or-practice allegations.  These analyses will assist the trier of fact in deciding an issue in dispute, and are relevant.  As a result, EEOC's Motion to Exclude the Testimony of Dr. Michael Ward and Dr. John Johnson should be denied in its entirety.

## BACKGROUND

EEOC alleges that Bloomberg "award[ed] [Class Members] less total intended compensation than the actual value of their prior year's compensation, once they announced their pregnancy and once they returned to work after taking maternity leave" from February 2002 through the present.  *Id.* ¶ 7(a).  In other words, EEOC claims that Bloomberg cut class member pay once they returned from maternity leave.  It also alleges that Bloomberg "demot[ed] [Class Members] . . . in terms of the number of employees directly reporting to them."  *Id.* ¶ 7(b).  Bloomberg retained labor economists Drs. Ward and Johnson to analyze Bloomberg's personnel data to assess whether the data supported or refuted these allegations.

Prior to 2009, "intended compensation" at Bloomberg included both a fixed base salary and variable compensation known as Equity Equivalence Certificate ("EEC") grants.  Ward Rep. at 4.[2]  Bloomberg gave each employee a certain number of EEC grants each year, each of which

---

[2] Annexed as Exhibit E to the Declaration of Raechel L. Adams in Support of EEOC's Motion to Exclude Expert Opinions of Dr. Michael P. Ward and Dr. John H. Johnson, IV ("Adams Decl.").

had an "intended value" based on projections of company performance for the coming year.  *Id.*
The actual value of the EEC grant when it was paid could differ from the intended value, but this
difference was attributable to company, not individual, performance.  *Id.* at 5.  For these reasons,
all three statistical experts concluded that the intended value of EEC grants when they were
assigned, combined with base salary, best reflects Bloomberg's judgment regarding an
individual's compensation.  *Id.*; Adams Decl. Ex. A (Lanier Rep.) ¶ 21; Adams Decl. Ex. I
(Johnson Rep.) at 5.  During the period studied, Bloomberg set compensation on each
employee's anniversary date.  Adams Decl. Ex. E at 4.

> **A.      Dr. Ward Found That Bloomberg's Personnel Data Refute EEOC's**
> **Allegations**

For the period February 1, 2002 through December 31, 2008 ("Study Period"), Dr.
Ward's analyses study:  (1) "changes in [class member] intended compensation before and after
maternity leave," compared "to changes in intended compensation for other leave takers"; and (2)
"the number of direct reports [to a class member] before and after a maternity leave" compared
"to changes in the number of direct reports for other leave takers."  Adams Decl. Ex. E at 2-3, 7.
Specifically, Dr. Ward analyzed compensation growth both over the entire Study Period, and
from the employee anniversary date just prior to an individual's first leave through the end of the
Study Period.  *Id.* at 11, 14.  He also studied whether maternity and non-maternity leave affected
compensation differently, *id.* at 14, and whether class members lost direct reports during the
Study Period.  *Id.* at 16-18.

*Analyses Over Entire Study Period*.  Dr. Ward first compared each employee's
compensation on her most recent employment anniversary to compensation on her first
anniversary at Bloomberg to determine total compensation growth over the entire Study Period.
*Id.* at 11.  He then compared the mean (average) and median (mid-point) compensation growth

rates for class members to the comparable figures for three sub-groups of non-class members: (1) those who took no leave during the Study Period (the "no leave" group); (2) those who took less than sixty days of leave during the Study Period (the "short leave" group); and (3) those who took at least sixty days of leave during the Study Period (the "long leave" group). *Id.* at 8, 11-12. Dr. Ward concluded that the long leave group was most similarly situated to the class because the average duration of non-maternity leaves of at least sixty days was similar to the average duration of maternity leaves. *Id.* at 8.

Dr. Ward made his comparisons for all Bloomberg employees, and for a subgroup of those employed for the full Study Period. *Id.* at 11; Ex. 4. The results showed that class members experienced *higher* average and median *growth* in intended compensation over the Study Period than non-class members in the long leave group — a result at odds with EEOC's allegation that class members experienced pay cuts upon returning from leave. *Id.* at 12; Ex. 4. These results were statistically significant, meaning that class members' higher compensation growth did not occur by chance. *Id.* There were no statistically significant differences in average compensation growth between class members and any non-class member group, or in median compensation growth between class members and employees who took no leave or short leaves. *Id.* Because average compensation can be skewed by a few very high or very low results, Dr. Ward concluded that the median figures more accurately represented the typical class member's experience. *Id.* at 12.

Dr. Ward also conducted regression analyses of total intended compensation to control for variables such as the interval over which the compensation changes were calculated; the individual's age at the beginning of the Study Period (as a proxy for labor market experience); and year of hire. *Id.* at 12-13. He also performed regression analyses that added a control

4

variable for time on leave. *Id.* Without controlling for time on leave, Dr. Ward's analyses showed that class members had slightly *higher* compensation *growth* than employees who took non-maternity leaves of sixty days or longer, although the result was not statistically significant. *Id.* at 13; Ex. 5. Class members had statistically significant lower compensation growth than other Bloomberg employees in the no leave and short leave groups without a control for time on leave. *Id.* After adding a control for time on leave, Dr. Ward's analyses showed no statistically significant differences in class member compensation growth as compared to compensation growth for all groups of non-class members. *Id.* at 13-14; Ex. 5

     ***Analyses From Just Prior to First Leave through End of Study Period.*** Dr. Ward also analyzed compensation growth from the anniversary date immediately preceding leave to the anniversary date immediately after the individual's last leave. *Id.* at 14-15. These results showed that only 15.75% of class members had lower intended compensation over this period, as compared to 28.97% of the long-leave group; these results were statistically significant in favor of the class. *Id.* at 15. Stated differently, Dr. Ward concluded that 84% of class members received "increases [in intended compensation] from before their leave to after." *Id.* at 15 n.13. Comparing compensation from the anniversary date immediately preceding leave to the last anniversary date in the Study Period showed that compensation decreased for 13.81% of class members, compared to 25.94% of the long leave group; these results were statistically significant in favor of the class. *Id.* at 15. Regression analyses comparing compensation growth from the anniversary date immediately preceding leave to the last anniversary date in the Study Period show no statistically significant differences between class member and non-class member compensation growth after controlling for time on leave. *Id.* at 15; Ex. 7.

     ***Analysis of Maternity Leave vs. Non-Maternity Leave.*** Because class members took

both maternity and non-maternity leave during the Study Period, Dr. Ward analyzed whether the two types of leave affected class member compensation differently. *Id.* at 14.  He examined class member compensation growth against the percentage of a class member's leave time that was maternity leave. *Id.*  Dr. Ward concluded that as the proportion of maternity leave to total class member leave increased, compensation growth rates increased, although these results were not statistically significant. *Id.*; Dreiband Decl. Ex. B (Ward Dep.) at 406-08, 412.

   ***Analyses of Direct Reports.***  Dr. Ward analyzed the differences in the number of direct reports to employees from the beginning and end of the Study Period.  Adams Decl. Ex. E at 16. He is the only statistical expert in the case who studied this issue, so his results are unrebutted. Dr. Ward's analysis was necessarily limited to individuals who had direct reports at the beginning of the Study Period, and showed no statistically significant differences in loss of direct reports between class members and any other group of Bloomberg employees (e.g. the long leave, short leave, and no leave groups).  *Id.* at 16-17; Ex. 8.  Dr. Ward performed the same comparison from the anniversary date before the beginning of the first major leave through the end of the Study Period.  This analysis showed no statistically significant difference between class member direct reports and the number of direct reports to any group of Bloomberg employees after controlling for length of leave, and showed no statistically significant difference in this measure between class members and Bloomberg employees in the long leave or no leave groups, even without controlling for length of leave.  *Id.* at 17-18; Ex. 9.

### B.    Dr. Johnson Independently Reached The Same Conclusion As Dr. Ward

   Dr. Johnson independently tested EEOC's allegations that Bloomberg paid class members less "once they announced their pregnancy and once they returned to work after taking maternity leave."  Adams Decl. Ex. I (Johnson Rep.) at 4-5.  Dr. Johnson's analyses study base salary and the intended value of EEC grants separately, and compared compensation pre- and

post-leave for each leave event. *Id.* at 9. Dr. Johnson eliminated from his analysis non-maternity

leaves taken by class members (*id.*, n.9) so that he could more "clean[ly] compar[e]" the

"treatment group" (class members who took maternity leave) to the "control group" (non-class

members who took non-maternity leave). Dreiband Decl. Ex. C (Johnson Dep.) at 105-07. This

enabled him to study whether Bloomberg discriminated against class members in compensation

"once they announced their pregnancy and once they returned to work after taking maternity

leave." *Id.*; Dreiband Decl. Ex. A (Second Am. Compl.), ¶ 7(a).

      Dr. Johnson initially examined changes in class member compensation. He defined class

members as Bloomberg employees who had a maternity leave ending between February 2002

and March 2009.[3] Adams Decl. Ex. I at 5. In an effort to test directly EEOC's allegation that

class members received lower pay "once they announced their pregnancy," Dr. Johnson

compared these individuals' base pay in the twelve month period following return from leave to

their compensation in the year beginning six months before the birth of a child ("Scenario 1").

*Id.* at 9. He did this because he believed that six months prior to birth was "where it would be

plausible that the female was starting to show she was pregnant." Dreiband Decl. Ex. C at 124-

25. Dr. Johnson concluded that class member base pay increased an average of $8,060 during

this period. Adams Decl. Ex. I at 11. He compared these figures to compensation changes for

female Bloomberg employees who took non-maternity leaves, and to all Bloomberg employees

who took non-maternity leaves. *Id.* at 11-12. These two groups experienced base pay increases

of $3,316 and $3,946, respectively. *Id.* Dr. Johnson also compared base pay in the twelve-

---

[3]     Bloomberg's compensation system changed on January 1, 2009. Although Dr.
Johnson initially studied the period through March 2009, he later adjusted his analysis in
response to criticism from EEOC to study only the period prior to these changes — i.e., through
December 31, 2008. Adams Decl. Ex. J (Johnson Reply Rep.) at 12-14. This change did not
impact Dr. Johnson's analyses or conclusions. *Id.*

month period before leave to the twelve-month period after leave ("Scenario 2"), and reached

similar conclusions. *Id.* at 12-13. When he compared the intended value of EEC grants given to

class members and similarly situated non-class members in his Scenarios 1 and 2, Dr. Johnson

concluded that class members received greater increases in average intended EEC grants than

non-class members who took leaves. *Id.* at 18-19; Ex. 5. Based on these analyses, Dr. Johnson

concluded that class members received pay increases after maternity leave, rather than being paid

less, and that those increases were greater than those received by employees who took non-

maternity leave. *Id.* at 11-13, 20-21.

Dr. Johnson also performed regression analyses to determine whether his initial findings

remained valid after accounting for factors such as leave duration, performance rating before the

leave, employee business unit and office location, and the year in which leave was taken. *Id.* at

21. After controlling for these factors, and examining compensation changes for Scenarios 1 and

2, Dr. Johnson concluded that class members had statistically significant *greater increases* in

base salary and EEC grants than non-class members who took leaves. *Id.* at 21-24. These results

held true when subjected to various tests, including (1) restricting the sample to the first leave for

each individual; (2) restricting the sample to females; (3) excluding leaves longer than one year,

or shorter than one month; (4) controlling for the number of leaves for each person; (5) making

the "before" and "after" periods consecutive, with no gap for the leave period; and (6) excluding

individuals who resigned from Bloomberg and returned only at a later date. *Id.* at 23-24.

Based on these analyses, Dr. Johnson concluded that "EEOC's allegations with respect to

compensation of the Class Members' are not supported by the empirical evidence." *Id.* at 24.

### C.    EEOC's Criticisms Did Not Effect Bloomberg's Experts' Conclusions

EEOC's proffered expert Dr. Louis Lanier criticized both Dr. Ward's and Dr. Johnson's

analyses because they allegedly: (1) studied only the effect of leave, rather than analyzing

whether class members were discriminated against based upon pregnancy or motherhood status; (2) relied on an outdated class list; and (3) excluded employees paid in foreign currencies. Adams Decl. Ex. B (Lanier Rebuttal Rep.) ¶¶ 6-8.  He also raised specific objections to Dr. Ward's and Dr. Johnson's individual analyses, such as criticizing Dr. Johnson for ignoring any potential effect on pay lasting more than one year after leave (*id.* ¶ 10), and criticizing Dr. Ward for failing to consider whether the average non-maternity leave relates to a disability affecting productivity.  *Id.* ¶ 35.  Dr. Lanier did not perform any affirmative studies to determine whether any of his criticisms of Bloomberg's experts' analyses affected their results or their conclusions.

Both Drs. Ward and Johnson submitted detailed reply reports that responded to each of Dr. Lanier's criticisms and performed alternate studies to test their effect, if any, on the experts' overall conclusions.  For example, to address Dr. Lanier's criticism that he did not study a long enough post-leave period, Dr. Johnson performed additional analyses that studied compensation for two years post-leave, rather than one year.  Adams Decl. Ex. J at 15-16.  To address Dr. Lanier's claim that he did not account for the possibility that non-class members who took long leaves had a disability that affected their productivity, and thus their pay, Dr. Ward analyzed the data excluding from his comparison sample non-class members who took disability leave. Adams Decl. Ex. G (Ward Reply Rep.) at 10-11.  After accounting for all of Dr. Lanier's criticisms, both individually and in the aggregate, both Dr. Ward and Dr. Johnson reached the same overall conclusions as they had in their initial reports:  the empirical data do not support EEOC's allegations that Bloomberg reduced compensation for class members, or demoted them by decreasing the number of individuals reporting to them.  *Id.* at 12; Adams Decl. Ex. J at 3.

## ARGUMENT

Dr. Ward's and Dr. Johnson's analyses and testimony easily satisfy Rule 702's relevance

and reliability standards.  First, the testimony is relevant because it directly assesses EEOC's complaint allegations regarding class member compensation and (in Dr. Ward's case) alleged demotions.  Their testimony will assist the trier of fact in resolving a critical issue in this case: namely, whether any statistical evidence supports EEOC's allegations.  EEOC's argument to the contrary ignores both its own allegations and the legal standards that indisputably govern the adjudication of those allegations.

Second, the testimony is reliable because it results from the proper application of well-recognized methods to the available data.  EEOC's primary argument to the contrary — that Drs. Ward and Johnson did not separately consider the impact of maternity leave versus non-maternity leave on compensation growth — mischaracterizes Dr. Ward's and Dr. Johnson's analyses, and the analyses of EEOC's own proffered expert, Dr. Lanier.  Dr. Lanier never analyzed this issue or made this distinction, but Dr. Ward and Dr. Johnson both studied it. Moreover, none of the supposed errors to which EEOC points in Dr. Ward's or Dr. Johnson's analyses impact the conclusions that these experts have drawn, nor does EEOC offer any evidence that would cast doubt on any of those conclusions.  None of the alleged errors renders Dr. Ward's or Dr. Johnson's testimony or conclusions unreliable or inadmissible.

Finally, Dr. Ward's and Dr. Johnson's analyses are not confusing.  Instead, they present complex issues in a simple and straightforward way.  Nor is their testimony cumulative.  Dr. Ward and Dr. Johnson looked at Bloomberg data from different perspectives, and used different approaches to analyze that data.  While each of their independent conclusions that the data refute EEOC's allegations supports the other, their testimony does not duplicate each other.

For all of these reasons, this Court should deny EEOC's Motion, and admit the opinions, testimony, and analyses of Drs. Ward and Johnson in their entirety.

## I.   BLOOMBERG'S EXPERTS' ANALYSES ARE RELEVANT BECAUSE THEY REFUTE EEOC'S ALLEGATIONS

To be admissible, Rule 702 requires expert testimony to "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993); *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).  This is a relevance standard: "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591.

EEOC claims that Dr. Ward's and Dr. Johnson's testimony is not relevant here because it purportedly fails to answer what EEOC now describes as the relevant question:  whether "class members who are pregnant or new mothers [have] been discriminated against in compensation at Bloomberg, as compared to employees who are not pregnant or new mothers."  Memorandum of Law in Support of Plaintiff EEOC's Motion to Exclude the Expert Opinions of Dr. Michael P. Ward and Dr. John H. Johnson, IV ("Pl. Mem.") at 11.  EEOC is wrong for three reasons.

*First*, EEOC misrepresents the allegations at issue.  EEOC's complaint alleges that class members experienced discrimination "once they announced their pregnancy and once they returned to work after taking maternity leave."  Dreiband Decl. Ex. A (Second Am. Compl.) ¶ 7(a).  However, all three statistical experts "only analyzed the compensation of class members with identifiable maternity leaves." [4]  Pl. Mem. at 2, n.2.  For purposes of the statistical analyses, the class is not made up of all pregnant women, or all "new mothers" (whatever that means); it is comprised of individuals who took maternity leave during the class period.

*Second*, EEOC ignores the indisputable legal standard that governs the allegations in the

---

[4]     EEOC incredibly suggests that this occurred because the experts were "constrained by Bloomberg's [personnel] data, which does not track pregnancy."  Pl. Mem. at 2 n.2.  EEOC does not explain how Bloomberg could "track pregnancy," nor how it could avoid a claim of discrimination under the PDA if it actually did so.

case, to which the experts' analyses must be tied.  Under the PDA, "women affected by pregnancy, childbirth, or related medical conditions *shall be treated the same* for all employment-related purposes . . . *as other persons not so affected but similar in their ability or inability to work*."  42 U.S.C. § 2000e(k) (emphasis added).  Consistent with this statutory text, a court will not find discrimination on the basis of pregnancy unless there is evidence that an employer treated women who took maternity leave differently than those who took other types of leave.  *See Orr v. City of Albuquerque*, 531 F.3d 1210, 1216 (10th Cir. 2008); *Doe v. C.A.R.S Protection Plus, Inc.*, 527 F.3d 358, 366-369 (3d Cir. 2008); *Marshall v. Am. Hosp. Ass'n.*, 157 F.3d 520, 527 (7th Cir. 1998); *Piraino v. Int'l Orientation Res.*, 137 F.3d 987, 991 (7th Cir. 1998); *Asher v. Riser Foods, Inc.*, No. 92-3357, 1993 U.S. App. LEXIS 7560, at *10-11 (6th Cir. Mar. 30, 1993) (per curiam); *Velez v. Novartis Pharm. Corp.*, 244 F.R.D. 243, 264-65 (S.D.N.Y. 2007); *Gratton v. JetBlue Airways*, No. 04 Civ. 7561, 2006 WL 2037912, at *5 (S.D.N.Y. July 21, 2006); *Minott v. Port Authority of N.Y.*, 116 F. Supp. 2d 513, 521 (S.D.N.Y. 2000).

EEOC regulations and guidance confirm that discrimination under the PDA occurs only when a plaintiff can show that she was treated differently than individuals with a similar inability to work.  29 C.F.R. § 1604.10(b); *see also id.* Appendix, Introduction.  Indeed, EEOC's Compliance Manual requires that pregnant employees be "compared to other persons who are similarly situated with regard to disability. . . . If [the charging party] is unable to work (whether temporarily or permanently), *she should be compared to employees who are likewise disabled for reasons unrelated to pregnancy*."  EEOC Compliance Manual, § 626.15(a), Investigating and Processing Pregnancy Discrimination Charges (emphasis added); *see also Gratton v. JetBlue Airways*, No. 04 Civ. 7561, 2005 WL 1251786, at *7 (S.D.N.Y. May 25, 2005) (recognizing EEOC guidelines as establishing that proper comparison is between "employers treatment of

12

pregnancy-related disabilities and other temporary disabilities").  Here, class member

compensation must be compared to that of individuals who have taken non-maternity leaves,

which is exactly what Drs. Ward and Johnson studied.

Third, EEOC misunderstands the basis for deciding which employees are similarly

situated, accusing Drs. Ward and Johnson of studying leave even though Bloomberg policy does

not allow managers "to take leaves of absence into account when deciding employee

compensation."  Pl. Mem. at 11.  The relevant legal standards, and not company policy,

determine which employees are similarly situated to class members, and thus which comparisons

must be made.  Here, the PDA makes clear that pregnant women who take leave must be

compared to other employees who took leave.  See supra at 11-12; cf. Fisher v. Vassar College,

70 F.3d 1420, 1448 (2d Cir. 1995) ("the only way" to prove that college engaged in sex

discrimination based on tenure candidate's extended leave for child-rearing was "by comparing

(a) the tenure experience of women who took extended leaves of absence from their work

(regardless of reason), with (b) the tenure experience of men who had also taken long leaves of

absence").  That is what Drs. Ward and Johnson did.  Under EEOC's theory, an expert analysis

that studied the impact of gender in a gender discrimination case, or race in a race discrimination

case, would be "irrelevant" to the allegations if company policy prohibited consideration of

gender or race, respectively, in setting compensation.  This suggestion is baseless.

## II.    DRS. WARD AND JOHNSON RELIABLY PERFORMED THEIR ANALYSES

EEOC next argues that the analyses and testimony offered by Drs. Ward and Johnson are

unreliable.  They are not.

### A.    Dr. Ward and Dr. Johnson Meticulously Applied Reliable Methods to Available Data

"To be reliable, expert testimony must be based on sufficient facts or data, and it must be

the product of reliable principles and methods properly applied."  *See Wright v. Stern*, 450 F.

Supp. 2d 335, 359 (S.D.N.Y. 2006); *see also FDIC v. Suna Assocs., Inc.*, 80 F.3d 681, 686 (2d

Cir. 1996) ("It is well-established that expert testimony must be based upon reliable theories or

principles.") (internal citation omitted).  "In gauging reliability, the district court should consider

the indicia of reliability identified in Rule 702, namely, [that] (1) the testimony is grounded on

'sufficient facts or data;' (2) the testimony 'is the product of reliable principles and methods;'

and (3) 'the witness has applied the principles and methods reliably to the facts of the case.'"

*Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004) (quoting Fed. R. Evid. 702).

Here, Dr. Ward's and Dr. Johnson's testimony easily satisfies these three indicia of

reliability.  *First*, each used Bloomberg personnel data, including computerized records of

Bloomberg pay decisions during the class period, to study EEOC's complaint allegations.  EEOC

does not challenge the sufficiency of the data upon which Drs. Ward and Johnson relied.  *Second*,

in conjunction with other methods, Drs. Ward and Johnson used well-recognized regression

analyses — which EEOC concedes is an appropriate methodology (Pl. Mem. at 3) — to reach

their conclusions.  *See Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 185 (2d Cir.

2001) ("Pertinent evidence based on scientifically valid principles will satisfy [*Daubert's*]

demands") (internal citation omitted).  *Third*, both experts reliably applied their methodologies to

the case.

Specifically, Dr. Ward studied whether class members received lower compensation

growth "once they announced their pregnancy and once they returned to work after taking

maternity leave."  Dreiband Decl. Ex. A (Second Am. Compl.) ¶ 7(a).  He did so first by

analyzing changes in class member compensation over his Study Period, and by analyzing

changes in that compensation from the anniversary date just prior to leave through the end of the

Study Period.  Adams Decl. Ex. E at Exs. 5, 7.  This approach studied whether any class member received less compensation after leave than she did prior to leave, and caused Dr. Ward to conclude that, in fact, class members received *greater* compensation after leave.  *Id.* at 11-12, 15-16.  He also compared these findings to several groups of Bloomberg employees, including those who took no leave, those who took short leaves, and those who took long leaves.  He concluded that class members had *greater* compensation growth than non-class members after controlling for time on leave.  *Id.* at 8, 16.  Finally, Dr. Ward performed regression analyses to test whether his conclusions about class member compensation were influenced by other factors that could affect compensation; these analyses reinforced his overall conclusion that class members received either *greater* intended compensation growth than non-class members who took leaves of any length, or that there were no statistically significant differences in compensation growth, after controlling for time on leave.  *Id.* at Exs. 5, 7.  There is nothing unreliable about this well-recognized approach.

Likewise, Dr. Johnson specifically examined whether class members' compensation decreased "once they announced their pregnancy and once they returned to work after taking maternity leave," as EEOC's complaint alleges.  Adams Decl. Ex. I at 8-9.  After concluding, as Dr. Ward had, that compensation actually *increased* over this period, Dr. Johnson performed an array of different tests to see whether class members were in any way compensated less than similarly situated non-class members at Bloomberg.  Like Dr. Ward's analyses, these tests included comparing class member compensation to that of non-class members who also took leave, and also included multiple regression analyses designed to determine whether other variables affected compensation and change Dr. Johnson's results.  *Id.* at Exs. 2-3, 5-8.  In each instance, Dr. Johnson reached the same conclusion:  the data refutes EEOC's claim that

Bloomberg treated class members less favorably in terms of compensation than it treated similarly situated non-class members. *Id.* at 11-13, 18-19, 22-24.  There is nothing unreliable about these analyses.  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (if "expert's [] testimony rests upon good grounds" and "lies within the range where experts might reasonably differ, the [fact-finder] should decide among the conflicting views") (internal citation and quotation marks omitted).

### B.    EEOC's Challenges To The Analyses And Testimony of Drs. Ward And Johnson Are Without Merit

To support its unreliability claim, EEOC argues primarily that Drs. Ward and Johnson erred by including only one "leave duration variable," and incorrectly asserts that EEOC's proffered expert, Dr. Lanier, did otherwise.  In addition, EEOC raises a handful of claims about the reliability of Dr. Ward's and Dr. Johnson's analyses, none of which render those analyses unreliable under the legal standards that EEOC cites or any other.

### 1.    EEOC's "Single Leave Duration" Variable Critique Mischaracterizes Both Dr. Ward's And Dr. Johnson's Analyses

EEOC challenges the reliability of both Dr. Ward's and Dr. Johnson's analyses on the ground that those analyses use a "single leave duration" variable that does not account for potential differences in the way in which maternity leave and non-maternity leave impact pay.  Pl. Mem. at 13-17.  EEOC claims that its own proffered expert, Dr. Lanier, conducted this analysis, and was thus able to separate the impact leave had on class member compensation from the impact that class membership had on compensation.  *Id.* at 14-15.  This argument distorts the work of all three experts.  In fact, it is Drs. Ward and Johnson who attempted to isolate the way in which maternity leave impacted pay, whereas Dr. Lanier's analyses treated maternity leave and non-maternity leave taken by class members identically.

Both Drs. Ward and Johnson attempted to isolate the effect of class member maternity leave on compensation, as distinguished from the effect of non-maternity leave.  Dr. Ward did so in his initial report (at 14), by examining whether for class members "time on non-maternity leave had a different effect on compensation growth than time on maternity leave."  Adams Decl. Ex. E at 14.  He found that as the amount of maternity leave as a percentage of total leave taken by a particular class member increased, the class member's pay outcome improved, although these findings were not statistically significant.  *Id.*; Dreiband Decl. Ex. B at 402-04, 412. Despite this, EEOC inexplicably claims that Dr. Ward "surprisingly failed to apply his own hypothesis," Pl. Mem. at 14, falsely suggesting that Dr. Ward did not test whether maternity leave and non-maternity leave had different effects on compensation growth.  That is exactly what Dr. Ward did test, and exactly what he reported.  Adams Decl. Ex. E at 14.  The fact that his results were not statistically significant demonstrates Dr. Ward's conclusion that "there is no statistical basis for separate treatment" of the two types of leave is correct.  In other words, because the different effect is not significant, there is no statistical basis to conclude that the results are a function of anything other than chance.  Furthermore, because Dr. Ward found that class pay outcomes improved as the percentage of maternity leave taken by class members increased, any inference from this different effect is totally inconsistent with EEOC's allegation that Bloomberg discriminated against class members *because of* their maternity leaves.[5]  Pl. Mem. at 15.

---

[5]  EEOC also falsely claims that "Dr. Ward does not present an analysis that measures whether the impact of taking leave is different for class members' compensation than the impact of taking leave is for non-class members' compensation, even though he himself found that the leave affects class members' pay differently than it does non-class members' pay." Pl. Mem. at 15.  That is exactly what Dr. Ward's analyses did study:  whether there were differences in compensation growth for class members who took maternity leave as compared to non-class members who took leaves of similar duration.  He found that to the extent there were any such differences, they favored the class.  Adams Decl. Ex. E at 15.

Dr. Johnson likewise attempted to isolate the impact of *maternity* leave on class members. He did so by studying class members' compensation before and after *maternity* leaves only, and eliminating non-maternity leaves taken by class members from his analysis.  Adams Decl. Ex. I at 9 n.9.  Dr. Johnson testified that he did this so that he could cleanly compare the treatment group (class members who took maternity leave) to the control group (non-class members who took non-maternity leave) (Dreiband Decl. Ex. C at 105-07), which appears to be the precise distinction that EEOC advocates.  EEOC's suggestion (Pl. Mem. at 17) that Dr. Johnson did not account at all for different types of leave in his analysis is therefore not correct — a point that he also made clear in his deposition.  Dreiband Decl. Ex. C at 327.

By contrast, Dr. Lanier's final report (which analyzed the impact of class membership on pay outcomes at various leave durations) fails to separate the effect of maternity leave from the effect of non-maternity leave on compensation.  Instead, it separates the impact on compensation of all leave taken by class members (some of which was maternity leave, and some of which was non-maternity leave) from the effect on pay of all leave taken by non-class members (all of which was non-maternity leave).  Adams Decl. Ex. H (Ward Sur-Sur-Reply Rep.) at 2.  To the extent that isolating the effect of maternity leave and non-maternity leave on compensation is important to a valid statistical analysis, as EEOC argues, Dr. Lanier's analysis must be excluded.

Because both Drs. Ward and Johnson attempted to isolate the impact of maternity leave taken by class members, and Dr. Lanier failed to do so, EEOC's criticism has no impact whatsoever on the reliability of Dr. Ward's or Dr. Johnson's analysis.

> **2.    EEOC's Remaining Criticisms Of Dr. Ward's And Dr. Johnson's Analyses Are Inaccurate And Do Not Render Those Analyses Inadmissible**

Not every criticism of an expert's analysis renders that analysis unreliable.  Although certain errors are so egregious so as to support exclusion — such as, for example, failing to

compare class members to similarly situated employees, or failing to include key explanatory variables in the expert's analysis — other criticisms or disputes among experts go to the weight of the evidence, rather than its admissibility. *See, e.g.*, *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible."); *Campbell*, 239 F.3d at 186  ("gaps or inconsistencies in the reasoning leading to [the expert] opinion . . . go to the weight of the evidence, not to its admissibility").  "As long as an expert's [] testimony rests upon good grounds, based on what is known" and the testimony "lies within the range where experts might reasonably differ, the jury, not the trial court, should decide among the conflicting views."  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d at 173 (internal citation and quotation marks omitted).  Moreover, as case law that EEOC relies on suggests, to make testimony inadmissible, criticisms must be sufficient to impact an expert's analyses or conclusions.  *Amorgianos*, 303 F.3d at 267 (evidence should be excluded "if the flaw [in an expert's reasoning] is *large enough that the expert lacks good grounds for his or her conclusions*") (emphasis added); *see also MTBE Prods. Liab. Litig.*, 643 F. Supp. 2d 471, 481 (S.D.N.Y. 2009) (correction of errors that did not affect conclusions does not affect reliability of analysis); *Wright*, 450 F. Supp. 2d at 361-62 (criticism that expert's use of "simple statistics" and controlling only for race "go to the weight rather than the admissibility of the evidence").

The remaining criticisms that EEOC makes about Dr. Ward's and Dr. Johnson's analyses do not support exclusion.  None of them undermine the fundamental grounds upon which Drs. Ward and Johnson based their conclusions.  Moreover, when tested, none of the criticisms changed Dr. Ward's or Dr. Johnson's analytical results, or the conclusions that they drew from those results, in any way.  And finally, many of the criticisms are simply wrong.

     **a.**     **EEOC's Other Criticisms Of Dr. Ward's Analyses Do Not Render Those Analyses Unreliable**

EEOC criticizes two other aspects of Dr. Ward's analyses and testimony, but neither of these criticisms render Dr. Ward's analyses unreliable.

EEOC's first claim — that Dr. Ward improperly failed to account for the passage of time between the leave endpoint and the end of his Study Period — is untrue, and fails to acknowledge that Dr. Ward conducted alternate studies that addressed this issue when EEOC first raised it. Dr. Ward's original analyses studied compensation growth over several time periods: an employee's first anniversary date through the end of the Study Period; the anniversary date immediately prior to an employee's first leave through the end of the Study Period; and the anniversary date immediately prior to leave through the anniversary date immediately after the employee's final leave during the Study Period. Adams Decl. Ex. E at 11, 14-15. None of these results showed any statistically significant differences in compensation growth that were adverse to the class. *Id.* at 13-16. Moreover, in response to Dr. Lanier's criticism that he had not examined sufficiently refined post-leave periods, Dr. Ward separately examined employees who had more than one, and who had more than two, pay anniversaries after their leave date to see whether that data suggested that the passage of time after leave led to differing effects on compensation growth. Adams Decl. Ex. G at 9. These data also showed no statistically significant differences in compensation growth between class members and non-class members for individuals with more than one, or more than two, post-leave anniversary dates. *Id.* Based on these analyses, Dr. Ward concluded that this criticism did not impact his final results in any way, and thus it does not impact the reliability of those results. *Id.*

*Amorgianos*, 303 F.3d at 267; *MTBE Prods. Liab. Litig.*, 643 F. Supp. 2d at 481; *Wright*, 450 F.

Supp. 2d at 361-62.

EEOC absurdly asserts (at 16, n.6) that the analyses that Dr. Ward performed to address this criticism are "overly simplistic."  EEOC criticizes Dr. Ward for improperly aggregating data, and looking at information over too long a period.  Dr. Ward responded by segregating the data and examining compensation growth over more refined post-leave periods, which EEOC claims improperly groups the data.  But EEOC cannot have it both ways:  it is either appropriate to aggregate the data, or to segregate it.  Dr. Ward did both, and either way the conclusion is the same:  there are no statistically significant disparities in compensation growth that disfavor class members as compared to similarly situated non-class members.

EEOC's second claim — that Dr. Ward's duration variable "represents a sum of the durations of all leaves taken within the study period," and can thus "encompass multiple short leaves or one long leave for a given individual" — likewise does not render Dr. Ward's analyses unreliable. Pl. Mem. at 16.  Dr. Ward studied the impact of all leave upon compensation; to do this, it made sense to add leaves taken across his Study Period, and neither EEOC nor Dr. Lanier point to any economic literature or other analyses that suggest otherwise.  EEOC's assertion that Dr. Ward "would unquestionably have reached different results" had he counted leave differently completely mischaracterizes the testimony by Dr. Lanier upon which it relies:  Dr. Lanier candidly conceded that he has no way of knowing whether Dr. Ward's results would have been materially different if he had counted leave differently, nor was Dr. Lanier able to offer an opinion on this question.  Adams Decl. Ex. K (Lanier Dep.) at 253.  The only available evidence suggests that examining the data separately for each leave, rather than adding them across the Study Period, leads to the same conclusion that Dr. Ward reached.  This is the analysis that Bloomberg's other expert, Dr. Johnson, performed.  *See* Adams Decl. Ex. I at 9.  He concluded

that, viewed individually rather than in the aggregate, maternity leave had no statistically significant impact on pay growth when compared to other types of leave.  *Id.* at 5-7.

> **b.** **EEOC's Other Criticisms Of Dr. Johnson's Analyses And Testimony Are Unconvincing**

EEOC criticizes four additional aspects of Dr. Johnson's analyses and testimony, but none of its claims renders Dr. Johnson's analyses or testimony unreliable.

*First*, Dr. Johnson has convincingly responded to EEOC's claim (at 18) that he inappropriately studied only a limited period after leave, thus potentially masking discrimination that occurred years after leave.  As Dr. Johnson's reply report explains, if discrimination were occurring, as EEOC's complaint alleges, "once [class members] announced their pregnancy and once they returned to work after taking maternity leave," one would expect the results of that discrimination to appear, and to be the largest, shortly after the class member returns from leave rather than many years later.  Adams Decl. Ex. J at 15.  Moreover, the further in time one gets from the leave date, the more likely it is that factors unrelated to pregnancy or maternity leave impact compensation and confound the analysis.  Dreiband Decl. Ex. C at 112-14.  Even so, Dr. Johnson expanded his analysis to look at compensation for two years beyond leave, rather than one year, and found no different effects.  Adams Decl. Ex. J at 15-17.  Thus, for EEOC's argument to have any weight, one would have to assume that Bloomberg waits to discriminate against women for pregnancy and maternity leave until more than two years after their leave is concluded — a completely unsupported assumption that is contrary to basic notions of common sense and to EEOC's allegations.  Moreover, Dr. Ward's analysis, which studied compensation over the entire Study Period and found no statistically significant differences in compensation adverse to the class, convincingly rebuts any such assertion.  Adams Decl. Ex. E at 11-14.

*Second*, EEOC's claim (at 18) that Dr. Johnson's Scenario 1 failed to consider similarly

situated employees does not render his analysis unreliable.  EEOC argues that this scenario improperly studied initial compensation over a twelve-month period occurring between twelve and eighteen months before leave for class members, depending upon when the birth occurred relative to the leave date, and over a twelve-month period immediately prior to leave for non-class members.  Pl. Mem. at 18-19.  Dr. Johnson explained that he did this to test EEOC's claim that discrimination occurred after class members "announced their pregnancy" (Dreiband Decl. Ex. A (Second Am. Compl.) ¶ 7(a)) because this is when it is plausible to believe that a woman's pregnancy may become evident.  Dreiband Decl. Ex. C at 124-25.  Neither EEOC nor Dr. Lanier provided any affirmative analyses suggesting that this scenario would have yielded different results if it had been performed differently.  Nevertheless, in response to EEOC's criticism, Dr. Johnson created his Scenario 3, which studied compensation for the year ending six months prior to leave for class members and non-class members alike.  Like all of Dr. Johnson's analyses, this one also established that the data refute EEOC's allegations that class members received pay cuts after returning from leave; instead, it showed that class members experienced greater compensation growth than non-class members who took leave.  Adams Decl. Ex. J at 14-15.

*Third*, EEOC's claim (at 20) that Dr. Johnson failed to use regression analyses, relying instead only on comparisons of raw data that did not control for other factors, is simply false. Like most statistical experts, Dr. Johnson began his report with an explanation of the data and performed several comparisons that were not regression analyses, the results of which completely refuted EEOC's allegations.  Adams Decl. Ex. I at 9-19.  But he did not stop there — he went on to perform detailed and voluminous regression analyses of each of the issues that he studied, and these analyses confirmed his initial conclusions that class members did not have lower compensation, or lower compensation growth, than non-class members who took similar

23

amounts of leave.  *Id.* at 20-24.  EEOC does not challenge these regression analyses.

In any event, the case law EEOC cites (at 20) confirms that "multiple regression analysis is not a prerequisite for the admission of statistical reports in discrimination cases."  *Bonton v. City of New York*, No. 03 Civ. 2833, 2004 WL 2453603, at *4 (S.D.N.Y. Nov. 3, 2004); *see also EEOC v. Venator Group*, No. 99 Civ. 4758, 2002 WL 181711, at *2 (S.D.N.Y. Feb. 5, 2002); *Schanzer v. United Techs. Corp.*, 120 F. Supp. 2d 200 (D. Conn. 2000) (when regression analyses confirm the results of non-regression analyses, all analyses are admissible).

None of the cases upon which EEOC relies holds otherwise.  EEOC's reliance on *Smith v. Xerox*, 196 F.3d 258 (2d Cir. 1999) is unavailing because the expert in that case relied solely on probability tests, and did not perform any regression analysis even though relevant data was available.  Here, Dr. Johnson conducted both non-regression and regression analyses.  EEOC's other authorities (at 21) are equally inapposite because they do not address the merit of non-regression analyses and thus provide no support for excluding Dr. Johnson's statistical comparisons.  In *Bickerstaff v. Vassar College*, the Second Circuit excluded the expert's statistical report because the multiple regression analysis "omitted the major variables" that should have been included in the regression model.  196 F.3d 435, 449 (2d Cir. 1999).  The expert's regression analysis in *Freeland v. AT&T Corp.* was similarly excluded because "[a]t least two significant variables [were] omitted." 238 F.R.D. 130, 149 (S.D.N.Y. 2006).  EEOC does not argue that Dr. Johnson excluded the most significant variables from his regression analyses.  Finally, EEOC's reliance on *Fahmy v. Duane Reed, Inc.*, No. 04 Civ. 1798, 2006 WL 1582084 (S.D.N.Y. June 9, 2006) is absurd.  That case did not even involve expert testimony, but discounted a numerical analysis proffered by the plaintiff himself.  *Id.* at *4.  Dr. Johnson's comprehensive statistical analyses cannot be compared to a lay person's bare factual submission.

*Fourth*, EEOC's claim (at 21) that Dr. Johnson improperly included a gender control in his analyses likewise fails to establish that his analyses are unreliable. Dr. Johnson's reply report makes clear that his analyses demonstrate pay growth among class members as compared to growth among all non-class members, both male and female. Adams Decl. Ex. J at 17-20. The decision to control for gender, therefore, did not impact the outcome of Dr. Johnson's studies, and is not a basis to exclude those studies here. *See, e.g.*, *MTBE Prods. Liab. Litig.*, 643 F. Supp. 2d at 481; *Wright*, 450 F. Supp. 2d at 361-62.

## III.    DR. WARD'S AND DR. JOHNSON'S ANALYSES AND TESTIMONY WILL NOT CONFUSE THE FACT-FINDER

EEOC argues that even if Dr. Ward's and Dr. Johnson's opinions are relevant and reliable under Rule 702, the Court should exclude them because their probative value is "outweighed by confusion of the issues or misleading the jury." Pl. Mem. at 24. EEOC supports this claim by recycling its mistaken assertion that Drs. Ward and Johnson did not separately consider maternity leave, and by repeating several of the same claims that it incorrectly suggests render Dr. Johnson's analyses unreliable.

EEOC first argues that Dr. Ward's and Dr. Johnson's supposed failure to "give separate effect to maternity leave" "renders their conclusions irrelevant, confuses the issues, and would only mislead the jury in assessing the facts at issue in this case." *Id.* As explained above (at 16-18), if EEOC is correct that "giv[ing] separate effect to maternity leave" is the key inquiry in this case, then its own proffered expert, Dr. Lanier, must be excluded because he indisputably did not do so — instead, he looked at the difference in effect of leave taken by class members (which included both maternity and non-maternity leave) and leave taken by non-class members (which included only non-maternity leave). Adams Decl. Ex. H at 2. Drs. Ward and Johnson both studied the impact of maternity leave on class member compensation. Adams Decl. Ex. E at 3;

Adams Decl. Ex. I at 8; *see also supra* at 16-18.  Under EEOC's theory, it is Dr. Lanier's failure to account for this difference that "renders [his] conclusions irrelevant, confuses the issues, and would only mislead the jury in assessing the facts at issue in this case."  Pl. Mem. at 24.

Next, EEOC restates several of its challenges to Dr. Johnson's analyses, claiming that these issues make his testimony too confusing for the fact-finder.  None has merit.

First, Dr. Johnson's "Scenario 1" is neither misleading nor confusing.  In fact, it is simple: in an effort to test EEOC's allegation that class members were disadvantaged when they announced their pregnancy, Dr. Johnson compared class member pay for the one year period ending six months prior to birth to the one year period beginning at the end of leave.  Adams Decl. Ex. I at 9.  He did this because he viewed this as the point "where it would be plausible that the female was starting to show she was pregnant" (Dreiband Decl. Ex. C at 124-25) and thus (under EEOC's theory) allegedly began to experience pay discrimination.  Dreiband Decl. Ex. A (Second Am. Compl.) ¶ 7(a).  He compared these results to the difference in pay for non-class members between the one year period prior to leave and the one year period after leave.  Adams Decl. Ex. I at 11-12, 18.  To support its claim that this straightforward scenario is confusing, EEOC seizes upon an isolated portion of Dr. Johnson's deposition in which he briefly misspoke in explaining it.  Pl. Mem. at 24.  But Dr. Johnson quickly clarified his testimony once he realized his error, Dreiband Decl. Ex. C at 173-74, and also explained this Scenario elsewhere in his deposition.  *Id.* at 123-25.  In any event, there is nothing confusing about Dr. Johnson's Scenario 1, which simply seeks to test EEOC's specific pregnancy discrimination allegations. *See, e.g.*, *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999) (reversing district court's exclusion of expert testimony because the expert's reasons and foundations were "perhaps confusingly explicated;" proper recourse was to hold *in limine* hearing to have expert

respond to court's concerns).

Second, Dr. Johnson's non-regression results, taken in context, will not "confuse and/or mislead a jury" as EEOC claims.  Pl. Mem. at 25.  To be sure, Dr. Johnson tested the data in many ways to see whether any of those tests would support EEOC's theory of the case. "[D]izzying" though they may appear to EEOC (*id.*), the results of those analyses are simple to understand:  no matter how one looks at the data, they refute, rather than support, EEOC's claims against Bloomberg because Dr. Johnson concluded that class members experienced *greater* compensation growth than non-class members who took leaves of similar duration.  EEOC does not want the results excluded because they are too difficult to understand; EEOC wants them excluded because they completely undermine EEOC's allegations.  But that is not a basis for exclusion.  Dr. Johnson will explain his results to the fact-finder, and will also explain in detail how they relate to EEOC's allegations.  That is all that is required to ensure that the probative value of the testimony is not "substantially outweighed" by the potential for confusing the fact finder.  *See, e.g.*, *Edmonds v. United States*, No. 05-540, 2009 WL 969938, at *1 (D.D.C. Apr. 7, 2009) ("[T]he potentially confusing nature of [] testimony goes to the weight to be accorded to the evidence; "proper course is to admit the expert testimony and leave clarification to cross-examination and the presentation of opposing expert testimony.").

Finally, Dr. Johnson's inclusion of a gender control variable in his regression analyses does not make these analyses confusing.  As Dr. Johnson explained, his statistical results support the proposition that class members received greater compensation growth than non-class members, regardless of gender.  Adams Decl. Ex. J at 19-20.  The inclusion of this variable is not confusing simply because EEOC disagrees that it should be included.

The only case that EEOC cites for the proposition that confusing testimony should be

excluded plainly does not support exclusion here.  *United States v. Mahaffy*, No. 05-CR-613, 2007 WL 1213738 (S.D.N.Y. Apr. 24, 2007).  There, one expert was excluded because the submission was egregiously untimely, provided no specialized knowledge that would assist the trier of fact, and failed to offer specific opinions.  *Id.* at *3.  The other expert's submission was cumulative because other witnesses had already testified on same topic, and irrelevant, because the expert offered opinions about industry practices at brokerage firms *other than* the one at issue. *Id.* at *4.  Although the court referred in passing to the potential to confuse in excluding the evidence, there were several independent reasons to exclude it, none of which exist here.

## IV.   DR. WARD'S AND DR. JOHNSON'S TESTIMONY IS NOT NEEDLESSLY CUMULATIVE

A district court has discretion under Rule 403 to exclude relevant evidence when its probative value is "substantially outweighed" by, among other things, "needless presentation of cumulative evidence."  Fed. R. Evid. 403; *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 596 (2d Cir. 1996) (citing *United States v. Holmes*, 44 F.3d 1150, 1157 (2d Cir. 1995)).  But expert testimony is not cumulative when the experts performed different tests or studied disputed issues in a different way.  *Colon v. BIC U.S.A., Inc.*, 199 F. Supp. 2d 53, 96-97 (S.D.N.Y. 2001) (expert testimony not cumulative in products liability case because different experts performed different tests on product); *Stone v. Stoker*, 962 F.2d 7, 1992 WL 98356 at *2 (4th Cir. May 13, 1992) (per curiam) (three causation experts permitted to testify because "[c]ausation was the crucial element of the case" and "each witness offered a distinct insight to the question.").

Consistent with these standards, the opinions and testimony offered by Drs. Ward and Johnson are not cumulative.  Although Drs. Ward and Johnson both tested available Bloomberg data against EEOC's pattern-or-practice allegations — and independently concluded that those data *refute* EEOC's allegations — both looked at the data in different ways, developed different

28

statistical models, and performed different statistical tests.  Dr. Ward studied changes in

compensation over the entire Study Period, whereas Dr. Johnson analyzed those changes

immediately pre- and post-leave.  Moreover, Dr. Ward aggregated data for each employee,

whereas Dr. Johnson looked at each leave separately.  Although taken together Dr. Ward's and

Dr. Johnson's conclusions confirm the same result — that the data refute EEOC's allegations

that Bloomberg discriminated against class members — they do not duplicate each other because

they reach those conclusions using different approaches.  And the fact that two experts

independently tested EEOC's allegations and concluded that there is no statistical evidence

supports those allegations is powerful evidence that Bloomberg should be able to present to the

trier of fact.

    None of the cases that EEOC cites undermines this conclusion because in each of them

the courts' exclusion of the challenged expert testimony was based on more than merely

cumulative grounds.  *See, e.g.*, *United States v. Walker*, 910 F. Supp. 861, 863 (N.D.N.Y. 1995)

(rejecting prosecutor's attempt to proffer the testimony of two ballistics' experts because jury

would be confused by the fact that these two experts were defendants' non-testifying consulting

experts); *Williams v. County of Orange*, No. 03 Civ. 5182, 2005 WL 6001507, at *5 (S.D.N.Y.

Dec. 13, 2005) (excluding testimony because expert failed timely to disclose his qualifications or

his sources, and his "vague report does not set forth a sufficient 'basis and reasons' to support his

opinion"); *Mengele v. Patriot II Shipping Corp.*, No. 99 Civ. 8745, 2002 WL 237847 (S.D.N.Y.

Feb. 19, 2002) (second expert's report was "conclusory" and based on plaintiff's own statements

about his medical history, which the jury could evaluate themselves).

## V.    DR. WARD'S UNCHALLENGED CONCLUSIONS ARE ADMISSIBLE

    EEOC's Motion does not challenge in any respect Dr. Ward's study of whether

Bloomberg discriminated against class members by "demoting [them] . . . in terms of the number

of employees directly reporting to them."  Dreiband Decl. Ex. A (Second Am. Compl.) ¶ 7(b).

This analysis is relevant, as it relates directly to a specific EEOC allegation, and it was reliably

performed, using well-recognized regression methods.  EEOC does not suggest otherwise.

Indeed, the only challenge that EEOC or Dr. Lanier has ever made to this portion of Dr. Ward's

analysis is that the analysis is invalid because very few Bloomberg employees have direct reports

— something that says far more about the validity of EEOC's allegations than it does about Dr.

Ward's analysis of them.  Adams Decl. Ex. B ¶ 39; Adams Decl. Ex. G at 11-12.  This portion of

Dr. Ward's analysis is unchallenged, unrebutted, and admissible.

  EEOC also has not substantively challenged the content of Dr. Ward's Sur-Sur Reply,

which convincingly establishes that Dr. Lanier's interpretation of his final analysis is

scientifically unsupported.  Although EEOC claims that this report "goes far beyond the spirit"

of the Court's order that permitted it (Pl. Mem. at 2 n.1), it failed to move to strike it, or even to

depose Dr. Ward about it when given the opportunity to do so.  *See* Dreiband Decl. Ex. D

(March 18, 2010 Letter from Bloomberg to J. Preska).  Instead of addressing the issue through an

appropriate motion, EEOC now disingenuously claims that it did not do so because it does not

wish to "burden the Court" with further motions.  Regardless of EEOC's motivations, Dr.

Ward's Sur-Sur-Reply is completely unchallenged and unrebutted, and it is therefore admissible.

## CONCLUSION

  For the foregoing reasons, Bloomberg respectfully requests that the Court deny Plaintiff

EEOC's Motion to Exclude the Expert Opinions of Dr. Michael P. Ward and Dr. John H.

Johnson, IV in its entirety, and admit the testimony of Bloomberg proffered experts Dr. Ward

and Dr. Johnson.

Dated: June 11, 2010                    WILLKIE FARR & GALLAGHER LLP


                                        By: /s/ Thomas H. Golden
                                            Thomas H. Golden (TG 1467)
                                            tgolden@willkie.com
                                            (A Member of the Firm)
                                            787 Seventh Avenue
                                            New York, New York 10019
                                            (212) 728-8000

                                        - and -

                                        JONES DAY

                                        By: /s/ Eric S. Dreiband
                                            Eric S. Dreiband (admitted pro hac vice)
                                            edreiband@JonesDay.com
                                            (A Member of the Firm)

                                            51 Louisiana Avenue, N.W.
                                            Washington, DC 20001
                                            (202) 879-3939

## CERTIFICATE OF SERVICE

The undersigned certifies that, on June 11, 2010, I caused a copy of Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Exclude Expert Opinions of Dr. Michael Ward and Dr. John Johnson to be served by e-mail upon the following counsel of record:

Kam Wong, Esq.
Raechel Adams, Esq.
Robert Rose, Esq.
United States Equal Employment Opportunity Commission
33 Whitehall Street, 5th Floor
New York, New York 10004
kam.wong@eeoc.gov
raechel.adams@eeoc.gov
robert.rose@eeoc.gov

Attorneys for Plaintiff Equal Employment Opportunity Commission

Milo Silberstein, Esq.
William Dealy, Esq.
Dealy & Silberstein, LLP
225 Broadway, Suite 1405
New York, New York 10007
msilberstein@dealysilberstein.com
wjd@dealysilberstein.com

Attorneys for Plaintiff-Intervenors Jill Patricot, Tanys Lancaster, Janet Loures and Marina Kushnir

Richard A. Roth, Esq.
Jonah Grossbardt, Esq.
The Roth Law Firm, PLLC
295 Madison Avenue, 22nd Floor
New York, New York, USA 10017
rich@rrothlaw.com
jonah@rrothlaw.com

Attorneys for Plaintiff-Intervenors Monica Prestia and Maria Mandalakis

/s/   Hannah M. Breshin
Hannah M. Breshin (hmbreshinotero@jonesday.com)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939