IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x
                                                          :

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,                                    :

        Plaintiff,         :        07-CV-8383 (LAP/HP)

        v.                          :        ECF ACTION

BLOOMBERG L.P.,               :

        Defendant.       :

--------------------------------------------------------------- x
                                                          :

JILL PATRICOT, TANYS LANCASTER,
JANET LOURES, MONICA PRESTIA,    :
MARINA KUSHNIR and MARIA
MANDALAKIS,                           :

        Plaintiff-Intervenors,     :

        v.                          :

BLOOMBERG L.P.,               :

        Defendant.       :

--------------------------------------------------------------- x

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
TO EXCLUDE THE REPORTS AND TESTIMONY OF DR. LOUIS LANIER**

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................................... i

I.   DR. LANIER'S ANALYSES SHOULD BE EXCLUDED AS IRRELEVANT .............. 1

II.  DR. LANIER'S USE AND INTERPRETATION OF HIS INTERACTION
     MODEL IS UNRELIABLE........................................................................................ 9

CONCLUSION............................................................................................................... 12

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abdu-Brisson v. Delta Air Lines, Inc.*,
   239 F.3d 456 (2d Cir. 2001)......................................................................................................8

*Bickerstaff v. Vassar College*,
   196 F.3d 435 (2d Cir. 1999).......................................................................................................3

*Braun v. Lorillard Inc.*,
   84 F.3d 230 (7th Cir. 1996) .....................................................................................................12

*California Federal Savings & Loan Association v. Guerra*,
   479 U.S. 272 (1987)...................................................................................................................4

*Daubert v. Merrell Dow Pharm. Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ...................................................................................................12

*DeLuca v. Merrell Dow Pharm. Inc.*,
   791 F. Supp. 1042 (D.N.J. 1992) .............................................................................................12

*Doe v. C.A.R.S. Protection Plus, Inc.*,
   527 F.3d 358 (3d Cir. 2008).......................................................................................................6

*Golod v. Hoffman La Roche*,
   964 F. Supp. 841 (S.D.N.Y. 1997)...........................................................................................12

*Laxton v. Gap, Inc.*,
   333 F.3d 572 (5th Cir. 2003) .................................................................................................4, 5

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007)......................................................................................12

*McFee v. Nursing Care Mgt. of Am., Inc.*,
   No. 2010-Ohio-2744, slip op. (Ohio June 22, 2010) .................................................................4

*Minott v. Port Authority*,
   116 F. Supp. 2d 513 (S.D.N.Y. 2000).......................................................................................6

*Mozee v. American Commercial Marine Service Co.*,
   940 F.2d 1036 (7th Cir. 1991) ...................................................................................................3

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
   462 U.S. 669 (1983)...................................................................................................................4

*Orr v. City of Albuquerque*,
    531 F.3d 1210 (10th Cir. 2008) ................................................................................6

*Ottaviani v. State University of New York*,
    875 F.2d 365 (2d Cir. 1989)......................................................................................5

*Piraino v. International Orientation Resources, Inc.*,
    137 F.3d 987 (7th Cir. 1998) ....................................................................................6

*Sheehan v. Donlen Corp.*,
    173 F.3d 1039 (7th Cir. 1999) ...............................................................................4, 5

*Sigmon v. Parker Chapin Flattau & Kimpl*,
    901 F. Supp. 667 (S.D.N.Y. 1995)..........................................................................4, 5

*Smith v. Xerox Corp.*,
    196 F.3d 358 (2d Cir. 1999) *overruled on other grounds by Meacham v. Knolls
    Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006).....................................................5

*Troupe v. May Dept. Stores Co.*,
    20 F.3d 734 (7th Cir. 1994) ......................................................................................9

*Velez v. Novartis Pharmaceuticals Corp.*,
    244 F.R.D. 243 (S.D.N.Y. 2007) ......................................................................6, 7, 8

*Wills v. Amerada Hess Corp.*,
    No. 98 Civ. 7126 (RPP), 2002 WL 140542 (S.D.N.Y. Jan. 31, 2002) ...................12

**RULES**

Federal Rule of Evidence 702................................................................................................12

**STATUTES**

42 U.S.C. § 2000e(k) ..............................................................................................................4

**OTHER AUTHORITIES**

EEOC Notice No. 915.002, Enforcement Guidance:  Unlawful Treatment of Workers
    with Caregiving Responsibilities (May 23, 2007) ...................................................5

Bloomberg L.P. established in its motion ("Br.") that the Court should exclude Dr. Louis Lanier's analyses and testimony because they are irrelevant and unreliable. EEOC's opposition ("Opp.") and Dr. Lanier's amended declaration ("Lanier Decl.") confirm this conclusion.

Dr. Lanier's analyses are irrelevant because they fail to compare class members to other leave takers, as the Pregnancy Discrimination Act requires. EEOC's contrary position is belied by its complaint, its interrogatory responses, its brief, and Dr. Lanier's testimony. Dr. Lanier's conclusion "that class members tend to have better pay outcomes upon return from leave than non-class members who took the same amounts of leave" (Lanier Decl. ¶ 12) contradicts EEOC's claim that Bloomberg paid class members less than similarly situated employees "once they returned to work after taking maternity leave." Second Am. Compl. ¶ 7(a).[1] His analyses and testimony therefore cannot be used to prove EEOC's allegations.

Dr. Lanier's analyses are also unreliable. He and EEOC concede that his interpretation of his interaction model is not "typical," because he presumes that the variables that his model interacts – leave duration and class membership – do not really interact. Lanier Decl. ¶¶ 13-14; Opp. 17. Despite having had months to produce a scientific justification for his unorthodox "non-interaction interaction model," neither EEOC nor Dr. Lanier offers any. The unrebutted scientific evidence shows that Dr. Lanier's interpretation of his model is "erroneous." Dreiband Decl. Ex. G (Ward Sur-Sur-Reply Rep.), App. B at 4; Declaration of Michael P. Ward ("Ward Decl.") ¶¶ 5-6. This Court should exclude Dr. Lanier's novel and unsupported interpretation of his "non-interaction interaction model."

## I.   DR. LANIER'S ANALYSES SHOULD BE EXCLUDED AS IRRELEVANT

Bloomberg established (Br. at 8-11) that Dr. Lanier's compensation growth analyses are

---

[1] Annexed as Exhibit A to the Declaration of Eric S. Dreiband in Support of Defendant's Motion to Exclude the Reports and Testimony of Dr. Louis Lanier ("Dreiband Decl.").

not relevant because they fail to compare class members to other leave takers as the PDA requires.  None of EEOC's four responses has merit.

*First*, EEOC claims (at 9) that the PDA permits broader discrimination claims than those based upon maternity leave.  EEOC argues that its case is "about discriminatory treatment of pregnant women and mothers, and not about treatment of leave takers."  Opp. 12.  EEOC's claim is belied by the record evidence, and its legal arguments are incorrect.

EEOC incorrectly suggests that Bloomberg's focus on maternity leave is "misplaced" and "overly literal" because EEOC does not challenge only actions occurring during pregnancy.  Opp. at 3.  Bloomberg does not make this claim.  EEOC's complaint alleges discrimination against class members "once they announced their pregnancy and once they returned to work after taking maternity leave."  Dreiband Decl. Ex. A ¶ 7(a).  EEOC's interrogatory responses, which it claims "have made the specifics of EEOC's allegations against Bloomberg crystal clear" (Opp. 2), make the same allegation repeatedly.  *See* Declaration of Raechel L. Adams ("Adams Decl.") Ex. 2 at 3 (class members receive "less compensation than their similarly situated comparator(s), *once they announced their pregnancy and/or returned to work after taking maternity leave*") (emphasis added); *see also id.* (same, alleging demotions and exclusion from management meetings).  EEOC concedes that it "alleges that class members do suffer [] affirmative sanctions for taking maternity leave," (Opp. 15) and that the three statistical experts "only analyzed the compensation of class members with identifiable maternity leaves."  Opp. at 3-4, n.2.

Dr. Lanier's testimony flatly contradicts his suggestion (Decl. ¶ 4) that he failed to consider leave in his analysis because the allegations focus on "mothers," rather than on maternity leave takers.  Dr. Lanier admitted that he performed "statistical analys[es] of data to see if there were patterns [of] . . . employment outcomes *related to pregnancy and/or maternity*

2

*leave*." Lanier Dep. at 39;[2] *see also id.* at 41 (definition of class members is "based on having taken some kind of pregnancy or maternity-related leave"); *id.* at 135, 158 (same). Dr. Lanier did not define the class as "mothers;" indeed, he conceded that "[t]here is a population within the data of women who are mothers . . . who are not included in this part of the class[,]" "[s]o to say that I've . . . defined the class as all mothers is [] not correct."[3] *Id.* at 160-61.

Dr. Lanier's claim that maternity leave takers provided the "best available proxy" for identifying mothers (Lanier Decl. ¶ 4) is wrong. Bloomberg's data identifies women working at Bloomberg who had dependent children (Ward Decl. ¶ 8), but Dr. Lanier did not use this data to identify class members. His analysis compares one set of mothers – those who took maternity leave during the class period – to men, childless women, and an unknown number of other mothers. Breshin Decl. Ex. A at 39, 41, 160-61. That analysis is even less relevant to proving discrimination against mothers than it is to proving discrimination against maternity leave takers.

Legally, EEOC makes two points (at 12): that the PDA appears in Title VII's definitional section; and that "the first clause of the PDA is not limited by the specific language in the second clause." EEOC does not explain how the PDA's inclusion in Title VII's definitional section is relevant to claims brought under it; that definition makes clear that pregnant women must be

---

[2] Annexed as Exhibit A to the Declaration of Hannah M. Breshin in Support of Defendant's Motion to Exclude the Reports and Testimony of Dr. Louis Lanier ("Breshin Decl.")

[3] Dr. Lanier also suggests (Decl. ¶ 4) that he did not initially compare class members to other leave takers because Bloomberg managers may not consider leave in setting compensation. But the law, not company policy, defines the appropriate comparator population. EEOC's authority (Opp. at 16 n.12) is not to the contrary. In *Bickerstaff v. Vassar College*, 196 F.3d 435 (2d Cir. 1999), the court held that the statistical analysis should have accounted for two variables Vassar considered in setting salary. *Bickerstaff*, 196 F.3d at 449. That is not the same thing as saying that Vassar's compensation policy provides the *exclusive* list of variables that should be included. *Mozee v. American Commercial Marine Service Co.*, 940 F.2d 1036 (7th Cir. 1991), is inapposite, as the court merely held that there was inadequate evidence to show that the statistical analyses should account for certain performance criteria.

treated the same as others "similar in their ability or inability to work." 42 U.S.C. § 2000e(k).

The cases that EEOC cites in support of its second point confirm Bloomberg's position that the PDA does not require preferential treatment for pregnant women. For example, in *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983), the Supreme Court noted that the "second clause . . . explains the application" of the principle that discrimination because of sex includes discrimination on the basis of pregnancy "to women employees," i.e., that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits . . . *as other persons not so affected but similar in their ability or inability to work*." *Id.* at 678, n.14. In discussing the text of the PDA, the Supreme Court in *California Federal Savings & Loan Association v. Guerra*, 479 U.S. 272 (1987), stated that "the second clause of the PDA was intended . . . to illustrate how discrimination against pregnancy is to be remedied." *Id*. at 285. The Ohio Supreme Court recently rejected the interpretation of the PDA that EEOC advocates, holding that "[a]lthough the scope of the second sentence is narrower than [] the first sentence, both serve the same goal – to ensure that employees who are pregnant are not discriminated against on the basis of pregnancy. To hold otherwise would be to require that employers treat pregnant employees more favorably than other employees. The statutes do not support such a result." *McFee v. Nursing Care Mgt. of Am., Inc.*, No. 2010-Ohio-2744, slip op. at 7 (Ohio June 22, 2010) (Breshin Decl. Ex. B).

Nor do the single plaintiff cases upon which EEOC relies support its claim that it challenges "how women working at Bloomberg are treated when they announce their intention to become pregnant, become pregnant, and once they are mothers, as compared to other employees who do none of those." Opp. 9. *Sigmon v. Parker Chapin Flattau & Kimpl*, 901 F. Supp. 667 (S.D.N.Y. 1995); *Laxton v. Gap, Inc.*, 333 F.3d 572 (5th Cir. 2003); *Sheehan v. Donlen Corp.*,

4

173 F.3d 1039 (7th Cir. 1999). None of these cases involve class actions, pattern-or-practice violations, or statistical evidence. Instead, they use anecdotal evidence to show that plaintiffs were terminated because of their announced pregnancy (*Laxton*), their repeated pregnancies (*Sheehan*), and being pregnant or a new mother (*Sigmon*). While the PDA allows such cases, Dr. Lanier did not study those allegations; he studied whether "there were patterns [of] . . . employment outcomes related to pregnancy and/or maternity leave." Breshin Decl. Ex. A at 39.[4]

     *Second*, EEOC claims (at 11, n.10) that the Second Circuit does not require a comparison of similarly situated individuals, claiming instead that "the focus . . . is on how the employer treats members of the protected class." That is wrong. In *Ottaviani v. State University of New York*, 875 F.2d 365, 370-71 (2d Cir. 1989), on which EEOC relies, the Second Circuit described the first step in a regression analysis as "identifying those legitimate criteria that affect the decision making process, [so that] individual plaintiffs can make predictions about *what* job or job benefits *similarly situated employees* should ideally receive." *Id.* at 367 (emphasis added). Similarly, the Second Circuit has held that "a disparate treatment claim looks at how an individual was treated compared to her *similarly situated coworkers*. Thus, statistical analyses that compare coworkers who competed directly against each other to receive a benefit . . . are appropriate." *Smith v. Xerox Corp.*, 196 F.3d 358, 370 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 141 (2d Cir. 2006) (emphasis added). In the Second Circuit, statistical analyses must compare similarly situated employees to

---

[4] EEOC also criticizes Bloomberg (at 13, n.11) for failing to cite its caregiver guidance, but does not explain what portion of that guidance supports its position. It actually supports Bloomberg's position. *See* EEOC Notice No. 915.002, Enforcement Guidance: Unlawful Treatment of Workers with Caregiving Responsibilities (May 23, 2007) ("[a]n employer . . . may not treat a pregnant worker who is temporarily unable to perform some of her job duties because of pregnancy less favorably than workers whose job performance is *similarly restricted because of conditions other than pregnancy*.") (emphasis added).

5

draw meaningful conclusions about alleged discrimination.

EEOC's claim that the cases upon which Bloomberg relies to establish the correct comparator population do "not require a plaintiff alleging pregnancy discrimination to present a comparison with similarly situated employees *at all*" (Opp. at 13) is without merit.  In *Orr v. City of Albuquerque*, the court compared pregnant women to "employees seeking non-pregnancy FMLA leave."  531 F.3d 1210, 1216 (10th Cir. 2008).  In *Minott v. Port Authority*, the plaintiff alleged "differential treatment of individuals who were similarly-situated as to their absenteeism, but who were not female and not pregnant," and this Court considered the proper comparator to be those employees who were absent for reasons unrelated to pregnancy.  116 F. Supp. 2d 513, 520-21 (S.D.N.Y. 2000).  In *Doe v. C.A.R.S. Protection Plus, Inc.*, plaintiff satisfied her prima facie case of disparate treatment by comparing herself "to other non-pregnant workers who were temporarily disabled."  527 F.3d 358, 366 (3d Cir. 2008).  And in *Piraino v. International Orientation Resources, Inc.*, 137 F.3d 987 (7th Cir. 1998), plaintiff challenged company policy permitting only employees who worked for at least a year to return from leave after she lost her job when she went out on maternity leave before working for a year.  The court found no discrimination, opining:  "Piraino has no evidence to suggest that if her situation involved, for example, a pre-planned tonsil surgery necessitating a six-week leave of absence, she would have been granted a leave of absence or allowed to return to work after her leave."  *Id.* at 991.

EEOC also challenges reliance on *Velez v. Novartis Pharmaceuticals Corp.*, 244 F.R.D. 243 (S.D.N.Y. 2007), where plaintiffs' PDA claim was denied because "incentive compensation is directly related to time employees are working," (Opp. 14), which EEOC implicitly claims is not true of Bloomberg's compensation policies.  This misunderstands Bloomberg's reliance on the case.  In *Velez*, the court's analysis of whether there was a viable compensation-based PDA

claim hinged on comparing how the compensation policy affected people who took maternity leave versus how it affected people who took non-maternity leave.  *See* 244 F.R.D. at 264 ("[T]he compensation system does not differentiate between employees who take leave for pregnancy and employees who take leave for other reasons.  If sales figures in a territory drop while a representative is on leave, that representatives' incentive payments will fall, regardless of the reason for leave.").  As relevant here, the Court held that "[i]t is not discriminatory to treat pregnancy-related leave the same as other forms of leave, and plaintiffs have offered no evidence that NPC's compensation policies do otherwise."  *Id.*  The same is true here.  As Dr. Lanier now concedes, "class members tend to have better pay outcomes upon return from leave than non-class members who took the same amounts of leave."  Lanier Decl. ¶ 12.

*Third*, EEOC suggests that Bloomberg makes an "invalid assumption" that class members should only be compared to those who took leave "sometime in the past."  Opp. 17.  EEOC is wrong for two reasons.  One, both EEOC and Dr. Lanier concede that "labor economics literature shows that leaves can be correlated with negative pay consequences to the extent there are changes in an employee's productivity associated with being out on leave."  Opp. 6; Breshin Decl. Ex. A at 277.  It is legitimate to compare class members to other Bloomberg employees who have previously taken similar amounts of leave.  Dr. Lanier controlled for pre-Bloomberg labor force experience in his analysis for much the same reason:  because time at work impacts compensation.  *Id.* at 122.  Two, EEOC is wrong to suggest that Bloomberg "assum[ed]" this fact.  It tested the question using available data, and found – as Dr. Lanier concedes – that class members experience the same or greater compensation growth as non-class members who took similar amounts of leave.  Dreiband Decl. Ex. H (Ward Rep.) at 12-16; Lanier Decl. ¶ 12.  This result applies even at Dr. Lanier's "zero duration" point.  Dreiband Decl. Ex. G at 10.

7

*Finally*, EEOC's claim (at 16 n.12) that because Dr. Lanier considered leave in his reply analysis, his analyses should be considered as a whole, misinterprets Bloomberg's objection. Although Bloomberg believes Dr. Lanier's initial analyses to be flawed because they failed to consider leave (*see* Br. at 11-13), Dr. Lanier's failure to compare class members to similarly situated Bloomberg employees pervades *both* his initial and his reply analyses.  He reports the results of his reply analysis at the single point where this error is relevant:  zero leave duration. His results at zero leave duration compare class member compensation growth to that of all other employees who took no leave during the current pay period, but most of these employees took no leave at all during the entire class period.  When compared to other leave takers, there are no statistically significant differences between class member and non-class member compensation growth under Dr. Lanier's model, even at zero leave duration.  Dreiband Decl. Ex. G at 10.

Simply put, Dr. Lanier purports to demonstrate that the class that he studied, all of whom took leave, experienced a pay growth rate disparity compared to everyone else.  But if other similar leave takers experienced a similar disparity – which he concedes they did – then the disparity is a function of leave, not sex-pregnancy discrimination, because all leave takers, maternity or non-maternity, experience the same thing.[5]  No matter how EEOC tries to frame its allegations, Dr. Lanier's analysis is not relevant evidence of sex-pregnancy discrimination.  *See Velez*, 244 F.R.D. at 264 ("[i]t is not discriminatory to treat pregnancy-related leave the same as

---

[5] EEOC's support for its claim that a compensation penalty for all leave takers presents a "grotesque scenario" where Bloomberg can immunize itself from suit by "victimiz[ing]" all similarly situated employees is inapposite, because there was no available comparator group in that case.  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001).  Here, the class can be compared to other similarly situated leave takers.  EEOC and Dr. Lanier concede that there are legitimate reasons to pay employees who take leave less than those who do not. Opp. 12; Lanier Decl. ¶ 22(d).  Dr. Lanier even agrees that it is more plausible that the "net leave duration effect [on compensation growth observed at Bloomberg] is the result of a legitimate business practice, as opposed to discrimination." *Id.* ¶ 18 n.4.

other forms of leave"); *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994) (the PDA "requires the employer to ignore an employee's pregnancy, but not her absence from work"). As Dr. Lanier now admits, the correct comparison shows that "class members tend to have better pay outcomes upon return from leave than non-class members who took the same amounts of leave" – a result consistent with Bloomberg's experts' findings, but completely at odds with EEOC's allegations. The Court should exclude Dr. Lanier's analyses and testimony.

## II.   DR. LANIER'S USE AND INTERPRETATION OF HIS INTERACTION MODEL IS UNRELIABLE

Recognizing that the remainder of Dr. Lanier's analyses are useless because they failed to control for or consider leave, EEOC's defense of Dr. Lanier's testimony relies heavily on his reply analyses, wherein he introduced an "interaction" model in an effort to account for the impact of leave on compensation at Bloomberg. He did this because simply controlling for leave in his initial analysis showed no statistically significant differences in compensation growth between class members and non-class members. Dreiband Decl. Ex. F (Ward Rebuttal Rep.) at 6-7. But, as Bloomberg established (at 17-19), Dr. Lanier has improperly interpreted the results of his interaction model. Dr. Lanier and EEOC concede that Dr. Lanier has not interpreted his model in the "typical" way, and fail to cite any support for his unorthodox interpretation, but defend it nonetheless. It is not defensible, and his testimony is therefore unreliable.

Dr. Lanier's reply analysis introduced an "interaction variable" that allowed class membership and leave duration to depend upon each other, to determine whether leave duration had a different effect on class members than it did on non-class members.[6] Opp. at 15; Lanier

---

[6] Dr. Lanier purports to have introduced his interaction variable – the impact of leave duration multiplied by the impact of class membership – to assess whether the effect of taking maternity leave differed from the effect of taking non-maternity leave. Opp. at 6; Dreiband Decl. Ex. E (Lanier Reply Rep.) at ¶¶ 20-23. EEOC concedes, however, that he actually studied whether

9

Decl. ¶ 6. EEOC claims that this model shows that class members received, on average, "lower total intended compensation increase[s] than similarly situated non-class members . . . who took the same amount of leave in the previous year," (Opp. 6), but EEOC's claim mischaracterizes Dr. Lanier's findings. As Dr. Lanier admits, his model shows that "class members tend to have better pay outcomes upon return from leave than non-class members who took the same amounts of leave." Lanier Decl. ¶ 12; Breshin Decl. Ex. A at 422.

Dr. Lanier nonetheless argues that he has identified a "fixed class penalty" in total compensation growth for the class that is "solely attributable" to class status. Opp. 7; Lanier Decl. ¶ 29. As Bloomberg established (at 19), however, this "fixed class penalty" results solely from a gross misinterpretation of Dr. Lanier's interaction model. What Dr. Lanier has really found is that, at zero leave duration, class members experience lower compensation growth when compared against all other Bloomberg employees who took no leave during the current pay period, the vast majority of whom never took leave at all during the class period. Dreiband Decl. Ex. G at 2-3. This finding does not apply, as Dr. Lanier suggests, to the entire class at all times; it applies only at zero leave duration during the current pay period. *Id.* at 2. That is because, in an interaction model, the two examined variables – here, class status and leave duration – are presumed to interact, or to depend upon each other, so the results at a particular leave duration apply only at that leave duration, and not across the class. *Id.* at 4-5. Thus, for example, at the average leave duration, it is undisputed that even Dr. Lanier's revised analysis shows that the difference between class member compensation growth and non-class member compensation

---

(continued…)

leave duration impacted class members (who took both maternity and non-maternity leave) differently than it impacted non-class members (who took only non-maternity leave). Opp. at 6, n.9; Lanier Decl. ¶¶ 5-6.

10

growth favors the class.[7]  Lanier Decl. ¶ 10; Dreiband Decl. Ex. G at 8.

Dr. Lanier now offers a new justification for his interpretation of the results of his interaction model, claiming that although he used an "interaction model," the two terms – class status and leave duration – do not actually "interact," or depend upon each other.  Lanier Decl. ¶ 14 ("[m]y interaction model differs from th[e] typical interaction scenario in that there is no presumed relationship (interaction) between the alleged discrimination against mothers and the amount of leave taken").  On this basis, Dr. Lanier posits that the impact of class membership on compensation growth at zero leave duration applies to the entire class at all times, regardless of whether and when they took leave.  *Id.* ¶ 23.  Dr. Lanier concedes that this interpretation of an interaction model – in essence, a "non-interaction interaction model" – is "not typical."  *Id.* ¶ 14.

The only scientific literature to which Dr. Lanier points in support of his interpretation (*Id.* ¶ 17 n.3) is authority cited by Dr. Ward suggesting that "even highly respected scholars continue to interpret lower-order interaction coefficients as if they were ordinary coefficients in a strictly additive model," as Dr. Lanier does here.  Dreiband Decl. Ex. G, App. B at 4.  According to Dr. Lanier, "[p]resumably, these highly respected scholars have some reason for doing so, having to do with the theory behind their use of the interaction."  Lanier Decl. ¶ 17 n.3.  Of course, Dr. Lanier does not identify any reason, and it appears that he has none.  Furthermore, the very next sentence of the literature Dr. Ward cites makes clear that Dr. Lanier's presumption about these unidentified "scholars" is incorrect:  "[*s*]*uch an interpretation is erroneous*."  Dreiband Decl. Ex. G., App. B at 4 (emphasis added).  So whatever their reason, these "highly

---

[7] Statistics are only useful if they assess the impact on the average class member, since it is always possible to find pockets of data to support any particular theory.  Dreiband Decl. Ex. G at 8 n.10.  EEOC (Opp. 16) claims that 92% of class members had a pay period in which they took no leave.  The source of this information is Dr. Lanier's original declaration; he amended this figure to 54% on June 17, 2010.  Lanier Decl. ¶ 22(a).  But only 34% of class member pay period observations were periods in which the class member took no leave.  Ward Decl. ¶ 4.

11

respected scholars" – and Dr. Lanier – have erroneously interpreted an interaction model.

The law is clear that under these circumstances, Dr. Lanier's unorthodox interpretation of his interaction model must be excluded. To be admissible, the party proffering expert testimony has the burden to show that "the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication," or that the expert can "point to some objective source – a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like – to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Daubert v. Merrell Dow Pharm. Inc.*, 43 F.3d 1311, 1318-19 (9th Cir. 1995); *see also Braun v. Lorillard Inc.*, 84 F.3d 230, 235 (7th Cir. 1996). The courts thus routinely exclude testimony, like Dr. Lanier's here, that uses unorthodox, novel, or atypical methods to reach its conclusions. *Daubert*, 43 F.3d at 1319 (excluding expert testimony where plaintiffs do not point to any external source to validate the expert's methodology; under *Daubert*, the expert's qualifications, conclusions, and assurances of reliability are "not enough."); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 637 (S.D.N.Y. 2007); *DeLuca v. Merrell Dow Pharm. Inc.*, 791 F. Supp. 1042, 1056-57 (D.N.J. 1992); *Wills v. Amerada Hess Corp.*, No. 98 Civ. 7126 (RPP), 2002 WL 140542, at *15 (S.D.N.Y. Jan. 31, 2002); *Golod v. Hoffman La Roche*, 964 F. Supp. 841, 860 (S.D.N.Y. 1997).

EEOC has the burden to establish that Dr. Lanier's testimony is reliable. Despite having months to locate some, Dr. Lanier provides no scientific basis whatsoever for his creation of a "non-interaction interaction model." Rule 702 therefore does not permit its admission.

## CONCLUSION

Defendant Bloomberg L.P. respectfully requests that the analyses, expert reports, and testimony of Dr. Louis Lanier be excluded from evidence in their entirety.

Dated: June 25, 2010  WILLKIE FARR & GALLAGHER LLP

By: /s/ Thomas H. Golden
    Thomas H. Golden (TG 1467)
    tgolden@willkie.com
    (A Member of the Firm)
    787 Seventh Avenue
    New York, New York 10019
    (212) 728-8000

- and -

JONES DAY

By: /s/ Eric S. Dreiband
    Eric S. Dreiband *(admitted pro hac vice)*
    edreiband@JonesDay.com
    (A Member of the Firm)
    51 Louisiana Avenue, N.W.
    Washington, DC 20001
    (202) 879-3939

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on June 25, 2010, I caused a copy of Defendant's Reply Memorandum in Support of Defendant's Motion to Exclude the Reports and Testimony of Dr. Louis Lanier to be served by e-mail upon the following counsel of record:

Kam Wong, Esq.
Raechel Adams, Esq.
Robert Rose, Esq.
United States Equal Employment Opportunity Commission
33 Whitehall Street, 5th Floor
New York, New York 10004
kam.wong@eeoc.gov
raechel.adams@eeoc.gov
robert.rose@eeoc.gov

Attorneys for Plaintiff Equal Employment Opportunity Commission

Milo Silberstein, Esq.
William Dealy, Esq.
Dealy & Silberstein, LLP
225 Broadway, Suite 1405
New York, New York 10007
msilberstein@dealysilberstein.com
wjd@dealysilberstein.com

Attorneys for Plaintiff-Intervenors Jill Patricot, Tanys Lancaster, Janet Loures and Marina Kushnir

Richard A. Roth, Esq.
Jonah Grossbardt, Esq.
The Roth Law Firm, PLLC
295 Madison Avenue, 22nd Floor
New York, New York, USA 10017
rich@rrothlaw.com
jonah@rrothlaw.com

Attorneys for Plaintiff-Intervenors Monica Prestia and Maria Mandalakis

/s/   Hannah M. Breshin
Hannah M. Breshin (hmbreshinotero@jonesday.com)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939