```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/31/10
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

EQUAL EMPLOYMENT OPPORTUNITY     :
COMMISSION,                      :
                                 :       07 Civ. 8383 (LAP)
                Plaintiff,       :
                                 :       MEMORANDUM & ORDER
       v.                        :
                                 :
BLOOMBERG L.P.,                  :
                                 :
                Defendant.       :
------------------------------------X
JILL PATRICOT, TANYS LANCASTER,  :
JANET LOURES, MONICA PRESTIA,    :
MARINA KUSHNIR and MARIA         :
MANDALAKIS,                      :
                                 :
        Plaintiff-Intervenors,   :
                                 :
       v.                        :
                                 :
BLOOMBERG L.P.,                  :
                                 :
                Defendant.       :
------------------------------------X

LORETTA A. PRESKA, Chief United States District Judge:

       Currently before the Court are the parties' Daubert motions
wherein Defendant Bloomberg L.P. ("Bloomberg") seeks to exclude
the testimony of Dr. Louis Lanier [dkt. no. 117], a labor
economist, and Dr. Eugene Borgida [dkt. no. 124], a social
psychologist, and Plaintiff Equal Employment Opportunity
Commission ("EEOC") seeks to exclude the testimony of Dr.
Michael P. Ward and Dr. John H. Johnson, IV [dkt. no. 115], both
of whom are labor economists.  For the reasons set forth below,
Plaintiff's Motion to Exclude Drs. Ward and Johnson is DENIED,

and Defendant's Motions to Exclude Dr. Lanier and Dr. Borgida
are GRANTED.

I.   BACKGROUND

    A.   EEOC's Complaint

Thirty days prior to the filing of the Complaint, Jill
Patricot, Tanys Lancaster, and Janet Loures filed charges with
the EEOC alleging sex/pregnancy discrimination, in violation of
Title VII of the Civil Rights Act of 1964 ("Title VII").  After
the filing of the Complaint, Patricot, Loures, Maria Mandalakis,
and Marina Kushnir filed charges with the EEOC alleging
retaliation by Bloomberg.  (Second Amended Complaint ¶ 1.)  EEOC
claims that from approximately February 2002 through the
present, Bloomberg engaged in a pattern or practice of unlawful
employment practices, including discriminating against Claimants
based on sex/pregnancy by: (1) paying them less total
compensation after they announced their pregnancy and returned
from maternity leave; (2) demoting them in title or in the
number of employees directly reporting to them; (3) diminishing
their responsibilities and/or replacing them with male employees
junior to the Claimants; (4) excluding them from management
meetings and otherwise isolating them once they announced their
pregnancy and returned from maternity leave; and (5) subjecting
them to stereotypes regarding female caregivers when they
returned from maternity leave. (Id. ¶ 7.)  EEOC further claims

that Bloomberg engaged in unlawful employment practices by
retaliating against the named Claimants and other similarly
situated female employees who protested the alleged unlawful
sex/pregnancy discrimination by reducing their compensation,
criticizing their performance, reducing their job opportunities,
and threatening to terminate them. (Id. ¶ 9.)

To help prove its allegations, the EEOC proposes the
testimony of Dr. Louis Lanier, a labor economist who studied the
effect that both class membership and maternity leave had on
class members' compensation.  The EEOC also offers the testimony
of Dr. Eugene Borgida, a social psychologist, for the purposes
of educating the jury "about the social science on stereotyping,
the nature of the [Bloomberg] organizational structure,
practices, and culture that may lead to stereotyping, and
organizational remedies, for monitoring and reducing the effects
of stereotypes." (EEOC's Memorandum of Law in Opposition to
Defendant's Motion to Exclude the Reports and Testimony of Dr.
Eugene Borgida ("EEOC Borgida Mem.") at 1.)  In support of its
defense that Bloomberg did not engage in a pattern or practice
of discrimination, Bloomberg offers the expert testimony of Dr.
Michael P. Ward and Dr. John H. Johnson, IV, two statisticians,
who analyzed whether the data supported or refuted "EEOC's
allegations that Bloomberg paid class members less than non-
class members or demoted them." (Memorandum of Law in Opposition

3

to Plaintiff EEOC's Motion to Exclude Expert Opinions of Dr.
Michael P. Ward and Dr. John H. Johnson, IV ("Bloomberg Mem.")
at 1.)

    B.   Dr. Lanier's Report

    Dr. Lanier is a Senior Economist and Practice Director at
Econ One Research, Inc., an economic consulting firm in Los
Angeles, CA. (Declaration of Raechel L. Adams in Opposition to
Defendant Bloomberg L.P.'s Motion to Exclude the Reports and
Testimony of Dr. Louis Lanier ("Adams' Lanier Decl."), Ex. 7
("Lanier Report") ¶ 1.)  Dr. Lanier has a Ph.D. in Applied
Economics from Clemson University. (Id.)  Dr. Lanier performed a
statistical analysis of the personnel data provided by Bloomberg
in order to determine if patterns related to pregnancy and/or
motherhood status exist in pay decisions and to determine the
extent to which any patterns exist in demotions or job changes
that systematically affect class members. (Id. ¶ 5.)

    i.   Initial Report

    Utilizing regression models, Dr. Lanier analyzed two
primary components of compensation--base pay and Equity
Equivalency Certificate ("EEC") grants[1]--and compared class
compensation outcomes to non-class compensation outcomes. (Id.

---

[1] EECs are certificates that are granted either one or two years
prior to their redemption dates.  At the time of the grant, the
value of the certificate is based solely on expectations
concerning the performance of the firm. (Lanier Report ¶ 21.)

¶¶ 20-21.)  For purposes of the analysis, each class member's status as a class member began on her first maternity leave after February 1, 2002; prior to going on maternity leave, class members were included in the non-class member control group. (Id. ¶¶ 24, 29.)  Based on his analysis, Dr. Lanier drew the following conclusions:

a.  Class members incurred statistically significant lower base pay rate changes than similarly situated non-class members with the same company tenure, job tenure and pre-Bloomberg experience, who worked in the same job codes and business units, who previously earned the same base rate of pay, and whose most recent EEC grants were of the same value;

b.  Class members were given statistically significant smaller intended EEC grants than similarly situated non-class members with the same company tenure, job tenure and pre-Bloomberg experience, who received their grants in the same month, who worked in the same job codes and business units, who earned the same base rate of pay, and whose two previous years' EEC grants had the same actual values;

c.  The effect of recent job changes on class members does not statistically differ from that of non-class members with respect to base pay rate changes.  However, the effect of recent job changes on class members does statistically differ from that of non-class members with respect to intended EEC grants to the detriment of class members.  Specifically, class members having experienced a recent job change (in the past two years) can expect approximately $1,500 to $2,400 lower intended EEC grants than their non-class counterparts;

* * *

5

e. Class members who have the same company tenure, job tenure and pre-Bloomberg experience, who work in the same job codes and business units, who are paid the same base rates, and who receive the same EEC grants systematically receive lower performance ratings. Also, the average performance ratings for class members drop[] by a statistically significant 0.1 margin between the "before" and "after" periods of pregnancy and/or maternity leave;

\* \* \*

(Id. ¶ 52.)

ii. Reply Report

In response to the expert reports of Drs. Ward and Johnson (discussed infra), Dr. Lanier submitted a Reply Report (see Adams' Lanier Decl., Ex. 10 ("Lanier Reply Report")) wherein he analyzed whether "there is a 'leave effect' associated with the pay outcomes of class members, as distinct from a 'class effect.'" (Lanier Reply Report ¶ 3.) In the Reply Report, Dr. Lanier controlled for leave by "including a class-leave duration interaction variable, which allows the effect of leave duration for class members (those who took maternity leave) to differ from the effect of leave duration for non-class members (those who took non-maternity leave)." (Id. ¶ 22.) Based on the leave modification, Dr. Lanier found that "statistically significant

disparities to the detriment of class members exist in base pay changes."[2] (Id. ¶ 52.)

C.   Dr. Ward's Report

Dr. Ward is the Vice President and Senior Analyst at Welch Consulting, a firm specializing in economic and statistical research. (Declaration of Raechel Adams in Support of Plaintiff EEOC's Motion to Exclude the Expert Opinions of Dr. Michael P. Ward and Dr. John H. Johnson, IV ("Adams' Ward Decl."), Ex. E ("Ward Report") at 1.)  Dr. Ward holds M.A. and Ph.D. degrees in Economics from the University of Chicago.  Dr. Ward was tasked with measuring the impact on compensation of maternity leaves contrasted to the impact of non-maternity leaves. (Id. at 3.) The statistical methodology Dr. Ward employed was a comparison of compensation changes.  He compared an employee's compensation prior to taking leave to the employee's compensation after the leave ended.  He also compared the changes in the number of direct reports before and after the employee took leave. (Id.)

Dr. Ward concluded that "women who take maternity leave fare slightly better, in terms of intended compensation, than other Bloomberg employees on leave for similar amounts of time."

[2] Dr. Lanier provided a Corrected Reply Report in which he corrected his analysis due to his discovery that Bloomberg's personnel data only partially tracked leave information for Bloomberg employees who are employed in foreign offices. (Adams' Lanier Decl., Ex. 15 ¶ 2.)  Dr. Lanier's outcome was not affected by the additional information. (Id. ¶ 34.)

(Id. at 18.)  Dr. Ward further found "no statistical evidence that Class Members' level of responsibility, as measured by direct reports, decreased to any significant degree as compared to other employees when taking time on leave into account." (Id.)

D.   Dr. Johnson's Report

Dr. Johnson is the President and CEO of Edgeworth Economics, L.L.C., a consulting firm that provides economic and financial analysis for complex litigation and public policy debates. (Adams' Ward Decl., Ex. I ("Johnson Report") ¶ 1.)  Dr. Johnson has a Ph.D. in Economics from the Massachusetts Institute of Technology.  Dr. Johnson "analyzed the compensation outcomes for control groups of Bloomberg employees--in particular, employees who took non-maternity leaves." (Id. ¶ 14.)  Dr. Johnson reviewed Bloomberg's personnel system and organized the data such that he could compare maternity leaves with other leaves and account for the timing of Bloomberg's compensation adjustments on individual employee anniversary dates. (Id. ¶ 15.)  For class members, Dr. Johnson "compared the base salary and EEC grant value during the 12-month period starting [six] months before birth to the 12-month period starting at the return from leave." (Id. ¶ 17.)  For non-class members, he "compared compensation during the 12-month period

before the start of the leave to the 12-month period after the
return from the leave." (Id.)

Based on Dr. Johnson's analysis, he found that the "base
salary of all Bloomberg employees taking a maternity leave which
ended between February 2002 and March 2009 (the Class Members)
increased an average of $8,060 (10.4 percent) in the 12-month
period following each leave, compared to the 12-month period
ending [six] months before birth of the child." (Id. ¶ 10.)  By
comparison, Dr. Johnson found that the base salaries of other
female employees who took non-maternity leaves increased $3,316
(4.8 percent) and the base salaries for all Bloomberg employees
who took non-maternity leave increased an average of $3,946 (5.1
percent) over the comparable period. (Id.)  Dr. Johnson found
that the intended value of EEC grants for "Bloomberg employees
returning from maternity leave between February 2002 and March
2009 increased an average of $3,562 (11.2 percent) in the 12-
month period following each leave, compared to the 12-month
period ending [six] months before the birth of the child." (Id.)
The intended value of EECs "granted to female Bloomberg
employees taking non-maternity leave decreased an average of $8
(less than .1 percent)" and the intended value of EECs granted
to all Bloomberg employees taking non-maternity leave increased
an average of $1,678 (6.5 percent) over comparable period."
(Id.)

E.   <u>Dr. Borgida's Report</u>

Dr. Borgida is a professor of psychology and law at the University of Minnesota (Twin Cities) and has a Ph.D. in psychology with a specialization in social psychology and psychology and law from the University of Michigan.  Dr. Borgida engaged in what is called a "social framework analysis," which "uses general conclusions from tested, reliable, and peer-reviewed social science research as a context for educating fact finders about the case facts at hand." (Declaration of Eric S. Dreiband in Support of Defendant's Motion to Exclude the Reports and Testimony of Dr. Eugene Borgida ("Dreiband's Borgida Decl."), Ex. A ("Borgida Report") ¶ 8.)  The analysis "provides an assessment of <u>general causation</u> in a research area in order to inform the fact finders about more <u>specific causation</u> issues associated with a particular case." (<u>Id.</u>)  In conducting his analysis, Dr. Borgida reviewed several deposition transcripts as well as Bloomberg personnel materials. (<u>Id.</u>, Appendix A.)  Dr. Borgida concluded that

> the stereotypes about employees who are mothers and/or pregnant more likely than not influenced the perceptions, evaluations, and decisions about them at Bloomberg.  The cultural and organizational context at Bloomberg more likely than not activated the gender stereotype about mothers as less competent and as less agentic and less committed to their careers.  Given the subjectivity, discretion, and lack of accountability in the Bloomberg decision making process, stereotypic perceptions more likely than not

10

influenced employment decisions about employees who
are mothers and/or pregnant.

(Id. at 38-39.)

II.  DISCUSSION

    A.  Legal Standard

    Federal Rule of Evidence 702, which governs the

admissibility of expert testimony, provides:

> If scientific, technical, or other specialized
> knowledge will assist the trier of fact to understand
> the evidence or to determine a fact in issue, a
> witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data,
> (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has
> applied the principles and methods reliably to the
> facts of the case.

Fed. R. Evid. 702.  In order for the expert opinion to be

admissible, the witness "must be qualified as an expert, the

testimony must be reliable, and the testimony must assist the

trier of fact." In re Fosamax Prods. Liab. Litig., 645 F. Supp.

2d 164, 172 (S.D.N.Y. 2009).

    "Courts within the Second Circuit have liberally construed

expert qualification requirements." In re Methyl Tertiary Butyl

Ether ("MTBE") Prods. Liab. Litig., No. 1:00-1898, 2008 WL

1971538, at *5 (S.D.N.Y. May 7, 2008) (internal quotation marks

omitted).  "A witness's qualifications 'can only be determined

by comparing the area in which the witness has superior

knowledge, skill, experience, or education with the subject matter of the witness's testimony.'" In re Fosamax, 645 F. Supp. 2d at 172 (quoting Carroll v. Otis Elevator Co., 896 F.2d 210, 212 (7th Cir. 1990)).

The Advisory Committee's note to Rule 702 explains that the Rule was amended to include the three reliability-based requirements in response to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and its progeny, Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), and General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). See Fed. R. Evid. 702 advisory committee's note.  In Daubert, the United States Supreme Court interpreted Rule 702 to require district courts to act as gatekeepers by ensuring that expert scientific testimony "both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597.  This requires "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-93; see also Kumho Tire, 526 U.S. 137 (holding that this gate keeping function applies to all expert testimony, whether based on scientific, technical or other specialized knowledge).

To be scientifically valid, the subject of expert testimony must rest on "good grounds, based on what is known." Daubert,

12

509 U.S. at 590 (internal quotation marks omitted).  In Daubert, the Court set forth a non-exclusive list of factors that district courts might consider in gauging the reliability of scientific testimony. Id. at 593-95.  These factors include: (1) whether the theory has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error and whether standards and controls exist and have been maintained with respect to the technique; and (4) the general acceptance of the methodology in the scientific community. Id.  "Whether some or all of these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony." In re Fosamax, 645 F. Supp. 2d at 173 (citing Kumho Tire, 526 U.S. at 138).  A district court has broad discretion both in determining the relevant factors to be employed in assessing reliability and in determining whether that testimony is in fact reliable. Kumho Tire, 526 U.S. at 153; Zuchowicz v. United States, 140 F.3d 381, 386 (2d Cir. 1998).

Weighing whether the expert testimony assists the trier of fact goes primarily to relevance. Daubert, 509 U.S. at 591. Relevance can be expressed as a question of "fit"-"whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Id. (citing United States v. Downing, 753 F.2d

1224, 1242 (3d Cir. 1985)). In addition, expert testimony is not helpful if it simply addresses "'lay matters which a jury is capable of understanding and deciding without the expert's help.'" United States v. Mulder, 273 F.3d 91, 101 (2d Cir. 2001) (quoting United States v. Castillo, 924 F.2d 1227, 1232 (2d Cir. 1991)). Finally, the testimony is not helpful if it "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) (quoting United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991)).

"In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). However, in accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion. Id. "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process--competing expert testimony and active cross-examination--rather than excluded from jurors'

14

scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." <u>Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.</u>, 161 F.3d 77, 85 (1st Cir. 1998) (quoting <u>Daubert</u>, 509 U.S. at 596); <u>see also</u> <u>Amorgianos</u>, 303 F.3d at 267.  If an expert's testimony lies within "the range where experts might reasonably differ," the jury, and not the trial court, should "decide among the conflicting views of different experts." <u>Kumho Tire</u>, 526 U.S. at 153.

     "The <u>Daubert</u> analysis focuses on the principles and methodology underlying an expert's testimony, not on the expert's conclusions. <u>In re Fosamax</u>, 645 F. Supp. 2d at 173-74 (citing <u>Daubert</u>, 509 U.S. at 595).  However, the Supreme Court in <u>Joiner</u> recognized that "conclusions and methodology are not entirely distinct from one another." 522 U.S. at 146. Therefore, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." <u>Id.</u> (stating that "nothing in either <u>Daubert</u> or the Federal Rules of Evidence requir[es] the admission of opinion evidence connected to existing data only by the <u>ipse dixit</u> of the expert.")  The ultimate object of the court's gate-keeping role under Rule 702 is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert

in the relevant field." <u>Kumho Tire</u>, 526 U.S. at 152.  "The
flexible <u>Daubert</u> inquiry gives the district court the discretion
needed to ensure that the courtroom door remains closed to junk
science while admitting reliable expert testimony that will
assist the trier of fact." <u>Amorgianos</u>, 303 F.3d at 267.

Finally, like all evidence, expert testimony may be
excluded under Rule 403 if its "probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the
issues or misleading the jury, or by considerations of undue
delay, waste of time, or needless presentation of cumulative
evidence." Fed. R. Evid. 403.

B.    Analysis

i.    <u>Drs. Ward and Johnson</u>

To support their arguments that Bloomberg either did or did
not engage in a pattern or practice of sex/pregnancy
discrimination, both sides have put forth statistical experts
who opine that after reviewing Bloomberg's compensation data,
the numbers conclusively prove their side's case.  As will be
discussed below, the Court finds that the experts are qualified,
that they utilized reliable methods in arriving at their
conclusions, and that their testimony will assist the trier of
fact.  The parties' arguments for excluding these experts do not
go towards admissibility but rather goes towards the weight that
the jury should give the testimony.  This is a classic "battle

of the experts" situation, and it should be left to the jury to decide which expert engaged in the proper analysis to determine whether discrimination took place.  Accordingly, Bloomberg's motion to exclude Dr. Lanier and EEOC's motion to exclude Drs. Ward and Johnson are denied.

### a.   Dr. Ward

EEOC concedes that Dr. Ward is qualified, that the data he used in drafting his report was reliable, and that his methodology--regression analysis[3]--was reliable. (Memorandum of Law in Support of Plaintiff EEOC's Motion to Exclude the Expert Opinions of Dr. Michael P. Ward and Dr. John H. Johnson, IV ("EEOC Ward & Johnson Mem.") at 9.)  Instead, EEOC argues that as applied to the facts of this case, Dr. Ward's methodology was flawed and will not assist the trier of fact. (Id.)  EEOC's primary argument in seeking to exclude Dr. Ward's testimony and expert report is that he studied the wrong question because he analyzed "the impact of leave on the compensation of Bloomberg

---

[3] "Multiple regression analysis is a statistical test which identifies factors, called independent variables, that might influence the outcome of an observed phenomenon, called a dependent variable.  In the employment discrimination context the dependent variable is the employment decision, such as hiring, promotion, termination.  The statistician identifies legitimate factors that could have influenced the decision, e.g., education and experience, and determines via multiple regression analyses how well these legitimate factors account for the employment decision.  In this manner the influence of a protected characteristic on the employment decision can be statistically isolated." Smith v. Xerox Corp., 196 F.3d 358, 363 n.3 (2d Cir. 1999).

employees, and not the impact of class status (i.e., being pregnant and/or having returned from maternity leave within the relevant time period)." (Id. at 10 (emphasis in original).) EEOC contends that the proper question is whether Bloomberg discriminated against employees who are pregnant or new mothers by, among other things, decreasing their compensation. (Id. at 11.)  In addition, EEOC claims that Dr. Ward did not "sufficiently account for the fact that the pay endpoint he studied may occur shortly after an employee returns from leave or several years after the employee returns from leave--or at any point in between." (Id. at 15.)  Despite EEOC's arguments, though, the Court finds that Dr. Ward's analysis satisfies the admissibility requirements of Rule 702.

"'It has been repeatedly affirmed that the [Pregnancy Discrimination Act] does not require the creation of special programs for pregnant women; nor does it mandate any special treatment.  To the contrary, the statute specifically requires that pregnant women be treated the same as all other employees with similar disabilities.'" Velez v. Novartis Pharmaceuticals Corp., 244 F.R.D. 243, 264 (S.D.N.Y. 2007) (quoting Dimino v. N.Y.C. Transit Auth., 64 F. Supp. 2d 136, 157 (E.D.N.Y. 1999)); see also Minott v. Port Auth. of N.Y. and N.J., 116 F. Supp. 2d 513, 521 (S.D.N.Y. 2000) ("Title VII and the Pregnancy Discrimination Act do not protect a pregnant employee from being

18

discharged for absenteeism even if her absence was due to pregnancy or complications of pregnancy, unless other employees are not held to the same attendance standards."). Here, Dr. Ward compared class members, whom he characterized as maternity leave-takers, to non-maternity leave takers to measure the impact on compensation that maternity leave may have. (Ward Report at 3.) He also compared leave-takers in general (maternity and non-maternity) to non-leave-takers to measure how leaves in general impact pay. (Id.) Such an analysis is appropriate here because Dr. Ward is attempting to compare the class members to similarly situated employees, i.e., those who have taken a substantial amount of leave. Cf. Fisher v. Vassar College, 70 F.3d 1420, 1448 (2d Cir. 1995) (agreeing that "the only way a claim of 'sex plus' discrimination could be predicated on the detrimental effects of prolonged professional inactivity would be by comparing (a) the tenure experience of women who took extended leaves of absence from their work (regardless of the reason), with (b) the tenure experience of men who had also taken long leaves of absence").

Whether Dr. Ward's conclusion tends to disprove EEOC's allegations of discrimination is a question for the jury. Moreover, the fact that Dr. Ward did not, as EEOC argues, account for the difference between maternity leave and other types of leave among class members is something for the jury to

19

take into account in determining how much weight should it
should give to Dr. Ward's conclusions.  That Dr. Ward did not
account for every possible variable that may have impacted the
class members' compensation does not render his report
inadmissible.  See Bazemore v. Friday, 478 U.S. 385, 400 (1986)
("While the omission of variables from a regression analysis may
render the analysis less probative than it otherwise might be,
it can hardly be said, absent some other infirmity, that an
analysis which accounts for the major factors must be considered
unacceptable as evidence of discrimination.  Normally, failure
to include variables will affect the analysis' probativeness,
not its admissibility."); see also Bickerstaff v. Vassar
College, 196 F.3d 435, 449 (2d Cir. 1999) (affirming district
court's rejection of expert's regression analysis not because
the analysis "included less than all the relevant variables;
rather, [the analysis was] not probative because it omitted the
major variables").

In addition to its argument that Dr. Ward's analysis is
unreliable, the EEOC also claims that his expert opinions should
be excluded under Rule 403 for being confusing and/or
misleading. (EEOC Ward & Johnson Mem. at 24.)  To support this
claim, the EEOC points to the same deficiencies set forth in its
Rule 702 challenge.  However, as discussed above, the Court
finds the EEOC's arguments to be meritless and finds that Dr.

20

Ward's testimony will not confuse the jury but rather will assist the jury in determining whether or not Bloomberg discriminated against the class members.

Accordingly, because the Court finds that Dr. Ward's testimony and expert report: (1) will assist the trier of fact; (2) are based upon sufficient data; (3) are the product of reliable principles and methods; and (4) apply the principles and methods reliably to the facts at issue here, EEOC's Motion to Exclude the Expert Opinion of Dr. Ward is DENIED.

### b.   Dr. Johnson

EEOC lodges many of the same criticisms against Dr. Johnson's opinion as it lodged against Dr. Ward's opinion. With respect to EEOC's arguments that Dr. Johnson's opinion should be excluded because he studied only a "pure leave effect" as opposed to studying the impact that maternity leave had on an employee's compensation versus non-maternity leave, EEOC's motion is denied. Similarly, the Court finds EEOC's contention that Dr. Johnson's opinion should be excluded because he studied only a small period of time after an employee's return from maternity leave to be without merit. As discussed above, this alleged shortcoming in Dr. Johnson's analysis goes to its weight not its admissibility.

EEOC challenges Dr. Johnson's opinion in several other respects, each of which is insufficient to preclude admission of the opinion.

### 1.   Dr. Johnson's "Scenario 1" Does Not Compare Similarly Situated Employees

First, EEOC argues that Dr. Johnson's "Scenario 1" fails to compare similarly situated employees. (EEOC Ward & Johnson Mem. at 18.)  In "Scenario 1" Dr. Johnson compares the compensation growth of class members from a point eighteen months before the birth of a class member's child to a point twelve months after the class member returned from leave, to the compensation growth of non-class members from a point twelve months before the start of a leave to a point twelve months after the employee's return from leave. (Johnson Report ¶¶ 16-17; Ex. 1.)  EEOC argues that the results are unfairly biased in favor of class members' compensation because the "before" window extends eighteen months prior to leave as compared to only twelve months for non-class members. (EEOC Ward & Johnson Mem. at 19.)  Bloomberg contends that Dr. Johnson analyzed the eighteen-month "before" window for class members because it was conceivable that a class member would begin to show that she was pregnant six months before the birth of the child and that EEOC was claiming that the discrimination began once the class member announced her pregnancy. (Bloomberg Ward & Johnson Mem. at 23.)  Regardless,

22

to account for EEOC's criticism, Dr. Johnson revised his analysis and looked at an equal window of time (a twelve month window beginning eighteen months before leave) for both maternity leave takers and non-maternity leave takers and found that "the alternate specification of the compensation window has no effect on my original findings." (Adams' Ward Decl., Ex. J ("Johnson Reply Report") ¶ 21.)  Therefore, even assuming it was erroneous for Dr. Johnson to use different time frames when comparing total compensation, the error did not impact the reliability of his opinion because the results were not altered by the use of different data. See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig., 643 F. Supp. 2d 471, 481 (S.D.N.Y. 2009) ("City's expert's method . . . was sufficiently reliable to be admissible in city's action . . . even though city's expert discovered an error in his work; expert's initial testimony was reliable, as it was the same method used by one of the experts of a defendant . . . and, when expert discovered his error, he double-checked his work in a timely fashion and supplemented the basis for his conclusions without altering the results."); Wright v. Stern, 450 F. Supp. 2d 335, 362 (S.D.N.Y. 2006) ("Whatever the alleged deficiencies of [the expert's] report, the rebuttal report is sufficiently reliable.").

23

2.   Dr. Johnson's Failure to Use Regression
     Analysis and Inclusion of Gender
     Control

EEOC's argument that Dr. Johnson's opinion should be
excluded because it used "very few multiple regression analyses"
is meritless. (EEOC Ward & Johnson Mem. at 20.) As an initial
matter, Dr. Johnson did in fact conduct regression analyses in
his report; specifically, he looked at whether other factors
such as "leave duration, performance rating before the leave,
the employee's business unit and office location, and factors
specific to the year in which the leave was taken." (Johnson
Report ¶ 34.) "Although multiple regression analysis is not a
prerequisite for the admission of statistical reports in
discrimination cases," "courts have repeatedly held that
statistical analyses that fail . . . to control for any
nondiscriminatory explanations are inadmissible. Bonton v. City
of New York, No. 03 Civ. 2833, 2004 WL 2453603, at *4 (S.D.N.Y.
Nov. 3, 2004) (emphasis in the original); see, e.g., Bickerstaff
v. Vassar College, 196 F.3d 435, 450 (2d Cir. 1999) (holding
that assumption that race bias tainted professor's course
evaluation scores is untenable without attempting to control for
other causes for low score); Smith v. Xerox Corp., 196 F.3d 358,
370-71 (2d Cir. 1999) (holding that plaintiff's statistical
analysis failed on its own to support an inference of
discriminatory treatment sufficient to withstand a summary

judgment motion because the analysis did not account for any
other causes or for the fact that older workers were more likely
to be terminated); Hollander v. Am. Cyanamid Co., 172 F.3d 192,
203 (2d Cir. 1999) (holding that expert report is inadmissible
because its "inference of [age] discrimination solely on the
basis of the raw numbers is impermissible in the absence of any
attempt to account for other causes of the . . . anomaly");
Raskin v. Wyatt Co., 125 F.3d 55, 67-68 (2d Cir. 1997) (holding
that expert report was inadmissible in part because it
"assume[d] any anomalies in the . . . data must be caused by age
discrimination, and [made] no attempt to account for other
possible causes").  Here, because Dr. Johnson did not omit major
variables from his analysis, see Bickerstaff, 196 F.3d at 449,
the Court finds that his opinion is sufficiently reliable to be
admissible under Rule 702.

Lastly, EEOC claims that to the extent Dr. Johnson conducts
meaningful regression analyses, those analyses are flawed
because he used an improper gender control. (EEOC Ward & Johnson
Mem. at 21.)  EEOC argues that the inclusion of a gender control
was inappropriate because the class members (all of whom are
women) should be compared to non-class members (both men and
women); therefore, by using the gender control, Dr. Johnson only
compared class members to female non-class members. (Id. at 22.)
In controlling for gender, Dr. Johnson "deflate[d] the predicted

compensation outcomes for male employees by the difference
between males and females, so that there is no direct comparison
between female class member compensation outcomes and male non-
class member compensation outcomes." (Id. at 22-23.)   In
response, Dr. Johnson notes that in his original report he
"computed values for both a female-only control group as well as
a control group that includes both males and females" and "found
that the class members experienced larger compensation increases
following a leave than either control group." (Johnson Reply
Report ¶ 26.)   Regardless, in his Reply Report, Dr. Johnson
stated that his original conclusions--that class members
experienced larger compensation increases--was unaffected
because he could still determine that class members experienced
larger compensation increases as compared to non-class members.
(Id. ¶¶ 29-30.)   Therefore, even assuming Dr. Johnson erred in
including a gender control, the outcome of his report was not
altered by the use of the control thereby making his report
reliable. See MTBE Prods. Liab. Litig., 643 F. Supp. at 481;
Wright, 450 F. Supp. 2d at 362.

Accordingly, because the Court finds that Dr. Johnson's
testimony and expert report satisfy the requirements set forth
in Fed. R. Evid. 702 and that the probative value of his opinion
is not substantially outweighed by the danger of confusion to

the jury pursuant to Fed. R. Evid. 403, EEOC's Motion to Exclude the Expert Opinion of Dr. Johnson is DENIED.

    ii.  Dr. Lanier

Bloomberg challenges Dr. Lanier's analyses claiming that they are irrelevant and unreliable. (See Memorandum of Law in Support of Defendant's Motion to Exclude the Reports and Testimony of Dr. Louis Lanier ("Bloomberg Lanier Mem.") at 1.) Bloomberg argues that Dr. Lanier's Report is irrelevant because he failed "to compare class members to similarly situated [Bloomberg] employees" and because he failed to show that class members suffered pay decreases upon returning from maternity leave. (Id.)  Bloomberg also contests the reliability of Dr. Lanier's Report claiming that he "misinterpreted his final analysis, concluding that it showed a class disparity in pay growth . . . when . . . it [actually] show[ed] the opposite," (id.), and that he used a generally accepted scientific approach (an interaction model) but interpreted the results in an unorthodox and unproven manner, (Reply Memorandum in Support of Defendant's Motion to Exclude the Reports and Testimony of Dr. Louis Lanier ("Bloomberg Lanier Reply Mem.") at 1).

Through his regression analysis, Dr. Lanier found that the class's base pay growth was 3.73% lower than the pay increase received by non-class members and that class members received $1,514 less in expected bonus than non-class members. (Lanier

27

Report ¶¶ 27, 31.)  In conducting his analysis, Dr. Lanier

defined the class as "people who took some type of maternity or

pregnancy-related leave" and compared them to "anyone who didn't

take a maternity leave during the class period." (Declaration of

Eric S. Dreiband in Support of Defendant's Motion to Exclude the

Reports and Testimony of Dr. Louis Lanier ("Dreiband's Lanier

Decl."), Ex. C ("Lanier Dep.") at 162:5-16, 9-10.)  Bloomberg's

expert, Dr. Ward, submitted a rebuttal report to Dr. Lanier's

Report wherein he criticized Dr. Lanier for failing to control

for leave and noted that had he controlled for leave, Dr.

Lanier's Report would have shown that the pay disparity between

class members and non-class members would be statistically

insignificant. (Adams' Ward Decl., Ex. F ("Ward Rebuttal

Report") at 6.)  In reply to Dr. Ward's critique, Dr. Lanier

performed another analysis where he added a control for leave

and found that on average, class members received a 1.17% lower

total intended compensation increase than what similarly

situated non-class members received in the same year, in the

same business unit, with the same amount of company tenure and

pre-Bloomberg labor force experience, who were previously paid

the same total intended compensation and EEC grants, and who

took the same amount of leave in the previous year. (Adams' Ward

Decl., Ex. D ("Lanier Corrected Report")

28

¶¶ 6-15, Table 0.)[4]  Moreover, using the same controls, Dr.
Lanier found that class members received .92% lower base pay
increases and $1,399 lower intended EEC grants than what non-
class members received. (Id. at Tables 1, 2.)   Therefore, EEOC
contends that considering Dr. Lanier's initial Report and Reply
Report together will assist the jury in determining whether
Bloomberg discriminated against class members after they
announced their intention to become pregnant, became pregnant,
and gave birth. (EEOC Lanier Mem. at 9.)

Notwithstanding its blanket objection to Dr. Lanier's
failure to control for leave in his initial Report, Bloomberg
argues that the Court should reject Dr. Lanier's corrected
analysis (which includes a control for leave) because Dr. Lanier
"reports the results of his reply analysis at the single point
where this error is relevant: zero leave duration." (Bloomberg
Lanier Reply Mem. at 8.)  As Dr. Ward noted in his Sur-Sur Reply
to Plaintiff's Corrected Report of Louis R. Lanier (Adams' Ward
Decl., Ex. H ("Ward Sur-Sur Reply Report")):

> Dr. Lanier's reported effect for zero days of leave
> compares Class Members with no leave in the current
> period to all other employees who had no leave in the

---

[4] Dr. Lanier filed the Corrected Report three days after filing
his Reply Report because he became aware of the fact "that the
PeopleSoft data only partially track[s] leave information for
Bloomberg employees who are employed in foreign offices."
(Lanier Corrected Report ¶ 2.)  Therefore, Dr. Lanier had to
update all of the tables and back pay damages analysis. (Id.
¶ 3.)

current period.  However, all Class Members previously
took a long leave while the vast majority of the Non-
Class Members had no previous long leave, and many had
no previous leave at all.  If a long leave has some
lasting effect on performance-related factors, such as
productivity, and therefore on pay, employees with a
recent long leave (all of the Class Members but only a
small fraction of Dr. Lanier's Non-Class Members) are
not similarly situated to employees who have never
been on a long leave (the vast majority of Dr.
Lanier's Non-Class Members).

(Id. at 9.)  Therefore, as Bloomberg contends, Dr. Lanier's

Reply Report still fails to compare similarly situated employees

because class members are, in effect, being compared to

employees who took little or no leave during the class period.

(Bloomberg Lanier Reply Mem. at 8.)  In actuality, Bloomberg

argues that "a correct comparison, with a correct

interpretation, establishes that there is no evidence of a

statistically significant disparity in changes in total or

intended compensation that is adverse to Class Members overall,

when they take leave, or after they return from leave. (Ward

Sur-Sur Reply Report at 10.)

As discussed above, the PDA "'specifically requires that

pregnant women be treated the same as all other employees with

similar disabilities.'" Velez v. Novartis Pharmaceuticals Corp.,

244 F.R.D. 243, 264 (S.D.N.Y. 2007) (quoting Dimino v. N.Y.C.

Transit Auth., 64 F. Supp. 2d 136, 157 (E.D.N.Y. 1999); see

Smith v. Xerox Corp., 196 F.3d 358, 370 (2d Cir. 1999) ("[A]

disparate treatment claim looks at how an individual was treated

compared to her similarly situated coworkers.  Thus, statistical analyses that compare coworkers who competed directly against each other to receive a benefit . . . are appropriate."); <u>Minott v. Port Auth. of N.Y. and N.J.</u>, 116 F. Supp. 2d 513, 521 (S.D.N.Y. 2000) ("Title VII and the [PDA] do not protect a pregnant employee from being discharged for absenteeism even if her absence was due to pregnancy or complications of pregnancy, unless other employees are not held to the same attendance standards.").  Here, in order to prove that Bloomberg discriminated against class members on account of their gender/pregnancies, EEOC must show that Bloomberg treated class members differently from "other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k).  Dr. Lanier's Report fails to make this comparison because he does not accurately compare class members to other similarly situated Bloomberg employees, <u>i.e.,</u> leave takers.  The Court finds his attempt to control for leave in his Reply Report to be utterly irrelevant because, as Dr. Ward demonstrated, Dr. Lanier's comparison at zero leave duration merely compared class members to other employees who, for the most part, never took leave during the entire class period.  Accordingly, because he did not compare class members to other similarly situated employees, Dr. Lanier's Report cannot assist the trier of fact and is thus inadmissible pursuant to Rule 702.

In addition to finding that Dr. Lanier's Report is
irrelevant, the Court also agrees with Bloomberg's argument that
Dr. Lanier's use in his Reply Report of an interaction model to
account for the impact of leave on compensation at Bloomberg is
unreliable because, as Dr. Lanier admitted, his "interaction
model differs from [the] typical interaction scenario in that
there is no presumed relationship (interaction) between the
alleged discrimination against mothers and the amount of leave
taken." (Declaration of Dr. Louis Lanier in Opposition to
Defendant Bloomberg L.P.'s Motion to Exclude the Reports and
Testimony of Dr. Louis Lanier ("Lanier Decl.") ¶ 14.) Dr.
Lanier acknowledged that the results of his interaction model
show that "class members tend to have better pay outcomes upon
return from leave than non-class members who took the same
amounts of leave." (Id. ¶ 12.) Despite these results, though,
Dr. Lanier opines that he has isolated the impact that class
status has on a class member's compensation and found that "the
measured fixed pay difference that is only related to class
status . . . is the appropriate measure of discrimination
against the class." (Id. ¶ 30.) Only by engaging in an atypical
methodology (i.e., using an interaction model where the two
factors--leave and class membership--do not interact) does Dr.
Lanier arrive at his conclusion that class members suffer a
fixed class penalty solely as a result of being a class member

32

and not as a result of taking leave. (Id. ¶¶ 29-30.)  What his method ultimately shows is that, at zero leave duration, class members experience lower compensation growth as compared to all other Bloomberg employees who took no leave during the current pay period.  But, as discussed above, the reason class members suffer a pay disparity compared to other employees at zero leave duration is because the majority of employees who took no leave in the current pay period also took no leave during the entire class period. (See Ward Sur-Sur Reply Report at 2-3.)  Therefore, by "isolating" what he calls the "Class Disparity," Dr. Lanier merely compared class members to other employees who took little or no leave.  He was only able to isolate the "Class Disparity" by ignoring the impact of leave duration. (Id. at 9.)  Dr. Lanier's unorthodox method of interpreting his interaction model is unsupported by any professional literature or other source that would suggest his methodology is recognized by other statisticians. See Wills v. Amerada Hess Corp., 379 F.3d 32, 49 (2d Cir. 2004) (affirming district court's exclusion of expert testimony where the expert conceded that his theory of causation was "controversial" and where district court found that another theory of causation was more generally accepted in the scientific community); Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 637 (S.D.N.Y. 2007) (finding that expert who failed to provide "support in the literature or in any other

33

survey for the method he used" and his "attempt to solve a
problem . . . with an untested theory [do] not meet the
standards of Rule 702 and Daubert"); see also Braun v. Lorillard
Inc., 84 F.3d 230, 235 (7th Cir. 1996) (expert testimony
properly excluded where it relied on unproven methods used after
the established methodology led to an inconclusive result; if an
expert "proposes to depart from the generally accepted
methodology of his field and embark upon a sea of scientific
uncertainty, the court may appropriately insist that he ground
his departure in demonstrable and scrupulous adherence to the
scientist's creed of meticulous and objective inquiry.").
Therefore, the Court finds that EEOC has failed to meet its
burden of showing that Dr. Lanier's methodology is reliable
pursuant to Rule 702 and therefore finds that his Report is
inadmissible.

Accordingly, because the Court finds Dr. Lanier's testimony
and expert report to be irrelevant and unreliable, Bloomberg's
Motion to Exclude the Reports and Testimony of Dr. Lanier is
GRANTED.

### iii. Dr. Borgida

EEOC proposes the testimony of Dr. Borgida, a social
psychologist who used a "social framework analysis" to reach his
conclusion that gender stereotyping was prevalent at Bloomberg.
To reach this conclusion, Dr. Borgida essentially drew on his

> knowledge of social psychology and the established,
> peer-reviewed scientific research literature on gender
> stereotyping and gender prejudice, including [his] own
> contribution to this body of social scientific
> knowledge, to review the set of case documents
> provided me for review by plaintiffs' or defense
> counsel . . . . [and] used specific examples drawn
> from the case materials to illustrate and highlight
> the scientific conclusions drawn from the social
> scientific research that are most applicable to the
> case at hand.

(Borgida Report ¶ 9.)  Dr. Borgida's analysis led him to

conclude that

> the stereotypes about employees who are mothers and/or
> pregnant more likely than not influenced the
> perceptions, evaluations, and decisions about them at
> Bloomberg.  The cultural and organizational context at
> Bloomberg more likely than not activated the gender
> stereotypes about mothers as less competent and as
> less agentic and less committed to their careers.
> Given the subjectivity, discretion, and lack of
> accountability in the Bloomberg decision making
> process, stereotypic perceptions more likely than not
> influenced employment decisions about employees who
> are mothers and/or pregnant.

(Id. at 38-39.)  EEOC seeks to introduce Dr. Borgida's testimony

"to educate the fact-finder about the social science on

stereotyping, the nature of the [Bloomberg] organizational

structure, practices, and culture that may lead to stereotyping,

and organizational remedies for monitoring and reducing the

effects of stereotypes." (EEOC Borgida Mem. at 1.)

    In Price Waterhouse v. Hopkins, 490 U.S. 228, 255-56

(1989), the United States Supreme Court "recognized the utility"

of expert testimony concerning gender stereotyping in gender

discrimination cases. Hnot v. Willis Group Holdings Ltd., No. 01
Civ. 6558, 2007 WL 1599154, at *2 (S.D.N.Y. June 1, 2007).
Courts in this district have found Dr. Borgida's testimony (or
similar testimony) to be "valuable in giving a jury context
within which to evaluate the particular evidence relating to the
workplaces at issue . . . ." Id. at *3; see Velez v. Novartis
Pharmaceuticals Corp., No. 04 Civ. 9194, slip op. at 7 (S.D.N.Y.
Feb. 25, 2010) (permitting psychologist's testimony, based on
his knowledge of "professional literature," concerning the
subjectivity of defendant's performance appraisal and pay
system); E.E.O.C. v. Morgan Stanley & Co., 324 F. Supp. 2d 451,
462 (S.D.N.Y. 2004) (permitting social scientist to "testify
about gender stereotypes and about how these stereotypes may
have affected decisions at Morgan Stanley"); Int'l Healthcare
Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d
345, 355 (S.D.N.Y. 2007) (denying motion to strike Dr. Borgida's
testimony).  As Daubert recognizes, and Kumho emphasizes, the
Court's analysis under Rule 702 is "a flexible one." Daubert,
509 U.S. at 594. Such flexibility is necessary in the case of
expert testimony based on "'soft' social sciences":

> Because there are areas of expertise, such as the
> social sciences in which the research, theories and
> opinions cannot have the exactness of hard science
> methodologies, trial judges are given broad discretion
> to determine "whether Daubert's specific factors are,
> or are not, reasonable measures of reliability in a
> particular case." Kumho Tire, 526 U.S. at 153.

36

United States v. Simmons, 470 F.3d 1115, 1123 (5th Cir. 2006) (internal quotations and citations omitted). The fact that a social scientist's approach might have "inherent methodological limitations," id., and does not produce "a testable hypothesis" or a "known or potential rate of error," In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994), does not necessarily render the resulting testimony unreliable under Rule 702. "Instead, the Court must perform its gatekeeping assessment on measures of reliability that are appropriate to the particular testimony in question." Bowers v. Nat'l Collegiate Athletic Ass'n, 564 F. Supp. 2d 322, 361 (D.N.J. 2008); see Milanowicz v. The Raymond Corp., 148 F. Supp. 2d 525, 536 (D.N.J. 2001) (noting that "courts should determine whether an expert has supported his conclusions through discussion of the relevant literature"); Paoli, 35 F.3d at 742, n.8 ("the qualifications of the expert witness testifying based on the methodology" bear on the reliability analysis). This is not to suggest, however, that a non-scientific expert's testimony is subjected to less rigorous standards of reliability but merely emphasizes that the reliability analysis under Rule 702 must be flexible to account for different types of expertise. See Bowers, 564 F. Supp. 2d at 361. Here, upon reviewing both Dr. Borgida's report and his deposition, the Court finds that his

37

expert opinion lacks the reliability required under Rule 702 and
therefore is inadmissible.

          a.   <u>Sufficient Facts and Data</u>

Dr. Borgida's opinion must be excluded because he relied on
insufficient facts and data.  As he admitted in his deposition,
Dr. Borgida only analyzed material provided and selected by the
EEOC. (Dreiband's Borgida Decl., Ex. B ("Borgida Dep.") at
145:17-23.)  He made no effort to ensure that the materials that
he reviewed were representative. (<u>Id.</u> at 164:21-23 ("I do not
have a sense of how representative that set of materials is with
regard to whatever constitutes the entire set.").)  Instead, he
simply assumed the validity of the allegations of the claimants
in this case. (<u>Id.</u> at 161-62 (discussing the difficulty of
accounting for bias in the claimants' testimony concerning
alleged discrimination at Bloomberg).)  Relying solely on the
information fed to him by the EEOC without independently
verifying whether the information is representative undermines
the reliability of his analysis. <u>See</u> <u>Rowe Entertainment, Inc. v.
William Morris Agency, Inc.</u>, No. 98 Civ. 8272, 2003 WL 22124991,
at *3 (S.D.N.Y. Sept. 15, 2003) (finding data upon which expert
relied to be insufficient because it was selected by plaintiff's
counsel and "would, perforce, be biased"); <u>see also</u> <u>id.</u> ("[A]ny
expert should be aware that a party and counsel in a litigation

have an interest in the outcome and that an expert study should
not be dependent on the information they supply.")

>   b.   Reliable Principles and Methods

By his own admission, Dr. Borgida did not conduct a
scientific study that would meet peer review standards because
he "[did not] know how [one] would do it with the case materials
[he] had." (Borgida Dep. at 134:17-20.)  Instead, Dr. Borgida
"went through the material" selected by EEOC and "dog-ear[ed]"
"examples that [he] thought illustrated" gender stereotyping.
(Id. at 72-73; see also id. at 138, 147, 150, 156, 158.)
Moreover, Dr. Borgida, although aware of countervailing
examples, elected not to include "disconforming instances" of
"individuals who claimed to not have . . . heard comments or to
taking a different point of view." (Id. at 170:13, 9-11.)
Indeed, he "didn't systematically go through and track
[counterexamples]" or "use a written coding system" for any of
the materials, whether confirming or "disconfirming," because
"[t]hat wasn't [his] goal." (Id. at 96:3-4; 151:22-23.)  Dr.
Borgida did acknowledge that a more systematic approach was
possible but that he did not employ such an approach in this
case. (Id. at 99 ("I'd have to go back to the materials and then
systematically re-review all of those materials and take copious
notes of what was said when, and then put them in a spreadsheet
and then sort of rotate that so that I have some sort of, you

know, printout of what was said when--what was allegedly said
when, to whom, and under what circumstances.").)

Although it is not necessary that Dr. Borgida's methodology
be subjected to the specific criteria set forth in Daubert, it
is also true that "opinion evidence that is connected to
existing data only by the ipse dixit of the expert" should not
be admitted. Kumho Tire, 526 U.S. at 157.  Dr. Borgida "must
provide some explanation [regarding his methodology] so that it
can be evaluated as to its reliability." Roniger v. McCall, No.
97 Civ. 8009, 2000 WL 1191078, at *3 (S.D.N.Y. Aug. 22, 2000)
(citing Kumho Tire, 526 U.S. at 157).  Merely touting his
expertise rather than relying on "analytic strategies widely
used by specialists" in the field does not make Dr. Borgida "an
expert as Rule 702 defines that term." Zenith Electronics Corp.
v. WH-TV Broadcasting Corp., 395 F.3d 416, 419 (7th Cir. 2005).
Upon reviewing Dr. Borgida's report and deposition, the Court
cannot discern any reliable method; rather, the opinions in the
report are supported by what appears to be a "because I said so"
explanation.  Dr. Borgida may be a renowned social psychologist,
but if he cannot explain how his conclusions satisfy Rule 702's
requirements, then he is "not entitled to give expert
testimony." Id.; see also Mid-State Fertilizer Co. v. Exch.
Nat'l Bank, 877 F.2d 1333, 1339 (7th Cir. 1989) ("An expert who

supplies nothing but a bottom line supplies nothing of value to the judicial process.").

The fact that Dr. Borgida conceded that he did not employ any "specific methodology," (Borgida Dep. at 142), and instead merely engaged in "dog-earing" passages from depositions that he believed supported his conclusion, (id. at 72-73), underscores the Court's conclusion that Dr. Borgida's methodology is not reliable and should not be admitted.

c.   Reliable Application of Methods to the Facts

In addition to finding Dr. Borgida's method to be unreliable, the Court also finds that Dr. Borgida did not apply his social framework analysis reliably to the facts here.  The Court is troubled by Dr. Borgida's decision to ignore completely what he referred to as "disconforming" examples in his report. (Borgida Dep. at 170:7.)  Specifically, Dr. Borgida engaged in credibility determinations, crediting testimony that supported his position while rejecting testimony that contradicted his opinion.  For example, with respect to testimony concerning Bloomberg's "no-rehire" policy for employees who leave Bloomberg for a competitor, Dr. Borgida's cites the deposition testimony of Peter Grauer, a Bloomberg manager, who stated

> "The rationale in the early days was these people are
> part of our team.  They are paid by us.  They have
> betrayed our trust by going to work somewhere else.
> They don't like working in our environment and are not
> grateful for the benefits and the opportunities we

41

> provided them.  So the hell with them."  Additionally,
> [Mr. Grauer] rejected "raising a family" as an
> exception to the no-rehire policy.  [He] says he is
> "inclined to take it out" and thus in August 2005
> rejected rehiring employees who left to care for their
> children.

(Borgida Report at 20-21.)  However, at his deposition, Dr.

Borgida conceded that he only reviewed a truncated version of an

email exchange between Mr. Grauer and another Bloomberg employee

and that had he reviewed the email in its entirety, it would

have made him "reconsider" his conclusion and "back off . . .

from [this conclusion] in the report." (Borgida Dep. at 213:8,

17-18.)  Moreover, in his report Dr. Borgida fails to cite the

deposition testimony of Mayor Michael Bloomberg who refuted Dr.

Borgida's characterization of Bloomberg's no-rehire policy. (See

Dreiband's Borgida Decl., Ex. D at 42:16-24 ("We have always had

a policy of not rehiring anybody who went to work elsewheres

(sic) in the private sector.  If they took time off for family

things or to do public service, which includes working in the

government, we've always been willing to hire them back if they

want to come back.  But if they go to work elsewheres (sic),

no.").)  An expert "should not be permitted to 'supplant the

role of counsel in making argument at trial, and the role of the

jury in interpreting the evidence.'" In re Rezulin Prods. Liab.

Litig., 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (quoting

Primavera Familienstifung v. Askin, 130 F. Supp. 2d 450, 527,

42

amended on reconsideration on other grounds, 137 F. Supp. 2d 438

(S.D.N.Y. 2001)).

Applying his methodology to the facts, Dr. Borgida reached

the conclusion that "stereotypic perceptions more likely than

not influenced employment decisions about employees who are

mothers and/or pregnant." (Borgida Report at 38-39.)  Dr.

Borgida effectively intuited this conclusion: "[I]n knowing the

research as I do, and in seeing and reading what I read and saw,

and in looking at the relationship between what I expected and

what I saw, I attached a more likely than not expression to . .

. that." (Id. at 87.)  Dr. Borgida, though, was unable to

identify specific examples of gender stereotypic thinking or of

decisions influenced by such thinking:

- In each of the months or years in the class period, (see id. at 98-99);
- By each of the managers at Bloomberg, (see id. at 90);
- Within each department at the company, (see id. at 85-86); or
- Affecting each woman in the company, (see id. at 105-06, 110).

Lastly, Dr. Borgida was unable to determine how many decisions

at Bloomberg were, as he believed, affected by gender

stereotypic thinking. (Id. at 373.)  To ignore contradictory

testimony in order to arrive at a desired conclusion highlights

the unreliability of Dr. Borgida's methodology.[5]

> ### d.   Relevance

Finally, Dr. Borgida's proposed testimony would not assist the trier of fact with respect to EEOC's claims of a pattern or practice of sex/pregnancy discrimination.  After describing the literature on gender stereotyping, Dr. Borgida set forth his characterization of the culture and organizational structure of Bloomberg--based on material selected by the EEOC--which he described as long hours, loyalty to the firm, and "subjective" decision-making processes. (See generally Borgida Report.) Then, Dr. Borgida recounted various snippets from several depositions (a majority of which were from claimants and all of which were selected by the EEOC) describing how they felt they were being discriminated against on the basis of their pregnancy. (See id. at 30-38.)  From this, Dr. Borgida arrived at his conclusion that gender stereotypes "more likely than not influenced employment decisions about employees who are mothers and/or pregnant." (Id. at 38-39.)  However, during his deposition, Dr. Borgida was unable to conclude that Bloomberg managers were intentionally stereotyping pregnant women or women returning from maternity leave. (Borgida Dep. at 443:19-444:9.)

---

[5] Dr. Borgida was provided a copy of Mr. Bloomberg's deposition transcript. (See Declaration in Opposition to Defendant's Motion to Exclude the Reports and Testimony of Dr. Eugene Borgida, Ex. 5.)

Therefore, even assuming Dr. Borgida's opinion was reliable
(which, as discussed above, it is not) it would not support
EEOC's allegations that the "unlawful employment practices
complained of . . . were intentional." (Second Amended Complaint
¶ 10.) See E.E.O.C. v. Wal-Mart Stores, Inc., No. 01 Civ.
339, 2010 WL 583681, at *3 (E.D. Ky. Feb. 16, 2010) (excluding
expert testimony of social psychologist who opined that gender
stereotyping affected decisions made about claimants because the
expert did not provide any evidence supporting the conclusion
that gender stereotyping necessarily includes intentional
discrimination).

Moreover, the Court agrees with the Minnesota Court of
Appeals' reasoning in Ray v. Miller Meester Advertising, Inc.,
664 N.W.2d 355 (Minn. Ct. App. 2003) wherein the court found
that the trial court abused its discretion by admitting Dr.
Borgida's testimony because the opinion was unhelpful to the
jury. The court noted that "[i]nformation about and commentary
on gender issues is so abundant in our society that it has
become a common stereotype that women receive disparate and
often unfairly discriminatory treatment in the workplace." Id.
at 365-66. In addition, the court in Ray observed that
"[g]ender stereotypes are the stuff of countless television
situation comedies and are the focus of numerous media
treatments on nearly a daily basis. It is unarguable that

virtually all adults in our society know about gender stereotypes." Id. at 366.  The Court agrees.  Upon reviewing Dr. Borgida's report and deposition, it becomes apparent that Bloomberg demands that its employees work hard and remain loyal to the company.  The jury will have the benefit of hearing testimony from claimants, Bloomberg managers, and other Bloomberg employees and can determine based on the evidence, and with the benefit of their common sense and experience, whether the claimants suffered discrimination based on their gender/pregnancy.  Accordingly, because the Court finds Dr. Borgida's proposed expert testimony is the result of an unreliable methodology and will not assist the trier of fact, his testimony is inadmissible pursuant to Fed. R. Evid. 702.

Even assuming that Dr. Borgida's opinion is otherwise admissible under the Rule 702, however, its minimal probative value is substantially outweighed by its prejudicial effect, making it inadmissible under Fed. R. Evid. 403.  Dr. Borgia's opinion focuses on factors that give rise to gender stereotyping and would serve merely to distract the jury's attention from considering the evidence as it applies to EEOC's pattern or practice claim and other causes of action alleged in the Second Amended Complaint.  Accordingly, Dr. Borgida's proposed testimony is precluded under Rule 403.

46

CONCLUSION

For the foregoing reasons: (1) Plaintiff's Motion to Exclude the Expert Opinions of Dr. Michael P. Ward and Dr. John H. Johnson, IV [dkt. no. 115] is DENIED; (2) Defendant's Motion to Exclude the Reports and Testimony of Dr. Louis Lanier [dkt. no. 117] is GRANTED; and (3) Defendant's Motion to Exclude the Reports and Testimony of Dr. Eugene Borgida is GRANTED.

SO ORDERED.

Dated:    New York, NY
          August 31, 2010

_Loretta A. Presba_
Loretta A. Preska, Chief U.S.D.J.

47