UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x
                                             :

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,                           :

            Plaintiff,           :

                  v.                :

                 07-CV-8383 (LAP/HP)

BLOOMBERG L.P.,               :

            Defendant.        :

----------------------------------------------------------x
                                             :

JILL PATRICOT, TANYS LANCASTER,     :
JANET LOURES, MONICA PRESTIA,
MARINA KUSHNIR and MARIA         :
MANDALAKIS,
                                             :

          Plaintiff-Intervenors,    :

                  v.                :

BLOOMBERG L.P.,               :

            Defendant.        :

----------------------------------------------------------x

### MEMORANDUM OF LAW IN SUPPORT OF BLOOMBERG L.P.'S MOTION FOR SUMMARY JUDGMENT AS TO EEOC'S PATTERN-OR-PRACTICE CLAIM

Eric Dreiband, Esq.                   Thomas H. Golden, Esq.
JONES DAY                           WILLKIE FARR & GALLAGHER LLP
51 Louisiana Avenue NW            787 Seventh Avenue
Washington, D.C.  20001-2113      New York, New York  10019
(202) 879-3939                       (212) 728-8000

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

STATEMENT OF FACTS .......................................................................................2

    A.    Bloomberg's Business and Its Employees ...................................2

    B.    Bloomberg Frequently Restructures To Maximize Its Business Opportunities....................................................................3

    C.    Bloomberg Demands Hard Work from All of Its Employees ................4

    D.    Bloomberg's Compensation and Benefits System....................5

    E.    Bloomberg's Expert Testimony Refutes EEOC's Compensation and Demotion Claims ....................................................6

    F.    EEOC's Complaint Sought Relief On Behalf Of A Class Comprised Of 603 Current Or Former Employees, 65 Of Whom Currently Are Claimants. ........................................................8

ARGUMENT ...........................................................................................................9

I.    A Pattern-Or-Practice Claim Fails if the Plaintiff Cannot Prove that Unlawful Discrimination was the Defendant's Standard Operating Procedure. ..................................9

II.    No Reasonable Factfinder Could Conclude that Bloomberg Engaged in a Pattern or Practice of Discrimination. ........................................15

    A.    EEOC's Evidence Fails to Compare Class Members to Similarly-Situated Bloomberg Employees. ....................................16

    B.    EEOC Cannot Establish A Pattern Or Practice Of Compensation Discrimination. ....................................................17

    C.    EEOC Lacks Legally Sufficient Evidence Of Other Alleged Practices ...............19

        1.    EEOC Lacks Legally Sufficient Evidence Of a Pattern or Practice of Discriminatory Demotions. ................................19

        2.    EEOC Lacks Legally Sufficient Evidence Of a Pattern or Practice of Excluding or Isolating Class Members................20

        3.    EEOC Lacks Legally Sufficient Evidence of a Pattern or Practice of Discriminatory Performance Evaluations............21

    D.    EEOC's Allegations of a Discriminatory "Culture" Leading to Stereotyping Are Not Actionable as a Matter of Law. ........................23

    E.    Taken Together, EEOC's Evidence is Insufficient to Establish a Pattern or Practice of Discrimination. ....................................26

CONCLUSION......................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Anderson v. Douglas & Lomason Co.*,
    26 F.3d 1277 (5th Cir. 1994) ........................................................................23

*Apsley v. Boeing Co.*,
    722 F. Supp. 2d 1218 (D. Kan. 2010) ....................................................26, 27

*Attenborough v. Constr. & Gen. Bldg. Laborers's Local 79*,
    691 F. Supp. 2d 372 (S.D.N.Y. 2009) ............................................................11

*Bell v. E.P.A.*,
    232 F.3d 546 (7th Cir. 2000) .........................................................................11

*Blake v. Potter*,
    No. 03 Civ. 7733, 2007 WL 2815637 (S.D.N.Y. Sept. 25, 2007) ....................23

*Celotex Corp v. Catrett*,
    477 U.S. 317 (1986)........................................................................................9

*Cooper v. Fed. Reserve Bank of Richmond*,
    467 U.S. 867 (1984)......................................................................................10

*Davis v. City of Panama*,
    510 F. Supp. 2d 671 (N.D. Fla. 2007) ............................................................14

*EEOC v. Carrols Corp.*,
    No. 5:98 CV 1772, 2005 WL 928634 (N.D.N.Y. Apr. 20, 2005) ....................13

*EEOC v. CRST Van Expedited, Inc.*,
    611 F. Supp. 2d 953 (N.D. Iowa 2009)....................................12, 14, 18, 20, 21

*EEOC v. McDonnell Douglas Corp.*,
    17 F. Supp. 2d 1048 (E.D. Mo. 1998), *aff'd* 191 F.3d 948 (8th Cir. 1999)..........22, 27, 28

*EEOC v. Republic Servs., Inc.*,
    640 F. Supp. 2d 1267 (D. Nev. 2009) ......................................................13, 18

*Eherns v. Lutheran Church*,
    385 F.3d 232 (2d Cir. 2004)............................................................................9

*Evans v. Port Authority of N.Y. & N.J.*,
    192 F. Supp. 2d 247 (S.D.N.Y. 2002)............................................................25

*Flynn v. N.Y. State Div. of Parole*,
    620 F. Supp. 2d 463 (S.D.N.Y. 2009)............................................................20

*Harris v. Forklift Sys. Inc.*,
   510 U.S. 17 (1993) ................................................................................................23

*Hollander v. Am. Cyanamid Co.*,
   172 F.3d 192 (2d Cir. 1999) ...................................................................................9

*Int'l Bhd. of Teamsters v. United States*,
   431 U.S. 324 (1977) .........................................................................................10, 11

*Kaur v. N.Y.C. Health & Hosps. Corp.*,
   688 F. Supp. 2d 317 (S.D.N.Y. 2010) ...................................................................21

*King v. Gen. Elec. Co.*,
   960 F.2d 617 (7th Cir. 1992) ................................................................................10

*Leifer v. N.Y. State Division of Parole*,
   No. 07-0642, 2010 WL 3292937 (2d Cir. Aug. 23, 2010) ...................................20

*Lopez v. Metro. Life Ins. Co.*,
   930 F.2d 157 (2d Cir. 1991) ..................................................................................12

*Meiri v. Dacon*,
   759 F.2d 989 (2d Cir. 1985) ...................................................................................9

*Middleton v. City of Flint*,
   92 F.3d 396 (6th Cir. 1996) ...................................................................................11

*Muhleisen v. Wear Me Apparel LLC*,
   644 F. Supp. 2d 375 (S.D.N.Y. 2009) ...................................................................26

*Pomillo v. Wachtell Lipton Rosen & Katz*,
   No. 97 Civ. 2230, 1999 WL 9843 (S.D.N.Y. Jan 11, 1999) ................................23

*Price Waterhouse v. Hopkins*,
   490 U.S. 228 (1989) ...............................................................................................23

*Robinson v. Metro-N. Commuter R.R. Co.*,
   267 F.3d 147 (2d Cir. 2001) .......................................................................1, 10, 11

*Seils v. Rochester City Sch. Dist.*,
   192 F. Supp. 2d 100 (W.D.N.Y. 2002), *aff'd* 99 F. App'x 350 (2d Cir. 2004) ................10

*Ste. Marie v. E. R.R. Ass'n*,
   650 F.2d 395 (2d Cir. 1981) ..............................................................................12, 24

*United States v. City of N.Y.*,
   631 F. Supp. 2d 419 (S.D.N.Y. 2009) ............................................................. 11-12

iv

*United States v. City of New York,*
    713 F. Supp. 2d 300, 317-18 (S.D.N.Y. 2010) .................................................................12

*Watson v. Ft. Worth Bank & Trust,*
    487 U.S. 977 (1988)................................................................................................21

*Watson v. Paulson,*
    578 F. Supp. 2d 554 (S.D.N.Y. 2008).....................................................................20

*Weeks v. N.Y. State Div. of Parole,*
    273 F.3d 76 (2d Cir. 2001)..............................................................................21, 24

*In re W. Dist. Xerox Litig.,*
    850 F. Supp. 1079 ( W.D.N.Y. 1994) ...................................10, 20, 21, 24, 25

*Witkowich v. Gonzales,*
    541 F. Supp. 2d 572 (S.D.N.Y. 2008)....................................................................24

*Woodbury v. N.Y.C. Transit Auth.,*
    832 F.2d 764 (2d Cir. 1987).................................................................................12

*Wright v. Circuit City Stores, Inc.,*
    201 F.R.D. 526 (N.D. Ala. 2001)..........................................................................28

*Wyvill v. United Cos. Life Ins. Co.,*
    212 F.3d 296 (5th Cir. 2000) ......................................................................... 12-13

## Statutes

42 U.S.C. § 2000e-6..............................................................................................9

42 U.S.C. § 2000e (k) ...........................................................................................9

Fed. R. Civ. P. 56 (a) ............................................................................................9

## Other Authorities

*EEOC Compliance Manual* § 604.3(b), 2006 WL 4672682 .......................................11

*EEOC Compliance Manual* § 10-III.A.2, 2006 WL 4672890 ....................................18

*Jock v. Sterling Jewelers Inc.*, Brief of EEOC as *amicus curiae,*
    Case No. 10-3247, 2010 WL 4278435 (2d Cir. Oct. 22, 2010)..........................11

# INTRODUCTION

EEOC carries a heavy burden to prove its sweeping pattern-or-practice claim.  It must show not just that Bloomberg L.P. ("Bloomberg" or the "Company") at times discriminated against pregnant women, but that such discrimination was Bloomberg's "standard operating procedure" and that the Company is "rotten to the core."  EEOC's evidence falls far short of the mark.

*First*, EEOC has no evidence whatsoever comparing class member experiences to those of other Bloomberg employees who took leaves of similar duration.  This evidence is crucial to showing that class members were treated differently than similarly-situated Bloomberg employees—the key to a disparate treatment claim.  EEOC cannot make that showing.

*Second*, the liability phase of a pattern-or-practice case is "largely preoccupied with class-wide statistical evidence directed at establishing an overall pattern or practice of intentional discrimination," *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 168 (2d Cir. 2001), and EEOC has no statistical evidence to support its broad allegations against Bloomberg. Bloomberg, by contrast, has presented admissible statistical evidence that completely refutes EEOC's core compensation and demotion claims, establishing that it *did not* discriminate against class members with respect to compensation or demotions.

*Third*, although in theory a pattern-or-practice claim may be proven using only anecdotal evidence, this is not such a case.  EEOC's anecdotal evidence, even if assumed to be true, falls far short of proving a company-wide discriminatory practice, and amounts to the sort of "isolated" and "sporadic" instances of alleged discrimination that courts have routinely held is insufficient to satisfy a plaintiff's burden.

*Fourth*, EEOC's claim that Bloomberg maintained an organizational culture that promotes stereotypic thinking, which allegedly manifested itself in stereotypic comments to class

1

members, is not actionable by itself, but can make out a discrimination claim only when an adverse employment action results.  EEOC has no classwide evidence that any stereotypes resulted in any adverse action against the Class.

*Finally*, EEOC cannot prove a pattern or practice by aggregating the individual practices that it alleges (and for which it does not have legally sufficient evidence in any event).  EEOC has no evidence that the Class was subject to a single overarching policy of discrimination.  EEOC's collection of varied and inconsistent alleged discriminatory acts occurring over a nine-year period and involving different departments, different supervisors, and employees working in different locations do not, when examined together, establish any sort of consistent "practice" of discrimination that was Bloomberg's "standard operating procedure."  Quite the opposite—this mixed bag of claims demonstrates no pattern or policy of discrimination.

In the end, to accept EEOC's theory of discrimination, a trier of fact would have to believe that Bloomberg set out to discriminate against pregnant women not by decreasing their compensation—because the statistical evidence establishes that Bloomberg treated pregnant women more favorably than similarly-situated employees—and not by demoting them, but rather in a hodgepodge of intangible ways.  That theory defies common sense.  Thus, no reasonable factfinder could conclude that Bloomberg's standard operating procedure was to discriminate against pregnant women, as EEOC must prove to maintain its pattern-or-practice claim.

## STATEMENT OF FACTS

### A.  Bloomberg's Business and Its Employees

Bloomberg is an international financial services and media company that provides financial news, information, and analytics to its customers through the BLOOMBERG PROFESSIONAL® Service, often referred to as the Bloomberg "terminal."  (Bloomberg L.P.'s Rule 56.1 Statement of Material Facts ("R. 56.1 Stmt.") ¶ 11.)  Bloomberg's core business is to

2

sell terminals.  (R. 56.1 Stmt. ¶ 12.)  It reached 10,000 terminal subscribers in its first decade, 100,000 by 1998, and 290,000 by 2008.  (*Id.* ¶¶ 13-15.)

Over the past twenty years, Bloomberg has also expanded into other areas.  The Company published its first news story in 1990, launched a website in 1995, and created television and radio stations.  (*Id.* ¶ 16.)  By 2009, Bloomberg News had grown into a 24-hour news service with more than 1,500 journalists in 140 bureaus worldwide.  (*Id.* ¶ 17.)  In 1995, Bloomberg formed Bloomberg Tradebook LLC, a broker-dealer that provides an electronic trading platform.  (*Id.* ¶ 18.)

As Bloomberg has grown, so too has its workforce.  When Bloomberg was created in 1981, Michael Bloomberg and his other three co-founders were its only employees.  (*Id.* ¶ 19.) Today Bloomberg has over 10,000 employees.  (*Id.* ¶ 20.)

Bloomberg is headquartered in New York City.  (*Id.* ¶ 21.)  Its other major domestic offices are located in or near Boston, Chicago, Houston, Los Angeles, Princeton, New Jersey, San Francisco, and Washington, D.C.  (*Id.* ¶ 22.)  Its major foreign offices include London, Paris, Frankfurt, Tokyo, Hong Kong, Singapore, and Sydney.  (*Id.* ¶ 23.)

### B.      Bloomberg Frequently Restructures To Maximize its Business Opportunities

Bloomberg's explosive growth has required its structure to evolve over the years.  Early on, Bloomberg was divided into loosely-defined sales, news, and technical teams.  (*Id.* ¶ 24.)  As Bloomberg continued to add offices around the world, its functional divisions, which included sales, news, research and development, and data, were further divided geographically.  (*Id.* ¶ 25.)

Historically, Bloomberg has been a fluid and flat organization, which enabled it to change quickly to respond to market needs and create opportunities for both Bloomberg and its employees.  A major company-wide restructuring occurred in 2001 when Michael Bloomberg left the Company, selecting Alexius "Lex" Fenwick to become the CEO, and Peter Grauer to be

Chairman and President.  (*Id.* ¶ 26.)  In 2005, Grauer restructured Bloomberg to "maximize[e] the company's performance" and to "groom[] a number of executives who could take on different responsibilities" in the coming years.  (*Id.* ¶ 27.)  In early 2008, Dan Doctoroff joined the Company as President, and a few months later the Company implemented "Plan B," another reorganization that again changed top executives' responsibilities and reorganized business units so that all activities related to a product were housed in the same unit.  (*Id.* ¶ 28.)

Bloomberg's major business units regularly restructured, too.  (*Id.* ¶ 29.)  Some restructurings are designed better to address customer needs.  Others occur because a group has become too large for one person to manage effectively, because a specific manager can better develop his or her skills by managing a smaller team, or because Bloomberg needs a focused team for a special project.  (*Id.* ¶ 30.)  Thus, it is "a very common occurrence in terms of career development and progression for people to move from one area to another."  (*Id.* ¶ 31.)

### C. Bloomberg Demands Hard Work from All of Its Employees

"[A]s a global leader in the provision of news, data and financial information, [Bloomberg] set[s] very high standards for people" and demands a lot "in terms of expertise [and] commitment to the job."  (*Id.* ¶ 32.)  The Company was founded on a philosophy of "hard work, cooperation, loyalty up and down, [and] customer service."  (*Id.* ¶ 33.)  Indeed, this Court has recognized that "Bloomberg demands that its employees work hard and remain loyal to the Company."  Mem. & Order 46, Aug. 31, 2010, ECF No. 166.  As a result, "everyone at Bloomberg has . . . a work/life balance issue because [they] work very hard."  (*Id.* ¶ 34.)  Both men and women have complained that it can be difficult for them to balance their families and the workload at Bloomberg.  (*Id.* ¶ 35.)

D.     **Bloomberg's Compensation and Benefits System**

Bloomberg amply rewards its employees' hard work.  The Company was founded on the philosophy that "you pay people a lot and expect a lot from them and that's a good way[] for the employees and the company to succeed together."  (*Id.* ¶ 36.)

Before 2009, Bloomberg made compensation decisions at the hire date, and annually thereafter on the employee's anniversary date.  (*Id.* ¶ 37.)  Compensation included both a fixed salary and variable compensation known as Equity Equivalence Certificate ("EEC") grants, which are designed to give each employee "a share in [] revenue growth."  (*Id.* ¶¶ 38-39.)  Each EEC grant had an "intended value" based on projections of Company performance for the coming year.  (*Id.* ¶ 39.)  That intended value, together with the employee's base salary, comprised the employee's "intended compensation" for the upcoming year.  (*Id.* ¶ 40.)  The actual value of the EEC grant, determined a year after the award, could differ from the intended value, but this difference was attributable to Company, not individual, performance.  (*Id.* ¶ 41.)  EECs issued at the same time all had the same value, but from year to year their value varied substantially, and therefore comparisons of the number of EECs granted across years is not relevant for comparing compensation.  (*Id.* ¶ 42.)[1]

In addition to monetary compensation, Bloomberg offers health and other benefits described by Claimants as "great," "exceptional," "amazing," and "phenomenal."  (*Id.* ¶ 44.) Many such benefits pertain specifically to pregnancy and maternity leaves and exceed what is required by law, including health insurance that covers infertility treatments, pre-natal care, and pregnancy-related disability; twelve weeks of paid maternity leave; and four weeks of unpaid

---

[1]     In early 2009, Bloomberg moved all compensation determinations to a calendar year cycle.  (R. 56.1 Stmt. ¶ 43.)  It also began to pay EECs at the time they were valued, rather than one year later.  (*Id.*)  And it added an annual bonus based on departmental and individual performance, and a long-term incentive plan.  (*Id.*)

leave for primary caregivers.  (*Id.* ¶ 45.)  Bloomberg also provides lactation facilities for nursing mothers in several of its offices, and free backup child care.  (*Id.* ¶ 46.)

### E.    Bloomberg's Expert Testimony Refutes EEOC's Compensation and Demotion Claims

For the period February 1, 2002 through December 31, 2008, Bloomberg expert Dr. Michael Ward compared:  (1) "changes in [class member] intended compensation before and after maternity leave," "to changes in intended compensation for other leave takers"; and (2) "the number of direct reports [to a class member] before and after a maternity leave" "to changes in the number of direct reports for other leave takers."  (*Id.* ¶ 47.)

To study compensation, Dr. Ward first compared each employee's compensation on her most recent employment anniversary to compensation on her first anniversary at Bloomberg to determine how compensation changed over this period.  (*Id.* ¶ 48.)  He then compared the mean (average) and median (mid-point) compensation growth rates for class members to the comparable figures for non-class members who took at least sixty days of leave, concluding that these employees were most similarly situated to the class because the average duration of their leaves was similar to the average duration of maternity leaves.  (*Id.*)

Dr. Ward's results showed that class members experienced *higher* average and median *growth* in intended compensation over the period he studied than these non-class members. (*Id.* ¶ 49.)  The difference in average growth was statistically significant, meaning that class members' higher average compensation growth did not occur by chance.  (*Id.*)  Dr. Ward also conducted regression analyses of total intended compensation to control for variables such as the interval over which the compensation changes were calculated; the individual's age (as a proxy for labor market experience); year of hire; and time on leave.  (*Id.* ¶ 51.)  Dr. Ward's analyses showed no statistically significant differences in class member compensation growth as compared to

compensation growth for all groups of non-class members when controlling for time on leave. (*Id.* ¶ 52.)

Dr. Ward also analyzed compensation growth from the anniversary date just before leave to the anniversary date immediately after the last leave.  (*Id.* ¶ 53.)  These results showed that 84 percent of class members received "increases [in intended compensation] from before their leave to after," as compared to less than 70 percent of similarly-situated employees; this difference was statistically significant in favor of the class.  (*Id.*)  He obtained similar results by comparing compensation from the anniversary date immediately preceding leave to the last anniversary date in his study.  (*Id.* ¶ 54.)

Finally, Dr. Ward analyzed the differences in the number of direct reports to employees from the beginning and end of the period studied, and from the anniversary date before the first major leave through the end of the period studied.  (*Id.* ¶ 55.)  His analysis showed no statistically significant differences in loss of direct reports between class members and any employee group studied when controlling for time on leave.  (*Id.*)

Bloomberg's second expert, Dr. Johnson, independently tested EEOC's allegations that Bloomberg paid class members less "once they announced their pregnancy and once they returned to work after taking maternity leave."  (*Id.* ¶ 57.)  Dr. Johnson compared the change in class members' base pay in the twelve-month period before leave to the twelve-month period after leave, concluding that it increased an average of $5,789 during this period, compared to an average increase of $3,946 over a similar period for all Bloomberg employees who took non-maternity leaves.  (*Id.* ¶ 58.)  Dr. Johnson made a similar comparison for the  month period following return from leave to the year ending six months before the birth of a child and reached similar conclusions.  (*Id.* ¶ 60.)  He also concluded that class members received greater increases

in average intended EEC grants than non-class members who took leaves.  (*Id.*)  In sum, Dr.
Johnson's analyses showed that class members received pay increases after maternity leave,
rather than being paid less, and that those increases were greater than those received by
employees who took non-maternity leave.  (*Id.* ¶ 61.)

Dr. Johnson also performed regression analyses to determine whether his findings
remained valid after accounting for leave duration, performance rating before the leave,
employee business unit and office location, and the year in which leave was taken.  (*Id.* ¶ 62.)
After controlling for these factors, Dr. Johnson concluded that class members had statistically
significant *greater increases* in base salary and EEC grants than non-class members who took
leaves.  (*Id.*)  These results held true when subjected to various tests.  (*Id.*)

### F.    EEOC's Complaint Sought Relief On Behalf Of A Class Comprised Of 603 Current Or Former Employees, 65 Of Whom Currently Are Claimants.

EEOC's Complaint alluded to a class of women—non-clerical female employees who
were pregnant or took maternity leave since February 2002 ("Class Members")—who allegedly
experienced discrimination based on "sex/pregnancy."  (*Id.* ¶ 8.)  Bloomberg's records show that
603 female employees were pregnant or took maternity leave between February 2002 and March
31, 2009.  (*Id.* ¶ 9.)  EEOC's original complaint identified three Class Members against whom
Bloomberg allegedly discriminated; ultimately, EEOC identified 75 additional Class Members
who allegedly suffered discrimination (collectively, "Claimants").  (*Id.* ¶ 10; Op. & Order 35,
Oct. 25, 2010, ECF No. 168 (the Court identified 79 Claimants, one of whom EEOC withdrew)).
By Orders dated October 25, 2010 and December 22, 2010, this Court dismissed as time-barred
all of EEOC's claims on behalf of 13 Claimants, thereby reducing the total number of Claimants
to 65.  Op. & Order, Oct. 25, 2010, ECF No. 168; Order Dec. 22, 2010, ECF No. 177.

## ARGUMENT

Summary judgment is designed to "avoid[] protracted, expensive and harassing trials," *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), when "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). These "salutary purposes of summary judgment . . . apply no less to discrimination cases than to . . . other areas of litigation." *Meiri*, 759 F.2d at 998.

Summary judgment is mandated against a party that "fails to . . . establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although the record is construed in the light most favorable to the non-moving party, inferences may only be drawn in that party's favor if supported by probative evidence. *See Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 202 (2d Cir. 1999). The evidence offered by the non-moving party must also be admissible. *See Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004).

## I. A PATTERN-OR-PRACTICE CLAIM FAILS IF THE PLAINTIFF CANNOT PROVE THAT UNLAWFUL DISCRIMINATION WAS THE DEFENDANT'S STANDARD OPERATING PROCEDURE.

EEOC alleges a pattern-or-practice discrimination claim under Section 707 of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-6, and the Pregnancy Discrimination Act, 42 U.S.C. 2000e(k). The PDA provides that "women affected by pregnancy, childbirth, or related medical conditions *shall be treated the same* for all employment-related purposes . . . *as other persons not so affected but similar in their ability or inability to work*." *Id.* (emphasis added). A court will not find pregnancy-based discrimination unless the plaintiff shows that women who took maternity leave were treated differently than those who took other types of leave. Mem. & Order 31, Aug. 31, 2010, ECF No. 166.

To prove a pattern or practice of such discrimination, EEOC must also satisfy an extraordinarily high threshold mandated by the Supreme Court:  it must prove that

"discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 875-76 (1984). EEOC must show "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts," but rather that Bloomberg discriminated "regularly and purposely" and that the discrimination was "repeated," "routine," and "pervasive." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335-36 (1977); *see also Robinson*, 267 F. 3d at 158.  Because "a piece of fruit may well be bruised without being rotten to the core," *Cooper*, 467 U.S. at 880, any lesser proof is legally insufficient.

"Courts considering what evidence is necessary to show that an employer routinely and purposely discriminated have . . . required substantial proof of the practice." *King v. Gen. Elec. Co.*, 960 F.2d 617, 624 (7th Cir. 1992); *In re W. Dist. Xerox Litig.*, 850 F. Supp. 1079, 1085 (W.D.N.Y. 1994) ("[T]he burden of establishing a pattern or practice of discrimination is not an easy one to carry.").  "Given the need to prove such pervasive, systematic discrimination, the standard of proof for a pattern or practice claim is higher than for a . . . disparate treatment claim. Isolated instances of discrimination will not suffice." *Seils v. Rochester City Sch. Dist.*, 192 F. Supp. 2d 100, 118-19 (W.D.N.Y. 2002), *aff'd* 99 F. App'x 350 (2d Cir. 2004).  Noting the need for far-reaching proof of a discriminatory pattern or practice, the Supreme Court has cautioned that "court[s] must be wary of a claim that the true color of a forest is better revealed by reptiles hidden in the weeds than by the foliage of countless freestanding trees." *Cooper*, 467 U.S. at 879.

To satisfy the exacting standards for a pattern-or-practice claim, a plaintiff typically must present *both* strong statistical evidence of the alleged pattern or practice *and* a substantial number of individual cases of discrimination causally related to the alleged pattern or practice.  "While a

pattern might be demonstrated by examining the discrete decisions of which it is composed, the Government's [pattern or practice] suits have more commonly involved proof of the expected result of a regularly followed discriminatory policy." *Teamsters*, 431 U.S. at 360 n.46.  In this regard, both this Court and the Second Circuit have observed that "heavy reliance on statistical evidence in a pattern-or-practice disparate treatment claim distinguishes such a claim from an individual disparate treatment claim . . . ." *Robinson*, 267 F.3d at 158 & n.5; *id.* at 168 (pattern or practice liability phase "is largely preoccupied with class-wide statistical evidence directed at establishing an overall pattern or practice of intentional discrimination"); Op. & Order 42 n.14, Oct. 25, 2010, ECF No. 168 (citing *Robinson* and *Bell* for the importance of statistical evidence in pattern-or-practice claim).

Therefore, "[w]hile anecdotal evidence may suffice to prove individual claims of discrimination, rarely, if ever, can such evidence show a systemic pattern of discrimination." *Middleton v. City of Flint*, 92 F.3d 396, 405 (6th Cir. 1996) (citation omitted); *see also Bell v. EPA*, 232 F.3d 546, 553 (7th Cir. 2000).  EEOC's Compliance Manual affirms this point, recognizing that "[i]n a charge alleging a pattern and practice of disparate treatment, statistical evidence is extremely important."  EEOC Compliance Manual § 604.3(b), *available at* 2006 WL 4672682.  And EEOC recently argued to the Second Circuit that "[s]tatistical evidence is an 'an important source of proof' in class suits alleging employment discrimination."  Br. of EEOC as *amicus curiae* in *Jock v. Sterling Jewelers Inc.*, Case No. 10-3247, 2010 WL 4278435 (2d Cir. Oct. 22, 2010), at 24.  In short, "statistical evidence is critical to the success of a pattern-or-practice disparate treatment claim."  *Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*, 691 F. Supp. 2d 372, 388-89 (S.D.N.Y. 2009)

To be sure, it may be theoretically possible to prove a pattern or practice without statistical evidence in cases unlike this one.  For example, evidence of individual discriminatory acts may suffice when a defendant employs a small number of people.  *See United States v. City of N.Y.*, 631 F. Supp. 2d 419, 425 (S.D.N.Y. 2009).  Anecdotal evidence together with *direct* evidence that the employer adopted a concrete discriminatory policy may likewise be adequate.  *See Ste. Marie v. Eastern Railroad Ass'n*, 650 F.2d 395, 406 (2d Cir. 1981).  And anecdotal evidence may be sufficient when coupled with the so-called "inexorable zero"—evidence that *no* class member was treated in a non-discriminatory manner.  *See United States v. City of N.Y.*, 713 F. Supp. 2d 300, 317-18 (S.D.N.Y. 2010) (noting the "incontrovertible fact that [the employer] has *never* hired a . . . female [employee]" for the position at issue) (emphasis added).

But outside such circumstances—none of which is present here—a plaintiff seeking to demonstrate a pattern-or-practice claim in the absence of meaningful statistics faces an exceedingly heavy burden, and courts will dismiss such claims when statistical evidence is lacking.  *See Ste. Marie*, 650 F.2d at 406 (after rejecting statistical evidence, the court found plaintiff's anecdotal evidence did not establish a pattern or practice of discrimination); *Woodbury v. N.Y.C. Transit Auth.,* 832 F.2d 764, 771 (2d Cir. 1987) (given the "complete absence of creditable statistical evidence," plaintiffs' anecdotal evidence of discrimination was "inadequate to support a finding of intentional discrimination."); *Lopez v. Metro. Life Ins. Co.*, 930 F.2d 157, 160 (2d Cir. 1991) (pattern-or-practice claim fails due to "the inadequacy of the statistical evidence . . ."), *abrogated on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

Indeed, courts have routinely rejected pattern-or-practice claims supported only by anecdotal evidence that is unrepresentative of the size, geographic scope, or experiences of the

class.  For example, *EEOC v. CRST Van Expedited, Inc.*, 611 F. Supp. 2d 918, 953, 957 (N.D. Iowa 2009), rejected EEOC's pattern-or-practice claim because only 146 out of 2701 female drivers (5.4 percent) alleged sexual harassment.  Similarly, in *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 302 (5th Cir. 2000), the Fifth Circuit held that 44 anecdotes by geographically-dispersed and professionally-diverse employees out of a workforce of 2700 were insufficient to establish a pattern or practice of discrimination.  *See also EEOC v. Carrols Corp.*, No. 5:98 Civ. 1772, 2005 WL 928634, at *4 (N.D.N.Y. Apr. 20, 2005) (granting summary judgment to defendant in a hostile work environment case where 333 colorable claims were identified out of group of 90,835 women, and noting that EEOC's evidence "f[e]ll well short of what is required").

Dismissal of a pattern-or-practice claim based only on anecdotal evidence is particularly warranted when the defendant introduces data that demonstrate the *absence* of discrimination. Anecdotes cannot overcome such evidence because, by definition, they represent only a fraction of employment decisions made, whereas statistics aggregate decisions and provide a reliable measure of what happened at a systemic level.  For this reason, courts have dismissed pattern-or-practice claims where, as here, the only available statistical evidence rebuts any inference of discrimination, even when the plaintiff pointed to anecdotal evidence of discrimination.

For example, the court in *EEOC v. Republic Services, Inc.*, 640 F. Supp. 2d 1267, 1319 (D. Nev. 2009), dismissed EEOC's pattern-or-practice claim because EEOC had no statistical evidence of discrimination and offered only anecdotes, while the defendant presented "data [that] created an inference that Defendant's policies were evenly enforced."  *Id.* at 1319.  The court observed that "there [wa]s no statistical evidence . . . before this Court from which th[e] Court could make [relevant comparisons] . . . and determine if there was a statistically significant

difference," and that EEOC's anecdotal evidence was not "sufficient by itself to create a genuine issue of fact of whether age discrimination was Defendants' regular, rather than the unusual practice" even though several of the individual claims survived summary judgment.  *Id.*

In *CRST*, EEOC also presented no statistical evidence of discrimination, whereas CRST presented evidence showing that alleged sexual harassment, even if true, occurred only in a very small percentage of cases across CRST's vast business.  611 F. Supp. 2d at 953-55.  The court noted that "the Supreme Court and the various circuit courts of appeals have long recognized that [statistical] evidence is usually an important component of proof in a pattern or practice case." *Id.* at 953.  Although the court acknowledged that statistical evidence is not *always* "necessary to prove a pattern or practice claim," without it "EEOC has not given the court any evidence to disprove [defendant's] statistical evidence." *Id.* at 953-55.  For that reason, the court granted defendant's motion for summary judgment on EEOC's pattern-or-practice claim. *Id.* at 958.  *See also Davis v. City of Panama*, 510 F. Supp. 2d 671, 689 (N.D. Fla. 2007) (granting summary judgment for defendant because, while the plaintiff did "provide anecdotal evidence of isolated incidents that occurred during his employment . . . . [The defendant,] on the other hand, . . . provided the Court with detailed statistical evidence indicating that there [wa]s no [pattern or practice of discrimination]").

As described below, EEOC's pattern-or-practice claim fails as a matter of law under these standards.  Bloomberg employs thousands of employees in multiple business units in dozens of locations.  Yet, in support of the practices that it alleges occurred throughout the Company, the most EEOC can muster are allegations of isolated acts of alleged discrimination. Those allegations lack any uniting theme suggesting a common policy or practice.  Many involve only stray remarks with no apparent connection to any employment action.  And they have been

14

offered by EEOC without the essential point of comparison:  employees who took similar amounts of leave.  It is therefore no surprise that EEOC has not developed any admissible statistical proof demonstrating discrimination, while Bloomberg has offered compelling statistical proof that directly refutes it.  EEOC's pattern-or-practice claim thus boils down to a hodgepodge of sporadic and unrelated discrete acts of alleged discrimination, which cannot establish a pattern-or-practice claim.

## II.    NO REASONABLE FACTFINDER COULD CONCLUDE THAT BLOOMBERG ENGAGED IN A PATTERN OR PRACTICE OF DISCRIMINATION.

EEOC's operative complaint alleges that Bloomberg engaged in a pattern or practice of discrimination against Class Members by:  (1) "awarding them less total intended compensation than the actual value of their prior year's compensation, once they announced their pregnancy and once they returned to work after taking maternity leave;" (2) demoting Class Members in various ways; (3) excluding Class Members from management meetings and otherwise isolating them; and (4) subjecting Class Members to stereotypes regarding female caregivers when they return from maternity leave.  (R. 56.1 Stmt. ¶ 3.)  In its responses to Bloomberg's interrogatories, EEOC added that Bloomberg's "organizational culture" allegedly promoted stereotypical thinking, and that Bloomberg's decisionmaking practices "have fostered subjectivity and discretion that has promoted stereotypic bias."  (*Id.* ¶ 6-7.)  But EEOC cannot point to evidence creating a genuine issue of material fact with respect to any of these claims.

EEOC offers no evidence at all comparing Bloomberg's treatment of Class Members to its treatment of other similarly-situated Bloomberg employees, and therefore cannot prevail on any of its far-reaching claims.  In addition, EEOC cannot prove its claim of discriminatory compensation, because the statistical evidence *disproves* any such discrimination.  EEOC likewise has legally insufficient proof that Bloomberg engaged in a pattern or practice of

discrimination against the class by demoting them, excluding or isolating them, subjecting them

to stereotypes, or permitting subjective and discretionary decisionmaking practices.  Rather,

EEOC can offer only scattered anecdotal evidence of each of these alleged practices.  Even if all

of these anecdotes were accurate and themselves actionable—which they are not—they are

legally insufficient to carry EEOC's heavy burden here.

> **A.      EEOC's Evidence Fails to Compare Class Members to Similarly-Situated Bloomberg Employees.**

As this Court has already held, "in order to prove that Bloomberg discriminated against

Class Members on account of their gender/pregnancies, EEOC must show that Bloomberg

treated Class Members differently from 'other persons not so affected but similar in their ability

or inability to work' . . . *i.e.*, leave takers."  Mem. & Order 31, Aug. 31, 2010, ECF No. 166.

The Court excluded EEOC's proffered statistical evidence because it failed to make this

comparison.  The isolated acts of alleged discrimination upon which EEOC must now rely as a

substitute for classwide evidence of discrimination suffer from the same flaw:  even if presumed

to be true, these acts, taken together, at most show that a small percentage of the class allege

disparate and varied discriminatory acts.  They say nothing about how Bloomberg treated typical

Class Members, nor do they say anything about how Class Members' experiences compare to

those of other leave takers—in other words, they cannot possibly show that Class Members were

treated less favorably than the relevant comparison population.  For this reason, EEOC's

anecdotal evidence necessarily falls far short of the evidence necessary to prove a pattern or

practice of discrimination under the PDA.  *Id.*; *see also id.* at 18 ("It has been repeatedly

affirmed that the [PDA] does not require the creation of special programs for pregnant women;

nor does it mandate any special treatment.  To the contrary, the statute specifically requires that

16

pregnant women be treated the same as all other employees with similar disabilities.") (citations and internal quotations omitted).

**B.    EEOC Cannot Establish A Pattern Or Practice Of Compensation Discrimination.**

No reasonable factfinder could conclude, as EEOC alleges, that "[Bloomberg] has discriminated against the Claimants based on sex/pregnancy by awarding them less total intended compensation than the actual value of their prior year's compensation, once they announced their pregnancy and once they returned to work after taking maternity leave," (R. 56.1 Stmt. ¶ 3).

As described above, it is virtually impossible for a plaintiff to prove a pattern or practice of compensation discrimination without meaningful statistics showing a relevant disparity and in the face of a defendant's statistics that demonstrate the *absence* of discrimination. Such is the case here. EEOC can offer no statistical evidence at all to support its sweeping allegation that Bloomberg cut the pay of women returning from maternity leave, or that it otherwise discriminatorily compensated those women. Mem. & Order 30-31, Aug. 31, 2010, ECF No. 166.

By contrast, Bloomberg has presented the admissible opinions of two independent statistical experts, each of which refutes EEOC's compensation discrimination allegations in their entirety. Dr. Michael P. Ward concluded that "women who take maternity leave fare slightly better, in terms of intended compensation, than other Bloomberg employees on leave for similar amounts of time. Not only did Class Members' intended compensation not decline after their leaves began, as alleged in the Complaint, but it increased at an average rate of over 6%." (R. 56.1 Stmt. ¶ 50.) More specifically, Dr. Ward concluded that 84 percent of Class Members received pay *increases* following leave, whereas less than 70 percent of similarly situated Bloomberg employees did so; this difference is statistically significant in favor of the class, and

refutes EEOC's claim that class member pay *decreased* following leave.  (*Id.* ¶ 53.)  Dr. Ward's

analyses also show that Class Members received statistically significant *higher* average pay

*increases* over the duration of his study period than other similarly situated Bloomberg

employees (*id.* ¶ 49), negating any inference that Bloomberg discriminated against Class

Members in terms of pay.  And, finally, Dr. Ward conducted detailed regression analyses

establishing that there are no statistically significant differences in pay growth between Class

Members and other Bloomberg employees when controlling for leave.  (*Id.* ¶ 51.)

Dr. John H. Johnson's expert report echoes these conclusions: "[T]he increase in

compensation of the Class Members following a maternity leave was at least as high as, if not

higher than, the change in compensation of non-maternity leave takers following a leave. . ."  (R.

56.1 Stmt. ¶ 59.)  In short, Dr. Johnson concluded that class member pay *increased* post-leave,

and that the increases were *greater* than other similarly situated Bloomberg employees.  (*Id.* ¶

61.)  Dr. Johnson's regression analyses showed that these results remained valid after controlling

for a wide range of variables, including leave duration.  (*Id.* ¶ 62.)

The expert evidence is dispositive, and refutes EEOC's compensation discrimination

claim.  At most, EEOC's evidence amounts to isolated and sporadic anecdotes of allegedly

discriminatory compensation decisions.  By contrast, Bloomberg's statistical evidence

aggregates compensation decisions during the relevant period, and establishes that, at a systemic

level, Bloomberg paid Class Members better than similarly situated non-Class Members.  *See*

*CRST*, 611 F. Supp. 2d at 953-55; *Republic Servs., Inc.*, 640 F. Supp. 2d at 1319.  Anecdotes,

which by definition represent only a fraction of compensation decisions during the relevant time

period, cannot override this evidence.  *See EEOC Compliance Manual*, "Section 10:

Compensation Discrimination," § 10-III.A.2, 2006 WL 4672890 (directing the investigator in a

compensation discrimination case to "analyze the compensation of all similarly situated employees because even if a comparison of only one or two similarly situated individuals might raise an inference of compensation discrimination, a comparison of all similarly situated individuals might dispel this inference.").

### C.    EEOC Lacks Legally Sufficient Evidence Of Other Alleged Practices

EEOC's evidence of an alleged pattern or practice of demoting claimants in various ways, of excluding them from management meetings and otherwise isolating them, and of permitting subjective and discretionary decisionmaking practices is also insufficient as a matter of law.  Many of the anecdotes offered are themselves legally inadequate to prove discrimination even as to a single claimant.  In any event, even if all of EEOC's anecdotes were themselves legally actionable, they nonetheless would not establish a pattern or practice of discrimination.

### 1.    EEOC Lacks Legally Sufficient Evidence Of a Pattern or Practice of Discriminatory Demotions.

EEOC's demotion claim, as alleged in its complaint, consists of several specific allegations: (1) reduction in direct reports; (2) demotion in title; (3) diminishment of responsibility; and (4) replacement with male employees junior to the Claimant.  (R. 56.1 Stmt. ¶ 4.)

Bloomberg has proffered statistical evidence that entirely refutes EEOC's claim that Bloomberg engaged in a pattern or practice of demoting Class Members by eliminating direct reports.  Dr. Ward studied this issue specifically, and found "no statistical evidence that Class Members' level of responsibility, as measured by direct reports, decreased to any significant degree as compared to other employees when taking leave into account."  (*Id.* ¶ 56.)  EEOC has no evidence that contradicts this conclusion.  Like its compensation claims, EEOC's demotion

claim based on a Class Member's direct reports must fail, since the only admissible statistical evidence disproves the allegation.

Given the absence of statistical evidence to support a pattern or practice of discriminatory demotions, EEOC's anecdotal evidence "must be correspondingly stronger . . . to meet [its] burden." *Xerox*, 850 F. Supp. at 1085.  However, EEOC's anecdotal evidence is legally insufficient to establish a discriminatory pattern or practice in *any* of the forms of demotions that it alleges.  Only 47, or 7.8 percent, of the 603 Class Members claim that they experienced any one of the four types of demotions alleged in the complaint.  (R. 56.1 Stmt. ¶ 63.)  Such infrequent alleged conduct cannot plausibly be considered Bloomberg's "standard operating procedure."  *See CRST*, 611 F. Supp. 2d at 953 (granting summary judgment to employer on pattern-or-practice claim where EEOC lacked statistical evidence and offered as anecdotal evidence claims of 5.4 percent of female employees).  More importantly, it cannot overcome Dr. Ward's statistical conclusion that there is no classwide evidence of discriminatory demotions.

> 2.    <u>EEOC Lacks Legally Sufficient Evidence Of a Pattern or Practice of Excluding or Isolating Class Members.</u>

EEOC fares no better with its allegation of a pattern or practice of excluding Class Members from management meetings and otherwise isolating them.  (R. 56.1 Stmt. ¶ 3.)

Although exclusion from management meetings might theoretically be significant enough to constitute an adverse employment action, the overwhelming majority of cases hold that such conduct does not have sufficient impact on the terms and conditions of employment to create an actionable discrimination claim.  *See, e.g.*, *Flynn v. N.Y. State Div. of Parole*, 620 F. Supp. 2d 463, 486 (S.D.N.Y. 2009) ("Plaintiff's exclusion from the monthly meetings can hardly be described as a material change in the terms or conditions of her employment."); *Watson v.*

*Paulson*, 578 F. Supp. 2d 554, 565 (S.D.N.Y. 2008); *Leifer v. N.Y. State Div. of Parole*, 2010 WL 3292937, at *1 (2d Cir. Aug. 23, 2010).

But, in any event, only eleven Class Members (1.8 percent) allege exclusion from management meetings, and only four (0.6 percent) allege other forms of purported isolation.  (R. 56.1 Stmt. ¶¶ 64, 65.)  Even assuming that these claims could survive summary judgment on their own—which they could not—such a small number of anecdotes is insufficient evidence to establish that Bloomberg routinely and systematically discriminated against over 600 of its employees.  This is especially true because EEOC cannot identify any adverse consequences experienced by the class as a result of alleged exclusion or isolation.  *See Xerox*, 850 F. Supp. at 1085; *CRST*, 611 F. Supp. 2d at 957.

3.   EEOC Lacks Legally Sufficient Evidence of a Pattern or Practice of Discriminatory Performance Evaluations.

EEOC also fails to create a triable issue as to its claim, omitted from its complaint but alleged in interrogatory responses (R. 56.1 Stmt. ¶ 6), that Bloomberg unlawfully permitted subjective and discretionary decisionmaking practices, allegedly leading to negative performance evaluations or performance improvement plans.

To the extent EEOC argues that subjectivity itself is unlawful, it is wrong as a matter of law.  As the Supreme Court has explained, "an employer's policy of leaving [employment] decisions to the unchecked discretion of lower level supervisors should itself raise no inference of discriminatory conduct."  *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 990 (1988).

Nor are isolated instances of allegedly discriminatory performance evaluations legally sufficient to make out a pattern or practice.  Negative evaluations alone, without any accompanying adverse consequences, are not adverse employment actions.  *See Weeks v. N.Y. State Div. of Parole*, 273 F.3d 76, 86 (2d Cir. 2001), *abrogated on other grounds by Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Kaur v. N.Y.C. Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 332 (S.D.N.Y. 2010).  Furthermore, only fifty Class Members (8.3 percent) allege such negative evaluations (R. 56.1 Stmt. ¶66)— a number that is legally insufficient to establish that discrimination was Bloomberg's "standard operating procedure," particularly absent any comparison to the number of similarly-situated employees who allegedly received negative performance evaluations.

At bottom, EEOC has no classwide evidence of any scheme to manipulate performance reviews in a discriminatory fashion and no evidence that performance reviews actually affected the class (let alone a representative number thereof).  In this respect, EEOC's subjective decisionmaking allegation, which is unmentioned in any of EEOC's three complaints, resembles the claim in *EEOC v. McDonnell Douglas Corp.,* 17 F. Supp. 2d 1048, 1054-55 (E.D. Mo. 1998), *aff'd*, 191 F.3d 948 (8th Cir. 1999).  The court in that pattern-or-practice age discrimination case granted summary judgment for the defendant because, among other things, EEOC offered "insufficient evidence [that the defendant's] performance evaluation system was intentionally manipulated" against older workers, and that "EEOC's evidence on this issue suggests, at the most, sporadic instances where age may have been a factor in a performance evaluation."  *McDonnell Douglas*, 17 F. Supp. 2d at 1055.

In this case, EEOC cannot show that performance evaluations were "intentionally manipulated" or infected with unlawful bias, or even that performance evaluations had any adverse impact on the class as a whole.  Furthermore, as to alleged subjective decisionmaking, numerous courts have held that "a decision by a company to give managers the discretion to make employment decisions, and the subsequent exercise of that discretion by some managers in a discriminatory manner, is not tantamount to a systematic company-wide policy of intentional

discrimination." *McDonnell Douglas*, 17 F. Supp. 2d at 1054-55 (quoting *Sperling v. Hoffmann-La Roche, Inc.*, 924 F. Supp. 1346, 1363 (D.N.J. 1996)).

**D.      EEOC's Allegations of a Discriminatory "Culture" Leading to Stereotyping Are Not Actionable as a Matter of Law.**

Lastly, EEOC alleges (but cannot establish) that Bloomberg maintained an organizational culture that promotes stereotypic thinking (Response to Interrog. 1) and "subjected" Class Members to "stereotypes regarding female caregivers when they returned from maternity leave." (R. 56.1 Stmt. ¶¶ 3, 7.)

EEOC has no admissible expert evidence to prove such sex or pregnancy stereotyping. Mem. & Order, Aug. 31, 2010, ECF No. 166.  Nor does EEOC have sufficient anecdotal evidence of such stereotyping because only 48, or 8 percent, of the 603 Class Members claim to have been subjected to stereotypic and/or negative comments of any sort.  (R. 56.1 Stmt. ¶ 67.)

In any event, even if EEOC could prove pervasive gender stereotyping at Bloomberg— which it cannot—such stereotyping, standing alone, would be insufficient to support EEOC's claim.  EEOC has expressly disclaimed any hostile work environment claim, (*id.* ¶ 5), and gender stereotyping alone does not rise to the level of an adverse employment action absent evidence that "the employer actually relied on . . . gender in making [an employment] decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989).  Said otherwise, "mere utterance of an… epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII," *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993) (citations omitted), and "is not indicative of a pattern or practice of . . . discrimination in violation of Title VII." *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1295 (5th Cir. 1994); *see also Blake v. Potter*, No. 03 Civ. 7733, 2007 WL 2815637, at *8 (S.D.N.Y Sept. 25,

2007); *Pomilio v. Wachtell Lipton Rosen & Katz*, No. 97 Civ. 2230, 1999 WL 9843, at *8 (S.D.N.Y. Jan. 11, 1999).

Nor are isolated stray remarks on which EEOC may rely sufficient to establish the widespread pattern or practice that EEOC alleges. If, as here, a plaintiff cannot show a causal link between an allegedly discriminatory comment and any policy, practice, or adverse employment action by the defendant, the alleged comment does not create a triable issue. For example, in *Xerox*, the plaintiffs, who alleged a pattern or practice of age discrimination, relied on a report recommending that the defendant lower the age of its workforce; the report was allegedly reviewed and considered by a committee including the defendant's president and several vice presidents. 850 F. Supp. at 1087-88. The court granted summary judgment, stressing that there was no evidence "that defendant *acted* upon the report by adopting a plan to get rid of older workers." *Id.* at 1088 (emphasis added).

Likewise, numerous courts, including this one, have reaffirmed that stray remarks are probative of discrimination only if "there is a sufficient nexus between the remark and the employment decision at issue." *Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 584 (S.D.N.Y. 2008) (internal citations omitted). This is so because discriminatory *animus*, without more, does not give rise to a claim. Only discriminatory *conduct* is actionable. *See Weeks*, 273 F.3d at 85 ("An adverse employment action is a requisite of a claim alleging disparate treatment[.]") (internal citations omitted).

And, in a pattern-or-practice case, a plaintiff must tie evidence of alleged discriminatory animus to the adoption of a company-wide policy or practice—not just to an individual instance of discrimination. In *Ste. Marie*, for example, the Second Circuit affirmed summary judgment in favor of the defendant employer on a pattern-or-practice claim based on its finding that a

company director's statement  "that the applicant was being rejected for the particular position on account of her sex seems to have been merely an open admission of disparate treatment in that instance, not an announcement of a policy of general application."  650 F.2d at 406.

Here, there is no evidence that any allegedly discriminatory comments by Bloomberg managers—even if assumed to have been made—were ever "acted upon" or led to any adverse employment action.  *Xerox*, 850 F. Supp. at 1088.  As shown above, EEOC has no evidence whatsoever that Bloomberg subjected the class to a pattern or practice of discrimination.  Absent evidence of discriminatory *effect*, any evidence by EEOC of alleged discriminatory *animus* does not give rise to a triable claim.

The specific comments on which EEOC can be expected to rely also fail to create a triable question for additional reasons.  EEOC may repeat the claim made by plaintiff-intervenor Jill Patricot that a former colleague once reported to her that, a year earlier, then-CEO Lex Fenwick had declared, "I don't want any pregnant bitches working for me."  (R. 56.1 Stmt. ¶ 80.) But EEOC cannot point to a single witness who claims to have heard Mr. Fenwick saying anything even approaching that.  Ms. Patricot's claim about what her former colleague supposedly told her—which was not even corroborated by that colleague's deposition testimony—is inadmissible hearsay.  *See Evans v. Port Auth. of N.Y. and N.J.*, 192 F. Supp. 2d 247, 263 (S.D.N.Y. 2002) (one co-worker's account to another co-worker of allegedly discriminatory comments made by a plaintiff's supervisor was inadmissible hearsay, and did not qualify as a party admission, where the co-worker was not the plaintiff's supervisor and did not have a significant role in the employment decision at issue.)

Similarly, EEOC may point to testimony by claimant Margaret Popper that Bloomberg News Editor-in-Chief Matt Winkler, in the context of criticizing Wall Street's record on

women's issues and commenting on the lack of women in senior positions in journalism, supposedly stated that "the problem with women is that they go off and have babies." (R. 56.1 Stmt. ¶ 81.) The words attributed to Mr. Winkler by Ms. Popper would seem not to reflect discriminatory bias, but rather frustration with retention rates in the workforce generally. *See Apsley v. Boeing Co.*, 722 F. Supp. 2d 1218, 1241 (D. Kan. 2010) (describing as "benign" a CEO's comment that the company's "workforce was getting older and that the managers needed to find ways to do something about it," because such comment merely shows "concern[] about [the] workforce's age because [managers] were afraid that a large percentage of their workforce would retire within a few years of each other, and, thus, leave [defendant] with an inexperienced workforce"). And Ms. Popper's own testimony that Mr. Winkler hired her when she was visibly pregnant (R. 56.1 Stmt. ¶ 78) shows that he did not harbor discriminatory animus. *See, e.g.*, *Muhleser v. Wear Me Apparel LLC*, 644 F. Supp. 2d 375, 386 (S.D.N.Y. 2009) ("[I]t is quite difficult to reconcile" defendant's "willingness to hire plaintiff while she was on maternity leave in January 2006 and to provide her three months' paid maternity leave a year later with plaintiff's allegation that he discriminatorily fired her because she was pregnant or because of her gender in March 2007.") In fact, Ms. Popper herself testified that "she had been treated well" in her first year at Bloomberg, during which her daughter was born three months into her tenure. (*Id.* ¶ 79.)

### E.   Taken Together, EEOC's Evidence is Insufficient to Establish a Pattern or Practice of Discrimination.

Plainly EEOC cannot establish a pattern or practice of discrimination as to any of the individual practices that it alleges. Its claim fares no better if its evidence is viewed in the aggregate. EEOC has no classwide evidence whatsoever. It has no statistical evidence suggesting, much less proving, a pattern or practice of compensation discrimination,

discrimination in demotions, or any other sort of discrimination.  It has no classwide evidence

that Bloomberg engaged in gender stereotyping.  And it has no classwide evidence comparing

Class Members to similarly-situated employees.  Instead, in its entirety EEOC's evidence

amounts to a limited number of discriminatory anecdotes over a 9-year class period in a

company with over 10,000 employees and hundreds of Class Members working in dozens of

locations worldwide, coupled with mostly temporally remote statements by Bloomberg managers

unrelated to any challenged employment decision.  This is the sort of isolated and sporadic

evidence that courts routinely hold is legally insufficient to prove a pattern-or-practice claim.

Indeed, courts regularly dismiss pattern-or-practice claims when the plaintiff presents

evidence far more compelling than EEOC's here.  For example, in *Apsley,* 722 F. Supp. 2d 1218,

the plaintiff attempted to prove a pattern or practice of age discrimination with:  (1) affirmative

statistical evidence, (2) allegations of ageist statements made by the company's CEO and other

high level managers, (3) an expert who opined about the defendant's supposedly biased "culture"

and improper "subjectivity," (4) claimed subjective decisionmaking, and (5) "forty-plus"

declarations from potential class members.  *Id.* at 1240, 1246.  The court gave "no credence" to

the purported cultural expert and found that that any evidence of "an age bias corporate culture

or . . . a corporate policy of discrimination" was "[n]oticeably lacking."  *Id.* at 1245.  The court

held that "no reasonable jury could find that age discrimination was the regular practice"

throughout the company, "as opposed to a couple of director groups."  *Id*.  For that reason, the

Court dismissed plaintiffs' pattern or practice age discrimination claim.

Similarly, in *McDonnell Douglas,* EEOC attempted to prove a pattern-or-practice claim

by relying upon (1) "decentralized and subjective" decisionmaking; (2) stray remarks about

"young change agents" and an alleged strategy to "hire and retain the best young people;" (3) an

expert who claimed that the company had a "cultural focus of youth;" (4) statistical evidence; and (5) affidavits from employees.  17 F. Supp. 2d at 1053-54.  The court granted summary judgment for the defendant and stressed the substantial burden a plaintiff faces in a pattern-or-practice case.  Although EEOC's statistical expert found statistically significant disparities, the court found that "the EEOC's statistical evidence falls short of the statistical evidence presented in *Teamsters* which established that the defendant, a national common carrier, failed to hire minorities for the more-desirable line-driver position.  Of the 1,828 line drivers, 13 were minorities, and until two years before the suit was filed, there were none."  *Id.* at 1053.  The court held that, taken together, EEOC's evidence was insufficient to establish a pattern or practice of age discrimination.  The Eighth Circuit affirmed.  *EEOC v. McDonnell Douglas Corp.*, 191 F.3d 948 (8th Cir. 1999).

EEOC's evidence is weaker than the rejected claims in *Apsley* and *McDonnell Douglas*.  In both of those cases, plaintiffs presented both statistical evidence and expert testimony about alleged disparities experienced by the class and an a culture of discrimination, and the court found neither compelling.  Here, EEOC cannot offer that evidence.  Similar to *Apsley* and *McDonnell Douglas*, EEOC can draw no causal connection between the allegedly discriminatory remarks it points to and any challenged employment "pattern" or "practice," or even any decision about the class.  And, of course, mere allegations of "subjective decisionmaking" are insufficient to establish discrimination.  Thus, even when its evidence is considered together, EEOC's claim fails as a matter of law.

EEOC's pattern-or-practice claim also fails because it is clear that there is no discernible "pattern" of discrimination at all.  EEOC must establish an identifiable practice that impacts a definable class in common ways, rather than an amalgamation of individual stories with no

common link.  *Cf. Wright v. Circuit City Stores*, 201 F.R.D. 526, 541 (N.D. Ala. 2001) (denying

class certification, finding no identifiable practice affecting a definable class in common ways,

when the claims involved multiple facilities across many states with a group of diverse and

differently-situated employees challenging many different policies).

The contradictory nature of EEOC's allegations undermines its pattern-or-practice claim.

For example, some Claimants allege that they were given training that they did not need (R. 56.1

Stmt. ¶ 68), while others complain they were denied training that they did need (*id.* ¶¶ 69, 70).

Some Claimants complain that they were encouraged to work part-time (*id.* ¶ 71), while others

complain that they were denied part-time work (*id.* ¶ 72).  Some Claimants complain about an

increased workload after maternity leave (*id.* ¶ 73, 74), while others complain that their

responsibilities diminished after maternity leave (*id.* ¶ 75-77).  Assuming that all of these "other"

allegations are true leads to one conclusion:  Bloomberg did not follow any systematic policy or

practice of discrimination against Class Members.

Finally, EEOC's exclusive reliance on anecdotal evidence is fundamentally flawed

because the absence of statistical evidence forces EEOC to proffer a theory of discrimination that

defies common sense:  that Bloomberg discriminated against pregnant women by excluding them

from meetings, making stereotypic remarks, and giving negative performance evaluations, all

while increasing their pay more frequently and at higher rates than other similarly-situated

employees.  It would be a strange "pattern" of discrimination indeed for any employer to

demonstrate its antipathy toward any protected group by paying them better than other

employees, but treating them poorly in less tangible ways.  The only sensible conclusion to be

drawn from the evidence is that there is no such pattern, and thus EEOC's pattern-or-practice

claim must be dismissed.

## CONCLUSION

For the foregoing reasons, Bloomberg respectfully requests that the Court enter an order dismissing EEOC's pattern-or-practice claim, and granting such other and further relief as it deems just and proper.

Dated: January 28, 2011
       New York, New York


                                    WILLKIE FARR & GALLAGHER LLP


                                    By: _____/s/_____
                                          Thomas H. Golden (tgolden@willkie.com)

                                    787 Seventh Avenue
                                    New York, NY 10025
                                    (212) 728-8000

                                    and

                                    JONES DAY
                                    Eric Dreiband, Esq.
                                    51 Louisiana Avenue NW
                                    Washington, DC 20001-2113

                                    Attorneys for Defendant Bloomberg L.P.