UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
EQUAL EMPLOYMENT OPPORTUNITY          :
COMMISSION,                           :          07 Civ. 8383 (LAP)
                                      :
            Plaintiff,                :          Opinion & Order
                                      :
            - v. -                    :
                                      :
BLOOMBERG L.P.,                       :
                                      :
            Defendant.                :
-----------------------------------X
JILL PATRICOT, TANYS LANCASTER,       :
JANET LOURES, MONICA PRESTIA,         :
MARINA KUSHNIR and MARIA              :
MANDALAKIS,                           :
                                      :
            Plaintiffs-Intervenors,   :
                                      :
            - v. -                    :
                                      :
BLOOMBERG L.P.,                       :
                                      :
            Defendant.                :
-----------------------------------X

LORETTA A. PRESKA, Chief United States District Judge:

          In a heralded complaint, the United States Equal

Employment Opportunity Commission accused Bloomberg L.P. of

engaging in a pattern or practice of discrimination against

pregnant employees or those who have recently returned from

maternity leave in violation of Title VII, 42 United States

Code.  However, "J'accuse!" is not enough in court.  Evidence is

required.  The evidence presented in this case is insufficient

to demonstrate that discrimination was Bloomberg's standard

operating procedure, even if there were several isolated

instances of individual discrimination.  As its standard operating procedure, Bloomberg increased compensation for women returning from maternity leave more than for those who took similarly lengthy leaves and did not reduce the responsibilities of women returning from maternity leave any more than of those who took similarly lengthy leaves.

The law requires that employers not discriminate against pregnant women on the basis of their pregnancy. Considering the evidence, not the accusations, the Court cannot say that the EEOC has proffered evidence from which a factfinder could conclude that Bloomberg engaged in a systemized practice of decreasing the pay, responsibility, or other terms and conditions of the employment of pregnant employees and mothers because they became pregnant or took maternity leave. Therefore, the Court grants the Defendant's motion for summary judgment on the Plaintiff's pattern or practice claim.

I. BACKGROUND

The basic allegations and procedural history of this case are stated adequately in the Court's prior opinions, with which the Court assumes familiarity.  EEOC v. Bloomberg L.P. (Bloomberg II), 751 F. Supp. 2d 628 (S.D.N.Y. 2010); EEOC v. Bloomberg L.P. (Bloomberg I), No. 07 Civ. 8383, 2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010).  Plaintiff Equal Employment Opportunity Commission ("EEOC") brought a case on behalf of a

class of similarly situated women who were pregnant and took
maternity leave ("Class Members"), asserting that Defendant
Bloomberg L.P. ("Bloomberg") engaged in a pattern or practice of
discrimination on the basis of the class members' sex and/or
pregnancy.  The EEOC alleges that Bloomberg reduced pregnant
women's or mothers' pay, demoted them in title or in number of
directly reporting employees (also called "direct reports"),
reduced their responsibilities, excluded them from management
meetings, and subjected them to stereotypes about female
caregivers, any and all of which violated the law because these
adverse employment consequences were based on class members'
pregnancy or the fact that they took leave for pregnancy
related-reasons.  The EEOC asserted the same claims on behalf of
several individual claimants.  The EEOC also brought a
retaliation case on behalf of several individual claimants, but
that portion of this lawsuit has been dismissed for failure to
conciliate those claims out of court.  <u>Bloomberg II</u>, 751 F.
Supp. 2d at 643.  The EEOC did not bring a hostile work
environment claim.  Before the Court is Bloomberg's motion for
summary judgment on the pattern or practice claim only.[1]

---

[1] Throughout this opinion, the Court looks to the
Declaration of Raechel L. Adams ("Adams Decl.") Dated April 8,
2011, the Declaration of Thomas H. Golden ("Golden Decl.") Dated
April 18, 2011, and the Declaration of Paul W. Horan ("Horan
Decl.") Dated January 28, 2011.  In addition, the Court
(cont'd . . .)

The relevant facts are not disputed.  Bloomberg is an international financial services and media company that provides news, information, and analysis.  (Bloomberg R.56.1 ¶ 11.)  Its core business is providing the Bloomberg terminal, but it has a website, television and radio stations, a broker-dealer service with an electronic trading platform, and a 24-hour global news service.  (Id. ¶¶ 12-18.)  Bloomberg employs over 10,000 people.  (Id. ¶ 20.)  Bloomberg identified to EEOC 603 Bloomberg employees who were pregnant or took maternity leave in the class period between February 1, 2002, and March 31, 2009.  (See id. ¶ 9.)  In this lawsuit, three individuals were included in the original complaint, and the EEOC has identified a total of 78 individuals who have claims of discrimination.  (Id. ¶ 10; EEOC R.56.1 ¶ 113.)

Bloomberg is divided into functional divisions, which are further divided geographically.  (Bloomberg R.56.1 ¶¶ 24-25.)  Bloomberg went through a major restructuring in 2001 and it regularly restructures its business units.  (Id. ¶¶ 26, 29.)  Bloomberg's founding philosophy was "hard work, cooperation, loyalty up and down, [and] customer service."  (Id. ¶ 33.)  It

_____

considers the parties' Rule 56.1 Statements: Bloomberg's Rule 56.1 Statement in Support of its Motion for Summary Judgment ("Bloomberg R.56.1"), the EEOC's Rule 56.1 Statement in Opposition ("EEOC R.56.1"), and Bloomberg's Rule 56.1 Statement in Reply ("Bloomberg Reply R.56.1").

has "very high standards for people" and demands much "in terms
of expertise [and] commitment to the job." (Id. ¶ 32.)  One
manager stated that "everyone at Bloomberg has . . . a work/life
balance issue because [everyone] work[s] very hard."[2] (Id.
¶ 34.)  Indeed, men and women have complained about their
ability to balance family life and their workload at Bloomberg.
(Id. ¶ 35.)  The "Code of Standards" for Bloomberg employees is
forthright about this fact of life at the company.  It states
that Bloomberg "is your livelihood and your first obligation."
(EEOC R.56.1 ¶ 90.)  But the founder of Bloomberg started the
company with the philosophy that "you pay people a lot and
expect a lot from them," thinking "that's a good way[] for the
employees and the company to succeed together." (Bloomberg
R.56.1 ¶ 36.)  However, before 2008, Bloomberg did not have a
robust training program or formal policy regarding pregnancy
discrimination.  (EEOC R.56.1 ¶ 100.)

        Compensation at Bloomberg, as in most for-profit
enterprises, signals to some degree an employee's performance.
At least during the times at issue here, compensation at
Bloomberg included both a base salary and variable, additional

---

        [2] The EEOC denies the "manner" of the allegation of
this quote and others like it because the person also made other
statements.  (EEOC R.56.1 ¶ 34.)  The Court does not consider
this to be a controverted fact because the EEOC does not dispute
the statement itself.

compensation known as Equity Equivalence Certificate ("EEC")
grants that were redeemable one year after they were granted.
(Bloomberg R.56.1 ¶¶ 38, 41.)  EEC grants had an "intended
value" based on projected company (not individual) performance,
and the intended value of EEC grants plus base salary comprised
an employee's total intended compensation for a given year.
(Id. ¶¶ 39-40.)  The actual value of an EEC grant could differ
from its intended value based on actual company (not individual)
financial performance; actual value was determined upon
redemption.  (Id. ¶¶ 41-42; Bloomberg Reply R.56.1 ¶ 113.)  The
change in the raw number of EEC grants from year to year did not
indicate better or worse performance because an EEC grant did
not have a constant intended or actual value year to year.
(Bloomberg Reply R.56.1 ¶ 113.)  Therefore, an employee's
intended compensation for a given year, rather than actual
compensation, is the relevant comparative metric for employee
compensation.

       An employee who performs well generally would receive
an increase in total intended compensation (a combination of
base salary and EEC grants) each year.  (EEOC R.56.1 ¶ 111.)
Among employees in the same group, those who performed
relatively better generally would receive relatively larger
increases in compensation.  (Id.)  Poor performers would receive
decreased EEC grants, with a grant of zero EECs signaling that

6

employee's likely termination.  (Id.)  Procedural elements of this system were changed slightly in early 2009.  (Bloomberg R.56.1 ¶ 43.)  Bloomberg offers benefits including health insurance that covers fertility treatments, prenatal care, and pregnancy-related disability, and it offers twelve weeks of paid maternity leave and four weeks of unpaid maternity leave for primary caregivers (at least in its United States offices). (Id. ¶ 45.)

Head managers of each business unit are responsible for hiring, compensation, and responsibilities of each employee. (EEOC R.56.1 ¶ 96.)  Although the chairman of Bloomberg has ultimate authority over compensation decisions, other aspects of employment are determined by managers.  (Id.)  Managers make compensation decisions using an online tool that sets forth guidelines and a budget for the manager.  (Bloomberg Reply R.56.1 ¶ 102.)  Bloomberg also provides formal training about compensation decisions, including specific admonitions not to discriminate on the basis of pregnancy or gender.  (Id.) Compensation is determined by objective, business-centered standards.  (Id.)  For example, sales employees are evaluated on commissions generated, new accounts, revenue targets, and monthly sales calls and meetings, while news employees are evaluated based on breaking news, corrections, and readership. (Id.)  These metrics were communicated to managers in

performance evaluation forms and by way of mentoring and one-on-one training.  (Id.)  There are no written guidelines for determining the compensation of new hires; that decision is left to the discretion of the hiring manager.  (Id. ¶ 102.)  Compensation and other employment decisions generally are within the discretion of managers.  (EEOC R.56.1 ¶ 102.)  Bloomberg does not follow a "traditional" structure for promotions or job titles.  (Id. ¶ 109; Bloomberg Reply R.56.1 ¶ 109.)

To illustrate how these systems played out objectively, Bloomberg presented two expert reports that have been admitted in this case.[3]  Bloomberg I, 2010 WL 3466370, at *18.  One expert, Dr. Michael Ward, compared changes in Class Member intended compensation and number of direct reports for

---

[3] The EEOC disputes the "analysis" of these experts, but it does not dispute the statements contained in the reports.  Thus, EEOC's objections do not create issues of material fact but, rather, are arguments about the weight this evidence.
In its Rule 56.1 statement, the EEOC states that "[s]tatistical evidence showed" that class members were paid less once they went on maternity leave than similarly situated non-class members at statistically significant levels.  (EEOC R.56.1 ¶ 112; see id. ¶ 117.)  In support of this assertion, it cites to its legal memoranda and supporting affidavits in its opposition to Bloomberg's motion to exclude EEOC's expert testimony.  Given the fact that the Court excluded EEOC's proffered expert evidence, Bloomberg I, 2010 WL 3466370, at *10-13, EEOC's tactical decision is perplexing.  See S.D.N.Y. Local R.56.1 ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible . . . ." (emphasis added)).
The Court does not consider this evidence.

Class Members against the same changes for other employees who took leave. (Bloomberg R.56.1 ¶ 47.) He concluded that Class Members experienced higher average and median growth in intended compensation than non-Class Members. (Id. ¶¶ 48-50.) When controlling for time on leave, he found no statistically significant differences in Class Member compensation growth as compared with non-Class Members. (Id. ¶ 52.) He also found no statistically significant differences in the loss of direct reports between Class Members and non-Class Members when controlling for time on leave. (Id. ¶¶ 55-56.)

The other expert, Dr. John Johnson, compared the change in Class Member base pay and EEC grants in the twelve-month period before taking leave to the twelve-month period after taking leave. (Id. ¶ 58.) He found that Class Member compensation increased, on average, by $5,789 during this period, compared with an average increase of $3,946 over a similar period for those employees who took non-maternity leave. (Id.) He reached a similar conclusion with respect to the twelve-month period following return from leave as compared to the twelve-month period ending six months prior to the birth of a child. (Id. ¶ 60.) Controlling for various factors such as leave duration, location, business unit, and the year when leave was taken, he concluded that Class Members received greater

statistically significant increases in compensation than non-Class Members who took leaves.[4]  (Id. ¶ 62.)

Against this data, the EEOC has presented anecdotal testimony from several claimants stating that they were discriminated against in terms of compensation.  (EEOC R.56.1 ¶ 113 (77 claimants).)  Seventy-seven of 78 total claimants said their intended total compensation decreased after becoming pregnant or returning from maternity leave.  (Id.; see id. ¶¶ 114-123.)  To illustrate an example, the EEOC alleges that Claimant 76[5] "has been a consistently strong performer in News in the California offices" who took three maternity leaves, and her total intended compensation was "repeatedly decreased and was less than the prior year's total actual compensation."  (Id. ¶ 115.)  Likewise, the EEOC alleges that Claimant 39 "has been a

---

[4] Indeed, even the EEOC's expert, Dr. Louis Lanier, whose report was excluded by the Court, Bloomberg I, 2010 WL 3466370, at *18, also concluded that "that class members tend to have better pay outcomes upon return from leave than non-class members who took the same amounts of leave."  (Declaration in Opposition to Defendant's Motion to Exclude Expert Reports Dated June 11, 2010 ¶ 12 (dkt. no. 147).)

[5] The parties have stipulated to a protective order in this case.  In keeping with that order, certain names were redacted and replaced with "Class Member" to indicate that the person is a female employee who took maternity leave during the class period (in other words, a potential claimant).  Other names were redacted and replaced with "Claimant" to indicate a Class Member for whom the EEOC has asserted a claim because it alleges the Class Member suffered discrimination.  These redactions are maintained in this opinion.

consistently strong performer, most recently in Sales in New
York"; she took maternity leave in 2009, and "[t]hereafter, her
total intended compensation decreased . . . and her total
intended compensation was less than her prior year's total
actual." (Id. ¶ 118.)  The EEOC also presented anecdotal
evidence that 49 of the 78 claimants were "demoted once they
announced their pregnancy and/or returned from maternity leave
in terms of title, the number of employees directly reporting to
them, diminishment of responsibilities, and/or replacement with
junior male employees." (Id. ¶ 124; see id. ¶¶ 125-135.) For
example, the EEOC alleges that after Claimant 32 returned from
maternity leave, her direct reports and responsibilities were
decreased and given to male peers, and she was demoted to "Data
Analyst, the position she held seventeen years prior when she
started." (Id. ¶ 126.) Similarly, the EEOC alleges that a
"good performer," Claimant 33, had been Manager of HR Operations
for North America but was replaced by a female with no children
and "demoted to Central Support, where she managed fewer people
and had less direct impact on company policy" after her
maternity leave. (Id. ¶ 131.) Finally, EEOC presented various
anecdotes under the umbrella of discrimination in the other
terms and conditions of employment, but these claims defy any
cohesive description. (Id. ¶¶ 136-148.) Generally, all of
these assertions, taken together, boil down to the EEOC's

conclusion that "Bloomberg management is predominantly male, and has tended to follow Wall Street's model of having few women in top management positions."[6]  (Id. ¶ 91.)

---

[6] The EEOC also presented many statements from upper management the EEOC considers as evidence of Bloomberg's bias, negative stereotypes, and disregard for women.  (EEOC R.56.1 ¶¶ 82-94.)  Bloomberg argues that many of these statements are hearsay and exist in the record merely as inflammatory material.  (Bloomberg Reply R.56.1 ¶¶ 83-87.)  Bloomberg is correct.  Even if the Court assumes that the statements themselves would be admissible as admissions of a party opponent or to show state of mind, see EEOC Br. at 4-5 n.3, many statements were offered into evidence by a person who heard the statement from another person (the "relaying declarant").  Thus, the statements are at least two-layer hearsay, and the question is whether the relaying declarant's statements are admissible.  Because the relaying declarant in those instances was a coworker or other individual with no decision-making authority relevant to the claims, the statements were not within the scope of the employment of the relaying declarant and are inadmissible.  Evans v. Port Auth. of N.Y. & N.J., 192 F. Supp. 2d 247, 263 (S.D.N.Y. 2002) (stating that courts "uniformly have determined that [statements from a coworker relaying a supervisor's statement] are not within the scope of employment when the declarant neither is the plaintiff's supervisor nor has a significant role in the employment decision at issue").  They are also not admissible to demonstrate the relaying declarant's state of mind because it is not at issue.  These statements are therefore neither admissions of a party opponent nor admissible pursuant to an exception to the hearsay rule as to the relaying declarant.  Accordingly, the statements relayed in paragraphs 83, 84, and 85 are not admissible evidence and are not considered.  Id.; see Williams v. Pharmacia, Inc., 137 F.3d 944, 951 (7th Cir. 1998) (holding that statements repeated by non-plaintiff women employees are inadmissible because, "although the women knew the outcomes of the managerial decisions at issue . . . the decisionmaking process itself — which is the relevant issue in proving a pattern or practice of discrimination — was outside the scope of the women's agency or employment"); Karnes v. Runyon, 912 F. Supp. 280, 285 (S.D. Ohio 1995) ("The double hearsay statements by witnesses with no personal knowledge of the events at issue (cont'd . . .)

II. DISCUSSION

Bloomberg argues that it is entitled to summary judgment on the EEOC's pattern or practice claim because the EEOC's evidence is insufficient as a matter of law.  Bloomberg advances two primary and interrelated reasons in support. First, the EEOC has presented only anecdotal evidence that, even if it is assumed to be true, is insufficient to demonstrate a pattern or practice of discrimination.  Bloomberg argues that EEOC's anecdotal evidence is not pervasive enough or of sufficient quality to prove a company-wide discriminatory practice and that EEOC has presented no evidence that compares class member experiences to other similarly situated Bloomberg employees.  Second, Bloomberg has presented affirmative and unrebutted statistical evidence that it did not engage in discrimination with respect to compensation or level of responsibility.  It argues that the statistics disprove that there was any company policy or pattern of discrimination, even if there were several complaints.

The EEOC disagrees, saying that its evidence is sufficient to raise a genuine issue of material fact about whether Bloomberg has engaged in a pattern or practice of sex or pregnancy discrimination.  It argues that the anecdotal evidence

_____

regarding two possible examples of discrimination is not enough to establish a practice or pattern.").

it has assembled provides a sufficient quantum and quality of evidence to survive summary judgment because that evidence demonstrates widespread, intentional discrimination at Bloomberg.  It also says that its lack of any statistical evidence is not fatal because statistical evidence is not legally required to present a pattern or practice case. Finally, EEOC argues that Bloomberg's statistical evidence is unworthy of credence.

### A. Legal Standard

#### 1. Summary Judgment

The standard for summary judgment is uncontroversial. In considering a motion for summary judgment, the Court resolves all ambiguities and draws all reasonable inferences against the moving party.  Lindsay v. Ass'n of Prof'l Flight Attendants, 581 F.3d 47, 50 (2d Cir. 2009).  "Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Kwan v. Schlein, 634 F.3d 224, 228 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law."

Lindsay, 581 F.3d at 50.  "The inquiry performed is the
threshold inquiry of determining whether there is the need for a
trial — whether, in other words, there are any genuine factual
issues that properly can be resolved only by a finder of fact
because they may reasonably be resolved in favor of either
party."  Liberty Lobby, 477 U.S. at 250.

        Rule 56 mandates summary judgment "against a party who
fails to make a showing sufficient to establish the existence of
an element essential to that party's case, and on which that
party will bear the burden of proof at trial."  Celotex, 477
U.S. at 322.  "[T]here is no issue for trial unless there is
sufficient evidence favoring the nonmoving party for a jury to
return a verdict for that party.  If the evidence is merely
colorable or is not significantly probative, summary judgment
may be granted."  Liberty Lobby, 477 U.S. at 249-50 (internal
citations omitted).  In the face of insufficient evidence,
"there can be 'no genuine issue as to any material fact,' since
a complete failure of proof concerning an essential element of
the nonmoving party's case necessarily renders all other facts
immaterial."  Celotex, 477 U.S. at 322-23.

                    2. Pattern or Practice of Discrimination

        "Title VII of the Civil Rights Act of 1964, § 703(a),
42 U.S.C. § 2000e et seq., prohibits various forms of employment
discrimination on the basis of race, color, religion, sex, or

national origin." <u>United States v. City of New York</u>, 713 F.
Supp. 2d 300, 316 (S.D.N.Y. 2010).  As amended by the Pregnancy
Discrimination Act of 1978 ("PDA"), Title VII prohibits
"discrimination based on a woman's pregnancy [because it] is, on
its face, discrimination because of her sex."  <u>Newport News</u>
<u>Shipbuilding & Dry Dock Co. v. EEOC</u>, 462 U.S. 669, 684 (1983).
Specifically, the PDA adds this definition to Title VII:

> The terms "because of sex" or "on the basis of sex"
> include, but are not limited to, because of or on the
> basis of pregnancy, childbirth, or related medical
> conditions; and women affected by pregnancy,
> childbirth, or related medical conditions shall be
> treated the same for all employment-related purposes
> . . . as other persons not so affected but similar in
> their ability or inability to work.

42 U.S.C. § 2000e(k); <u>see</u> <u>id.</u> § 2000e-1(a)-(b).  Thus, to make
out a pregnancy discrimination claim, the plaintiff must show
that she was treated differently from others who took leave or
were otherwise unable or unwilling to perform their duties for
reasons unrelated to pregnancy or that she simply was treated
differently because of her pregnancy.  <u>Velez v. Novartis Pharm.</u>
<u>Corp.</u>, 244 F.R.D. 243, 264 (S.D.N.Y. 2007) ("It has been
repeatedly affirmed that the PDA does not require the creation
of special programs for pregnant women; nor does it mandate any
special treatment.  To the contrary, the statute specifically
requires that pregnant women be treated the same as all other
employees with similar disabilities." (quoting <u>Dimino v. N.Y.C.</u>

16

Transit Auth., 64 F. Supp. 2d 136, 157 (E.D.N.Y. 1999)); see
Fisher v. Vassar Coll., 70 F.3d 1420, 1448 (2d Cir. 1995),
reheard en banc on other grounds, 114 F.3d 1332, abrogated on
other grounds by Reeves v. Sanderson Plumbing Prods., Inc., 530
U.S. 133 (2000).

    A pattern or practice claim is a particular vehicle to
bring a Title VII case.  "Pattern-or-practice disparate
treatment claims focus on allegations of widespread acts of
intentional discrimination against individuals.  To succeed on a
pattern-or-practice claim, plaintiffs must prove more than
sporadic acts of discrimination; rather, they must establish
that intentional discrimination was the defendant's 'standard
operating procedure.'"  Robinson v. Metro-N. Commuter R.R. Co.,
267 F.3d 147, 158 (2d Cir. 2001) (quoting Int'l Bhd. of
Teamsters v. United States, 431 U.S. 324, 336 (1977)).  In light
of all the circumstances of the case, discrimination must be
proven by a preponderance of the evidence to be the defendant's
"regular" policy.  Teamsters, 431 U.S. at 336, 339-40; Rossini
v. Ogilvy & Mather, Inc., 798 F.2d 590, 604 (2d Cir. 1986).
There is a "manifest" difference between claims of individual
discrimination and claims of a pattern or practice of
discrimination.  Cooper v. Fed. Reserve Bank of Richmond, 467
U.S. 867, 876 (1983).  In part, this is because the Supreme
Court has cautioned that isolated or individual instances of

discrimination, even if true, should not be construed to turn every Title VII case in "a potential companywide class action." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 159 (1982). Indeed, "courts considering what evidence is necessary to show that an employer routinely and purposely discriminated have also required substantial proof of the practice." King v. Gen. Elec. Co., 960 F.2d 617, 624 (7th Cir. 1992); see In re W. Dist. Xerox Litig., 850 F. Supp. 1079, 1085 (W.D.N.Y. 1994) ("[T]he burden of establishing a pattern or practice of discrimination is not an easy one to carry.").

Pattern or practice cases proceed in two phases, a liability phase and a remedial phase. Robinson, 267 F.3d at 158. In the liability phase, "plaintiffs must produce sufficient evidence to establish a prima facie case of a policy, pattern, or practice of intentional discrimination against the protected group." Id. The burden then shifts to the employer to demonstrate that plaintiffs' "proof is either inaccurate or insignificant." Id. at 159 (quoting Teamsters, 431 U.S. at 360). Defendants may "assault . . . the source, accuracy, or probative force" of plaintiffs' proof. Id. (quoting 1 Arthur Larson et al., Employment Discrimination § 9.03[2], at 9-23 to 9-24). If the plaintiff succeeds in proving liability, the court may fashion classwide injunctive relief, and then, in the remedial phase, individual plaintiffs may avail themselves of a

rebuttable presumption of discrimination in litigating a
particular adverse employment decision during the class period
to obtain individual relief.  Id.  Here, the litigation is at
the liability phase.

        To establish liability, plaintiffs' cases alleging a
pattern or practice of discrimination are characterized by a
"heavy reliance on statistical evidence."  Id. at 158 n.5; Bell
v. EPA, 232 F.3d 546, 553 (7th Cir. 2000) (describing
statistical evidence as the "core" of a prima facie pattern or
practice case); Attenborough v. Constr. & Gen. Bldg. Laborers'
Local 79, 691 F. Supp. 2d 372, 388-89 (S.D.N.Y. 2009)
("[S]tatistical evidence is critical to the success of a
pattern-or-practice disparate treatment claim.").  "[T]he
liability phase is largely preoccupied with class-wide
statistical evidence directed at establishing an overall pattern
or practice of intentional discrimination."  Robinson, 267 F.3d
at 168.  Statistics are so central to pattern or practice cases
that they "alone can make out a prima facie case of
discrimination if the statistics reveal" a gross disparity in
employee treatment.  Id. at 158.  Statistics "are not
irrefutable," and they must be viewed in light of all of the
circumstances of the case.  See Teamsters, 431 U.S. at 339-40.
Ordinarily, then, a plaintiff establishes a pattern or practice
"through a combination of strong statistical evidence of

disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally." Mozee v. Am. Comm'l Marine Serv. Co., 940 F.2d 1036, 1051 (7th Cir. 1991); see Robinson, 267 F.3d at 158.  Thus, a plaintiff "may prove such a case with evidence of specific instances of discrimination." Bloomberg II, 751 F. Supp. 2d at 648 n.15.

Nevertheless, anecdotal evidence normally serves a distinct purpose: it brings "the cold numbers convincingly to life." Teamsters, 431 U.S. at 339.  "To the extent that evidence regarding specific instances of alleged discrimination is relevant during the liability stage, it simply provides 'texture' to the statistics."[7] Robinson, 267 F.3d at 168; see O'Donnell Constr. Co. v. Dist. of Columbia, 963 F.2d 420, 427 (D.C. Cir. 1992) ("Anecdotal evidence is most useful as a supplement to strong statistical evidence . . . ."). Therefore, "[w]hile anecdotal evidence may suffice to prove individual claims of discrimination, rarely, if ever, can such evidence show a systemic pattern of discrimination." Middleton v. City of Flint, 92 F.3d 396, 405 (6th Cir. 1996) (quoting O'Donnell, 963 F.2d at 427).

---

[7] There are exceptions: "[W]hen there is a small number of employees, anecdotal evidence alone can suffice." City of New York, 713 F. Supp. 2d at 317 (internal quotation marks omitted).  Also, anecdotal evidence coupled with the "inexorable zero" (i.e., no class members are employed) or direct evidence of a discriminatory policy can suffice. See id. at 317-18.

B. Analysis

The EEOC's case is based on four primary forms of an alleged pattern or practice of discrimination against Class Members. The EEOC says that Bloomberg (1) reduced the intended compensation of Class Members; (2) demoted Class Members; (3) excluded Class Members from management meetings and isolated them; and (4) subjected Class Members to stereotypes regarding female caregivers and otherwise had an organizational bias against pregnant women and mothers. Bloomberg makes a multifaceted attack on the EEOC's case. It argues first that the EEOC's evidence is insufficient to establish a pattern or practice of discrimination on any of the EEOC's four theories. Second, Bloomberg argues that, even taking the EEOC's evidence as true, Bloomberg's unrebutted statistical evidence demonstrates the absence of any discrimination at the company. Finally, Bloomberg argues that, beyond these two arguments, the conjunction of EEOC's failure of proof with Bloomberg's statistical evidence entitles Bloomberg to judgment as a matter of law. This section is organized into three sections. First, the Court discusses EEOC's evidence to establish a pattern or practice of discrimination. Then, the Court analyzes Bloomberg's statistical evidence. Finally, the Court discusses the confluence of each side's evidence.

### 1. The EEOC's Evidence

The Court discusses the EEOC's evidence case in three ways. First, it analyzes the effect of the type of evidence presented. Next, it discusses the sufficiency of the anecdotal evidence produced on the compensation, demotion, and other similar claims. Finally, it discusses the EEOC's evidence of negative stereotypes and bias among Bloomberg's management.

### a. The Type of the EEOC's Evidence

The EEOC's evidence consists of only anecdotal evidence of alleged discriminatory incidents. During the class period, Bloomberg identified 603 women who were pregnant or took maternity leave. Of those women, the EEOC alleged claims of discrimination because of pregnancy on behalf of 78 claimants. Of those claimants, the EEOC claims that 77 had their total intended compensation decreased because of their pregnancies and that 49 were demoted for the same reason. The EEOC alleged that various other claimants of the 78 felt isolated or were excluded from meetings. The EEOC has presented no admissible statistical evidence that Bloomberg has discriminated against pregnant women and mothers. Bloomberg I, 2010 WL 3466370, at *10-18. Even assuming that all of the claimants' allegations are true, the EEOC's evidence is insufficient to make out a prima facie case of a pattern or practice of discrimination.

The case law is weighty in favor of defendants in pattern or practice cases where plaintiffs present only anecdotal evidence and no statistical evidence.  E.g., EEOC v. Republic Servs., Inc., 640 F. Supp. 2d 1267, 1317-19 (D. Nev. 2009) (plaintiff's statistical evidence stricken and summary judgment granted in favor of defendant); EEOC v. CRST Van Expedited, Inc., 611 F. Supp. 2d 918, 952-54 (N.D. Iowa 2009) (granting summary judgment for defendants where plaintiff presented no statistical evidence); see Ste. Marie v. E. R.R. Ass'n, 650 F.2d 395, 405 (2d Cir. 1981).[8]  Given the importance

---

[8] See also, e.g., Davis v. Valley Hospitality Servs., LLC, 214 F. App'x 877, 879 (11th Cir. 2006) (stating that plaintiffs "failed to offer sufficient evidence" in part because they "offered no statistical evidence"); EEOC v. McDonnell Douglas Corp., 191 F.3d 948, 952-53 (8th Cir. 1999) ("As for the EEOC's anecdotal evidence, it demonstrates, at most, isolated discriminatory acts on the part of certain managers, rather than McDonnell Douglas's 'standard operating procedure.'" (citation omitted)); Coker v. Charleston Cnty. Sch. Dist., 2 F.3d 1149, 1993 WL 309580, at *6 (4th Cir. 1993) (table); Hunter v. City of Mobile, No. 08 Civ. 666, 2010 WL 618325, at *10-11 (S.D. Ala. Feb. 18, 2010); Jimenez v. City of New York, 605 F. Supp. 2d 485, 530-31 (S.D.N.Y. 2009); Sharpe v. Bair, 580 F. Supp. 2d 123, 136-37 (D.D.C. 2008); Dodson v. Morgan Stanley DW, Inc., No. 06 Civ. 5669, 2007 WL 3348437, at *7 (W.D. Wash. Nov. 8, 2007); Sandoval v. City of Chicago, No. 07 Civ. 2835, 2007 WL 3087136, at *5 (N.D. Ill. Oct. 18, 2007) (no statistical evidence sufficient to show pattern of discrimination to warrant class certification); Henshaw v. Hartford Ins., No. 04 Civ. 22, 2005 WL 1562265, at *9 (E.D. Cal. June 30, 2005) ("[Plaintiff's pattern or practice] theory is problematic for several reasons. For one, she has provided no statistical evidence to support it."); Ellis v. Elgin Riverboat Resort, 217 F.R.D. 415, 423-28 (N.D. Ill. 2003); Seils, 192 F. Supp. 2d at 119 ("Perhaps, the most glaring flaw is plaintiffs' reliance on purely anecdotal (cont'd . . .)

of statistical evidence in a pattern or practice case, <u>Robinson</u>,
267 F.3d at 158 n.5, 160, the conclusions reached by these
courts are entirely unsurprising.   Indeed, the EEOC's own
compliance manual states that statistical evidence is "extremely
important" in a pattern or practice case.   EEOC Compliance
Manual § 604.3(b), <u>available at</u> 2006 WL 4672682.   This is not to
say that statistical evidence is required in a pattern or
practice case, but the nature of such an allegation and the case
law suggest that failure to present any statistical evidence
means that the EEOC's anecdotal and other evidence "must be
correspondingly stronger . . . to meet [its] burden."   <u>In re
Xerox</u>, 850 F. Supp. at 1085; <u>see</u> <u>King</u>, 960 F.2d at 624.

     The Court of Appeals recognized the critical
importance of statistical evidence in <u>Ste. Marie v. Eastern
Railroad Association</u>:

> While evidence of subjective and discretionary
> promotion and transfer procedures may indeed strengthen
> the inference of a pattern or practice of purposeful
> discrimination that can be drawn from a valid
> statistical showing of disparities in the work force,

---

evidence."); <u>Reeves v. Fed. Reserve Bank of Chi.</u>, No. 00 Civ.
5048, 2003 WL 21361735, at *13 (N.D. Ill. June 12, 2003); <u>Moore
v. Summers</u>, 113 F. Supp. 2d 5, 21 (D.D.C. 2000) ("Plaintiffs'
failure to make a statistical showing of a disparity between the
percentage of eligible whites and blacks promoted . . . largely
deprives plaintiffs' anecdotal evidence of its probative
value."); <u>In re Xerox</u>, 850 F. Supp. at 1086 ("Regardless of
whether statistical evidence is absolutely necessary, however,
it is clear that isolated incidents of individual discrimination
cannot by themselves establish a pattern or practice.").

this is because the statistical disparities in such a case are evidence that the potential for disparate treatment created by loose procedures has been realized on a significant scale.  But when, as here, relevant statistics are lacking and the probative evidence of discrimination is confined, . . . all that could be inferred is that [discrimination] has been actualized in the [individual] cases.

650 F.2d at 405 (citations omitted).  This reasoning squarely applies here.

The singular fact that the EEOC has no statistical evidence in support of its case, while maybe not fatal in itself, is severely damaging in this case.  In addition to that fact, the EEOC has presented nothing other than anecdotal evidence.  The result is fatal.

In contrast, the cases EEOC relies upon involve situations where there was statistical evidence of discrimination, direct evidence of discrimination, or the "inexorable zero" combined with anecdotal evidence; in any configuration, that combination creates a much more compelling prima facie case of a pattern or practice of discrimination. See, e.g., City of New York, 713 F. Supp. 2d at 318 (finding pattern or practice based on combination of "inexorable zero" and strong anecdotal evidence).  As already noted, combining anecdotal evidence with some direct or statistical evidence is important because the purpose of the anecdotal evidence is to "bring the cold numbers convincingly to life."  Teamsters, 431

U.S. at 339; Velez, 244 F.R.D. at 266.  Here, the EEOC has no
statistical evidence, no evidence of an explicit discriminatory
policy, and no evidence of an "inexorable zero" in any position
to combine with its anecdotal evidence.  Given the above, the
Court cannot say that a reasonable jury could find a pattern or
practice of discrimination in this case.  See Robinson, 267 F.3d
at 168; Republic Servs., 640 F. Supp. 2d at 1319; CRST, 611 F.
Supp. 2d at 953; see also Ste. Marie, 650 F.2d at 406 ("If there
were evidence that a policy of discrimination had been adopted,
perhaps two or even one confirmatory act would be enough.  But
the evidence [here] is not of that ilk.").

      As the Court in Republic Services stated:

> At most, . . . the EEOC created a genuine issue of
> fact as to whether individuals [suffered adverse
> employment consequences] because of their [pregnancy].
> With a such a large company with numerous supervisors
> and lines of business, possible instances of
> [pregnancy] discrimination do not create an issue of
> fact as to whether it was Defendants' usual practice
> to discriminate based on [pregnancy].  Instead, these
> instances are sporadic.

640 F. Supp. 2d at 1319.  The same reasoning applies here in
large part because the facts of the two cases are analogous.
The EEOC presented no admissible statistical evidence in
Republic Services, just as here, and its anecdotes, standing
alone, at most create an issue of fact as to whether individual
discrimination was realized in several cases.  Thus, summary
judgment in favor of Bloomberg is appropriate.

b. <u>The Sufficiency of the EEOC's
Anecdotal Evidence</u>

In addition, the EEOC's anecdotal evidence standing on
its own is insufficient.  Based on this evidence alone, a
reasonable jury could not conclude that Bloomberg engaged in a
pattern or practice of discrimination because of pregnancy.  The
evidence (1) indicates that a only small portion of Class
Members had any claim; (2) does not compare the experiences of
Class Members to similarly situated employees; and (3) is of low
probative value or quality in that it does not support the
EEOC's assertions, amounts to ordinary business disagreements,
or otherwise provides weak support for a pattern or practice, as
opposed to individual, claim.  The Court explains.

i. <u>Portion of Class With
Claims Is Small</u>

First, even if the Court lumps all claims alleged
together and ignores the time-barred claims, only 78 of 603
female employees who became pregnant or took maternity leave
during the class period — 12.9% — had a claim of any kind.[9]  EEOC
alleges (1) exclusion from management meetings on behalf of
eleven class members (1.8% of the 603 possible claimants), (2)
other forms of isolation on behalf of four class members (0.7%),
(3) demotions on behalf of forty-nine class members (8.1%), and

---

[9] Assuming Bloomberg employs exactly 10,000 people
(Bloomberg R.56.1 ¶ 20), this is 0.78% of its whole workforce.

(4) compensation reductions on behalf of seventy-seven class members (12.8%).[10]  No doubt, it could be that in the minority of cases, pregnant women experienced individual discrimination. While the Court does not suggest that there is a percentage of comparable employees who must complain to make out a pattern or practice claim, the fact that nearly 90% of Bloomberg's pregnant or mother employees had no claims is significant.  A pattern or practice case cannot rest on "the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts."  Teamsters, 431 U.S. at 336.  The phrase "pattern or practice" is not a "term of art."  Id. at 336 n.16.  Using that construction as a guidepost, the Court concludes that even if Bloomberg discriminated against the claimants presented here, that level of discrimination does not indicate Bloomberg's "standard operating procedure," id. at 336, or "widespread acts of intentional discrimination against individuals," Robinson, 267 F.3d at 158.

---

[10] Taking into account the fact that 13 claimants are time-barred as to all claims because they left Bloomberg before the class period began, Bloomberg II, 751 F. Supp. 2d at 650; Stipulation & Order, dkt. no. 177, at 3, only 65 individuals potentially have actionable claims.  Assuming those 13 individuals were included erroneously in the total of 603 possible claimants, the total number of possible claimants would be 590.  This means that only 11.0% of the possible claimants had claims, an even smaller percentage.

                                        ii.  EEOC Does Not Make
                                             a Legally Relevant
                                             Comparison

          Second, the EEOC's proffered evidence does not compare

the alleged experiences of Bloomberg's pregnant or mother

employees with similarly situated employees.  Nor does the EEOC

purport to make that comparison.  EEOC Br. at 15 n.11.  Such a

comparison is vital in discrimination cases because to prove

discrimination, the EEOC must show that the employee in the

protected class was treated differently because she was in that

class.  Troupe v. May Dep't Stores Co., 20 F.3d 734, 738 (7th

Cir. 1994) ("The plaintiff has made no effort to show that if

all the pertinent facts were as they are except for the fact of

her pregnancy, she would not have been fired.  So in the end she

has no evidence from which a rational trier of fact could infer

that she was a victim of pregnancy discrimination."); Velez, 244

F.R.D. at 264.  An employer is free to treat all employees

"badly," Troupe, 20 F.3d at 738, but it cannot single out

members of a protected group and treat them differently.  See,

e.g., Saks v. Franklin Covey Co., 316 F.3d 337, 343 (2d Cir.

2003); Minott v. Port Auth. of N.Y. & N.J., 116 F. Supp. 2d 513,

421 (S.D.N.Y. 2000) ("Title VII and the Pregnancy Discrimination

Act do not protect a pregnant employee from being discharged for

absenteeism even if her absence was due to pregnancy or

complications of pregnancy, unless other employees are not held

                                    29

to the same attendance standards."). In other words, the "Pregnancy Discrimination Act requires the employer to ignore an employee's pregnancy, but . . . not her absence from work, unless the employer overlooks the comparable absences of nonpregnant employees . . . ." <u>Troupe</u>, 20 F.3d at 738. The same principle holds true for compensation, promotions, or evaluations. <u>Velez</u>, 244 F.R.D. at 264-65 (stating that a compensation policy that "does not differentiate between employees who take leave for pregnancy and employees who take leave for other reasons" is not a basis for a pregnancy discrimination claim on the basis of pay); <u>see</u> <u>Fisher</u>, 70 F.3d at 1448 ("A policy may discriminate between those employees who take off long periods of time in order to raise children and those who either do not have children or are able to raise them without an appreciable career interruption. That . . . does not give rise to a claim under Title VII."). Absent evidence of differential treatment, a reasonable jury cannot conclude that discrimination occurred. The EEOC has presented no such comparative evidence.

> iii. <u>EEOC's Evidence Is Qualitatively Insufficient</u>

Third, even ignoring the numerical insufficiency and lack of comparative evidence, the quality of EEOC's evidence is variable at best. Because the Court must consider all of the

circumstances, looking to the quality of the EEOC's anecdotal evidence is relevant.  Rossini, 798 F.2d at 604 ("In evaluating all of the evidence in a discrimination case, a district court may properly consider the quality of any anecdotal evidence or the absence of such evidence."); Velez, 244 F.R.D. at 266 ("[A]necdotal evidence is not statistical evidence.  The declarations are offered not primarily for their quantity, but for their quality.  The testimony in the declarations is valuable insofar as it could persuade a reasonable factfinder that a pattern or practice of discrimination exists . . . . That is, the factfinder would examine the declarations not merely to see how many have been produced, but to see what they say.").  Some evidence the EEOC offers simply does not support the EEOC's assertions.  Other evidence shows that the individual's claim is insufficient support for a pattern or practice claim because, for example, a claimant's compensation, while starting at a high amount, increased over time but not as much as the claimant wanted.  And other evidence shows that the individual's characterization of what occurred contradicts the EEOC's characterization.  Taken together, the quality of the EEOC's evidence does not support an inference that Bloomberg engaged in a pattern or practice of discrimination.

Some anecdotes are illustrative.  The EEOC alleges that Class Member 3's intended compensation, as with other Class

Members' compensation, "repeatedly decreased, her base salary repeatedly remained flat, and her number of [EECs] repeatedly decreased or stayed flat" after Bloomberg became aware of her pregnancy. (Bloomberg Reply R.56.1 ¶ 123.) However, since 2001, when she announced her pregnancy, her total intended compensation was as follows: $219,534 in 2001, $221,529 in 2002, $244,677 in 2003, $292,240 in 2004, $294,318 in 2005, $284,626 in 2006, $318,760 in 2007, and $304,187 in 2008. (Id.; Golden Decl. Ex. 92.) Both sides cite to the same documentary evidence in support of their assertions about the amount of Class Member 3's intended compensation, so there is no dispute about source facts. Based on this evidence, a reasonable jury could not reconcile the numbers with EEOC's claim. Indeed, Class Member 3 enjoyed increases in compensation every year but two between 2001 and 2008; her compensation, which began at a healthy level, steadily rose; and both decreases were for less than 5% of the prior year's compensation. Class Member 3 also testified that she "can state multiple examples where either I was promoted when I returned from maternity leave or actually promoted whilst either trying to be pregnant or actually [was] pregnant." (Bloomberg Reply R.56.1 ¶ 123.) She was in fact promoted one time while on maternity leave and another time when Bloomberg knew she was undergoing treatment for in vitro fertilization. (Id.)

32

Similarly, EEOC's claim on behalf of Claimant 20 is not probative. Claimant 20, a Senior Software Engineer, took two maternity leaves, one in 2005 and one in 2007. (Id. ¶ 122b; Golden Decl. Ex. 76, at 3.) The EEOC claims that after she took these leaves, "her base salary repeatedly remained flat, and her total intended compensation repeatedly decreased." (Bloomberg Reply R.56.1 ¶ 122b.) However, her base salary increased from $110,000 in 2004 (the year before her first leave) to $127,500 in 2008 with three increases and no decreases. (Golden Decl. Ex. 76, at 1.) Her total intended EEC grants were $32,433 in 2004, $34,263 in 2005, $29,338 in 2006, $32,582 in 2007, and $37,792 in 2008. (Id. at 2.) Thus, her total intended compensation decreased once, in 2006, and the decrease was slight. In 2005 and 2007, years in which she took maternity leave, her compensation increased. The fact that she may have wanted to be paid more amounts to a disagreement with Bloomberg's business decisions. Moreover, although the EEOC claims she was "a consistently strong performer," her performance reviews are mostly "3s" (of 5) meaning she "meets and occasionally exceeds expectations for the role." (Golden Decl. Ex. 58, at 1.) A reasonable jury could not find that this claimant is evidence of a pattern of discrimination.

Other examples come from the EEOC's claims of demotions. The EEOC claims that Class Member 4 was "transferred

from Trading Systems Manager to Core Terminal Sales Manager and
within three months of assuming that role, [Max] Lennington and
[CEO Lex] Fenwick demoted her to Relationship Manager, a
position with no direct reports, and assigned her largest male
clients to male subordinates" after she took her second
maternity leave. (Bloomberg Reply R.56.1 ¶ 135.)  However, she
viewed her move to Core Terminal Sales Manager to be "a good
one" because her "responsibility for a dollar volume" of sales
increased significantly, and she "was responsible for a lot more
of [Bloomberg's] core revenue." (Golden Decl. Ex. 43, at 139-
40.)  Likewise, she viewed her move to Relationship Manager as a
"promotion" because the one client she dealt with was "one of
the largest and one of the reasons a lot of financial
institutions didn't crumble." (Id. at 140-41.)  She said that
Bloomberg has "been very good to me," that she "had an amazing
experience there," and that she has "had excellent experiences
as a working mother at Bloomberg." (Id. at 168, 180.)  Her
total intended compensation increased every year between 2003
and 2008, moving from $173,135 to $463,980. (Bloomberg Reply
R.56.1 ¶ 135.)  Similarly, the EEOC makes a claim on behalf of
claimant Jill Patricot.  She was promoted when decision makers
were aware of her pregnancy, but she was then removed from that
position when she insisted on leaving work at 4:45 p.m., before
her peers in the group and after she was asked to stay until at

34

least 5:30 p.m.  (Golden Decl. Ex. 40, at 69-70, 80, 278-79.)
And the EEOC alleges that Claimant 33 was demoted after
returning from maternity leave, but she testified that she
changed positions because her new role needed a strong manager,
that she managed 17 as opposed to 20-25 people, that she
continued to report to the Global Head of HR, and that she
regularly interacted with Bloomberg's chairman and a founding
partner.  (Bloomberg Reply R.56.1 ¶ 131.)  She took maternity
leave from September 2003 to February 2004, and her intended
compensation was $173,228 in 2003, $222,086 in 2004, $242,926 in
2005, and $250,486 in 2006.  (Id.)  No jury could view this
evidence as supporting the allegation that Bloomberg engaged in
a regular practice of discrimination.

        Another example is claimant Caroline Wagner.  The EEOC
claims she thought a transfer from New York to San Francisco
would have been a "great opportunity for . . . career
advancement," but only men were granted a transfer.  (EEOC
R.56.1 ¶ 143.)  The EEOC claims that her manager, a man, denied
the transfer because he did not want any "fucking pregnant
bitches" in San Francisco.  (Id.)  While these allegations
appear to make a claim, the evidence tells a different tale.
The manager's comment is inadmissible hearsay because it is
offered by way of the testimony of the claimant's coworker who
did not have managerial authority over the claimant.  See supra

note 6 (not considering double-layer hearsay); Adams Decl. Ex.
2, at 25-29 (coworker relating alleged statement).  The Court
thus does not consider the statement.  The EEOC points to no
evidence other than its own assertion that "only men were
granted the transfer" to San Francisco.  (EEOC R.56.1 ¶ 143.)  A
lawyer's assertion is not evidence.  Therefore, there is no
basis to impute discrimination in this anecdote.  Moreover,
Bloomberg supported the claimant's visa application to move from
London to New York prior to her request to move to San
Francisco.  (Adams Decl. Ex. 315 (Bloomberg's letter to
immigration authorities in support of visa).)  This anecdote
seems to express the claimant's disappointment with Bloomberg's
business decision, but it offers no evidence of discrimination.
A reasonable jury thus could not conclude that Bloomberg engaged
in a pattern of discrimination based on this anecdote.

       Similarly, the EEOC's assemblage of evidence in
support of its assertion that managers regularly questioned
female employees' commitment to the job (EEOC R.56.1 ¶ 89) is
unsupported by the record.  For example, one Class Member who
worked from home on Mondays to take care of her children felt
discriminated against when her manager made an offhand remark
that the employee was not going to be in on Monday because she
was busy "growing her gardens" (meaning her children).  (Adams
Decl. Ex. 33, at 106-07.)  While that single comment may have

been rude or impolitic, the EEOC is not prosecuting a hostile
work environment claim here.  The Class Member later stated that
she felt like she "wasn't doing what [she] used to do" and was
not attending committee meetings scheduled to accommodate the
Asia-Pacific or European regions (meaning they were scheduled
very late or very early in the workday).  (Id. at 228-29.)
However, her manager said that she was a "new mom" and did not
"have to attend these meetings" to accommodate her schedule.
(Id. at 229-30.)  A reasonable jury cannot conclude that
accommodating her schedule is evidence of a pattern of
discrimination at Bloomberg, even if this employee felt that
certain comments made to her were gauche or, indeed, individual
instances of discrimination.  Likewise, a pregnant employee was
told to go home before noon when she had morning sickness, even
though she may not have been finished with her day's tasks (she
started working at 3:30 a.m.).  (Id. Ex. 74, at 87-92.)  She
wanted to go home, though she said she could have continued
working, and her manager was being accommodating in allowing her
to leave.  (Id.)  Another female employee was asked if her "head
was in the game at work instead of at home" after her
performance reviews decreased following the birth of her child.
(Adams Decl. Ex. 123, at 63.)  She said her head was at work but
then said that her statement was not entirely accurate because
she was "a different person" being a mother.  (Id. at 65.)  She

maintained her motherhood did not affect her performance.  (Id.)
A reasonable jury cannot conclude that this is evidence of a
pattern of discrimination or widespread belief that women were
not dedicated at Bloomberg.  A statement in one situation
involving decreased performance following the birth of a child
does not indicate a standard operating procedure of
discrimination.  A reasonable jury cannot conclude that these
anecdotes  are evidence of a pattern of discrimination or
widespread belief that women were not dedicated at Bloomberg.

        One last anecdote further illustrates the case the
EEOC presents.  The EEOC states that a manager responded to a
claimant's request about travel requirements for a higher-level
position by assuming she was asking because she had a child.
(EEOC R.56.1 ¶ 87.)  The EEOC then says the manager stated that
if the claimant "want[s] to be the nine to five . . . mom that
was home making dinner every night, that wasn't going to
happen."  (Id.)  However, no evidence suggests that the manger
said the above; the claimant characterized the manager's
response that way.  (Golden Decl. Ex. 14, at 56.)  Moreover, the
claimant said that she asked so as to be able to make decisions
about her job jointly with her husband and was happy to be able
to sit down with the manager to understand what was required in
the position.  She said she received "good information" she
could use to discuss applying for the position with her husband

and that she could use the information in making her career and family plans.  (Id. at 55-57.)  This evidence is not probative of any policy of discrimination at Bloomberg; instead, it demonstrates that Bloomberg shared truthful information about what was expected of employees in that position so they could make their own career decisions, irrespective of their gender.

Even viewing the record in favor of the EEOC, the quality of EEOC's assemblage of evidence is not the sort courts have found to be sufficient evidence of a pattern of discrimination.  When the EEOC must present evidence that Bloomberg engaged in a "standard operating procedure" of discrimination, Teamsters, 431 U.S. at 336, evidence that does not support the EEOC's assertions, evidence based on complaints with the demands placed on everyone at the company, and evidence of run-of-the-mill employment disputes (such as quibbles with the amount of increases in pay or promotion opportunities) does not suffice.  Whether every decision made satisfied the desires of each claimant is not the subject of discrimination law. Evidence of a regular policy of discrimination must be adduced. The EEOC has produced significant documentation in this case, but the Court finds the quality of this evidence to be at best a mixed bag, as illustrated above.  When relying solely on anecdotal evidence to make out a pattern or practice claim, the EEOC's evidence must be "correspondingly stronger."  In re

Xerox, 850 F. Supp. at 1085; see King, 960 F.2d at 624.  This is all the more true in this case, where the discrimination claims involve professional personnel with relatively autonomous job functions, softer skills, and management that relies on individual and judgment-based reviews for making personnel decisions.  See Ellis v. Elgin Riverboat Resort, 217 F.R.D. 415, 424 (N.D. Ill. 2003) ("[A] decentralized hiring procedure, which allows decisionmakers to consider subjective factors, supports individual claims of discrimination but cuts against the assertion that an employer engages in a pattern or practice of discriminatory hiring as a standard operating procedure.").

        In contrast to this case, courts have allowed claims to proceed when the amount of anecdotal evidence presented is small, but the severity of the anecdotes compensates for the numerical deficiency by being highly probative.  Cf. Velez, 244 F.R.D. at 266-67 (finding that direct statements denying raises because of maternity leave, encouraging an employee to get an abortion, and urging employees not to get pregnant, among other things, persuasive anecdotal evidence); EEOC v. Scolari Warehouse Mkts., Inc., 488 F. Supp. 2d 1117, 1131-32 (D. Nev. 2007) (finding that several "quite severe" vulgar and explicit comments by managers to employees are sufficient to state a pattern or practice claim).  The EEOC has not adduced evidence of egregious or "quite severe" conduct that, in light of the

40

lack of any statistical evidence and the relatively small sample of women who fall within the class, might make a stronger showing of a pattern or practice of discrimination than the evidence produced here.  See Scolari Warehouse Mkts., 488 F. Supp. 2d at 1131; In re Xerox, 850 F. Supp. at 1085; see also Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 873 (2d Cir. 1992) (relying in part on "egregious" conduct to support Monell claim).  Any instances of alleged individual discrimination here, while not insignificant, do not rise to the level of egregious conduct that would tip the balance in favor of imputing a pattern or practice of discrimination to Bloomberg based on, at best, a mixed record and small number of anecdotes of possible discrimination.

Here, much of the evidence appears to be the EEOC's claims that individuals were unhappy with the amount of a raise or unhappy with a denial of a transfer or unhappy about not receiving a promotion.  The EEOC says these plaints are due to discrimination.  But, in many instances, the facts do not support an inference of discrimination: Class Members were paid well, received increases in compensation (even after taking maternity leave), were promoted, and the like, even after their pregnancies.  "A court must be wary of a claim that the true color of a forest is better revealed by reptiles hidden in the weeds than by the foliage of countless freestanding trees."

NAACP v. Claiborne Hardware Co., 458 U.S. 886, 934 (1982).  The
EEOC has not presented the quality of evidence that would allow
a factfinder to infer that discrimination is Bloomberg's
standard operating procedure or widespread practice.

         iv. Summary

   To conclude: the anecdotal evidence offered is not the
kind of high-quality and pervasive anecdotal evidence of a
pattern or practice of discrimination other courts have relied
on when faced with a complete lack of statistical evidence of
discrimination.  Only 12.9% of the relevant employee population
at Bloomberg had a claim.  The EEOC has presented no comparisons
between pregnant employees and other similarly situated
employees to permit an inference of a pattern of discriminatory
treatment.  And the quality of the EEOC's evidence is a mixed
bag that does not support an inference that Bloomberg engaged in
a pattern or practice of discrimination.  The EEOC's anecdotal
evidence on its own is insufficient to show a pattern or
practice of or widespread acts of intentional discrimination.

      c. Evidence of Bias and Negative
        Stereotypes

   Finally, the EEOC points to evidence of bias and
negative stereotypes against women to say that these statements
reflect the intent of the company to perpetrate pervasive
discrimination.  Moreover, the EEOC argues that Bloomberg's

decisionmaking process is centralized and discretionary and, in combination with this alleged bias on the part of upper management, is further evidence of a policy of discrimination at Bloomberg, even if the only evidence shows that a handful of individuals made discriminatory remarks.

While it is true that the EEOC notes several comments that are offensive or would indicate some kind of discriminatory animus (EEOC Br. at 3-7), much of this evidence is either two-layer hearsay and is not considered, see supra note 6, or does not support what the EEOC claims.

For example, the EEOC alleges that a male manager said Class Member 2 would be his first choice as his replacement but, "given her family circumstances" (she had just had twins), he chose a male instead.  (EEOC R.56.1 ¶ 86.)  However, Class Member 2 said that she "told [the manager she] wouldn't want his job" because "[i]t's just too demanding.  A family is more important to me.  You make choices." (Golden Decl. Ex. 6, at 170.)  Thus, this evidence of negative stereotypes is not evidence of discrimination.  Another example the EEOC points to is that managers in the Data Group "have viewed maternity leave as 'burdensome.'" (Bloomberg Reply R.56.1 ¶ 87c.)  However, the remainder of the testimony of the manager the EEOC quotes is that out of a group of about twelve people, "we had as many as five people out on maternity leave at the same time.  And at

that point, I said that was causing a burden on the group
. . . . I expressed the opinion that I would like to have
additional resources assigned to me to be able to help cover
during those leaves so we could perform our functions better."
(Id.)  Again, this is not evidence of discrimination.

        After removing the hearsay and unsupported assertions,
the EEOC is left with several statements from, at most, a
handful of managers or executives.  To be sure, the EEOC has
unearthed some admissible evidence of comments that fit its
description of stereotypes and bias.[11]  When Claimant 33 reported
to the CEO in 2003 that the head of the News division made some
negative comments about women taking paid maternity leave but
then not returning to the company, the CEO said, "Well, is every
fucking woman in the company having a baby or going to have a
baby?"  (Adams Decl. Ex. 71 at 544.)  The EEOC also points to
several comments from the head of the News division specifically
as evidence of Bloomberg's pattern or practice of

_____

        [11] Some of the statements the EEOC points to are not
relevant to pregnancy or gender discrimination.  For example, a
threat from a manager that he would "kill your children and burn
down your house[s]" if a deadline was missed (Adams Decl. Ex.
104, at 499), has nothing to do with the type of discrimination
the EEOC alleges here.  It was an aggressive and crass threat,
but it does not indicate that Bloomberg took adverse employment
actions based on pregnancy or gender.

discrimination.[12]   (EEOC R.56.1 ¶¶ 88, 90.)   But the number of admissible comments and supported assertions offered by the EEOC numbers around ten at most from roughly four or five individuals.  (Id. ¶¶ 86-89.)  In a company of 10,000, with 603 women who took maternity leave, and during a class period of nearly six years, this type of evidence does not make out a pattern or practice claim.

With respect to the specific statements the EEOC relies upon, it is well known that "Title VII 'does not set forth a general civility code for the American workplace.'" Kaytor v. Elec. Boat Corp., 609 F.3d 537, 546 (2d Cir. 2010) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)) (internal quotation marks omitted).  "The mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee is not indicative of a pattern or practice of racial discrimination in violation of Title VII." Anderson v. Douglas & Lomason Co., 26 F.3d 1277, 1295 (5th Cir. 1994) (internal quotation marks omitted); see Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  Importantly, the EEOC did not bring a hostile work environment claim, and it points to no actions taken on account of these statements.  The extent to

---

[12] The claimant relaying the comments from this executive on which the EEOC relies was hired by him when she was six months pregnant.  (Bloomberg R.56.1 ¶ 78.)

which a statement like this one evidences discrimination
depends, in large part, on its relation in time and relevance to
the allegedly discriminatory action.  Henry v. Wyeth Pharms.,
Inc., 616 F.3d 134, 149 (2d Cir. 2010); Witkowich v. Gonzales,
541 F. Supp. 2d 572, 584 (S.D.N.Y. 2008) (stating that there
must be "a sufficient nexus between the remark and the
employment decision at issue").  Isolated remarks by a handful
of executives — or one specific executive, the head of News,
which EEOC focuses on heavily here — do not show that
Bloomberg's standard operating procedure was to discriminate
against pregnant women and mothers.  See Ottaviani v. SUNY at
New Paltz, 875 F.2d 365, 369, 377 (2d Cir. 1989) (affirming a
district court's conclusion, in part, that "isolated incidents
of discrimination were insufficient to support the class' claim
of a pattern or practice of gender discrimination"); Ste. Marie,
650 F.2d at 405-07; Am. Fed'n of State, Cnty. & Mun. Emps., AFL-
CIO v. Cnty. of Nassau, 799 F. Supp. 1370, 1414 (E.D.N.Y. 1992)
("[I]solated  instances of sexist remarks by three County
officials . . . do[] not without more establish a pattern and
practice of intentional discrimination by the County.").  Even
if one executive was problematic, one executive's comments do
not indicate a pattern or practice of discrimination in such a
large organization.

Attempting to skirt this reasoning, the EEOC argues that a handful of managers made "[a]ll employment decisions throughout the entire class period and across all geography." EEOC Br. at 9. The EEOC alleges that, because employment decisionmaking power was centralized, "top business managers have kept the HR [human resources] function powerless and under their thumb." Id. at 10. On this basis, the EEOC urges the Court to consider statements by one or a handful of managers as evidence of the company's policy. The Court rejects this invitation.

First of all, it appears from the record that lower-level managers made the actual decisions about promotions and compensation, and higher-level executives the EEOC focuses upon approved decisions to manage business units with a view toward the company's financial performance. (Bloomberg Reply R.56.1 ¶ 102; see EEOC R.56.1 ¶ 96.) This is hardly surprising. In a company of over 10,000 individual employees, a handful of managers could not possibly make every individualized employment determination or manage business units to the level of detail suggested by the EEOC. Instead, they focused on managing their managers and keeping the company as a whole profitable, mindful of the overall business goals of the company. The EEOC's focus on the fact that the Chairman or head of a business unit has "ultimate" authority over certain decisions states a truism.

(EEOC R.56.1 ¶ 96.)   The fact that the company operates with a
hierarchy is not illegal.   Secondly, as the Court will explain
infra, if these biased managers in fact had the level of control
the EEOC suggests and were "inspiring a culture of
intimidation," EEOC Br. at 10, the results of their campaign to
discriminate pervasively would appear in the statistics.   Those
results do not appear.

       In short, the EEOC's evidence of a pervasive bias and
negative stereotypes fails to show what the EEOC argues.   Much
of the evidence is inadmissible hearsay, and other evidence does
not support the EEOC's assertions.   At most, the EEOC has shown
some isolated remarks from a few individuals over the course of
a nearly six year period in a company of over 10,000, with over
600 women who took maternity leave.   Relying on a handful of
individuals' statements does not amount to showing a pattern or
practice of intentional discrimination.

                         d. Conclusion

       The EEOC's evidence is insufficient to make out a
prima facie case for several reasons.   First, the EEOC presented
only anecdotal evidence and no statistical or other evidence to
combine with its anecdotal evidence.   This type of evidence
fails to make out a pattern or practice case, especially because
pattern or practice cases are characterized by a "heavy
reliance" on statistics.   Robinson, 267 F.3d at 158 n.5.

Second, the EEOC's anecdotal evidence is, on its own,
insufficient.  The EEOC's evidence involves only 78 claims out
of a potential group of at least 603 women who took maternity
leave during the nearly six-year class period.  Moreover, the
EEOC's evidence does not make a relevant comparison between
women who took leave for pregnancy-related reasons and other
employees who took leave for any reason, so an inference of
discriminatory conduct cannot be drawn.  Making that inference
is essential to a discrimination case.  And the EEOC's evidence
is not the type of high-quality anecdotal evidence from which a
reasonable juror can draw an inference that Bloomberg adopted a
policy of discrimination — even if isolated instances of
individual discrimination may have occurred — because it does
not support the assertions advanced by the EEOC or otherwise
provide probative evidence of a pattern or practice of
discrimination.  See Ste. Marie, 650 F.2d at 407 n.14 (lumping
seven discrete claims together "only strengthen[s] our
perception that plaintiff's evidence shows sporadic, not routine
discrimination"); Republic Servs., 640 F. Supp. 2d at 1319.
Third, the EEOC's evidence of a pervasive bias and negative
stereotypes consists of much inflammatory hearsay combined with
a handful of isolated comments from a few managers over the
course of nearly six years.  None of this evidence, even taken
all together, is sufficient to make out a pattern or practice

claim.  At most, it shows possible instances of individual discrimination.  Consequently, Bloomberg is entitled to summary judgment on the EEOC's pattern or practice claim.

## 2. Bloomberg's Statistical Evidence

Aside from the EEOC's own evidentiary proffer, the EEOC's case fails to survive summary judgment for another reason.  Bloomberg has offered statistical evidence that disproves the EEOC's compensation- and promotion-based pattern or practice claim.  Of any of the EEOC's claims, the compensation claim is the unifying theme of this lawsuit. Unlike any of the other types of claims advanced here, all but one claimant made a claim of discrimination in terms of compensation.  Bloomberg has also offered statistical evidence that disproves the EEOC's promotion-based pattern or practice claim.  This claim is the only other claim in this lawsuit that covers a majority of claimants (the others do not even approach a majority).  Bloomberg's statistical evidence affirmatively disproves the EEOC's pattern or practice case based on either compensation or demotions, so Bloomberg is entitled to summary judgment for another, independent reason: it has met its burden to demonstrate that the EEOC's "proof is either inaccurate or insignificant," Robinson, 267 F.3d at 159, and no reasonable jury could therefore return a verdict in favor of the EEOC.

The findings of Bloomberg's two experts are laid out
in Bloomberg I, 2010 WL 3466370, at *3-4, *7-10, and there is no
need to repeat them in detail here.  Bloomberg's first expert,
Dr. Ward, compared "changes in [Class Member] intended
compensation before and after maternity leave" to "changes in
intended compensation for other leave takers." (Bloomberg
R.56.1 ¶ 47.)  He also compared "the number of direct reports
[to Class Members] before and after a maternity leave" to
"changes in the number of direct reports for other leave
takers." (Id.)  He used the number of direct reports as a proxy
for demotion or promotion because of Bloomberg's nontraditional
structure.  (See Horan Decl. Ex. 29, at 16.)  In both cases, he
compared maternity leave takers with others who took non-
maternity leaves of at least 60 days because "employees who took
non-maternity leaves of 60 days or longer serve as the closest
comparators to the Class Members.  Like women who took maternity
leave, they have been continuously absent from work for an
extended period of time." (Id. at 8.)  There were 665 maternity
leaves taken by 512 women (some took more than one maternity
leave) during the class period and 768 non-maternity leaves
taken by 599 employees during the class period.  (Id. at 9.)
Maternity leaves averaged 134.5 days in duration, and non-
maternity leaves averaged 123.5 days in duration.  (Id.)

After analyzing the data and making the comparisons between Class Members and other employees who took non-maternity leaves, he concluded that the difference in compensation growth between Class Members and others who took leaves of at least 60 days "is not statistically significant, with and without control for time on leave." (Id. at 15.)  When controlled for time on leave, "Class Members' growth in intended compensation was higher" than it was for employees who took non-maternity leaves of similar duration, "although the differences were not statistically significant." (Id. at 16.)  He stated that the data "show that intended compensation increased for 85% of Class Members after they returned from maternity leave." (Id.)  Dr. Ward concluded that "women who take maternity leave fare slightly better, in terms of intended compensation, than other Bloomberg employees on leave for similar amounts of time." (Id. at 18.)

Although it is true that compensation "growth for Class Members is below growth for those who took no leaves and those who took short leaves" (Id. at 15), this does not violate the law.  "A policy may discriminate between those employees who take off long periods of time in order to raise children and those who either do not have children or are able to raise them without an appreciable career interruption.  That is not

52

inherently sex specific and does not give rise to a claim under
Title VII." <u>Fisher</u>, 70 F.3d at 1448.

Dr. Ward also concluded that "[c]omparisons between
Class Members and other employees who took [at least] 60-day
leaves show no significant differences [in the number of direct
reports], even in models without control for time on leave."
(Horan Decl. Ex. 29, at 18.)  He found that there was "no
statistical evidence that Class Members' level of responsibility
. . . decreased to any significant degree as compared to other
employees when taking time on leave into account."  (<u>Id.</u>)  "In
short, the data do not support the allegation that Bloomberg
systematically reduced the number of people reporting directly
to Class Members."  (<u>Id.</u>)

Bloomberg's second expert, Dr. Johnson, did an
independent analysis of the EEOC's claims with respect to
compensation.  <u>Bloomberg I</u>, 2010 WL 3466370, at *3-4.  Dr.
Johnson "compared the average base salary of Class Members
during the 12-month period ending 6 months before birth of the
child with the average base salary during the 12-month period
following a leave" for leaves that ended during the class
period.  (Horan Decl. Ex. 30, at 11.)  He found that,
"[c]ontrary to the EEOC's allegations, the Class Members'
average base salary went up, not down, following a leave."
(<u>Id.</u>)  Comparing this change to the changes in other employees

who took non-maternity leaves, he found that "the compensation of the Class Members increased more than the compensation of the control groups, in both dollar and percentage terms." (Id. at 11-12.) He also tested "average base salaries during the 12-month period prior to leave with the 12-month period after returning from leave" and found again that compensation increased for Class Members more than it did for non-Class Members who took leave. (Id. at 12-13.) Finally, he tested EEC grants (as measured by intended compensation) and found that "EEC compensation received by the Class Members increased at a faster rate — in both dollar and percentage terms — than the compensation received by the control groups" of employees who took non-maternity leave. (Id. at 18.) After performing regression analysis, his simple comparison findings were confirmed by the data, and his "results . . . are robust to a number of sensitivity tests." (Id. at 22-23.) In sum, he found that the "empirical observations contradict the EEOC's allegations of pregnancy discrimination at Bloomberg with regard to compensation." (Id. at 7.)

        This evidence is highly probative and uncontroverted by any similar statistical evidence. See, e.g., CRST, 611 F. Supp. 2d at 954 ("[T]he problem is that the EEOC has not given the court any evidence to disprove [the defendant's] statistical evidence."). Although the EEOC argues that it "provided

voluminous affirmative evidence" to controvert Bloomberg's statistics, it compares apples to oranges.  "[A]necdotal evidence is not statistical evidence."  Velez, 244 F.R.D. at 266.  While "statistics are not irrefutable," Teamsters, 431 U.S. at 340, the EEOC provides no "apples to apples" evidence in an attempt to refute the statistics.  As both experts found, Bloomberg did not discriminate against Class Members in pay, and as Dr. Ward found, Bloomberg did not discriminate against Class Members in promotions as measured by the number of direct reports.

The EEOC's effort to discredit the expert reports is misguided.  It argues that "both experts focused only on the tiny subset of employees who took amounts of leave similar to the Class Members' maternity leaves."  (EEOC Br. at 27.) However, both experts used sets of long-leave takers that contained more individuals than the EEOC included in the entire class when the experts made their comparisons.  (Horan Decl. Ex. 29, at 9; id. Ex. 30, at 12.)  More importantly, focusing a comparison only on employees who took amounts of leave similar to that taken by Class Members is precisely what is required to determine whether there was any legally cognizable discrimination in this case.  Smith v. Xerox Corp., 196 F.3d 358, 370-71 (2d Cir. 1999), overruled on other grounds by Meachem v. Knolls Atomic Power Lab., 461 F.3d 134 (2d Cir.

2006); Minott, 116 F. Supp. 2d at 521; Adler v. Kent Vill.
Housing Co., 123 F. Supp. 2d 91, 97 (E.D.N.Y. 2000) ("[T]he
plaintiff must show that similarly situated individuals of a
different group were treated differently."); cf. Fisher, 70 F.3d
at 1448 (stating that the way to prove sex discrimination
"predicated on the detrimental effects of prolonged professional
inactivity would be by comparing (a) the . . . experience of
women who took extended leaves of absence from their work
(regardless of the reason), with (b) the . . . experience of men
who had also taken long leaves of absence").  Making a
comparison to similarly situated employees is essential to
proving a discrimination case because it is only illegal to
treat employees of a protected class differently from similarly
situated employees.  See 42 U.S.C. § 2000e(k) ("[W]omen affected
by pregnancy, childbirth, or related medical conditions shall be
treated the same for all employment-related purposes . . . as
other persons not so affected but similar in their ability or
inability to work . . . ."); In re Carnegie Ctr. Assocs., 129
F.3d 290, 295-96 (3d Cir. 1997); Troupe, 20 F.3d at 738.
Indeed, the reason the EEOC's expert evidence was excluded was
that it did not make a comparison to similarly situated
employees.  Bloomberg I, 2010 WL 3466370, at *12.  In addition,
the EEOC's contention that the expert evidence, which showed
compensation increased more for those employees who took no

leave, actually supports its claim is a non sequitur because employees who did not take leave are not similarly situated. (EEOC Br. at 27.)  Thus, the EEOC's argument fails.

Finally, the EEOC's assertion that the statistical analyses are irrelevant because its claim is really about Bloomberg's animus toward pregnancy and mothers in general, not about the treatment of maternity leave takers, is not persuasive.  The EEOC's complaint alleges that the class members were discriminated against on the basis of compensation, promotions, and other terms and conditions of their employment "once they announced their pregnancy and once they returned to work after taking maternity leave." (Second Amended Compl. ¶ 7(a)-(c).)  The class does not indiscriminately include all mothers, but, rather those who took maternity leave.  Indeed, the EEOC's own evidence makes those Class Members who took maternity leave the centerpiece of support for its claims. Moreover, the data are consistent with the EEOC's objection to the expert evidence on the basis that Bloomberg does not take leave into account when making personnel decisions.  (EEOC R.56.1 ¶ 150.)

Based on the objective data, not conjecture or the assertions of counsel, Bloomberg has proven that it did not engage a pattern or practice of discrimination as alleged by the EEOC.  The fact that Bloomberg's experts made the legally

relevant comparison and found an absence of discrimination in pay or promotions is significant.  It has proven that its regular practice was to treat women who took maternity leave the same as others who took similar amounts of leave for non-pregnancy related reasons.  That is what the law requires. Therefore, in light of unrebutted statistical evidence that disproves the EEOC's claim, Bloomberg is entitled to summary judgment on the EEOC's pattern or practice claim for this reason as well.

### 3. Confluence of the Evidence

Finally, the Court considers the confluence of all of the evidence presented and concludes that summary judgment is appropriate.  Looking at all of the circumstances of the case, Rossini, 798 F.2d at 604, the EEOC has insufficient evidence that Bloomberg engaged in a pattern or practice of discrimination, and Bloomberg has unrebutted evidence that it did not discriminate against class members.  Summary judgment is appropriate when the party that bears the ultimate burden of persuasion, as the EEOC does here, see Robinson, 267 F.3d at 159, does not have sufficient evidence to allow a jury to return a verdict for it at trial.  Liberty Lobby, 477 U.S. at 249-50; Celotex, 477 U.S. at 322.  The combination of Bloomberg's unrebutted strong statistical evidence that it did not discriminate when combined with (1) the EEOC's lack of any

statistical or direct evidence of discrimination (or an "inexorable zero"), (2) the small number of claimants as compared with the number of Class Members, (3) the fact that the EEOC's evidence does not compare Class Members' experiences with those of similarly situated employees, (4) the overall low quality of anecdotal evidence, and (5) the EEOC's reliance on a small number of admissible comments from a handful of Bloomberg managers to show bias all together adds up to a case where no reasonable jury could return a verdict in favor of the EEOC.

In this regard, the EEOC's case is quite similar to CRST, where the court held in the face of no "expert evidence, statistics or legal authority to support its argument," 611 F. Supp. 2d at 953, and only anecdotal evidence in support of a pattern or practice claim, "a reasonable jury could not find that it is [the defendant's] 'standard operating procedure'" to discriminate, id. at 952.  The court went on to say that while the anecdotal evidence "may subject [the defendant] to liability as to individual women at trial, the EEOC has not presented sufficient evidence to show that tolerating [discrimination] was the 'regular rather than the usual practice' . . . ." Id. (quoting Teamsters, 431 U.S. at 336).  So it is here.

III. CONCLUSION

Some concluding remarks are called for in this case. At bottom, the EEOC's theory of this case is about so-called

"work-life balance."  Absent evidence of a pattern of
discriminatory conduct — i.e., a pattern that women or mothers
were discriminated against because of their pregnancy as
compared with others who worked similar schedules — the EEOC's
pattern or practice claim does not demonstrate a policy of
discrimination at Bloomberg.  It amounts to a judgment that
Bloomberg, as a company policy, does not provide its employee-
mothers with a sufficient work-life balance.  There is
considerable social debate and concern about this issue.  Former
General Electric CEO Jack Welch stated, "There's no such thing
as work-life balance.  There are work-life choices, and you make
them, and they have consequences."[13]  Naomi Schaefer Riley,
"Taste: Work and Life — and Blogging the Balance," Wall St. J.,
July 17, 2009, at W11.  Looking at it purely from a career- or
compensation-focused point of view, Mr. Welch's view reflects

_____

[13] Others agree.  Yahoo CEO Carol Bartz called the idea
of work-life balance a "myth."  Martha Mendoza, "The World
According to Carol Bartz," More Magazine, available at
http://www.more.com/news/womens-issues/world-according-carol-
bartz?page=5.  Kraft CEO Irene Rosenfeld says that the idea of
work-life balance "is a little bit of a misnomer."  Steve
Forbes, "Forget Work-Life Balance Says Kraft CEO, Forbes.com,
http://www.forbes.com/2010/10/20/family-balance-rosenfeld-women-
intelligent-investing-kraft.html (last accessed Aug. 10, 2011).
Google's CEO said, "For senior executives, it's probably the
case that balance is no longer possible."  James Manyika,
"Google's View on the Future of Business: An interview with CEO
Eric Schmidt," McKinsey Quarterly, http://www.mckinseyquarterly.
com/Googles_view_on_the_future_of_business_An_interview_with_CEO
_Eric_Schmidt_2229 (last accessed Aug. 10, 2011).

the free-market employment system we embrace in the United States, particularly for competitive, highly paid managerial posts such as those at issue here.  But it is not the Court's role to engage in policy debates or choose the outcome it thinks is best.  It is to apply the law.  The law does not mandate "work-life balance."  It does not require companies to ignore employees' work-family tradeoffs — and they are tradeoffs — when deciding about employee pay and promotions.  It does not require that companies treat pregnant women and mothers better or more leniently than others.  All of these things may be desirable, they may make business sense, and they may be "forward-thinking."  But they are not <u>required</u> by law.  The law simply requires fair treatment of all employees.  It requires holding employees to the same standards.

In a company like Bloomberg, which explicitly makes all-out dedication its expectation, making a decision that preferences family over work comes with consequences.  But those consequences occur for anyone who takes significant time away from Bloomberg, not just for pregnant women and mothers.  To be sure, women need to take leave to bear a child.  And, perhaps unfortunately, women tend to choose to attend to family obligations over work obligations thereafter more often than men in our society.  Work-related consequences follow.  Likewise, men tend to choose work obligations over family obligations, and

family consequences follow.  Whether one thinks those
consequences are intrinsically fair, whether one agrees with the
roles traditionally assumed by the different genders in raising
children in the United States, or whether one agrees with the
monetary value society places on working versus childrearing is
not at issue here.  Neither is whether Bloomberg is the most
"family-friendly" company.  The fact remains that the law
requires only equal treatment in the workplace.  Employment
consequences for making choices that elevate non-work activities
(for whatever reason) over work activities are not illegal.
Creating different consequences for pregnancy and motherhood is.
Because Bloomberg does not create different consequences for
women from the consequences for others who take leave, its
conduct does not violate the law.

        In terms of career-specific factors only, women who
take maternity leave, work fewer hours, and demand more
scheduling flexibility likely are at a disadvantage in a
demanding culture like Bloomberg's.  Of course, that view does
not account for the entire picture, particularly for the
incredible value of time taken with one's family.  That time is
priceless, more valuable to a child's well-being than any dollar
earned.  A female employee is free to choose to dedicate herself
to the company at any cost, and, so far as this record suggests,
she will rise in this organization accordingly.  The law does

not require companies to ignore or stop valuing ultimate
dedication, however unhealthy that may be for family life.  Cf.
Rachel L. Swarns, "'Family Friendly' White House Is Less So for
Aides," N.Y. Times, July 3, 2009, at A1 ("White House advisers
often work 60 to 70 hours a week and bear the scars of missed
birthdays and bedtimes, canceled dinners and play dates,
strained marriages and disgruntled children, all for prestigious
posts that offer a chance to make an impact . . . .").  Whether
an individual in any family wishes to make that commitment is an
intensely personal decision that must account for the tradeoffs
involved, and it is not the role of the courts to dictate a
healthy balance for all.  Nor is it the role of the courts to
tell businesses what attributes they must value in their
employees as they make pay and promotion decisions.  Choices are
available — and the Court acknowledges that the individual's
decisions are among the most difficult that anyone must make.
The women involved in the allegations here are talented, well-
educated, motivated individuals working in highly paid jobs.  To
attain the success they enjoy, much is expected of them at work,
but they have options (unlike many others).

        Ultimately, in this case, the EEOC has not presented
sufficient evidence that Bloomberg, as its standard operating
procedure, discriminated against pregnant women and mothers.
Even if individual Bloomberg employees made certain isolated

decisions that were discriminatory, EEOC has not made out a prima facie case that the company made discrimination its regular practice.  As Bloomberg's statistical evidence shows, Bloomberg's standard operating procedure was to treat pregnant employees who took leave similarly to any employee who took significant time away from work for whatever reason.  The law does not create liability for making that business decision.

        For all of the reasons stated above, Bloomberg's motion for summary judgment on the EEOC's pattern or practice claim [dkt. no. 179] is GRANTED.  The parties shall confer and inform the Court by letter no later than September 16, 2011, how they propose to proceed with respect to the remaining individual claims of discrimination.

SO ORDERED.

Dated:    New York, New York
          August 17, 2011

                                _Loretta A. Presle_
                                LORETTA A. PRESKA
                                Chief U.S. District Judge

64