UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
                                                  :
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,                                       :

                 Plaintiff,                       :
                                                              07-CV-8383 (LAP/HP)
        v.                                        :

BLOOMBERG L.P.,                                   :

                 Defendant.                       :

------------------------------------------------------------------ x

### BLOOMBERG L.P.'S RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT REGARDING CLAIMS ASSERTED ON BEHALF OF TAMIKA ALEXANDER-ABRAHAM

1.      EEOC alleges that Bloomberg discriminated against Tamika Alexander-Abraham with

respect to her compensation since 1999, denying a transfer to the News department in 2005,

diminishing her responsibilities over the News internship program in 2006-2008, requiring her to

travel more in 2005-2008, subjecting her to heightened scrutiny in 2005-2006, and negative

performance evaluations in 2005-2006.  Omnibus Declaration of Thomas H. Golden, dated

January 18, 2012 ("Omni. Decl."), Ex. 7 (12/15/11 Letter from Mulaire to Golden).

2.      Ms. Alexander-Abraham started at Bloomberg as an HR Representative in December

1997.  Declaration of Thomas H. Golden Concerning Tamika Alexander-Abraham, dated

January 18, 2012, Ex. 1 (Alexander-Abraham PeopleSoft Data).[1]

3.      Ms. Alexander-Abraham took her first maternity leave from November 12, 1999 to

February 14, 2000.  Ex. 1 (Alexander-Abraham PeopleSoft Data).  Her daughter was born on

November ■, 1999. *Id.*

4.      In December 1999, while she was on maternity leave, Ms. Alexander-Abraham's total

intended compensation increased 24.59%, from $37,640 to $46,895.  Ex. 1 (Alexander-Abraham

PeopleSoft Data).  In December 2000, her first year back from maternity leave, Ms. Alexander-

Abraham's total intended compensation increased 38.13%, from $46,895 to $64,776.  Ex. 1

(Alexander-Abraham PeopleSoft Data).

5.      In December 2001, over a year after her return from her first maternity leave, Ms.

Alexander-Abraham's total intended compensation increased by 2.45%, from $64,776 to

$66,362.  Ex. 1 (Alexander-Abraham PeopleSoft Data).

6.      In the fall of 2001, Ms. Alexander-Abraham expressed interest in an open position in

Bloomberg's Washington D.C. news bureau.  Ex. 2 at 38-39, 48-49 (Alexander-Abraham Dep.).

---

[1] Hereinafter, references to "Ex. ___" refer to exhibits to the Declaration of Thomas H. Golden
Concerning Tamika Alexander-Abraham, dated January 18, 2012.

Bloomberg granted Ms. Alexander-Abraham's request, and she transferred in February 2002. Ex. 2 at 47-48 (Alexander-Abraham Dep.); Ex. 1 (Alexander-Abraham PeopleSoft Data).

7.      After the transfer, Ms. Alexander-Abraham held the same position as she held in New York. Ex. 1 (Alexander-Abraham PeopleSoft Data). Ms. Alexander-Abraham continued to support teams based in the New York office. Ex. 2 at 49-50, 154 (Alexander-Abraham Dep.).

8.      In December 2002, Ms. Alexander-Abraham's total intended compensation increased by 14.78%, from $66,362 to $76,171. Ex. 1 (Alexander-Abraham PeopleSoft Data).

9.      Ms. Alexander-Abraham took her second maternity leave from July 7, 2003 to November 10, 2003. Ex. 1 (Alexander-Abraham PeopleSoft Data). Her daughter was born on July ██, 2003. *Id.* Following her leave, she resumed her role as an HR Representative. *Id.*

10.     In November 2003, just after she returned from leave, Ms. Alexander-Abraham received mostly 3s ("performance meets expectations given amount of experience") on her performance review. Ex. 3 at EE03837-40. The previous year, Ms. Alexander-Abraham had received mostly 4s and 5s, which corresponded to "performance frequently exceeds expectations given amount of experience" and "performance significantly and consistently exceeds expectations given amount of experience," respectively. Ex. 4 at BLP-0033715-18.

11.     Deirdre Maloney, who was responsible for Ms. Alexander-Abraham's compensation in 2003-2006, and is a claimant in this case, testified that Ms. Alexander-Abraham "could have been a stronger performer." Ex. 19 at 4 (Def.'s Am. & Suppl. Resps. & Obj. to Pl.'s 1st & 3d Interrogs.); Ex. 5 at 252-53 (Maloney Dep.).

12.     In December 2003, shortly after returning from her second maternity leave, Ms. Alexander-Abraham's total intended compensation increased 5.07%, from $76,171 to $80,030. Ex. 1 (Alexander-Abraham PeopleSoft Data). Ms. Alexander-Abraham's 2003 compensation

was determined, in part, by Ms. Maloney, who took maternity leave from September 24, 2003 to February 2, 2004. Ex. 19 at 4 (Def.'s Am. & Suppl. Resps. & Obj. to Pl.'s 1st & 3d Interrogs.); Ex. 18 (Maloney PeopleSoft Data); Ex. 5 at 315 (Maloney Dep.).

13.     EEOC has not identified any comparators to assess Ms. Alexander-Abraham's compensation in 1999-2003. Ex. 11 at 10-11, 181 (Pl.'s 2d Am. Obj. & Resps. to Def.'s 5th Interrogs.); Ex. 12 at 3 (Pl.'s 3d Suppl. Resps. to Def.'s 5th Interrogs.).

14.     In December 2004, more than a year after her second maternity leave, Ms. Alexander-Abraham's total intended compensation increased 2.34%, from $80,030 to $81,901. Ex. 1 (Alexander-Abraham PeopleSoft Data).

15.     EEOC identified one purported comparator for 2004; she held a different job title and took no prior leaves. Ex. 11 at 10 (Pl.'s 2d Am. Obj. & Resps. to Def.'s 5th Interrogs.); Ex. 15 (Alexander-Abraham Comparator Chart). None of EEOC's purported comparators for any year took any extended leaves. Ex. 15 (Alexander-Abraham Comparator Chart).

16.     In summer 2005, Ms. Alexander-Abraham began working as a recruiter while continuing to perform the duties of an HR generalist. Ex. 2 at 51-54 (Alexander-Abraham Dep.).

17.     Ms. Alexander-Abraham alleges that in summer 2005 (over a year after she returned from maternity leave), her manager, Tiffany Morant, asked her to travel to New York at least twice a month for two days at a time. Ex. 2 at 157-58, 160 (Alexander-Abraham Dep.).

18.     Ms. Morant wanted Ms. Alexander-Abraham to travel to New York to interact with the members of the recruiting team and "meet with the managers for the groups that [she] would now be recruiting for." Ex. 2 at 157-58 (Alexander-Abraham Dep.).

19.     Ms. Alexander-Abraham acknowledged that the other members of the recruiting team "didn't have to travel to New York because they were in New York." Ex. 2 at 161-62

(Alexander-Abraham Dep.). However, EEOC alleges "a similarly situated counterpart, ███████

███, who was not pregnant or returning from maternity leave, was not required to" travel to

New York. Ex. 11 at 10-11 (Pl.'s 2d Am. Obj. & Resps. to Def.'s 5th Interrogs.). ████████,

who worked in Bloomberg's San Francisco office supporting San Francisco-based teams, visited

New York and other offices 13 times in her 21 months at Bloomberg. Ex. 23 at 69 (Aronowitz

Dep.); Ex. 17 (████Badge Data).

20.     After the summer of 2005, Ms. Alexander-Abraham traveled to New York every other

week. Ex. 2 at 163-64 (Alexander-Abraham Dep.). In 2008, after Ms. Alexander-Abraham told

her supervisor at the time, Lisa Jennings, that "the traveling was becoming a hardship for [her],"

Ms. Jennings allowed Ms. Alexander-Abraham to reduce her travel to New York to once a

month. Ex. 2 at 152, 168-70 (Alexander-Abraham Dep.).

21.     In summer 2005, almost two years after Ms. Alexander-Abraham returned from her

second maternity leave, she spoke to Matt Winkler, the head of Bloomberg's News department,

about creating a position in the News department to work on recruiting, internships, and diversity

initiatives. Ex. 2 at 178-81 (Alexander-Abraham Dep.).

22.     Deirdre Maloney, Global HR Manager, denied Ms. Alexander-Abraham's request to

transfer because she "felt very strongly that the recruiting function should lie within the HR

business." Ex. 5 at 305, 410-11 (Maloney Dep.). Ms. Maloney's decision "had nothing to do

with Tam[i]ka Alexander taking that responsibility. I was, again, concerned about the dilution of

some of these things that you have to be mindful of when you're recruiting . . . I wanted to make

sure that these practices were consistent across -- across the company." *Id.* at 408; *see also id.* at

306-07, 405-08. Prior to making this decision, Ms. Maloney had been pregnant and taken

maternity leave. Ex. 18 (Maloney PeopleSoft Data).

23.     As a compromise, Bloomberg allowed Ms. Alexander-Abraham to work on the news internship and diversity initiatives from her position in the HR department.  Ex. 2 at 190 (Alexander-Abraham Dep.); Ex. 7 at BLP-0033833.

24.     The News internship program changed between 2006 and 2008; it developed a greater focus on journalism training, which required the coordinator to have journalism experience.  Ex. 2 at 204-05, 210-11 (Alexander-Abraham Dep.); Ex. 8 at 264 (Winkler Dep.).  Ms. Alexander-Abraham does not have journalism experience.  Ex. 8 at 264 (Winkler Dep.).  The individual who assumed the internship responsibilities, ███████████, had previously been a Producer in News.  Ex. 13 (██████ PeopleSoft Data).

25.     EEOC alleges that ████████ "who did not perform better than [Ms. Alexander-Abraham] did and who was not pregnant or returning from maternity leave, was allowed to transfer into the News department."  Ex. 11 at 10 (Pl.'s 2d Am. Obj. & Resps. to Def.'s 5th Interrogs.).  ██████████ worked in London and transferred from Recruiting to become a Project Manager in News in January 2007, a year and a half after Ms. Alexander-Abraham's request.  Ex. 16 (█████ PeopleSoft Data); Ex. 2 at 178-81 (Alexander-Abraham Dep.).  In 2007, ████ ██████ was rated a 2, while Ms. Alexander-Abraham was rated between 5 and 6.[2]  Ex. 16 (█ PeopleSoft Data); Ex. 1 (Alexander-Abraham PeopleSoft Data).

26.     In December 2005, Ms. Morant asked Ms. Alexander-Abraham to notify her if she was away from her desk "in case something came up."  Ex. 2 at 218-20 (Alexander-Abraham Dep.).

27.     Ms. Alexander-Abraham's 2005 performance evaluation noted:  "Tamika has been asked to be more accountable to her manager for her attendance, partially as a result of being in a remote office, and partially because there have been times when she has been needed to handle

---

[2] Ratings were based on a scale of 1 to 6 with 1 being the highest rating.  Omni. Decl. Ex. 37 at BLP-0028722; Ex. 38 at BLP-0062035.

an issue or join a meeting and she is not available." Ex. 9 at EE03867.

28.    Ms. Alexander-Abraham was often "unable to handle an issue right away or join a

meeting because [she was] not available." Ex. 2 at 349 (Alexander-Abraham Dep.).

29.    Ms. Alexander-Abraham alleges that Lucy Walton and Tara Anand also reported to Ms.

Morant, but did not have to notify Ms. Morant when they were away from their desks. Ex. 2 at

220 (Alexander-Abraham Dep.); Ex. 11 at 11 (Pl.'s 2d Am. Obj. & Resps. to Def.'s 5th

Interrogs.). Ms. Morant worked in the New York office. Ex. 2 at 217 (Alexander-Abraham

Dep.). Ms. Anand also worked in the New York office; Ms. Walton worked in the London

office. *Id.* at 220.

30.    According to Ms. Alexander-Abraham, only her 2003-2006 compensation was

discriminatory. Ex. 2 at 103 (Alexander-Abraham Dep.).

31.    According to ███████, Ms. Alexander-Abraham's manager from 2004 to 2008 who

was partly responsible for her 2005 and 2006 performance reviews, Ms. Alexander-Abraham

was "not very strong. She's a little above mediocre. For her years of experience she should be

much stronger than she is." Ex. 1 (Alexander-Abraham PeopleSoft Data); Ex. 9 at EE03865; Ex.

10 at EE03877; Ex. 14 at 105-06 (████Dep.). ████████ had been pregnant, taken leave,

and was a mother at the time Ms. Alexander-Abraham reported to her. Ex. 14 at 211-12

(████Dep.); Ex. 22 (████PeopleSoft Data).

32.    According to Ms. Maloney, who was partly responsible for Ms. Alexander-Abraham's

compensation in 2003-2006, Ms. Alexander-Abraham lacked motivation and did not "function[]

at the level that she could." Ex. 19 at 4 (Def.'s Am. & Suppl. Resps. & Obj. to Pl.'s 1st & 3d

Interrogs.); Ex. 5 at 252-53, 301 (Maloney Dep.).

33.    According to ██████████████, who was partly responsible for Ms. Alexander-

Abraham's compensation in 2003-2005, given the "fairly small employee population" Ms. Alexander-Abraham supported, she should have been "more proactive and engaged." Ex. 1 (Alexander-Abraham PeopleSoft Data); Ex. 19 at 4 (Def.'s Am. & Suppl. Resps. & Obj. to Pl.'s 1st & 3d Interrogs.); Ex. 20 at 278 (████████Dep.). ████████████ was pregnant and took maternity leave during the time she supervised Ms. Alexander-Abraham.  Ex. 21 (████████ PeopleSoft Data); Ex. 20 at 339-40 (████████Dep.).

34.     Another of Ms. Alexander-Abraham's managers considered her to be "a very weak performer relative to the amount of experience that she has." Ex. 6 at 266-68 (Wheatley Dep.).

35.     Ms. Alexander-Abraham is currently employed at Bloomberg.  Omni. Decl. ¶ 52.