UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- x
                           :

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,                        :

          Plaintiff,        :

          v.              :          07-CV-8383 (LAP/HP)

BLOOMBERG L.P.,               :

          Defendant.     :

--------------------------------------------------------- x
                           :

JILL PATRICOT, TANYS LANCASTER,
JANET LOURES, MONICA PRESTIA,    :
MARINA KUSHNIR and MARIA
MANDALAKIS,                :

          Plaintiff-Intervenors,   :

          v.              :

BLOOMBERG L.P.,               :

          Defendant.     :

                           :
--------------------------------------------------------- x

<u>MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT BLOOMBERG L.P.'S MOTION FOR SUMMARY JUDGMENT
AS TO CLAIMS OF THE PLAINTIFF-INTERVENORS</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................vii-xv

SUMMARY JUDGMENT STANDARD.............................................................................1

LEGAL STANDARDS ..........................................................................................................1

I.   STATUTES OF LIMITATION ..................................................................................1

II.  TITLE VII DISCRIMINATION AND RETALIATION CLAIMS ...................2

    A.  The *Prima Facie* Case Standard .....................................................................3

        1.  Discriminatory Treatment ........................................................................3

            (a) The Intervenor Must Have Been A Member Of A Protected Class
                At The Time Of The Alleged Discrimination ....................................3

            (b) The Intervenor Must Have Been Qualified For The Position ......................4

            (c) The Intervenor Must Have Suffered An Adverse Employment Action........5

            (d) The Adverse Employment Action Must Have Occurred Under
                Circumstances That Give Rise To An Inference Of Discrimination............7

        2.  Discriminatory Compensation.........................................................................8

            (a) The Intervenor Must Have Been A Member Of A Protected Class At
                The Time Of The Alleged Discrimination .....................................9

            (b) The Intervenor Must Have Been Paid Less Than Similarly Situated
                Non-Members Of Her Protected Class...........................................9

            (c) The Intervenor Must Show Discriminatory Animus...................................10

        3.  Retaliation ..................................................................................................11

            (a) The Intervenors Must Have Engaged In Protected Activity ......................11

            (b) The Alleged Retaliator Had To Know Of The Protected Activity.............11

            (c) The Intervenors Must Have Experienced A Materially Adverse
                Employment Action ...............................................................12

            (d) There Must Be A Causal Connection Between The Protected Activity
                And The Adverse Employment Action ...........................................13

    B.  Legitimate, Non-Discriminatory Business Reasons .........................................13

i

    C.  The Burden To Prove Proffered Reasons Were Pretextual ...................................15

III.    STATE AND CITY DISCRIMINATION AND RETALIATION CLAIMS .................16

IV.    HOSTILE WORK ENVIRONMENT ........................................................................16

V.    THE FAMILY AND MEDICAL LEAVE ACT .......................................................17

VI.    EMOTIONAL DISTRESS CLAIMS ........................................................................18

VII.    NEGLIGENT HIRING AND SUPERVISION .........................................................18

VIII.    CONSTRUCTIVE DISCHARGE CLAIM ...............................................................19

JILL PATRICOT ...............................................................................................................20

I.    UNDISPUTED FACTS ............................................................................................20

II.    CLAIMS ...................................................................................................................23

    A.  Summary Judgment Is Proper On Patricot's Discrimination Claims .........................23

        1.  Patricot's Promotion Was Not An Adverse Action................................................23

        2.  Patricot's Compensation Increase Was Not An Adverse Action .....................24

        3.  Patricot's Alleged Exclusion From Meetings Was Not Adverse ......................25

        4.  Bloomberg's Failure To Accommodate Patricot's Child Care Schedule
           Does Not Violate Title VII...............................................................................25

        5.  Patricot's Demotion Was Not Discrimination Based On Pregnancy ................26

        6.  Patricot Cannot Establish A Discriminatory Failure-To-Promote Claim ..........27

    B.  Summary Judgment Is Proper On Patricot's Retaliation Claims................................28

        1.  Patricot's Compensation Decrease Was Justified By Her Loss Of Managerial
           Responsibility....................................................................................................28

        2.  Bloomberg's Media Statement Was Not A Materially Adverse Action
           Directed At Patricot..........................................................................................29

        3.  Yelling At Patricot On One Occasion Is Not Actionable...................................30

    C.  Patricot Was Not Subject To A Hostile Work Environment ....................................30

    D.  Patricot Was Not Constructively Discharged ..........................................................31

TANYS LANCASTER..................................................................................................32

I.      UNDISPUTED FACTS ........................................................................................32

II.     CLAIMS ..............................................................................................................36

    A.  Summary Judgment Is Proper On Lancaster's Discrimination Claims ......................37

        1.  Lancaster Cannot Establish A *Prima Facie* Case Of Discriminatory Demotion in 2004 ...................................................................................37

        2.  Lancaster's Compensation In 2004 Was Not Discriminatory .............................37

        3.  Lancaster's 2005 Transfer Was Not Discriminatory............................................38

        4.  Lancaster's 2005 Performance Review Was Not Discriminatory.........................39

        5.  Lancaster's Compensation in 2005 Was Not Discriminatory .............................40

    B.  Summary Judgment Is Proper On Lancaster's Retaliation Claims............................40

    C.  Summary Judgment Is Proper On Lancaster's Constructive Discharge Claim ..........41

JANET LOURES..........................................................................................................42

I.      UNDISPUTED FACTS ........................................................................................42

II.     CLAIMS ..............................................................................................................44

    A.  Summary Judgment Is Proper On Loures's Discrimination Claims............................45

        1.  Some of Loures's Claims That She Was Stripped Of Responsibilities Are Time-Barred, And All Are Meritless...................................45

           (a)  Loures's Diminished Responsibilities Claims After Her Maternity Leaves Are Time-Barred ...................................................................................45

           (b)  Loures's Claim That Her Demotion From Management Was Discriminatory Fails Because She Was Demoted Due To Her Performance, Not Her Pregnancy ....................................................................................45

           (c)  Loures's Claim That Her Transfer From The Process Analysis Team To The Profiles Group In June 2006 Fails Because She Cannot Establish Discrimination.....................................................................................47

           (d)  Loures's Allegations About Changing Job Responsibilities Are Meritless .............................................................................................47

        2.  Loures's Compensation Awards Were Not Discriminatory................................48

B.  Summary Judgment Is Proper On Loures's Retaliation Claims ..................................50

    1.  Loures's Complaints About The R&D Department Staff Fail To State
       A Claim For Retaliation ..................................................................................50

    2.  Bloomberg's Media Statement Was Not A Materially Adverse Action
       Directed At Loures .........................................................................................51

    3.  Loures's Claims That She Was Being Monitored Are Frivolous ....................52

    4.  Loures's Remaining Retaliation Claims Are Meritless...................................52

C.  Summary Judgment Is Proper On Loures's Hostile Work Environment Claim..........54

D.  Loures's Claims Do Not Implicate The Human Rights
    Laws Of New York State And New York City ...........................................................55

MONICA PRESTIA .......................................................................................................................56

I.     UNDISPUTED FACTS .................................................................................................56

II.    CLAIMS ........................................................................................................................59

A.  Summary Judgment Is Proper On Prestia's Discrimination Claims............................60

    1.  Prestia Cannot Establish A *Prima Facie* Case Based On Scrutiny Of
       Her Late Arrival Times In August 2005 ........................................................60

    2.  Prestia Cannot Establish A *Prima Facie* Case Based On Perceived
       Slights By Kaschak After Prestia Returned From Maternity Leave .................60

    3.  Prestia Cannot Establish A *Prima Facie* Case Based On The Investigation
       Of Potentially Falsified PROS Entries ...........................................................61

    4.  Summary Judgment Is Proper As To Prestia's Claim That Her 2005
       Performance Evaluation Was Discriminatory .................................................62

    5.  Prestia's 2006 Compensation Award Was Not Discriminatory .....................62

    6.  Prestia Cannot Prove Her Remaining Discrimination Claims ........................63

B.  Summary Judgment Is Proper On Prestia's Retaliation Claims ..................................64

C.  To The Extent That Prestia States A Claim For A Hostile Work Environment,
    Summary Judgment Is Proper ...................................................................................65

D.  Summary Judgment Is Proper On Prestia's Family Medical Leave Act Claim ..........65

E.  Summary Judgment Is Proper On Prestia's Emotional Distress Claim.......................66

F.  Summary Judgment Is Proper On Prestia's Negligent Hiring and Supervision Claim ................................................................................................67

G.  Summary Judgment Is Proper On Prestia's Constructive Discharge Claim ...............67

MARIA MANDALAKIS ...............................................................................................68

I.      UNDISPUTED FACTS ......................................................................................68

II.     CLAIMS ..............................................................................................................71

A.  Summary Judgment Is Proper On Mandalakis' Discrimination Claims.....................71

1.  Summary Judgment Is Proper On Mandalakis' Claim That She Was Discriminated Against By Not Receiving A Significant Client When Another Salesperson Left..................................................................................................71

2.  Summary Judgment Is Proper On Mandalakis' Compensation Claims.................72

B.  Summary Judgment Is Proper On Mandalakis' Retaliation Claims ...........................73

C.  Summary Judgment Is Proper On Mandalakis' Family and Medical Leave Act Claim ..................................................................................................................74

D.  Summary Judgment Is Proper On Mandalakis' Emotional Distress Claims ..............74

E.  Summary Judgment Is Proper On Mandalakis' Negligent Hiring, Retention, and Supervision Claim.....................................................................................................75

F.  Summary Judgment Is Proper On Mandalakis' Hostile Work Environment Claims ........................................................................................................................76

MARINA KUSHNIR .....................................................................................................76

I.      UNDISPUTED FACTS ......................................................................................76

II.     CLAIMS ..............................................................................................................80

A.  Summary Judgment Is Proper On Kushnir's Discrimination Claims .........................80

1.  Kushnir's 2007 Development Plan Was Not Discriminatory ...............................80

2.  Kushnir's 2007 Performance Evaluation and Plan Was Not Discriminatory ........82

3.  Kushnir's 2008 Annual and End-of-Year Performance Evaluations Were Not Discriminatory ......................................................................................................82

4.  Kushnir's February 2009 Warning Letter Was Not Discriminatory ....................83

5.  Kushnir's April 2009 Warning Letter Was Not Discriminatory ........................84

6.  Kushnir's Assorted Complaints About Her Job Do Not Constitute Discrimination.................................................................................................85

7.  Kushnir's Compensation Was Not Discriminatory ...............................87

B.  Summary Judgment Is Proper On Kushnir's Retaliation Claims ............................88

C.  Summary Judgment Is Proper On Kushnir's Hostile Work Environment Claim........89

CONCLUSION ..................................................................................................................89

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Abdu-Brisson v. Delta Air Lines, Inc.,*
   239 F.3d 456 (2d Cir. 2001)...............................................................13, 64

*Alfano v. Costello,*
   294 F.3d 365 (2d Cir. 2002)...............................................................16, 17

*Andrews v. E. Tenn. Children's Hosp.*
   No. 07 CV 288, 2008 WL 4646115 (E.D. Tenn. Oct. 17, 2008)...........................7

*Baskerville v. Culligan Int'l Co.,*
   50 F.3d 428 (7th Cir. 1995) ...............................................................17

*Beers v. NYNEX Material Enter. Co.,*
   No. 88 CV 0305 (MBM), 1992 WL 8299 (S.D.N.Y. Jan. 13, 1992)...................81

*Birthwright v. New York,*
   No. 01 CV 3940 (CBM), 2005 U.S. Dist. LEXIS 19787 (S.D.N.Y. Sept. 8, 2005)..........19

*Black v. Zaring Homes, Inc.,*
   104 F.3d 822 (6th Cir. 1997) ...............................................................17

*Brennan v. Metro. Opera Ass'n, Inc.,*
   192 F.3d 310 (2d Cir. 1999)...............................................................31

*Brinkman v. State Dep't of Corr.,*
   863 F. Supp. 1479 (D. Kan. 1994)...............................................................3

*Brown v. Bronx Cnty. Med. Grp.,*
   834 F. Supp. 105 (S.D.N.Y. 1993)...............................................................19

*Burlington N. & Santa Fe Ry. Co. v. White,*
   548 U.S. 53 (2006)...............................................................5, 12

*In re Carnegie Ctr. Assocs.,*
   129 F.3d 290 (3d Cir. 1997)...............................................................14

*Chi v. Age Grp., Ltd.,*
   No. 94 CV 5253 (AGS), 1996 WL 627580 (S.D.N.Y. Oct. 29, 1996)...................26

*Chukwuha v. City of N.Y.*
   795 F. Supp. 2d 256 (S.D.N.Y. 2011)...............................................................86

*Clark Cnty. Sch. Dist. v. Breeden,*
   532 U.S. 268 (2001)...............................................................13

vii

*Coghlan v. Am. Seafoods Co., LLC*,
 413 F.3d 1090 (9th Cir. 2005) .................................................................................. 7

*Conigliaro v. Horace Mann Sch.*,
 No. 95 CV 3555 (CSH), 2000 WL 45439 (S.D.N.Y. Jan. 19, 2000).................................. 10

*Crady v. Liberty Nat'l Bank & Trust Co.*,
 993 F.2d 132 (7th Cir. 1993) .................................................................................... 47

*Crawford v. Metro. Gov't of Nashville*,
 555 U.S. 271 (2009).................................................................................................. 11

*Cunningham v. N.Y. State Dep't of Labor*,
 No. 1:05-CV-1127-DNH-RFT, 2010 WL 1781465, (N.D.N.Y. Apr. 30, 2010)..........5, 6, 64

*DeJarnette v. Corning Inc.*,
 133 F.3d 293 (4th Cir. 1998) ..................................................................................... 8

*Doner-Hendrick v. N.Y. Inst. of Tech.*,
 No. 11 CV 121, 2011 WL 2652460 (S.D.N.Y. July 6, 2011)..........................................56

*Dotson v. City of Syracuse*,
 No. 04 CV 1388, 2009 WL 2176127 (N.D.N.Y. July 21, 2009).......................................14

*Dunbar v. Cnty. of Saratoga*,
 358 F. Supp. 2d 115 (N.D.N.Y. 2005)..........................................................................48

*EEOC v. Bloomberg L.P.*,
 778 F. Supp. 2d 458 (S.D.N.Y. 2011)..................................................................... passim

*Escribano v. Greater Hartford Acad. of Arts*,
 No. 09-4553-cv, 2011 WL 4001030 (2d Cir. Sept. 9, 2011) ...........................................15

*Evans v. City of N.Y.*,
 No. 00 CV 4197(BSJ), 2003 WL 22339468 (S.D.N.Y. Oct. 14, 2003) ............................12

*Faison v. Leonard St., LLC*,
 No. 08 CV 2192(PKC), 2009 WL 636724 (S.D.N.Y. Mar. 9, 2009) ................................16

*Ferris v. Delta Air Lines, Inc.*,
 277 F.3d 128 (2d Cir. 2001).................................................................................18, 75

*Fincher v. Depository Trust & Clearing Corp.*,
 604 F.3d 712 (2d Cir. 2010).................................................................................19, 68

*Forde v. Beth Israel Med. Ctr.*,
 546 F. Supp. 2d 142 (S.D.N.Y. 2008)..........................................................................15

*Foster v. Humane Soc'y of Rochester & Monroe County, Inc.*,
    724 F. Supp. 2d 382 (W.D.N.Y. 2010) ................................................................. 11

*Fox v. State Univ. of N.Y.*,
    686 F. Supp. 2d 225 (E.D.N.Y. 2010) ................................................................. 10

*Fried v. LVI Servs., Inc.*,
    No. 10 CV 9308, 2011 WL 4633985 (S.D.N.Y. Oct. 4, 2011) ......................... 56

*Galabya v. N.Y.C. Bd. of Educ.*,
    202 F.3d 636 (2d Cir. 2000) ................................................................................. 5

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*,
    136 F.3d 276 (2d Cir. 1998) ............................................................................... 12

*Gibbs v. Consol. Edison Co. of N.Y., Inc.*,
    714 F. Supp. 85 (S.D.N.Y. 1989) ....................................................................... 13

*Goldstein v. Mass. Mut. Life Ins. Co.*,
    820 N.Y.S.2d 852 (App. Div. 2d Dep't 2006) ..................................................... 2

*Gomez v. Pellicone*,
    986 F. Supp. 220 (S.D.N.Y. 1997) ..................................................................... 14

*Gordon v. N.Y.C. Bd. of Educ.*,
    No. 01 CV 9265(SAS), 2003 WL 169800 (S.D.N.Y. Jan. 23, 2003) ................. 6

*Grady v. Affiliated Cent., Inc.*,
    130 F.3d 553 (2d Cir. 1997) ............................................................................... 29

*Graham v. Long Island R.R.*,
    230 F.3d 34 (2d Cir. 2000) ................................................................................. 10

*Grant v. Bethlehem Steel Corp.*,
    622 F.2d 43 (2d Cir. 1980) ................................................................................. 64

*Gratton v. JetBlue Airways*,
    No. 04 CV 7561(DLC), 2006 WL 2037912 (S.D.N.Y. July 21, 2006) ............... 9

*Green v. Emmanuel African Methodist Episcopal Church*,
    278 A.D.2d 132, 718 N.Y.S.2d 324 (App. Div. 1st Dep't 2000) ......................... 2

*Greene v. Trs. of Columbia Univ. in N.Y.*,
    234 F. Supp. 2d 368 (S.D.N.Y. 2002) ................................................................. 2

*Hicks v. Baines*,
    593 F.3d 159 (2d Cir. 2010) ............................................................................... 11

*Hoffman v. Parade Publ'n*,
    933 N.E.2d 744 (N.Y. 2010)......................................................................................56

*Holifield v. Reno*,
    115 F.3d 1555 (11th Cir. 1997)................................................................................46

*Holowecki v. Fed. Express Corp.*,
    440 F.3d 558 (2d Cir. 2006).................................................................................1, 80

*Howell v. N.Y. Post Co.*,
    612 N.E.2d 699 (N.Y. 1993)...............................................................................18, 66

*Hussein v. Pierre Hotel*,
    No. 93 CV 3698, 1996 WL 19029 (S.D.N.Y. Jan. 18, 1996)...................................54

*Ifill v. United Parcel Serv.*,
    No. 04-CV 5963(LTS)(DFE), 2008 WL 2796599 (S.D.N.Y. July 17, 2008) .................5, 60

*Isaac v. City of N.Y.*,
    701 F. Supp. 2d 477 (S.D.N.Y. 2010)......................................................................73

*Jain v. Marsh, Inc.*,
    No. 08 CV 2515, 2010 WL 743553 (S.D.N.Y. Mar. 1, 2010)...................................54

*Jones v. Yonkers Pub. Schs.*,
    326 F. Supp. 2d 536 (S.D.N.Y. 2004).......................................................................14

*Kader v. Paper Software*,
    111 F.3d 337 (2d Cir. 1997)......................................................................................32

*Keller v. Great Lakes Collection Bureau, Inc.*,
    No. 02-CV-0719C(F), 2005 WL 2406002 (W.D.N.Y. Sept. 29, 2005) .......................3

*Koster v. Chase Manhattan Bank N.A.*,
    609 F. Supp. 1191 (S.D.N.Y. 1985)..........................................................................10

*Krop v. Nicholson*,
    506 F. Supp. 2d 1170 (M.D. Fla. 2007)....................................................................26

*Lester v. Natsios*,
    290 F. Supp.2d 11 (D.D.C. 2003) ...............................................................................6

*Lucenti v. Potter*,
    432 F. Supp. 2d 347 (S.D.N.Y. 2006)..................................................................12, 13

*Martin v. MTA Bridges & Tunnels*,
    610 F. Supp. 2d 238 (S.D.N.Y. Apr. 3, 2009) .........................................................13

*Martinez-Santiago v. Zurich N. Am. Ins. Co.*,
No. 07 CV 8676(RJH), 2010 WL 184450 (S.D.N.Y. Jan. 20, 2010) ...................................25

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973)....................................................................................................2

*McPherson v. NYP Holdings, Inc.*,
No. 03-CV-4517(NGG)(LB), 2005 WL 2129172 (E.D.N.Y. Sept. 1, 2005) ...............8, 9, 10

*Meiri v. Dacon*,
759 F.2d 989 (2d Cir. 1985).........................................................................................1, 5

*Mianulli v. Potter*,
634 F. Supp. 2d 90 (D.D.C. 2009) ...................................................................................82

*Minott v. Port Auth. of N.Y. & N.J.*,
116 F. Supp. 2d 513 (S.D.N.Y. 2000)................................................................................8

*Misek-Falkoff v. Int'l Bus. Mach. Corp.*,
556 N.Y.S.2d 331 (App. Div. 1990)............................................................................2, 75

*Moreno v. Town of Huffington*,
334 Fed. App'x 426 (2d Cir. 2009)...................................................................................6

*Mudholkar v. Univ. of Rochester*,
No. 00-7412, 2000 WL 1476576 (2d Cir. Oct. 4, 2000)....................................................47

*Muhleisen v. Wear Me Apparel, LLC*,
644 F. Supp. 2d 375 (S.D.N.Y. 2009).............................................................................1, 3

*Muthu v. JetBlue Airways Corp.*,
No. 08 CV 4887 (LAP), 2009 U.S. Dist. LEXIS 60164 (S.D.N.Y. Mar. 31, 2009) ...........19

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002)......................................................................................................2

*Nidzon v. Konica Minolta Bus. Solutions USA, Inc.*,
752 F. Supp. 2d 336 (S.D.N.Y. 2010)..............................................................................85

*Nieves v. Dist. Council 37*,
No. 04 CV 8181(RJS), 2009 WL 4281454 (S.D.N.Y. Nov. 24, 2009) .................................12

*Noyer v. Viacom Inc.*,
22 F. Supp. 2d 301 (S.D.N.Y. 1998)................................................................................18

*Nugent v. St. Luke's Roosevelt Hosp. Ctr.*,
No. 05 CV 5109(JCF), 2007 WL 1149979 (S.D.N.Y. Apr. 18, 2007)................................31

*Ofudu v. Barr Labs., Inc.*,
    98 F. Supp. 2d 510 (S.D.N.Y. 2000)............................................................................2

*Olle v. Columbia Univ.*,
    332 F. Supp. 2d 599 (S.D.N.Y. 2004).........................................................................14

*Ortiz-Moss v. N.Y. Dep't of Transp.*,
    623 F. Supp. 2d 379 (S.D.N.Y. 2008).........................................................................17

*Owens v. N.Y.C. Hous. Auth.*,
    934 F.2d 405 (2d Cir. 1991).........................................................................................4

*Pace v. Fisher Price*,
    No. 03-CV-6474 (ILG), 2005 WL 3360452 (E.D.N.Y. Dec. 9, 2005)..........................7

*Patterson v. Cnty. of Oneida*,
    375 F.3d 206 (2d Cir. 2004).........................................................................................1

*Penn. State Police v. Suders*,
    542 U.S. 129 (2004)...................................................................................................20

*Perry v. Burger King Corp.*,
    924 F. Supp. 548 (S.D.N.Y. 1996).............................................................................19

*Petrosino v. Bell Atl.*,
    385 F.3d 210 (2d Cir. 2004).............................................................................4, 16, 28

*Piantanida v. Wyman Ctr., Inc.*,
    116 F.3d 340 (8th Cir. 1997).......................................................................................4

*Pough v. Mineta*,
    No. 03 CV 6838, 2008 WL 4371294 (N.D. Ill. Sept. 19, 2008)............................6, 61

*Pucino v. Verizon Commc'ns, Inc.*,
    618 F.3d 112 (2d Cir. 2010).......................................................................................16

*Ragin v. E. Ramapo Cent. Sch. Dist.*,
    No. 05 CV 6496(PGG), 2010 WL 1326779 (S.D.N.Y. Mar. 31, 2010).............12, 50, 51

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)...................................................................................................13

*Reilly v. Metro-North Commuter R.R. Co.*,
    No. 93 CV 7317 (PKL), 1996 WL 665620 (S.D.N.Y. 1996) ...........................8, 15, 62, 82

*Rinsler v. Sony Pictures Entm't, Inc.*,
    No. 02 CV 4096 (SAS), 2003 WL 22015434 (S.D.N.Y. Aug. 25, 2003) ....................8, 37

*St. Mary's Honor Ctr. v. Hicks,*
   509 U.S. 502 (1993)..................................................................................................13, 15

*Salvatore v. KLM Royal Dutch Airlines,*
   No. 98 CV 2450 (LAP), 1999 WL 796172 (S.D.N.Y. Sept. 30, 1999)......................16, 17

*Sanders v. N.Y.C. Human Res. Admin.,*
   361 F.3d 749 (2d Cir. 2004)...............................................................................................25

*Schnabel v. Abramson,*
   232 F.3d 83 (2d Cir. 2000)................................................................................................15

*Shabat v. Billott,*
   108 F.3d 1370, 1997 WL 138836 (2d Cir. 1997) .............................................................16

*Shapiro v. N.Y.C. Dep't of Educ.,*
   561 F. Supp. 2d 413 (S.D.N.Y. 2008)..............................................................................53

*Sheila C. v. Povich,*
   781 N.Y.S.2d 342 (App. Div. 1st Dep't 2004) ...........................................................18, 66

*Shumway v. United Parcel Serv., Inc.,*
   118 F.3d 60 (2d Cir. 1997).................................................................................................9

*Solomen v. Redwood Advisory Co.,*
   183 F. Supp. 2d 748 (E.D. Pa. 2002) ..............................................................................3, 4

*Spence v. Md. Cas. Co.,*
   995 F.2d 1147 (2d Cir. 1993)...........................................................................................20

*Stauber v. N.Y. City Transit Auth.,*
   781 N.Y.S.2d 26(App. Div. 2004)..............................................................................19, 67

*Stoddard v. Eastman Kodak Co.,*
   309 Fed. App'x 475 (2d Cir. 2009)....................................................................................7

*Stofsky v. Pawling Central Sch. Dist.,*
   635 F. Supp. 2d 272 (S.D.N.Y. 2009)..............................................................................51

*Szarzynski v. Roche Labs., Inc.,*
   No. 07 CV 6008, 2010 WL 811445 (W.D.N.Y. Mar. 1, 2010)..........................................53

*T.W. v. New York,*
   729 N.Y.S.2d 96 (App. Div. 2001) ...................................................................................19

*Thornley v. Penton Publ'g, Inc.,*
   104 F.3d 26 (2d Cir. 1997)...........................................................................................4, 81

*Torres v Pisano,*
    116 F.3d 625 (2d Cir. 1997).................................................................18

*Troupe v. May Dep't Stores Co.,*
    20 F.3d 734 (7th Cir. 1994) ...........................................................8, 14

*Velez v. Novartis Pharm. Corp.,*
    244 F.R.D. 243 (S.D.N.Y. 2007) ....................................................9, 14

*Vinson v. City of New York,*
    No. 04 CV 7769 (JGK), 2007 WL 965338 (S.D.N.Y. Mar. 30, 2007)......................4

*Viola v. Philips Med. Sys. of N.A.,*
    42 F.3d 712 (2d Cir. 1994).................................................................15

*Visco v. Cmty. Health Plan,*
    957 F. Supp. 381 (N.D.N.Y. 1997).......................................................10

*Weeks v. New York State (Div. of Parole),*
    273 F.3d 76 (2d Cir. 2001)..................................................................5

*Weisman v. N.Y.C. Dep't of Educ.,*
    No. 03 CV 9299 (PKC), 2005 WL 1813030 (S.D.N.Y. Aug. 1, 2005) .................6

*Weston-Smith v. Cooley Dickinson Hosp., Inc.,*
    153 F. Supp. 2d 62 (D. Mass. 2001) ....................................................47

*Williams v. R. H. Donnelley Corp.,*
    368 F.3d 123 (2d Cir. 2004)................................................................7

*Woodard v. Monticello Cent. Sch. Dist.,*
    No. 06 CV 13361(KMK), 2008 WL 5062125 (S.D.N.Y. Dec. 1, 2008) ................7

*Woodman v. WWOR-TV, Inc.,*
    411 F.3d 69 (2d Cir. 2005)..................................................................7

*Wright v. Ernst & Young LLP,*
    152 F.3d 169 (2d Cir. 1998)...............................................................73

*Youssef v. F.B.I.,*
    541 F. Supp. 2d 121 (D.D.C. 2008).....................................................73

*Zolondek v. Worldwide Flight Servs., Inc.,*
    No. 02 CV 2030, 2006 WL 4100886 (E.D.N.Y. Aug. 28, 2006) .....................52

**Statutes**

29 U.S.C. § 2614(a)(1) (2010) ...................................................................17

29 U.S.C. § 2617 (c)(1) (2009) ............................................................................2

29 U.S.C. § 2617 (c)(2) (2009) ............................................................................2

42 U.S.C. § 2000e(k) (2003) ................................................................................8

42 U.S.C. § 2000e-3(a) (2003) ..........................................................................11

42 U.S.C. § 2000e-5(e)(1) (2003) ........................................................................1

29 C.F.R. § 825.215(a) (2008) ..........................................................................17

29 C.F.R. § 825.215(d) (2008) ..........................................................................17

Fed. R. Civ. P. 56(a) ............................................................................................1

N.Y. Workers' Com. Law § 29(6) ............................................................18, 66, 75

The six Plaintiff-Intervenors seek recovery under a broad array of theories, including sex and/or pregnancy discrimination; retaliation; hostile work environment and constructive discharge; various tort claims; and the Family Medical Leave Act.  They do not have sufficient evidence to survive summary judgment on any of their claims, all of which should be dismissed.

## SUMMARY JUDGMENT STANDARD

Summary judgment is designed to "avoid[] protracted, expensive and harassing trials," *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), when "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).  "To defeat a motion for summary judgment, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Muhleisen v. Wear Me Apparel, LLC*, 644 F. Supp. 2d 375, 382 (S.D.N.Y. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth 'concrete particulars' showing that a trial is needed." *Id.* (quoting *Nat'l Union Fire Ins. Co. v. Deloach*, 708 F. Supp. 1371 (S.D.N.Y. 1989)).  Intervenors fail to make that showing.

## LEGAL STANDARDS

I.    STATUTES OF LIMITATION

The limitations period for a plaintiff's Title VII claims begins 300 days before she files an administrative charge with the EEOC.  *See* 42 U.S.C. § 2000e-5(e)(1) (2003).  Since each Intervenor filed her own charge, none can piggyback onto others' charges.  *Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 564 (2d Cir. 2006).

Rarely, courts recognize a "continuing violation" exception under which, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Patterson v. Cnty. of Oneida*, 375 F.3d

1

206, 220 (2d Cir. 2004). This doctrine is "highly disfavored" in the Second Circuit. *Ofudu v. Barr Labs., Inc.*, 98 F. Supp. 2d 510, 515 (S.D.N.Y. 2000). And it clearly does *not* apply to "[d]iscrete acts such as termination, failure to promote, [or] denial of transfer." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

The statute of limitations for a discrimination action under the New York State Human Rights Law (Executive Law §§ 290, 296 *et seq.*) and the New York City Human Rights Law (Title 8 of the New York City Administrative Code) is three years from the date that the claim accrued. *Greene v. Trs. of Columbia Univ. in N.Y.*, 234 F. Supp. 2d 368, 377 (S.D.N.Y. 2002).

Claims under the Family and Medical Leave Act must be brought within two years, unless the violation is willful, in which case the plaintiff may bring her claim within three years. 29 U.S.C. § 2617(c)(1), (2) (2009).

Intervenors Monica Prestia and Maria Mandalakis bring claims for intentional infliction of emotional distress, which has a limitations period of one year, *Misek-Falkoff v. Int'l Bus. Machs. Corp.*, 556 N.Y.S.2d 331, 331 (App. Div. 1990), negligent infliction of emotional distress, which has a limitations period of three years, *Goldstein v. Mass. Mut. Life Ins. Co.*, 820 N.Y.S. 2d 852 (App. Div. 2006), and negligent hiring, retention, and supervision, which also has a three-year limitations period. *Green v. Emmanuel African Methodist Episcopal Church*, 718 N.Y.S. 2d 324 (App. Div. 2000).

## II.    TITLE VII DISCRIMINATION AND RETALIATION CLAIMS

Courts apply a three-part burden-shifting analysis to Title VII discrimination and retaliation claims: (1) the plaintiff must establish a *prima facie* case of discrimination and/or retaliation; (2) the employer may rebut that *prima facie* case by offering legitimate reasons for its actions; and (3) the burden shifts back to the plaintiff to show that the employer's reasons are pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).

A.     The *Prima Facie* Case Standard.

    1.     **Discriminatory Treatment.**

To establish a *prima facie* case of discriminatory treatment, an Intervenor must establish that "(1) she is a member of a protected class (2) with the qualifications for the position at issue (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination." *Muhleisen v. Wear Me Apparel, LLC*, 644 F. Supp. 2d 375, 382 (S.D.N.Y. 2009).

        (a)     **The Intervenor Must Have Been A Member Of A Protected Class At The Time Of The Alleged Discrimination.**

Unlike traditional characteristics protected by Title VII, pregnancy is not immutable. "[S]ome effects of pregnancy linger beyond the act of giving birth," but "at some point the female employee is no longer 'affected by pregnancy, childbirth, or related medical conditions.'" *Solomen v. Redwood Advisory Co.*, 183 F. Supp. 2d 748, 753 (E.D. Pa. 2002) (quoting 42 U.S.C. § 2000e(k)). The understanding that pregnancy is not a permanent condition "is implicit in the opinions of several federal courts that have denied protection . . . to plaintiffs based upon their status as mothers with young children." *Id.* (collecting cases). In *Keller v. Great Lakes Collection Bureau, Inc.*, No. 02 CV 0719, 2005 WL 2406002, at *4 (W.D.N.Y. Sept. 29, 2005), the court held that two years after giving birth, a plaintiff's "status as a working mother of two children" was "not enough to bring her into the protected class of pregnant workers" because there was nothing "to suggest that, two years after giving birth, plaintiff was still affected by the pregnancy." *See also Brinkman v. State Dep't of Corr.*, 863 F. Supp. 1479, 1486 (D. Kan. 1994) (holding plaintiff no longer in protected class one year after pregnancy). If she "was not pregnant at or near the time of the adverse employment action," an Intervenor must produce sufficient evidence that "she was 'affected by pregnancy, childbirth or related medical

3

conditions' at the time of the adverse employment action." *Solomen*, 183 F. Supp. 2d at 754

(quoting 42 U.S.C. § 2000e(k)).  Being a new parent attempting to balance the demands of work

and family life is not a condition related to either pregnancy or childbirth.  *Piantanida v. Wyman*

*Ctr., Inc.*, 116 F.3d 340, 342 (8th Cir. 1997).  Absent that showing, an Intervenor is not among

the protected class and cannot survive summary judgment on pregnancy discrimination claims.

      **(b)**    **The Intervenor Must Have Been Qualified For The Position.**

An Intervenor must also show that she was "qualified" for the position.  *See Owens v.*

*N.Y.C. Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991).  That determination turns on the specific

"criteria the employer has specified for the position."  *Thornley v. Penton Publ'g, Inc.*, 104 F.3d

26, 29 (2d Cir. 1997).  In other words, "the basic skills necessary for performance of [the] job,"

are whatever specific skills the particular employer demands, and the employer alone determines

what those skills are.  *Owens*, 934 F.2d at 409.  Courts dismiss discrimination claims where the

plaintiff cannot show that she possessed the proper qualifications for the job at issue.  *See, e.g.*,

*Vinson v. City of New York*, No. 04 CV 7769 (JGK), 2007 WL 965338, at *4, *8 (S.D.N.Y. Mar.

30, 2007) (plaintiff lacking required education failed to establish *prima facie* case of

discrimination).

In addition, "[t]o establish a *prima facie* case of a discriminatory failure to promote, a

Title VII plaintiff must ordinarily demonstrate that . . . *she applied* and was qualified for a job *for*

*which the employer was seeking applicants*."  *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir.

2004) (emphasis added) (internal quotation marks omitted).

The Second Circuit has also "analyzed this element in terms of whether [a] plaintiff

shows 'satisfactory job performance' at the time of the discharge."  *Thornley*, 104 F.3d at 29.  As

with the necessary qualifications, whether job performance was satisfactory depends on the

employer's specific criteria for the performance of the job.  *Id.*  In determining whether an

employee's job performance is satisfactory, courts look to "the evaluations rendered by supervisors." *Meiri*, 759 F.2d at 995.

        **(c)**       **The Intervenor Must Have Suffered An Adverse Employment Action.**

Title VII does not insulate a complaining employee "from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). An "adverse employment action" occurs only when an employee "endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). Such an action requires a "change in working conditions . . . more disruptive than a mere inconvenience or an alteration of job responsibilities," and may include such actions as a termination, a demotion evidenced by decreased pay, or significantly diminished material responsibilities. *Id.*

Conversely, "typical difficulties of the workplace"—*i.e.*, reprimands and excessive scrutiny—are *not* materially adverse actions. *Cunningham v. N.Y. State Dep't of Labor*, No. 05 CV 1127, 2010 WL 1781465, at *5 (N.D.N.Y. Apr. 30, 2010). The Second Circuit has noted, "[i]t hardly needs saying that criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." *Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). In *Ifill v. United Parcel Service*, No. 04 CV 5963 (LTS)(DFE), 2008 WL 2796599, at *3 (S.D.N.Y. July 17, 2008), the court rejected the plaintiff's complaints that her supervisor "singled her out and micromanaged her by forcing her to report her whereabouts at every second of the day, including when she used the bathroom or went to lunch" as insufficient to constitute adverse employment actions because they did not affect the terms and conditions of her

employment. Similarly, in *Weisman v. New York City Department of Education*, No. 03 CV

9299 (PKC), 2005 WL 1813030, at *6 (S.D.N.Y. Aug. 1, 2005), the court held that no adverse

action occurred when a frequently tardy employee's supervisor carefully monitored her

attendance and admonished her that continued tardiness could result in a negative performance

review.

Other miscellaneous slights that an employee might experience are also not adverse

actions. In *Cunningham v. New York State Department of Labor*, No. 1:05-CV-1127

(DNH)(RFT), 2010 WL 1781465, at *6 (N.D.N.Y. Apr. 30, 2010), the court held that the

plaintiff's "complaints about [the location of] his new office fall squarely within the class of

trivial harms that . . . Title VII was not intended to protect against." *Id.* And in *Pough v. Mineta*,

No. 03 CV 6838, 2008 WL 4371294, at *2-4 (N.D. Ill. Sept. 19, 2008), the court explained that

the plaintiff's complaints that her employer awarded her a wooden plaque and 'thank you' memo

in private while her co-workers received the same recognition in public were "the type of ego

bruising actions which alone cannot constitute an adverse employment action." *Id.* at *3.

Courts have also held that work-related stress is not an adverse employment action, as

"[t]he discrimination laws do not guarantee employees a stress-free work environment." *Lester

v. Natsios*, 290 F. Supp. 2d 11, 30 n.7 (D.D.C. 2003). *Gordon v. New York City Board of

Education*, No. 01 CV 9265(SAS), 2003 WL 169800, at *6 (S.D.N.Y. Jan. 23, 2003),

accordingly dismissed the claim of a plaintiff who did "not allege that her negative [evaluation]

caused any adverse consequences other than extreme stress and anxiety, which are insufficient to

establish an 'adverse employment action.'"

Promotions are not considered adverse actions when the plaintiff's compensation and/or

responsibilities increase. *See Moreno v. Town of Huffington*, 334 Fed. App'x 426, 428 (2d Cir.

2009). And it is not an adverse action to require an employee to report to a prior peer. *See Stoddard v. Eastman Kodak Co.*, 309 Fed. App'x 475, 479 (2d Cir. 2009). Instead, for an action to be considered a demotion, there needs to be a "'decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.'" *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (quoting *Galayba v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).

> **(d)      The Adverse Employment Action Must Have Occurred Under Circumstances That Give Rise To An Inference Of Discrimination.**

To establish an inference of discrimination, Intervenors must adduce evidence that the relevant decision-maker at Bloomberg "knew of [their] protected status in connection with . . . [the] discrimination claims." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 81 (2d Cir. 2005). Indeed, "a defendant's discriminatory intent cannot be inferred, even at the *prima facie* stage, from circumstances unknown to the defendant." *Pace v. Fisher Price*, No. 03 CV 6474 (ILG), 2005 WL 3360452, at *4 (E.D.N.Y. Dec. 9, 2005). General knowledge within a corporate defendant will not suffice; the Intervenor must adduce evidence that the specific decision-maker knew of her pregnancy when he or she took the alleged adverse action. *See Andrews v. E. Tenn. Children's Hosp.*, No. 1:07-CV-288, 2008 WL 4646115, at *8 (E.D. Tenn. Oct. 17, 2008).

In addition, "when the allegedly discriminatory actor is someone who has previously selected the plaintiff for favorable treatment, that is very strong evidence that the actor holds no discriminatory animus, and the plaintiff must present correspondingly stronger evidence of bias in order to prevail." *Coghlan v. Am. Seafoods Co., LLC*, 413 F.3d 1090, 1097 (9th Cir. 2005). This Court has repeatedly recognized this "same actor" inference, *e.g.*, *Woodard v. Monticello*

*Cent. Sch. Dist.*, No. 06 CV 13361 (KMK), 2008 WL 5062125, at *14 (S.D.N.Y. Dec. 1, 2008);

and it applies in PDA cases. *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298 (4th Cir. 1998).

The Intervenors must also establish temporal proximity. They cannot show an inference

of discrimination if a lengthy gap exists between the decision-maker's actual knowledge and the

actions. For example, in *Rinsler v. Sony Pictures Entm't, Inc.*, No. 02 CV 4096 (SAS), 2003 WL

22015434, at *6 (S. D.N.Y. Aug. 25, 2003), a transfer that occurred three months after the

plaintiff announced her pregnancy did not establish a *prima facie* case under the PDA.

When the Intervenor has taken leave, she must also show that Bloomberg treated

similarly-situated non-maternity leave-takers better. *See EEOC v. Bloomberg L.P.*, 778 F. Supp.

2d 458, 473 (S.D.N.Y 2011) ("*Bloomberg II*"). *Accord Troupe v. May Dep't Stores Co.*, 20 F.3d

734, 738 (7th Cir. 1994); *Minott v. Port Auth. of N.Y. & N.J.*, 116 F. Supp. 2d 513, 521

(S.D.N.Y. 2000). Each Intervenor must offer evidence that "other persons not so affected [by

pregnancy] but similar in their ability or inability to work" received better treatment. 42 U.S.C.

§ 2000e(k) (2003). Here, the Intervenors "make[] no showing, allegation, or even suggestion

that any other employee–male or female, pregnant or not–who was absent for a comparable

period was treated more favorably than she upon returning to work." *Reilly v. Metro-North

Commuter R.R. Co.*, No. 93 CV 7317 (PKL), 1996 WL 665620, at *7 (S.D.N.Y. 1996).

### 2.   Discriminatory Compensation.

To establish a *prima facie* case of disparate compensation, each Intervenor must show

that (1) she was a member of a protected class; (2) she was paid less than similarly-situated non-

members of her protected class; and (3) Bloomberg's actions were motivated by discriminatory

animus. *McPherson v. NYP Holdings, Inc.*, No. 03-CV-4517(NGG)(LB), 2005 WL 2129172, at

*3 (E.D.N.Y. Sept. 1, 2005).

(a)   **The Intervenor Must Have Been A Member Of A Protected Class At The Time Of The Alleged Discrimination.**

The criteria to be a member of the protected class are the same for claims of discriminatory treatment and claims of discriminatory compensation. *See supra* Legal Standards, Section II.A.1(a), pp. 3-4.

(b)   **The Intervenor Must Have Been Paid Less Than Similarly Situated Non-Members Of Her Protected Class.**

To establish a *prima facie* case of discriminatory compensation, each Intervenor generally must show that she was paid less than similarly-situated comparators who were not in the protected class. *McPherson*, 2005 WL 2129172, at *3.

Where the challenged compensation decision follows the Intervenor's leave, or where her absence from work justifies the decision, the Intervenor must point to comparators who have also taken "leave or [been] otherwise unable or unwilling to perform [his or her] duties for reasons unrelated to pregnancy." *EEOC v. Bloomberg L.P.*, 778 F. Supp. 2d 458, 468 (S.D.N.Y. 2011). That is because the law requires Bloomberg to ignore only an "employee's pregnancy . . . not her absence from work[.]" *Velez v. Novartis Pharm. Corp.*, 244 F.R.D. 243, 264-65 (S.D.N.Y. 2007). This is consistent with *Gratton v. JetBlue Airways*, No. 04 CV 7561(DLC), 2006 WL 2037912, at *5 (S.D.N.Y. July 21, 2006), in which this Court flatly rejected the plaintiff's argument that, for purposes of her pregnancy discrimination case, a similarly-situated comparator "may be any non-pregnant employee." Instead, this Court held that similarly-situated comparators must be co-workers who were not pregnant, *yet who also took similar leave for other reasons. Id.*

In addition to showing that they and their proposed comparators had similar leave histories, the Intervenors must also establish that they were "similarly situated" in all other "material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997).

While precise equivalence in characteristics and circumstances is not required, there must be a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). Intervenors must establish, among other things, similar educations, work experience, specific work duties, seniority, performance histories, and work hours. *See Fox v. State Univ. of N.Y.*, 686 F. Supp. 2d 225, 232 (E.D.N.Y. 2010). In *Fox*, the court rejected many of the plaintiff's proposed comparators as not "similarly situated" because they worked full-time, whereas the plaintiff only worked part-time. *Id.* The court also rejected the plaintiff's two high-paid part-time comparators because there was no evidence that they had the same performance history, responsibilities, or seniority as the plaintiff. *Id.*; *see also McPherson v. NYP Holdings, Inc.*, No. 03 CV 4517(NGG)(LB), 2005 WL 2129172, at *5 (E.D.N.Y. Sept. 1, 2005) (comparators not similarly situated where "each had significantly more years of experience in the newspaper industry than the Plaintiff").

As to work duties, "the performance of some common tasks does not make jobs substantially equal when material differences also exist." *Conigliaro v. Horace Mann Sch.*, No. 95 CV 3555 (CSH), 2000 WL 45439, at *8 (S.D.N.Y. Jan. 19, 2000). "It is the overall job, not its individual segments, that must form the basis of comparison." *Koster v. Chase Manhattan Bank N.A.*, 609 F. Supp. 1191, 1194 (S.D.N.Y. 1985). Intervenors must establish enough similarity with their comparators to eliminate "differentiating or mitigating circumstances" that could explain the alleged differential treatment. *Visco v. Cmty. Health Plan*, 957 F. Supp. 381, 389 (N.D.N.Y. 1997).

### (c)     The Intervenor Must Show Discriminatory Animus.

Intervenors must demonstrate that the alleged disparities in their compensations arose under circumstances creating an inference of discriminatory intent. The standard for showing

discriminatory animus is akin to the standard to establish an inference of discrimination, as discussed *supra* Legal Standards, Section II.A.1(d), p. 7-8.

### 3.   Retaliation.

Intervenors must establish "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citations and internal quotation marks omitted).

### (a)   The Intervenors Must Have Engaged In Protected Activity.

Title VII prohibits retaliation where "[an individual] has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a) (2003). Protections extend to "employees who report workplace [pregnancy] discrimination" to their employer and to the EEOC. *Crawford v. Metro. Gov't of Nashville*, 555 U.S. 271, 273 (2009).

For complaints to be protected activity, an Intervenor must allege that she specifically complained about discrimination, and not other issues or work-related problems. In *Foster v. Humane Society of Rochester & Monroe County, Inc.*, 724 F. Supp. 2d 382, 394-95 (W.D.N.Y. 2010), the plaintiff complained to a supervisor about problems at work, even using the term "hostile environment," but did not complain that she was being discriminated against on account of her sex. *Id.* The court rejected her retaliation claim because she "did not engage in protected activity under Title VII." *Id.* at 395.

### (b)   The Alleged Retaliator Had To Know Of The Protected Activity.

To state a *prima facie* case, each Intervenor must show that the person who took the

alleged adverse action knew of her protected activity. *See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).

### (c)    The Intervenors Must Have Experienced A Materially Adverse Employment Action.

The Supreme Court has defined a "materially adverse employment action" as an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). Thus, a plaintiff must show that she was subjected to something more than "petty slights, minor annoyances, and simple lack of good manners" at work. *Id.* (citation omitted).

Courts must "screen out trivial conduct" as grounds for retaliation claims. *Id.* at 70. For example, in *Ragin v. East Ramapo Cent. Sch. Dist.*, No. 05 CV 6496(PGG), 2010 WL 1326779, *17-21 (S.D.N.Y. Mar. 31, 2010), the plaintiff claimed that her employer retaliated by giving her negative performance evaluations, failing to investigate her discrimination claims, withdrawing support for a production in which she was involved, publicly upbraiding her, and yelling at her. The court rejected her claims because such actions "without other consequences do not constitute an adverse employment action." *Id.* at *19; *see also Evans v. City of N.Y.*, No. 00 CV 4197(BSJ), 2003 WL 22339468, at *11 (S.D.N.Y. Oct. 14, 2003) ("[p]ositive evaluations that are not as positive as previous performance evaluations do not constitute adverse employment actions.").

Courts have also made clear that reprimands and excessive scrutiny are not adverse actions for purposes of a retaliation claim. *Nieves v. Dist. Council 37*, No. 04 CV 8181(RJS), 2009 WL 4281454, at *8 (S.D.N.Y. Nov. 24, 2009) ("[P]erformance warnings, without more, do not constitute a materially adverse action."); *Lucenti v. Potter*, 432 F. Supp. 2d 347, 364

(S.D.N.Y. 2006) ("Reprimands, threats of disciplinary action, and excessive scrutiny do not constitute adverse employment actions.").

Finally, stray remarks—even if made by a decision-maker—without more, are not adverse actions. *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001). Yelling at an employee is also not materially adverse. *See Martin v. MTA Bridges & Tunnels*, 610 F. Supp. 2d 238, 256 (S.D.N.Y. Apr. 3, 2009).

### (d)   There Must Be A Causal Connection Between The Protected Activity And The Adverse Employment Action.

The requirements for Intervenors to show a causal connection between the protected activity and materially adverse employment action are substantially similar to the requirements for them to show a causal connection between their membership in the protected class and their alleged adverse employment actions and/or to raise an inference of discrimination. As explained above, temporal proximity is required, but its presence is not dispositive. *See supra* Legal Standards Section II.A.1(d), at p. 8; *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (three months between employer knowledge of protected activity and adverse action "will not do").

### B.   Legitimate, Non-Discriminatory Business Reasons.

An employer overcomes a *prima facie* case by showing legitimate, non-discriminatory, non-retaliatory reasons for its actions. In doing so, the employer's "burden is one of production, not persuasion." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). The employer does not need to prove by a preponderance of the evidence that the rationale was not discriminatory, but need only present a clear explanation for the action. *Gibbs v. Consol. Edison Co. of N.Y., Inc.*, 714 F. Supp. 85, 89 (S.D.N.Y. 1989). At that point, the presumption of discrimination is rebutted. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993).

The fact that an employee takes leave and works fewer hours than her co-workers is a legitimate business reason for paying her less, assigning her different responsibilities than her co-workers, and taking various other actions. In *Velez v. Novartis Pharmaceuticals Corp.*, a putative class of plaintiffs claimed that the defendant's pay structure, which gave employees returning from maternity leave the same partially incentive-based compensation as all other employees, had "a larger and more detrimental impact on women than on men, even though it treats pregnancy the same as any other legitimate reason for leave." 244 F.R.D. 243, 263-65 (S.D.N.Y. 2007). The court disagreed, explaining that while an employer is required to "ignore an employee's pregnancy," the employer is not required to ignore "'her absence from work, unless the employer overlooks the comparable absences of nonpregnant employees . . . in which event it would not be ignoring pregnancy after all.'" *Id.* at 264-65 (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994)). Simply put, employers do not have to "pretend that absent employees are present whenever their absences are caused by pregnancy." *In re Carnegie Ctr. Assocs.*, 129 F.3d 290, 296 (3d Cir. 1997).

Courts have approved countless other legitimate business reasons that a defendant may have for taking actions that adversely affect an employee. For example, misconduct, poor performance, and lateness are all well-recognized, legitimate reasons for an adverse action. *See, e.g., Jones v. Yonkers Pub. Schs.*, 326 F. Supp. 2d 536, 543-44 (S.D.N.Y. 2004); *Gomez v. Pellicone*, 986 F. Supp. 220, 228 (S.D.N.Y. 1997); *Dotson v. City of Syracuse*, No. 5:04-CV-1388, 2009 WL 2176127, at *18 (N.D.N.Y. July 21, 2009). Courts have also recognized that an employer's restructuring of operations can be a legitimate, non-discriminatory reason for an adverse employment action. *Olle v. Columbia Univ.*, 332 F. Supp. 2d 599, 616-17 (S.D.N.Y. 2004).

C.      **The Burden To Prove Proffered Reasons Were Pretextual.**

When an employer offers legitimate, non-discriminatory reasons for its actions, the

burden shifts back to the plaintiff to show that the stated explanations are pretext for the true

discriminatory motive. *Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir. 2000). "[A] reason

cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was

false, *and* that discrimination was the real reason." *St. Mary Honor Ctr. v. Hicks*, 509 U.S. 502,

515 (1993) (emphasis in original); *see also Escribano v. Greater Hartford Acad. of Arts*, No. 09–

4553–cv, 2011 WL 4001030, at *2 (2d Cir. Sept. 9, 2011).

Courts have made it clear that certain evidence is simply insufficient to prove pretext.

Temporal proximity, for example, is not enough to prove that an employer's proffered reasons

for an adverse action are pretext. In *Forde v. Beth Israel Medical Center*, 546 F. Supp. 2d 142,

151 (S.D.N.Y. 2008), the plaintiff argued that her employer began criticizing her work

performance on the day she announced her pregnancy and fired her one week after her

announcement. The court held that "the close proximity of a termination to the plaintiff's

announcement of her pregnancy alone is insufficient to demonstrate a pretext." *Id.* at 152.

Earlier, more favorable performance evaluations also do not prove pretext. In *Viola v.

Philips Medical Systems of North America*, 42 F.3d 712, 717-18 (2d Cir. 1994), the plaintiff

argued pretext based on a first-ever negative evaluation, after a long history of positive

evaluations. The Second Circuit explained that "[w]ere we to view this pattern as suspect,

without more, many employees would be able to appeal their personnel evaluations to a jury." *Id.*

at 718. Similarly, a plaintiff's bald assertions that an evaluation is "unfair" cannot prove pretext.

*See Reilly v. Metro-North Commuter R.R. Co.*, No. 93 CV 7317 (PKL), 1996 WL 665620, at *9

(S.D.N.Y. Nov. 15, 1996).

## III.    STATE AND CITY DISCRIMINATION AND RETALIATION CLAIMS

Intervenors bring discrimination and retaliation claims under the New York State Human

Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL").  The

analysis is identical to Title VII claims.  *See Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112,

117 n.2 (2d Cir. 2010).

## IV.    HOSTILE WORK ENVIRONMENT

To prove a hostile work environment, the Intervenor must show that the conduct

complained of was "sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment," and that the conduct can be imputed

to the employer.  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).  It is not enough that she

subjectively perceived the environment to be abusive, but she must also demonstrate that the

workplace was "so severely permeated with discriminatory intimidation, ridicule, and insult that

the terms and conditions of her employment were thereby altered."  *Id.*  Moreover, she "must

demonstrate either that a single incident was extraordinarily severe, or that a series of incidents

were 'sufficiently continuous and concerted' to have altered the conditions of her working

environment."  *Id.* at 374; *see also Shabat v. Billott*, 108 F.3d 1370, 1370 (2d Cir. 1997).

"Title VII does not establish a 'general civility code.'"  *Petrosino v. Bell Atl.*, 385 F.3d

210, 223 (2d Cir. 2004).  Accordingly, to be actionable, the conduct must be especially

egregious.  *See, e.g., Faison v. Leonard St., LLC*, No. 08 CV 2192 (PKC), 2009 WL 636724, at

*4 (S.D.N.Y. Mar. 9, 2009) ("persistent shouting and a display of poor temperament" by

plaintiff's supervisor not severe enough to create a hostile work environment); *Salvatore v. KLM

Royal Dutch Airlines*, No. 98 CV 2450 (LAP), 1999 WL 796172, at *10 (S.D.N.Y. Sept. 30,

1999) (finding that supervisor's "scream[ing] at [plaintiff] at the top of his lungs, and plac[ing]

[plaintiff] in fear that he would become physical and hit her," in addition to calling plaintiff a

"gangbanger" and suggesting that plaintiff was breastfeeding for her personal gratification, did

not create a hostile work environment because it did not occur with sufficient frequency); *Alfano*

*v. Costello*, 294 F.3d 365, 379 (2d Cir. 2002) (approvingly citing cases in which hostile work

environment claims were dismissed for insufficiency of evidence of pervasiveness, including,

among others, *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823-24 (6th Cir. 1997) (in a four-

month period, repeated sexual jokes, and at least five other sexually offensive remarks);

*Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995) (in a seven-month period,

nine sexually offensive incidents, including repeated references to plaintiff as a "pretty girl,"

grunting noises when she wore leather skirt, and one episode of simulated masturbation)").

Finally, to be actionable under Title VII, the conduct complained of must be related to the

Intervenor's protected status. *Ortiz-Moss v. N.Y. Dep't of Transp.*, 623 F. Supp. 2d 379, 400

(S.D.N.Y. 2008); *Alfano*, 294 F.2d at 377 ("[P]ersonnel decisions that lack a linkage or

correlation to the claimed ground of discrimination" cannot be considered.) In *Salvatore*, for

example, the court dismissed a hostile work environment claim where there was no showing that

the supervisor's "screaming was related to [the plaintiff's] gender." 1999 WL 796172, at *10.

## V.     THE FAMILY AND MEDICAL LEAVE ACT

To establish a claim under the Family and Medical Leave Act, an Intervenor must show

that she was *not* restored to the position of employment she held when her leave commenced, or

to an equivalent position with equivalent employment benefits, pay, and other terms and

conditions of employment.  29 U.S.C. § 2614(a)(1) (2010).  "An equivalent position is one that is

virtually identical to the employee's former position in terms of pay, benefits and working

conditions, including privileges, perquisites and status."  29 C.F.R. § 825.215(a) (2008).  The

position "must involve the same or substantially similar duties and responsibilities, which must

entail substantially equivalent skill, effort, responsibility, and authority." 29 C.F.R. § 825.215(d)

(2008). Because this requirement "does not extend to de minimis or intangible, unmeasurable aspects of the job," *id.*, small changes in the nature of a job implemented during an employee's leave do not establish a failure to reinstate. *Noyer v. Viacom Inc.*, 22 F. Supp. 2d 301, 305-06 (S.D.N.Y. 1998).

## VI.    EMOTIONAL DISTRESS CLAIMS

Negligent infliction of emotional distress ("NIED") claims are barred by New York's Workers' Compensation Law § 29(6), which provides that the statute "shall be the exclusive remedy to an employee . . . injured . . . by the negligence or wrong of another in the same employ." *See also Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 138 (2d Cir. 2001); *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997). To establish a claim for NIED, an Intervenor must show (1) breach of a duty owed to her that either unreasonably endangers her physical safety or causes her to fear for her safety and (2) that defendant's conduct is so extreme and outrageous that it goes beyond all possible bounds of decency so as to be regarded as atrocious and utterly intolerable in a civilized society. *Sheila C. v. Povich*, 781 N.Y.S.2d 342 (App. Div. 2004).

To establish a claim for intentional infliction of emotional distress ("IIED"), an Intervenor must show (1) that the defendant engaged in extreme and outrageous conduct, (2) that the defendant acted with intent to cause, or with disregard of a substantial probability of causing, severe emotional distress, (3) the existence of a causal connection between the defendant's conduct and the plaintiff's injury and (4) severe emotional distress on the part of the plaintiff. *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (1993).

## VII.    NEGLIGENT HIRING AND SUPERVISION

New York's Workers' Compensation Law is the exclusive remedy for employers' negligence. Although New York courts recognize the tort of negligent hiring and supervising, they generally require that a plaintiff "show assault or professional incompetence on the part of

the negligently hired and retained employee resulting in personal injury to the plaintiff." *Brown v. Bronx Cnty. Med. Grp.*, 834 F. Supp. 105, 110 (S.D.N.Y. 1993).

An Intervenor must establish that (1) she was injured due to the intentional or negligent act of an employee of the defendant, (2) that the act took place on the employer's premises or while she was utilizing the employer's equipment, and (3) at the time the employee was hired or retained, the employer knew of or should have known about the employee's propensity for the sort of behavior that caused the plaintiff's harm. *See T.W. v. New York*, 729 N.Y.S.2d 96, 97-98 (App. Div. 2001); *Birthwright v. New York*, No. 01 CV 3940 (CBM), 2005 U.S. Dist. LEXIS 19787, at *37-38 (S.D.N.Y. Sept. 8, 2005).

Generally, courts have not recognized negligent hiring or retention claims in the context of harassment, and instead have required some physical injury. *See Perry v. Burger King Corp.*, 924 F. Supp. 548, 552-53 (S.D.N.Y. 1996); *Mutlu v. JetBlue Airways Corp.*, No. 08 CV 4887 (LAP), 2009 U.S. Dist. LEXIS 60164, at *25 (S.D.N.Y. Mar. 31, 2009); *Stauber v. N.Y. City Transit Auth.*, 781 N.Y.S.2d 26, 27 (App. Div. 2004).

## VIII.   CONSTRUCTIVE DISCHARGE CLAIM

To survive summary judgment on a constructive discharge claim, an Intervenor must satisfy a more demanding standard than for hostile work environment and retaliation claims. *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010). Thus, when the "acts which [a plaintiff] alleges [give] rise to a hostile work environment [are] the same as those upon which her constructive discharge claim [is] based," summary judgment for the employer on the first claim requires summary judgment for the employer on constructive discharge as well. *Id.*

To establish constructive discharge, an Intervenor must show that Bloomberg deliberately created "working conditions so intolerable that a reasonable person would have felt compelled to

resign." *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004). And "a constructive discharge cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer" or that "the employee's working conditions were difficult or unpleasant." *Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993).

## JILL PATRICOT

### I.    UNDISPUTED FACTS

Bloomberg hired Patricot in London in 1998, and transferred her to New York in 1999. (Bloomberg L.P.'s Rule 56.1 Statement of Material Facts ("R. 56.1 Stmt.") ¶ 1.) In November 2004, when pregnant, Patricot accepted a promotion to become the head of Global Data in New York. (*Id.*) Patricot welcomed the opportunity: "I wanted the promotion, I needed the money, and I needed the stature, it was going to be good for me." (*Id.* ¶ 10.) Patricot was also "excited for the change." (*Id.*) Before Patricot left for maternity leave, her supervisor Beth Mazzeo told her that she was doing a "fabulous" and "great" job. (R. 56.1 Stmt. ¶ 4.) In May 2005, while on leave, Patricot received her compensation award, increasing her total intended compensation from $216,953 to $270,522. (*Id.* ¶ 6.)

Patricot returned from maternity leave on September 22, 2005, and alleges that thereafter Mazzeo excluded her from meetings and would not return her calls. (*Id.* ¶ 11.) Patricot was upset that she was not immediately informed about a proposal to have a new "pricing group" in New York, and alleges that another manager told her that she was excluded from a meeting about compensation of individuals in Global Data. (*Id.* ¶ 13.)

While Patricot typically worked from 8:00 a.m. to 6:00 p.m. or 7:00 p.m. before taking leave, after leave, she left the office every day at approximately 4:30 p.m. in order to arrive home to relieve her nanny. (*Id.* ¶ 15.) She never asked for permission to leave at this hour, and her

predecessor, Jennifer Bartashus, complained to Patricot's boss, Beth Mazzeo, that Patricot's subordinates were coming to her with issues that Patricot should have handled.  (*Id.* ¶¶ 15, 18.)

In December 2005, Mazzeo, a mother of three, met with Patricot about hours.  (*Id.* ¶ 15.) Patricot alleges that Mazzeo told her "sometimes when you have a baby your career is paused," and that her own career "was [paused] too for a little but [she/Mazzeo] eventually got back."  (*Id.*) Patricot understood that Mazzeo was "trying to relate."  (*Id.*)  Mazzeo told Patricot that she needed to work until 5:30 p.m., and that other male managers were working until 5:30 p.m. or 6:00 p.m.  (*Id.* ¶ 16.)  Nonetheless, Patricot continued to leave work before 5:00 p.m. each day. (*Id.* ¶¶ 15, 19.)

Mazzeo talked to Patricot again about her hours in February 2006.  (*Id.* ¶ 19.)  Mazzeo said Patricot needed to stay until 5:30 p.m. and that she was setting a bad example.  (*Id.*) Mazzeo asked Patricot to stay until 5:30 p.m. two days a week, but Patricot refused.  (*Id.*)

On or about February 3, 2006, Patricot met with Jennifer Sack from Human Resources, who told her that Mazzeo had a problem with Patricot's hours.  (*Id.* ¶ 20.)  Sack asked Patricot if her husband (who also worked at Bloomberg) could relieve the nanny on occasion, which Patricot found inappropriate.  (*Id.*)  Patricot suggested that she could come in an hour earlier, but could not name any manager in Global Data who worked a 7:00 a.m. to 4:45 p.m. workday.  (*Id.*)

On or about February 10, 2006, Mazzeo called Patricot and advised her that if she did not change her hours, Mazzeo would demote her to data analyst.  (*Id.* ¶ 21.)  Patricot continued to refuse to change her hours, and on February 14, 2006, Mazzeo removed her from her role managing the New York Global Data group.  (*Id.* ¶¶ 19, 22.)  On a particular day after the demotion, Mazzeo sat in a desk next to Patricot for the entire day, allegedly to intimidate her. (*Id.* ¶ 25.)  Ray Whitman took over Patricot's position.  (*Id.* ¶ 22.)

Patricot told Sales Executive Max Linnington that she wanted to come back to Sales, and asked him what Team Leader positions were open. He responded that there were none available at the time. (*Id.* ¶ 26.) Patricot asked Linnington if she could cover hedge funds in Connecticut, and he agreed, noting that this would allow her to get to her home in Westchester County, New York early, which Patricot conceded was a "plus." (*Id.*)

Patricot filed her EEOC discrimination charge on March 24, 2006. (*Id.* ¶ 28.) In April 2006, Patricot wrote in her self-evaluation that she had "reached out to the Federal Government to hold an unbiased investigation," particularly regarding Mazzeo. (*Id.*) In May 2006, Bloomberg kept Patricot's base salary at $130,000, but awarded her 140 Bloomberg Equity Equivalent Certificates ("EECs"), compared to the previous year's 185. (*Id.* ¶ 29.) Her total intended compensation decreased from $270,522 to $233,727. (*Id.*) Patricot became pregnant again in 2006, left for maternity leave in November 2006, gave birth to her second child in November, and returned to Bloomberg in March 2007. (*Id.* ¶ 30.)

On October 3, 2007, Patricot filed a motion to intervene in the EEOC's lawsuit against Bloomberg. (*Id.*) In her proposed complaint, Patricot alleged that Michael Bloomberg was somehow responsible for the supposed discrimination, and referred to him repeatedly. (*Id.*) She also attended a press conference with fellow plaintiff-intervenor, Tanys Lancaster, concerning their complaint. (*Id.* ¶ 30.) According to press reports, Bloomberg's spokesperson Judith Czelusniak "accused the women of launching a 'publicity stunt' by dragging the Mayor's name into their battle in their lawsuit against the company to settle." (*Id.* ¶ 31.) Patricot admits that neither her customers nor her colleagues referenced Czelusniak's statement to her. (*Id.*)

Patricot filed her complaint on October 25, 2007. (*Id.* ¶ 32.) On or about May 6, 2008, shortly after the EEOC disclosed to the Court during a status conference that there were (at that

time) 58 claimants in the case, Patricot alleges that Linnington treated her in an abusive manner. (*Id.* ¶ 33.) Patricot does not know whether Linnington knew about the status conference. (*Id.*)

Patricot became pregnant again in 2007 and went on a third maternity leave in May 2008. (*Id.* ¶ 34.) While on leave, she attended Mazzeo's deposition in December 2008. (*Id.*) Patricot alleges Mazzeo was untruthful in her deposition. (*Id.*) Although Mazzeo was in charge of Global Data, and Patricot had been in the Sales department since March 2006, on January 2, 2009, Patricot resigned from Bloomberg. (*Id.*)

## II.   CLAIMS

Patricot alleges discrimination and retaliation claims against Bloomberg under Title VII, the NYSHRL and the NYCHRL. As to Title VII, Patricot filed her EEOC discrimination charge on March 24, 2006, and her EEOC retaliation charge on June 13, 2008. Her discrimination claims are timely under Title VII only if they arose after May 28, 2005, and her retaliation claims are timely only if they arose after August 18, 2007. Finally, her NYSHRL and NYCHRL claims are timely if they arose after October 25, 2004, three years before she filed her complaint.

### A.   Summary Judgment Is Proper On Patricot's Discrimination Claims.

#### 1.   Patricot's Promotion Was Not An Adverse Action.

Patricot claims that her November 2004 *promotion* is a discriminatory adverse action, despite the fact that it dramatically increased her responsibilities—she went from managing a handful of employees to managing over 70, including seven managers—and led to an approximately $50,000 raise in her already substantial salary. (R. 56.1 Stmt. ¶¶ 8, 6.) This claim is time barred under Title VII, and insufficient under the NYSHRL and NYCHRL.

An employment decision that substantially improves the employee's terms and conditions of employment cannot constitute an adverse employment action. *See supra* Legal Standards,

Section II.A.1(c), at p. 6-7.  In any event, Patricot cannot predicate a Title VII claim on a promotion that she admits she voluntarily accepted, and, indeed, desired.  (R. 56.1 Stmt. ¶ 10.)

Patricot speculates that Bloomberg gave her a $50,000 raise, and put her in charge of 75 people, all so it could hide her pregnancy from "powerful hedge fund managers" in Connecticut.  (*Id.* ¶¶ 3, 8.)  Of course, Patricot has no evidence to support this bizarre allegation.  To the contrary, Bloomberg promoted Patricot to Head of Global Data to capitalize on her success in Sales and to create better linkages between Sales and Global Data.  (*Id.* ¶ 2.)  And while Patricot's promotion to Global Data placed her—and other employees in her group at the time—in a satellite office, that location was only temporary, and did not impact Patricot's ability to keep in touch with others.  (*Id.* ¶ 9.)  This claim has no merit.

### 2.    Patricot's Compensation Increase Was Not An Adverse Action.

Patricot also alleges that Bloomberg discriminated against her because the number of her EECs decreased from 210 to 185.  But this Court has held that fluctuations in the raw number of EECs from year to year is irrelevant and that "an employee's intended compensation for a given year, rather than actual compensation, is the relevant comparative metric for employee compensation." *EEOC v. Bloomberg L.P.*, 778 F. Supp. 2d 458, 463 (S.D.N.Y. 2011).  In fact, Patricot's total intended compensation *increased* by $54,000, from $216,952 in May 2004 to $270,522 in May 2005.  (R. 56.1 Stmt. ¶ 6.)  And Patricot's 24.69% pay increase outpaced the pay increases for most of the male managers who reported to both Beth Mazzeo and Tom Secunda— ▮▮▮▮ (19.86%), ▮▮▮▮ (13.38%), ▮▮▮▮ (8.7%), and ▮▮▮▮ (14.38%)—even though *all* had higher performance ratings than Patricot.  (*Id.* ¶ 7)  Indeed, only three managers in Global Data had higher rates of increase than Patricot, and they all had better

performance ratings.[1]  (*Id.*)  Patricot's claim accordingly fails.  *See, e.g., Martinez-Santiago v. Zurich N. Am. Ins. Co.*, No. 07 CV 8676(RJH), 2010 WL 184450, at *10 (S.D.N.Y. Jan. 20, 2010) ("[W]hen an individual's salary falls within the middle of a range, the mere existence of other higher paid employees does not necessarily give rise to an inference of discrimination.").

### 3.   Patricot's Alleged Exclusion From Meetings Was Not Adverse.

Patricot also alleges that Bloomberg excluded her from meetings, but exclusion from meetings is not an adverse action absent evidence of significant detrimental impact on the employee's ability to perform her duties.  *See Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 756 (2d Cir. 2004).  Patricot has no such evidence.  In fact, despite alleging that Bloomberg excluded her from meetings with managers in Princeton, Patricot admits that she *did* travel to Princeton for meetings, and that many of the Princeton managers she worked with traveled to New York, and she met them there.  (R. 56.1 Stmt. ¶ 12.)  And if any exclusion did occur, Patricot admits it was not critical to her job performance and was self-imposed.  (*Id.*) (testifying that she did not want to "waste time by going down [to Princeton]" because "my people were up in New York, that's what I was responsible for").  Because Patricot has failed to even allege how missing unspecified meetings in Princeton impacted the terms and conditions of her employment, her claim must fail.

### 4.   Bloomberg's Failure To Accommodate Patricot's Child Care Schedule Does Not Violate Title VII.

Patricot's claim that Bloomberg discriminated against her by refusing to allow her to leave every day at 4:45 p.m. for child care reasons is not actionable under Title VII.  As this

---

[1] Patricot asserts that her compensation award should be compared to the compensation received by managers in the Sales Department, where she was previously employed.  Patricot's compensation was, however, determined by different supervisors since she was already in Global Data, and the individuals that she names are therefore not similarly situated.

Court has previously recognized, "[t]he law does not mandate 'work-life balance,'" and Patricot

has no evidence of differential treatment. *Bloomberg II*, 778 F. Supp. 2d at 485. Indeed,

Patricot's request was one for special treatment: no one else in Patricot's position—male or

female, parent or childless—worked the schedule Patricot desired. Jennifer Bartashus, a

childless woman who previously held Patricot's Global Data position, regularly left after

5:30 p.m. when holding the Global Data position, and both of the men who performed Patricot's

duties after she transferred to the data analyst position regularly left after 5:45 p.m. when

performing such duties. (R. 56.1 Stmt. ¶ 24.) In fact, before taking maternity leave, Patricot

herself often worked until 6:00 p.m. or 7:00 p.m. (*Id.* ¶ 15.) Similarly, none of the other peer

managers in Global Data who reported to Mazzeo were allowed to leave before 5:00 p.m. (*Id.* ¶

16.) Because Patricot has offered no evidence that Bloomberg granted other similarly situated

managers in Global Data the special schedule that she desired, Bloomberg is entitled to summary

judgment on this claim. *See Chi v. Age Grp. Ltd.*, No. 94 CV 5253 (AGS),1996 WL 627580

(S.D.N.Y. Oct. 29, 1996) (plaintiff failed to establish *prima facie* case of discrimination where

employer took action because employee was unwilling to work past 5:30 p.m. even though doing

so was a job requirement); *Krop v. Nicholson*, 506 F. Supp. 2d 1170, 1175-76 (M.D. Fla. 2007)

(granting summary judgment to employer where employer rejected mother's flex-time request,

and mother had no evidence that employer granted modified work schedule to similarly situated

male employees).

### 5.   Patricot's Demotion Was Not Discrimination Based On Pregnancy.

Patricot's refusal to work the hours required of her Global Data role constituted a

legitimate reason for Bloomberg to remove her from it. Indeed, numerous Bloomberg managers

testified that it was important for the Head of Global Data in New York to be available until 6:00

p.m., in order to supervise, mentor, and assist Global Data employees as they interacted with

Bloomberg's sales force and met with customers, all after the markets closed at 4:00 p.m. (R.

56.1 Stmt. ¶ 17.) Patricot readily admits that she had responsibilities to fulfill between 5:00 p.m.

and 5:30 p.m. (*Id.*) And indeed, Mazzeo's discussions with Patricot about her hours were

prompted by complaints that Patricot's subordinates were seeking guidance after Patricot left for

the day, and approaching Patricot's predecessor in the position, Bartashus, for answers. (*Id.* ¶

18.) The situation was untenable.

Patricot asserts pretext, but her contentions lack merit.

- *First*, Patricot argues that she could have worked a 10-hour day if Bloomberg allowed her to come in at 7:00 a.m. But the issue was not the number of hours, it was that the individuals Patricot managed needed supervision after 5:00 p.m. (*Id.* ¶ 20.)

- *Second*, Patricot argues that Bloomberg did not really need coverage up to 5:30 p.m., because after her demotion, her immediate successor, Ray Whitman, who was based in Princeton, only came up to New York two to three times per week. But Mazzeo offered Patricot that same arrangement, and she refused it, insisting that she had to leave work no later than 4:45 p.m. *every day.* (*Id.* ¶ 19.)

- *Third*, Patricot alleges Mazzeo refused to accommodate her child care schedule because she wanted to install Ulrick Bjercke as the Head of Global Data in New York. This is pure speculation that is disproven by the record. Whitman, not Bjercke, succeeded Patricot in her role. (*Id.* ¶ 22.) And when Whitman asked Mazzeo to reassign his duties in September 2006, she gave them to Peter Warms. Thus, Bjercke never assumed the position. (*Id.* ¶ 23.)

### 6. Patricot Cannot Establish A Discriminatory Failure-To-Promote Claim.

Patricot next claims that, after she transferred to Sales, Bloomberg discriminated against

her by not making her Team Leader in *March of 2006.* But Patricot has no evidence that

Bloomberg had an open Team Leader position in March of 2006, and, in fact, she concedes that

it may not have. (*Id.* ¶ 27.) Patricot cannot predicate a failure-to-promote claim on a position

that did not exist. And while Patricot asserts that "a month or two month[s] later" two

individuals were promoted to Team Leader, and at even "later junctures" additional persons

assumed Team Leader roles, none of this shows that Bloomberg was seeking Team Leader

applicants in March of 2006, when Patricot expressed interest.  (*Id.* ¶)  Further, because Patricot

did not formally apply for any of the Team Leader positions that subsequently became available,

she cannot state a claim for discriminatory failure-to-promote.  *See Petrosino v. Bell Atl.*, 385

F.3d 210, 227 (2d Cir. 2004) ("[T]he second element of a *prima facie* case cannot be established

merely with evidence that a plaintiff generally requested promotion consideration.  A specific

application is required. . . .").[2]

**B.     Summary Judgment Is Proper On Patricot's Retaliation Claims.**

   **1.     Patricot's Compensation Decrease Was Justified By Her Loss Of
            Managerial Responsibility.**

   Patricot first alleges that Bloomberg retaliated against her by decreasing her

compensation in May 2006 after her supervisors knew she had filed a charge of discrimination

with the EEOC in March 2006.  But Bloomberg had a legitimate reason for reducing Patricot's

total intended compensation:  Patricot was no longer Head of Global Data, or even a Team

Leader, and her rating had declined.  In addition, Patricot's total intended compensation,

$233,727, ranked first out of the five people who reported to Patricot's supervisor.  (*Id.* ¶ 29.)

Indeed Patricot's compensation was significantly higher than three of the other four members,

each of whom earned from $50,000 to more than $80,000 *less than* Patricot.  (*Id.*)

--------------------------------------------------

   [2] Patricot also cannot show any inference of discrimination with respect to not being
made a Team Leader in March 2006.  Because there were no Team Leader positions available,
Linnington granted Patricot's request to be assigned hedge fund work in Connecticut, which was
near her home in Westchester County, New York.  (R. 56.1 Stmt. ¶ 26.)  Linnington believed
that this would give her "more flexibility in the workplace" because she could visit her clients
directly from her home in Westchester County rather than coming into the office in the morning.
Linnington viewed it as a "triple win: . . . a win for Jill, a win for the customer and a win for the
firm."  (*Id.*)  Patricot herself said "[i]t was definitely a plus" that she would be working close to
home.  (*Id.*)

In any event, Patricot has no evidence of discriminatory animus.  Max Linnington and other members of the Sales department made the compensation decision.  As discussed *supra*, Linnington thought highly of Patricot, and had readily accommodated her child care needs, circumstances that undercut any inference that Linnington reduced Patricot's compensation because of her pregnancy, as opposed to her performance rating and reduced role.  *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (difficult to impute invidious motive where alleged discriminator previously took favorable employment action towards plaintiff).  Neither is there any evidence that Linnington was involved in Patricot's conflict with Mazzeo regarding her work schedule in Global Data.  Because Patricot has failed to come forward with any probative evidence of pretext, Bloomberg is entitled to summary judgment.

> **2.   Bloomberg's Media Statement Was Not A Materially Adverse Action Directed At Patricot.**

Patricot's allegation that a Bloomberg spokesperson made a retaliatory statement to the media after Patricot sought to intervene in the EEOC's lawsuit and participated in a press conference about the lawsuit must fail.  Patricot takes offense that Czelusniak reportedly used the phrase "publicity stunt" in discussing aspects of her complaint.  This, is not an adverse employment action.  And in any event, the context of Czelusniak's comments makes clear that she was referring to the use of Mayor Bloomberg's name in the complaint—despite his limited involvement in the Company and complete lack of involvement with the Intervenors for several years—as a way to generate publicity about the lawsuit, not the lawsuit itself.  (*Id.* ¶ 31.)  No reasonable person could be dissuaded from pursuing claims based on such comments.  And to the extent that Patricot alleges she was anxious at work because colleagues and/or customers *knew* about the lawsuit, she cannot attribute that to Bloomberg's general media statements—

especially where Patricot herself participated in a press conference to tell the world of her claims. (*Id.* ¶ 30.)

### 3.   Yelling At Patricot On One Occasion Is Not Actionable.

Patricot also alleges that Linnington once yelled at her, but yelling is not materially adverse in the context of a retaliation case. (*Id.* ¶ 33.); *see supra* Legal Standards, Section II.A.3(c),at pp. 12-13. In any event, there is no causal connection between Patricot's protected activity and the isolated yelling. Patricot intervened in the EEOC's lawsuit against Bloomberg on October 25, 2007, but Linnington did not allegedly yell at her until May 6, 2008, over six months later. (*Id.* ¶¶ 30, 33.) That is too long to support any inference that Linnington's actions were retaliatory. *See supra* Legal Standards, Section II.A.3(d), at p. 13.

Patricot's claim that this encounter was actually caused by a status conference in this litigation that occurred on May 1, 2008, also fails to state a *prima facie* case of retaliation, both because Patricot did not attend the conference, and thus it was not protected activity as to her, and because there is no evidence that Linnington knew anything at all about the conference. (R. 56.1 Stmt. ¶ 33.) The claims thus fails.

### C.   Patricot Was Not Subject To A Hostile Work Environment.

Patricot's claim that Mazzeo subjected her to a hostile work environment upon return from leave is frivolous. During the five-month period from September 22, 2005 until she transferred to the Sales Department in early March 2006, Patricot states generally that Mazzeo was not responsive to her calls, which is the kind of petty slight that is not actionable under Title VII, and excluded her from some (but not all) meetings, which as discussed *supra*, did not alter Patricot's performance of her duties, even if true. (*Id.* ¶ 11.)

Patricot also alleges that Mazzeo "went into a whole tirade" about Patricot's early departures from work, verbally abused her in a phone call when informing Patricot that

Bloomberg would demote her if she did not adjust her hours to meet her managerial responsibilities, and tried to intimidate Patricot by sitting next to her after she removed her from her position. (*Id.* ¶¶ 13, 21, 25.) None of this is sufficient to create a hostile work environment. All of these instances related exclusively to Mazzeo's legitimate concerns about Patricot's leaving work, without permission, at least a full hour earlier than the other managers in Global Data. Because these concerns were not discriminatory, Mazzeo did not violate Title VII by yelling about the issue. Indeed, Patricot's disagreement with how Mazzeo communicated her non-discriminatory policy could not render Mazzeo's conduct discriminatory. *See Nugent v. St. Luke's Roosevelt Hosp. Ctr.*, No. 05 CV 5109(JCF), 2007 WL 1149979 at *18 (S.D.N.Y. Apr. 18, 2007) ("authoritative management style" not discriminatory). In any event, several of Patricot's peers—male managers who reported directly to Mazzeo—testified that they also had negative experiences with Mazzeo's demanding work style. (R. 56.1 Stmt. ¶ 14.) "[A]n environment which is equally harsh for both men and women . . . does not constitute a hostile work environment under the civil rights statutes." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).

### D.     Patricot Was Not Constructively Discharged.

Bloomberg is entitled to summary judgment on Patricot's claim that she was constructively discharged on January 2, 2009, while still out on pregnancy-related leave that commenced in May of 2008. The purported claim rests on Patricot's allegations that she was (1) "ostracized" by senior management after she filed her charge of discrimination with the EEOC in March 2006; (2) yelled at by Max Linnington in a single incident in March 2008; and (3) "scared to return to work" after she attended Mazzeo's deposition in December 2008, where Mazzeo purportedly testified untruthfully. The first two instances are not so intolerable as to force a reasonable person to resign. *See supra* Legal Standards, Section VIII, at pp. 19-20. Occurring in

March 2006 and in March 2008, they are also too remote from Patricot's 2009 resignation to support a constructive discharge claim.

Patricot's allegations concerning the deposition—which she voluntarily attended—similarly fail. Patricot claims that Mazzeo's testimony led her to speculate that "the culture had not changed," so she had to quit. (R. 56.1 Stmt. ¶ 34.) But Mazzeo's testimony was not deliberately intended by Bloomberg to create intolerable working conditions for Patricot, and therefore cannot support a constructive discharge claim. *See Kader v. Paper Software*, 111 F.3d 337, 339-40 (2d Cir. 1997). Indeed, Mazzeo testified only about what she recalled, and did not say or do anything related to Patricot's present working conditions. Regardless, Patricot and Mazzeo no longer had a working relationship, and Mazzeo's testimony could not have created intolerable working conditions for Patricot. (R. 56.1 Stmt. ¶ 34.) And, in all events, because Patricot never returned to Bloomberg, she "never actually experienced the intolerable conditions" she purportedly feared, and thus cannot make out a claim for constructive discharge. *Kader*, 111 F.3d at 341.

## TANYS LANCASTER

### I.    UNDISPUTED FACTS

Bloomberg hired Lancaster in September 1994, and she transferred to Bloomberg's New York City office in March 2000. (R. 56.1 Stmt. ¶ 35.) As of December 2002, Lancaster was in charge of Bloomberg's Algorithmics Project and maintained responsibility for business development. (*Id.* ¶ 36.)

In August 2004, Bloomberg approved Lancaster's request for paid medical leave for ██ ████████ from August 25, 2004 through September 7, 2004. (*Id.* ¶ 37.) In September 2004, Lancaster informed Kenneth Cooper, the head of Bloomberg's Global Trading Systems, that she was pregnant with twins, and Cooper congratulated her. (*Id.* ¶ 38.)

32

In early October 2004, Lancaster met with Cooper to discuss her compensation for the 2004-2005 evaluation cycle. (*Id.* ¶ 40.) Cooper informed Lancaster that Brenton Karmen would begin managing the Algorithmics Project because that project was better aligned with the "buy-side" of Bloomberg trading systems, and that Lancaster would begin reporting to Karmen. (*Id.*) Cooper explained that the change in the reporting structure was part of a restructuring to reduce the number of managers reporting directly to Cooper. (*Id.* ¶ 41.) Lancaster's compensation did not decrease as a result of the change. (*Id.* ¶ 43.) Instead, Lancaster's total intended compensation increased by more than $45,000, from $237,041 to $282,088. (*Id.*) Lancaster never told Cooper that she viewed the reporting structure change as a demotion, and neither Cooper nor any other Bloomberg manager ever told Lancaster that she was being demoted. (*Id.* ¶ 45.)

In November 2004, Lancaster requested to work seven hours per day—instead of the required ten—per her doctor's recommendation. (*Id.* ¶ 46.) Bloomberg granted her request for reduced hours and another request for intermittent leave and was "quite good" about accommodating her petitions for a modified work schedule during her pregnancy. (*Id.*)

In February 2005, Lancaster requested disability leave, effective March 4, 2005, for medical issues associated with her pregnancy. (*Id.* ¶ 47.) Bloomberg provided paid disability leave for the next eight weeks through May 2, 2005. (*Id.*) Lancaster gave birth to twins on May █ 2005. (*Id.* ¶ 48.) Lancaster's maternity leave began May 3, 2005 and ended on August 23, 2005. (*Id.*)

In June 2005, Karmen told Lancaster that he did not think that the Algorithmics project needed a full-time manager. (*Id.* ¶ 49.) Lancaster told Karmen she was "absolutely fine" with his assessment and that she remained open to working on something new when she returned from

33

leave. (*Id.*) But in June or July of 2005, while still on leave, she began to explore job opportunities outside of Bloomberg. (*Id.* ¶ 50.) On or about June 16, 2005, Lancaster learned from a former Bloomberg employee who was working for Advisen, a Bloomberg competitor, that Advisen was interested in hiring her. (*Id.*)

In or around July 2005, Lancaster told Karmen that she needed to work "flexible hours"—from approximately 8:15 a.m. to 4:45 p.m.—when she returned to Bloomberg. (*Id.* ¶ 51.) Karmen had no issue with Lancaster working that schedule. (*Id.*) Lancaster and Karmen discussed two new roles for Lancaster to consider filling when she returned from maternity leave, but Lancaster was interested in neither. (*Id.* ¶ 52.)

Around the same time, Lancaster spoke with Patrick Eldridge, Bloomberg's then Global Manager of Trading System Customer Care, about working on his team. (*Id.* ¶ 53.) Lancaster told him she needed to work flexible hours and he was "fine" with her proposed schedule. (*Id.*) Lancaster understood that Eldridge had to discuss the prospect of Lancaster joining his team with his manager, Nicole Comello, who was in London attending meetings. (*Id.* ¶ 54.)

In or around August 2005, Lancaster interviewed with Jeff Cohen, a former Bloomberg employee who was Advisen's head of sales. (*Id.* ¶ 55.) Following her interview, Lancaster continued to communicate with Cohen about working for Advisen. (*Id.*) On or around August 15, 2005, Lancaster met with Tom Ruggieri, Advisen's CEO and founder, to discuss the role that Advisen envisioned for her. (*Id.*)

Lancaster returned from leave on August 23, 2005. (*Id.* ¶ 56.) She still reported to Karmen because her request to transfer to Patrick Eldridge's group remained pending. (*Id.*) In early September 2005, Lancaster met with Nicole Comello about the possibility of working on

Eldridge's team. (*Id.* ¶ 57.) Comello never told Lancaster that she would report directly to Eldridge. (*Id.*)

On September 16, 2005, Lancaster received a formal job offer from Advisen. (*Id.* ¶ 58.) On September 19, 2005, Lancaster sent an email to Jeff Cohen at Advisen, indicating that she "would be delighted to accept the offer" of employment if Advisen agreed to provide twenty days of vacation. (*Id.*) Lancaster "anticipate[d] joining Advisen in mid-October 2005" assuming that Advisen provided the additional vacation time. (*Id.*) Within hours, Cohen sent Lancaster a revised offer letter that included the additional vacation time that she requested. (*Id.* ¶ 59.)

Either the same day or the day after Lancaster had provisionally accepted Advisen's offer (either September 19 or 20, 2005), Lancaster learned that, at Bloomberg, her transfer to Eldridge's team had been approved and that she would report to Douglas Galm, who reported directly to Eldridge. (*Id.* ¶ 60.) Lancaster had wanted to report directly to Eldridge because she "was a senior level employee" and "felt that that is where [she] should sit within his structure." (*Id.*) On September 20, 2005—after she had already provisionally accepted Advisen's offer—Lancaster e-mailed Claimant Deirdre Maloney, an HR representative at Bloomberg, ostensibly because she was "very concerned" that her new role could be a demotion and could negatively affect her future career opportunities and compensation. (*Id.* ¶ 62.)

On September 21, 2005—two days after telling Advisen she would be joining them in October—Lancaster contacted Jennifer Sack, another Bloomberg HR representative. (*Id.* ¶¶ 58, 63.) When Sack met with Lancaster later that day, Lancaster told her that she was concerned that reporting to Galm would limit the growth of her career and negatively affect her compensation. (*Id.* ¶ 63.)

That same day, Lancaster met with Karmen to discuss her performance review and compensation for the September 2005-September 2006 evaluation cycle. (*Id.* ¶ 64.) The review was critical, noting that Lancaster was doing a poor job managing the Algorithmics project. (*Id.*) Lancaster herself admitted that the project was not as successful as she would have liked. (*Id.* ¶ 67.) Lancaster's annual base salary for the September 2005-September 2006 evaluation cycle remained at $130,000, and she received 150 EECs, with an intended or estimated value of $113,849 for a total intended compensation of $243,849. (*Id.* ¶ 68.)

Also on September 21, 2005, Lancaster signed the offer letter from Advisen that she had received two days earlier along with a confidentiality agreement; she returned both documents to Advisen on September 22, 2005. (*Id.* ¶ 70.)

Lancaster took a vacation to the United Kingdom on or around September 22, 2005 and did not return to the United States until around October 1, 2005. (*Id.* ¶ 73.) Lancaster resigned from Bloomberg on October 3, 2005. (*Id.*) During Lancaster's exit interview, she said that she was leaving Bloomberg for a position that offered more flexibility to work from home. (*Id.* ¶ 74.) She did not allege discrimination or mistreatment on the basis of pregnancy, gender, or her status as a maternity leave-taker. (*Id.*)

## II.   CLAIMS

Lancaster brings discrimination and retaliation claims under Title VII and the NYSHRL and NYCHRL. Because she filed her EEOC charge on May 9, 2006, her Title VII claim is timely only if the challenged events occurred on or after July 14, 2005. She filed her complaint on October 25, 2007, and therefore her NYSHRL and NYCHRL claims are timely if the challenged events occurred on or after October 25, 2004.

A.    **Summary Judgment Is Proper On Lancaster's Discrimination Claims.**

    1.    **Lancaster Cannot Establish A *Prima Facie* Case Of Discriminatory Demotion in 2004.**

Lancaster claims that she suffered a discriminatory "demotion" when Bloomberg asked her to report to a prior peer in October 2004. Lancaster's alleged demotion claim is time barred, because it occurred before October 25, 2004 (as to her NYSHRL and NYCHRL claims) and after July 14, 2005 (as to her Title VII claim). (*Id.* ¶ 40.) Bloomberg also had a legitimate business reason for making the change: It wanted to streamline Cooper's direct reports to reduce the number of managers reporting directly to Cooper. (*Id.* ¶ 41.) Business restructuring is a legitimate business reason, *see supra* Legal Standards, Section II.B, at p. 14, and Bloomberg viewed the Algorithmics project, for which Lancaster was responsible, ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ which explains why Lancaster was impacted by the restructuring. (R. 56.1 Stmt. ¶ 40.) Bloomberg's reasons were not pretextual. Indeed, Lancaster's male peer, ▮▮▮▮▮▮ was also required to report to a prior peer, Suzy Walther, because of the same streamlining. (*Id.* ¶ 42.)

Finally, the fact that Bloomberg had just granted Lancaster a paid leave of absence for ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ undermines any inference of anti-pregnancy bias as to this or any other claim she makes. *Rinsler v. Sony Pictures Entm't, Inc.*, No. 02-CV 4096(SAS), 2003 WL 22015434 (S.D.N.Y. Aug. 25, 2003).

    2.    **Lancaster's Compensation In 2004 Was Not Discriminatory.**

Even though her total intended compensation increased by more than $45,000 in 2004, Lancaster claims she suffered a discriminatory compensation award in October 2004 because her salary remained constant at $130,000 and the total *number* of certificates she received decreased (even though the value of the certificates increased substantially). As this Court has already

noted, it is not base salary or number of certificates that is the appropriate measure of compensation; it is total intended compensation. *Bloomberg II*, 778 F. Supp. 2d at 463. By that measure, Lancaster's situation improved in 2004. And she presents no evidence of any similarly situated comparators who were paid less, or whose pay increased by a greater margin. *See supra* Legal Standards, Section II.A.2(b), at pp. 9-10.

Finally, to the extent that Lancaster insists on ignoring the actual value of her compensation and focuses strictly on the number of certificates awarded, Bloomberg had legitimate business reasons for awarding Lancaster fewer certificates in 2004. In 2004, there was an across-the-board reduction in the number of certificates given to employees and top managers, consistent with the expectation that each certificate would be worth more than a certificate awarded the previous year, and Lancaster was just one of many affected. (R. 56.1 Stmt. ¶ 44.)

### 3.   Lancaster's 2005 Transfer Was Not Discriminatory.

Lancaster claims that Bloomberg discriminated against her by approving the transfer that she *requested* to work on Patrick Eldridge's Trading System Customer Care team after she returned from leave in 2005. Lancaster admits that she affirmatively sought the transfer, but was unhappy that—post-transfer—she would report to Douglas Galm, rather than directly to Eldridge. (*Id.* ¶¶ 53, 57, 60.) Although Lancaster had already agreed to join Bloomberg's competitor, Advisen, by the time she learned that she would be reporting to Galm, Lancaster nonetheless claims that Bloomberg discriminated against her by having her report to Galm. (*Id.* ¶ 60.)

The Court can summarily dismiss this claim. Lancaster offers no evidence that the new reporting relationship would have changed her role or duties, or adversely impacted her future compensation. (*Id.* ¶ 61.) Thus, she did not suffer an adverse action, especially because she had already accepted employment with another employer when she learned of it. (*Id.* ¶ 60.)

### 4.   Lancaster's 2005 Performance Review Was Not Discriminatory.

Lancaster claims that her 2005 performance review was discriminatory, but the circumstances do not give rise to an inference of discrimination.  The chief criticism in Lancaster's review was that Lancaster was not meeting expectations for the Algorithmics project.  (*Id.* ¶ 64.)  Rather than refuting that criticism, Lancaster admitted that the Algorithmics project was not as successful as she would have liked.  (*Id.* ¶ 67.)  In particular, the sales were "slower" than desired, and it was taking longer than expected to engage customers.  (*Id.*)  Thus, far from being discriminatory, the criticisms in Lancaster's review were—by her own admission—valid.

Bloomberg also had legitimate business reasons for Lancaster's review, namely that Lancaster was not growing the Algorithmics project.  As identified by Karmen even before he took over the project, and then after he dug into the project and understood the magnitude of the problems, Algorithmics was doing poorly.  (*Id.* ¶ 65.)  There had also been customer complaints and dissatisfaction about Algorithmics, and Bloomberg had to discontinue the product Lancaster had originally managed.  (*Id.*)

Well established law precludes Lancaster from showing pretext based on prior positive reviews from a different manager.  *See supra* Legal Standards, Section II.C, at p. 15.  And, in any event, the same concerns that characterized Lancaster's 2005 review also existed in the "positive" 2004 review.  Although Cooper was not as involved in the Algorithmics project as Karmen, Cooper's 2004 review recognized problems in Lancaster's performance on the project and he testified that Lancaster's performance on it was poor.  (R. 56.1 Stmt. ¶ 66.)  Karmen, as Lancaster's new manager, was entitled to evaluate her based on his own perception of the project and its problems, and nothing about Cooper's review undermines the credibility of Karmen's review.

### 5.    Lancaster's Compensation in 2005 Was Not Discriminatory.

Lancaster claims that Bloomberg discriminated against her by decreasing her compensation in 2005. Lancaster's claim fails because she does not identify any similarly-situated comparators, *i.e.*, similarly-situated co-workers who also took lengthy leave, but who were paid more than she was. *See supra* Legal Standards, Section II.A.2(b), at pp. 9-10. Indeed, during the twelve-month period between September 2004 and September 2005, Lancaster was on full, paid leave for more than five months—from March 4, 2005 until August 23, 2005—and on intermittent leave for an additional four months. (R. 56.1 Stmt. ¶¶ 46, 47, 48.) Thus, for most of the year, Lancaster was on paid leave of some sort. Bloomberg was not required to ignore Lancaster's lengthy absence, nor was it required to compensate Lancaster the same as other employees who worked more. *See supra* Legal Standards, Section II.B, at p. 14. Additionally, Bloomberg had legitimate business reasons for reducing Lancaster's compensation in 2005: Her performance on the Algorithmics project had been poor. (R. 56.1 Stmt. ¶ 64.)

### B.    Summary Judgment Is Proper On Lancaster's Retaliation Claims.

Lancaster alleges that the allegedly "discriminatory" actions discussed above—her 2005 performance review and compensation, of which she was notified on September 21, 2005—were retaliation for complaints to HR representatives on September 20 and 21, 2005. (*Id.* ¶ 69.)

The timing of Lancaster's supposed protected activity and the adverse actions she alleges demonstrate the absurdity of her retaliation claims:

- On September 20, 2005, Lancaster e-mailed Claimant Deirdre Maloney, an HR representative, because she was "very concerned" that her new role could be a demotion and could negatively affect her future career opportunities and compensation. (*Id.* ¶ 62.)

- On September 21, 2005, after Lancaster learned that Maloney was on leave, she contacted Maloney's colleague Jennifer Sack. (*Id.* ¶ 63.) Sack met with Lancaster later that day.

- Lancaster told Sack that she was concerned that reporting to Galm would limit the growth of her career and negatively affect her compensation. (*Id.* ¶ 63.)

Lancaster's 2005 performance review and compensation cannot be retaliation for her complaints to human resources because Karmen, the manager who took the allegedly retaliatory actions, did not know about these complaints until after the performance review was completed and her compensation was set. (*Id.* ¶ 69.) Indeed, Karmen did not know that Lancaster "went to HR to complain" until she told him *during* the September 21, 2005 meeting. (*Id.* ¶ 69.) And in any event, merely complaining to management about work-related problems outside the scope of anti-discrimination statutes is not protected activity, and there is no evidence that Lancaster complained about discrimination. *See supra* Legal Standards, Section II.A.3(a), at p. 11. There is thus no causal connection between the adverse actions and protected activity; therefore, Lancaster's claim must fail.

### C.   Summary Judgment Is Proper On Lancaster's Constructive Discharge Claim.

Finally, Lancaster has no constructive discharge claim based on her voluntary resignation to join Bloomberg's competitor, Advisen. To prove constructive discharge, Lancaster must show that Bloomberg deliberately made her working conditions so intolerable that she was forced into an involuntary resignation. *See supra* Legal Standards, Section VIII, at pp. 19-20. But the undisputed facts show that Bloomberg considered employment alternatives for Lancaster, and thus clearly wanted to retain her. (R. 56.1 Stmt. ¶ 71.) Lancaster also admitted that Bloomberg was good about accommodating reduced hours requests during pregnancy, and that Karmen and Eldridge had no problems with her revised work schedule. (*Id.* ¶¶ 46, 51, 72.)

In any event, the undisputed facts show that Lancaster voluntarily resigned because she accepted an employment offer from Advisen, a company she had pursued during her maternity leave and which she said offered her more flexibility. (*Id.* ¶¶ 55, 56, 74.) Lancaster

41

provisionally accepted her offer with Advisen on September 19, 2005, *even before* she complained to HR and *even before* she received her negative review from Karmen. (*Id.* ¶ 58, 62, 63, 64.) Finally, in her exit interview, Lancaster said nothing about discrimination, but instead admitted she was leaving Bloomberg for a position that offered more flexibility to work from home. (*Id.* ¶ 73.)

## JANET LOURES

### I.   UNDISPUTED FACTS

Janet Loures began working for Bloomberg in September 1989 as a quality control analyst. (*Id.* ¶ 76.) While Stuart Bell, the manager of Global Data, was on a management rotation from January to March/April 2001, Loures and Ariane Andrews co-managed Global Data on an interim basis. (*Id.* ¶ 78.)

In April 2001, Beth Mazzeo was selected to head Global Data in Princeton, and Loures returned to her Quality Assurance manager position. (*Id.* ¶ 79.) In October 2001, when Loures was about 36 weeks pregnant, Mazzeo reorganized Global Data and promoted Loures to manager for London Global Data and New/Security Issuance. (*Id.* ¶ 80.) Loures's new position consisted of several subgroups, including Translations, Data License, and New Issuance. (*Id.*) Loures left for maternity leave on October 23, 2001. (*Id.* ¶ 81.)

When Loures returned from maternity leave in February 2002, Mazzeo asked Loures to focus on Translations. (*Id.* ¶ 82.) Mazzeo also wanted to have London and Asia Global Data continue to report to Mazzeo, as they had during Loures's leave, so she could get to know the staff. (*Id.*) Loures was upset about the loss of direct reports; Mazzeo was upset that Loures was focused on direct reports instead of concentrating on the important, high-visibility project she had been assigned. (*Id.*)

Mazzeo told Loures that the process of restructuring Global Data was ongoing, that Loures was a good employee, and that there would be new opportunities for her. (*Id.* ¶ 83.) Indeed, in March or April 2003, Mazzeo told Loures that she intended to give her responsibility for the Quality Assurance group, and she did so in late April or early May 2003. (*Id.* ¶ 84.) In May 2003, Loures told Mazzeo that she was pregnant for a second time. (*Id.*) Loures went on her second maternity leave in September 2003. (*Id.* ¶ 85.) During her leave, Mark Zoldi served as interim manager of Quality Assurance, and he retained this position when Loures returned from her leave in April 2004. (*Id.* ¶ 86.) Mazzeo told Loures that she wanted Loures instead to focus on Translations, and that Loures had not really lost anything because the Quality Assurance group might not be around much longer. (*Id.*)

In summer 2005, Loures volunteered to take over a project, but Mazzeo did not select her. (*Id.* ¶ 87.) In September 2005, several managers met and discussed restructuring manager responsibilities due to the departure of a manager, and Loures claims she was slated to take over Profiles and Bloomberg Law. (*Id.* ¶ 88.) Loures ultimately was not assigned to take on these responsibilities, and she felt humiliated, although she had not really lost anything. (*Id.*)

In November 2005, Loures received a "360 Personal Feedback Report," which included feedback from Mazzeo that Loures viewed as negative, and negative ratings by her direct reports. (*Id.* ¶ 89.) Indeed, Loures's direct reports were more critical of her than Mazzeo was. (*Id.* ¶¶ 89, 90.) Loures claims that in December, Mazzeo told Loures that she thought Loures's talent was in process, not management, and moved Loures to the Process Analysis team in January 2006. (*Id.* ¶ 93.) In June 2006, the Process Analysis team was disbanded, and Loures was transferred—along with male employees—to the Profiles group. (*Id.* ¶ 94.)

Loures filed an EEOC discrimination charge in October 2006. (*Id.* ¶ 95.) From then until approximately June 2007, Loures claims that R&D department employees retaliated by failing to act promptly on, or by excessively scrutinizing, her programming requests. (*Id.*) Loures does not know if the head of R&D knew about her pregnancies, her leaves, or her EEOC charge. (*Id.*)

Loures alleges that John Palang of the R&D department was hostile to her, made her job more difficult by making her do certain functions manually, ignored her, and once told her, "You don't care about this." (*Id.* ¶ 98.) In May 2008, she complained to HR about John Palang's hostile treatment of her, which she believed was retaliation for her participation in this action. (*Id.* ¶ 99.) HR investigated and told her that Palang's behavior was inappropriate, but not retaliatory. (*Id.*)

On or about May 23, 2008, two unknown callers dialed into one of Loures's business conference calls. (*Id.* ¶ 100.) On or about May 27, 2008, Bloomberg installed 22 surveillance cameras on the floor where her desk was located, including one in the corner near her desk. (*Id.* ¶ 101.) Cameras were installed over the desks of a number of other Bloomberg employees as well, including Mazzeo and Neal O'Grady. (*Id.* ¶ 101.)

Loures alleges that at various times in the 2007–2009 period different managers retaliated against her by excluding her from meetings. (*Id.* ¶ 105.)

## II.   CLAIMS

Loures alleges discrimination and retaliation under Title VII and the NYSHRL and NYCHRL. She filed an EEOC discrimination charge on October 27, 2006, and a retaliation charge on May 31, 2008; thus, her Title VII claims are timely only if the alleged discrimination occurred on or after December 31, 2005, and if the alleged retaliation occurred on or after

August 5, 2007.  And she filed her complaint on October 25, 2007, so her NYSHRL and

NYCHRL claims are timely only if they occurred on or after October 25, 2004. [3]

**A.      Summary Judgment Is Proper On Loures's Discrimination Claims.**

   **1.    Some of Loures's Claims That She Was Stripped Of Responsibilities
           Are Time-Barred, And All Are Meritless.**

           **(a)    Loures's Diminished Responsibilities Claims After Her
                   Maternity Leaves Are Time-Barred.**

Loures claims she lost responsibilities because fewer employees reported to her when she

returned from her first leave in February 2002, and because she no longer supervised the Quality

Assurance Group following her second leave in 2003 and 2004.  These claims are time-barred

because they concern discrete acts in 2002 to 2004, long before the December 31, 2005

limitations date for her Title VII claims and the October 25, 2004 date for state and city claims.

Loures's claim that her December 2005 removal from management was discriminatory is

likewise time-barred under Title VII.

           **(b)    Loures's Claim That Her Demotion From Management Was
                   Discriminatory Fails Because She Was Demoted Due To Her
                   Performance, Not Her Pregnancy.**

Loures cannot establish a *prima facie* case of discrimination regarding her supposed

demotion from management to a role in Process Analysis.  First, Loures was no longer a member

of the protected class at the time of this change.  Loures did not move out of management in

Global Data until December 2005, more than two years after she gave birth, and twenty-one

months after she returned from her second maternity leave.  That is too long to infer

discrimination and nothing suggests that Loures suffered from "related conditions" years after

_____

   [3] As explained *infra* Loures, Section II.D, at p. 56, Loures does not have standing to bring
claims under the NYSHRL or the NYCHRL.  Nonetheless, we address the merits of those claims
to the extent that they are timely.

45

her pregnancy. *See supra* Legal Standards, Section II.A.1(d), at p. 8.

Even under Loures's version of events, Bloomberg also had legitimate non-discriminatory reasons for moving Loures; namely, she was not a strong manager. In November 2005, Loures received a "360 Personal Feedback Report" that included feedback from her direct reports, one or two of her peers, and her supervisor, Mazzeo. (R. 56.1 Stmt. ¶ 89.) Mazzeo recognized Loures's "towering strengths," including perseverance, process management, customer focus, and technical skills. (*Id.* ¶¶ 89, 90.) Mazzeo rated Loures as high or higher than Loures rated herself in several skill areas, while the employees who reported directly to Loures rated her significantly worse than Loures rated herself. (*Id.*)

In addition to Loures's deficient management skills, Loures's peers—other managers in Global Data who reported to Mazzeo—testified that she was "difficult to deal with," and could be "stubborn" and "inflexible." (*Id.* ¶ 91.) Bloomberg had legitimate reasons to prevent bad managers from continuing to manage. *See Holifield v. Reno*, 115 F.3d 1555, 1559 (11th Cir. 1997) (legitimate reason for demoting manager where investigative report concluded that "allegations concerning [plaintiff's] poor management skills were substantially true" and there were "schisms between [plaintiff] and his subordinates").

Loures alleges the Report was a pretextual basis for her demotion and that Mazzeo was already scheming to demote her, but she proffers no evidence that Mazzeo, who had previously promoted her while she was pregnant, wanted to demote her based on *discriminatory animus* related to Loures's second pregnancy that occurred more than two years earlier.[4] Indeed, the

---

[4] Indeed, similar logic would foreclose Loures's time-barred claims involving Mazzeo even if such claims were timely.

Feedback Report speaks for itself, and Loures concedes that it identified managerial shortcomings.  (*Id.* ¶ 92.)

> **(c)**     **Loures's Claim That Her Transfer From The Process Analysis Team To The Profiles Group In June 2006 Fails Because She Cannot Establish Discrimination.**

Loures cannot establish a *prima facie* case of discrimination based on her transfer from the Process Analysis team to the Profiles group in June 2006.  The transfer took place almost *three years* after her pregnancy, and more than two years after her return from leave, all of which eviscerates any inference of discriminatory intent.  Neither was the transfer adverse.  While Loures's "responsibilities changed, [s]he does not show that they were less significant than the responsibilities [s]he previously enjoyed." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993) (rejecting discriminatory transfer claim).

Finally, the transfer resulted from a business restructuring decision—to disband the Process Analysis team—and Loures "has produced no probative evidence that [s]he was the target of the reorganization." *Mudholkar v. Univ. of Rochester*, No. 00-7412, 2000 WL 1476576, *2 (2d Cir. Oct. 4, 2000).  Indeed, Loures concedes that male employees on the Process Analysis team were also transferred, undermining any assertion of discrimination.  (R. 56.1 Stmt. ¶ 94.); *see Weston-Smith v. Cooley Dickinson Hosp., Inc.*, 153 F. Supp. 2d 62, 71 (D. Mass. 2001) ("The fact that other employees suffered the same fate as [plaintiff] suggests that the restructuring was not pretext[ual.]").

> **(d)**     **Loures's Allegations About Changing Job Responsibilities Are Meritless.**

Loures also alleges that during the summer and in September 2005 she volunteered for new opportunities, but was passed over.  Any Title VII discrimination claims based on these incidents are time-barred.  And in any event, they occurred one year, and eighteen months,

respectively, after Loures returned from her leave, precluding any inference of discrimination. Nor were the actions adverse. Mazzeo's selection of a different employee than Loures to handle a departing manager's work did not impact Loures's position, responsibilities, benefits or compensation. *See, e.g., Dunbar v. Cnty. of Saratoga*, 358 F. Supp. 2d 115, 132 (N.D.N.Y. 2005) (failure to grant a favorable assignment not adverse action because assignment "carried no additional pay or benefit"). Loures also testified that in late 2005 Mazzeo promised to assign her to supervise Translations, Bloomberg Law, and Profiles groups. (R. 56.1 Stmt. ¶ 88.) But a position with consolidated supervision for those three groups was never established, Loures herself admits that she lost nothing, and Loures has no evidence that Bloomberg refused to create the position because of her pregnancy, which was long over both when she was promised the position and when she was denied it. (*Id.* ¶ 88.)

### 2.   Loures's Compensation Awards Were Not Discriminatory.

Loures claims that every compensation award that she received from 2002 through 2007 was discriminatory. In analyzing these decisions, total intended compensation is the relevant measure. *See EEOC v. Bloomberg L.P.*, 778 F. Supp. 2d 458, 464 (S.D.N.Y. 2011).

As a threshold matter, Loures's 2005-2007 compensation claims arose long after Loures ceased to be a member of the protected class. *See supra* Legal Standards, Section II.A.1(a), at pp. 3-4. Thus, Loures has no actionable compensation claims.

Loures's claims are also meritless. In four of the six years, her compensation increased:

- In 2002—seven months after Loures returned from leave—her total intended compensation increased from $224,245 to $226,058, and she ranked fourth in terms of total compensation among the eight managers who reported to Mazzeo. Five of the six male managers who reported to Mazzeo (and who had not taken leave) experienced substantial *decreases* in total intended compensation that year. (███████(33.18% decrease); ███(14.84% decrease); ███(8.93% decrease); ███(4.20% decrease), and ███(15.43% decrease)). (R. 56.1 Stmt. ¶ 108.)

- In 2004, Loures received a substantial increase in her total intended compensation almost seven months after she returned from her second leave. ███████ a peer manager of Loures, received a 3.53% increase in total compensation. (*Id.* ¶ 109.) ███████ also a peer manager of Loures, received a 4.55% *decrease* in total intended compensation. (*Id.*) By contrast, Loures received a 14.73% percent increase. (*Id.*)

- In 2005—eighteen months after Loures returned from leave—Loures received a 14.75% increase in total intended compensation. (*Id.* ¶ 110.)

- In 2007—when Loures was *three and a half years* removed from her leave and far outside the protected class—she received a 4.56% increase in her total intended compensation, to $187,854. (*Id.* ¶ 111.) Although Loures's rate of increase was less than peers ███████ and ███████████ these individuals earned much less than Loures in total intended compensation (approximately $140,000). (*Id.*)

For all of these years—2002, 2004, 2005 and 2007—Loures offers no evidence that pregnancy discrimination affected her compensation *increases*; nor does she offer evidence that similarly situated comparators (*i.e.*, managers who took leave) were treated differently.

In 2003 and 2006, Loures's total intended compensation decreased, but Loures has failed to show that the decreases were attributable to pregnancy discrimination. In September 2003 (nineteen months after returning from maternity leave), her total intended compensation decreased by 29.96%, but other peer managers who reported to Mazzeo—and who never took a leave longer than 20 days—experienced comparable and even greater decreases. (███████ (30.53%); ███████ (42.76%); and ███████ (25.88%)). (*Id.* ¶ 112.) Moreover, the decrease reflected Loures's poor performance in the preceding months. *See supra* at 42, 46.

Loures received a 13.82% decrease in total intended compensation in 2006, but this was *two and a half years* after she returned from maternity leave, precluding any inference of discrimination. (R. 56.1 Stmt. ¶ 113.) *See supra* Legal Standards, Section II.A.2.(c), at pp. 10-11; Section II.A.1(d), at p. 8. Nor can Loures show that Bloomberg paid her less than similarly situated comparators, *i.e.*, other senior data analysts who had taken leave for reasons unrelated to pregnancy. *See supra* Legal Standards, Section II.A.2(b), at pp. 9-10. In fact, Loures's 2006

compensation far exceeded that of other senior data analysts:   Loures's total intended

compensation was $179,662, whereas other senior data analysts who also reported to Ray

Whitman had total intended compensation of $112,671 (███████) and $118,565 (████████).

(R. 56.1 Stmt. ¶ 113.)

    In any event, Bloomberg had a legitimate business reason for decreasing Loures's pay.

Another senior data analyst who was highly compensated relative to her peers, ████████

experienced a more significant decrease in total intended compensation than Loures (24.34%)

because her total intended compensation, like that of Loures, was also already quite high at

$189,661. (*Id.* ¶ 114.)  No longer a manager in 2006, Loures's compensation similarly needed to

be adjusted to reflect the lack of supervisory responsibilities and could not continue to far

outpace the compensation of her new peers—other senior data analysts.

## B.    Summary Judgment Is Proper On Loures's Retaliation Claims.

    Grasping for a non-time-barred retaliation claim, Loures points to every possible slight or

negative interaction she has ever experienced and labels it retaliation.  Bloomberg is entitled to

summary judgment on all of Loures's retaliation claims, because she cannot establish a *prima*

*facie* case of retaliation, or that Bloomberg's actions were motivated by retaliatory animus.

### 1.    Loures's Complaints About The R&D Department Staff Fail To State A Claim For Retaliation.

    Loures alleges that after she filed her EEOC charge in October 2006, the R&D

Department excessively scrutinized, ignored, or only partially completed her requests for

programming assistance, or "tickets," from the end of 2006 through June 2007.  Because this

conduct occurred before August 5, 2007, it is time-barred.  *See supra* Loures, Section II, at pp.

44-45.  It is also too remote to the filing of her EEOC charge six months earlier to be actionable.

*See, e.g., Ragin v. E. Ramapo Cent. Sch. Dist.*, No. 05 CV 6496(PGG), 2010 WL 1326779, at

*24 (S.D.N.Y. Mar. 31, 2010) ("[M]any courts in this circuit have held that periods of two months or more defeat an inference of causation."). Loures also admits that she has no probative evidence that the alleged retaliators, David Lakshmanan or John Palang, knew that she had filed her EEOC charge, eviscerating any causal connection between her activity and their purported conduct. (R. 56.1 Stmt. ¶ 95.) Finally, the conduct did not constitute a materially adverse action that would reasonably deter the filing of a complaint. *See supra* Legal Standards, Section II.A.3(c), at pp. 12-13. While Loures alleges that Lakshmanan and Palang were unresponsive to her programming tickets, Loures admits that Palang and a temporary programmer addressed all of her tickets in June 2007. (R. 56.1 Stmt. ¶ 95.). *See Stofsky v. Pawling Cent. Sch. Dist.*, 635 F. Supp. 2d 272, 304 (S.D.N.Y. 2009) (employer's failure to "address[] [plaintiff's] problems more quickly and more effectively" was "not retaliation"). Loures also alleges that Palang was hostile to her a year later, in May 2008, because he spoke to Loures's co-worker about a problem with reports from one of Loures's vendors, rather than speaking with Loures herself. (R. 56.1 Stmt. ¶ 98.) But hostility and petty slights do not constitute retaliation. *See supra* Legal Standards, Section II.A.3(c), at pp 12-13. Moreover, HR investigated the incident and concluded that Palang was "aggressive" with other co-workers, and there is no evidence that Palang's hostile behavior to Loures on this particular day had anything to do with retaliatory animus towards her; it occurred eighteen months after she filed her EEOC charge, and there is no evidence that Palang knew about that charge. (R. 56.1 Stmt. ¶¶ 95, 99.)

### 2.   Bloomberg's Media Statement Was Not A Materially Adverse Action Directed At Loures.

Loures's allegation that Bloomberg spokesperson Judith Czelusniak made retaliatory media statements following Loures's motion to intervene in EEOC's lawsuit fails for the same reasons that Patricot's identical claim fails. Czelusniak did not refer to Loures specifically, and

the context of the statement makes clear that Czelusniak was referring to the "stunt" of unnecessarily naming Mayor Bloomberg in the complaint – a fair comment under the circumstances.

### 3.   Loures's Claims That She Was Being Monitored Are Frivolous.

Loures's allegations that she was monitored—by telephone or by camera—after she engaged in protected activity are implausible, but—even if credited—are not retaliatory acts. Loures asserts that two unknown callers dialed in to one of Loures's business conference calls. (R. 56.1 Stmt. ¶ 100.)  But Loures cannot even identify the callers or provide any evidence regarding their intentions, and concedes that when she complained, Bloomberg promptly investigated and gave her a secure conference call PIN so it would not happen again.  (*Id.*)  Loures's unsubstantiated paranoia is not an actionable claim of any sort.

Loures also asserts that a security camera was placed near her desk approximately one week after she complained to HR about Palang.  (*Id.* ¶ 101.)  Even if the camera had been aimed directly at Loures, that would not have been an adverse action.  *See Zolondek v. Worldwide Flight Servs., Inc.*, No. 02 CV 2030, 2006 WL 4100886, at *15 (E.D.N.Y. Aug. 28, 2006) (allegations that plaintiff was "watched constantly and monitored by a camera[] are not harmful to the point that they could well dissuade a reasonable worker from complaining").  Of course, the *camera was not installed to monitor Loures*; it was just one of many cameras that Bloomberg installed as part of a larger risk management initiative.  Indeed, cameras were also installed at or near the desks of other managers. (R.56.1 ¶ 101.)  In any event, Loures has no evidence that individuals in Risk Management knew about her protected activity.  This claim accordingly fails.

### 4.   Loures's Remaining Retaliation Claims Are Meritless.

Loures has a handful of other retaliation claims, none of which are actionable.  She alleges Mazzeo stared menacingly at her at work on the day the complaint was filed.  (*Id.* ¶ 96.)

Even if true, this is not materially adverse. *See Shapiro v. N.Y.C. Dep't of Educ.*, 561 F. Supp. 2d 413, 427 (S.D.N.Y. 2008). Loures's claim that Whitman retaliated against her when he sat a supposedly hostile person, Lin Zhang, next to her, is implausible given her concession that Whitman moved Loures away from Zhang *within one hour* of Loures's complaint about the seating arrangement. (R. 56.1 Stmt. ¶ 103.)

Loures also alleges that over a three-year period (2007-2009), various supervisors at one time or another excluded her from a meeting, and/or did not solicit her input when she believed they should have. (*Id.* ¶ 105.) But "the failure to ask plaintiff for input" in a business decision is "so minor that [it] fail[s] to satisfy the *Burlington Northern* standard for adverse employment actions." *Szarzynski v. Roche Labs., Inc.*, No. 07-CV-6008, 2010 WL 811445, at *13 (W.D.N.Y. Mar. 1, 2010). And, Loures has not proffered any evidence that her exclusion from certain random meetings had any significant impact on her professional advancement such that it would deter a reasonable person from complaining about discrimination. *See supra* Patricot, Section II.A.3, at p. 25.

Finally, Loures alleges that in 2007 and 2008, Whitman retaliated against her by "peppering" her review with negative comments. (R. 56.1 ¶ 104.) However, Loures's 2007 review was generally positive, noting that Loures met "and occasionally exceed[ed]" expectations for her role, and it coincided with a pay increase that year. (*Id.* ¶¶ 104, 111.) This allegation amounts to nothing more than subjective disagreement with her supervisor's assessment of her performance. (*Id.* ¶ 104.) Therefore, her 2007 review was not adverse, and she offers no evidence of pretext. *See supra* Legal Standards, Section II.A.3(c), at pp. 12-13. Furthermore, Loures's 2008 review occurred over a year after filing her complaint. (*Id.* ¶ 95.) It

is therefore too remote in time from any protected activity to constitute actionable retaliation. *See supra* Legal Standards, Section II.A.3(d), p. 13.

### C. Summary Judgment Is Proper On Loures's Hostile Work Environment Claim.

Loures "contends that every negative thing that happened to her created a hostile work environment and that it was orchestrated" by Mazzeo, but the incidents themselves were not objectively hostile, and Loures has no evidence that Mazzeo's conduct was motivated by discriminatory animus. *Jain v. Marsh, Inc.*, No. 08 CV 2515, 2010 WL 743553, at *4 (S.D.N.Y. Mar. 1, 2010). Because Loures fails to offer any "hard evidence showing that [her] version of the events is not wholly fanciful," her hostile work environment claim should be dismissed. *Id.*

No reasonable fact-finder could conclude that Loures's allegations about the conduct she experienced, taken individually or collectively, created a hostile work environment, and she cannot show that any of the conduct she describes was related to her pregnancy. *See supra* Legal Standards, Section IV, at pp. 16-17. Loures complains about her subjective feelings of humiliation, but does not offer any probative evidence of conduct by supervisors intended to humiliate. She alleges she was humiliated when a co-worker told her that he no longer reported to her, but while the substance of his message may have upset Loures, it occurred in private and he was not her supervisor. (R. 56.1 Stmt. ¶ 106); *see Hussein v. Pierre Hotel*, No. 93 CV 3698, 1996 WL 19029, at *4 (S.D.N.Y. Jan. 18, 1996) ("vague allegations regarding . . . humiliation by non-supervisory employees [were] insufficient" for hostile work environment claim). Loures also says she was humiliated because she suspects people were talking about her loss of responsibilities, but she has no evidence of this. (R. 56.1 Stmt. ¶ 106.) Loures's subjective feelings and speculation about what others thought about her role cannot support a hostile work environment claim. *See supra* Legal Standards, Section IV, at pp. 16-17.

Nor did Loures's four negative interactions with Mazzeo—over a period of three years—create a hostile work environment because such conduct is not pervasive. *Id.* Loures alleges Mazzeo humiliated her in two staff meetings: once by ignoring her when she volunteered to take on a project, and once, at another meeting, by changing her mind about a plan to have Loures supervise two groups she had slated Loures to supervise in September 2005. (R. 56.1 Stmt. ¶¶ 87, 88.) These petty slights are not actionable, and have no connection to Loures's pregnancy, which occurred roughly two years earlier. *See supra* Legal Standards, Section II.A.1(c), at p. 6.

Loures's claim that it was "harassing" for Mazzeo to say that Loures was not "committed enough" does not create a hostile work environment. (R. 56.1 Stmt. ¶ 107.) Loures interpreted this comment as a criticism of Loures's commitment to the job after becoming a mother, but she points to no evidence that this was Mazzeo's intent. (*Id.*) And Loures's subjective interpretation of Mazzeo's remark cannot support a hostile work environment claim. *See supra* Legal Standards, Section IV, at p. 16.

Loures alleges a single instance where Mazzeo was "aggressive," "screaming," and "pointing in her face" when Loures complained about her direct reports. (*Id.* ¶ 107.) But yelling by supervisors does not create a hostile work environment, and, in any event, Loures has no evidence of discriminatory animus. *See supra* Legal Standards, Section IV, at p. 16-17. Loures admits, moreover, that Mazzeo was frustrated with Loures because she thought Loures was obsessed with the number of her direct reports, rather than her assigned job. (R. 56.1 Stmt. ¶ 107.)

### D.   Loures's Claims Do Not Implicate The Human Rights Laws Of New York State And New York City.

Loures also brings her Title VII discrimination and retaliation claims under the New York State Human Rights Law and the New York City Human Rights Law. These claims should

be dismissed because since 1996, Loures has been a resident of Englishtown, New Jersey, and an employee in Bloomberg's offices in Princeton, New Jersey. (*Id.* ¶ 77.) In order for a nonresident to invoke the protections of New York State and City human rights laws, she must prove that the discriminatory act had an impact within the boundaries of the State and City, respectively. *See Hoffman v. Parade Publ'n*, 933 N.E.2d 744, 745 (N.Y. 2010). Loures has not alleged, much less proved, that any discriminatory act had an impact in New York City or State, as she herself has always lived and worked in New Jersey. Accordingly, her city and state law claims should be dismissed. *See Fried v. LVI Servs., Inc.*, No. 10 CV 9308, 2011 WL 4633985, at *13 (S.D.N.Y. Oct. 4, 2011); *Doner-Hendrick v. N.Y. Inst. of Tech.*, No. 11 CV 121, 2011 WL 2652460, at *8 (S.D.N.Y. July 6, 2011).

## MONICA PRESTIA

**I.    UNDISPUTED FACTS**

Bloomberg hired Prestia in December 1997 as an Account Executive. (R. 56.1 Stmt. ¶ 115.) She became pregnant in February 2005, and announced her pregnancy in May 2005. Her immediate supervisor, Frank Vulpi, responded that he was happy for her. (*Id.*)

Beginning in November 2004, Bloomberg required all advertising salespeople to input notes about prospective sales into the Prospect System (the "PROS" system). (*Id.* ¶ 116.) In March or April 2005, Carroll Kaschak—Prestia's second-level manager—met with her to express displeasure with how she did so. (*Id.* ¶ 117.)

Prestia began █████████████████████ related to her pregnancy in May 2005. (*Id.* ¶ 118.) On or before May 23, 2005, Prestia met with Stacey Follon, an HR representative, and indicated she would need to take intermittent leave one to two days per week beginning May 23, 2005 and continuing until the birth of her child, and that her workload must "be shortened/accommodated to fit shorter work days" because she could not work five days a week

from 8:00 a.m. to 6:00 p.m. (*Id.* ¶ 119.) Prestia agreed to call Bloomberg on days when she would be absent. (*Id.*) Kate Wheatley, one of Bloomberg's HR representatives, approved the leave request. (*Id.*)

Even though the "normal workday at Bloomberg" was 8:00 a.m. to 6:00 p.m.—and even though Prestia understood that she was allowed to work from 9:00 a.m. until 5:00 p.m. only on days when she was not feeling well—Prestia began working daily from 9:00 a.m. until 5:00 p.m. in June or July 2005. (*Id.* ¶¶ 120, 121.) Kaschak noticed that Prestia and another employee on Vulpi's team, ██████████ were arriving late, and reminded Vulpi that they were required to be at work on time. (*Id.* ¶ 121.) At that time, Kaschak did not know that HR had approved Prestia's request to arrive late sometimes. (*Id.* ¶ 123.)

On August 12, 2005, Prestia e-mailed HR's Stacey Follon: "I don't believe that my supervisors are aware of the specifics of my medical note and that is causing me a lot of unwanted stress." (*Id.* ¶ 124.) On August 15, 2005, Prestia met with Stacey Follon and told her that she was upset because Vulpi had spoken to her on several occasions about coming in late. (*Id.* ¶ 125.) Follon said that she could not speak to Kaschak and Vulpi about Prestia's medical issues because her medical issues were confidential. (*Id.*) Neither Vulpi nor Kaschak were present during Prestia's meeting with Follon and Prestia does not know whether Follon told Vulpi or Kaschak that it was okay for her to come in late and leave early. (*Id.* ¶ 126.)

On August 23, 2005, Prestia's doctor ███████████████████████████ beginning September 2, 2005, and said that she could return to work "after delivery." (*Id.* ¶ 127.) Prestia began paid leave September 1, 2005, gave birth November ██ 2005, and returned from leave February 21, 2006. (*Id.*)

On or before March 13, 2006, Kaschak came across a potentially falsified PROS note that Prestia had entered concerning Rallye Motors. (*Id.* ¶ 132.) Kaschak called Priya Varindani, Prestia's HR representative, and explained that Prestia's note indicated that Prestia had met with Martin Hall during her recent visit to Rallye Motors, even though an earlier note from a different salesperson indicated that Martin Hall no longer worked for Rallye Motors. (*Id.*) Kaschak met with Prestia on March 13, 2006, discussed Prestia's visit to Rallye Motors, and asked her to 'clean up' some of her PROS notes. (*Id.* ¶ 133.) Kaschak called Varindani after meeting with Prestia. (*Id.*) Kaschak, Prestia, and Varindani met together the next day. (*Id.* ¶ 134.) During the meeting, Kaschak directly asked Prestia whether she went to Rallye Motors and, if so, with whom she met. (*Id.*) Prestia told them she dropped off a media kit with the receptionist. (*Id.*)

On March 16, 2006, Prestia's attorney sent a letter to Wheatley indicating that Prestia had retained her with respect to "matters that arose during [Prestia's] pregnancy." (*Id.* ¶ 135.) This was the first time she complained about alleged discrimination. (*Id.*)

On or around March 24, 2006, Prestia met with Vulpi and Kaschak and received a written performance evaluation for December 2004 to December 2005. (*Id.* ¶ 136.) Prestia disagreed with the ratings that she received. (*Id.*)

On about April 3, 2006, Wheatley told Prestia that she investigated her concerns and was confident that Prestia would not have any further issues. (*Id.* ¶ 140.) Prestia told Wheatley that she disagreed with her evaluation and faxed her a written rebuttal. (*Id.*) After speaking with Prestia, Kaschak, and Vulpi and reviewing Prestia's past reviews, Wheatley concluded that Prestia's performance evaluation accurately reflected Vulpi's assessment of her performance and was consistent with past performance ratings. (*Id.* ¶ 141.)

In April or May 2006, Prestia met with Vulpi to receive information regarding her compensation. (*Id.* ¶ 142.) The only difference in her compensation was that she received five fewer EECs after she returned from leave compared to the previous year, which she claims was "unprecedented." (*Id.*) The ten certificates she received, however, had a higher total intended value ($7,452) than the total intended value of the fifteen certificates Prestia received the previous year ($7,200). (*Id.* ¶ 143.) Prestia's base salary remained the same, at $135,000, and thus her total intended compensation increased slightly. (*Id.* ¶ 142.)

This was not the first time Prestia saw a year-to-year decrease in the number of certificates awarded to her. In December 2003, Prestia had been awarded 85 EECs with an intended value of $26,625. (*Id.* ¶ 144.) But the next year, in or around December 2004, Prestia was awarded fifteen EECs with an intended value of $7,200. (*Id.*) Thus, Prestia was awarded 70 fewer certificates in December 2004 than December 2003, *before* she became pregnant. (*Id.*)

Prestia stopped actively working at Bloomberg in June 2006, and resigned in May 2008. (*Id.* ¶¶ 146, 147, 148)

## II.   CLAIMS

Prestia brings discrimination and retaliation claims under Title VII and the NYSHRL and NYCHRL. She filed her EEOC charge on June 16, 2006, and thus her Title VII claims are timely if they occurred on or after August 20, 2005. (*Id.* ¶ 149.) She filed her complaint on January 4, 2008, and therefore her NYSHRL and NYCHRL claims are timely if the challenged events occurred on or after January 4, 2005.

Prestia also asserts claims under the Family and Medical Leave Act, which are timely only if the challenged events occurred on or after January 4, 2006 (January 4, 2005 if she can prove a willful FMLA violation). She asserts an IIED claim, which is timely only if the

challenged events occurred on or after January 4, 2007, and various negligence claims, which are

timely if the challenged events occurred on or after January 4, 2005.

### A.   Summary Judgment Is Proper On Prestia's Discrimination Claims.

#### 1.   Prestia Cannot Establish A *Prima Facie* Case Based On Scrutiny Of Her Late Arrival Times In August 2005.

Prestia complains that Bloomberg subjected her to undue scrutiny about her arrival time

while she was pregnant. Much of the scrutiny that Prestia complains about occurred in July

2005, and thus any Title VII claims based on it are time-barred. In addition to being largely

time-barred, such scrutiny is *not* an adverse action. (*Id.* ¶ 121.); *see Ifill v. United Parcel Serv.*,

No. 04 CV 5963, 2008 WL 2796599, at *6 (S.D.N.Y. July 17, 2008) (complaints about constant

monitoring and scrutiny not sufficient to constitute adverse actions); *see supra* Legal Standards,

Section II.A.1(c), at pp. 5-6. Here, while Prestia claims that she felt "stress[ed]," "confus[ed]"

and "upset[]" that Vulpi repeatedly asked her why she was arriving late, she alleges no tangible

change in the terms and conditions of her employment. (*Id.* ¶¶ 124, 125.)

Regardless, there is no evidence to raise an inference of discrimination. *See supra* Legal

Standards, Section II.A.1(d), at pp. 7-8. Prestia was not singled out for her pregnancy. Around

the same time that Kaschak first spoke with Vulpi about Prestia arriving late to work, she spoke

with Vulpi about another woman on his team, ██████████ who was also coming in late. (R.

56.1 Stmt. ¶ 121.) Kaschak similarly focused on the schedules of other employees. (*Id.* ¶ 122.)

#### 2.   Prestia Cannot Establish A *Prima Facie* Case Based On Perceived Slights By Kaschak After Prestia Returned From Maternity Leave.

Prestia complains that Kaschak ignored her after she returned from maternity leave,

failed to ring an "acknowledgment bell" for Prestia's sales, and failed to introduce Prestia to one

or two new employees, neither of which were in Kaschak's Radio Advertising Sales group. (*Id.*

¶ 129.) None of these perceived slights—all of which, at most, hurt Prestia's pride—can be

deemed adverse employment actions. *See supra* Legal Standards, II.A.1(c), at p. 5-6; *Pough v. Mineta*, No. 03 C 6838, 2008 WL 4371294, at *2-4 (N.D. Ill. Sept. 19, 2008) (lack of public recognition for accomplishments does not constitute adverse action).

Kaschak also had legitimate reasons for the actions. Wheatley investigated Prestia's bell-ringing allegation and concluded that Prestia did not receive the desired bell ringing because she failed to make sales or made sales when Kaschak was not in the office to ring the bell. (R. 56.1 Stmt. ¶ 130.) Kaschak failed to introduce Prestia to one or two new employees because Prestia was on the phone while Kaschak was making introductions. (*Id.*) Prestia cannot show that these reasons are pretextual.

### 3.    Prestia Cannot Establish A *Prima Facie* Case Based On The Investigation Of Potentially Falsified PROS Entries.

Prestia complains that Kaschak subjected her to investigation and heightened scrutiny about her PROS entries. First, an employer's investigation of an employee, including close scrutiny of their work, is not an adverse action. *See supra* Legal Standards, Section II.A.1(c), at pp. 5-6. Regardless, Prestia's complaint only tells half the story. While conducting a standard review of PROS notes, Kaschak discovered a PROS note that Prestia had entered concerning a visit to Rallye Motors. (*Id.* ¶ 132.) Prestia's note indicated that Prestia had met with Martin Hall during her recent visit to Rallye Motors, but an earlier note from a different salesperson indicated that Martin Hall no longer worked for Rallye Motors. (*Id.*) Based on that discrepancy, Kaschak had reason to suspect that Prestia might be falsifying information on her notes, and, consequently, had legitimate reasons to conduct an investigation. And in the face of these justifications, Prestia has no evidence of pretext.

4.      **Summary Judgment Is Proper As To Prestia's Claim That Her 2005 Performance Evaluation Was Discriminatory.**

Prestia disagreed with her 2005 performance ratings, but they had nothing to do with her pregnancy. They instead reflected her poor job performance in prospecting new accounts and meeting her ad sale revenue target. (*Id.* ¶ 136.) For example, Prestia's revenue arose from a single account that required little maintenance, and she was lackadaisical about prospecting and getting new business. (*Id.* ¶ 137.) Prestia herself admitted that she failed to achieve her revenue target in 2005, even though Bloomberg pro-rated her target to account for four months of maternity leave. (*Id.* ¶ 138.)

Prestia's arguments that Bloomberg's stated reasons for her poor performance evaluation were pre-textual are legally meritless and unsupported by evidence.

- Prestia's claim that her 2005 performance evaluation was the "worst" evaluation she ever received is irrelevant because her supervisors were not bound by Prestia's prior performance evaluations. *See supra* Legal Standards, Section II.C, at p. 15.

- Prestia's self-serving claim that her evaluation should have been more positive is immaterial because "[a]n employee's opinion that a performance review [is] unfair, supported only by her own conclusory statements to that effect, cannot bootstrap her claims into a Title VII claim of discrimination." *Reilly v. Metro-North Commuter R.R. Co.*, No. 93 CV 7317(PKL), 1996 WL 665620, at *9 (S.D.N.Y. Nov. 15, 1996).

- Prestia's claim that she would have met her revenue target but for maternity leave is unavailing because Bloomberg pro-rated the target to account for her leave.

- Prestia claims that the evaluation contained stereotypic comments, but it noted only that Prestia had "not experienced the same intensity" as before and expressed hope that Prestia would "be back to her normal aggressive new business mode." (R. 56.1 Stmt. ¶ 139.)

5.      **Prestia's 2006 Compensation Award Was Not Discriminatory.**

Prestia claims that her 2006 compensation award was discriminatory because, while her salary remained the same as the previous year—and her total intended compensation increased— she received fewer certificates. (*Id.* ¶ 142.) Total intended compensation is, of course, the

relevant measure. *EEOC v. Bloomberg L.P.*, 778 F. Supp. 2d 458, 463 (S.D.N.Y. 2011). Prestia did receive 15 certificates in December 2004, before her leave, and 10 in December 2005, after her leave. (*Id.* ¶ 143.) But the 15 certificates in 2004 had an intended value of $7,200, whereas the 10 certificates in 2005 had an intended value of $7,452, meaning the intended value of her certificates *increased* after her maternity leave. (*Id.*)

In any event, to establish discrimination, Prestia must be able to show that she was paid less than similarly situated non-members of her protected class, meaning similarly situated employees who *also took leave*. *See Bloomberg II*, 778 F. Supp. 2d at 473; *see supra* Legal Standards, Section II.A.2(b), at pp. 9-10. Prestia has failed to make that showing. Bloomberg also had legitimate business reasons for the small increase in Prestia's compensation, namely, her performance.

That Prestia suffered far sharper cuts in incentive certificates before she became pregnant refutes any claim that her 2006 compensation award was a pretext for discrimination or retaliation. Specifically, in December 2003 (pre-pregnancy and pre-maternity leave), Prestia was awarded 85 certificates with a value of $26,625, while in December 2004 (also pre-pregnancy and pre-maternity leave), she was awarded only 15 certificates—70 fewer than the previous year—with an intended value of only $7,200. (R. 56.1 Stmt. ¶ 144.) Her total intended compensation also decreased in that period from $161,625 to $142,200. (*Id.*) Thus, Prestia's certificate award in 2006 was consistent with her diminishing sales performance and previous corresponding reductions, none of which resulted from pregnancy discrimination.

### 6. Prestia Cannot Prove Her Remaining Discrimination Claims.

Prestia complains that on one occasion before she left for maternity leave, Kaschak shouted at her for being unfamiliar with the PROS system. But yelling at an employee does not constitute an adverse employment action. *See supra* Legal Standards, II.A.3(c), at p. 13.

Prestia also complains that Bloomberg discriminated against her after she returned from maternity leave by moving her desk to a location where her co-workers were sitting behind her, but that is not an adverse action. (*Id.* ¶ 128.); *See Cunningham v. N.Y. State Dep't of Labor*, No. 1:05-CV-1127-DNH-RFT, 2010 WL 1781465, at *6 (N.D.N.Y. Apr. 30, 2010) (relocation of office from fifth floor to first floor not adverse employment action). And, Prestia admits that the entire sales team moved to a new floor while Prestia was out on maternity leave, undermining any inference of discrimination. (*Id.*)

Finally, Prestia claims that she was discriminated against shortly after she returned from maternity leave when Trevor Fellows, a Bloomberg manager, said to her, "Monica, hey, what's this, your third kid?" as he was walking by her desk. (*Id.* ¶ 131.) This comment is innocuous. In any event, Prestia did not report to Fellows at the time, and the law is clear that a stray comment, even from a direct supervisor, is not an adverse action. (*Id.*); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001).

**B.      Summary Judgment Is Proper On Prestia's Retaliation Claims.**

Prestia also alleges that several of the same allegedly "discriminatory" actions discussed above were retaliatory after she retained legal counsel and complained of discrimination. But the vast majority of these actions arose *before* Prestia first complained about alleged discrimination based on pregnancy or sex on March 16, 2006, precluding a *prima facie* case of retaliation. (R. 56.1 Stmt. ¶ 135.) Similarly, Prestia's performance evaluation cannot establish a *prima facie* case of retaliation because the alleged retaliator—Kaschak—had no knowledge of Prestia's protected activity when she met with Prestia to discuss the evaluation on March 24, 2006. (*Id.* ¶ 136.); *see Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980).

In fact, Prestia's compensation award is the only allegedly retaliatory action that arose *after* Kaschak learned of Prestia's protected activity. But that award was based on Prestia's

performance review, which could not have been retaliatory because it occurred before Kaschak learned of the protected activity. In any event, Prestia cannot sustain a retaliation claim based on her compensation award for the same reasons the award does not give rise to a discrimination claim: Prestia's income actually increased. *See supra* Prestia, Section II.A.5, at p. 63.

### C.   To The Extent That Prestia States A Claim For A Hostile Work Environment, Summary Judgment Is Proper.[5]

To survive summary judgment on her hostile work environment claim, Prestia must establish that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment. *See supra* Legal Standards, Section IV, at p. 16. None of the complained-of conduct even approaches that threshold.

Prestia has no evidence of discriminatory intimidation based on sex or pregnancy. Vulpi fully supported Prestia's pregnancy and no evidence suggests that Kaschak was biased against pregnant women. Prestia alleges bias solely because Kaschak "[u]pon information and belief . . . is unable to become pregnant," and a co-worker allegedly asked Prestia, "Monica, what is this, your third baby?" Even if supported by evidence, no reasonable jury could infer bias on these meager facts. *See supra* Legal Standards, Section IV, at pp. 16-17. In any event, none of the actions that Prestia alleges—ranging from the relocation of her desk to a bad performance review—even approach the high standard necessary to maintain a hostile work environment claim.

### D.   Summary Judgment Is Proper On Prestia's Family Medical Leave Act Claim.

---

[5] Prestia's complaint does not specifically allege hostile work environment, but paragraphs 16-19 are captioned "Hostile Work Environment," and she also alleges that Bloomberg discriminated and retaliated against her by subjecting her to "harassment" and "hostile work environment," among other things.

Although Prestia was eligible for FMLA leave and took maternity leave under the FMLA, she presents no evidence that Bloomberg failed to return her to her position as a salesperson following leave. Nor does she allege that her responsibilities or duties changed in any way. And Prestia cannot establish a failure to reinstate by pointing to *de minimis* changes, such as an altered desk location and small salary increases. *See supra* Legal Standards, Section V, pp. 17-18. Accordingly, Prestia's FMLA claim should be dismissed.

**E.     Summary Judgment Is Proper On Prestia's Emotional Distress Claims.**

Prestia's IIED claim should be dismissed as time-barred, since all of the events she challenges occurred prior to January 4, 2007. Prestia's NIED claim should be dismissed as barred by New York's Workers' Compensation Law § 29(6), which provides that the statute "shall be the exclusive remedy to an employee . . . injured . . . by the negligence or wrong of another in the same employ." *See supra* Legal Standards, Section VI, at p. 18.

Additionally, Prestia's IIED and NIED claims must also be dismissed because she cannot establish the elements of these claims. *See supra* Legal Standards, Section VI, at p. 18. Both claims require a showing that the defendant engaged in extreme and outrageous conduct that goes beyond all possible bounds of decency so as to be regarded as atrocious and utterly intolerable in a civilized society. Nothing in the record comes close to establishing that high standard. Additionally, with respect to her IIED claim, Prestia presents no evidence that Kaschak or any other Bloomberg employee intentionally or recklessly caused her severe emotional distress. *See Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993) (IIED requires recklessness or intent).

With respect to her NIED claim, Prestia has not established that her safety was threatened. *Sheila C.*, 11 A.D.3d at 130, 781 N.Y.S.2d at 350 (NIED requires a threat to safety). Prestia alleges that Bloomberg's treatment threatened her ███████████████ but the doctor's note

she submitted in support of taking early leave stated that Prestia required ███████████ ███████████████████████████████ it makes no mention of harassment or work-related stress. (R. 56.1 Stmt. ¶¶ 118, 119.)

### F.      Summary Judgment Is Proper On Prestia's Negligent Hiring and Supervision Claim.

Prestia's negligent hiring/supervision claim, like her NIED claim, should be dismissed because New York's Workers' Compensation Law is the exclusive remedy for an alleged employers' negligence. *See supra* Legal Standards, Section VII, at p. 18. Further, Prestia's claim fails because she identifies no tortious conduct by Bloomberg or Bloomberg employees, and absent tortious conduct, she cannot show causation. Further, Prestia identifies no cognizable injury because she alleges only emotional injury, and she identifies no evidence that at the time of hire, or anytime subsequently, Bloomberg should have concluded that Kaschak, Vulpi, or any other Bloomberg employee had a propensity to engage in tortious conduct (which they did not). Further, because Prestia alleges no injury other than emotional distress, her claim for "negligent hiring, retention, and supervision" is nothing more than a repackaged claim for negligent infliction of emotional distress and should be dismissed for the reasons set forth *supra* Legal Standards, Section VII, at p. 19; *see Stauber v. N.Y.C. Transit Auth.*, 781 N.Y.S.2d 26, 27 (App. Div. 2004) ("[S]ince plaintiff fails to allege any substantial injury other than emotional distress, all of her theories of negligence—including, among others, negligent hiring, training, and supervision . . . reduce to a claim for negligent infliction of emotional distress . . . and must fail for failure to satisfy the aforementioned element of extreme and outrageous conduct."). For all these reasons, Prestia's negligent hiring/supervision claims fail.

### G.      Summary Judgment Is Proper On Prestia's Constructive Discharge Claim.

Prestia, who resigned in May 2008, now asserts she was constructively discharged.[6] This claim should be dismissed because Prestia never alleged it in her complaint. Additionally, summary judgment on Prestia's claim of a hostile work environment also forecloses her constructive discharge claim, because both claims rely upon the same purported evidence. *See supra* Legal Standards, Section VIII, at pp. 19-20. *Accord Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010).

In any event, there is no evidence that Bloomberg intentionally tried to get Prestia to resign or made her working conditions intolerable. To the contrary, Bloomberg repeatedly accommodated Prestia and her pregnancy; Bloomberg approved her requests for reduced hours before maternity leave, full salary while on maternity leave, and discretionary leave and extensions (totaling almost two years), even after Prestia sued Bloomberg. (R. 56.1 Stmt. ¶¶ 119, 127, 147, 148.) And HR took all of Prestia's complaints seriously, investigated them, and met repeatedly with Prestia to discuss them. (*Id.* ¶ 145.) Accordingly, Prestia could not prevail on a constructive discharge claim.

## MARIA MANDALAKIS

### I.   UNDISPUTED FACTS

Since July 1998, Mandalakis has worked as a Broadcast Specialist for Bloomberg Radio Sales in Bloomberg's New York office. (R. 56.1 Stmt. ¶ 150.) She became pregnant with her first child in February 2003. (*Id.* ¶ 153.) Mandalakis took maternity leave from September 22, 2003 until February 16, 2004. (*Id.* ¶ 155.) On January 11, 2004, she requested—and Bloomberg granted—an additional month of unpaid leave on top of her three-months paid leave. (*Id.*)

---

[6]   As claimed in Prestia's responses to Bloomberg's interrogatories, dated August 31, 2009, at 5 (alleging that "the retaliation was so egregious that it resulted in Plaintiff-Intervenor being constructively discharged.").

Mandalakis returned from maternity leave to the same Broadcast Specialist position on approximately February 16, 2004. (*Id.* ¶ 156.) Mandalakis' total intended compensation for 2004 was $140,534. (*Id.* ¶ 157.) On September 9, 2004, Mandalakis requested and received paid leave to care for her husband from October 6, 2004 until October 14, 2004. (*Id.* ¶ 159.)

Mandalakis became pregnant with her second child in December 2004. (*Id.* ¶ 160.) In January 2005, Mandalakis told her Team Leader, Frank Vulpi, that she was pregnant, and he congratulated her. (*Id.*) Mandalakis requested—and Bloomberg granted—intermittent leave starting in January 2005 and continuing until she went on maternity leave due to ████ ████ (*Id.* ¶ 161.) Mandalakis ██████████████ on June 26, 2005, and took maternity leave from June 26, 2005 until December 24, 2005. (*Id.* ¶ 162.) For 2005, Mandalakis received $137,228 in total intended compensation. (*Id.* ¶ 163.)

Mandalakis returned from leave to the same position as a Broadcast Specialist in January 2006. (*Id.* ¶ 150.) In March 2006, Mandalakis received her July 2005 written performance evaluation from Vulpi and Kaschak. (*Id.* ¶ 167.) Mandalakis alleges that Kaschak included "scathing" comments in her review while Mandalakis was on maternity leave. (*Id.*) Mandalakis characterizes the section of her review entitled "Communication/Negotiating" as "scathing" because, while it says positive things about her, it ultimately gives her a "5" rating based on her low billing. (*Id.*) Mandalakis alleges that in March 2006, during the review meeting, Carroll Kaschak said that Mandalakis' performance had changed, and that Mandalakis was the "Energizer Bunny" now. (*Id.* ¶ 169) Mandalakis' total intended compensation was $141,669 in July 2006. (*Id.* ¶ 170.)

On January 2, 2007, Mandalakis requested—and Bloomberg granted—intermittent leave to care for her son. (*Id.* ¶ 171.) Mandalakis' total intended compensation was $151,291 for the

period July 2007 to July 2008. (*Id.* ¶ 172.)  In September 2007, Mandalakis claims that Vulpi

took over an account called JLMedia when Account Representative Lee Albertson left the Radio

Sales Team. (*Id.* ¶ 173.)  She further alleges that Vulpi used it to funnel orders to other people

on the team. (*Id.*)  On December 7, 2007, Mandalakis again requested and received intermittent

leave to care for her son. (*Id.* ¶ 174.)  Mandalakis filed her EEOC charge on or around January

30, 2008. (*Id.* ¶ 175.)

> Sometime in 2008, Mandalakis met with HR representative Shelby Siegel to discuss

Bloomberg's hours in light of the fact that Mandalakis ████████████████████████████

████████. (*Id.* ¶ 176.)  Mandalakis also claims that she told Siegel that she felt harassed while she

was pregnant. (*Id.*)  On October 23, 2008, HR Representative Deb Brown sent Mandalakis a

letter confirming that she could work from home one day per week. (*Id.* ¶ 177.)

> On July 25, 2008, Mandalakis received a written review from Vulpi, which stated that

she had been at 65% of her 2007 billing goal and was in a good position to meet her 2008 goal.

(*Id.* ¶ 178.)  Mandalakis received a year-end performance evaluation from Vulpi in December

2008. (*Id.* ¶ 179.)  Mandalakis admits that at the end of 2008, "her efforts [were] enthusiastic yet

she end[ed] the year at the lower third of the team," as stated in her December 2008 performance

evaluation. (*Id.*)  In July 2008, Mandalakis' salary was set at $138,000 and she received 20

certificates with an intended value of $16,797. (*Id.* ¶ 182.)  This represents a 2.32% increase in

her total intended compensation compared to the previous year. (*Id.*)

> In January 2009, Mandalakis' work from home arrangement was reviewed and she has

continued to work from home one day per week since. (*Id.* ¶ 180.)  During that same time period,

Mandalakis' salary was kept at $138,000 and she received 20 certificates with an intended value

of $6,369.  (*Id.* ¶ 182)  This represents a 4.80% decrease in her total intended compensation.

(*Id.*)  On March 31, 2009, she filed her Complaint in this lawsuit.  (*Id.* ¶ 183.)

## II.   CLAIMS

### A.   Summary Judgment Is Proper On Mandalakis' Discrimination Claims.

The vast majority of Mandalakis' discrimination claims are time-barred.  Because the limitations period for a plaintiff's Title VII claims begins 300 days before filing an administrative charge with the EEOC, and because Mandalakis filed her EEOC charge on or around January 30, 2008, any claims occurring more than 300 days before then—on or before April 5, 2007—are time-barred.  *See supra* Legal Standards, Section I, at p. 1.  (R. 56.1 Stmt. ¶ 175.)  Her discrimination claims under state and local law are likewise time-barred if they occurred before March 31, 2006, three years before she filed her complaint.  This bar encompasses all claims that arose during and shortly after both pregnancies.

#### 1.   Summary Judgment Is Proper On Mandalakis' Claim That She Was Discriminated Against By Not Receiving A Significant Client When Another Salesperson Left.

Mandalakis complains that when another co-worker left her department in September 2007, Vulpi assigned her one of his less significant clients.  (R. 561. Stmt. ¶ 173.)  Mandalakis fails to demonstrate that the assignment impacted her compensation, and thus cannot establish an adverse action.  *See supra* Legal Standards, Section II.A.1(c), at pp. 5-6.  Moreover, this allegedly occurred 21 months after Mandalakis returned from leave and more than two years after she last gave birth, eviscerating any inference of discriminatory intent, and placing Mandalakis outside the protected class.  *See supra* Legal Standards, Section II.A.1(d), at pp. 7-8. (R. 56.1 Stmt. ¶¶ 162, 173.)

2.      **Summary Judgment Is Proper On Mandalakis' Compensation Claims.**

Mandalakis claims that her compensation was discriminatory from 2003 through 2009. Specifically, she claims her compensation decreased, or increased at a lower rate, once she got pregnant than it did prior to her pregnancy. (R. Stmt. 56.1 ¶ 184.) She also alleges that her total intended compensation was less than, or increased at a lesser rate than, individuals who performed similarly but were not pregnant or returning from maternity leave. (*Id.*) These allegations are belied by the undisputed compensation data.

Mandalakis took two maternity leaves while at Bloomberg, from September 2003 to February 2004, and from June 2005 to December 2005. (*Id.* ¶¶ 155, 162.) She also took two additional leaves. (*Id.* ¶¶ 159, 171.) Before 2009, her pay was set annually on her July 14 anniversary date. (*Id.* ¶ 151.)

In 2002, before she became pregnant, Mandalakis received a 12.11% pay decrease. (*Id.* ¶ 152.) The following year, while pregnant, Mandalakis received a 2.82% pay decrease. (*Id.* ¶ 154.) Since her pay was more favorable while pregnant than it was when she was not, there is nothing to connect this pay decrease to her pregnancy. In 2004, five months after returning from maternity leave, Mandalakis received a nearly 4% pay increase, followed by a 2.35% decrease in 2005, while she was on leave, and a 3.24% increase the following year, after she returned from leave. (*Id.* ¶¶ 157, 163, 170.) There is nothing about this trajectory that suggests discrimination based on pregnancy; indeed, her worst pay outcome during her Bloomberg career was in 2002, before she ever became pregnant, and her second worst was in 2009, four years after her last pregnancy. (*Id.* ¶¶ 152, 182.) Finally, her remaining compensation claims (for 2007, 2008, and 2009) are too remote in time to her 2005 pregnancy and maternity leave to infer discrimination. *See supra* Legal Standards, Section II.A.2(c), at pp. 10-11.

A review of Mandalakis' comparators during the relevant period similarly rebuts her claim that she was paid less than, or had lower percentage increases than, "individuals who performed similarly." (R. 56.1 Stmt. ¶ 184.) In 2003, for example, Mandalakis was rated a 7 (on a scale of 0 to 9, with 9 being the worst), and received a 2.82% pay decrease. (*Id.* ¶ 154.) There were no other individuals in her job group rated a 7, but the two rated an 8 received 11.58% and 5.13% pay decreases, respectively, and made about $35,000 less per year than Mandalakis; the individual rated a 6 received an 8.20% decrease and made approximately $20,000 less than Mandalakis. (*Id.*) Likewise, in 2004, Mandalakis was rated a 5, and made over $25,000 more than the other individual with the same job title and supervisor who was rated a 5. (*Id.* ¶ 158.) While she made less than her comparator in 2005, that is because he had previously been her supervisor for several years; he received a greater percentage pay decrease (3.97% versus 2.35%) than she did in 2005. (*Id.* ¶ 168.) None of these comparisons even hints at pregnancy discrimination.

### B.     Summary Judgment Is Proper On Mandalakis' Retaliation Claims.

Most of Mandalakis' retaliation claims cannot be considered on summary judgment because she failed to plead them in her Complaint and instead first raised them after both the close of discovery and the March 31, 2009 deadline to amend pleadings. As a general rule, plaintiffs are limited to the claims alleged in their complaint. *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998). And a plaintiff may not amend her complaint through a response to a dispositive motion or affidavits attached to such a response.[7]  Here, Mandalakis never

---

[7] *See, e.g., Isaac v. City of N.Y.*, 701 F. Supp. 2d 477, 490-91 (S.D.N.Y. 2010) (refusing to consider unpled protected activities for which plaintiff claimed he was retaliated against); *Youssef v. F.B.I.*, 541 F. Supp. 2d 121, 160-64 (D.D.C. 2008) (refusing to consider unpled acts of retaliation).

amended her pleadings, but instead raised new retaliation claims for the first time in an EEOC charge after the discovery and amendment deadlines. Accordingly, Mandalakis' new retaliation claims—including all claims based on events after July 2009—should not be considered.

Mandalakis' properly pled claims likewise fail as a matter of law. The retaliatory acts that Mandalakis alleges are based on the same allegedly discriminatory acts that are, for the most part, time-barred. *See supra* Mandalakis, Section II.A, at p. 71. And among the few non-time-barred acts, Mandalakis fails to show that they were materially adverse. *Supra* Legal Standards, Section II.A.3(c), at pp. 12-13. Finally, there is no causal connection. Mandalakis adduces no evidence that her supervisors were aware of her alleged complaints to HR when they prepared her performance reviews and determined her compensation in 2005 or 2006. Indeed, there is no evidence that Mandalakis' supervisors knew of her discrimination complaints up until the time she filed her EEOC charge in late 2007, making retaliation impossible. *See supra* Legal Standards, Section II.A.3(b), at pp. 11-12.

### C. Summary Judgment Is Proper On Mandalakis' Family and Medical Leave Act Claim.

Mandalakis was eligible for FMLA leave and took maternity leave under the FMLA, but Mandalakis presents no evidence that Bloomberg failed to reinstate her to her prior position upon return. *See supra* Legal Standards, Section V, p. 17-18. To the contrary, she concedes that she returned from both leaves to the exact same position that she held before taking leave. (R. 56.1 Stmt. ¶¶ 150, 156, 164.) That admission is fatal to Mandalakis' FMLA claim, and entitles Bloomberg to judgment as a matter of law.

### D. Summary Judgment Is Proper On Mandalakis' Emotional Distress Claims.

Mandalakis' IIED claim should be dismissed as time-barred. There is a one-year statute of limitations for IIED claims, running from the date of conduct that is alleged to have caused the

emotional distress, and all of the events Mandalakis describes in her Complaint occurred prior to March 31, 2008. *Misek-Falkoff v. Int'l Bus. Machs. Corp.*, 556 N.Y.S.2d 331, 331 (App. Div. 1990). Likewise, Mandalakis' NIED claim should be dismissed as barred by New York's Workers' Compensation Law § 29(6), which provides that the statute "shall be the exclusive remedy to an employee . . . injured . . . by the negligence or wrong of another in the same employ." *Ferris v. Delta Airlines, Inc.*, 277 F.3d 128, 138 (2d Cir. 2001).

Regardless, Mandalakis' IIED and NIED claims should be dismissed because she alleges no extreme and outrageous conduct that goes beyond all possible bounds of decency. Additionally, with respect to her IIED claim, she presents no evidence that any Bloomberg employee intentionally or recklessly caused her severe emotional distress. *See supra* Legal Standards, Section VI, at p. 18.

**E.      Summary Judgment Is Proper On Mandalakis' Negligent Hiring, Retention, and Supervision Claim.**

Mandalakis' negligent hiring/supervision claim, like her NIED claim, should be dismissed because New York's Workers' Compensation Law is the exclusive remedy for employers' negligence. *See supra* Legal Standards, Section VII, at p. 19. Moreover, courts do not recognize negligent hiring, retention, and supervision claims based on harassment and instead require physical injury. *Id.* Mandalakis' claim fails because she identifies no tortious conduct by Bloomberg or Bloomberg employees, without which she cannot show causation. Further, Mandalakis identifies no cognizable injury because she alleges only emotional injury, and she identifies no evidence that at the time of hire, or anytime subsequently, Bloomberg had reason to believe any employee had a propensity to engage in tortious conduct. Further, since Mandalakis alleges no injury other than emotional distress, her claim for "negligent hiring,

retention, and supervision" is nothing more than a repackaged claim for negligent infliction of emotional distress and should be dismissed. *Id.*

**F.    Summary Judgment Is Proper On Mandalakis' Hostile Work Environment Claims.**

None of the conduct that Mandalakis has identified even approaches the threshold of severe and pervasive discriminatory intimidation necessary to survive summary judgment on her hostile work environment claim.  The conduct of which Mandalakis complains—ranging from perceived slights, to disagreement with the allocation of clients, to stray remarks—was not, as a matter of law, either sufficiently severe or pervasive. *See supra* Legal Standards, Section IV, at pp. 16-17.

<u>**MARINA KUSHNIR**</u>

**I.    UNDISPUTED FACTS**

Marina Kushnir began working for Bloomberg as a software engineer in the Data License Group in August 2000.  (R. 56.1 Stmt. ¶ 185.)  In August 2005, Kushnir gave birth and began her first maternity leave. (*Id.* ¶ 186.)  Derek Lo, Kushnir's direct supervisor, and Michael Devaney, Kushnir's department manager, delivered Kushnir's 2005 performance evaluation by phone in August 2005.  (*Id.* ¶ 187.)  Kushnir's total intended compensation that year was set at $103,252; she was awarded 24 certificates.  (*Id.* ¶¶ 188, 191.)  Lo explained to Kushnir that Bloomberg reduced the number of her certificates because of market conditions.  (*Id.* ¶ 188.)

Upon Kushnir's return from leave in January 2006, Lo assigned her to troubleshooting projects on existing applications.  (*Id.* ¶ 189.)  Kushnir agreed with this assignment because of her seniority and related knowledge of older technologies.  (*Id.* ¶ 189.)  In August 2006, Kushnir's total intended compensation was set at $104,696.  (*Id.* ¶ 191.)

In early March 2007, Lo began drafting a development plan that identified areas of Kushnir's performance needing improvement.  (*Id.* ¶ 192.)  Lo presented Kushnir with the development plan on May 15, 2007 and expressed his concerns about her performance.  (*Id.* ¶ 192.)  Specifically, Bloomberg's performance standards had increased companywide, and, as a result, Kushnir needed to be more proactive, take ownership of projects, and take more initiative.  (*Id.* ¶¶ 193, 195.)  Lo reviewed Kushnir's recent projects and identified specific areas for improvement.  (*Id.* ¶ 195.)

On June 15, 2007, Kushnir notified Lo and the other members of the Data License group that she was pregnant.  (*Id.* ¶ 196.)  On August 29, 2007, Kushnir met with other managers and Lo, to receive her annual performance review.  (*Id.* ¶ 199.)  Lo presented Kushnir with her performance review, a performance plan that included deadlines for completing certain objectives, and her compensation for August 2007 through August 2008.  (*Id.* ¶ 199.)  Lo reiterated that Kushnir was not meeting company standards, needed to be more proactive, and needed to take more initiative.  (*Id.* ¶ 200.)  He also expressed his growing concern with Kushnir's productivity, ability to multi-task, and difficulty working with the code.  (*Id.*)  HR Representative Melissa Horowitz told Kushnir she received no certificates because her performance did not meet company standards, but could earn certificates in subsequent years if her performance improved.  (*Id.* ¶ 202.)

Kushnir began her second maternity leave on September 5, 2007, and gave birth on September ██, 2007.  (*Id.* ¶ 203.)  On November 13, 2007, while on leave, Kushnir filed a charge of discrimination with EEOC.  (*Id.* ¶ 204.)

Shortly after Kushnir's return from leave on April 4, 2008, Lo assigned her several urgent projects and requested that she complete one by the end of the day on April 9, 2008.  (*Id.* ¶ 211.)

Another employee completed the project on April 9, 2008 because Kushnir did not meet the deadline. (*Id.*) On May 20, 2008, Kushnir filed a charge of retaliation with the EEOC. (*Id.* ¶ 215.)

Catherine Hui became Kushnir's direct supervisor in June of 2008. (*Id.* ¶ 216.) In August of 2008, Kushnir met with Hui, Avi Hayes (Hui's manager), and Christina Bisconti (an HR representative) to receive her annual performance review covering August 2007 through August 2008. (*Id.* ¶ 217.) Kushnir's 2008 performance ratings were primarily "4s" and "5s," which correspond to "[p]erformance meets expectations in some but not all respects for the role" and "[p]erformance must improve to meet minimal expectations for the role." (*Id.*) Hayes told Kushnir that her performance was "bad" and needed to improve, and Bisconti reiterated that Kushnir was not meeting her manager's expectations. (*Id.*)

A glaring weakness in Kushnir's performance was her inability to use newer technologies. Kushnir's managers urged her to become familiar with newer technologies such as the C++ programming language beginning as early as August 2004. (*Id.* ¶ 207.) Lo reminded Kushnir that she needed to know C++ after she returned from maternity leave in April 2008 because the majority of new projects in her group would be written in C++. (*Id.* ¶ 206.) All new hires into the group are required to know C++, and at least one senior application builder who joined the group at the same time as Kushnir learned it while employed at Bloomberg. (*Id.* ¶ 208.) Kushnir even received a project geared to help her learn C++, but she did not complete it. (*Id.* ¶ 209.) Yet, as of her August 20, 2009 deposition, *five years after first receiving the performance objective*, Kushnir failed to learn or implement any existing knowledge of C++. (*Id.* ¶ 210.)

In September 2008, Vijay Shah became Kushnir's direct supervisor and Hui became Shah's manager. (*Id.* ¶ 218.) On or about November 10, 2008, Shah presented Kushnir with a

development plan containing deadlines for various projects, which Kushnir accepted. (*Id.* ¶ 219.)

Kushnir met with Hui, Shah and Bisconti on December 23, 2008 to receive her performance

review. (*Id.* ¶ 220.) Kushnir's performance ratings ranged from "3s" to "5s" on a scale of 1 to 6

with 1 representing the best performance and 6 representing the worst performance. (*Id.*) Again,

Kushnir failed to meet certain target dates required by her November 10, 2008 development plan.

(*Id.* ¶ 221.) Shah presented Kushnir with another written performance plan and explained that

she needed to improve her productivity, increase her sense of ownership, and take less time

working on tickets. (*Id.*) The Data License group was writing new code using C++, RDE, BAS,

and COMBD2, and Kushnir needed to learn these technologies. (*Id.*)

Between February 1 and February 3, 2009, Kushnir caused two extremely serious

problems that affected many clients, including a code failure (the "World Problem") that

impacted hundreds of clients. (*Id.* ¶ 222.) On February 12, 2009, Shah, Hui and Bisconti

presented Kushnir with a warning letter and communicated that her performance still was not

meeting company standards. (*Id.* ¶ 223.) The warning letter included project deadlines and

notified Kushnir that her employment could be subject to termination if her performance did not

improve. (*Id.*) Kushnir filed a third charge of retaliation with the EEOC in or around February

2009 after she received her February warning letter. (*Id.* ¶ 225.)

On April 20, 2009, Shah, Mancinelli and Bisconti met with Kushnir to present her with a

second warning letter. (*Id.* ¶ 226.) Shah read aloud the letter, which stated that Kushnir failed to

meet Bloomberg's performance standards. (*Id.*) The next day, Kushnir, Bisconti, and Shah met

to discuss concerns Kushnir raised in the April 20, 2009 meeting. (*Id.* ¶ 227.) Shah detailed the

number of days required for each assigned project and told Kushnir that he believed the

deadlines were reasonable and could be met. (*Id.*) As of August 20, 2009, the second day of her

deposition in this case, Kushnir had still failed to complete projects assigned to her in the April 20, 2009 warning letter by the established deadlines or at all. (*Id.* ¶ 231.) Kushnir filed a fourth charge of retaliation in April of 2009. (*Id.* ¶ 232.) Kushnir took disability leave as of approximately July 31, 2009, and remains on leave to this day. (*Id.* ¶ 233.)

## II.   CLAIMS

### A.   Summary Judgment Is Proper On Kushnir's Discrimination Claims.

As a threshold issue, several of Kushnir's complaints are time-barred. Because Kushnir filed her EEOC charge of discrimination on November 9, 2007—precluding her from piggybacking onto the charges of others—any discrimination claims that arose more than 300 days before then—on or before January 13, 2007—are time-barred under Title VII. *See supra* Legal Standards, Section I, at p. 1; *Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 564 (2d Cir. 2006). Her NYSHRL and NYCHRL discrimination claims are timely only if they arose after March 31, 2006, three years before she filed her complaint.

#### 1.   Kushnir's 2007 Development Plan Was Not Discriminatory.

Kushnir claims as to her 2007 Development Plan fail as a matter of law. First, Kushnir's placement on a development plan is not a materially adverse employment action because it is well established that criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline), standing alone, is not an adverse employment action. *See supra* Legal Standards, Section II.A.1(c), at pp. 5-6. The undisputed facts also show that Derek Lo began drafting the development plan in March 2007, eighteen months after Kushnir had last been pregnant and *before* Kushnir disclosed her subsequent pregnancy. (R. 56.1 Stmt. ¶ 192.) Lo could not discriminate against a pregnancy of which he was ignorant.

Second, Bloomberg had a legitimate, non-discriminatory reason for its actions:

Bloomberg sought to improve Kushnir's poor skills and performance, which fell far short of

Bloomberg's expectations for a senior software engineer. *See supra* Legal Standards, Section

II.B., at pp. 14-15; *Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 29 (2d Cir. 1997).

Bloomberg's performance standards had increased companywide in late 2006 and early 2007.

(R. 56.1 Stmt. ¶ 193.)  Under the new performance standards, the skills needed to be a senior

software engineer at Bloomberg included the ability to program in C++, and Kushnir, despite

multiple warnings and opportunities to learn the program, indisputably lacked those skills.  (R.

56.1 Stmt. ¶¶ 193-94, 206-07.)

Finally, Kushnir cannot establish that these reasons are pretextual by alleging that the

May 2007 development plan was the first time in her career that management criticized her

performance.  Even if Kushnir had previously been a model employee (which she was not),

Kushnir's supervisor was entitled to evaluate her in light of Bloomberg's enhanced performance

standards and without regard to prior performance evaluations. *See Beers v. NYNEX Material*

*Enter. Co.*, No. 88 CV 0305, 1992 WL 8299, at *11 (S.D.N.Y. Jan. 13, 1992).  In any event,

Kushnir's July 2005 performance evaluation suggested areas for improvement in initiative,

independent problem solving and communication with customers.  (R. 56.1 Stmt. ¶ 187.)

Kushnir evidently failed to heed those suggestions and her June 2006 performance evaluation

reflected heightened concern, noting Kushnir's need to improve in the areas of productivity,

urgency, initiative and meeting previous objectives.  The 2006 evaluation expressly stated: "In

the next year, we would like Marina to improve her development speed, set more aggressive

milestone targets, and show more initiative to take on new projects and learn more about Data

License systems.  With her level of experience, we expect her to be able to tackle projects more

independently, both in the research and development phases." (R. 56.1 Stmt. ¶ 190.) These are the *same* core concerns that continued to manifest—with still increasing severity—in the 2007 and 2008 evaluations by which Kushnir claims to have been blindsided.

### 2.   Kushnir's 2007 Performance Evaluation and Plan Was Not Discriminatory.

Kushnir's claims based on her 2007 annual performance evaluation and plan also cannot survive summary judgment. Bloomberg had legitimate, non-discriminatory reasons for issuing Kushnir a negative performance evaluation and plan. *See supra* Legal Standards, Section II.B., at pp. 13-15. Specifically, Lo explained that Kushnir needed to be more proactive and to take more initiative, and he expressed his growing concern with Kushnir's productivity, ability to work on more than one project at a time, and her difficulty working with code. (R. 56.1 Stmt. ¶ 200.)

Kushnir cannot prove that these reasons were pretextual. While she claims that the evaluation and plan imposed unreasonable requirements and deadlines because she had recently become pregnant, a plaintiff's own "self-serving and conclusory allegation that the deadlines were in fact unreasonable or that the deadlines were the result of [her pregnancy]" is insufficient to establish pretext. *Mianulli v. Potter*, 634 F. Supp. 2d 90, 97 (D.D.C. 2009). Moreover, Kushnir admits that she never expressed concern to Lo about an inability to meet any of the target deadlines. (R. 56.1 Stmt. ¶ 201.) And, of course, "[a]n employee's opinion that a performance review is unfair, supported only by her own conclusory statements to that effect, cannot bootstrap her claims into a Title VII claim of discrimination." *Reilly v. Metro-North Commuter R.R. Co.*, No. 93 CV 7317(PKL),1996 WL 665620, at *9 (S.D.N.Y. Nov. 15, 1996).

### 3.   Kushnir's 2008 Annual and End-of-Year Performance Evaluations Were Not Discriminatory.

As with her other performance evaluations claims, Kushnir's 2008 claims fail as a matter of law because of her indisputably poor performance. Kushnir herself admitted that senior software engineers are expected to handle more complex projects and recognize problems more quickly than junior engineers; that notwithstanding these expectations, her own performance and productivity "deteriorated" during her tenure at Bloomberg; and that she had failed to learn or implement any existing knowledge of C++ despite repeated warnings and opportunities to do so. (R. 56.1 Stmt. ¶¶ 193, 206-10, 217, 221.)

Kushnir's continued poor performance and failure to demonstrate improvement are legitimate, non-discriminatory reasons for her poor 2008 performance ratings, and are well-documented and undisputed:

- Comments in Kushnir's 2008 annual and end-of-year evaluations stated she did not show "noticeable technical skills or domain knowledge improvement in the previous year" and that she needed to improve productivity and her sense of ownership and urgency. (*Id.* ¶¶ 217, 221.)

- Kushnir's numerical performance ratings reflected that in most areas her performance either "must improve to meet minimal expectations" or at best "[met] expectations in some but not all respects." (*Id.* ¶¶ 217, 220.)

- Comments in the 2008 end-of-year evaluation reiterated the urgent need for Kushnir to make progress towards learning new technologies. (*Id.* ¶ 221.)

Kushnir cannot establish pretext. She claims that management's criticisms are unfair because she received positive performance reviews before becoming pregnant. But neither temporal proximity between disclosure of pregnancy and an adverse action nor a change in management's evaluation of an employee's performance are sufficient to raise an inference of pretext. *See supra* Legal Standards, Section II.C., at p. 15. Moreover, prior reviews are irrelevant here because Kushnir admits that her performance not only failed to improve with increased seniority and tenure but in fact "deteriorated" over time. (R. 56.1 Stmt. ¶ 221.)

### 4.   Kushnir's February 2009 Warning Letter Was Not Discriminatory.

Kushnir's claims challenging her 2009 warning letter are likewise meritless. The undisputed evidence shows that Bloomberg had legitimate, non-discriminatory reasons for issuing Kushnir a warning letter: She failed to meet several performance objectives set forth in her most recent performance evaluation, and she initiated a risky code change that caused a code failure ("World Problem") impacting hundreds of clients. (*Id.* ¶ 222.)

Kushnir does not dispute the underlying facts supporting Bloomberg's non-discriminatory reasons for issuing her a warning letter. Indeed, Kushnir knew about almost all of the deadlines in the letter. (*Id.* ¶ 224.) Kushnir nonetheless claims the warning letter was discriminatory. But Kushnir evidently misses the point of the letter: she argues that deadlines set forth in the letter were unreasonably short and should have been extended because of the time she spent responding to the World Problem *she caused*, and that she should have been given more time to complete one of the projects because it required BAS and C++, both of which she had *refused to learn*. (*Id.* ¶¶ 222, 224.) But Kushnir knew about almost all of the deadlines in the letter and software engineers were expected to anticipate unexpected work when budgeting time for their assigned projects. (*Id.* ¶ 224.) And Kushnir's claims about programming languages have already been fully addressed. *See supra* Kushnir, Sections II.A.1. & II.A.3.

### 5. Kushnir's April 2009 Warning Letter Was Not Discriminatory.

Kushnir's claims based on her April 2009 warning letter fail because Bloomberg had legitimate, non-discriminatory reasons for issuing Kushnir another warning letter, namely, her failure to meet the objectives of the February letter. Indeed, Kushnir admitted that each of the failures cited in the April letter is true. (*Id.* ¶ 228.) Further, the facts show that the expectations set forth in the April letter are reasonable.

First, HR met with Kushnir and her managers to discuss Kushnir's concerns about the deadlines in the April letter and Kushnir promised to provide deadlines she believed were

reasonable but failed to do so. (*Id.* ¶ 229, 230.) Notwithstanding the fact that Kushnir had repeatedly been told to learn C++, when Kushnir told Shah that she would be unable to complete the C++ project by the deadline, Shah gave her permission to instead complete the project in a programming language other than C++. (*Id.* ¶ 232.) Kushnir, however, simply refused to do the project. (*Id.*) Kushnir had repeatedly been told that she must timely provide commitment dates for new projects and her managers testified her workload was no greater than other team members. (*Id.* ¶ 213.) With respect to the deadline set for two days after the warning letter was delivered, Shah testified that the project was already over two weeks late at the time the warning was issued, so Kushnir had had more than two days to complete it. (*Id.* ¶ 231.)

### 6. Kushnir's Assorted Complaints About Her Job Do Not Constitute Discrimination.

Kushnir complains that she was assigned less prestigious work following maternity leave in January 2006; that she was forced to take vacation days rather than family leave days for doctor appointments related to pregnancy; that while she was pregnant, her manager asked her to reschedule the timing of her vacation days; and that she was subjected to excessive workload and monitoring upon return from her second maternity leave. Each claim fails.

First, Kushnir's Title VII claims about activity that occurred before January 13, 2007 are time-barred. *See supra* Kushnir, Section II.A., p. 80. As a result, summary judgment is proper on Kushnir's claims that she was assigned less prestigious work after returning from her first leave, given that she alleges the conduct occurred prior to that date.

In any event, the complained-of actions are not actionable. A plaintiff's belief that her duties are less prestigious does not rise to the level of an adverse employment action. *Nidzon v. Konica Minolta Bus. Solutions USA, Inc.*, 752 F. Supp. 2d 336, 350 (S.D.N.Y. 2010). Similarly, Kushnir's allegations related to taking of vacation days are not adverse actions because an

employer's denial of a specific vacation request is not an adverse action so long as the denial does not completely bar an employee from taking vacation. *Chukwuha v. City of N.Y.*, 795 F. Supp. 2d 256, 261-62 (S.D.N.Y. 2011). Nor is allegedly excessive scrutiny or workload an adverse action. *See supra* Legal Standards, Section II.A.1(c), at pp. 5-6. Moreover, as is discussed more fully below, Kushnir cannot establish disparate treatment or other facts that would allow her to demonstrate that any of the complained-of conduct took place under circumstances giving rise to an inference of discrimination. Therefore, Kushnir's claims fail.

Bloomberg has also proffered legitimate business reasons for each of the challenged actions. Kushnir admitted that no one told her she was prohibited from taking family leave days, that she elected to take vacation days, and that both types of days are fully paid. (R. 56.1 Stmt. ¶ 198.) Further, Lo testified that Kushnir had entered every Friday or Monday as a vacation day throughout the summer of 2007, that he opposed her request because there was a large project due at the end of the summer, and that he asked Kushnir to take a two-week block of vacation that would not disrupt completion of the project. Kushnir admits she did not forgo any vacation days she scheduled but instead, in response to her conversation with Lo, she rescheduled when she took vacation days. (*Id.* ¶ 197.)

With respect to Kushnir's excessive workload claim, Lo testified that workload is never distributed evenly and that it is not unusual for half of the available DRQS tickets to be assigned to one software engineer. (*Id.* ¶ 213.) Concerning Kushnir's claim that her work was aggressively monitored, Kushnir admitted that immediately following her return from leave, Lo was monitoring her progress on an urgent DRQS ticket, and Lo testified that it was his practice to check on an employee's progress on urgent tickets. (*Id.* ¶ 211.) Lo further testified that he

held one-on-one meetings with Kushnir following her return from leave to provide counseling on performance issues that had previously been brought to Kushnir's attention. (*Id.* ¶ 214.)

Neither of the two stray remarks on which Kushnir relies with respect to her excessive monitoring and workload claims is sufficient to defeat summary judgment. Kushnir alleges that (1) upon her return from her second maternity leave, Derek Lo assigned her an urgent ticket and when Kushnir told Lo she needed to leave by 5:00 p.m. to take her newborn to a doctor appointment, Lo responded that Kushnir should finish the ticket that day and decide what was more "important"; and (2) on the same day, during a regularly scheduled one-on-one meeting, Lo asked Kushnir to tell him her long- and short-term goals at Bloomberg. (*Id.* ¶¶ 211, 212.) The first comment was nothing more than a stray remark that has no nexus to any materially adverse employment action related to pregnancy. Moreover, Lo asked all of his direct reports about short- and long-term goals to aid him in creating career development plans for each employee that were tailored based on the career goals the employee hoped to achieve. (*Id.* ¶ 212.) Finally, Lo's comment regarding career goals is facially neutral, and Kushnir presents no evidence that it was in any way related to sex or pregnancy.

### 7.    Kushnir's Compensation Was Not Discriminatory.

Kushnir claims that she experienced a reduction in the number of EECs she was awarded between 2005-2008; and asserts "upon belief" that Bloomberg reduced her EECs because Kushnir had disclosed her pregnancies and/or taken maternity leave. Bloomberg is entitled to summary judgment on these claims.

Kushnir fails to establish a *prima facie* case of discriminatory compensation. She has not identified a single relevant comparator—a similarly situated employee who *also* took leave— who received higher compensation than she did, and has failed to allege that she was qualified to

receive higher wages received by any appropriate comparator. *See supra* Legal Standards, Section II.A.2(b), at pp. 9-10

Kushnir has also failed to present any other evidence sufficient to raise an inference of discrimination, and the record evidence precludes such a finding:

- In August 2005, Bloomberg awarded Kushnir fewer certificates than the year before, but her supervisor fully explained to her that the reduction was due to market conditions. (*Id.* ¶ 188.) In any event, her total intended compensation for 2005 was higher than the other employee with the same rating that reported to her supervisor. (*Id.* ¶ 188) (Kushnir Comparator Worksheet).

- In 2006, after Kushnir returned from maternity leave, the number of certificates she was awarded decreased, but her total intended compensation *increased* from $103,252 to $104,696. (*Id.* ¶ 191.) Total intended compensation "is the relevant comparative metric for employee compensation." *Bloomberg II*, 778 F. Supp. 2d at 463. She again made more than the person with the same job title, rating, and seniority who reported to her supervisor. (*Id.* ¶ 192.) (Kushnir Comparator Worksheet).

- Kushnir's total intended compensation remained unchanged and she was awarded zero certificates in 2007 and 2008; but Kushnir's poor performance in the areas of technical skills development, productivity, and urgency justified that result.

**B.    Summary Judgment Is Proper On Kushnir's Retaliation Claims.**

Kushnir cannot establish a *prima facie* case of retaliation. First, the conduct that Kushnir claims was retaliatory is the same post-2007 conduct that she has claimed to be discriminatory. As discussed, the overwhelming majority of that conduct does not constitute an adverse action as a matter of law. *See supra* Kushnir, Section II.A.6, at pp. 85-86. Second, each of the challenged actions occurred several months after Kushnir filed her most recent charge with the EEOC, vitiating any causal connection between the allegedly adverse actions and Kushnir's EEOC charges. *See supra* Legal Standards, Section II.A.3(d), at p. 13. In any event, Bloomberg has proffered legitimate, nonpretextual reasons for each of the actions. *See supra* Legal Standards, Section II.B., at pp. 13-14; Kushnir, Sections II.A.2-II.A.5.

**C.    Summary Judgment Is Proper On Kushnir's Hostile Work Environment Claim.[8]**

Kushnir's hostile work environment claim fails because she has not provided any evidence from which a reasonable finder of fact could conclude that the conduct of which she complains was based on her pregnancy or her sex and she alleges neither severe nor pervasive conduct. *See supra* Legal Standards, Section IV.

## CONCLUSION

The Court should grant Defendant's motion for summary judgment in its entirety.

Dated: January 18, 2012
       New York, New York

JONES DAY                                    WILLKIE FARR & GALLAGHER LLP

Eric Dreiband, Esq.                          By: _____/s/_____
51 Louisiana Avenue, N.W.                          Thomas H. Golden
Washington, DC 20001-2113                          (A Member of the Firm)
                                                   787 Seventh Avenue
                                                   New York, New York 10019
                                                   tgolden@willkie.com
                                                   (212) 728-8000

                                             *Attorneys for Defendant Bloomberg L.P.*

---

7398734.14

---

[8] Kushnir has not included a specific count in her complaint for hostile work environment but alleges that Bloomberg discriminated and retaliated against her by subjecting her to a "hostile work environment," among other things.