```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
EQUAL EMPLOYMENT OPPORTUNITY        :
COMMISSION,                         :        07 Civ. 8383 (LAP)
                                    :
            Plaintiff,              :        MEMORANDUM & ORDER
                                    :
      v.                            :
                                    :
BLOOMBERG L.P.,                     :
                                    :
            Defendant.              :
-----------------------------------X
JILL PATRICOT, TANYS LANCASTER,     :
JANET LOURES, MARINA KUSHNIR,       :
MONICA PRESTIA, and MARIA           :
MANKALAKIS,                         :
                                    :
            Plaintiff-Intervenors,  :
                                    :
      v.                            :
                                    :
BLOOMBERG L.P.,                     :
                                    :
            Defendant.              :
-----------------------------------X
```



LORETTA A. PRESKA, Chief United States District Judge:

Defendant Bloomberg L.P. ("Bloomberg") has moved for summary judgment [dkt. no. 574] dismissing Plaintiff-Intervenor Jill Patricot's ("Patricot") claims for post-resignation backpay under Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law (the "NYSHRL"), and the New York City Human Rights Law (the "NYCHRL").  For the reasons stated below, Bloomberg's motion [dkt. no. 574] is GRANTED.

I. BACKGROUND

The Court presumes familiarity with Patricot's allegations which are described in detail in the Court's order dated September 9, 2013 [dkt. no. 558] ("September 2013 Order"). Accordingly the Court sets forth below only the facts most pertinent to the instant motion.[1]

Jill Patricot began working at Bloomberg in 1999. (Patricot Decl. ¶ 4.)   In October 2004, when she was a Team Leader in Bloomberg's Sales Department, (Golden Decl. Ex. 10 (Patricot Peoplesoft Data)), Bloomberg became aware that Patricot was pregnant with her first child.  (Id. Ex. 2 (Patricot et al. Am. Compl.) ¶ 59.)   In November 2004, Bloomberg

---

[1] The Court's recitation of facts is based on the following declarations and the exhibits attached thereto: Declaration of Thomas H. Golden, dated Feb. 14, 2014 [dkt. no. 576] ("Golden Decl."); Declaration of Milo Silberstein, dated Feb. 28, 2014 [dkt. no. 579] ("Silberstein Decl."); Declaration of Jill Patricot, dated Feb. 28, 2014 [dkt. no. 580] ("Patricot Decl."); and Reply Declaration of Thomas H. Golden, dated Mar. 7, 2014 [dkt. no. 583 ("Golden Reply Decl.").   The Court also considers the parties' statements pursuant to Local Rule 56.1: Bloomberg L.P.'s Rule 56.1 Statement of Material Facts in Support of its Motion for Summary Judgment Dismissing Ms. Patricot's Claim for Post-Resignation Backpay, dated Feb. 14, 2014 [dkt. no. 577] ("Bloomberg's 56.1"); Plaintiff-Intervenor Jill Patricot's Rule 56.1 Counter-Statement of Material Facts in Opposition to Defendant Bloomberg L.P.'s Motion for Summary Judgment as to Plaintiff-Intervenor Jill Patricot's Claims for Post-Resignation Backpay, dated Feb. 28, 2014 [dkt. no. 581] ("Patricot's 56.1"); Bloomberg L.P.'s Reply Rule 56.1 Statement of Material Facts in Further Support of its Motion for Summary Judgment Dismissing Ms. Patricot's Claim for Post-Resignation Backpay, dated Mar. 7, 2014 [dkt. no. 584] ("Bloomberg's Reply 56.1").

offered Patricot a promotion to Head of New York Global Data,
which she accepted.  (Id. Ex. 2 ¶ 60.)  Patricot began her first
maternity leave in April 2005 and returned to Bloomberg in
September 2005.  (Id. Ex. 10 (Patricot Peoplesoft Data).)
Between 2004 and 2006 Patricot indicated in private
conversations that she was considering leaving Bloomberg to
pursue a career in a different field.  (Id. Exs. 1, 3-9, 15-16.)
However, there is no evidence that conversations of this nature
continued after 2006.

In February 2006, Patricot was demoted from Head of New
York Global Data to the position of data analyst.  (Silberstein
Decl. Ex. 2 (Patricot Dep.), at 138-39.)[2]  Not long after the
demotion, she obtained a new position in Bloomberg's Sales
Department in March 2006.  (Id. Ex. 2 (Patricot Dep.), at 169-
70; Golden Decl. Ex. 10 (Patricot Peoplesoft Data).)  When
Patricot returned to the Sales Department, she asked her
supervisor, Max Linnington, whether there were any Team Leader
positions available, and he indicated that there was none.
(Silberstein Decl. Ex. 2 (Patricot Dep.), at 170-71.)
Nonetheless, during the next three years, thirty-nine non-
managerial employees, including some employees who once reported

---

[2] Patricot characterizes the data analyst job as "an entry level
position."  (Patricot's 56.1 ¶ B.)  Bloomberg contends that it
"was not necessarily an entry-level position" but admits that
Patricot was demoted.  (Bloomberg's Reply 56.1 ¶ B.)

to Patricot, were promoted to Team Leader.  (Id. Ex. 2 (Patricot Dep.), at 170-72; id. Ex. 8 (Bloomberg's Responses and Objections to Patricot' First Set of Interrogatories), at Ex. 2.)

Patricot began her second maternity leave in August 2006 and returned to Bloomberg in March 2007.  (Golden Decl. Ex. 10 (Patricot Peoplesoft Data).)  In February 2007, Bloomberg began a part-time program for certain departments of the company. (Golden Decl. Ex. 18 (Feb. 8, 2007 Email).)  There is no indication that Patricot was eligible for or participated in this program.

On May 6, 2008 Max Linnington allegedly yelled at Patricot on Bloomberg's sales floor in front of other employees. (Silberstein Decl. Ex. 2 (Patricot Dep.), at 488-91.) Patricot become so distraught that it was necessary for two of her colleagues to walk her off the floor.  (Id.)[3]  Patricot began her third maternity leave the next day, on May 7, 2008.  (Golden Decl. ¶ 20.)

In July 2008, Bloomberg announced a major internal reorganization of the company's departments and managers which, among other things, caused Max Linnington to be relocated to

---

[3] Patricot's 56.1 Statement also states that her colleagues "brought her to the company nurse."  (Patricot's 56.1 ¶ 28.) However, Patricot does not cite any evidence in support of this additional allegation.

Dubai.  (Golden Decl. Ex. 11 (Cooper 30(b)(6) Dep.), at 425; Id.
Ex. 13 (Max Linnington Peoplesoft Data).  In August 2008,
Bloomberg launched a new part-time flexible work arrangement
program.  (Golden Ex. 12 (Jennings 30(b)(6) Dep.), at 61.)[4]

Patricot resigned from Bloomberg on January 2, 2009, while
still on maternity leave.  (Golden Decl. Ex. 2 (Patricot et al.
Am. Compl.) ¶ 137.)  Patricot claims that if she had returned to
Bloomberg she would have reported directly to Tom Secunda, who
Patricot claims was partially responsible for her demotion to
data analyst in 2006.  (Patricot's 56.1 ¶ J.)  However,
according to Bloomberg, there would have been at least three
levels of supervisors between Patricot and Secunda.
(Bloomberg's Reply 56.1 ¶ J (citing Golden Reply Decl. Ex. 23
(Patricot Peoplesoft data).)  As a result of her resignation,
Patricot forfeited a guaranteed bonus of about $150,000.
(Patricot Decl. ¶ 3; id. Ex. B.)

Following her resignation from Bloomberg, Patricot
unsuccessfully applied for positions at several companies.  (Id.
¶ 5; id. Exs. C-D.)  In July 2011, she and her sister founded a
clothing company, which has not yet turned a profit.  (Id. ¶ 6;

---

[4] Patricot asserts, without citing any evidence, that Bloomberg
began a limited part-time program in 2007 as "a direct reaction
to the filing of her charge with the EEOC in 2006" and Bloomberg
initiated the 2008 reorganization and flexible work arrangement
policy as "a direct reaction to the filing of this lawsuit in
2007."  (Patricot's 56.1 ¶¶ 26, 30-32.)

id. Ex. E.)  Patricot also is writing a book about her experience at Bloomberg and is currently seeking a publisher. (Id. ¶ 7.)

Patricot filed her complaint as an intervenor on October 25, 2007 [dkt. no. 7].  On September 9, 2013, the Court granted in part and denied in part Bloomberg's motion for summary judgment.  (See September 2013 Order, at 58.)[5]  The Court denied Bloomberg's motion for summary judgment with respect to Patricot's Title VII and NYSHRL discrimination claims arising out of her 2006 demotion and compensation decrease but granted Bloomberg's motion with respect to the remainder of Patricot's Title VII and NYSHRL claims.  Id.  The Court also denied Bloomberg's motion for summary judgment with respect to Patricot's NYCHRL discrimination and retaliation claims.  See id.  Bloomberg filed the instant motion on February 14, 2014 [dkt. no. 574].

II.  DISCUSSION

   A.  Summary Judgment Standard

In considering a motion for summary judgment, the Court construes evidence in the light most favorable to the non-moving party and also draws all reasonable inferences in favor of the

---

[5] In a separate order, the Court also granted in full Bloomberg's motion for summary judgment with respect to the Equal Employment Opportunity Commission's claims.  (See Order, dated Sept. 9, 2013 [dkt. no. 557].)

non-moving party.  Lindsay v. Ass'n of Prof'l Flight Attendants,
581 F.3d 47, 50 (2d Cir. 2009).  "Summary judgment is
appropriate only 'if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law.'"  Kwan v. Schlein, 634 F.3d 224,
228 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)); see also
Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "An issue
of fact is genuine if the evidence is such that a reasonable
jury could return a verdict for the nonmoving party.  A fact is
material if it might affect the outcome of the suit under the
governing law."  Lindsay, 581 F.3d at 50.  "The inquiry
performed is the threshold inquiry of determining whether there
is the need for a trial — whether, in other words, there are any
genuine factual issues that properly can be resolved only by a
finder of fact because they may reasonably be resolved in favor
of either party."  Anderson v. Liberty Lobby, 477 U.S. 242, 250
(1986).

     Rule 56 of the Federal Rules of Civil Procedure mandates
summary judgment "against a party who fails to make a showing
sufficient to establish the existence of an element essential to
that party's case, and on which that party will bear the burden
of proof at trial."  Celotex, 477 U.S. at 322.  "[T]here is no
issue for trial unless there is sufficient evidence favoring the
nonmoving party for a jury to return a verdict for that party."

                              7

Liberty Lobby, 477 U.S. at 249.  In the face of insufficient evidence, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 322-23.

    B.   Patricot's NYCHRL Constructive Discharge Claim

Patricot contends that her NYCHRL constructive discharge claim survived the Court's previous summary judgment ruling. Although the September 2013 Order did not explicitly grant summary judgment on Patricot's NYCHRL constructive discharge claim, such a ruling logically follows from the Court's dismissal of Patricot's Title VII and NYSHRL constructive discharge claims.

The Court is mindful that "NYCHRL claims must be analyzed separately and independently from federal and state discrimination claims."  Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F. 2d 102, 113 (2d Cir. 2013) (citing New York City Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85 ("NYCCRRA")); see also Williams v. N.Y.C. Housing Auth., 61 A.D. 3d 62, 66-69 (1st Dep't 2009).  Nonetheless, New York state courts[6] have articulated an NYCHRL constructive discharge

---

[6] "A federal court faced with a question of . . . state law must do its best to guess how the state court of last resort would decide the issue.  Where the high court has not spoken, the best (cont'd)

standard that is identical to the Title VII standard.  See, e.g.
Lambert v. Macy's E., Inc., 84 A.D.3d 744, 746 (2d Dep't 2011)
(holding that summary judgment was appropriate on plaintiff's
constructive discharge claim under the NYCHRL because defendant
"did not deliberately make [plaintiff's] working conditions so
intolerable that a reasonable person would have felt compelled
to resign"); Short v. Deutsche Bank Sec., Inc., 79 A.D. 3d 503,
504 (1st Dep't 2010) ("To establish a constructive discharge
[under the NYCHRL], plaintiff was required to produce evidence
that her employer deliberately created working conditions so
intolerable, difficult or unpleasant that a reasonable person
would have felt compelled to resign.") (internal quotation marks
and citation omitted).[7]  Therefore, because there was
insufficient evidence to support a constructive discharge claim
under Title VII, Patricot's NYCHRL constructive discharge claim
also fails as a matter of law.  Accordingly, the September 2013

---

(cont'd from prev. page)
indicators of how it would decide are often the decisions of
lower state courts."  In re Brooklyn Navy Yard Asbestos Litig.,
917 F.2d 831, 850 (2d Cir. 1992) (citations omitted).

[7] Under Title VII, "[c]onstructive discharge of an employee
occurs when an employer, rather than directly discharging an
individual, intentionally creates an intolerable work atmosphere
that forces an employee to quit involuntarily.  Working
conditions are intolerable if they are so difficult or
unpleasant that a reasonable person in the employee's shoes
would have felt compelled to resign."  Serricchio v. Wachovia
Secs. LLC, 658 F.3d 169, 186 (2d Cir. 2011).

Order granted Bloomberg's motion for summary judgment with respect to Patricot's NYCHRL constructive discharge claim.[8]

### C.    Post-Resignation Backpay

Having reiterated that Patricot's Title VII, NYSHRL, and NYCHRL constructive discharge claims have been dismissed, the Court must determine whether she can obtain post-resignation backpay despite her voluntary resignation.

### 1.    Title VII, NYSHRL, and NYCHRL Legal Standards

Title VII authorizes backpay as a remedy for unlawful discrimination.  See 42 U.S.C. § 2000e-5(g)(1).  Backpay is also a remedy for discrimination under the NYSHRL.  See N.Y. Exec. L. § 297 (9) ("Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any

---

[8] In a recent case, the New York Supreme Court, Appellate Division, stated that New York courts have "not yet ruled as to the contours of a [NYCHRL] constructive discharge claim using enhanced liberal construction analysis required by the New York City Civil Rights Restoration Act of 2005. . . . As such, it should not be assumed that the standards for establishing constructive discharge under the [NYCHRL] are the same as have been set forth for Title VII, either in respect to the degree of difficulty or unpleasantness of working conditions required to make out the claim or otherwise." Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP, 981 N.Y.S.2d 89, 92 n.1 (1st Dep't 2014).  The Court respectfully disagrees.  Admittedly, there do not appear to be any post-NYCCRRA cases which discuss in detail the NYCCRRA's effect on the NYCHRL constructive discharge standard.  However, there is no reason to be believe that the courts in Lambert and Short failed to take into account the NYCCRRA when articulating an NYCHRL constructive discharge standard identical to the Title VII standard.

court of appropriate jurisdiction for damages . . . and such
other remedies as may be appropriate."); see also In re Mize v.
State Div. of Human Rights, 33 N.Y.2d 53, 56 (1973) (upholding
the Commissioner of the State Division of Human Rights's award
of backpay in an NYSHRL administrative proceeding and stating
that "[p]ractically speaking the denial of back pay where there
is a finding of discrimination would appear to condone violation
of the law until challenge is raised.  An award of back pay
would seem to be a rather normal sanction to be imposed.").  The
standards for awarding backpay under Title VII and the NYSHRL
are identical.  See, e.g., In re Argyle Realty Assocs. v. N.Y.
State Div. of Human Rights, 65 A.D.3d 273, 277-78 (2d Dep't
2009) (upholding an administrative award of backpay under the
NYSHRL and noting that "reliance on the interpretation of
[T]itle VII by federal courts is appropriate" because "[t]he
standards for recovery under the [NYSHRL] are the same as the
federal standards under [T]itle VII") (quoting Forrest v. Jewish
Guild for the Blind, 3 N.Y.3d 295, 305 n.3 (2004)).

     The NYCHRL also authorizes a broad range of remedies for
violations of its anti-discrimination provisions, which
undoubtedly includes backpay.  See N.Y.C. Admin. Code § 8-502(a)
("[A]ny person claiming to be grieved by an unlawful
discriminatory practice . . . shall have a cause of action in
any court of competent jurisdiction for damages, including

                              11

punitive damages, and for injunctive relief and such other remedies as may be appropriate . . . .").  As noted above, the NYCHRL must be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws and provisions comparably-worded to provisions of this title, have been so construed."  Id. § 8-130.

Under Title VII, the NYSHRL, and the NYCHRL, a victim of discrimination has a duty to mitigate backpay damages.  See 42 U.S.C. § 2000e-5(g)(1) ("Interim earnings or amounts earnable with reasonable diligence by the person . . . discriminated against shall operate to reduce the back pay otherwise allowable."); Hawkins v. 115 Legal Service Care, 163 F.3d 684, 695 (2d Cir. 1998) ("An employee discharged in violation of Title VII has an obligation to attempt to mitigate her damages by using 'reasonable diligence in finding other suitable employment.'") (quoting Ford Motor Co. v. E.E.O.C., 458 U.S. 219, 231 (1982))); Rio Mar Rest. v. New York State Div. of Human Rights, 270 A.D.2d 47, 48 (1st Dep't 2000) (noting that under the NYSHRL "a complainant ordinarily has a duty to exercise diligence to mitigate his or her damages by making reasonable

efforts to obtain comparable employment").[9]   If an employee has
not been constructively discharged, her duty to mitigate damages
may require her to continue working for her discriminatory
employer.  See, e.g., Bergeson v. N.Y. State Office of Mental
Health, 526 F. App'x 109, 111 (2d Cir. 2013) ("A plaintiff who,
for personal reasons, resigns from or declines a job
substantially equivalent to the one she was denied has not
adequately mitigated damages."); Nobler v. Beth Israel Med.
Ctr., 715 F. Supp. 570, 572 (S.D.N.Y. 1989) ("The purpose of
denying back pay in cases where discrimination occurs but does
not rise to the level of constructive discharge is to encourage
employees to stay at the place of employment in order to give
employers a chance to remedy the discrimination.").

    2.  Post-Resignation Backpay in the Absence of a
        Constructive Discharge

    Bloomberg asserts that "where, as here, the plaintiff
voluntarily resigned from her position and has no constructive
discharge claim, she has failed as a matter of law to mitigate
damages with respect to post-resignation backpay and may not

_____

[9] The Court has not identified any statutory provision or case
which expressly recognizes a duty to mitigate damages under the
NYCHRL.  However, there is no reason to believe that this well-
established legal principle would not apply to the NYCHRL.
Moreover, the parties do not dispute this issue.  As Patricot
concedes, she "cannot recover backpay in an employment
discrimination matter where she has failed to mitigate her
damages." (Patricot's Memo., at 12 (citing Greenway v. Buffalo
Hilton Hotel, 143 F.3d 47, 53-54 (2d Cir. 1998)).)

recover any such amounts." (Memorandum of Law in Support of Bloomberg L.P.'s Motion for Summary Judgment Dismissing Ms. Patricot's Claim for Post-Resignation Backpay, dated Feb. 14, 2014 [dkt. no. 575] ("Bloomberg's Memo."), at 6.) In other words, Bloomberg urges the Court to adopt a rule which would categorically bar a plaintiff who has not been constructively discharged from receiving post-resignation backpay. The authority Bloomberg marshals in support of this rule is not compelling. Bloomberg relies on Tse v. UBS Financial Services., Inc., 568 F. Supp. 2d 274 (S.D.N.Y. 2008). In Tse the court correctly observed that the Second Circuit Court of Appeals has not addressed whether post-resignation backpay is available for a plaintiff who has not been constructively discharged. Id. Nonetheless, "[t]he prevailing view of the appellate courts that have addressed the issue is that 'in order for an employee to recover back pay for lost wages beyond the date of his [employment], the evidence must establish that the employer constructively discharged the employee." Tse, 568 F. Supp. 2d at 300 (quoting Jurgens v. E.E.O.C., 903 F.2d 386, 389 (5th Cir. 1990)).

Although Tse acknowledged that under "the strong version of the 'constructive discharge' rule" which certain courts have adopted, a "plaintiff would simply be barred as a matter of law from recovering post-employment damages," the Tse court did not

14

expressly adopt this position itself.  Tse, 568 F. Supp. 2d at
302.  Instead, Tse recognized that "the fact-specific nature of
back pay determinations" may justify certain "exceptions and
distinctions" which are consistent with "the general, well-
established principle that an employee may not receive backpay
damages where she could have mitigated her economic harm."  Id.
at 302.

In the absence of controlling precedent from the Court of
Appeals, there is no reason to adopt Bloomberg's proposed rule
categorically barring post-resignation backpay in the absence of
a constructive discharge.  Instead, the Court finds that a
plaintiff's duty to mitigate, considered on a case-by-case
basis, adequately guards against unmerited backpay awards.  See
Albemarle Paper Co. v. Moody, 422 U.S. 405, 421-22 (1975)
("[G]iven a finding of unlawful discrimination, backpay should
be denied only for reasons which, if applied generally, would
not frustrate the central statutory purposes of eradicating
discrimination throughout the economy and making persons whole
for injuries suffered through past discrimination.").

Bloomberg's proposed rule is especially inappropriate for
NYCHRL claims because of the requirements of the NYCCRRA.
Bloomberg contends that the NYCCRRA has no bearing on this issue
because two post-NYCCRRA federal district court cases state that
the standards for awarding backpay under Title VII and NYCHRL

are identical.  (See Bloomberg's Memo., at 7 n.5 (citing Clark v. Gotham Lasik, PLLC, No. 11 Civ. 01307, 2013 WL 4437220(LGS), at *4 (S.D.N.Y. Aug. 20, 2013); Becerril v. E. Bronx NAACP Child Dev. Ctr., No. 08 Civ. 10283, 2009 WL 2611950(PAC)(KNF), at *3 (S.D.N.Y. Aug. 18, 2009) ("The same standards used to award front and back pay in Title VII discrimination cases also apply to cases arising under NYSHRL and NYCHRL.").)  However, even assuming these cases are correct, it is not helpful to say that the standards for backpay under Title VII and the NYCHRL are the same when the Title VII standard for post-resignation backpay in these circumstances is unclear in this Circuit.  See Esterquest v. Booz-Allen & Hamilton, Inc., No. 97 Civ. 6957 (LMM), 2003 WL 21673630, at *3 (S.D.N.Y. July 17, 2003) (declining to foreclose the availability of post-resignation backpay under Title VII, the NYSHRL, and the NYCHRL for a plaintiff who was not constructively discharged "[b]ecause the Second Circuit has not yet taken a position on this issue").  Applying Bloomberg's proposed restrictive rule, which has arisen in the Title VII context and has not even been adopted by the Court of Appeals, would contravene the NYCCRRA's express statutory directive to construe the NYCHRL liberally.  Accordingly, the Court holds that Title VII, the NYSHRL, and the NYCHRL do not categorically bar post-resignation backpay for plaintiffs who have not been constructively discharged.

### 3.    Duty to Mitigate

Although Patricot's voluntary resignation does not necessarily preclude her from receiving post-resignation backpay, she is not entitled to this remedy if she failed to mitigate damages.  Bloomberg argues that Patricot could have mitigated damages by continuing her employment at Bloomberg.  As the court stated in Tse a "plaintiff's decision to take the situation into her own hands—either by voluntarily resigning or by walking away from the job—undermine[s] the goal of anti-discrimination law of encouraging employees to address discriminatory conduct from within the employment relationship while ensuring that the employees do not suffer further damage as a result of remaining within that relationship."  Tse at 303. Patricot does not seem to dispute that an employee's duty to mitigate will often require her to stay with her discriminatory employer.  (See Plaintiff-Intervenor Jill Patricot's Memorandum of Law in Opposition to Defendant Bloomberg's L.P.'s Motion for Summary Judgment as to Ms. Patricot's Claim for Post-Resignation Backpay, dated Feb. 28, 2014 [dkt. no. 578] ("Patricot's Memo."), at 2 ("[I]t is true that restrictions on backpay awards are meant to encourage the employee to attempt to overcome the discriminatory resistance within the workplace.") However, Patricot argues that, in her situation, she should not have been

17

expected to stay at Bloomberg because "her advancement at
Bloomberg . . . became permanently foreclosed."  (Id.)

Courts have recognized certain limited circumstances where
it would be unreasonable to expect a plaintiff to mitigate
damages by continuing to work for her employer.  For example,
the Ninth Circuit Court of Appeals has allowed post-resignation
backpay for an employee who voluntarily resigned not because she
was denied a promotion but because she was discriminated against
in her application for a completely different position for the
same employer.  Thorne v. City of El Segundo, 802 F.2d 1131,
1134 (9th Cir. 1986) ("[The plaintiff] was preparing to enter an
entirely different career . . . .  The mere fortuity that [the
plaintiff] had a preexisting employment with the employer . . .
does not bring her case within the scope of promotion or
demotion cases that [forceclose backpay].)"  (citations
omitted).[10]  In Nobler v. Beth Israel Medical Center, 715 F.
Supp. 570 (S.D.N.Y. 1989), the court allowed the plaintiff to
recover post-resignation backpay because "the position which
[the plaintiff] was allegedly discriminatorily denied . . . was
unique" and "there was no purpose to be served by [the
plaintiff's] staying . . . to try to work out the dispute within

---

[10]  In Thorne the plaintiff was a clerk-typist for the City of El
Segundo Police Department who was allegedly discriminated
against in connection with her application to be a police
officer.  Id. at 1134.

the context of the employment relationship, for amelioration was unavailable." Id. at 572.  Finally, in Townsend v. Exchange Ins. Co., 196 F. Supp. 2d 300 (W.D.N.Y. 2000), the court held that the plaintiff could recover post-resignation backpay based on a combination of the rationales articulated in Thorne and Noble.  The court stated that it was "not a promotion case . . . but more like a refusal to rehire or termination case." Id. at 310.  Also, the plaintiff "squarely confronted an obstacle in the career progression of his job" and "[s]imply because there were two . . . positions, not one, does not make the uniqueness rationale, articulated in Nobler, inapplicable." Id.

Patricot argues that Nobler and Townsend support her claim for post-resignation backpay.[11]  Nobler is inapposite.  In that case, the most salient fact was that the plaintiff was denied a position that "was unique" and once the plaintiff was passed over "there was no possibility of promotion to an equivalent position . . . ." Nobler, 715 F. Supp. 570.  Here, there is no evidence that Patricot had missed out on a promotion to a unique position.  In fact, as Patricot points out, in three years thirty-nine employees were appointed to the Team Leader position.  (See Silberstein Decl. Ex. 2 (Patricot Dep.), at 170-

---

[11] Patricot does not appear to rely on the promotion-rehire distinction articulated in Thorne.

72; id. Ex. 8 (Bloomberg's Responses and Objections to
Patricot's First Set of Interrogatories), at Ex. 2.)

Patricot also notes some superficial similarities between
her and the plaintiff in the Townsend. Like Patricot, the
plaintiff in Townsend was passed over for several positions,
including a position he previously held before a corporate
reorganization. 196 F. Supp. 2d at 303. Also, in Townsend the
plaintiff voluntarily resigned shortly after returning from
disability leave, which is similar to Patricot who resigned just
before returning from her third maternity leave. Id. at 303-04.
But the differences between Patricot and the plaintiff in
Townsend are more significant than the similarities. First of
all, one of the bases for allowing post-resignation backpay in
Townsend was the court's determination that it was "not a
promotion case . . . but more like a refusal to rehire or
termination case." Id. at 310. Patricot does not make this
argument here. Also, in Townsend the plaintiff had formally
applied for a team leader position, id. at 303, whereas there is
no evidence that Patricot ever formally applied for the team
leader position at Bloomberg. Moreover, in Townsend there were
only two team leader positions available in the entire
organization. The Townsend court found that when the plaintiff
failed to obtain one of these relatively unique positions he

faced "an obstacle in the career progression of his job."
Townsend, 196 F. Supp. 2d at 310.

Contrary to Patricot's claim, the evidence—even when viewed in the light most favorable to Patricot—indicates that many paths for career advancement remained open for her at Bloomberg.[12] As noted above, the Team Leader position was not unique, and openings were not rare. In addition, Patricot's steady compensation increases are inconsistent with her claim that she had no future at Bloomberg. (See Golden Decl. Ex. 10 (Patricot Peoplesoft Data).) Patricot also restates evidence of her alleged discrimination as proof that she faced "numerous insurmountable obstacles to her career advancement at Bloomberg." (Patricot's Memo., at 8-12.) But evidence of discrimination alone is not sufficient to absolve a plaintiff of her duty to mitigate damages by continuing to work for her employer.[13]

---

[12] Bloomberg suggests that Patricot had always planned to leave Bloomberg and places considerable emphasis on certain private conversations in which Patricot expressed an interest in embarking on a new career. (Golden Decl. Exs. 1, 3-9, 15-16.) The latest communication of this kind occurred in January 2006. The Court fails to see how Patricot's musings about her future career plans between 2004 and 2006 are particularly helpful for understanding the circumstances surrounding her resignation in 2009.

[13] Moreover, as the Court observed in the September 2013 Order, Patricot "does not offer any evidence" showing that, during her third maternity leave, her working conditions suddenly became (cont'd)

Moreover, the evidence suggests that prior to Patricot's resignation Bloomberg initiated policy changes which may have been favorable to Patricot's career progression.  In July 2008, while Patricot was on maternity leave, Bloomberg initiated a major internal reorganization which led to, among other things, the transfer of Patricot's former boss, Max Linnington, from New York to Dubai.  (Golden Decl. Ex. 11 (Cooper 30(b)(6) Dep.), at 425; Id. Ex. 13 (Max Linnington Peoplesoft Data).)  Also, in August 2008, Bloomberg began a new "part-time and flexible work arrangement policy" which informally "encouraged managers to provide more flexibility to employees" and formally "permitted employees to apply to either work part-time or work on a more flexible schedule or work from a remote location." (Id. Ex. 12 (Jennings 30(b)(6) Dep.), at 61; Bloomberg 56.1 ¶ 32.)  Patricot contends that Bloomberg's characterization of these policy changes is "incomplete and misleading" because the changes were "a direct reaction to the filing of [Patricot's] lawsuit in 2007." (Patricot's 56.1 ¶¶ 30-32.) But Patricot's attempt to take credit for the 2008 policy changes undercuts her mitigation argument.  Under even the most permissive mitigation standard, a plaintiff is required to "where possible, attack discrimination

---

(cont'd from prev. page)
"so intolerable" that she was compelled to resign.  (September 2013 Order, at 52-53.)

within the context of their existing employment relationships."
Thorne v. City of El Segundo, 802 F.2d 1131, 1134 (9th Cir.
1986); see also Nobler, 715 F. Supp. at 571.  Here, not only was
it possible for Patricot to attack her discrimination within the
context of her existing employment at Bloomberg but, by her own
admission, Patricot was successfully causing Bloomberg to make
positive changes.

     In sum, there is no issue of material fact with respect to
whether Patricot failed to mitigate damages by voluntarily
resigning from Bloomberg.  Drawing all inferences and resolving
all ambiguities in favor of Patricot, no reasonable jury could
conclude that Patricot faced circumstances which absolved her of
her duty to mitigate damages by continuing to work for
Bloomberg.  The facts in this case are distinguishable from
cases in which courts have allowed post-resignation backpay in
the absence of a constructive discharge.  Patricot was not
denied a unique position, and the evidence does not indicate
that she faced a permanent obstacle to career advancement at
Bloomberg.  If anything, the evidence suggests that Patricot's
prospects for career progression at Bloomberg improved during
her third maternity leave.  Of course there are understandable
reasons why Patricot would choose to voluntarily resign from
Bloomberg, a company she claims discriminated against her.

However, having made that choice, the law does not allow her to recover post-resignation backpay.

III. CONCLUSION

For the reasons stated above, Bloomberg's motion for summary judgment [dkt. no. 574] dismissing Patricot's claims for post-resignation backpay is GRANTED.


SO ORDERED.

Dated:    New York, New York
          April 28, 2014

                              _____
                              LORETTA A. PRESKA
                              Chief U.S. District Judge