UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

                                  Plaintiff,

                   -against-

BLOOMBERG L.P.,

                                   Defendant.
------------------------------------------------------------------------x    07-CV-8383
                                                    (LAP)(HBP)
                                                    ECF CASE
JILL PATRICOT, TANYS LANCASTER,
JANET LOURES, MARINA KUSHNIR, MONICA
PRESTIA, and MARIA MANDALAKIS,

                          Plaintiff-Intervenors,

                   -against-

BLOOMBERG L.P.,

                                   Defendant.
------------------------------------------------------------------------x

<u>**EEOC'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT BLOOMBERG L.P.'S MOTION FOR SUMMARY
JUDGMENT AS TO EEOC'S PATTERN-OR-PRACTICE CLAIM**</u>

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 1

    I.  Defendant Has Perpetrated a Pattern or Practice of Intentional Discrimination Against Pregnant Women and Mothers through Its Biased, Centralized, and Unchecked Employment Decisions. ............................................................... 2

        A.  Top Management Is Biased Against and Holds Negative Stereotypes About Women, Pregnant Women and Mothers. ............................................... 2

        B.  Defendant's Centralized, Subjective, Standardless and Unchecked Decision-Making Structure Contributes to a Pattern or Practice of Discrimination. ......... 8

        C.  Defendant's Discriminatory Pattern or Practice Has Affected the Class Across the Globe, Across Business Units, for at Least the Last Decade. ......................... 12

            1.  Defendant's discriminatory pattern or practice has extended to Class Members' compensation. ............................................................... 15

            2.  Defendant's discriminatory pattern or practice has resulted in Class Members' demotions. ................................................................. 18

            3.  Defendant's discriminatory pattern or practice has extended to other terms, conditions or privileges of Class Members' employment. .............................. 19

    II.  EEOC Can Prove a Pattern or Practice With Anecdotal Evidence Alone. ............... 23

    III. Defendant's Statistical Evidence Should Not Be Accorded Any Weight. ................... 26

CONCLUSION ......................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Abdu-Brisson v. Delta Air Lines, Inc.*,
239 F.3d 456 (2d Cir. 2001) ............................................................................. 29

*Adorno v. Port Auth.*,
258 F.R.D. 217 (S.D.N.Y. 2009) ............................................................ 11, 15, 24

*Anderson v. Douglas & Lomason Co.*,
26 F.3d 1277 (5th Cir. 1994) ............................................................................. 7

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................... 1, 2

*Apsley v. Boeing*,
722 F. Supp. 2d 1218 (D. Kan. 2010) ............................................................. 25

*Attenborough v. Constr. & Gen. Bldg. Laborers*,
691 F. Supp. 2d 372 (S.D.N.Y. 2009) ............................................................. 25

*Back v. Hastings on Hudson Union Free Sch. Dist.*,
365 F.3d 107 (2d Cir. 2004) ........................................................................ 6, 8, 9

*Bell v. E.P.A.*,
232 F.3d 546 (7th Cir. 2000) ............................................................................ 26

*Beyer v. Cnty. of Nassau*,
524 F.3d 160 (2d Cir. 2008) ............................................................................ 21

*Blake v. Potter*,
No. 03 Civ. 7733(LAP), 2007 WL 2815637 (S.D.N.Y. Sept. 25, 2007) .................................... 7

*Catlett v. Mo. Highway & Transp. Comm'n*,
828 F.2d 1260 (8th Cir. 1987) .......................................................................... 24

*Chadwick v. Wellpoint, Inc.*,
561 F.3d 38 (1st Cir. 2009) ........................................................................... 6, 8

*Cook v. Arrowsmith Shelburne, Inc.*,
69 F.3d 1235 (2d Cir. 1995) ............................................................................. 5

*Coral Constr. Co. v. King Cnty.*,
941 F.2d 910 (9th Cir. 1991) ............................................................................ 29

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ....................................................................................... 28

*Davis v. City of Panama City*,
510 F. Supp. 2d 671 (N.D. Fla. 2007) .............................................................. 26

*De La Cruz v. N.Y. City Human Res. Admin. Dep't of Soc. Serv.*,
82 F.3d 16 (2d Cir. 1996) ................................................................................ 20

*Donahue v. Windsor Locks Bd. of Fire Comm'rs*,
834 F.2d 54 (2d Cir. 1987) ............................................................................... 1

*Dortz v. City of N.Y.*,
    904 F. Supp. 127 (S.D.N.Y. 1995) ................................................................ 23

*Duling v. Gristede's Operating Corp.*,
    267 F.R.D. 86 (S.D.N.Y. 2010)............................................................... 11, 15

*EEOC v. Am. Nat'l Bank*,
    652 F.2d 1176 (4th Cir. 1981) ................................................................... 24

*EEOC v. Bloomberg L.P.*,
    2010 WL 4237077, No. 07 Civ. 8383(LAP) (S.D.N.Y. Oct. 25, 2010).................................. 24

*EEOC v. Carrols Corp.*,
    No. 5:98 Civ. 1772, 2005 WL 928634 (N.D.N.Y. Apr. 20, 2005)............................................ 14

*EEOC v. CRST Van Expedited, Inc.*,
    611 F. Supp. 2d 918 (N.D. Iowa 2009) .................................................... 14, 27

*EEOC v. Int'l Profit Ass'n*,
    No. 01 C 4427, 2010 WL 1416153, (N.D. Ill. Mar. 31, 2010)........................................ 14, 29

*EEOC v. L.A. Weight Loss*,
    509 F. Supp. 2d 527 (D. Md. 2007)........................................................ 13, 24, 25

*EEOC v. McDonnell Douglas Corp.*,
    17 F. Supp. 2d 1048 (E.D. Mo. 1998) ......................................................... 25

*EEOC v. Mitsubishi Motor Mfg.*,
    990 F. Supp. 1059 (C.D. Ill. 1998) ......................................................... 12, 14

*EEOC v. Republic Servs., Inc.*,
    640 F. Supp. 2d 1267 (D. Nev. 2009) .......................................................... 9

*EEOC v. Schott N. Am., Inc.*,
    No. 06cv1246, 2009 WL 310897 (M.D. Pa. Feb. 5, 2009) ......................................... 4

*EEOC v. Scolari Warehouse Mkts., Inc.*,
    488 F. Supp. 2d 1117 (D. Nev. 2007) ....................................................... 13, 15, 24

*Employees Committed for Justice v. Eastman Kodak Co.*,
    407 F. Supp. 2d 423 (W.D.N.Y. 2005)......................................................... 12

*Faulk v. Home Oil Co.*,
    184 F.R.D. 645 (M.D. Ala.1999) ................................................................ 9

*Flynn v. N.Y. State (Div. of Parole)*,
    620 F. Supp. 2d 463 (S.D.N.Y. 2009) ........................................................ 23

*Galabya v. N.Y. City Bd. of Educ.*,
    202 F.3d 636 (2d Cir. 2000) .................................................................... 20

*Garrett v. Hewlett-Packard Co.*,
    305 F.3d 1210 (10th Cir. 2002) ................................................................. 11

*Grant v. Bethlehem Steel Corp.*,
    635 F.2d 1007 (2d Cir.1980) ................................................................... 11

*Herbert v. City of N.Y.*,
No. 08 Civ 7892 (PGG), 2010 WL 3955577 (S.D.N.Y. Oct. 8, 2010) ...................................... 18

*Hill v. Rayboy-Brauestein*,
467 F. Supp. 2d 336 (S.D.N.Y. 2006) ........................................................................... 21

*Holsey v. Armour & Co.*,
743 F.2d 199 (4th Cir. 1984) ................................................................................. 13, 24

*Humphrey v. Cnty. of Nassau*,
No. 06-CV-3682(JFB)(AKT), 2009 WL 875534 (E.D.N.Y. Mar. 30, 2009) ......................... 22

*In re W. Dist. Xerox Litig.*,
850 F. Supp. 1079 (W.D.N.Y. 1994) ..................................................................... 9, 26, 29

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977) .......................................................................................... 2, 14, 23, 28

*J. Ste. Marie v. Easter R.R. Ass'n*,
650 F.2d 395 (2d Cir. 1981) ...................................................................................... 5, 25

*Kaur v. N.Y. City Health & Hosps. Corp.*,
688 F. Supp. 2d 317 (S.D.N.Y. 2010) ........................................................................... 22

*Knight v. Nassau Cnty. Civil Serv. Comm'n.*,
649 F. 2d 157 (2d Cir. 1981) ....................................................................................... 11

*Laxton v. Gap, Inc.*,
333 F.3d 572 (5th Cir. 2003) ......................................................................................... 8

*Leifer v. N.Y. State Div. of Parole*,
No. 07-0642-cv, 2010 WL 3292937 (2d Cir. Aug 23, 2010) ............................................ 23

*Lettieri v. Equant, Inc.*,
478 F.3d 640 (4th Cir. 2007) ......................................................................................... 5

*Linares v. City of White Plains*,
773 F. Supp. 559 (S.D.N.Y. 1991) ................................................................................ 23

*Lopez v. Metro. Life Ins. Co.*,
930 F.2d 157 (2d Cir. 1991) ......................................................................................... 26

*Lust v. Sealy, Inc.*,
383 F.3d 580 (7th Cir. 2004) ......................................................................................... 6

*Lynn v. Univ. of Cal.*,
656 F.2d 1337 (9th Cir. 1981) ....................................................................................... 6

*Malarkey v. Texaco, Inc.*,
983 F.2d 1204 (2d Cir. 1993) ......................................................................................... 8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ...................................................................................................... 4

*Matthews v. Conn. Light & Power Co.*,
No: 3:05cv226(PCD), 2006 WL 2506597 (D. Conn. Aug. 28, 2006)................................... 8

*Montana v. First Fed. Sav. & Loan Ass'n of Rochester,*
  869 F.2d 100 (2d Cir. 1989) ......................................................................................... 1

*Nat'l R.R. Passenger Corp. v. Morgan,*
  536 U.S. 101 (2002) ............................................................................................... 7, 22

*Nev. Dep't of Human Res. v. Hibbs,*
  538 U.S. 721 (2003) ...................................................................................................... 6

*Paz v. Wauconda Healthcare & Rehab. Ctr., L.L.C.,*
  464 F.3d 659 (7th Cir. 2006) ........................................................................................ 5

*Plaetzer v. Borton Auto., Inc.,*
  No. Civ. 02-3089 JRT/JSM, 2004 WL 2066770 (D. Minn. Aug. 13, 2004).............. 5

*Pomilio v. Wachtell Lipton Rosen & Katz,*
  No. 97 Civ. 2230(MBM), 1999 WL 9843 (S.D.N.Y. Jan. 11, 1999)........................... 7

*Port Auth. Police Asian Jade Soc'y v. Port Auth.,*
  681 F. Supp. 2d 456 (S.D.N.Y. 2010) .................................................................. 2, 9, 11

*Preda v. Nissho Iawi Am. Corp.,*
  128 F.3d 789 (2d Cir. 1997) ....................................................................................... 23

*Punsal v. Mount Sinai Servs. of Mount Sinai Sch. of Med. of N.Y. Univ.,*
  No. 01-5410, 2004 WL 736892 (S.D.N.Y. Apr. 6, 2004) ......................................... 22

*Reeves v. Sanderson Plumbing Prods.,*
  530 U.S. 133 (2000) ...................................................................................................... 8

*Riedinger v. D'Amincantino,*
  974 F. Supp. 322 (S.D.N.Y. 1997) ............................................................................ 22

*Robinson v. Metro-North Commuter R.R.,*
  267 F.3d 147 (2d Cir. 2001) ................................................................................. 12, 23

*Santiago-Ramos v. Centennial P.R. Wireless Corp.,*
  217 F.3d 46 (1st Cir. 2000) ...................................................................................... 8, 28

*Seils v. Rochester City Sch. Dist.,*
  192 F. Supp. 2d 100 (W.D.N.Y. 2002)....................................................................... 26

*Shager v. Upjohn, Co.,*
  913 F.2d 398 (7th Cir. 1990) ........................................................................................ 5

*Sheehan v. Donlen Corp.,*
  173 F.3d 1029 (7th Cir. 1999) ...................................................................................... 5

*Sigmon v. Parker Chapin Flattau & Kimpl,*
  901 F. Supp. 667 (S.D.N.Y. 1995) ............................................................................ 28

*Sorlucco v. N.Y. City Police Dep't,*
  971 F.2d 864 (2d Cir. 1992) .......................................................................... 2, 5, 13, 14

*Staub v. Proctor Hosp.,*
  No. 09-400, 2011 WL 691244 (U.S. Mar.1, 2011) ...................................................... 8

v

*Timothy v. Our Lady of Mercy Med. Ctr.*,
   No. 03 Civ. 3556(RCC), 2004 WL 503760 (S.D.N.Y. Mar. 12, 2004) ..................................... 23

*Tingley-Kelley v. Trs. of Univ. of Penn.*,
   677 F. Supp. 2d 764 (E.D. Pa. 2010) ................................................................................. 8

*Todaro v. Siegel, Fenchel, & Peddy, P.C.*,
   No. 04-CV-2939 (JS)(WDW), 2009 WL 3150408 (E.D.N.Y. Sept. 25, 2009) ................. 16, 17

*Trezza v. Hartford, Inc.*,
   No. 98 CIV. 2205 (MBM), 1998 WL 912101 (S.D.N.Y. Dec. 30, 1998) ........................... 8, 28

*United States v. City of N.Y.*,
   713 F. Supp. 2d 300 (S.D.N.Y. 2010) ....................................................................... passim

*Velez v. Novartis*,
   244 F.R.D. 243 (S.D.N.Y. 2007) ................................................................... 15, 24, 28

*Watson v. Paulson*,
   578 F. Supp. 2d 554 (S.D.N.Y. 2008) ....................................................................... 23

*Weeks v. N.Y. State (Div. of Parole)*,
   273 F.3d 76 (2d Cir. 2001) ................................................................................. 7, 22

*Woodbury v. N.Y. City Transit Auth.*,
   832 F.2d 764 (2d Cir. 1987) ......................................................................................... 25

*Wright v. Circuit City Stores*,
   201 F.R.D. 526 (N.D. Ala. 2001) ................................................................................. 9

*Wright v. Stern*,
   450 F. Supp. 2d 335 (S.D.N.Y. 2006) ................................................... 5, 10, 12, 24

*Wyvill v. United States Cos. Life Ins. Co.*,
   212 F.3d 296 (5th Cir. 2000) ........................................................................................ 14

**Rules**

Federal Rule of Evidence 702 ........................................................................................... 28

Federal Rule of Evidence 801(c) ....................................................................................... 4

Federal Rule of Evidence 803(3) ....................................................................................... 4

Federal Rule of Evidence 801(d)(2)(D) ............................................................................. 5

**Treatises**

Barbara Lindemann & Paul Grossman,
   *Employment Discrimination Law* .............................................................................. 9

## INTRODUCTION

Summary judgment is inappropriate as to Equal Employment Opportunity Commission's (EEOC's) pattern-or-practice claim because the evidence proves that discrimination against pregnant women and mothers in compensation, demotions, and other terms, conditions or privileges of employment has been standard operating procedure since at least 2002. Defendant's biased, centralized, and unchecked decisions have subjected pregnant women and mothers to discrimination across the globe, in every business unit, for at least a decade.[1]  First, Defendant's top managers hold biased and stereotyped views of women, pregnant women and mothers.  Second, Defendant's entire decision-making structure is centralized in its New York headquarters in these few top managers, and is subjective, standardless, inconsistent, and unchecked.  Third, Defendant has been aware of sex/pregnancy discrimination but disregarded it, even in the face of litigation.  Finally, EEOC has amassed evidence of sex/pregnancy discrimination from 78 Claimants, along with other Class Members, from a wide range of business units, jobs, levels, and geographic regions.

## ARGUMENT

The Court cannot grant summary judgment because all of the evidence, viewed in the light most favorable to EEOC, demonstrates a genuine issue of material fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).  A court "must resolve all ambiguities" against the moving party.  *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987). Courts have particularly expressed hesitation to grant summary judgment where motive, intent or state of mind are at issue, including in employment discrimination cases.  *Montana v. First Fed.*

---

[1] Defendant has not moved for summary judgment as to EEOC's individualized claims regarding dozens of Claimants brought under section 706 of Title VII.  Thus, even if the Court rejected EEOC's pattern-or-practice claim, EEOC's section 706 claims would remain for trial.

1

*Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 103 (2d Cir. 1989). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Anderson*, 477 U.S. at 255 (citation omitted).

In *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977), the Supreme Court held that a company is liable for perpetrating a pattern or practice of discrimination "where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature . . . There would be a pattern or practice if, for example . . . a company repeatedly and regularly engaged in acts prohibited by the statute." Given the nature of pattern-or-practice cases, all underlying discriminatory acts are treated as one overarching unlawful employment practice and courts consider the evidence holistically. *See Sorlucco v. N.Y. City Police Dep't*, 971 F.2d 864, 871-73 (2d Cir. 1992); *Port Auth. Police Asian Jade Soc'y v. Port Auth.*, 681 F. Supp. 2d 456, 466 (S.D.N.Y. 2010).

I.    **Defendant Has Perpetrated a Pattern or Practice of Intentional Discrimination Against Pregnant Women and Mothers through Its Biased, Centralized, and Unchecked Employment Decisions.**

      A.    **Top Management Is Biased Against and Holds Negative Stereotypes About Women, Pregnant Women and Mothers.**

At its highest level, Defendant has exhibited clear hostility toward women, pregnant women and mothers. Founder of Bloomberg L.P. (Bloomberg), Michael Bloomberg, who continues to be involved in key decisions at the company and who set the culture and tone of the company, told an employee to "kill it" when she told him that she was pregnant. *See* EEOC's Local Rule 56.1 Statement of Disputed Material Facts in Opposition to Defendants' Motion for Summary Judgment (EEOC 56.1) ¶¶ 82-83.[2] He also commented that allowing mothers flexible work arrangements for childcare is like allowing a man time off to practice his golf swing. (*Id.* ¶

---

[2]All references to EEOC's Facts include references to the exhibits cited.

2

83.)  When Michael Bloomberg left the Company in 2002 to become Mayor of New York City, he installed Lex Fenwick as Chief Executive Officer and Peter Grauer as Chairman to run the company.  (*Id.* ¶ 82.)  Fenwick demanded that managers "get rid of these pregnant bitches," referring to two women on maternity leave.  (*Id.* ¶ 84.)  A Sales manager warned a Claimant with pregnancy complications that she needed to meet her sales quota, because "Lex doesn't care if you're bleeding."  (*Id.*)  Fenwick kept a list of women he did not think should receive raises because they were pregnant or had gone on maternity leave (*id.*) and had a general reputation for discriminating against pregnant women and mothers, including removing women from their Sales jobs after they became pregnant.  (*Id.*)  Fenwick also stereotyped women at Bloomberg, believing they were likely not to return to work after taking maternity leave and that it was hard for mothers to work the expected ten-hour days.  (*Id.*)  As a rule, Fenwick "bullied" women, more than he bullied men.  (*Id.*)  Twelve days after one of his direct reports told Fenwick she was pregnant, he removed about 850 of her 1000 reports and slashed her compensation, despite her superior performance.  (*Id.* ¶ 134.)

Ken Cooper, Global Head of Human Resources (HR) and of Operations at different points, is notorious for comments that it is a woman's and not a man's role to take care of a child and that "women [do] not really [have] a place in the workforce" but rather "belong at home raising the children."  (*Id.* ¶ 85.)  He also made clear that unless the mother has a health emergency, "there's absolutely no reason for someone to take paternity leave."  (*Id.*)  While a high-performing subordinate was on maternity leave, Cooper conducted a "restructuring" that demoted her multiple levels and cut her compensation drastically.  (*Id.* ¶ 127.)

With Head of Global Data Beth Mazzeo setting the tone by announcing that "women are not going to move very far within the company" and that a woman's "career is paused at

Bloomberg" after having children (*id.* ¶ 87), managers in Data believe maternity leave is "burdensome" for the company, have referred to women who requested flexible work arrangements as "stupid moms," thought that once a woman became pregnant, she became "crazy," and saw the number of pregnant women at Bloomberg as a "fertility extravaganza," and suggested eliminating "procreation" as a goal. (*Id.*) Mazzeo herself excluded a pregnant Claimant from management meetings, and when this undisputedly high-performing Claimant requested a slight schedule adjustment following her maternity leave, Mazzeo gave her the Hobson's choice of a demotion down to an entry-level position or leaving the department. (*Id.*) Mazzeo demoted another Claimant all the way from Interim Head of Global Data to an entry-level position after her pregnancy. (*Id.* ¶ 126.)

In 2003, while discussing maternity leave, Head of News Matt Winkler said, "half these fuckin' people take the leave and they don't even come back. It's like stealing money from Mike Bloomberg's wallet. It's theft. They should be arrested." (*Id.* ¶ 88.) In response to an HR manager complaining about this outburst, CEO Fenwick stated, "well is every fucking woman in the company going to have a baby?" (*Id.*) When told about an employee asking for assistance with maternity leave, Linda Norris, Global Head of HR, responded, "well, she's the one who decided to have a baby." (*Id.* ¶ 85.) When a female employee complained to Kim Bang, male President of Tradebook Sales, about her pay, he asked, "can't you just be happy being pregnant?" (*Id.* ¶ 86.)[3]

---

[3] Defendant's arguments that particular biased remarks are open to interpretation are inappropriate at this stage because "[o]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Shager v. Upjohn, Co.*, 913 F.2d 398, 402 (7th Cir. 1990) ("the task of disambiguating ambiguous utterances is for trial, not for summary judgment"). Further, these remarks are admissible pursuant to Federal Rule of Evidence 801(c) (non-hearsay) and/or 803(3) to show state of mind. *See EEOC v. Schott N. Am., Inc.*, No. 06cv1246, 2009 WL 310897, at *4-*5

All of these actions and comments are clear direct evidence of discriminatory animus against women, pregnant women and mothers, and a jury may use them to find a pattern or practice of discrimination. *See Sorlucco*, 971 F.2d at 871-73; *Wright v. Stern*, 450 F. Supp. 2d 335, 374-75 (S.D.N.Y. 2006). *See also Lettieri v. Equant, Inc.*, 478 F.3d 640, 649 (4th Cir. 2007); *Paz v. Wauconda Healthcare & Rehab. Ctr., L.L.C.*, 464 F.3d 659, 666 (7th Cir. 2006); *Sheehan v. Donlen Corp.*, 173 F.3d 1029, 1044-45 (7th Cir. 1999); *Plaetzer v. Borton Auto., Inc.*, No. Civ. 02-3089 JRT/JSM, 2004 WL 2066770, at *10 (D. Minn. Aug. 13, 2004).[4]

In addition to top managers making specific comments evincing animus, Defendant generally disdains women, particularly pregnant women and mothers. (*See* EEOC 56.1 ¶¶ 82-94.) Defendant's highest tier of managers has been well aware for years that few women (let alone mothers) hold top management positions, yet it has actively refused to address this issue. (*See Id.* ¶ 91.) Likewise, top management has known for years that the company was losing a disproportionate number of experienced (and valued) women and mothers each year, but did not see it as a problem. (*Id.* ¶ 92.) Head of Global Data Mazzeo, whose direct reports were overwhelmingly men known as "Beth's boys," even scoffed, "Who would want to work with an office full of women?" (*Id.* ¶ 87.) These are precisely the kinds of facts that led the *City of N.Y.* court to a finding of pattern-or-practice sex discrimination. *See United States v. City of N.Y.*, 713 F. Supp. 2d 300, 315, 322-23 (S.D.N.Y. 2010) (the "absence of female [employees] was well-

---

(M.D. Pa. Feb. 5, 2009) (discriminatory remarks serving as circumstantial evidence of a discriminatory atmosphere are not hearsay). They are also admissible pursuant to Federal Rule of Evidence 801(d)(2)(D) because they were made by managers acting within their scope of employment. *See Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1238 n.1 (2d Cir. 1995) (plaintiff's testimony that supervisors told her that she was fired because of her sex is admissible even if the supervisors were conveying to plaintiff what the General Manager told them).
[4] Defendant's citation to *J. Ste. Marie v. Easter R.R. Ass'n*, 650 F.2d 395, 406 (2d Cir. 1981) is inapposite. There, plaintiffs' evidence of discriminatory animus consisted of one admission by one manager regarding one employment decision.

known to [defendant] supervisors," and evidence of a "boy's club" culture further strengthened the anecdotal evidence already offered by the Government). *See also Lynn v. Univ. of Cal.*, 656 F.2d 1337, 1343 (9th Cir. 1981) (disdain for women's issues evinces intent to discriminate against women).  Defendant has observed or received complaints about its hostile attitudes toward and actions against pregnant women, but it has disregarded such observations and complaints, even in the face of litigation.  (*Id.* ¶ 93.)  Defendant has persevered in its attempts to "get rid of" the "pregnant bitches."  (*Id.* ¶¶ 84, 116, 129, 131, 134, 142, 143, 146, 147.)[5]

The Supreme Court has noted that "the faultline between work and family [is] precisely where sex-based overgeneralization has been and remains strongest." *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 738 (2003).  The Second Circuit explicitly considered "what constitutes a gender-based stereotype," and found no ambiguity: "notions that mothers are insufficiently devoted to work, and that work and motherhood are incompatible, are properly considered to be, themselves, gender-based." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 120-21 (2d Cir. 2004) (citing *Hibbs*, 538 U.S. at 731 n.5 ("women's family duties trump those of the workplace" is a "gender stereotype").  Contrary to Defendant's arguments, comments evincing sex-based stereotypical views and bias against women and mothers support an inference of discrimination. *See Chadwick v. Wellpoint, Inc.*, 561 F.3d 38, 45 (1st Cir. 2009) ("[A]n employer is not free to assume that a woman, because she is a woman, will necessarily be a poor worker because of family responsibilities"); *Back*, 365 F.3d at 122; *Lust v. Sealy, Inc.*, 383 F.3d

---

[5] To the extent Defendant touts its 2007 part-time policy or its 2008 "Plan B" initiative, which Defendant alleges it designed in part to retain women and mothers and to improve its Human Resources function and problematic decisionmaking, it must be noted that these initiatives began in response to a sex discrimination suit in London and almost a year after EEOC filed this suit, respectively, and neither includes any specific mechanisms for assessing Defendant's progress in eradicating sex or pregnancy discrimination. (EEOC 56.1 ¶ 94.)  Moreover, it is not clear how effective Defendant's new policies have been. (*Id.*)  Similarly, for all Defendant advertises its "family-friendly" benefits, it makes clear that family should never be considered as important as the Company. (*Id.* ¶ 90.)

580, 583 (7th Cir. 2004) (upholding jury's finding that employee was denied promotion based on sex when manager did not recommend her because she had children and he assumed that she did not want to relocate her family).[6]

Evidence of these stereotypes include Defendant's assumption that female employees would rather stay at home than work and that it is too hard for mothers to meet Bloomberg's stringent work demands.  (EEOC 56.1 ¶¶ 84-89.)  For example, in 2007, Winkler, the head of News, stated that women cannot work the long hours required by the journalism industry and said publicly that, "the problem with women is that they go off and have babies."  (*Id.* ¶ 88.) Linda Norris, while head of HR, asked women going on maternity leave whether they intended to return to work but did not ask that of other employees taking leave. (*Id.* ¶¶ 85.)  When a Data Claimant inquired about the travel demands for a promotion she was interested in, Mazzeo assumed that the Claimant was inquiring because she had a child and told the employee that if she "wanted to be the nine-to-five mom that was home making dinner every night, that wasn't going to happen," and promoted a less-qualified man instead.  (*Id.* ¶¶ 87, 137.)  The Head of Sales for North and South America, Max Linnington, expressed that a female candidate "would be my main choice [as a potential successor to himself] but given her family circumstances, [a male candidate] would be my second choice," referring to the female candidate's recent birth to twins.  (*Id.* ¶ 86.)  Managers throughout the company have also questioned female employees

---

6 Defendant's citation to *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1295 (5th Cir. 1994), is inapposite because the district judge, during a bench trial, made credibility determinations about witnesses and the weight of evidence, and the decision did not examine the comments at issue.  Defendant's citations to *Blake v. Potter*, No. 03 Civ. 7733(LAP), 2007 WL 2815637, at *8 (S.D.N.Y. Sept. 25, 2007), and *Pomilio v. Wachtell Lipton Rosen & Katz*, No. 97 Civ. 2230(MBM), 1999 WL 9843, at *8 (S.D.N.Y. Jan. 11, 1999), are likewise distinguishable. Furthermore, they are confusing as the citations concern analysis of retaliation claims.  Similarly, the citation to *Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 85 (2d Cir. 2001), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), pertains to the standard for an adverse employment action.

about their commitment to the job, intent to return to work, and their ability to do the job once they became pregnant or went on maternity leave. (*Id.* ¶ 89.) In *Back,* where supervisors questioned whether plaintiff could do the job with children, and told her that "if [her] family was [her] priority . . . maybe this was not the job for [her]," the court held that such comments constitute "direct evidence" of discrimination "even where uncorroborated." 365 F.3d at 124.[7]

Especially when there is evidence that discriminatory comments and beliefs come from the highest-level managers, who are involved in almost all employment decisions, it does not matter if the comments were not made in the direct context of a particular adverse employment action. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 152 (2000). *See also Staub v. Proctor Hosp.*, No. 09-400, 2011 WL 691244, at *6 (U.S. Mar.1, 2011); *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1210 (2d Cir. 1993) (affirming district court's admission of non-decision-maker remarks because those remarks showed the "pervasive corporate hostility towards [plaintiff]"); *Matthews v. Conn. Light & Power Co.*, No: 3:05cv226(PCD), 2006 WL 2506597, at *7-8 (D. Conn. Aug. 28, 2006) (supervisor's comments about plaintiff's ability to perform her job as a mother with a young child, comments about her child-care arrangements, and comments that the job may not be a "good match" for plaintiff are not stray remarks because "a jury could conclude that they have an 'ominous' significance and may find a nexus between [supervisor's] comments and the termination action").

**B.    Defendant's Centralized, Subjective, Standardless and Unchecked Decision-Making Structure Contributes to a Pattern or Practice of Discrimination.**

Defendant does not dispute that its policies, practices and employment decisions are highly centralized, as heads of the business units and their managers make every decision about

---

[7] *See also Chadwick*, 561 F.3d at 46-47; *Laxton v. Gap, Inc.*, 333 F.3d 572, 584 (5th Cir. 2003); *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 57 (1st Cir. 2000); *Tingley-Kelley v. Trs. of Univ. of Penn.*, 677 F. Supp. 2d 764, 777-78 (E.D. Pa. 2010); *Trezza v. Hartford, Inc.*, No. 98 CIV. 2205 (MBM), 1998 WL 912101, at *2 (S.D.N.Y. Dec. 30, 1998).

compensation, demotion, promotion, transfer, performance assessment, and part-time work.

(EEOC 56.1 ¶¶ 95-96.)  All employment decisions throughout the entire class period and across

all geography are centralized primarily in New York City in a handful of high-level managers.

(*Id.*)  Because these managers are involved in all employment decisions, a jury can reasonably

find a connection between their bias and stereotypes and a pattern of discriminatory employment

decisions.  *See Back*, 365 F.3d at 124 n.12 ("The district court inaccurately characterized

[managers'] purported statements about Back's inability to combine work and motherhood as

'stray remarks.'  The comments alleged were (1) made repeatedly, (2) drew a direct link between

gender stereotypes and the conclusion that Back should not be tenured, and (3) were made by

supervisors who played a substantial role in the decision to terminate.  As such, they are

sufficient to support a finding of discriminatory motive.").[8]  Further, courts in the Second Circuit

have found evidence of standardless, unchecked, and centralized decision-making indicative of a

pattern or practice of discrimination.  *See Jade Soc'y v. Port Auth.*, 681 F. Supp. 2d at 460; *City

of N.Y.*, 713 F. Supp. 2d at 308, 318-19, 325.

---

[8] *In re W. Dist. Xerox Litig.*, 850 F. Supp. 1079, 1087-88 (W.D.N.Y. 1994), is distinguishable precisely because, as the court noted, the terminations there were by "different supervisors made on a decentralized employee-by-employee basis", *id.* at 1081, and the document plaintiffs relied on was unauthenticated and at best only showed that "*someone* at Xerox considered the possibility of cost reductions through lowering the average age of the workforce." *Id.* at 1088 (italics in original).  *See also EEOC v. Republic Servs., Inc.*, 640 F. Supp. 2d 1267, 1319 (D. Nev. 2009) (suggesting that if EEOC had shown more centralization, it might have raised a genuine issue of material fact).  *Wright v. Circuit City Stores*, 201 F.R.D. 526, 541 (N.D. Ala. 2001), is also distinguishable because there, the court found that the claims were individualized rather than class-based because the purported class "report[ed] directly to and under the direct supervision of numerous autonomous decision-makers" and the claims involved "intervening conscious decisions of a multitude of diverse managers and supervisors." *Id.* at 541-42.  The district court's analysis in *Circuit City* actually supports EEOC's contentions here because the "locus of decisionmaking authority is an important consideration when determining whether class certification is appropriate for systemic discrimination claims involving multiple facilities." *Id.* at 539 (citing *Faulk v. Home Oil Co.*, 184 F.R.D. 645, 655 (M.D. Ala.1999) (citing 2 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law*, 1598 ("Even [in disparate treatment cases] evidence of centralized policy or decisionmaking can support certification of classes encompassing geographically separate facilities or different business units."))).

9

All decisions by Defendant's highest-level business managers go unchecked, inspiring a culture of intimidation, and top business managers have kept the HR function powerless and under their thumb. (*Id*. ¶¶ 97-110.) For example, when an HR Manager explained to Winkler, Head of News, that he needed to run potentially discriminatory business decisions by HR, Winkler screamed, "no one's going to tell me how to run my fucking business." (*Id*. ¶ 97.) When the HR manager asked CEO Fenwick to talk with Winkler about this issue, Fenwick replied, "why the fuck is he going to come to you [if there is a chance you will tell him his proposed reorganization will have a discriminatory impact on pregnant women]?" (*Id*.)

Moreover, at least until August 2008 (almost a year after EEOC filed the instant lawsuit), there were no standards or written guidelines regarding compensation, and employees frequently did not know who is involved in their compensation decisions. (*Id*. ¶¶ 102.) There were no standards or written guidelines about what level of performance is required to achieve the different level of ratings used to measure performance at Bloomberg, and managers had different interpretations of what the performance ratings meant. (*Id*. ¶¶ 102-104.) There were no standards about what behavior was sufficient for a disciplinary action or a performance improvement plan. (*Id*. ¶ 105.) This type of "'subjective and ad hoc' employment practices . . . bolster [a] plaintiff['s] claim that defendants discriminated against class members." *City of N.Y.*, 713 F. Supp. at 318 (quoting *Wright v. Stern*, 450 F. Supp. 2d at 365-66 ("Multiple courts have observed that '[g]reater possibilities for abuse . . . are inherent in subjective definitions of employment selection and promotion criteria.'") (citation omitted). This is because stereotypes and bias can be very well hidden and are especially likely to influence personnel decisions when they are based on informal, arbitrary, and subjective factors. *See Knight v. Nassau Cnty. Civil*

*Serv. Comm'n.*, 649 F. 2d 157, 161 (2d Cir. 1981) ("an employer may not use wholly subjective and unarticulated standards to judge employee performance for purposes of promotion.").[9]

Additionally, Defendant admits that it does not post open managerial positions and that open positions are filled at upper management's discretion.  (EEOC 56.1 ¶ 110.)  This type of informal, subjective tap-on-the shoulder or word-of-mouth method, which prevents class members from applying or otherwise formally expressing their interest in openings, has been found "suspect and used to mask ongoing bias." *City of N.Y.*, 713 F. Supp. 2d at 318 (quoting *Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007, 1016 (2d Cir.1980).  Since Defendant has had no organizational chart and few job titles, professes not to consider any job change a demotion or a promotion, and admits that it does not clearly define career advancement at the company (EEOC 56.1 ¶ 109), it makes it very easy for Bloomberg to hide its discriminatory intent by denying that a Class Member's demotion was actually a demotion or that a promotion for a non-Class Member was really a promotion. *See Adorno v. Port Auth.*, 258 F.R.D. 217, 232 (S.D.N.Y. 2009) ("[v]iewing the evidence in the light most favorable to plaintiffs, the lack of criteria in promotions is sufficient to raise a genuine issue of material fact, precluding summary judgment"). This is particularly true because Defendant's subjective and nontransparent employment decisions are left to the discretion of a centralized group of mostly male upper managers who have expressed bias and stereotypes against women, pregnant women, and mothers. *See Duling v. Gristede's Operating Corp.,* 267 F.R.D. 86, 98 (S.D.N.Y. 2010) (in examining whether "the challenged practice is causally related to a pattern of disparate

---

[9] See *also Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002) (reversing summary judgment because, "[a]bsent evidence that HP's system of ranking and evaluation relies on objective criteria, we hold that Mr. Garrett has satisfied his burden to demonstrate pretext under the third prong of *McDonnell Douglas* for the purposes of avoiding summary judgment."); *Jade Soc'y*, 681 F. Supp. 2d at 469 (relying on evidence of highly subjective, standardless, and centralized decision-making to find a pattern or practice of discrimination).

treatment," the evidence "tend[ed] to show that all hiring decisions are made by five male

individuals, in their sole discretion, are unguided by any policies or criteria, and are not reviewed

by anyone else"); *City of N.Y.,* 713 F. Supp. 2d at 308, 318-19 (citing defendant's insular, "word-

of-mouth" recruiting practice, which "lacked written standards with specific instructions to guide

[defendant] personnel" and unchecked, centralized decision-making, observing that "the only

consistent practice at [defendant] was that complete discretion and authority was vested" in

defendant's leadership); *Wright v. Stern,* 450 F. Supp. 2d at 365-66 (denying defendants' motion

for summary judgment of promotion and compensation pattern-or-practice where managerial

positions were filed without postings, the Commissioner had unilateral authority and discretion,

and defendant had no policies; finding that these practices "permit discrimination to flourish").

### C.      Defendant's Discriminatory Pattern or Practice Has Affected the Class Across the Globe, Across Business Units, for at Least the Last Decade.

Defendant's intentional perpetration and tolerance of discrimination from the top down

have permeated the company and provide a uniting theme underlying its consistent and myriad

adverse actions against the Class.  Pattern-or-practice claims under Title VII involve "allegations

of widespread acts of intentional discrimination against individuals," *Robinson v. Metro-North*

*Commuter R.R.,* 267 F.3d 147, 158 (2d Cir. 2001).  Evidence of multiple claimants' varied

experiences can be considered in combination to support a finding of pattern or practice.  *See*

*EEOC v. Mitsubishi Motor Mfg.*, 990 F. Supp. 1059, 1070 (C.D. Ill. 1998).  *See also Employees*

*Committed for Justice v. Eastman Kodak Co.*, 407 F. Supp. 2d 423, 441 (W.D.N.Y. 2005)

(noting that the complaint's allegations of discriminatory pay, promotion, and training could

either "allege discrete acts of disparate pay and failure to promote or implicate a company-wide

practice, policy and custom of intentional race-based discrimination").  The volume, quality and

widespread nature of the Class Member experiences in this case meet or exceed the quality and

quantity other courts have found sufficient to meet the pattern or practice standard.

First, to determine whether the totality of anecdotal evidence indicates a pattern, courts have eschewed numeric claimant minimums.  *See Sorlucco*, 971 F.2d at 871-73 (finding pattern or practice in the application of disciplinary procedures based on evidence of discrimination as to one plaintiff alongside evidence of animus by management and the termination of four women); *Holsey v. Armour & Co.*, 743 F.2d 199, 204-15 (4th Cir. 1984) (affirming the lower court's finding of a company-wide pattern or practice of race-based denials of promotion and exclusion, detailing evidence of disparate treatment as to seven class members, the opaque and subjective promotions process, and noting that "[t]he testimony of both employees and company officials…clearly established a pattern of intentional discrimination" on its own); *City of N.Y.*, 713 F. Supp. 2d  at 320, 325 (pattern or practice of disparate treatment in hiring throughout the City's Division of Bridges on the basis of evidence of four class members' discrimination; "the [fact that] discrimination appeared to impact only four women does not diminish the Government's case – there is 'no precise mathematic formulation' for a pattern or practice claim") (citations omitted); *EEOC v. L.A. Weight Loss*, 509 F. Supp. 2d 527, 531, 533-34 (D. Md. 2007) (denying summary judgment as to EEOC's pattern or practice claim of sex-based discriminatory hiring, relying on testimony from eight witnesses to find genuine issues of material fact as to discriminatory hiring for *all* positions, in approximately 400 facilities); *EEOC v. Scolari Warehouse Mkts., Inc.*, 488 F. Supp. 2d 1117, 1126, 1131-35 (D. Nev. 2007) (relying on anecdotal evidence of discrimination as to seventeen claimants, principally at one location, out of a class member pool of over 5,000 to deny summary judgment as to EEOC's pattern or practice claim of sexual harassment throughout defendant's numerous locations).[10]

_____

[10] Defendant mistakenly argues that EEOC's anecdotal evidence falls short of proving a pattern or practice claim based on a raw comparison of the numbers of claimants to the total class size.

Second, the quality of EEOC's Class Member evidence is particularly compelling. In *Sorlucco*, the Second Circuit was strongly persuaded by the egregious nature of discrimination experienced by a single female plaintiff who was subjected to harsher discipline than her male peer. 971 F.2d at 866-69, 871-73. This evidence of her individual experience, in combination with facts that four women were terminated while nine men were not out of a total of 35 probationary officers that were subject to departmental discipline from 1980 to 1985, and other anecdotal evidence about defendant's bias and practices, was sufficient for the jury to have "reasonably inferred that there was a custom of sex bias operating within the NYPD and governing its disciplinary decisions" as to probationary officers. *Id.* EEOC presents similarly compelling Class Member evidence here. (EEOC 56.1 ¶¶ 112-148).

Third, plaintiffs can show a pattern or practice through circumstantial evidence drawn from numerous locations – even if geographically widely dispersed – and evidence need not reflect discrimination at *every* location, or in *every* part of a particular facility. *See Mitsubishi*, 990 F. Supp. at 1075 n.8 (C.D. Ill. 1998) (citing *Teamsters*, 431 U.S. at 336 n.16 (1977)). *See also City of N.Y.*, 713 F. Supp. 2d at 306, 325 (finding pattern and practice of discrimination by

---

*See* Def. Mem. at 13. Even though the court in *EEOC v. Carrols Corp.*, No. 5:98 Civ. 1772, 2005 WL 928634 (N.D.N.Y. Apr. 20, 2005), relied in part on the number of claimants versus the number of potential claimants, it explicitly declined to identify that percentage as a specific threshold necessary to establish a pattern or practice case. *See id.* at *5. *See also EEOC v. Int'l Profit Ass'n*, No. 01 C 4427, 2010 WL 1416153, at *4-6 (N.D. Ill. Mar. 31, 2010) (noting that the *CRST* court not only conceded that anecdotal evidence alone could be sufficient for proving a pattern or practice, but like the *Carrols* court, declined to treat the claimant to class members ratio as a threshold or benchmark; emphasizing that the claimant to potential claimant or total employee ratio should not be used "as a talisman entitling [defendant] to summary judgment"). Moreover, even if this Court were to accept Defendant's inappropriate emphasis on raw numbers, EEOC's anecdotal evidence exceeds the percentages in the decisions Defendant cites. 78 out of 603 (EEOC 56.1 ¶ 9) class members are claimants in the instant action – approximately 12.9%. This percentage clearly exceeds the *CRST, Carrols,* and *Wyvill* percentages, approximately 5.4%, .367%, and 1.63%, respectively. *See EEOC v. CRST Van Expedited, Inc.*, 611 F. Supp. 2d 918, 953, 957 (N.D. Iowa 2009); *Carrols,* 2005 WL 928634, at *4; *Wyvill v. United States Cos. Life Ins. Co.*, 212 F.3d 296, 302 (5th Cir. 2000).

14

city's Department of Transportation in hiring bridge painters throughout division); *Duling*, 267

F.R.D. at 96-100 (on class certification motion alleging pattern-or-practice discrimination in

hiring and promotion at chain of 42 grocery stores, finding commonality where hiring was

delegated to four individuals, and promotion recommendations were approved by individual at

company headquarters); *Adorno*, 258 F.R.D. at 217 (denying summary judgment on pattern-or-

practice allegations concerning promotions throughout regional police force); *Scolari*, 488 F.

Supp. 2d at 1126, 1131-1132, 1135 (denying summary judgment of pattern or practice

throughout 100-plus locations); *Velez v. Novartis,* 244 F.R.D. 243, 266-67 (S.D.N.Y. 2007) (in

certifying class, finding nationwide commonality based on declarations from women in fourteen

states).

### 1.      Defendant's discriminatory pattern or practice has extended to Class Members' compensation.

Defendant's data show that it discriminated against 77 out of 78 Claimants, and

additional Class Members, in compensation.  (EEOC 56.1 ¶ 113-123.)  Among other methods,

Defendant paid them less total intended compensation, kept their base salaries flat, and/or

decreased the number of certificates (certs) they were awarded, as compared to their own

trajectories before becoming pregnant and as compared to non-Class Members.[11]  Indeed, across

all business units and across geographic locations, Class Members experienced consistent

increases in compensation until announcing their pregnancy or taking maternity leave, when they

---

[11] Neither in a statistical context nor in an anecdotal context did EEOC compare Class Members to non-Class Members taking similar amounts of leave.  The legal reasons are discussed in Section III herein.  Moreover, it would be essentially impossible to prove individual discrimination using such comparator evidence because Defendant does not consistently track leave in its data and because very few Class Members worked alongside and were otherwise comparable to long-leave-takers.  (EEOC 56.1 ¶¶ 150-151.)

experienced a negative turn in their compensation trajectory, despite management's continued positive view of their performance. (*Id.* ¶¶ 113-123.)[12]

Defendant departed from procedural regularity in its compensation decisions for pregnant women and mothers. For example, compensation managers testified that any decrease in the number of certificates, total intended compensation, or base salary would be highly abnormal, particularly for good performers, because the standard compensation trajectory for average employees is to experience increases in all components of compensation every year. (*Id.* ¶¶ 111.) In fact, Defendant's own documents establish that on average, employees received compensation increases from 2000 through 2008. (*Id.*) The negative turns in compensation for Class Members despite positive performance establishes a sharp departure from the norm. Indeed, Defendant's own statistical findings are consistent with EEOC's allegations. *See infra* at 27.[13] This evidence establishes a pattern or practice of discrimination. *See City of N.Y.,* 713 F. Supp. 2d at 318-19 ("no mechanisms to ensure that the persons . . . were employing permissible criteria" in the challenged employment practice, departures "from procedural regularity in multiple respects" and "complete discretion and authority . . . vested" in the highest level managers are indicative of a pattern of intentional discrimination).

_____

[12] Comparison of a female employee's compensation trajectory before she had children, when she was not yet part of the protected category as alleged in this case, and after she became pregnant or had children, is highly probative for analyzing disparate treatment as to compensation in a pregnancy discrimination case because unlike other disparate treatment contexts where class status is static and continuous such as race, pregnancy discrimination begins at a distinct point - pregnancy or maternity leave - thereby creating a clear dividing line triggering the protected status. *See Todaro v. Siegel, Fenchel, & Peddy, P.C.*, No. 04-CV-2939 (JS)(WDW), 2009 WL 3150408, at *1-3, *8 (E.D.N.Y. Sept. 25, 2009) (in a Title VII pregnancy discrimination case, citing facts comparing one plaintiff's pre- and post-pregnancy salary increases, and finding a second plaintiff's salary to have increased until she told defendant she was pregnant, at which point her compensation decreased, and upholding plaintiffs' jury verdict on liability).

[13] Although the Court ruled them inadmissible (*see infra* at 28 n.21), EEOC's statistics also showed that Class Members were paid less in base salary, intended cert value, and total intended compensation once they went on maternity leave than similarly-situated non-Class Members, at statistically significant levels. (EEOC 56.1 ¶ 117.)

As one example, Claimant [redacted] [handwritten: 43] has been a consistently strong performer in the

Sales unit at Bloomberg's New York office since 1995, and from 2001 to 2005 held the same

position in the Product Training Group. (EEOC. 56.1 ¶¶ 117.) In March 2003, [handwritten: Claimant 43] [redacted] went on

maternity leave; the next month her total intended compensation decreased. (*Id.*) After returning

from leave in July 2003, the number of certs Defendant awarded her decreased for the first time

ever in April 2004. (*Id.*) In April 2005, a month before her second maternity leave, she was

awarded still fewer certs and her base salary remained flat for the first time ever. (*Id.*) After

returning from her second maternity leave in September 2005, she received the lowest base

salary increase ever in April 2006.[14] (*Id.*) [handwritten: Claimant 43] [redacted] repeatedly complained about her

compensation after she became pregnant from 2003 through at least 2006; in response to a 2006

complaint that her poor salary increases had become a pattern, her manager responded, "There

are two kinds of people - the type that will take a $1,000 raise and say, 'Fuck you,' or the type

that will take a $1,000 raise and say, 'Thank you.' I hope you're the second type." (*Id.*) These

are precisely the type of aberrations in compensation history that the court in *Todaro* found

persuasive for showing pregnancy discrimination. 2009 WL 3150408, at *1-3, 8 (comparing a

plaintiff's own salary increases during and after pregnancy with her own salary increases before

her pregnancy, and also comparing plaintiffs' salary increases after her pregnancy to the salary

increases of a similarly situated male employee – another associate-level attorney at the firm).

(*See also* EEOC 56.1 ¶¶ 111-123.)[15]

---

[14] In 2007, [handwritten: Claimant 43] [redacted] held the same job title and position as male coworker [handwritten: Comparator 1] [redacted], who began his employment at Bloomberg in 2003. [handwritten: Claimant 43] [redacted] and [handwritten: Comparator 1] [redacted] received identical performance ratings, but [redacted]'s total intended compensation increased by approximately 29% while [handwritten: Claimant 43] [redacted]'s only increased by approximately 12%. (EEOC 56.1 ¶ 117.)

[15] Individual examples provided here and in EEOC's Local Rule 56.1 Statement of Facts are not exhaustive of the anecdotal evidence of discrimination against class members. EEOC limits its presentation based on the Court's page limitation on the parties' 56.1 statements. (March 1, 2011 Order, Doc. No. 184.) Should this Court require more examples reflecting Defendant's pattern

2.   **Defendant's discriminatory pattern or practice has resulted in Class Members' demotions.**

Forty-nine Claimants were subjected to discriminatory demotion. (EEOC 56.1 ¶¶ 124.) Defendant admits that it uses certain titles denoting management and that indicators of demotion include decreases in compensation, direct reports, responsibilities, and reporting to a lower level manager. (*Id.* ¶ 125.) A change in position may be a demotion and an adverse action without any evidence of change in compensation. *See Herbert v. City of N.Y.*, No. 08 Civ 7892 (PGG), 2010 WL 3955577, at *9 (S.D.N.Y. Oct. 8, 2010) (finding adverse action without considering compensation evidence where demotion from assistant principal to teacher diminished responsibilities and carried a less distinguished title).

For example, non-Claimant Class Member ████████████ joined Bloomberg in 1996 and by 2003 had risen to Global Operations Manager, supervising 1,000 employees, reporting directly to CEO Fenwick and with no more than 20 people at her level. (EEOC 56.1 ¶ 134.) In 2004, twelve days learning that she was pregnant, Fenwick demoted ████ [Class Member 1] to overseeing 150 employees and reporting to a male former peer. (*Id.*) ████ [Class Member 1] pleaded with Fenwick to reverse his decision, insisting that her pregnancy "would in no way affect [her] performance." (*Id.*) Despite top-rated performance, Fenwick decreased ████'s [Class Member 1] 2005 compensation, cutting her certs by more than fifty percent. (*Id.*)

Likewise, ████████████ [Claimant 32] rose through the ranks since starting in 1989 in the Data business unit, and was promoted from Analyst to Team Leader, to Product Manager, to Department Manager, and to interim Head of Data, eventually supervising 900 employees before going on maternity leave in October 2001. (*Id.* ¶ 126.) After ████ [Claimant 32] returned, Mazzeo began a campaign of diminishing her responsibilities and assigning them to male employees,

_____

or practice, EEOC will supplement its 56.1 statement and exhibits upon request.

decreasing her reports from about 900 to about 60 within a year. (*Id.*) When ▓▓▓ [Claimant 32] suffered a miscarriage in October 2002, Mazzeo told ▓▓▓ [Claimant 32] that she questioned her commitment to her work and her future at the company. (*Id.*) At the same meeting, Mazzeo again removed responsibilities from ▓▓▓ [Claimant 32], splitting them between two male peers. (*Id.*) After ▓▓▓ [Claimant 32] returned from her second maternity leave in 2004, Mazzeo told ▓▓▓ [Claimant 32] that she would not be considered for any managerial positions, stripping ▓▓▓ [Claimant 32] of her last managerial responsibility in December 2005 and giving it to a man, all while admitting ▓▓▓ [Claimant 32's] positive performance. (*Id.*) By June 2006, ▓▓▓ [Claimant 32] had been demoted to the position she had held when she started at the company seventeen years prior. (*Id.*) ▓▓▓ [Claimant 32's] compensation was also adversely affected as her responsibilities decreased. (*Id. See also id.* ¶¶ 127-135.)

Defendant's proffered statistics on decreased direct reports should be given little weight because Defendant admits that the underlying data are incomplete and unreliable, because it admits that EEOC's demotion allegation is not fully capable of study, and because relatively few Class Members had direct reports. (*Id.* ¶¶ 150-151.)

### 3. Defendant's discriminatory pattern or practice has extended to other terms, conditions or privileges of Class Members' employment.

Defendant's pattern or practice includes, but is not limited to, discriminatory denials of promotion, undesired transfers and denials of transfers, denials of training, exclusion from meetings, negative performance evaluations and performance improvement plans, disparate recognition, increased work and travel requirements, heightened scrutiny, denial of advancement opportunities, disparate treatment in flexibility requests, and disparate assignment of accounts and responsibilities. EEOC alleges discrimination as to the terms, conditions, or privileges of employment (beyond compensation and demotion) of all 78 Claimants. (*Id.* ¶ 136.)

For example, Mazzeo denied Claimant Colleen Cutrupi a promotion within Data in New Jersey in 2004, after Cutrupi returned from maternity leave.  (*Id.* ¶ 137.)  Cutrupi was qualified for the position and was considered to be the best candidate by Kevin Iraca, the Department Manager who interviewed candidates and who also urged Mazzeo to choose Cutrupi for the position.  (*Id.*)  When Cutrupi met with Mazzeo before the interview to discuss the requirements of the position, Mazzeo questioned Cutrupi's fitness for the position because of her motherhood status, telling Cutrupi that if she wanted to be "the nine to five. . . mom that was home making dinner every night," that wasn't going to happen. (*Id.*)  Instead of Cutrupi, Mazzeo selected a man with less experience with the product. (*Id.  See also* ¶¶ 138-140, 148.)

Similarly, Claimant Marcia Barros, an Analyst within Data, was transferred to less prestigious positions because of pregnancies in 2004 and 2006.  (*Id.* ¶ 142.)  A transfer is an adverse employment action where it "results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000).  *See also De La Cruz v. N.Y. City Human Res. Admin. Dep't of Soc. Serv.*, 82 F.3d 16, 21 (2d Cir. 1996) (transfer from elite division to "less prestigious unit with little opportunity for professional growth" could constitute adverse action).  Within a month of informing Defendant of her pregnancy in 2004, Barros was told that she was being moved, because of her pregnancy, from an analyst position within the Pricing Group to a group performing mostly lower-level data work. (*Id.*)  The nature of this work was such that she shared it with a summer intern, despite having worked at the company for approximately three years. (*Id.*)  After returning from maternity leave for her second pregnancy in 2006, Barros was moved twice within a month, each time to a less prestigious role, until she was completely excluded from client interactions and performed mostly data entry.  (*Id.*)  In deciding to transfer Barros,

her managers admitted that they assumed she would not remain at the company because she had twins and a small child at home. (*Id.*)

The Second Circuit has held denials of transfer actionable where a plaintiff presents evidence "to permit a reasonable factfinder to conclude that the sought for position is materially more advantageous than the employee's current position, whether because of prestige, modernity, training opportunity, job security, or some other objective indicator of desirability." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 165 (2d Cir. 2008); *see also Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006). As an example, Claimant Caroline Wagner was discriminatorily denied a transfer within Tradebook Sales in 2005 because Ken Napolitano, the Tradebook Sales manager, did not want "any fucking pregnant bitches" in San Francisco. (EEOC 56.1 ¶¶ 143.) The transfer would have been materially advantageous to Wagner because Defendant was seeking to staff a new Tradebook Sales group in San Francisco, which presented an opportunity for career advancement. (*Id.*) Wagner would have also been given the opportunity to work with new prospects in strong prospecting territory, allowing her to demonstrate her skills and leading to opportunities for promotion. (*Id.*) Only men received transfers to the San Francisco office. (*Id.*)

Similarly, Claimant ████████ [Claimant 10]'s career advancement was hindered when Defendant denied her training in 2002, when she began working as an Analyst in the Data unit in New Jersey and indicated that she was pregnant. (*Id.* ¶ 144.) A similarly-situated female employee without children started a few days before ████ [Claimant 10] and received the training ████ [Claimant 10] was denied. (*Id.*) When ████ [Claimant 10] asked why she was not being trained, her manager told her there was no point in training her if she was going to go on maternity leave. (*Id.*) By the time ████ [Claimant 10]

eventually received training, her coworker had already begun making deals.  (*Id.*; *see also* ¶

140.)[16]

Negative work evaluations constitute adverse employment actions if they affect

compensation or could impact an employee's future employment prospects.  *See Humphrey v.*

*Cnty. of Nassau*, 06-CV-3682(JFB)(AKT), 2009 WL 875534, at *5 (E.D.N.Y. Mar. 30, 2009);

*Punsal v. Mount Sinai Servs. of Mount Sinai Sch. of Med. of N.Y. Univ.*, No. 01-5410, 2004 WL

736892, at *9 (S.D.N.Y. Apr. 6, 2004).  Threats of termination, written reprimands, and negative

performance evaluations can affect an employee's ability to perform her job and therefore the

terms, privileges, duration, or conditions of her employment.  *Riedinger v. D'Amincantino*, 974

F. Supp. 322, 328 (S.D.N.Y. 1997).

Claimant ███████████ was placed on a Performance Improvement Plan (PIP) in

May 2007 by Executive Editor for the Americas John McCorry, shortly after returning from

maternity leave.  (EEOC 56.1 ¶ 146.)  McCorry had expressed frustration when learning that

███████ was pregnant.  (*Id.*)  McCorry put ███████ on a PIP even though ███████'s

immediate supervisors gave her a positive evaluation.  (*Id.*)  ███████'s managers admit that

they did not understand the criticism that she received in the PIP but acknowledge that if ███

███ did not meet the goals in the PIP she would be terminated.  (*Id.*)  ███████'s

compensation suffered as a result of the PIP.  (*Id.*)[17]

---

[16] Defendant asserts that it is contradictory to claim that, for example, some Claimants were
given unnecessary training and that others were denied necessary training.  (Def. Mem. 20.)
However, each Class Member's discrimination must be assessed in context.

[17] Defendant cites distinguishable cases where negative performance evaluations were not found
to be adverse because plaintiffs failed to provide evidence allowing an inference of a material
change in working conditions.  *See Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir.
2001), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101
(2002); *Kaur v. N.Y. City Health & Hosps. Corp.*, 688 F. Supp. 2d 317, 332 (S.D.N.Y. 2010).
Here, however, Defendant requires that compensation be tied to performance, so a negative
evaluation has a direct adverse and material effect.  (EEOC 56.1 ¶ 145.)  Defendant also uses

Similarly, Defendant excluded Claimant [69] ███████, an HR representative in New

Jersey, from meetings following her maternity leave in 2006, such that her manager handled her

responsibilities.  (*Id.* ¶ 147.)  [Claimant 69] ███████'s exclusion led to her manager criticizing her

performance, micro-managing her and placing her on a PIP.  (*Id.*)  [Claimant 69] ██████'s compensation was

adversely affected that year when her certificates remained flat for the first time in her

compensation history at the company.  (*Id.*)  These exclusions from management meetings are

adverse employment actions because they interfere with an employee's duties.  *See Preda v.

Nissho Iawi Am. Corp.*, 128 F.3d 789 (2d Cir. 1997) (*per curiam*); *Dortz v. City of N.Y.*, 904 F.

Supp. 127, 156 (S.D.N.Y. 1995); *Linares v. City of White Plains*, 773 F. Supp. 559, 561-62

(S.D.N.Y. 1991).[18]

Class Members suffered a variety of other actions that taken in the aggregate may

constitute adverse action under Title VII.  *See Timothy v. Our Lady of Mercy Med. Ctr.*, No. 03

Civ. 3556(RCC), 2004 WL 503760, at *6-*7 (S.D.N.Y. Mar. 12, 2004) (citing cases).  *See also*

EEOC 56.1 ¶¶ 136-148.)

**II.     EEOC Can Prove a Pattern or Practice With Anecdotal Evidence Alone.**

Contrary to Defendant's argument, EEOC need not rely on statistical proof in a pattern-

or-practice case.  Although many pattern-or-practice discrimination cases involve statistics,

statistical evidence is not necessary to establish a *prima facie* case.  *See Teamsters*, 431 U.S. at

339-40 (allowing for statistics as *one means* by which to prove a pattern or practice); *Robinson v.

Metro-North Commuter R.R.*, 267 F.3d 147, 158-59 (2d Cir. 2001) ("Neither statistical nor

---

negative performance evaluations and performance improvement plans to "manage out"
undesired employees with the looming threat of termination.  (*Id.*)
[18] In Defendant's cases, exclusions were not considered adverse because the plaintiffs failed to
present any evidence that the exclusion materially affected their responsibilities.  *See Leifer v.
N.Y. State Div. of Parole*, No. 07-0642-cv, 2010 WL 3292937, at *1 (2d Cir. Aug 23, 2010);
*Flynn v. N.Y. State (Div. of Parole)*, 620 F. Supp. 2d 463, 486 (S.D.N.Y. 2009); *Watson v.
Paulson*, 578 F. Supp. 2d 554, 565 (S.D.N.Y. 2008).

anecdotal evidence is automatically entitled to reverence to the exclusion of the other"); *Catlett v. Mo. Highway & Transp. Comm'n*, 828 F.2d 1260, 1265 (8th Cir. 1987) (observing that anecdotal evidence alone may suffice to prove a pattern or practice); *Holsey,* 743 F.2d at 213-15 (affirming district court's finding of a pattern or practice of race discrimination in hiring, promotions and other terms of employment, stating that while statistics were supportive, the testimonial evidence "establish[ed] more than isolated or 'accidental' discriminatory acts"). Rather, an accumulation of facts, including direct and circumstantial evidence, statistics, patterns, practices, general policies, or specific instances of discrimination, may all help to establish a pattern-or-practice of discrimination. *EEOC v. Am. Nat'l Bank*, 652 F.2d 1176, 1188 (4th Cir. 1981). Indeed, this Court specifically acknowledged that EEOC may prove this pattern-or-practice case with evidence of individual instances of discrimination. *EEOC v. Bloomberg L.P.*, 2010 WL 4237077, No. 07 Civ. 8383(LAP), at *22 n.15 (S.D.N.Y. Oct. 25, 2010). Other Judges in this District have relied solely on anecdotal evidence to defeat summary judgment motions as to plaintiffs' pattern-or-practice discrimination claims. *See City of N.Y.*, 713 F. Supp. 2d at 317-18;[19] *Adorno*, 258 F.R.D. at 232; *Wright*, 450 F. Supp. 2d at 374-75 (S.D.N.Y. 2006). *See also LA Weight Loss*, 509 F. Supp. 2d at 533; *Scolari*, 488 F. Supp. 2d at 1126, 1131-35; *cf. Velez*, 244 F.R.D. at 266.

Defendant cites many cases for the proposition that statistics are often an important component of a plaintiff's pattern or practice proof. But the courts in those cases nevertheless

---

[19] Defendant misrepresents the holding in *City of N.Y.* as that anecdotal evidence may suffice "when coupled with the so-called 'inexorable zero' – evidence that no class member was treated in a non-discriminatory manner." (Def. Mem. at 12.) The opinion actually states: "*Regardless of the weight given to the total absence of female hires*, the remaining anecdotal evidence was more than sufficient to show that DOT lacked consistent hiring standards in the Bridge Painter Section, that less qualified men were given preferences over more qualified women, and that the disparate treatment was intentional appeasement of DOT's existing all-male workforce." *City of N.Y.*, 713 F. Supp. 2d at 318 (emphasis added).

reviewed the record in totality and accorded significant weight to the anecdotal evidence, they just found it weak and/or insufficient in ways that do not exist in the instant case. *See Apsley v. Boeing*, 722 F. Supp. 2d 1218, 1243 (D. Kan. 2010) (of "forty-plus" declarations from class members, "only one states that the declarant was not chosen for hire because of their age"); *Attenborough v. Constr. & Gen. Bldg. Laborers*, 691 F. Supp. 2d 372, 377-79, 383-84, 389 (S.D.N.Y. 2009) ("Plaintiffs' primary evidence of discrimination is their own testimony" and "Plaintiffs' theory concerning disparate treatment . . . suffers from a more fundamental flaw [than their lack of statistical evidence]."); *EEOC v. McDonnell Douglas Corp.*, 17 F. Supp. 2d 1048, 1053-54 (E.D. Mo. 1998) (plaintiff only relied on one untimely document and one comment as its total evidence of age bias). Similarly, in *J. Ste. Marie*, 650 F.2d at 405, the Second Circuit reversed District Judge Carter's pattern-or-practice liability decision based primarily on the District Judge's improper burden-shifting analysis and what the Second Circuit found to be the plaintiffs' flawed statistics. In turning to the anecdotal evidence the plaintiffs had presented (*i.e.*, subjectivity of defendant's hiring and promotion processes, defendant's history of discrimination, and seven findings of individual discrimination), the Second Circuit found insufficient proof of a pattern or practice but stated: "A different case would be presented if there were evidence that the challenged procedures had been adopted with the intent of facilitating discriminatory treatment. We are unaware of any such evidence in the record." *Id.* at 405 n.12. In *Woodbury v. N.Y. City Transit Auth.*, 832 F.2d 764 (2d Cir. 1987), where the District Court had found a pattern or practice of discrimination with respect to the initiation of disciplinary proceedings, the Second Circuit held the anecdotal evidence insufficient to make out a pattern or practice where it consisted of only two pieces: (1) the manner in which the defendant had resolved a single disciplinary matter dating six months before the relevant time period even

began, and (2) the "impressions" of individual claimants whose claims the District Court had found meritless. *Id.* at 771.

Furthermore, the circumstances in many of Defendant's cited cases are quite distinguishable. *See Bell v. E.P.A.*, 232 F.3d 546, 553 (7th Cir. 2000) ("not a systemic (pattern and practice) disparate treatment case"); *Lopez v. Metro. Life Ins. Co.*, 930 F.2d 157, 160 (2d Cir. 1991) (individual plaintiff's pattern-or-practice disparate treatment claim of failure to train and provide opportunities failed based on irrelevant statistics only showing dearth of black employees at the company generally; no discussion of anecdotal evidence beyond the individual plaintiff's experience); *Davis v. City of Panama City*, 510 F. Supp. 2d 671, 688-89 (N.D. Fla. 2007) (individual case where plaintiff provided no direct evidence of intent to discriminate and only provided isolated experiences of his own plus conclusory statements about how defendant treated the protected group); *Seils v. Rochester City Sch. Dist.*, 192 F. Supp. 2d 100, 119 (W.D.N.Y. 2002) (individuals' case where plaintiffs did not attempt to put forward any statistics and presented only "conclusory" anecdotal evidence); *In re W. Dist. Xerox Litig.*, 850 F. Supp. at 1085 (case involving challenge to "massive" reduction in force and lacking in managers' admissions, and where "plaintiffs have themselves magnified their own burden by not using statistics to back up their claims"). Not only has EEOC presented many individual examples of Defendant's discriminatory pattern or practice in application, but such evidence coupled with direct evidence of bias at the highest levels of Bloomberg, as well as the company's centralized, subjective, and unchecked decision-making structure clearly surpasses that in Defendant's cases.

### III.    Defendant's Statistical Evidence Should Not Be Accorded Any Weight.

Defendant argues that this Court should grant summary judgment on EEOC's pattern-or-practice particularly because Defendant introduced statistical evidence of an absence of

discrimination [in compensation and diminished reports] and "EEOC has not given the court any evidence to disprove [defendant's] statistical evidence." (Def. Mem. at 13-15, quoting *CRST*, 611 F. Supp. 2d at 954.) Not only has EEOC provided voluminous affirmative evidence as discussed above, but it does indeed challenge Defendant's statistical evidence as legally and factually flawed.

Based solely on EEOC's Complaint, and ignoring the anecdotal evidence amassed during discovery, Defendant's two experts studied the compensation and opined that the class fared at least as well as others who took similar amounts of leave.[20] However, both experts inappropriately focused only on the tiny subset of employees who took amounts of leave similar to the Class Members' maternity leaves. Dr. Johnson excluded more than 80% of Bloomberg's workforce to study only employees who took leaves comparable in length to the Class Members' leaves. (EEOC 56.1 ¶ 149.) When Dr. Ward actually included all Bloomberg employees in his study, he found a disparity disfavoring the Class – compensation "growth for Class Members is below growth for those who took no leaves and those who took short leaves." (*Id.*) Because that finding would tend to support EEOC's case, though, he then focused his presentation only on the "long-leave-takers" and concluded that women taking maternity leave were actually compensated more than employees who took other types of leave. (*Id.*)

Additionally, contrary to Defendant's misleading presentation, EEOC's pattern-or-practice case centers on the practice of top-down intentional discrimination against pregnant women and mothers, not against women who are unable to work. The evidence demonstrates that Bloomberg discriminates against women when they announce their intention to become pregnant, when they become pregnant, when they are on maternity leave, and when they return from maternity leave as compared to employees who do none of those (including Class Members

---

[20] Dr. Ward also did a "diminished reports" analysis. *See supra* at 19.

themselves, pre-pregnancy).  Indeed, any mention of maternity leave in EEOC's Complaint is to describe the timing of some of the discrimination.  Many individual examples of discrimination against Class Members demonstrate sudden adverse employment actions timed suspiciously soon after the announcement of pregnancies, before any leave.  (*See, e.g.*, EEOC 56.1 ¶¶ 113, 114, 120, 123, 124, 127, 129, 130, 132, 134-136, 139, 142-144, 148.)  The relevant legal question therefore is whether Bloomberg takes adverse action against Class Members based on their status as Class Members, *i.e.*, pregnant women and mothers.  Defense experts' sole focus on leave-takers defies applicable law as well as the facts of this case.[21]  EEOC's inclusion in its Complaint of the PDA for its clarifying first clause does not justify Defendant's analysis. Because Defendant's statistics address the wrong legal question, they should be disregarded in analyzing the totality of the anecdotal evidence.

Defendant's statistical evidence is also not useful because it contradicts Defendant's anecdotal evidence.  *See Teamsters*, 431 U.S. at 340 ("statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. . . . their usefulness

---

[21] Endorsing Defendant's leave-takers approach in its August 31, 2010 Order (Doc. No. 166), this Court excluded EEOC's statistical expert's opinions and refused to exclude Defendant's statistical experts' opinions pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  This Order could not have constituted more than evidentiary rulings in the context of the expert evidence presented at the time, however. The Court was not privy at that time to any of the anecdotal evidence presented here, which overwhelmingly demonstrates Defendant's animus toward and action against pregnant women and mothers specifically, and its generous treatment of employees taking nonmaternity leave (*see infra*).  Such evidence demonstrates that EEOC's pattern-or-practice claim is most factually similar to *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53-57 (1st Cir. 2000), *Velez v. Novartis Pharms. Corp.*, 244 F.R.D. 243, 265 (S.D.N.Y. 2007)*, Sigmon v. Parker Chapin Flattau & Kimpl*, 901 F. Supp. 667 (S.D.N.Y. 1995), *Trezza v. Hartford, Inc.*, No. 98 CIV. 2205(MBM), 1998 WL 912101 (S.D.N.Y. Dec. 30, 1998), and other sex/pregnancy cases, whether filed under the PDA specifically or Title VII generally, and should be analyzed similarly.  *See also Velez v. Novartis* 5/11/10 Trial Transcript at 3544, 3548 (jury found Novartis liable for classwide sex and pregnancy discrimination, where jury instruction included PDA but made no mention of comparing pregnant plaintiffs to other leave-takers).  EEOC incorporates by references all of its submissions in connection with the *Daubert* briefing (Doc. Nos. Nos. 115, 130, 131, 146-47, 149, 153, 155-57).

depends on all of the surrounding facts and circumstances"); *Int'l Profit Assoc.*, 2010 WL

1416153, at *6 (denying summary judgment of EEOC's pattern-or-practice claim because

"statistics' 'usefulness depends on all of the surrounding facts and circumstances.'  Neither the

case law presented nor the facts and circumstances of this case suggest that [defendant's]

proffered statistics, standing alone, entitle it to judgment as a matter of law."); *In re W. Dist.*

*Xerox Litig.*, 850 F. Supp. 1079 (W.D.N.Y. 1994) ("statistical evidence unsupported by

anecdotal evidence has many of the same flaws as bare anecdotal evidence") (citing *Coral*

*Constr. Co. v. King Cnty.*, 941 F.2d 910, 919 (9th Cir. 1991)).

   Defendant has never presented any anecdotal evidence corresponding to its statistical

experts' analyses, which posit that Defendant treats all leave-takers adversely, not just women

taking maternity leave.[22]  Indeed, Bloomberg's policy dictates that managers *not* consider leave

in compensation or evaluation decisions.  (*See* EEOC 56.1 ¶ 150.)  Further, managers across

Bloomberg testified that they have never taken leave into account in making those decisions.

(*See id.*)  Additionally, of the 117 employees identified as witnesses in Defendant's Initial

Disclosures (including five supplements thereto), none suggested being offered to testify about

how badly Bloomberg treated them due to their nonmaternity leave.  (*See id.* ¶ 152.)  If anything,

Defendant has presented the opposite – evidence of its extreme generosity with employees on

extended leave.  (*See id.*)  Just as EEOC's evidence must be considered in totality, so must

Defendant's, and Defendant's statistics simply do not correspond to its own anecdotal evidence.

The Court should therefore disregard them.

---

[22] Such an argument could open Defendant up to other discrimination challenges.  *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (describing as "grotesque" the "scenario where an employer can effectively immunize itself from suit if it is so thorough in its discrimination that all similarly situated employees are victimized.").

Dated: April 8, 2011

Respectfully submitted,

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION

Raechel L. Adams (RA-0460)
Acting Supervisory Trial Attorney
33 Whitehall Street, 5th Floor
New York, NY 10004
Tel: (212) 336-3707
Fax: (212) 336-3623
e-mail: raechel.adams@eeoc.gov